**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| VANGUARD NATURAL RESOURCES, | § | Case No. 17-30560 (MI) |
| LLC, *et al.*,[1] | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | |

**DECLARATION OF RICHARD A. ROBERT, CHIEF FINANCIAL OFFICER
OF VANGUARD NATURAL RESOURCES, LLC IN SUPPORT OF
CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Richard A. Robert, hereby declare under penalty of perjury:

1.     I am the Chief Financial Officer of Vanguard Natural Resources, LLC ("VNR"), a

publicly traded limited liability company organized under the laws of Delaware and one of the

above-captioned debtors and debtors in possession (collectively, "Vanguard" or the "Debtors").

I have been employed by VNR as the Chief Financial Officer since January 2007.  Before

joining VNR, I had many decades of experience in the oil and gas industry, most recently

providing financial and strategic planning to entrepreneurial ventures.

2.     To effectuate a restructuring, on the date hereof (the "Petition Date"), the Debtors

filed their voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code,

11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the

Southern District of Texas (the "Court").  To minimize the adverse effects on their businesses,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Vanguard Natural Resources, LLC (1161); Eagle Rock Acquisition Partnership, L.P. (6706); Eagle Rock Acquisition Partnership II, L.P. (0903); Eagle Rock Energy Acquisition Co., Inc. (4564); Eagle Rock Energy Acquisition Co. II, Inc. (3364); Eagle Rock Upstream Development Company, Inc. (0113); Eagle Rock Upstream Development Company II, Inc. (7453); Encore Clear Fork Pipeline LLC (2032); Escambia Asset Co. LLC (3869); Escambia Operating Co. LLC (2000); Vanguard Natural Gas, LLC (1004); Vanguard Operating, LLC (9331); VNR Finance Corp. (1494); and VNR Holdings, LLC (6371).  The location of the Debtors' service address is: 5847 San Felipe, Suite 3000, Houston, Texas 77057.

the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions").  The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful reorganization of the Debtors, and best serves the Debtors' estates and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.

3.      I am generally familiar with Vanguard's day-to-day operations, business and financial affairs, and books and records.  Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge of Vanguard's employees and operations and finances, information learned from my review of relevant documents, information supplied to me by other members of Vanguard's management and its advisors, or my opinion based on my experience, knowledge, and information concerning Vanguard's operations and financial condition.  I am authorized to submit this Declaration on behalf of Vanguard, and I am above 18 years of age.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

## VANGUARD'S BUSINESS

### Overview of Vanguard's Operations

4.      Vanguard is an oil and natural gas company with a principal focus on acquisition, production, and development activities in the Rocky Mountain, Mid-Continent, Gulf Coast, and West Texas regions of the United States.  Vanguard conducts its exploration and production ("E&P") activities across eleven states in ten geographic basins.  Headquartered in Houston, Texas, Vanguard has approximately 370 employees.  Vanguard's strategy involves acquiring

properties with mature, long-lived production, relatively predictable decline curves, and lower-risk development opportunities.

5.      Vanguard's E&P operations involve the capture and sale of oil and natural gas from domestic, onshore hydrocarbon basins.  Through oil and gas leases entered into with mineral rights owners throughout Vanguard's operating regions, Vanguard holds working interests in oil and gas properties that give it the right to drill and maintain wells in the applicable geographic areas.  Vanguard operates these wells with the expectation of producing hydrocarbons.

6.      As an "operator," Vanguard is the party that is engaged in the production of oil or gas for a certain geographic unit, often established pursuant to state law, for the benefit of itself and other parties with mineral interests or leasehold interests in the same unit.  Acting as operator, Vanguard will conduct the day-to-day business of producing oil and gas at the well sites and will initially cover its own expenses as well as the expenses incurred on behalf of the owners of working interests in a designated unit covered by a joint operating agreement, pooling order, or similar agreement.

7.      In areas where Vanguard has oil and gas leases, but does not have the largest leasehold interest in the unit, a third party will typically serve as the operator for the wells relating to Vanguard's oil and gas leases and will distribute an allocable share of any sale proceeds to Vanguard.  These non-operating interests are significant to Vanguard's business, accounting for approximately 44% of Vanguard's total estimated proved reserves as of September 30, 2016.

8.      Vanguard transports the majority of its hydrocarbon production by pipeline or tanker truck for sale to its customers.  After receipt of gross proceeds, Vanguard distributes funds

to various working interest holders, royalty interest holders, governmental entities, and other parties with an interest in production.  The remaining proceeds are retained by Vanguard as operating revenues.

9.      VNR is the ultimate parent of the Vanguard entities.  VNR is a publicly traded Delaware limited liability company that is a "pass through" non-taxable entity, whereby income and losses are realized by VNR's unitholders.  As such, tax attributes, such as net operating gains and losses, are realized by unitholders rather than VNR.

10.      A detailed chart summarizing Vanguard's organizational structure is set forth on **Exhibit 2**.

## **Vanguard's History**

11.      Founded in October 2006, VNR went public in October 2007 through an initial public offering (the "IPO").  VNR's common units are traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol VNR.

12.      Following the IPO, Vanguard's business focused on oil and natural gas reserve production primarily in the southern portion of the Appalachian Basin.[2]  Subsequently, Vanguard expanded by acquiring properties and oil and natural gas reserves primarily located in the following ten operating basins: (a) the Green River Basin in Wyoming; (b) the Permian Basin in West Texas and New Mexico; (c) the Gulf Coast Basin in Texas, Louisiana, Mississippi and Alabama; (d) the Anadarko Basin in Oklahoma and North Texas; (e) the Piceance Basin in Colorado; (f) the Big Horn Basin in Wyoming and Montana; (g) the Arkoma Basin in Arkansas and Oklahoma; (h) the Williston Basin in North Dakota and Montana; (i) the Wind River Basin in Wyoming; and (j) the Powder River Basin in Wyoming.

---

[2]  Vanguard divested its properties in the Appalachian Basin in 2012.

13.     Among other acquisitions, in October 2015, Vanguard completed two significant merger transactions.  First, Vanguard merged with LRR Energy, L.P. and its general partner, LRE GP, LLC, in a $413.3 million unit-for-unit transaction (the "LRE Merger").  As consideration for the LRE Merger, VNR issued approximately 15.4 million in VNR common units valued at $123.3 million based on the closing price per VNR common unit of $7.98 on October 5, 2015, and assumed $290.0 million in debt.  Following the LRE Merger, that debt was extinguished using borrowings under Vanguard's reserve-based credit facility.

14.     Second, Vanguard merged with Eagle Rock Energy Partners, L.P. in a $415.2 million unit-for-unit transaction (the "Eagle Rock Merger").  As consideration for the Eagle Rock Merger, VNR issued approximately 27.7 million VNR common units valued at $258.3 million based on the closing price per VNR common unit of $9.31 on October 8, 2015 and assumed $156.6 million in debt.  Following the Eagle Rock Merger, $122.3 million of the debt was extinguished using borrowings under Vanguard's reserve-based credit facility.

**Vanguard's Assets and Operations**

15.     As of September 30, 2016, Vanguard estimated that its total proved reserves were approximately 1,898 Bcfe,[3] of which approximately 67% were natural gas reserves, 17% were oil reserves, and 16% were natural gas liquid reserves.  Of these total estimated proved reserves, approximately 70%, or 1,338 Bcfe, were classified as proved developed.

16.     In addition, as of September 30, 2016, Vanguard owned working interests in 13,787 gross (4,480 net) productive wells.  Vanguard's operated wells accounted for approximately 56% of its total estimated proved reserves as of September 30, 2016.  Vanguard's average net daily production for the nine months ended September 30, 2016 and the year ended

---

[3]  Bcfe means billion cubic feet equivalent.

December 31, 2015 was 447 MMcfe/day[4] and 415 MMcfe/day, respectively.  Vanguard has

interests in approximately 776,676 gross undeveloped leasehold acres surrounding its existing

wells.  As of September 30, 2016, based on internal reserve estimates, approximately 30% (or

560 Bcfe) of Vanguard's estimated proved reserves were attributable to its interests in

undeveloped acreage.

**I.      Upstream Activities**

17.      As noted above, Vanguard presently conducts its core E&P operations in ten

operating basins in the United States.  The basins and Vanguard's fields and operations are

highlighted on the following map:



---

4   MMcfe means million cubic feet equivalent.

A.      Green River Basin Properties

18.      Vanguard's Green River Basin properties are comprised of assets in the Pinedale and Jonah fields of southwestern Wyoming.  As of September 30, 2016, total proved reserves of the Green River Basin properties were estimated to be approximately 1 Tcfe,[5] of which 45% were proved developed.  Natural gas comprised 87% of the total proved reserves.  During the third quarter of 2016, the average daily net production of the Green River Basin properties was approximately 136 MMcfe/day.

Green River Basin:



B.      Permian Basin Properties

19.      Vanguard's Permian Basin properties are located in several counties in Southeastern New Mexico and West Texas, and encompass hundreds of fields with multiple producing intervals.  As of September 30, 2016, total proved reserves of the Permian Basin properties were estimated to be approximately 35 MMBoe,[6] of which 96% were proved developed.  Liquids comprised 63% of the total proved reserves.  During the third quarter of

---

[5]  Tcfe means trillion cubic feet equivalent.

[6]  MMBoe means million barrels of oil equivalent.

2016, the average daily net production of the Permian Basin properties was approximately 8 MBoe/day.[7]

Permian Basin:



C.    Gulf Coast Basin Properties

20.    Vanguard's Gulf Coast Basin properties include properties in the onshore Gulf Coast area, North Louisiana, Alabama, East Texas, South Texas and Mississippi.  As of September 30, 2016, total proved reserves of the Gulf Coast Basin properties were estimated to be approximately 238 Bcfe, of which 74% were proved developed.  Natural gas comprised 47% of the total proved reserves.  During the third quarter of 2016, the average daily net production of the Gulf Coast Basin properties was approximately 49 MMcfe/day.

---

[7]  MBoe means thousand barrels of oil equivalent.

Gulf Coast Basin:

 

D.   Anadarko Basin Properties

21.   The Anadarko Basin consists of operated and non-operated properties in the
Golden Trend field, Verden field, and other fields located in the Anadarko Basin of western
Oklahoma.  As of September 30, 2016, total proved reserves of the Anadarko Basin properties
were estimated to be approximately 35 Bcfe, of which 94% were proved developed.  Natural gas
comprised 66% of the total proved reserves.  During the third quarter of 2016, the average daily
net production of the Anadarko Basin properties was approximately 10 MMcfe/day.

Anadarko Basin:



E.     Piceance Basin Properties

22.     The Piceance Basin is located in northwestern Colorado. Vanguard's Piceance Basin properties, which it operates, are located in the Gibson Gulch area. As of September 30, 2016, total proved reserves of the Piceance Basin properties were estimated to be approximately 406 Bcfe, of which 72% were proved developed. Natural gas comprised 67% of the total proved reserves. During the third quarter of 2016, the average daily net production of the Piceance Basin properties was approximately 80 MMcfe/day.

Piceance Basin:



F.     Big Horn Basin Properties

23.     Vanguard's Big Horn Basin properties are comprised of assets in Wyoming and Montana.  As of September 30, 2016, total proved reserves of the Big Horn Basin properties were estimated to be approximately 14 MMBoe, of which 100% were proved developed. Liquids comprised 96% of the total proved reserves.  During the third quarter of 2016, the average daily net production of the Big Horn Basin properties was approximately 3 MBoe/day.

Big Horn Basin:



G.     Arkoma Basin Properties

24.     Vanguard's Arkoma Basin properties include properties in the Woodford Shale, located in eastern Oklahoma, the Fayetteville Shale, located in Arkansas, and royalty interests and non-operated working interests in both states.  As of September 30, 2016, total proved reserves of the Arkoma Basin properties were estimated to be approximately 187 MMcfe, of which 100% were proved developed.  Natural gas comprised 90% of the total proved reserves. During the second quarter of 2016, the average daily net production of the Arkoma Basin properties was approximately 47 MMcfe/day.

Arkoma Basin:



H.    Williston Basin Properties

25.    Vanguard's Williston Basin properties are located in North Dakota and Montana. As of September 30, 2016, total proved reserves of the Williston Basin properties were estimated to be approximately 4 MMBoe, of which 100% were proved developed.  Liquids comprised 95% of the total proved reserves.  During the third quarter of 2016, the average daily net production of the Williston Basin properties was approximately 1 MMBoe/day.

Williston Basin:



I.     Wind River Basin Properties

26.     The Wind River Basin is located in central Wyoming.  Vanguard's activities are concentrated primarily in the eastern Wind River Basin, along the greater Waltman Arch.  As of September 30, 2016, total proved reserves of the Wind River Basin properties were estimated to be approximately 23 Bcfe, of which 100% were proved developed.  Natural gas comprised 92% of the total proved reserves.  During the third quarter of 2016, the average daily net production of the Wind River Basin properties was approximately 10 MMcfe/day.

Wind River Basin:



J.     Powder River Basin Properties

27.     The Powder River Basin is primarily located in northeastern Wyoming.  As of September 30, 2016, total proved reserves of the Powder River Basin were estimated to be approximately 14 Bcfe, of which 100% were proved developed.  Natural gas comprised 100% of the total proved reserves.  During the third quarter of 2016, the average daily net production of the Powder River Basin properties was approximately 21 MMcfe/day.

Powder River Basin:



## II.    Midstream Activities

28.    Primarily for the benefit of its production activities, Vanguard also provides midstream services, which involve the gathering, transportation, and processing of produced hydrocarbons.  Vanguard also owns and maintains other midstream assets, including electrical infrastructure, pipelines, and disposal systems.

### A.    Gathering Systems

29.    Vanguard owns the Piceance Basin Gas Gathering System, which includes sixty miles of gathering lines, eight miles of discharge lines, four water injection wells that have a 4,000-5,000 water barrel per day capacity, and forty-six miles of water (frac and produced) transportation lines.  Vanguard also owns the 2.4 mile Mamm Creek-Summit Natural Gas Pipeline in the Piceance Basin, the 5.8 mile Wild Horse Natural Gas Pipeline in the South Elk Basin, the 3.7 mile Clearfork Oil Pipeline in the Elk Basin, and the 9.4 mile Wild Cow Natural Gas Surface Pipeline in the Sierra Madre field.

30.    Vanguard also owns 51% of the partnership interests in Potato Hills Gas Gathering System ("Potato Hills").  Potato Hills operates a 35.5 mile low-pressure natural gas gathering system located in Pushmataha County and Latimer County, Oklahoma.  Vanguard

acquired Potato Hills from Oneok Field Services Company LLC in 2016 for approximately $7.9

million.  The remaining 49% of the partnership interests in Potato Hills are held by Continuum

Midstream, LLC.

31.     As part of the $7.9 million acquisition of Potato Hills, Vanguard owns 100% of

the compression assets associated with Potato Hills' gathering system, which are essential for

transporting natural gas from the pipeline to customers.  Vanguard charges customers fees for

using the compression assets, including a $107,000 per month reservation fee.

32.     Vanguard also owns a 32% interest in the Bayou Dorcheat Gathering System in

the Haynesville Shale in North Louisiana.  This system consists of a 22-mile pipeline linking

North Shongaloo and Red Rock, Louisiana to the Debtors' gas processing plant in Haynesville,

Louisiana.

B.     Plants and Facilities

33.     Vanguard owns a variety of oil, gas, and sulfur processing plants and facilities

across its operating regions.  Vanguard's ownership interests in plants and facilities include: (a)

62.2% ownership of the Elk Basin Plant, which is a 48 MMcf/day refrigeration gas processing

plant in Powell, Wyoming; (b) 20.0% ownership of the Fairway Plant, which is a lean oil gas

processing plant in East Haynesville, Louisiana; (c) 27.4% ownership of the Cotton Valley Plant,

which is a 90 MMcf/day cryogenic gas processing plant in Haynesville, Louisiana; (d) 74%

ownership of the BEC Plant, which is a gas processing, hydrogen sulfide treating, and sulfur

recovery plant in Atmore, Alabama; and (e) 93.9% ownership of the Flomation Gathering

Station, which is a sulfur recovery unit, in Escambia County, Alabama.

III.     **Sales and Marketing Arrangements**

34.     Vanguard's oil production is principally sold to marketers, processors, refiners,

and other purchasers that have access to nearby pipeline, processing and gathering facilities.  In

areas where there is no practical access to pipelines, oil can be trucked to central storage

facilities where it is aggregated and sold to various markets and downstream purchasers.

Vanguard also sells some of its oil production from its operated Permian Basin properties at the

wellhead to third-party gathering and marketing companies.

35.    If Vanguard serves as the operator of a well, it will generally sell the natural gas

production on the spot market or under market-sensitive, short-term agreements with credit-

worthy purchasers, including independent marketing companies, gas processing companies, and

other purchasers who have the ability to pay the highest price for the natural gas production and

move the natural gas under the most efficient and effective transportation agreements.  In

addition, Vanguard markets its own natural gas on some of its non-operated properties.  Natural

gas is transported through Vanguard's own and third-party gathering systems and pipelines, and

Vanguard incurs processing, gathering and transportation expenses to move its natural gas from

the wellhead to a specified delivery point. These expenses vary based on the volume and distance

shipped, and the fee charged by the third-party gatherer, processor or transporter.

36.    Vanguard's production sales agreements generally contain customary terms and

conditions for the oil and natural gas industry, provide for sales based on prevailing market

prices in the area, and generally are month-to-month or have terms of one year or less.

## IV.    Hedging Portfolio

37.    To provide protection against volatility in oil and natural gas prices, Vanguard has

historically maintained a hedging portfolio of oil and natural gas swaps, collars, puts, and other

derivatives.  These commodity derivative instruments generally provide cash settlement

payments to Vanguard when prevailing oil and gas prices are below contract prices on the

settlement date.  By removing some measure of price volatility associated with production,

Vanguard's hedging portfolio has helped mitigate the effects of the sustained decline in

commodity prices.  In October 2016, Vanguard monetized certain of its outstanding commodity price hedge agreements for total proceeds of approximately $42.3 million, and, in December 2016, Vanguard monetized its remaining outstanding commodity price and interest rate hedge agreements for total proceeds of approximately $11.7 million[8].  The foregoing proceeds were used to reduce the amount of borrowings under the Debtors' reserve-based first lien credit facility.  As a result of the monetization of hedges in October and December, 2016, Vanguard has no commodity hedging contracts in place as of the Petition Date.[9]

## PREPETITION CAPITAL STRUCTURE

38.      As of the Petition Date, Vanguard has approximately $1.8 billion in total funded debt outstanding, including approximately $1.3 billion outstanding under its first lien revolving credit facility, approximately $75.6 million of second lien notes, and approximately $432.9 million of unsecured notes.  Vanguard also owes approximately $19.4 million under a capital lease of equipment in the Piceance Basin, and has approximately $20.0 million in ordinary course trade payables as of the Petition Date.  Vanguard also has three series of preferred units with an aggregate liquidation preference of approximately $335.4 million.

39.      The following table summarizes Vanguard's prepetition capital structure:

| Debt | Approximate Amount Outstanding (in millions) |
|------|---------------------------------------------:|
| **First Lien Credit Facility** | **$1,248.8** |
| **Second Lien Notes** | **$75.6** |
| **Total Unsecured Senior Notes** | **$432.9** |
| 8.375% Senior Notes due 2019 | $51.1 |
| 7.875% Senior Notes due 2020 | $381.8 |

---

[8]  This amount includes the $5 million negative impact from interest rate hedges that were also monetized.

[9]  Vanguard has one remaining interest rate hedge that will expire in February 2017.

| Capital Lease Financing Obligations | $19.4 |
|---|---|
| Trade Payables | $20.0 |
| **Total Debt** | **1,796.1** |

| Preferred Units | Approx. Liquidation Preference (in millions) |
|---|---|
| Series A Preferred Units | $62.2 |
| Series B Preferred Units | $169.3 |
| Series C Preferred Units | $103.9 |
| **Total Preferred Units** | **$335.4** |

| Common Units | Units Outstanding (as of September 30, 2016) |
|---|---|
| Common Units | 131,039,675 |
| Class B Units | 420,000 |

### First Lien Credit Facility

40.     On September 30, 2011, Vanguard Natural Gas, LLC, as borrower, the other

Debtors, as guarantors, Citibank, N.A., as administrative agent (the "Prepetition Agent"), and

various lenders (the "Prepetition Lenders") entered into a certain Third Amended and Restated

Credit Agreement (as amended, restated, supplemented, or otherwise modified from time to time,

the "First Lien Credit Agreement"), which provides Vanguard with a reserve-based revolving

first lien credit facility (the "First Lien Credit Facility").[10]  The First Lien Credit Facility is

subject to borrowing base limitations which are periodically adjusted based on the Prepetition

Lenders' redeterminations of the value of Vanguard's oil and gas reserves.  The obligations

under the First Lien Credit Agreement are secured by first-priority liens on substantially all of

---

[10]  The guarantors under the First Lien Credit Agreement are VNR, Eagle Rock Energy Acquisition Co., Inc., Eagle Rock Energy Acquisition Co. II, Inc., Eagle Rock Acquisition Partnership, L.P., Eagle Rock Acquisition Partnership II, L.P., Eagle Rock Upstream Development Company, Inc., Eagle Rock Upstream Development Company II, Inc., Encore Clear Fork Pipeline LLC, Escambia Asset Co. LLC, Escambia Operating Co. LLC, Vanguard Operating, LLC, VNR Finance Corp., and VNR Holdings, LLC (collectively, the "Guarantors").

Vanguard's assets including, among other things, equity interests in the Guarantors, midstream assets such as pipelines, and substantially all of Vanguard's oil and gas interests (collectively, the "Collateral").  As of the Petition Date, approximately $1.3 billion in borrowings and approximately $150,000 of letters of credit are outstanding under the First Lien Credit Facility.

**Second Lien Notes**

41.     VNR and VNR Finance Corp. ("VNR Finance") are the issuers of the 7.00% senior secured second lien notes due 2023 (the "Second Lien Notes").  Delaware Trust Company is the indenture trustee and collateral trustee for the Second Lien Notes.  As of the Petition Date, approximately $75.6 million in Second Lien Notes was outstanding.  All of VNR's wholly-owned subsidiaries have guaranteed the obligations of VNR and VNR Finance under the Second Lien Notes.  The Second Lien Notes are secured by second-priority liens on the Collateral.  The Intercreditor Agreement, dated as of February 10, 2016, between the Prepetition Agent and the Second Lien Notes Trustee governs the parties' relative rights with respect to the Collateral and provides other protections to the parties.

**Unsecured Senior Notes**

42.     VNR and VNR Finance are the issuers of the 7.875% senior notes due 2020 (the "2020 Senior Notes").  In addition, Vanguard Operating, LLC, is the issuer of the 8.375% senior notes due 2019 (the "2019 Senior Notes" and, together with the 2020 Senior Notes, the "Senior Notes").  Wilmington Trust Company is the indenture trustee for the holders of 2019 Senior Notes, and UMB Bank, N.A. is the indenture trustee for the holders of 2020 Senior Notes.  As of the Petition Date, approximately $381.8 million and $51.1 million in 2020 Senior Notes and 2019 Senior Notes, respectively, were outstanding.  VNR is a guarantor under the 2019 Senior Notes.  In addition, all wholly-owned subsidiaries of VNR (other than the issuers) have guaranteed the obligations under the Senior Notes.

## Lease Financing Obligations

43.     On October 24, 2014, in connection with Vanguard's acquisition of certain Piceance Basin properties described above, Vanguard entered into an assignment and assumption agreement with Banc of America Leasing & Capital, LLC as the lead bank, to acquire rights to certain compressors and related facilities, and assume the related financing obligations (the "Lease Financing Obligations").  Certain rights, title, interest and obligations under the Lease Financing Obligations were assigned to several lenders and are covered by separate assignment agreements, which expire on August 10, 2020 or July 10, 2021, as the case may be.  Vanguard has the option to purchase the equipment at the end of the lease term for fair market value at that time.  The Lease Financing Obligations also contain an early buyout option that gives Vanguard the right to purchase the equipment for $16.0 million on February 10, 2019.  The lease payments related to the equipment are recognized as a principal and interest expense based on a weighted average implicit interest rate of 4.16%.  As of the Petition Date, approximately $19.4 million in Lease Financing Obligations are outstanding.

## Equity Interests in Vanguard (Preferred and Common Units)

**I.      Preferred Units**

44.     VNR has issued three series of preferred units: (a) the 7.875% Series A Cumulative Redeemable Perpetual Preferred Units ("Series A Preferred Units"); (b) the 7.625% Series B Cumulative Redeemable Perpetual Preferred Units ("Series B Preferred Units"); and (c) the 7.75% Series C Cumulative Redeemable Perpetual Preferred Units ("Series C Preferred Units," and, collectively with the Series A Preferred Units and Series B Preferred Units, the "Cumulative Preferred Units").  As of September 30, 2016, there were 13,881,873 Cumulative Preferred Units issued and outstanding.  The Cumulative Preferred Units are listed on the NASDAQ under the symbols "VNRAP," "VNRBP," and "VNRCP," respectively.  On February

25, 2016, Vanguard's board of directors elected to suspend cash distributions to holders of Cumulative Preferred Units.

II.    **Common Units**

45.    As of September 30, 2016, there were 131,039,675 VNR common units outstanding.  In addition, as of September 30, 2016, there were approximately 420,000 units of Class B units in VNR outstanding, all of which are held by VNR's management.[11]  On February 25, 2016, Vanguard's board of directors elected to suspend cash distributions to holders of common units and Class B units.

<u>**EVENTS LEADING TO CHAPTER 11**</u>

46.    Notwithstanding a favorable cost structure and the relatively predictable decline curves associated with its production, Vanguard's revenues, earnings, and liquidity have been substantially and negatively affected by depressed commodity prices that have persisted over a prolonged period of time.  Beginning in mid-2014, oil prices significantly declined due to worldwide oversupply and have yet to recover.  Simultaneously, the natural gas market saw the impact of continued growth in natural gas production in the United States, which has caused a sustained drop in natural gas prices over a several year period.

47.    The difficulties faced by the Debtors are consistent with the difficulties faced industry-wide.  E&P companies, like Vanguard, have been especially hard-hit from the decline in commodity prices, because their revenues are generated from the sale of unrefined oil and natural gas.  More than 100 oil and natural gas producers in North America have filed for bankruptcy since the beginning of 2015, and numerous other oil and gas companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to

---

[11]  Class B units have substantially the same rights and obligations as the common units.

avoid defaulting, or have effectuated out-of-court restructurings. The depressed oil and natural gas price environment over the last two years has made it especially difficult for some companies to identify and execute on any viable restructuring alternatives.

48.    Even with an extensive hedging portfolio in place, these challenges, among others, caused a significant decline in Vanguard's financial health. To illustrate, Vanguard's revenue declined from approximately $788.1 million in calendar year 2014 to approximately $566.6 million in calendar year 2015, and down to $264.4 million through the third quarter of 2016, all as a result of depressed commodity prices. Moreover, operating cash flow for the first nine months of 2016 was $179.6 million as compared to $265.3 million over the same period of 2015.

### Addressing Liquidity Challenges

49.    Vanguard's management team has been diligently focused on preserving liquidity and reducing operating and corporate expenditures to align the business with the current commodity price environment, including an overall management strategy focused on increasing asset value through innovation and cost reduction, as opposed to a focus on top-line growth. To date, Vanguard's cost-saving initiatives have included reducing rates with key vendors, reducing employee and other human resources costs, lowering certain E&P software costs, and shutting-in uneconomical wells to allocate capital to the highest return areas and preserve liquidity. Vanguard also eliminated distributions to its preferred and common unit holders in February 2016. Vanguard simultaneously acquired strategic and mature E&P assets while prices remain low.

50.    In order to further reduce operational costs, and eliminate expenses that are unnecessary to Vanguard's reorganization, Vanguard recently completed an office-space consolidation that involved vacating leased premises at Wedge Tower in Houston, Texas.

Vanguard is seeking, as part of the relief sought at the outset of the chapter 11 cases, to reject its lease at the Wedge Tower. In addition, Vanguard has identified other uneconomical and unnecessary executory contracts and unexpired leases that should be rejected. The Wedge Tower lease and the other uneconomical and unnecessary contracts and leases that have been identified for immediate rejection currently cost Vanguard more than $12.0 million per year in the aggregate.

51.     Prior to the Petition Date, Vanguard also took a proactive approach to improve liquidity and reduce its debt under the First Lien Credit Facility. In May 2016, Vanguard completed the sale of its natural gas, oil and natural gas liquids assets in the SCOOP/STACK area in Oklahoma to entities managed by Titanium Exploration Partners, LLC for approximately $272.5 million. In addition, Vanguard sold certain properties in several different counties in Texas, New Mexico and Oklahoma for an aggregate consideration of approximately $22.2 million. Vanguard primarily used the cash received from these sales to reduce its borrowings under the First Lien Credit Facility.

52.     Despite these efforts, Vanguard's liquidity was further constrained as a result of borrowing-base redeterminations over the past several months that eliminated Vanguard's ability to draw on its First Lien Credit Facility and triggered mandatory repayments of principal to address the resulting borrowing-base deficiency. In May 2016, as part of an amendment to the First Lien Credit Agreement, the borrowing base under the First Lien Credit Facility was reduced from $1.8 billion to $1.3 billion, which resulted in a borrowing base deficiency of approximately $103.5 million. To address this borrowing base deficiency, Vanguard was required to repay the deficiency in six equal monthly installments, beginning in June 2016. Vanguard has repaid the full borrowing base deficiency resulting from the May redetermination.

53.     Following the May borrowing base redetermination, Vanguard also began to explore a variety of strategic alternatives designed to address its imminent liquidity challenges. To assist in those endeavors, Vanguard hired Evercore Group L.L.C. ("Evercore") as its financial advisor to advise Vanguard on potential refinancing options, and begin the process of soliciting financing proposals from prospective lenders.

54.     During the financing-solicitation process, Vanguard and Evercore also remained in dialogue with its existing creditors and stakeholders in order to collaborate on potential out-of-court solutions to Vanguard's liquidity constraints. For several months, Vanguard and its advisors met with principal creditors and their advisors, and provided those parties with substantial diligence regarding Vanguard's assets and operations.

55.     Although Vanguard initially hoped that these efforts would lead to a successful out-of-court restructuring opportunity, that hope faded after Vanguard completed another semi-annual redetermination of its borrowing base under the First Lien Credit Agreement on November 3, 2016, and new potential investors were concerned about Prepetition Lenders' continued reductions in Vanguard's borrowing base. As a result of the November borrowing-base redetermination, Vanguard's borrowing base was further reduced from $1.3 billion to $1.1 billion. Vanguard was required to repay this borrowing base deficiency of $225.0 million with the first $37.5 million payment made in October 2016 and the remaining balance to be paid in five equal monthly installments of $37.5 million, beginning in January 2017. Vanguard made the second of these installment payments on January 3, 2017, thereby reducing the outstanding borrowings to approximately $1.3 billion, and reducing the borrowing base deficiency to $150 million.

56.     Faced with a lack of viable out-of-court financing options, the focus of Vanguard's discussions with stakeholders shifted to restructuring alternatives to be implemented through the voluntary filing of cases under chapter 11 of the Bankruptcy Code.  In light of the fact that the most recent borrowing base redetermination will quickly decimate the Debtors' liquidity, the Debtors' board of directors determined that these chapter 11 cases are necessary to preserve the Debtors' going concern value.

57.     After extensive discussions with their advisors, Vanguard determined that filing for chapter 11 was in their best interest and in the best interest of their creditors.  Given the lack of alternatives and the fact that the vast majority of claims against Vanguard arise from the Debtors' funded-debt obligations, the Debtors have focused their restructuring efforts on discussions with the Prepetition Lenders, certain holders of Second Lien Notes, and certain holders of Senior Notes.  Vanguard's main goal in those discussions and in these chapter 11 cases was to restructure their balance sheet through a consensual plan of reorganization supported by their Prepetition Lenders, and the holders of Second Lien Notes and Senior Notes.

58.     The Debtors' efforts in this regard have been successful.  After extensive good-faith negotiations with certain holders of Second Lien Notes and Senior Notes (collectively, the "Consenting Noteholders"), on February 1, 2017, the Consenting Noteholders and the Debtors finalized an agreement on the terms of a restructuring as set forth in the restructuring support agreement (the "RSA"), a copy of which is attached hereto as **Exhibit 3**.

59.     In accordance with the RSA, the Debtors and the Consenting Noteholders have agreed on a chapter 11 plan term sheet (the "Term Sheet"), which is attached as an exhibit to the RSA.  The proposed restructuring will be effectuated through a plan of reorganization, consistent with the RSA and the Term Sheet, featuring a value-maximizing debt-to-equity conversion of the

Senior Notes and investment of new capital to pay down existing indebtedness.  As a result, the

Debtors anticipate emerging from chapter 11 with a significantly deleveraged balance sheet.

Successful implementation of the Debtors' proposed restructuring will avoid a sale of all or

substantially all of the Debtors' assets, which likely would occur at a significant discount given

current market conditions, allowing the Debtors to benefit from any of their assets' appreciation

in value if the market improves.  The RSA binds the support of the Consenting Noteholders for

the contemplated restructuring so long as the Debtors are successful in taking the steps necessary

to meet the milestone deadlines and other conditions contained therein, which establish a

timeline to emerge from chapter 11 in only 150 days.  Through the implementation of the

transactions set forth in the RSA and Term Sheet, the Debtors will eliminate $707.9 million in

debt under the First Lien Credit Facility and the Senior Notes.

   60.  Certain principal terms of the RSA and Term Sheet are summarized below:

- The Prepetition Lenders' allowed claims under the First Lien Credit Agreement will be paid down with $275 million in cash from the proceeds of the Senior Note rights offering and the equity investment made by consenting holders of Second Lien Notes. The Prepetition Lenders will also participate in a new $1.1 billion reserve-based lending facility (the "Exit Facility") on terms substantially the same as the First Lien Credit Facility and provided by some or all of the Prepetition Lenders under the First Lien Credit Facility.  The Exit Facility will be due 4 years after emergence and the first redetermination under the Exit Facility will occur after December 2018, providing the Debtors with an 18-month redetermination holiday, with semi-annual redeterminations thereafter.

- Allowed Second Lien Notes claims will receive new notes in the current principal amount of $75.6 million, which shall be substantially similar to the current Second Lien Notes but providing a12-month later maturity and a 200 basis point increase to the interest rate.

- Each holder of an allowed Senior Notes claim shall receive (a) its *pro rata* share of 97% of

the equity interests in the reorganized Debtors (the "New Equity Interests") and (b) the opportunity to participate in the Senior Notes rights offering.

- If the plan is accepted by the classes of general unsecured claims and holders of the Cumulative Preferred Units, holders of the Cumulative Preferred Units will receive their *pro rata* share of (a) 3% of the New Equity Interests and (b) three-year warrants for 3% of the New Equity Interests.

- If the plan is accepted by the classes of general unsecured claims, the holders of the Cumulative Preferred Units and holders of VNR's common units, holders of VNR's common units will receive their *pro rata* share of three-year warrants for 3% of the New Equity Interests.

- The plan will provide for the $255.75 million Senior Note rights offering, and the $19.25 million investment by consenting Second Lien Noteholders, to purchase New Equity Interests at an agreed 25% discount to plan value, which is calculated based, in part, on the Debtors having a total enterprise value of $1.625 billion.

61.     In addition to these terms, the Term Sheet provides that the plan will establish a customary management incentive plan under which 10% of the New Equity Interests will be reserved for officers and other key employees of the respective reorganized Debtors.  The plan and the order confirming the plan will also provide for customary mutual releases and exculpations.

62.     Neither the Prepetition Agent nor the Prepetition Lenders have executed the RSA. The Debtors and the Consenting Noteholders expect to engage with the Prepetition Lenders in an effort to reach agreement on the terms of the Debtors' plan.  However, as a result of the extensive, good-faith negotiations with the Prepetition Lenders to date, the Debtors have

obtained a committed $50 million debtor-in-possession financing facility underwritten by the Prepetition Agent and certain Prepetition Lenders, which is subject to Court approval.   This postpetition financing, combined with the Debtors' cash from operations, is expected to provide sufficient liquidity during the chapter 11 cases to support the Debtors' continuing business operations and minimize disruption.

63.     Furthermore, the Debtors' choices with respect to postpetition financing were limited by the Debtors' liquidity needs, and prepetition capital structure.  Evercore determined that the Debtors' limited unencumbered assets made it impossible to incur financing by pledging assets that were not already collateral of the Prepetition Lenders.  In addition, the Debtors require the use of cash collateral to operate their business and implement their plan confirmation strategy.  Accordingly, any post-petition financing and use of cash collateral requires cooperation with the Prepetition Lenders to avoid the uncertainty of a contested priming basis, which would create substantial risk of damage to the Debtors' cash intensive businesses and could leave the Debtors unfinanced or underfinanced. I will discuss the DIP Facility in more detail in the section that follows on first day pleadings.

**FIRST DAY MOTIONS**

64.     Contemporaneously with this declaration, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize Vanguard's business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of Vanguard's balance sheet.  I have reviewed each of the First Day Motions.  I believe that the relief requested in the First Day Motions is necessary to allow Vanguard to operate with minimal disruption during the pendency of these chapter 11 cases.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed on **Exhibit 1**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.


Dated: February 1, 2017                    */s/ Richard A. Robert*
                                           Richard A. Robert
                                           Chief Financial Officer, Vanguard Natural
                                           Resources, LLC

# <u>EXHIBIT 1</u>

**Evidentiary Support for First Day Motions**

## EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS[1]

## PART A – ADMINISTRATIVE AND PROCEDURAL MOTIONS

I.      **Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion")**

1.      Pursuant to the Joint Administration Motion, Vanguard seeks entry of an order directing joint administration of these chapter 11 cases for procedural purposes only.  Given the complex and interlinked commercial relationships among the Debtors, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.  Thus, the entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by, among other things, avoiding duplicative filings.  Joint administration also will allow the Office of the United States Trustee for the Southern District of Texas and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  Furthermore, joint administration will relieve the Court of the burden of entering duplicative orders and maintaining duplicative files for each Debtor and will simplify administrative supervision of these chapter 11 cases by the U.S. Trustee.

2.      Moreover, joint administration will not adversely affect the Debtors' respective constituencies because the Joint Administration Motion seeks only administrative, not substantive, consolidation of the Debtors' estates.  Parties in interest will not be harmed by the relief requested, but instead will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

---

[1]  Capitalized terms used but note defined herein have the meanings ascribed to them in the applicable First Day Motion.

3.      On behalf of Vanguard, I respectfully submit that the Joint Administration Motion should be granted.

II.      **Debtors' Emergency Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (the "Extension Motion")**

4.      Pursuant to the Extension Motion, Vanguard seeks entry of an order extending the deadline by which Vanguard must file its Schedules and Statements by twenty-eight days, for a total of forty-two days from the Petition Date, through and including March 15, 2017, without prejudice to Vanguard's ability to request additional extensions for cause shown.

5.      Vanguard and its professionals have spent, and continue to spend, a substantial amount of time on ensuring that Vanguard has a smooth transition into chapter 11, with minimal disruptions to Vanguard's business.  That task requires working with Vanguard's customers, vendors, suppliers, and various other parties-in-interest to stabilize business operations.  As a result, due to the complexity and diversity of its operations, and the burdens occasioned by preparing for these chapter 11 cases, Vanguard anticipates that it will be unable to complete its Schedules and Statements within fourteen days of the Petition Date.  To prepare its Schedules and Statements, Vanguard must compile information from books, records, and documents relating to a myriad of claims, assets, and contracts.  This information is voluminous and is located in numerous places throughout Vanguard's organization.  Indeed, due to the difficulty of this process, Vanguard has engaged Opportune LLP to, among other things, provide a team of professionals dedicated to the preparation of the Schedules and Statements.  Nevertheless, collection of the necessary information has and will require an enormous expenditure of time and effort on the part of Vanguard and its employees.  Indeed, the preparation of Schedules and Statements covers fourteen Debtors, who together have thousands of creditors, assets, and

liabilities across multiple jurisdictions.  Additionally, because numerous invoices related to prepetition goods and services have not yet been received and entered into Vanguard's accounting system, it may be some time before Vanguard has access to all of the information required to prepare the Schedules and Statements.

6.      While Vanguard, with the help of its professional advisors, is mobilizing its employees to work diligently and expeditiously on the preparation of the Schedules and Statements, resources are limited.  In view of the amount of work entailed in completing the Schedules and Statements and the competing demands upon Vanguard's employees and professionals to assist in efforts to stabilize business operations during the initial postpetition period, Vanguard will not be able to properly and accurately complete the Schedules and Statements within the fourteen-day period following the Petition Date.

7.      At present, Vanguard anticipates that it will require approximately forty-two days from the Petition Date to complete its Schedules and Statements.  Vanguard, therefore, requests that the Court extend the fourteen-day period provided under Bankruptcy Rule 1007(c) by twenty-eight days, for a total of forty-two days from the Petition Date.

8.      Vanguard submits that the vast amount of information Vanguard must assemble and compile, the size and complexity of Vanguard's business operations, and the many employee and professional hours required to complete the Schedules and Statements, together constitute good and sufficient cause for granting the extension of time requested herein.  As a result, Vanguard requests that the Court grant such an extension, without prejudice to Vanguard's rights to seek any further extensions from the Court.  The requested extension will enhance the accuracy of Vanguard's Schedules and Statements and avoid the necessity of substantial subsequent amendments.

9.       Failure to receive the requested deadline extension would impose an undue administrative burden on Vanguard.  On behalf of Vanguard, I respectfully submit that the Extension Motion should be granted.

**III.    Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to File Consolidated List of Creditors and Consolidated List of 50 Largest Unsecured Creditors, (II) Waiving Requirement to File Equity Lists and Modifying Equity Holder Notice Requirements, and (III) Approving Form and Manner of Notifying Creditors of Commencement of these Chapter 11 Cases and Other Information (the "Creditor Matrix Motion")**

10.       In the Creditor Matrix Motion Vanguard seeks entry of an order (a) authorizing Vanguard to file a consolidated creditor matrix and list of the 50 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor, (b) waiving the requirement to file a list of equity security holders and modifying the requirements for provision of notice to such holders, and (c) approving the form and manner of notice of commencement of these chapter 11 cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

11.       The preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome.  Accordingly, Vanguard respectfully requests authority to file one consolidated list of creditors for all of the Debtors.

12.       Because a large number of creditors may be shared among the Debtors in these cases, Vanguard requests authority to file a single, consolidated list of its 50 largest general unsecured creditors (the "Top 50 List").  The Top 50 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

13.       Debtor VNR, which is the corporate parent for the other Debtors, is a publicly held limited liability company listed on NASDAQ with over 131 million common units outstanding and recent average trading volumes of more than 2.8 million units daily.  VNR does

4

not itself maintain a list of its equity security holders.  Preparing and submitting such a list with last known addresses for each such equity security holder and sending notices to those parties will be expensive and time consuming and will serve little or no beneficial purpose at this time. VNR will be notifying holders of its common units that a chapter 11 petition was voluntarily filed through the filing of a current report on Form 8-k with the Securities and Exchange Commission.  This Form 8-k will also provide information to equity holders regarding how they can obtain free copies of pleadings and other information through the website maintained by the Debtors' claims and noticing agent, Prime Clerk LLC, which is available at http://cases.primeclerk.com/vanguard.

14.     Moreover, VNR filed with its petition a list of those persons, if any, who directly or indirectly own, control, or hold, with power to vote, 5% or more of its voting securities, based on information ascertained from filings with the Securities and Exchange Commission.  To the extent equity holders are entitled to vote on a chapter 11 plan, Vanguard will provide them with the appropriate bar date and plan-related notices, which will permit them to assert their interests.

15.     Through Prime Clerk LLC, Vanguard's proposed claims, noticing, and solicitation agent (the "Noticing and Claims Agent"), Vanguard proposes to serve the Notice of Commencement, substantially in the form attached as Exhibit B to the Creditor Matrix Motion (the "Notice of Commencement"), on all parties entitled to notice of commencement of these chapter 11 cases to advise them of the meeting of creditors under section 341 of the Bankruptcy Code.  Service of the single Notice of Commencement will not only avoid confusion among creditors, but will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on Vanguard's voluminous creditor matrix.

16.     The relief requested in the Creditor Matrix Motion concerns deadlines and procedures of immediate relevance at the outset of these chapter 11 cases, and the failure to receive this relief would pose an undue administrative burden at this critical juncture.  On behalf of Vanguard, I respectfully submit that the Creditor Matrix Motion should be granted.

## IV.    Debtors' Emergency Application for Appointment of Prime Clerk LLC ("**Prime Clerk**") as Claims, Noticing, and Solicitation Agent, Effective *Nunc Pro Tunc* to the Petition Date (the "**Claims Agent Application**")

17.     Pursuant to the Claims Agent Application, Vanguard seeks entry of an order appointing Prime Clerk as Claims and Noticing Agent in Vanguard's chapter 11 cases effective *nunc pro tunc* to the Petition Date.

18.     Vanguard's selection of Prime Clerk to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates.  Moreover, Vanguard submits, based on all engagement proposals obtained and reviewed, that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

19.     Although Vanguard has not yet filed its schedules of assets and liabilities, it anticipates that there will be tens of thousands of persons and entities to be noticed and that many of these parties will file claims.  In view of the number of anticipated claimants and the complexity of Vanguard's businesses, Vanguard submits that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve Vanguard and/or the Clerk of the administrative burden of, noticing and soliciting and tabulating votes, and is in the best interests of both Vanguard's estates and creditors.

20.     At Vanguard's request, Prime Clerk has acted as the claims and balloting agent since the Petition Date with the understanding that Vanguard would seek approval of its employment and retention, effective *nunc pro tunc* to the Petition Date, so that Prime Clerk may

6

be compensated for its services prior to entry of an order approving Prime Clerk's retention. Vanguard believes that no party in interest will be prejudiced by the granting of the *nunc pro tunc* employment, because Prime Clerk has provided and will continue to provide valuable services to Vanguard's estates in the interim period.

21.    The retention of Prime Clerk on an emergency basis is necessary to avoid an undue administrative burden during the first twenty-one days of these chapter 11 cases.  On behalf of Vanguard, I respectfully submit that the Claims Agent Application should be granted.

### PART B – OPERATIONAL MOTIONS

I.    **Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Workforce Obligations, Including Wages and Benefits, and (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Wages Motion")**

22.    Pursuant to the Wages Motion, Vanguard  seeks entry of interim and final orders: (a) authorizing, but not directing, Vanguard to (i) pay all prepetition and postpetition obligations on account of Workforce Obligations including payment of related costs, and to (ii) continue to honor its practices, programs, and policies for its Workforce, as those practices, programs, and policies were in effect as of the Petition Date and as such practices, programs, and policies may be modified, amended, or supplemented from time to time in the ordinary course of Vanguard's business; and (b) authorizing and directing all financial institutions to receive, honor, process, and pay any and all checks and wire transfers drawn on Vanguard's accounts in satisfaction of the Workforce Obligations to the extent that Vanguard has sufficient funds standing to its credit with such bank, and to rely on the representations of Vanguard as to which checks are issued and authorized to be paid in accordance with the Wage Motion without any duty of further inquiry and without liability for following Vanguard's instructions.  Under the Final Order only, Vanguard requests authority to honor prepetition and postpetition obligations under the Quarterly

Incentive Program and to continue to make related payments in the ordinary course of business. In addition, Vanguard requests that the Court schedule a final hearing twenty-one days after the commencement of these chapter 11 cases, or as soon after twenty-one days as is convenient for the Court to consider approval of the Wage Motion on a final basis.

### Vanguard's Workforce

23.     As of the Petition Date, Vanguard employs approximately 370 individuals on a full-time and part-time basis (the "Employees").  Approximately 190 Employees are paid on an hourly basis, and approximately 180 Employees earn a salary.  None of the Employees are subject to a collective bargaining agreement.

24.     Vanguard Natural Gas, LLC, one of the Debtors, has a co-employment relationship with Insperity PEO Services, L.P., formerly known as Administaff Companies II, L.P. ("Insperity"), which is set forth in a Client Service Agreement effective as of December 1, 2007 (collectively, with all related agreements, amendments, and modifications, the "Insperity CSA").[2]  Under the Insperity CSA, Insperity serves as the legal co-employer of the Employees and handles certain administrative responsibilities for human-resources related functions, including payroll, employee benefits, and payroll taxes (including the employer-paid portion of payroll taxes) for the Employees.  Although Vanguard handles the day-to-day management of the Employees and their activities related to Vanguard's core business, Insperity supports Vanguard in many critical personnel issues.

25.     Vanguard pays Insperity for the cost of Employee wages and benefits, as well as Insperity's fees for these services.  In 2016, Vanguard paid approximately $56 million for all

---

[2]  Three Employees—Vanguard's chief operating officer, chief financial officer, and executive vice president of Operations—have contractual employment agreements with VNR Holdings, LLC, and Vanguard Natural Gas, LLC, and are also covered Employees under the Insperity CSA.

payroll, bonus, benefit expenses, and Insperity's fees for the administration of employee benefits, human resource services, and related technology.

26.     In addition to the Employees, Vanguard supplements its workforce by utilizing temporary workers (the "Temporary Workers") sourced periodically from various staffing agencies (the "Staffing Agencies").  The Temporary Workers fulfill certain duties on a short-term basis.  Vanguard also utilizes hundreds of independent contractors who provide critical support to Vanguard's field operations (the "Independent Contractors" and, together with the Employees and the Temporary Workers, the "Workforce").

27.     At this time, Vanguard retains approximately sixty Independent Contractors and fifty-five Temporary Workers.  The Independent Contractors and Temporary Workers—most of which are employed in the field—are critical to the operation of Vanguard's business and support the efforts of Vanguard's Employees.

### Employee Compensation and Benefits

28.     Vanguard, through Insperity, provides compensation and benefits programs for its Employees and pays various related administrative fees and premiums for those programs. Vanguard's compensation obligations and benefits programs are comprised of: (A) Wage Obligations, (B) Paid Time Off, (C) Withholding Obligations, (D) the Severance Program, (E) Reimbursable Expenses, (F) Company Car Benefits, (G) the Relocation Program, (H) Health and Welfare Benefits, (I) the 401(k) Plan, and (J) the Quarterly Incentive Program, (each as defined in the Wage Motion below, and collectively, the "Employee Compensation and Benefits").   The Employees rely on the Employee Compensation and Benefits to support themselves and their families, and they will face financial hardship if the Employee Compensation and Benefits are not paid.

A.      Wage Obligations

29.      In the ordinary course of Vanguard's business, it pre-funds Insperity for all wages, salaries and compensation owed to the Employees (collectively, "Wage Obligations"). Insperity is responsible for administering and distributing Vanguard's Wage Obligations to the Employees.  On average, Vanguard pays approximately $1.5 million per pay period for all Employees semi-monthly for Wage Obligations.  Payroll often varies depending upon the season, taxes, overtime, and other factors.

30.      Employees are paid at the end of a two-week pay period for the work performed in those two weeks immediately preceding the pay date.  Vanguard spent an average of approximately $3.1 million a month on Wage Obligations in the twelve months before the Petition Date.

31.      Because the Petition Date is at the beginning of a pay period, as of the Petition Date, Vanguard believes it does not owe Employees on account of accrued Wage Obligations earned before the Petition Date.  Moreover, Vanguard has pre-funded Insperity for all Employee Compensation and Benefits for February 15, 2017 as required by the Insperity CSA.  Therefore, as of the Petition Date, no Employees are owed Wage Obligations in excess of $12,850.

B.      Paid Time Off

32.      As part of their overall compensation, Vanguard offers Employees certain paid time off ("PTO").  PTO includes vacation time (between two and five weeks per year, with no carry-over),[3] which is available for use when other leave benefits are not available, up to forty hours of sick leave annually (which does not carry over), ten company holidays, up to five days

---

[3] Three members of Vanguard's management team (the "Executives") receive twenty-five business days of PTO each calendar year, of which a maximum of ten days of accrued but unused PTO may be carried over from one calendar year to the next.

of bereavement leave, and up to five days of leave for jury duty. Employees who are terminated or resign are entitled to a cash payment in lieu of the accrued but unused vacation time. Resigning Employees can only receive the cash payment if they give a two-week's notice to the Company.

33.     In addition, Vanguard provides certain other forms of paid leave and unpaid leave, including:

- paid and unpaid leave under the Family and Medical Leave Act of 1993 for: (a) birth, adoption, or foster care, (b) family care, (c) medical emergencies, (d) military exigencies, and (e) military caregiving needs;

- short-term disability of up to 60% of pay for six to eight weeks for maternity leave (depending on the type of birth) provided by Cigna Corporation ("Cigna") through Insperity; and

- other paid and unpaid leaves of absence for personal reasons, many of which are required by law, including missed work time in the ordinary course of business for time spent voting, and unpaid leaves of absence for family medical emergencies and military service.

34.     Vanguard estimates that, as of the Petition Date, the aggregate amount of accrued but unused PTO is approximately $200,000. Vanguard does not believe it will have to make any payments as a result of accrued but unused PTO during the interim period.

C.     Withholding Obligations

35.     During each applicable pay period,  Vanguard, through Insperity, routinely deducts certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, child support, and related fees, and pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below) (collectively, the "Deductions"). Some of the Deductions are forwarded to various third-party recipients. During the twelve months prior to the Petition Date, monthly Deductions were approximately $275,000. Vanguard believes that as of petition date, it does not owe any Deductions.

36.     Vanguard, through Insperity, is also required by law to withhold from Wage Obligations amounts related to, among other things, federal and state income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes"), for remittance to the appropriate federal and state taxing authorities.  Vanguard must then match the Employee Payroll Taxes from its own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "Payroll Taxes").  The Payroll Taxes are generally processed and forwarded to the appropriate federal or state taxing authority at the same time Employees' payroll checks are disbursed.  During the twelve months before the Petition Date, Employer Payroll Taxes were approximately $2.9 million, or approximately $125,000 semi-monthly.

D.     Severance Program

37.     In the ordinary course of business, Vanguard has historically provided severance benefits to Employees through Insperity in the event of a termination by Vanguard (the "Severance Program").  Employees have generally received, upon termination, two weeks of severance pay in a lump sum upon executing and returning the separation agreement to Insperity.[4]

38.     Vanguard believes that the severance offered by Insperity has been critical to maintaining Employee morale and loyalty.  Increased instability in Vanguard's Workforce will only undermine Vanguard's ability to strengthen its financial and operational foundation, to generate growth, and to be positioned for long-term success.  As a condition to receiving

---

[4]  Three Executives are subject to employment agreements that provide for severance consisting of (a) accrued compensation and reimbursements, (b) a lump sum payment equal to the amount of thirty-six months of such Executives' salary, and (c) accelerated vesting of unvested units awarded pursuant to Vanguard's LTIP (as defined in the Wages Motion).

severance, Vanguard typically requires that each Employee execute a release agreement in which the Employee releases any claims held against Vanguard.

39.     Vanguard spent approximately $110,000 on account of the Severance Program in the twelve months prior to the Petition Date.  Vanguard severed a total of eighteen Employees in the last twelve months in order to adjust its operations to an unfavorable business environment. Severance is typically paid as a lump sum payment after the severed Employee executes a release.  As of the Petition Date, Vanguard does not owe any severance.

E.     Reimbursable Expenses

40.     Vanguard reimburses certain Employees and members of their board of directors for certain expenses incurred in the scope of their duties (the "Reimbursable Expenses").  The Reimbursable Expenses include, without limitation, expenses for work-related travel, lodging, auto expenses, telephone charges, internet charges, and meals.  Employees who pay for their own Reimbursable Expenses up front can apply for reimbursement by submitting an expense report. Once they have determined that the charges are for legitimate reimbursable business expenses, the Debtors reimburse the Employees for these expenses.

41.     On average, Vanguard pays approximately $25,000 on account of Reimbursable Expenses per month.  Additionally, approximately twenty-five Employees hold corporate credit cards that are used for business expenses.  Vanguard pays approximately $35,000 per month for the company credit cards.

42.     It is impractical for Vanguard to determine the exact amount outstanding for Reimbursable Expenses at any particular time because Employees do not always submit claims for reimbursement promptly.  As of the Petition Date, Vanguard estimates that its total liability for accrued Reimbursable Expenses (whether submitted or unsubmitted) is approximately $120,000.

13

F.    Company Car Benefits

43.    In the ordinary course of business, Vanguard provides vehicles (collectively, the "Company Vehicles") to approximately 235 Employees in the field—none of the Company Vehicles are provided for Employees based in Houston. Vanguard pays for the lease premiums, provides insurance under Vanguard's automobile insurance policy, and reimburses those Employees who use a Company Vehicle for the costs of repairs and gas (the "Company Car Benefits"). Vanguard intends to continue the Company Car Benefits during the course of its chapter 11 cases. As of the Petition Date, Vanguard estimates that the aggregate amount of accrued but unpaid obligations under the Company Car Benefits program is approximately $200,000.

G.    Relocation Program

44.    Vanguard pays for certain expenses to relocate or provide temporary housing for certain Employees (the "Relocation Program"). Specifically, the Relocation Program provides Employees with a relocation allowance, temporary housing, reimbursement for house hunting expenses, and transport of household goods. In the twelve months prior to the Petition Date, Vanguard spent approximately $70,000 on account of the Relocation Program for one Employee. As of the Petition Date, however, Vanguard does not believe that it has any accrued but unpaid obligations related to the Relocation Program.

H.    Health and Welfare Benefits

45.    Vanguard's Employees are offered a suite of health and welfare benefits (the "Insperity Health and Welfare Benefits"), which are funded in whole or in part by Vanguard and the remainder of which are funded by Employee contributions. All of the Insperity Health and Welfare Benefits are provided or otherwise administered by Insperity under the Insperity CSA. The Insperity Health and Welfare Benefits are an integral part of the Employees' compensation,

14

and Vanguard intends to honor them in the ordinary course of business during the course of these chapter 11 cases.

46.     Insperity manages the Insperity Health and Welfare Benefits that include, among other things: (i) medical care and dental care (through Insperity's self-funded program with UnitedHealthCare), and vision care (provided by VSP through Insperity), and applicable coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") administered by Insperity; (ii) Employee-funded flexible spending (the "Flexible Spending Account Program") and health savings accounts (administered by Insperity); (iii) employer-paid basic life and personal accident insurance (provided by Cigna through Insperity); (iv) Employee-paid voluntary group universal life insurance and personal accident insurance (provided by Cigna through Insperity); (v) short-term and long-term disability insurance (provided by Cigna through Insperity); (vi) workers' compensation insurance (with Lockton Company through Insperity[5]) (the "Worker's Compensation Programs"); (vii) Matching Contributions under the 401(k) Plan, (each as defined and described more fully below); (viii) a dependent care program the ("Dependent Care Program"); and (ix) an Employee Assistance Program.

47.     As of the Petition Date, Vanguard estimates that the amount of accrued but unpaid obligations under the Dependent Care Program and Flexible Spending Account Program is approximately $50,000.[6]

48.     Vanguard remits to Insperity approximately $400,000 per semi-monthly payroll period, or approximately $9.0 million per year, for securing from third parties, or itself

---

[5]  Exceptions to these workers' compensation arrangements with Insperity are the monopolistic states North Dakota and Wyoming, where Vanguard must pay premiums to the states directly.  Vanguard's premium for Wyoming for the first quarter of 2017 is due at the end of April 2017 and will be approximately $10,000.  For North Dakota, Vanguard will owe its approximately $2,500 annual premium in June 2017.

[6]  Through the co-employment agreement between Insperity and Vanguard, Insperity accrues, keeps and tracks any unreimbursed dependent care or flexible spending dollars, not Vanguard.

providing, the Insperity Health and Welfare Benefits, Matching Contributions, all employer-paid taxes and withholding taxes, worker's compensation, EPLI insurance, and all other products and services under the Insperity CSA.  The $400,000 remitted to Insperity per payroll period directly funds the Health and Welfare Benefits and other human resources programs.  Vanguard intends to continue to perform under the Insperity CSA during the course of these chapter 11 cases, including continuation of the Insperity Health and Welfare Benefits, and seeks authority to pay all amounts owed to Insperity under the Insperity CSA that arise in the ordinary course of business.

49.     Vanguard's relationship with Insperity is vital to Vanguard's progress moving forward as a company.  As previously noted, the relationship with Insperity allows Vanguard to (a) realize substantial cost savings with respect to the administration of its employee payroll and benefits by not having to employ additional human resources professionals and administer payroll and benefit programs in several states, and (b) significantly reduce and contain the costs of participating in certain benefit programs, including the medical plans, relative to the costs of participating in those programs without a third-party intermediary like Insperity.

50.     In addition, Insperity administers Vanguard's Worker's Compensation Programs. For 2016, Insperity paid out $2,400 on one workers compensation claim and Vanguard does not believe it has any outstanding worker's compensation claims as of the Petition Date. If the Worker's Compensation Programs are not properly funded, Vanguard could be subject to administrative or legal proceedings.  Vanguard could also be subject to actions by states in which Vanguard operates for failure to comply with state laws requiring worker's compensation coverage.  Vanguard pays worker's compensation insurance programs in all jurisdictions where it operates and needs to continue to do that.  Accordingly, Vanguard seeks authority to pay all

workers' compensation obligations, including any outstanding insurance premiums and any other amounts related to prepetition workers' compensation claims as they become due in the ordinary course of Vanguard's business.

      I.      401(k) Plan

      51.      Under the Insperity CSA, the Employees are eligible to participate in a tax-qualified defined contribution retirement plan (the "401(k) Plan"). Approximately 350 Employees currently contribute to the 401(k) Plan. Through contributions withheld from regular payroll and bonus payroll, eligible Employees may establish an account as of the first payroll following the date of hire at which time they can elect to contribute a percentage of their eligible compensation to the 401(k) Plan on a pre-tax basis. Vanguard makes matching contributions to each Employee participant's account under the 401(k) Plan equal to 100% of the first 6% of compensation deferred (the "Matching Contributions"), which is included in the per-payroll-period amounts paid to Insperity identified above. The approximate amount of Matching Contributions is $80,000 for each semi-monthly payroll. Matching contributions are fully vested when paid. As of the Petition Date, Vanguard does not owe any Matching Contributions.

      J.      Quarterly Incentive Program

      52.      All non-executive Employees are eligible to participate in a quarterly incentive program (the "Quarterly Incentive Program"). Under the program, Vanguard determines a set of quarterly performance benchmarks (the "Benchmarks")[7] for a calendar year, as well as the maximum incentive payment for each Employee under the Quarterly Incentive Program. Awards under the Quarterly Incentive Program are distributed each quarter as follows: 20% for

---

[7] The Benchmarks for 2016 are: (1) actual adjusted EBITDA compared to forecast; (2) actual production results compared to forecast; (3) actual cash general and administrative expense compared to forecast; and (4) actual leased operating expenses compared to forecast.

Q1; 20% for Q2; 20% for Q3; and 40% for Q4.  The payments are made one quarter in arrears

(i.e. the annual Q4 award is made on March 31).

53.     Awards under the Quarterly Incentive Program are calculated based on

(a) Vanguard's performance as compared against the Benchmarks for each quarter, and (b) with

respect to payments made at the conclusion of Vanguard's fiscal year, (i) Vanguard's

performance as compared against the Benchmarks, and (ii) a discretionary performance-based

bonus representing 20% of the Employee's maximum incentive payment.

54.     Because Vanguard's bonuses are paid a quarter in arrears, 2016 fourth quarter

bonuses (40% of the annual bonus) are due to non-executive Employees by March 31, 2017.

Vanguard expects to distribute a total of approximately $3.2 million, which includes bonuses

paid directly to Employees, any portion withheld and contributed to a 401(k) plan, and amounts

to satisfy Withholding Obligations under the Quarterly Incentive Program on March 31, 2017.

Moreover, as of the Petition Date, Vanguard has accrued approximately $500,000 for the first

quarter of 2017 as part of the Quarterly Incentive Program obligations, which will not come due

to be paid until June 30, 2017.

55.     Vanguard believes the Quarterly Incentive Program is integral to the operation of

Vanguard's business.  In particular, the Quarterly Incentive Program aligns Employees' interests

with those of Vanguard generally by linking payments under the Quarterly Incentive Program to

performance and overall efficiency of Vanguard's operations.  In addition, the Employees rely

on the Quarterly Incentive Program as part of their overall compensation arrangement with

Vanguard.

K.      Executive Incentive Program

56.     Vanguard has three executive officers (the "Executives") who participate in a

separate incentive program that pays them cash bonuses when earnings are announced each

quarter (the "Executive Incentive Program").  Awards under the Executive Incentive Program are calculated on a quarterly basis and distributed in cash, up to the maximum incentive payment (which is two-times annual salary) for each Executive, based on Vanguard's performance as compared against the Benchmarks.

57.     The Executives are scheduled to receive the fourth quarter installment for the 2016 annual bonus on or about March 1, 2017.  Vanguard expects to distribute a total of approximately $700,000 on or about March 1, 2017.  Given the timing of Vanguard's payments for the Executive Incentive Program, Vanguard is not seeking the Court's authorization for any payments under this program at this time, but reserves the right to request approval at a later date.

L.      Long-Term Incentive Plan

58.     Vanguard also provides the Employees and the Executives with benefits under Vanguard's long-term incentive program (the "LTIP").  In accordance with the LTIP, Vanguard issues annual grants of restricted units and phantom units to the Executives, which vest over a three-year period, and makes certain cash payments related to the units distributed under the LTIP.  Nevertheless, Vanguard is not seeking authorization to pay such amounts at this time, but reserves the right to request approval at a later date.

**Independent Contractor and Temporary Worker Compensation**

59.     Vanguard makes payments to Independent Contractors (the "Independent Contractor Compensation") and Staffing Agencies on account of Temporary Workers (the "Staffing Obligations") for the performance of certain services critical to Vanguard's operations, including, among other things, maintenance services and operational functions related to Vanguard's oil and gas businesses.  Vanguard's Employees rely on the support of Independent Contractors to complete discrete projects that help Vanguard's businesses—primarily in the oil

and gas fields—and Temporary Workers to fill short-term positions that are not economically feasible to fill on a full or part-time basis with Employees.  Vanguard believes the authority to continue paying its Independent Contractors and Staffing Agencies is critical to minimize disruption of Vanguard's continued business operations.

60.     Vanguard spent approximately $4.7 million on payments to Staffing Agencies in the aggregate during the twelve months prior to the Petition Date and owed Staffing Agencies approximately $100,000 per week during the same period.  As of the Petition Date, Vanguard estimates that approximately $500,000 of Staffing Obligations is accrued and unpaid, which on average amounts to approximately $9,000 for each Temporary Worker.

61.     Vanguard spent approximately $3.8 million on Independent Contractors in the aggregate during the twelve months prior to the Petition Date and Vanguard owed Independent Contractors an average of $75,000 per week.  As of the Petition Date, Vanguard estimates that approximately $500,000 of Independent Contractor Compensation is accrued and unpaid, which, on average amounts to approximately $9,000 for each Independent Contractor.

62.     Vanguard does not believe it owes any individual Independent Contractor or Temporary Worker amounts in excess of $12,850.

63.     As described above, payment of Employee Compensation and Benefits, Independent Contractor Compensation, and Staffing Obligations are critical to the survival of Vanguard's business.

64.     On behalf of Vanguard, I respectfully submit that the Wages Motion should be granted.

**VI.     Debtors' Emergency Motion for Entry of Order (I) Approving Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (III) Approving**

**Debtors' Proposed Procedures for Resolving Additional Assurance Requests (the "Utilities Motion")**

65.     Pursuant to the Utilities Motion, Vanguard seeks entry of an order (a) approving Vanguard's proposed adequate assurance of payment for future utility services, (b) prohibiting utility companies from altering, refusing, or discontinuing services, and (c) approving Vanguard's proposed procedures for resolving adequate assurance requests.

66.     In connection with the operation of its business and management of its properties, Vanguard obtains electricity, telephone, natural gas, water, sewer, and other similar services (collectively, the "Utility Services") from a number of utility companies or their agents (collectively, the "Utility Companies" and each, a "Utility Company").  A list of Utility Companies that provided Utility Services to Vanguard as of the Petition Date (the "Utility Services List") is attached to the Utilities Motion as Exhibit B.[8]  On average, Vanguard spends approximately $2 million each month for Utility Services.

67.     Uninterrupted Utility Services are essential to Vanguard's ongoing business operations, and hence the overall success of these chapter 11 cases.  Vanguard's business involves developing, producing, and marketing oil and natural gas.  To successfully develop, extract, and market oil and natural gas, Vanguard must maintain the ability to run their exploration and production equipment in a near-constant state.  Vanguard's operations also require electricity and gas for lighting, heating, and air conditioning.  In addition to the production processes conducted in the field, Vanguard operates a corporate office in the Galleria area of Houston, Texas responsible for ensuring the smooth operation of Vanguard's business.

---

[8]  Although Vanguard believes that the Utility Service List includes all of their Utility Companies, Vanguard reserves the right to supplement the Utility Service List if it omitted any Utility Company.  Additionally, the inclusion of any entity on, as well as any omission of any entity from, the Utility Services List is not an admission by Vanguard that such entity is, or is not, a utility within the meaning of section 366 of the Bankruptcy Code, and Vanguard reserves all rights regarding the same.

This office requires electricity, telecommunications, internet, water, and waste management services to operate.  Should any Utility Provider refuse or discontinue service, even for a brief period, Vanguard's business operations would be severely disrupted, and such disruption would jeopardize Vanguard's ability to manage its reorganization efforts.  Accordingly, it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

68.     To the best of Vanguard's knowledge, there are no defaults or arrearages with respect to Vanguard's undisputed invoices for prepetition Utility Services, other than payment interruption that may be caused by the commencement of these chapter 11 cases.  On average, Vanguard pays approximately $2 million each month for third-party Utility Services, calculated as a historical average payment for the twelve-month period ended December 31, 2016. Accordingly, Vanguard estimates that its cost for Utility Services during the next thirty days (not including any deposits to be paid) will be approximately $2 million.  Vanguard provides certain of the Utility Companies with cash deposits as set forth in the schedule attached to the Utilities Motion as Exhibit B (collectively, the "Prepetition Deposits") that total approximately $1.3 million as of December 31, 2016.

69.     To provide additional assurance of payment, Vanguard proposes to deposit $508,446 into a segregated account (the "Adequate Assurance Deposit") that it has already created at Capital One, N.A ("Capital One").  The Adequate Assurance Deposit represents an amount approximately one half of Vanguard's average monthly cost of Utility Services during the twelve-month period ended December 31, 2016, minus prepetition deposits, if any.  The Adequate Assurance Deposit will be held in the segregated account at Capital One (the "Adequate Assurance Account") for the duration of these chapter 11 cases and may be applied to any postpetition defaults in payment to the Utility Companies.

70.    It is critical that Utility Services continue uninterrupted during these chapter 11 cases.  I believe that the proposed Adequate Assurance Deposit and Adequate Assurance Procedures properly balance the Utility Companies' statutory right to adequate protection while also providing the Debtors with certainty on the process for providing such adequate protection.

71.    On behalf of Vanguard, I respectfully submit that the Utilities Motion should be granted.

**VII.    Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Payment of (A) Certain Oil and Gas Obligations, (B) Warehousing Claims, and (C) 503(b)(9) Claims and (II) Confirming Administrative Expense Priority of Outstanding Order (the "Oil and Gas Obligations Motion")**

72.    Pursuant to the Oil and Gas Obligations Motion, Vanguard  seeks entry of interim and final orders: (a) authorizing, but not directing, Vanguard to pay in the ordinary course of business all prepetition and postpetition amounts owing on account of (i) Mineral Payments, (ii) Working Interest Disbursements and Working Interest Costs, (iii) Joint Interest Billings, (iv) GTP Expenses, (v) Warehousing Claims, and (vi) 503(b)(9) Claims; and (b) confirming the administrative expense priority status of Outstanding Orders and authorizing payment of such obligations in the ordinary course of business.  In addition, Vanguard requests that the Court schedule a final hearing twenty-one days after the commencement of these chapter 11 cases, or as soon after twenty-one days as is convenient for the Court, to consider approval of the Oil and Gas Obligations Motion on a final basis.  Furthermore, out of an abundance of caution, and in order to successfully implement the relief requested in the Oil and Gas Obligations Motion and to further its reorganization efforts, Vanguard also requests that the Interim Order and Final Order permit Vanguard to require that (a) a payee maintain or apply, as applicable, terms ("Customary Terms") during the pendency of these chapter 11 cases that are at least as favorable as those terms existing as of the Petition Date, or on terms satisfactory to Vanguard in its sole

discretion, as a condition to receiving any payment under the Interim Order or Final Order, and (b) if a payee, after receiving a payment under the Interim Order or Final Order, ceases to provide Customary Terms, then Vanguard may, in its discretion, deem such payment to apply instead to any postpetition amount that may be due to that payee or treat that payment as an avoidable postpetition transfer of property.

### Oil and Gas Obligations

73.     A mineral interest generally consists of a real property interest in the minerals (including oil and natural gas) under a parcel of property, typically in fee simple,[9] and the exclusive right to capture those minerals through exploration, drilling, and production operations. Mineral interests can be conveyed by executing a mineral deed that severs the mineral interests from the surface interests in land.

74.     In addition, through a written agreement (an "Oil and Gas Lease"), owners of mineral interests lease, grant, or otherwise convey their right to capture minerals (a "Working Interest") to a third party (a "Working Interest Holder").

75.     Vanguard holds interests in various oil and gas properties in eleven states: Alabama, Arkansas, Colorado, Louisiana, Mississippi, Montana, New Mexico, North Dakota, Oklahoma, Texas, and Wyoming.

A.     Royalty and Mineral Payments

76.     A Working Interest may be subject to or burdened by various other interests in minerals, production, or profit, such as a "Royalty." A Royalty is a mineral interest owner's

---

[9]  By the Oil and Gas Obligations Motion, Vanguard does not concede that the assertion of any such liens would constitute a valid basis for removing Vanguard as Operator of any well and Vanguard expressly reserve the right to contest such an action.

24

reserved "share of production, free of expenses of production."[10]  In addition to Royalties,

burdens on Working Interests may take many other forms, including, but not limited to

overriding royalty interests, non-participating royalty interests, net profit interests, and

production payments (collectively, and together with Royalties, "Working Interest Burdens").

77.     The pooling of Working Interests confers on each Working Interest Holder an

undivided, fractional interest in the defined area.  The Working Interest holders designate one

Working Interest holder as the "Operator."

78.     As Operator, Vanguard makes payments to the holders of the Working Interest

Burdens at its various wells (the "Mineral Payments") after extracting and selling its oil and gas.

Failure to make the Mineral Payments would have a severe negative impact on Vanguard's

interests in its oil and gas properties.  Mineral Payments are governed by the terms of the Oil and

Gas Leases and state statutory frameworks—via pooling orders or otherwise—that set strict

payment deadlines and contain enforcement mechanisms including interest, fines, recovery of

costs and attorneys' fees, and treble damages.  Failure to pay Mineral Payments could expose

Vanguard to these enforcement actions and could result in actions seeking the forfeiture,

cancellation, or termination of Vanguard's Oil and Gas Leases.

79.     The Mineral Payments vary over time due to many factors such as specific terms

of underlying agreements, changes in ownership, changes in the amount or type of minerals

captured, and mineral price fluctuations.  In the twelve months before the Petition Date,

Vanguard made Mineral Payments totaling approximately $60 million.  These payments are

remitted by Vanguard to Working Interest Burden holders (the "Mineral Payees") throughout the

course of a given month.  As a result of the time required to market and sell the production and

---

[10]  8-R Howard R. Williams and Charles J. Meyers, Manual of Oil and Gas Terms § R, Matthew Bender & Co. (16th ed. database updated 2015).

the significant accounting process required each month to accurately disburse the resulting proceeds, Mineral Payments generally are made between sixty and ninety days after production of the underlying oil and gas.

80.     Vanguard estimates that, as of the Petition Date, there are approximately $10 million in Mineral Payments that are outstanding.  Approximately $5 million in Mineral Payments is due to be paid during the interim period.

        B.     <u>Working Interest Disbursements and Costs</u>

81.     The relationship between the pooled Working Interest Holders (Operators and Non-Operating Working Interest Holders (as defined below)) is often governed by a joint operating agreement (a "<u>JOA</u>").  A JOA provides a contractual basis for the cooperative exploration, development, and production of oil and gas properties among multiple leasehold co-tenants.  In other instances, Working Interests are pooled without an express JOA, in which case the relationship between the Working Interest Holders is governed by applicable state law—pooling orders or otherwise—and industry custom.

82.     The Working Interests of non-operator lessees on an oil and gas property are referred to as "<u>Non-Operating Working Interests</u>" and the holders of those interests are called "<u>Non-Operating Working Interest Holders</u>."

83.     Usually, the Operator will incur most of the initial costs associated with drilling and production, including lease operating expenses and capital expenditures, on account of itself and Non-Operating Working Interests Holders (the "<u>Working Interest Costs</u>"), including payments to third parties such as vendors, contractors, drillers, haulers, and other suppliers of oil and gas related services (the "<u>Mineral Contractors</u>").  The JOA will typically provide for the Operator to bill each Non-Operating Working Interest Holder for its *pro rata* share of the

Operator's Working Interest Costs.  These amounts are commonly referred to as "joint interest billings" or "JIBs."  In turn, the Operator distributes to each Non-Operating Working Interest Holder its share of the well's proceeds (a "<u>Working Interest Disbursement</u>").

84.     Vanguard's Working Interest Disbursements and JIBs fluctuate significantly from month to month, particularly so during the recent turbulence in commodity prices. In the twelve months preceding the Petition Date, Vanguard paid approximately $30 million in Working Interest Disbursements to Non-Operating Working Interest Holders.  As of the Petition Date, Vanguard estimates that it had approximately $5 million of Working Interest Disbursements outstanding.  Approximately $2.5 million in Working Interest Disbursements are due to be paid during the interim period.

85.     For the wells on which it is the Operator, Vanguard generates a JIB for each Non-Operating Working Interest Holder on a monthly basis.  The timing of JIB payments from Non-Operating Working Interest Holders can vary depending on the specific payment arrangement in place, but outstanding JIB balances are usually paid within sixty to ninety days after the billing date.

86.     Regardless of when an Operator is reimbursed by Non-Operating Working Interest holders through the JIB process, the Operator must continue to pay Working Interest Costs in a timely fashion.  Failure to pay Working Interest Costs when due could result in, among other things, the perfection or enforcement of contractual, statutory, or constitutional liens on Vanguard's assets by third parties such as the Mineral Contractors supplying goods and services to the oil and gas properties, as well as Vanguard's potential removal as Operator under various JOAs.[11]

---

[11]  Vanguard does not concede that the assertion of any such liens would constitute a valid basis for removing Vanguard as Operator of any well, and Vanguard expressly reserves the right to contest any attempted removal.

87.     In the twelve months preceding the Petition Date, Vanguard paid approximately $200 million in Working Interest Costs to operate the wells on which it is the Operator.  Non-Operating Working Interest Holders were billed by Vanguard approximately $45 million on account of JIBs.  As of the Petition Date, Vanguard estimates that it had approximately $23 million of Working Interest Costs outstanding, approximately $14 million of which will need to be paid during the interim period.  Vanguard expects to be reimbursed approximately $6 million by Non-Operating Working Interest Holders for any unpaid Working Interest Costs during this period.

C.     JIBs Owed by Vanguard

88.     Vanguard also holds Non-Operating Working Interests in various oil and gas properties.  A third party acts as the Operator for those interests and is responsible for the daily operations and the Working Interest Costs.  Vanguard's primary responsibility with respect to its Non-Operating Working Interests is to pay the Operators for Vanguard's *pro rata* share of Working Interest Costs through the JIB process—either with cash or in-kind payments—on time.  Some states mandate through pooling orders that Non-Operating Working Interest Holders pay the Operator a set fee per well rather than traditional *pro rata* cost sharing.  In these states, the pooling order set fee is also collected through the JIB process.

89.     The Operator of an oil and gas property commonly is granted a contractual or statutory lien on Non-Operating Working Interest Holders' interests in the oil and gas property to secure the payment of obligations owed to the Operator.  Therefore, Vanguard's failure to timely pay the JIBs it owes could result in Operators asserting lien rights under applicable state laws on Vanguard's interests in the Oil and Gas Leases or the related production.  If asserted, those liens

could restrict Vanguard's ability to dispose, transfer, or otherwise monetize its property, potentially impairing Vanguard's businesses severely.

90.     Vanguard's monthly obligation to third-party Operators under JIBs is unpredictable on a month-to-month basis, especially given the current commodity price environment.  However, over the twelve months preceding the Petition Date, Vanguard paid approximately $100 million in JIBs to third-party Operators.  As of the Petition Date, Vanguard estimates that it has approximately $14 million of prepetition JIBs outstanding, approximately $8 million of which will need to be paid during the interim period.

> D.     Gathering, Transportation, and Processing Expenses

91.     Sometimes Vanguard sells some of its production for delivery at the wellhead. For production not sold that way, Vanguard is obligated to third parties under various gathering, processing, and related agreements for, among other things, costs associated with gathering, treating, transporting, processing, compressing, and similar services (the "GTP Expenses"). Potential consequences of not paying GTP Expenses include penalties and interest, turnover actions, conversion and constructive trust claims, assertion of significant secured claims against property of the estate, litigation, and, in some instances, removal as Operator.

92.     Vanguard similarly incurs GTP Expenses on non-operated oil and gas properties where Vanguard elects to take its production "in-kind," separate and apart from the other Working Interest Holders, rather than requesting that the third party Operator sell the production on Vanguard's behalf.  Where Vanguard takes its production in-kind, Vanguard incurs GTP Expenses.

93.     As of the Petition Date, Vanguard estimates that it owes approximately $12 million in GTP Expenses that are paid directly by Vanguard.  Of this amount, Vanguard believes that approximately $6 million in GTP Expenses will become due during the interim period.

E.     Payment of Warehousing Claims

94.     In the ordinary course of business Vanguard relies on certain vendors to store materials (collectively, the "Warehousemen"), such as casings, when they are not being used.

95.     If Vanguard were to default on any obligation to the Warehousemen, the Warehousemen may assert a possessory lien on Vanguard's property in their possession, attempt to retain possession of that property, and bar Vanguard's access to what is stored at the Warehousemen's yards.

96.     As a result, Warehousemen may refuse to deliver or release Vanguard's property or other property in their possession before the prepetition amounts owed to them by Vanguard (collectively, the "Warehousing Claims") have been satisfied and their liens redeemed.

97.     In the twelve months preceding the Petition Date, Vanguard paid approximately $100,000 in Warehousing Claims.  As of the Petition Date, Vanguard estimates that it has approximately $25,000 of prepetition Warehousing Claims outstanding.  Accordingly, Vanguard seeks authority, but not direction, to pay prepetition and postpetition Warehousing Claims.

F.     503(b)(9) Claims

98.     Vanguard may have received certain goods or materials from various vendors (collectively, the "503(b)(9) Claimants") within the twenty days before the Petition Date.  Many of Vanguard's relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, Vanguard often obtains supplies on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.

99.     Vanguard also believes certain 503(b)(9) Claimants could alter Vanguard's existing trade credit—or demand payment in cash on delivery—which would make Vanguard's liquidity worse.  Vanguard believes that as of the Petition Date it does not owe any amounts on account of goods delivered within the twenty days prior to the Petition Date which may be

30

entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code (each, a "503(b)(9) Claim").   Vanguard proposes to pay the 503(b)(9) Claims as they come due in the ordinary course of business.

G.    Outstanding Orders

100.    Prior to the Petition Date and in the ordinary course of business, Vanguard may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders").  To avoid becoming general unsecured creditors of Vanguard's estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless Vanguard issues substitute purchase orders postpetition.  Receiving delivery of Outstanding Orders may be critical to preventing a disruption in Vanguard's business operations.  Therefore, Vanguard seeks authorization to confirm the administrative expense priority status of amounts owed on account of Outstanding Orders that have not been completed and to make payments on account of Outstanding Orders in the ordinary course of business.

H.    Justification

101.    Failure to permit Vanguard to make prepetition Working Interest Disbursement and Mineral payments could subject Vanguard to unnecessary litigation, either in or outside of the Bankruptcy Court, at a time when its resources are already strained.  Similarly, if left unpaid Mineral Payees, Mineral Contractors, and Non-Operating Working Interest Holders may be successful in asserting liens with respect to accrued and unpaid Mineral Payments, Working Interest Costs, and Working Interest Disbursements notwithstanding the commencement of the chapter 11 cases and the imposition of the automatic stay.  If these parties were able to assert liens on Vanguard's property, the results would be costly to Vanguard and its creditors.  Moreover, Vanguard's failure to timely make JIB payments is likely to result in third-party

Operators asserting lien rights against Vanguard's interests in, among other things, the wells, the production and proceeds from such wells, or Vanguard's Working Interests (which are real property rights), as well fixtures and equipment associated with the oil and gas properties.

102.     In Vanguard's business judgment, the harm and economic disadvantage that would stem from failure to pay any of the prepetition Oil and Gas Obligations is grossly disproportionate to the amount of the prepetition claim that would have to be paid.  With respect to each of the holders of the prepetition Oil and Gas Obligations, Vanguard has determined that, to avoid significant disruption of its business operations, there is no practical or legal alternative to payment of the prepetition Oil and Gas Obligations.

103.     Vanguard's long-term business prospects depend on the willingness of numerous Operators, Mineral Contractors, Working Interest Holders, vendors providing gathering, transportation, processing and other services, Warehousemen, investors and property owners, and others to continue dealing with Vanguard.  Vanguard's long-term prospects depend on its ability to acquire and process reserves in the future.  To do so successfully, Vanguard will require the cooperation of various other actors in the industry—including critically investors and property owners—as indicated above.  These parties may be unwilling to conduct new business with Vanguard if they doubt Vanguard can satisfy its Oil and Gas Obligations.

104.     Vanguard has significant dealings with other industry players on its approximately 15,000 wells, and has experienced no interruption in operations with those companies—Vanguard has had to make only *one* relatively small claim in a chapter 11 case since the commodity price downturn.  Vanguard believes that trend should continue in this case.

105.     Even if Vanguard could avoid payment of certain accrued Oil and Gas Obligations, the collateral consequences on Vanguard's business would greatly exceed any cost

savings Vanguard would achieve.  Therefore, satisfaction of the Oil and Gas Obligations in the ordinary course of business is critically important to Vanguard's ongoing business.

106.     On behalf of Vanguard, I respectfully submit that the Oil and Gas Obligations Motion should be granted.

## VIII.   Debtors' Emergency Motion for Entry of Interim and Final Orders Authorizing Payment of Certain Prepetition and Postpetition Taxes and Fees (the "Taxes Motion")

107.     Pursuant to the Taxes Motion, Vanguard  seeks entry of interim and final orders: (a) authorizing, but not directing, Vanguard to remit and pay (or use tax credits to offset) the Taxes and Fees that accrued prior to the Petition Date and that will become payable during the pendency of these chapter 11 cases and (b) authorizing, but not directing, Vanguard to remit and pay (or use tax credits to offset) Taxes and Fees that arise or accrue in the ordinary course of business on a postpetition basis.

## Taxes and Fees

108.     In the ordinary course of business, Vanguard collects or incurs income, franchise, severance, ad valorem, and property taxes, as well as other business, environmental, and regulatory fees (collectively, the "Taxes and Fees").[12]  Vanguard pays the Taxes and Fees on a monthly, quarterly, or annual basis to various federal, state, and local governments, including taxing and licensing authorities, identified in a schedule attached to the Taxes Motion as **Exhibit C**[13] (collectively, the "Authorities"), in accordance with applicable laws and regulations.

---

[12]  By the Taxes Motion, Vanguard does not seek the authority to collect and remit state and federal employee-related taxes and withholdings.  Such relief is instead requested in the Wages Motion.

[13]  Although **Exhibit C** to the Taxes Motion is intended to be comprehensive, Vanguard may have inadvertently omitted Authorities from **Exhibit C**.  By the Taxes Motion, the Debtors request relief with respect to Taxes and Fees payable to all Authorities, regardless of whether such Authority is specifically identified on **Exhibit C**.

Vanguard estimates that the total amount of prepetition Taxes and Fees owing to the various Authorities will not exceed approximately $25.5 million.

109.     Vanguard seeks authority pursuant to the Taxes Motion to make such payments where:  (a) Taxes and Fees accrue or are incurred postpetition; (b) Taxes and Fees accrued or were incurred prepetition but were not paid prepetition or were paid in an amount less than actually owed; (c) Taxes and Fees paid prepetition by Vanguard were lost or otherwise not received in full by any of the Authorities; or (d) Taxes and Fees incurred for prepetition periods may become due after the commencement of these chapter 11 cases.

110.     The relief requested is appropriate because, among other things, the severance taxes Vanguard collects on behalf of the Authorities are likely not property of Vanguard's estates.  Moreover, non-payment of the prepetition Taxes and Fees will cause immediate and irreparable harm to Vanguard because it (a) would cause Vanguard to incur substantial, irreversible tax penalties from governmental authorities that are likely to be paid in full and in cash as priority claims under section 507(a)(8) of the Bankruptcy Code, (b) could prevent Vanguard from operating its business, and (c) could expose certain directors and officers of Vanguard to personal liability for certain unpaid Taxes and Fees.

111.     The Taxes and Fees are summarized as follows:

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due During Interim Period |
|---|---|---|---|
| **Franchise Taxes** | Taxes required to conduct business in the ordinary course. | $240,000 | $0 |

| Category | Description | Approximate Amount Accrued as of Petition Date | Approximate Amount Due During Interim Period |
|---|---|---|---|
| **Property and Severance Taxes**[14] | Taxes and obligations related to real and personal property holdings. | $23,100,000 | $8,000,000 |
| **Income Taxes** | Taxes related to income of certain Vanguard affiliates. | $22,000 | $0 |
| **Environmental and Business Fees** | Fees related to compliance with environmental laws and regulations, licensing fees, business permits, and other fees paid to state agencies. | $2,000,000 | $500,000 |
| **Total** | | $25,362,000 | $8,500,000 |

## Franchise Taxes

112.     Vanguard is required to pay Texas state franchise taxes in order to continue conducting its business pursuant to Texas law.  Vanguard pays the franchise taxes when they come due after taking into account any applicable extensions.  In 2015, Vanguard paid approximately $112,000 in franchise taxes.  For 2016, Vanguard estimates that it owes approximately $240,000 to the State of Texas on account of prepetition franchise taxes, none of which will become due and owing during the interim period.[15]

## Property and Severance Taxes

113.     Various state and local governmental Authorities in the jurisdictions where Vanguard operates levy property taxes, including ad valorem and severance taxes (collectively, "Property and Severance Taxes") against Vanguard's real and personal property.   To avoid the

---

[14]  Property and severance taxes are typically paid up to a year in arrears and therefore the amounts set forth are for calendar year 2015 production.  At this time, Vanguard has not yet received property and severance tax bills for calendar year 2016 production and thus those taxes are not included in this Motion.

[15]  Vanguard also pays approximately $5,000 per year in filing fees related to franchise taxes.

imposition of statutory liens on its real and personal property, as well as other adverse consequences, Vanguard must pay the Property and Severance Taxes in the ordinary course of business on an annual, semi-annual, quarterly, or monthly basis, depending on how the applicable tax is billed.   In some situations, Vanguard pays these taxes on behalf of third parties. For example, where Vanguard acts as the operator on an oil or gas lease, it pays the full amount of Property and Severance Taxes due in connection with the leased property to the Authorities, but a portion of that tax will be reimbursed by contributions from the non-operating holders of interests in the oil and gas lease.

114.    In 2015, Vanguard paid approximately $71 million in Property and Severance Taxes to the Authorities.  Vanguard estimates that approximately $23.1 million in Property and Severance Taxes have been accrued prior to the Petition Date, approximately $8 million of which will be due and payable during the interim period.

### Income Taxes

115.    Vanguard, through certain of its Eagle Rock affiliates, incurs federal income tax liability.  In 2015, Vanguard paid approximately $5,000 in federal income taxes.  As of the Petition Date, Vanguard estimates that it has accrued approximately $22,000 in federal income taxes for 2016.  None of Vanguard's income tax liability will become due and owing during the interim period.  Vanguard expects to settle and pay its remaining federal income tax liability for 2016 in September 2017.

### Environmental and Business Fees

116.    Vanguard incurs a variety of fees related to environmental and conservation laws and regulations, business licensing and annual report fees, permitting, and participation in state regulatory agencies and boards.  Vanguard remits these fees to the relevant Authorities on a monthly, quarterly, or annual basis.

117.    In 2015, the aggregate amount of fees that Vanguard paid was approximately $2.5 million.  As of the Petition Date, Vanguard estimates that it has accrued $2 million in outstanding prepetition environmental and business fee obligations, of which $500,000 will become and owing during the interim period.

118.    To continue operating its businesses, comply with applicable law, and maximize enterprise value, Vanguard must promptly pay the Taxes and Fees.  On behalf of Vanguard, I respectfully submit that the Taxes Motion should be granted.

**IX.    Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Bank Accounts, Business Forms, and Cash Management System, (ii) Waiving Requirements of Section 345 of the Bankruptcy Code, and (III) Authorizing Continuation of Intercompany Transfers (the "<u>Cash Management Motion</u>")**

119.    Pursuant to the Cash Management Motion, Vanguard seeks entry of interim and final orders: (a) authorizing, but not directing, Vanguard to continue using its existing bank accounts, business forms, and Cash Management System, (b) waiving requirements of section 345 of the Bankruptcy Code, and (c) authorizing the continuation of the Intercompany Transfers.

<u>Overview</u>

120.    In the ordinary course of business, Vanguard maintains a comprehensive cash management system (the "<u>Cash Management System</u>") to support its national operations in the oil and natural gas development and production business.  As part of the Cash Management System, Vanguard has multiple bank accounts across three financial institutions (collectively, the "<u>Bank Accounts</u>").

<u>The Bank Accounts</u>

121.    Vanguard's Bank Accounts contain at approximately $35.7 million in cash.  A chart listing the Bank Accounts is attached to the Cash Management Motion as **Exhibit C** and a diagram showing how funds flow among the accounts is attached to the Cash Management Motion as **Exhibit D**.

122.    The Bank Accounts are described as follows:

- To manage daily cash inflows and outflows associated with operations, Vanguard maintains a master deposit account ("Main Operating Account") with Capital One, N.A. ("Capital One") in the name of Vanguard Operating, LLC that collects revenue generated by, and makes payments associated with, its operating activities including by wire, automated clearing-house transfers, and checks. The Main Operating Account is also associated with a lockbox at Capital One that is used to receive checks from other operators on account of joint interest billings.

- Vanguard also maintains a secondary account (the "Secondary Operating Account" and, collectively with the Main Operating Account, the "Operating Accounts"), with Capital One in the name of Vanguard Natural Gas, LLC, for the processing of certain disbursements, including payments on account of its credit facility, hedges, and general and administrative expenses by wire, automated clearing-house transfers, and checks.  The Secondary Operating Account maintains a balance of $250,000, with any excess or deficiency maintained by the Main Operating Account.

- Vanguard maintains one additional zero-balance account with Capital One (the "ZB Account") that is used to make payments on account of interest on Vanguard's notes and to make distributions to equity holders by wire transfers.

- Vanguard maintains one money market deposit account (the "Investment Account") with Citizens Bank, N.A. ("Citizens Bank").  The Investment Account pays a higher rate of interest that would otherwise not be incurred if cash were held only in the Main Operating Account.

- Vanguard maintains one segregated account with Capital One (the "Adequate Assurance Account") that was created to hold funds that will be used to provide adequate assurance of future performance to utilities as proposed in Vanguard's Utilities Motion.  While the Adequate Assurance Account holds no funds pending entry of an order regarding the Utilities Motion, Vanguard proposes to transfer funds to the Adequate Assurance Account by wire, bank, and automated clearing-house transfers and from the Adequate Assurance Account to utilities by wire transfers, automated clearing-house transfers, and checks in accordance with the procedures described in the Utilities Motion.

- Vanguard maintains one deposit account (the "<u>Vendor Account</u>") with Wells Fargo Bank, N.A. ("<u>Wells Fargo</u>") that is used for the primary purpose of paying Wells Fargo, which is Vanguard's vendor for printing and processing royalty checks, for the costs of such printing and processing.[16]  Vanguard transfers funds to the Vendor Account by manual transfer.

- Vanguard maintains one account (the "<u>Segregated Account</u>") with U.S. Bank, N.A. ("<u>U.S. Bank</u>") that serves as a depository account for certain oil royalties earned in Wyoming but by owners that are currently in suspense.  Vanguard transfers funds to the Segregated Account by manual transfers on a monthly basis. The funds in the Segregated Account belong to unknown third-parties, not Vanguard.

- Potato Hills Gas Gathering System ("<u>Potato Hills</u>"), a joint venture and non-Debtor affiliate, maintains a Bank Account (the "<u>Potato Hills Account</u>") at Capital One used for its expenses and revenues.  The Potato Hills Account is a stand-alone account that does not send or receive any automatic transfers from other Bank Accounts.  The Potato Hills Account is considered to be under Vanguard's bank account structure so that it does not incur bank fees.

123.    The United States Trustee for Region 7 has established certain operating guidelines for debtors in possession to supervise administration of chapter 11 cases (the "<u>U.S. Trustee Guidelines</u>").[17]  The U.S. Trustee Guidelines generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the U.S. Trustee.[18]

124.    With the exception of U.S. Bank (which maintains the Segregated Account), all of the banks with which Vanguard has accounts are designated as authorized depositories that have agreed to comply with the requirements of the U.S. Trustee.  Thus, all but one of the Bank

---

[16]  At any given time, the Vendor Account carries a balance of $10,000 to $30,000.

[17]  *See* U.S. Dep't of Justice, *Guidelines for Debtors-in-Possession: United States Trustee Program, Region 7*, https://www.justice.gov/sites/default/files/ustregions/legacy/2014/03/27/01_Guidelines_for_Debtors_In_Possession. pdf.

[18]  *See* U.S. Dep't of Justice, *Southern / Western Districts of Texas: List of Authorized Depositories as of March 17, 2016*, https://www.justice.gov/ust-regions-r07/file/03_authorized_depositories.pdf/download.

Accounts are in compliance with the U.S. Trustee Guidelines with respect to the use of authorized depositories.

125.    Vanguard believes that applying the U.S. Trustee Guidelines to the Bank Accounts would require a substantial modification, if not an abandonment, of its Cash Management System.  The U.S. Trustee Guidelines require chapter 11 debtors to, among other things, (a) close all existing bank accounts and open new debtor-in-possession bank accounts, (b) establish one debtor in possession account for all estate monies required for payment of taxes, including payroll, (c) maintain a separate debtor in possession account for cash collateral, and (d) obtain checks for all debtor in possession accounts which bear the designation "Debtor-In-Possession," state the bankruptcy case number, and list the type of account.[19]

126.    The Bank Accounts are part of the carefully constructed and largely automated Cash Management System that ensures Vanguard's ability to efficiently monitor and control all of its cash (as more fully described below).  Requiring Vanguard to close all existing accounts and open all new accounts would significantly disrupt Vanguard's operations and result in delays in payments to employees, contract counterparties, and creditors.  Closing all existing accounts would also deprive Vanguard of its ability to collect revenue because, while Vanguard can request payment to new accounts, it has no ability to require payors to adjust their payment systems to any new revenue collection system implemented by Vanguard.  If Vanguard implemented a new revenue collection system, such implementation could result in funds due to Vanguard being placed in suspense, which would delay, and potentially ultimately prevent, Vanguard from collecting such revenues.  Such disruptions would severely impede Vanguard's ability to ensure as smooth a transition into chapter 11 as possible.  Accordingly, Vanguard

---

[19] *See id.*

requests that it be permitted to maintain the Bank Accounts, notwithstanding the U.S. Trustee Guidelines.

127.    For similar reasons, Vanguard requests that the Court waive Rule 7(B) of the *Procedures for Complex Chapter 11 Bankruptcy Cases for the United States Bankruptcy Court for the Southern District of Texas*, (the "Complex Chapter 11 Guidelines"),[20] which requires debtors engaged in certain oil and gas activities to maintain a segregated account for funds received after the Petition Date that are attributable to overriding royalties, working interest owners, and third-party funds.   The Debtors have the capacity to track, and have historically tracked, payments and any transfers of funds related to, or on account of, royalty owners, overriding interest owners, working interest owners, and other similar third-party funds (the "Mineral Payments").  Applying the Complex Chapter 11 Guidelines to those Bank Accounts that disburse Mineral Payments would unnecessarily impose substantial costs and administrative burdens on Vanguard and the estates and would delay payments to overriding royalty and mineral interest holders.

128.    Further, funds attributable to Mineral Payments are proposed to be paid by Vanguard postpetition in the ordinary course of business pursuant to the Oil and Gas Obligations Motion.  Vanguard will hold certain Mineral Payments that are due and owing but are otherwise unpayable in suspense and track such funds in accordance with its existing practice.  Given that Mineral Payments will either be made or, if they cannot be made, held in suspense and tracked, Vanguard submits that the application of Rule 7(B) of the Complex Chapter 11 Guidelines to the Cash Management System is unnecessary under the circumstances.

---

[20] *Available at:* http://www.txs.uscourts.gov/sites/txs/files/complex_rules.pdf.

**Business Forms and Checks**

129.     To minimize expenses to its estates, Vanguard also requests that it be authorized to continue to use all correspondence, business forms, and checks existing immediately prior to the Petition Date, without reference to Vanguard's status as debtor in possession.

130.     As a result of the notices Vanguard sent, and the size of and publicity surrounding these cases, parties doing business with a Vanguard Debtor undoubtedly will be aware of its status as chapter 11 debtor in possession.  Changing checks, correspondence, and business forms would be expensive and burdensome to Vanguard and disruptive to Vanguard's business operations, and would provide little real benefit to the parties with whom Vanguard does business.  For these reasons, Vanguard requests that it be authorized to use existing checks and business forms without being required to place the label "Debtor in Possession" on each.

**Credit Card Programs**

131.     As part of its Cash Management System, Vanguard maintains two different credit card programs through Capital One and U.S. Bank (the "Credit Card Programs"). One of these programs is used by approximately twenty-five employees of Vanguard to cover general expenses associated with operating Vanguard's business.  The other program is used only for purchases of gasoline by field workers that utilize Vanguard's vehicle fleet, and has approximately 200 participants.  Vanguard receives bills from Capital One and Emkay Incorporated ("Emkay") (which handles invoicing for Vanguard's Credit Card Program with U.S. Bank) on account of charges incurred through the Credit Card Programs and pays such bills directly to Capital One and Emkay on a monthly basis.  Vanguard does not believe that any amounts are due on account of the Credit Card programs as of the Petition Date.  Capital One and U.S. Bank maintain records of employees that participate in the Credit Card Programs.  The

Credit Card Programs allow Vanguard employees to make operationally necessary purchases, and discontinuation of the Credit Card Programs would disrupt Vanguard's business operations and could potentially cost employees, as described in the following paragraph.

132.    If the Credit Card Programs are discontinued, Capital One and U.S. Bank could attempt to collect funds from such employees, potentially resulting in injury to their personal credit and finances. Accordingly, Vanguard submits that it should be permitted to maintain the Credit Card Programs in the ordinary course as part of its Cash Management System.

**Virtual Card Program**

133.    As part of its Cash Management System, Vanguard established a virtual card payment program (the "Virtual Card Program") with FIS AvantGard LLC ("FIS") in January 2017 to pay vendors that opt in to the program.[21]  Payments made through the Virtual Card Program are subject to the same internal controls that apply to checks and will follow Vanguard's weekly check run schedule.  To make payments through the Virtual Card Program, Vanguard prefunds FIS via automated clearing-house transfers from the Main Operating Account.  In turn, FIS releases the funds to vendors.  Based on current enrollment information, Vanguard estimates that between $550,000 and $1,000,000 in vendor payments will flow though the Virtual Card Program on a monthly basis after the Petition Date.  The Virtual Card Program benefits vendors, allowing them to receive payment several days sooner than traditional check payments.  The company also receives benefits from paying vendors through the Virtual Card Program, as it reduces administrative burdens and results in more timely payments to vendors. Consequently, Vanguard submits that it should be permitted to maintain the Virtual Card Program in the ordinary course as part of its Cash Management System.

---

[21]  All vendors have the option of participating in the Virtual Card Program and do so on a voluntary basis. To participate, vendors register with FIS.

## Cash Management System

134.    As stated above, Vanguard maintains a carefully constructed Cash Management

System that ensures Vanguard's ability to monitor and control all of its cash.  Accordingly, to

avoid disruption of its operations and ensure an orderly transition into chapter 11, Vanguard

requests authorization, but not direction, to continue to use its existing Cash Management

System (as may be modified by Vanguard in the ordinary course of business).

135.    The procedures used by Vanguard to operate its Cash Management System

constitute ordinary, usual, and essential business practices of Vanguard and are consistent with

those used by other major corporate enterprises in the oil and gas industry.  The Cash

Management System provides significant benefits to Vanguard, including the ability to (a) trace

funds through the system and ensure that all transactions are adequately documented and readily

ascertainable, (b) centrally control corporate funds, (c) minimize idle cash, and (d) reduce

administrative expenses by facilitating the movement of funds and the development of more

timely and accurate balance presentment information.  As stated above, requiring Vanguard to

adopt new, segmented cash management systems would be expensive and disruptive.

Consequently, maintenance of the existing Cash Management System during these chapter 11

cases is in the best interests of Vanguard, its estates, and its creditors.

## Waiver of Compliance with Section 345(b) of the Bankruptcy Code

136.    Section 345(a) of the Bankruptcy Code provides that a "trustee in a case under

this title may make such deposit or investment of the money of the estate for which such trustee

serves as will yield the maximum reasonable net return on such money, taking into account the

safety of such deposit or investment."  Section 345(b) further requires that, for deposits and

investments that are not "insured or guaranteed by the United States or by a department, agency,

or instrumentality of the United States or backed by the full faith and credit of the United States," a debtor must require the institution with which the money is deposited or invested to either post a bond or deposit "securities of the kind specified in section 9303 of title 31" unless the court "orders otherwise."

137.     Each Bank Account that is a deposit account is maintained at a bank that is insured by the Federal Deposit Insurance Corporation (the "FDIC") and, therefore, complies with section 345(b) of the Bankruptcy Code.[22]

138.     As part of the Cash Management System, Vanguard maintains its excess cash in conservative investments that satisfy prudent investment guidelines, which have a primary goal of protecting principal and a secondary goal of maximizing yield and liquidity (the "Investment Practices").  Vanguard transfers excess cash to the Investment Account[23] and intends to continue to do so in the future.  The Investment Account is a money market deposit account at a bank that is FDIC insured.  This Investment Account is not invested in securities but instead is a deposit account that pays interest at money market rates.  Moreover, Citizens Bank, which established the Investment Account for Vanguard, is an authorized depository with the U.S. Trustee.  The Investment Practices permit Vanguard to balance its need to access liquidity on a daily basis with protections that are comparable to those contemplated by section 345(b) of the Bankruptcy Code. Requiring Vanguard to bond the Investment Account, as contemplated—unless the Court orders otherwise—by section 345(b) of the Bankruptcy Code, would impose considerable costs on Vanguard's estates.

---

[22]  These banks are authorized depositories with the U.S. Trustee.

[23]  At this time, Vanguard has only transferred $100,000 of excess cash to the Investment Account.

139.     To the extent that Vanguard's accounts do not comply with section 345 of the Bankruptcy Code or any other requirements of the United States Trustee, Vanguard requests that the Court waive any such noncompliance.  Vanguard submits that "cause" exists for such a waiver because, among other things, (a) the banks are highly rated and are federally chartered banks subject to supervision by federal banking regulators in the United States, (b) Vanguard retains the right to remove funds held at the Banks and establish new bank accounts as needed, (c) the cost associated with satisfying the requirements of section 345 is burdensome, and (d) the process of satisfying those requirements would lead to needless inefficiencies in the management of Vanguard's business.  Moreover, the Bank Accounts that are deposit accounts are already required to be bond-insured by the FDIC.  Requiring Vanguard to comply with section 345 of the Bankruptcy Code with respect to such Bank Accounts would amount to requiring the Banks to post a second bond to secure Vanguard's deposits.  Strict compliance with the requirements of section 345 would not, in any event, be practical in these chapter 11 cases.  A bond secured by the undertaking of a corporate surety would be prohibitively expensive, if such a bond is available at all.  Accordingly, Vanguard believes that the benefit of waiving the 345(b) requirement far outweighs any potential harm to the estates.

## Intercompany Transfers

140.     Individual Debtors also engage in financial transactions in the ordinary course of their respective businesses with each other, resulting in discrete transfers (the "Intercompany Transfers") in the appropriate intercompany accounts.  Historically, the majority of these transfers have occurred between Vanguard Operating, LLC (which maintains the Main Operating Account) and Vanguard Natural Gas, LLC (which maintains the Secondary Operating Account).

Vanguard accounts for, and tracks each of, the Intercompany Transfers in the ordinary course and prepares a reconciliation of such transactions at the end of each month.

141.    Vanguard anticipates that the Intercompany Transfers will continue following the Petition Date.  Because Vanguard engaged in the Intercompany Transfers on a regular basis prepetition and such transactions are common for enterprises like Vanguard's, Vanguard believes that such transactions are ordinary course, within the meaning of section 363(c)(1) of the Bankruptcy Code, and thus do not require the Court's approval.  Nonetheless, out of an abundance of caution, Vanguard is seeking express authority to engage in such transactions.[24]

142.    To ensure that each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, Vanguard will continue to maintain records of the Intercompany Transfers, including records of all current intercompany accounts receivable and payable, with balances existing as of the Petition Date.  Accordingly, Vanguard submits that authorizing potential future Intercompany Transfers is in the best interests of its estates and creditors.

143.    Vanguard further requests that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all postpetition payments between or among a Debtor and its affiliate on account of an Intercompany Transfer be accorded status as an administrative expense against the recipient debtor.  This relief will ensure that each entity receiving payments from a Debtor will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions would jeopardize the recoveries available to each Debtor's respective creditors.  For the avoidance of doubt, the relief requested in the Cash Management Motion with respect to the postpetition Intercompany Transfers and the

---

[24]  The Cash Management Motion provides an overview of Vanguard's typical Intercompany Transfers.  The relief requested in the Cash Management Motion is applicable with respect to all Intercompany Transfers and is not limited to those Intercompany Transfers described in the Cash Management Motion.  To the extent that there are any outstanding prepetition obligations related to Intercompany Transfers not described herein, Vanguard, out of an abundance of caution, seeks authority to honor such obligations.

intercompany receivables and payables (the "Intercompany Balances") resulting therefrom does not constitute an admission of Vanguard or any other party as to the validity, priority, or status of any prepetition Intercompany Balance or any Intercompany Transaction from which such Intercompany Balance may have arisen.

### Proposed Payment Processing Procedures

144.     As set forth above, Vanguard requests that all financial institutions be authorized and directed to honor and process payments on account of the Cash Management System as directed by Vanguard.  Vanguard has sufficient liquidity to pay the amounts delineated in the Cash Management Motion in the ordinary course of business and has implemented controls to ensure that prepetition claims will not be paid except as authorized by this Court.  Vanguard therefore submits that the payment processing procedures described in the Cash Management Motion are appropriate.

145.     Vanguard utilizes the Cash Management System on a daily basis to support virtually all aspects of its operations.  On behalf of Vanguard, I respectfully submit that the Cash Management Motion should be granted.

**X.     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Continue Insurance Policies and Surety Bond Program and Pay All Related Obligations, and (II) Authorizing and Directing Banks and Financial Institutions to Honor and Process Checks and Transfers Related to Such Obligations (the "Insurance Motion")**

146.     Pursuant to the Insurance Motion, Vanguard  seeks entry of interim and final orders: (a) authorizing, but not directing, Vanguard to (i) fund the Insurance Policies and pay all premiums and other obligations related thereto, including any taxes, deductibles, administration fees, consulting fees, brokerage fees, assessments, or other fees arising thereunder or in connection therewith, whether arising prepetition (excluding brokerage fees and commissions) or

48

postpetition (collectively, the "Insurance Obligations"), (ii) enter into new insurance coverage, as needed, in its business judgment, (iii) continue and maintain its Surety Bond Program, (iv) pay all premiums and other related obligations, including any commissions arising under, or in connection with, the Surety Bond Program (the "Surety Obligations"), that become due and payable, or are related to the period after, the Petition Date, in the ordinary course of business and (v) renew, revise, extend, supplement, change, or enter into new surety bond programs, as needed, in its business judgment and consistent with past practices and (b) authorizing and directing the banks to honor and process checks and transfers related to such obligations.

## Vanguard's Insurance Policies

147.     Vanguard maintains various insurance policies that provide coverage to Vanguard for both general commercial business risks and risks specific to the exploration and production industry, including, but not limited to, coverage for Vanguard's general liability, pollution liability, directors' and officers' liability, employment liability, automobile liability, loss of production income, various control of well policies, and property liability (collectively, the "Insurance Policies").  The Insurance Policies, which Vanguard obtained from third-party insurance carriers (collectively, the "Insurers"), and their corresponding annual premiums, are listed on **Exhibit C** attached to the Insurance Motion.

148.     The Insurance Policies are essential to the protection and continued functioning of Vanguard's business.  Under the Insurance Policies, Vanguard is required to pay premiums based on fixed rates set by the Insurers.  Vanguard pays approximately $1.6 million in annual premiums.[25]  Vanguard is also required to pay deductibles and self-insured retention amounts

---

[25]  Vanguard recently renewed all but one of its insurance policies at a cost of approximately $1.6 million.  The remaining insurance policy was obtained recently will not to be renewed for six years. The premium for this policy is $198,000. Vanguard did not include this premium in the overall $1.6 million amount, as the policy is not renewable on an annual basis and will not need to be renewed until 2023.

under certain of the Insurance Policies for claims asserted against it.  Vanguard believes that no balance is outstanding on account of insurance premiums that are due and owing as of the Petition Date, though premium payments may come due during the pendency of Vanguard's chapter 11 cases.

149.    To the extent that any premiums, deductibles, or self-insured retentions due under the Insurance Policies may be attributed to prepetition insurance coverage, Vanguard believes that payment of those amounts would be necessary to obtain the continued benefits of insurance coverage and ensure continued coverage.  Similarly, Vanguard is confident that continued payment of premiums for the Insurance Policies, as such premiums come due in the ordinary course of business, is necessary.

150.    Continuation and renewal of the Insurance Policies, as well as the ability to enter into new insurance policies, is essential to preserving the value of Vanguard's businesses, properties, and assets.  In many cases, the coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern Vanguard's commercial activities. Moreover, the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees, issued by the United States Trustee for Region 7 (rev. 1/31/14) (the "U.S. Trustee Guidelines")[26] require Vanguard to maintain insurance coverage throughout the pendency of these chapter 11 cases.  Accordingly, Vanguard requests authority to fund obligations under its existing Insurance Policies and to revise, extend, supplement, renew, change, or enter into new insurance coverage, as needed in its business judgment.

---

[26] *See* U.S. Dep't of Justice, *Region 7 Guidelines for Debtors-in-Possession,* https://www.justice.gov/sites/ default/files/ust-regions/legacy/2014/03/27/01_Guidelines_for_Debtors_In_Possession.pdf.

**Insurance Broker**

151.     Vanguard employs McGriff, Seibels & Williams, Inc. (the "Broker") to assist

with the procurement and negotiation of its Insurance Policies.  As of the Petition Date,

Vanguard is not aware of any other fees or commissions owed to its Broker for any Insurance

Policy.  Vanguard seeks authorization, pursuant to section 363(c) of the Bankruptcy Code, to pay

postpetition Broker commissions as necessary in the ordinary course of business and pay any

such undisputed obligations, in its discretion, as they come due, in order to avoid any disruption

in its insurance coverage.

**Surety Bond Program**

152.     In the ordinary course of business, Vanguard is required to provide surety bonds

to certain third parties to secure Vanguard's payment or performance of certain obligations, often

to governmental units or other public agencies (the "Surety Bond Program"), regarding the

operation of Vanguard's wells.  The bonds that comprise Vanguard's Surety Bond Program are

listed on **Exhibit D** attached to the Insurance Motion.  These may include plugging and

abandonment obligations, environmental obligations, licensing requirements, and road damage

obligations.  Often, statutes or ordinances require Vanguard to post surety bonds to secure such

obligations.  Failure to provide, maintain, or timely replace its surety bonds may prevent

Vanguard from undertaking essential functions related to its operations.  With the exception of a

surety bond issued by IFIC (as defined below), no collateral has been provided to sureties as

security for obligations under Vanguard's Surety Bond Program.

153.     The issuance of a surety bond shifts the risk of Vanguard's nonperformance or

nonpayment from Vanguard to a surety.  But unlike an insurance policy, if a surety incurs a loss

on a surety bond, it is entitled to recover the full amount of that loss from the principal.  To that

end, Vanguard Operating LLC is party to a series of indemnity agreements that set forth the

sureties' rights to recover from Vanguard (the "Surety Indemnity Agreements").  Pursuant to the

Surety Indemnity Agreements, Vanguard agrees to indemnify the surety from any loss, cost, or

expense which the surety may incur on account of the issuance of any bonds on behalf of

Vanguard.

154.    The premiums for the surety bonds are generally determined on an annual basis

and are paid by Vanguard when the bonds are issued and annually upon each renewal.  Annual

premiums for Vanguard's surety bonds total approximately $325,000.  Vanguard's outstanding

surety bonds were issued separately by the Hanover Insurance Company ("Hanover"), US

Specialty Insurance Company ("US Specialty"), and International Fidelity Insurance Company

("IFIC") (collectively, the "Sureties").  Only the lone IFIC bond, for approximately $1.4 million,

is secured.[27]  The remaining bonds are unsecured.  As of January 1, 2017 Vanguard had

approximately $22.7 million in outstanding surety bonds.

155.    To continue its business operations during the reorganization process, Vanguard

must be able to provide financial assurances to state governments, regulatory agencies, and other

third parties.  To maintain the existing Surety Bond Program, Vanguard requests the authority,

but not direction, to pay obligations incurred in the ordinary course of business to the Sureties as

they come due, including the bond premiums and any bond commissions as needed.  In addition,

Vanguard seeks authority to renew or potentially acquire additional bonding capacity as needed

in the ordinary course of its business, and execute other agreements in connection with the

Surety Bond Program.

156.    Vanguard does not believe that any prepetition premiums remain outstanding as

of the Petition Date.  Vanguard does not expect, to the best of its knowledge, to incur any

---

[27]  The IFIC bond is secured by $300,000 worth of collateral.

indemnity obligations to the Sureties under Surety Indemnity Agreements regarding surety bonds that are renewed or issued postpetition because Vanguard expects to fulfill the obligations that have been, or will be, bonded by such surety bonds in the ordinary course of business.

157.    To preserve the value of its businesses and comply with applicable law, Vanguard must maintain insurance coverage and continue its Surety Bond Program.  On behalf of Vanguard, I respectfully submit that the Insurance Motion should be granted.

**XI.     Debtors' Emergency Motion for Entry of Interim and Final Orders (I) (A) Authorizing Debtors to Obtain Post-Petition Senior Secured Superpriority Financing and  (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "DIP Motion")**

158.    The proposed debtor-in-possession credit agreement (the "DIP Credit Agreement") contemplates a postpetition, super priority, senior secured revolving credit facility in the aggregate principal amount of up to $50,000,000 (the "DIP Facility").  The DIP Credit Agreement authorizes the Debtors to borrow up to $15 million of the DIP Facility loans on an interim basis and will provide the Debtors with consensual access to the use of Prepetition Lenders' cash collateral.  The DIP Credit Agreement contains certain milestones, as set forth in the DIP Motion and Interim DIP Order, that the Debtors must meet throughout their chapter 11 cases.  Failure to meet such milestones constitutes an event of default under the DIP Credit Agreement.  These milestones were negotiated and required by the lenders under the DIP Credit Agreement as a condition to the DIP Facility.  The Debtors believe that these milestones are fair and appropriate, are achievable, and will permit sufficient time to pursue a restructuring that maximizes value.  The Debtors successfully negotiated postpetition financing from the only viable sources on terms that are fair and reasonable under the circumstances.  The DIP Facility will provide the Debtors with an opportunity to implement their restructuring plan.

159.     It is essential that the Debtors immediately obtain the proposed financing, which is necessary to preserve and protect the value of their estates.  As I noted above, the decline in oil and natural gas prices has adversely affected the Debtors' liquidity.  The liquidity provided by the DIP Facility is necessary to, among other things, ensure that the Debtors are able to meet their obligations, including payroll obligations, as they come due and avoid disruption to their operations.  As is typical in its industry, Vanguard's business is cash intensive, with significant daily costs to manage and develop oil and natural gas properties, satisfy obligations to employees, maintain the safety of its operations, and fulfill environmental and other regulatory requirements.  To ensure a seamless transition into chapter 11, operate their businesses, preserve value, and pursue their restructuring goals, the Debtors require immediate access to postpetition financing and the use of Cash Collateral.

160.     Vanguard, in consultation with its advisors, has reviewed and analyzed its projected cash needs and has prepared a DIP Budget (as updated from time to time in accordance with the DIP Credit Agreement) outlining Vanguard's postpetition cash needs during the anticipated length of these cases. Vanguard believes that the DIP Budget is an accurate reflection of its funding requirements over the identified period, will allow it to meet its obligations, and is reasonable and appropriate under the circumstances.  Furthermore, I believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the DIP Facility and the DIP Budget.

161.     Immediate and ongoing access to funding under the DIP Facility will demonstrate to its employees, vendors, suppliers, and other key constituencies and parties in interest that Vanguard has sufficient resources available to meet its obligations in the ordinary course during these cases.  Additionally, without immediate access to available funds under the DIP Facility

and the continued and uninterrupted use of Cash Collateral, Vanguard's businesses operations would be put at risk of serious and immediate impairment.  In such an event, Vanguard would face the loss of cooperation from certain of its key supporters, and the entire success of its restructuring would be imperiled.  This would then force Vanguard to modify its operations in a significant and adverse manner, which I believe could hamper Vanguard's ability to maximize the value of its estates.  In sum, without the relief requested, I believe Vanguard would suffer substantial, irreparable and ongoing harm. Accordingly, Vanguard's need for access to postpetition financing and the use of Cash Collateral on the terms set forth in the DIP Credit Agreement and the DIP Orders is immediate and urgent.

162.    On behalf of Vanguard, I respectfully submit that the DIP Motion should be granted.

## __EXHIBIT 2__

**Corporate Organizational Structure**

**(Attached.)**



# **EXHIBIT 3**

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO A PLAN OF REORGANIZATION.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

---

### VANGUARD NATURAL RESOURCES, LLC

### RESTRUCTURING SUPPORT AGREEMENT

**February 1, 2017**

---

This Restructuring Support Agreement (together with the exhibits attached hereto, and as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), dated as of February 1, 2017, is entered into by and among:  (i) Vanguard Natural Resources, LLC, a Delaware limited liability company ("VNR," together with its direct and indirect subsidiaries, the "Debtors" or the "Company," each a "Debtor"), (ii) certain holders of those certain 7.0% Senior Secured Second Lien Notes due 2023 (the "Second Lien Notes," and all claims and obligations arising under or in connection with the Second Lien Notes, the "Second Lien Note Claims") issued under the Indenture dated February 10, 2016, by and among VNR, VNR Finance Corp. ("VNR Finance"), and U.S. Bank National Association, as trustee, that are signatories hereto (collectively, the "Consenting Second Lien Note Holders" and the amount of claims held by the Consenting Second Lien Note Holders at any time, the "Consenting Second Lien Note Holder Claims"); (iii) certain holders of those certain 7.875% Senior Notes due 2020 (the "2020 Notes", and all claims and obligations arising under or in connection with the 2020 Notes, the "2020 Note Claims") issued under the Indenture dated April 4, 2012, by and among VNR, VNR Finance, and U.S. Bank National Association, as trustee, that are signatories hereto (collectively the "Consenting 2020 Note Holders" and the amount of claims held by the Consenting 2020 Note Holders at any time, the "Consenting 2020 Note Holder Claims"); and (iv) certain holders of those certain 8 3/8% Senior Notes due 2019 (the "2019 Notes" and together with the 2020 Notes, the "Senior Notes", and all claims and obligations arising under or in connection with the 2019 Notes, the "2019 Note Claims" and together with the 2020 Note Claims, the "Senior Note Claims") issued under the Indenture dated as of May 27, 2011, among Eagle Rock Energy Partners, L.P., Eagle Rock Energy Finance Corp., and U.S. Bank National Association, as trustee, that are signatories hereto (the "Consenting 2019 Note Holders," and together with the Consenting 2020 Note Holders, the "Consenting Senior Note Holders", and the amount of claims held by the Consenting 2019 Note Holders at any time, the "Consenting 2019 Note Holder Claims" and together with the Consenting 2020 Note Holder Claims, the "Consenting Senior Note Holder Claims").  "Restructuring Support Parties" shall mean the Consenting Second Lien Note Holders and the Consenting Senior Note Holders.  This Agreement collectively refers to the Debtors, the Restructuring Support Parties, and each other person that becomes a party to this Agreement in accordance with its terms as the "Parties" and each individually as a "Party."

**RECITALS**

WHEREAS, the Parties have engaged in good faith, arm's-length negotiations regarding a restructuring transaction (the "Restructuring") pursuant to the terms and conditions set forth in this Agreement, including a proposed joint chapter 11 plan of reorganization for the Debtors on terms consistent with the Plan Term Sheet attached hereto as Exhibit A (the "Term Sheet") and incorporated by reference pursuant to Section 2 hereof (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with this Agreement, the "Plan"); and

WHEREAS, certain Consenting Second Lien Note Holders (the "2L Investors") have committed to purchase $19.25 million of New Equity Interests (as defined in the Term Sheet) pursuant to a commitment agreement (the "Equity Commitment Agreement") on terms consistent with the Term Sheet and subject to executing such agreement, the initial amount of the several commitment of each 2L Investor under the Equity Commitment Agreement (their "Equity Commitment") is set forth on Exhibit D hereto; and

WHEREAS, certain Consenting Senior Note Holders (the "Backstop Parties") have committed to backstop the Senior Notes Rights Offering (as defined in the Term Sheet) pursuant to a backstop commitment agreement (the "Backstop Commitment Agreement") on terms consistent with the Term Sheet and subject to executing such agreement, the initial amount of the several commitment of each Backstop Party under the Backstop Commitment Agreement (their "Backstop Commitment") is set forth on Exhibit E hereto; and

WHEREAS, it is contemplated that the Restructuring will be implemented, pursuant to the Plan; through a voluntary case commenced by the Debtors (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), and

WHEREAS, this Agreement is not intended to be and shall not be deemed to be a solicitation for acceptances of any chapter 11 plan;

NOW, THEREFORE, in consideration of the promises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

**AGREEMENT**

1.    RSA Effective Date.  This Agreement shall become effective (the "RSA Effective Date"), and the obligations contained herein shall become binding upon the Parties, upon the execution and delivery of counterpart signature pages to this Agreement by and among (a) VNR, (b) Consenting Second Lien Note Holders holding, in aggregate, at least two thirds in principal amount outstanding of all Second Lien Note Claims, and (c) Consenting Senior Note Holders holding, in aggregate, at least a majority in principal amount outstanding of all 2020 Note Claims.

2.    Exhibits and Schedules.  Each of the exhibits and schedules attached hereto (collectively, the "Exhibits and Schedules") is expressly incorporated herein and made a part of

2

this Agreement, and all references to this Agreement shall include the Exhibits and Schedules. Subject to the following sentence, in the event of any inconsistencies between the terms of this Agreement and the Plan, (a) prior to the Effective Date (as defined below), this Agreement shall govern, and (b) on and after the Effective Date, the Plan shall govern.  In the event of any inconsistency between this Agreement (without reference to Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to Exhibits and Schedules) shall govern.

3.      <u>Definitive Documentation</u>.      The definitive documents and agreements (the "<u>Definitive Documentation</u>") governing the Restructuring shall include: (a) the Plan (and all schedules, exhibits and supplements thereto); (b) the order approving and confirming the Plan, including the settlements described therein (the "<u>Confirmation Order</u>"); (c) the disclosure statement (and all exhibits thereto) with respect to the Plan (the "<u>Disclosure Statement</u>"); (d) the solicitation materials with respect to the Plan (collectively, the "<u>Solicitation Materials</u>"); (e) the order approving the Disclosure Statement and the Solicitation Materials (the "<u>DS Order</u>"); (f) the interim (the "<u>Interim DIP Order</u>") and final (the "<u>Final DIP Order</u>") orders authorizing the use of cash collateral and/or the entry into debtor in possession financing; (g) any credit agreement for debtor-in-possession financing (the "<u>DIP Facility</u>"); (h) the Backstop Commitment Agreement; (i) the order approving the entry into the Backstop Commitment Agreement; (j) the Equity Commitment Agreement; (k) any order approving the Equity Commitment Agreement; and (l) the documents identified on <u>Exhibit C</u> hereto that will comprise the Plan Supplement.  The Definitive Documentation identified in the foregoing sentence (i) remains subject to negotiation and completion (ii) shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, (iii) shall (except with respect to the Definitive Documentation referenced in subsection (f) and (g))otherwise be in form and substance satisfactory to the Debtors and those parties holding more than 66.66% of the Backstop Commitments as identified on <u>Exhibit E</u> (the "<u>Required Consenting Senior Note Holders</u>"), and (iv) shall, with respect to the Equity Commitment Agreement, the order approving the Equity Commitment Agreement, and the notes to be issued to the holders of Allowed Second Lien Notes Claims under the Plan, be otherwise in form and substance reasonably satisfactory to Consenting Second Lien Note Holders holding more than 66.66% of the Consenting Second Lien Note Holder Claims (the "<u>Required Consenting Second Lien Note Holders</u>").    The Debtors will use commercially reasonable efforts to provide draft copies of the Definitive Documentation that the Debtors intend to file with the Bankruptcy Court (other than "first day" motions) to counsel to the Restructuring Support Parties at least two (2) business days before the date on which Debtors intend to file such documents or as soon as reasonably practicable thereafter.

4.      <u>Milestones</u>.  VNR shall implement the Restructuring on the following timeline (in each case, a "<u>Milestone</u>"):

(a)      VNR shall commence the Chapter 11 Case on or before February 3, 2017;

(b)      no later than 20 days after the date of the commencement of the Chapter 11 Case (the "<u>Petition Date</u>"), the Debtors shall file with the Bankruptcy Court (i) the Plan, (ii) the Disclosure Statement, and (iii) a motion seeking entry of an order approving the Backstop Commitment Agreement and the Equity Commitment Agreement;

(c)        no later than 50 days after the Petition Date, the Bankruptcy Court shall enter orders approving the Backstop Commitment Agreement and the Equity Commitment Agreement;

(d)        no later than 65 days after the Petition Date, the Bankruptcy Court shall enter the DS Order;

(e)        no later than 125 days after the Petition Date, the Bankruptcy Court shall enter the Confirmation Order; and

(f)        no later than 155 days after the Petition Date, the Company shall have received all necessary regulatory and other required approvals and consents to consummate the Restructuring in accordance with the Agreement, the Plan and Confirmation Order and the effective date of the Plan (the "Effective Date") shall occur.

Notwithstanding the above, a specific Milestone may be extended or waived with the express prior written consent of the Debtors and the Required Consenting Senior Note Holders; provided that (i) the Milestone set forth in section (c) may not be extended with respect to the Equity Commitment Agreement without the consent of the Required Consenting Second Lien Holders, unless (x) such Milestone is extended to same extent with respect to the Backstop Commitment Agreement and (y) no order approving the Backstop Commitment Agreement has been entered and (ii) the Milestone set forth in section (e) may not be extended beyond 185 days without the consent of the Required Consenting Second Lien Note Holders.

5.        <u>Commitment of Restructuring Support Parties</u>.

(a)        From the RSA Effective Date and until the occurrence of a Termination Date (as defined below), each Restructuring Support Party shall (severally and not jointly), but without limiting the consent and approval rights provided by this Agreement:

(i)        support and take all commercially reasonable actions necessary or requested by the Debtors to facilitate consummation of the Restructuring in accordance with the terms and conditions of this Agreement and the Term Sheet including without limitation, to (A) if applicable, following receipt of an approved Disclosure Statement, timely vote to accept the Plan, in accordance with the applicable procedures set forth such Disclosure Statement and Solicitation Materials, with respect to each and all of its claims (as defined in section 101(5) of the Bankruptcy Code) against, and interests in, the Company, now or hereafter owned by such Restructuring Support Party or for which it now or hereafter serves as the nominee, investment manager, or advisor for holders thereof, and (B) to the extent such election is available, not elect on its ballot to preserve claims, if any, that each Restructuring Support Party may own or control that may be affected by any releases contemplated by the Plan;

(ii)        not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its vote with respect to the Plan; *provided*, *however*, that the

vote(s) of a Restructuring Support Party shall be immediately revoked, withdrawn, and deemed void *ab initio* upon the occurrence of the Termination Date with respect to such Restructuring Support Party;

(iii)   except as otherwise permitted hereunder, use commercially reasonable efforts not to (1) object to, delay, impede, or take any other action to interfere with, directly or indirectly, the Restructuring, confirmation of the Plan, or approval of the Disclosure Statement, or (2) propose, file, support, or vote for, directly or indirectly, any restructuring, workout, or chapter 11 plan for the Debtors other than the Restructuring and the Plan;

(iv)   not commence any proceeding to oppose or alter any of the terms of the Plan (provided that the Plan is consistent in all material respects with the terms and conditions of this Agreement and has received the consents required by Section 3 hereof);

(v)   support (and not object to) the "first-day" motions and other motions consistent with this Agreement filed by the Debtors in furtherance of the Restructuring, provided that the Debtors have complied with Section 12 hereof; and provided further that nothing in this Agreement shall prevent a Restructuring Support Party from opposing any term or condition contained in (or proposed to be contained in) the Interim DIP Order, the Final DIP Order, or the DIP Facility;

(vi)   not take, nor encourage any other person or entity to take, any action, including, without limitation, initiating or joining in any legal proceeding, which is materially inconsistent with this Agreement and could reasonably be expected to interfere with the approval, acceptance, confirmation, consummation, or implementation of the Restructuring or the Plan, as applicable; and

(vii)   not instruct (or join in any direction requesting that) Delaware Trust Company (or its successor, as applicable), as trustee under the Second Lien Notes, UMB. Bank, National Association (or its successor, as applicable) as trustee under the 2020 Notes, or Wilmington Savings Fund Society, FSB (or its successor, as applicable) as trustee under the 2019 Notes to take any action, or refrain from taking any action, that would be inconsistent with this Agreement or the Restructuring.

Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by any Restructuring Support Party nor the acceptance of the Plan by any Restructuring Support Party shall (y) be construed to prohibit any Restructuring Support Party from contesting whether any matter, fact, or thing is a material breach of, or is materially inconsistent with, this Agreement or (z) be construed to prohibit any Restructuring Support Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring.

LEGAL_US_W # 88666596.2

6.     <u>Commitment of the Debtors</u>.  From the RSA Effective Date and until the occurrence of a Termination Date:

(a)     subject to paragraph (c) below, the Debtors (i) agree to (A) support and complete the Restructuring and all transactions set forth in the Plan and this Agreement (in accordance with the terms of this Agreement), (B) complete the Restructuring and all transactions set forth or described in the Plan in accordance with the Milestones set forth in <u>Section 4</u> of this Agreement, (C) take all reasonably necessary actions in furtherance of the Restructuring, this Agreement, and the Plan, including prompt execution and delivery of Definitive Documentation and promptly seeking Bankruptcy Court approval of the Definitive Documentation, (D) pay the fees and expenses required by <u>Section 17</u>, (E) make commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring, (F) oppose any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (x) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (y) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (z) dismissing the Chapter 11 Cases, (G) oppose any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable, and (H) use all commercially reasonable efforts necessary to implement a hedging program that is acceptable to the Required Consenting Senior Note Holders (a "<u>Consensual Hedge Program</u>") and (ii) shall not undertake any actions materially inconsistent with the adoption and implementation of the Plan and confirmation thereof.

(b)     the Debtors shall, subject to the paragraph (c) below, not, directly or indirectly: (i) seek, solicit, or support any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of assets, financing (debt or equity), or restructuring of the Debtors, other than the Plan and Restructuring Transactions (an "<u>Alternative Transaction</u>"), and (ii) cause or allow any of their affiliates or any of their respective directors, officers, employees, agents, advisors or other representatives (collectively its "<u>Representatives</u>") to solicit any agreements (or continue any existing solicitation) relating to an Alternative Transaction; <u>provided that</u> the sale of the assets related to Glasscock County Texas shall not constitute an Alternative Transaction.

(c)     for the avoidance of doubt and without limiting the foregoing, in order to fulfill the Debtors' fiduciary obligations, the Debtors and their respective agents and representatives may receive (but not solicit) proposals or offers for Alternative Transactions from third parties without breaching or terminating this Agreement and, subject to the terms of this Agreement, may discuss and provide due diligence to third parties in connection with such bona fide, written, unsolicited proposals or offers that did not result from a

breach of this Agreement; provided, that the Debtors' shall (a) provide a copy of any written offer or proposal (and notice of any oral offer or proposal) for an Alternative Transaction within one (1) business day of the Debtors' or their advisors' receipt of such offer or proposal received to the respective legal counsel and the financial advisors to the Restructuring Support Parties; (b) provide such information to the respective advisors to the Restructuring Support Parties regarding such discussions (including the identity of the proposing person(s) and copies of any materials provided to such parties hereunder) as necessary to keep the Restructuring Support Parties contemporaneously informed as to the status and substance of such discussions; and (c) to the extent the Debtors or their Representatives furnish any non-public information to the person proposing such Alternative Transaction, they shall simultaneously furnish such information to the respective legal counsel and financial advisors to the Restructuring Support Parties.

7.     <u>Consenting Senior Note Holder Termination Events</u>.  The Required Consenting Senior Note Holders shall have the right, but not the obligation, upon five (5) days' written notice to the Company and counsel to the Consenting Second Lien Note Holders, to terminate the obligations of their Consenting Senior Note Holders under this Agreement upon the occurrence of any of the following events (each, a "<u>Consenting Senior Note Holder Termination Event</u>"), unless waived, in writing, by the Required Consenting Senior Note Holders on a prospective or retroactive basis:

(a)     the failure to meet any Milestone in <u>Section 4</u> unless (i) such failure is the result of any act, omission, or delay on the part of Consenting Senior Note Holders in violation of its obligations under this Agreement or (ii) such Milestone is extended in accordance with <u>Section 4</u>;

(b)     the occurrence of a material breach of this Agreement by the Company that has not been cured (if susceptible to cure) within five (5) business days after the receipt by the Company of written notice of such breach;

(c)     entry of an order by the Bankruptcy Court converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

(d)     entry of an order by the Bankruptcy Court appointing a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in the Chapter 11 Case;

(e)     entry of an order by the Bankruptcy Court terminating any Debtor's exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

(f)     any Debtor amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation, unless such amendment or modification is (i) consistent in all material respects with this Agreement and (ii) acceptable in form and substance to the Required Consenting Senior

LEGAL_US_W # 88666596.2

Note Holders;

(g)     entry of an order by the Bankruptcy Court amending or modifying the Definitive Documentation, unless such amendment or modification is (i) consistent in all material respects with this Agreement and (ii) reasonably acceptable to the Required Consenting Senior Note Holders;

(h)     either (i) the Debtors determine to pursue any Alternative Transaction, including any plan of reorganization (other than the Plan) or (ii) any Debtor files, propounds, or otherwise publicly supports or announces that any Debtor will support any Alternative Transaction, including any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any material assets, without the prior written consent of the Required Consenting Senior Note Holders;

(i)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring; provided, however, that the Debtors shall have five (5) business days after issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement and (ii) is reasonably acceptable to the Required Consenting Senior Note Holders;

(j)     a breach by any Debtor of any representation, warranty, or covenant of such Debtor set forth in this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the Restructuring that (if susceptible to cure) remains uncured for a period of ten (10) business days after the receipt by the Company of written notice of such breach;

(k)     the filing by the Debtors of any Definitive Documentation that does not comply with Section 3 of this Agreement;

(l)     the declaration of an event of default under the Interim DIP Order, the Final DIP Order, or a DIP Facility;

(m)     the termination of the Backstop Commitment Agreement or Equity Commitment Agreement, in each case in accordance with its terms;

(n)     the Required Consenting Second Lien Note Holders terminate this Agreement as set forth in Section 8 of this Agreement; or

(o)      the occurrence of the maturity date of a DIP Facility.

Notwithstanding anything to the contrary in this Agreement, following the commencement of the Chapter 11 Cases and unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and/or termination of this Agreement in accordance with its terms

is not prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code (the "Automatic Stay"), the occurrence of any Consenting Senior Note Holder Termination Event shall result in an automatic termination of this Agreement as to the Consenting Senior Note Holders five (5) business days following such occurrence unless waived in writing by the Required Consenting Senior Note Holders.

8.    Consenting Second Lien Note Holder Termination Events.    The Required Consenting Second Lien Note Holders shall have the right, but not the obligation, upon five (5) days' written notice to the Company and counsel to the Consenting Senior Note Holders, to terminate the obligations of the Consenting Second Lien Note Holders under this Agreement upon the occurrence of any of the following events (each, a "Consenting Second Lien Note Holder Termination Event"), unless waived, in writing, by the Required Consenting Second Lien Note Holders on a prospective or retroactive basis:

(a)    the failure to meet any Milestone in Section 4 unless (i) such failure is the result of any act, omission, or delay on the part of Consenting Second Lien Note Holders in violation of its obligations under this Agreement or (ii) such Milestone is extended in accordance with Section 4;

(b)    the filing by the Debtors of any Definitive Documentation that is inconsistent with the treatment provided to Second Lien Note Claims or the 2L Investment in the Term Sheet;

(c)    the filing by the Debtors of any Definitive Documentation that does not have the consent required by Section 3 (iv), to the extent such consent is required by such subsection;

(d)    entry of an order by the Bankruptcy Court amending or modifying the Definitive Documentation, unless such amendment or modification is consistent in all material respects with the treatment provided to Second Lien Note Claims or the 2L Investment in the Term Sheet;

(e)    the termination of the Equity Commitment Agreement in accordance with its terms; or

(f)    the Required Consenting Senior Note Holders terminate this Agreement as set forth in Section 7 of this Agreement.

Notwithstanding anything to the contrary in this Agreement, following the commencement of the Chapter 11 Cases and unless and until there is an unstayed order of the Bankruptcy Court providing that the giving of notice under and/or termination of this Agreement in accordance with its terms is not prohibited by the Automatic Stay, the occurrence of any Consenting Second Lien Note Holder Termination Event shall result in an automatic termination of this Agreement as to the Consenting Second Lien Note Holders five (5) business days following such occurrence unless waived in writing by the Required Consenting Second Lien Note Holders.

9.    VNR Termination Events.    VNR may, in its sole discretion, terminate this Agreement as to all Parties upon five (5) days' written notice to the Restructuring Support Parties following the occurrence of any of the following events (each a "Company Termination Event"

9

and, together with the Consenting Senior Note Holder Termination Events, and the Consenting Second Lien Note Holder Termination Events the "Termination Events"):

> (a)     a breach by a Restructuring Support Party of any of the representations, warranties, or covenants of such Restructuring Support Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the Restructuring that (if susceptible to cure) remains uncured for a period of ten (10) business days after the receipt by such Restructuring Support Party of written notice of such breach; provided that in the event such breach is a breach solely of Consenting Second Lien Note Holders such breach may be cured by the Consenting Senior Note Holders;

> (b)     a breach by any Restructuring Support Party of any of its obligations under this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring or the consummation of the Restructuring that (if susceptible to cure) remains uncured for a period of ten (10) business days after the receipt by all Restructuring Support Parties of written notice of such breach provided that in the event such breach is a breach solely of Consenting Second Lien Note Holders such breach may be cured by the Consenting Senior Note Holders;

> (c)     VNR determines that continued pursuit or support of the Restructuring (including, without limitation, the Plan or the solicitation of the Plan) would be inconsistent with the exercise of its fiduciary duties;

> (d)     the Required Consenting Senior Note Holders terminate this Agreement as set forth in Section 7 of this Agreement; or

> (e)     the issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling, or order preventing the consummation of a material portion of the Restructuring.

10.     Mutual Termination; Automatic Termination. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement by and among VNR, on behalf of itself and each other Debtor, and the Required Consenting Senior Note Holders. Notwithstanding anything in this Agreement to the contrary, this Agreement and the obligations of all Parties hereunder shall terminate automatically on the Effective Date.

11.     Effect of Termination.

(a)     The earliest date on which a Party's termination of this Agreement is effective in accordance with Section 7, Section 8, Section 9, or Section 10 of this Agreement shall be referred to as a "Termination Date." Upon the occurrence of a Termination Date (w) under Section 7, the obligations of the Consenting Senior Note Holders shall be terminated immediately and such holders shall be released from their respective commitments, undertakings, and agreements hereunder and all other Parties hereto are released from their commitments, undertakings, and agreements to the Consenting Senior Note Holders, (x) under Section 8, the obligations of the

10

Consenting Second Lien Note Holders shall be terminated immediately and such holders shall be released from their respective commitments, undertakings, and agreements hereunder and all other Parties hereto are released from their commitments, undertakings, and agreements to the Consenting Second Lien Note Holders, and (y) under Section 9 or Section 10, all Parties' obligations under this Agreement shall be terminated effective immediately, and all Parties hereto shall be released from their respective commitments, undertakings, and agreements hereunder; provided, however, that in each case, each of the following shall survive such termination and all rights and remedies with respect to such claims shall not be prejudiced in any way: (i) any claim for breach of this Agreement that occurs prior to such Termination Date and (ii) this Section 11 and Sections 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 33, 34, 35 and 36.  Termination shall not relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the Termination Date.

12.     Cooperation and Support. VNR shall provide draft copies of all "first day" motions and "second day" motions that any Debtor intends to file with the Bankruptcy Court to counsel for the Restructuring Support Parties at least three (3) business days (or as soon thereafter as is reasonably practicable under the circumstances) prior to the date when such Debtor intends to file such document, and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court. The Debtors will use reasonable efforts to provide draft copies of all other material pleadings any Debtor intends to file with the Bankruptcy Court to counsel to the Restructuring Support Parties at least two (2) business days prior to filing such pleading and shall consult in good faith with such counsel regarding the form and substance of any such proposed pleading.  For the avoidance of doubt, the Parties agree to negotiate in good faith the Definitive Documentation that is subject to negotiation and completion, consistent with the last sentence of Section 3 hereof and the Term Sheet.

13.     Transfers of Claims and Interests.

(a)     Each Restructuring Support Party shall not (i) sell, transfer, assign, hypothecate, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Restructuring Support Party's claims against, or interests in, any Debtor, as applicable, in whole or in part, or (ii) deposit any of such Restructuring Support Party's claims against, or interests in, any Debtor, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims or interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "Transfer" and the Restructuring Support Party making such Transfer is referred to herein as the "Transferor"), unless such Transfer is to (a) another Restructuring Support Party and notice of such Transfer is provided to counsel to VNR and counsel to the Consenting Second Lien Note Holders or Consenting Senior Note Holders, as applicable or (b) any other entity that agrees, in writing, to be bound by the terms of this Agreement by executing and delivering to VNR, a Transferee Joinder substantially in the form attached hereto as Exhibit B (the "Transferee Joinder").  With respect to claims against, or interests in, a Debtor held by the relevant transferee upon consummation of a Transfer in accordance herewith, such transferee shall be deemed to make all of the representations, warranties, and covenants of a Restructuring Support Party, as applicable, set forth in this Agreement, and shall be deemed to be a Party and a Restructuring Support Party for all purposes under the Agreement.  Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights under this Agreement solely to the extent of such transferred rights and obligations but shall otherwise remain party to this Agreement as a Restructuring Support Party

11

with respect to any Second Lien Claims or Notes Claims not so transferred.  Any Transfer made in violation of this <u>Section 12</u> shall be deemed null and void and of no force or effect.

(b)     Notwithstanding <u>Section 13(a)</u>: (A) a Restructuring Support Party may settle or deliver any Claims to settle pursuant to an agreement to Transfer such Claim entered into by such Party prior to the date of this Agreement pending as of the date of such Party's entry into this Agreement without the requirement that the transferee be or become a Party or execute a Transferee Joinder (subject to compliance with applicable securities laws and it being understood that any Claims acquired and held (i.e. not as part of a short transaction) shall be subject to the terms of this Agreement; and (B) (i) a Restructuring Support Party may transfer (by purchase, sale, assignment, participation or otherwise) its right, title, and/or interest in respect of any of such Restructuring Support Party's claims against, or interests in, any Debtor, as applicable, to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker be or become a Restructuring Support Party, provided that such transfer shall only be valid if such Qualified Marketmaker transfers (by purchase, sale, assignment, participation or otherwise) such right, title and/or interest within ten (10) days of its receipt thereof to a transferee that is, or concurrent with such transfer becomes, a Restructuring Support Party, and (ii) to the extent that a party to this Agreement is acting in its capacity as a Qualified Marketmaker, it may transfer (by purchase, sale, assignment, participation or otherwise) any right, title, or interest in respect of any claims against, or interests in, any Debtor, as applicable, that the Qualified Marketmaker acquires from a holder of such interests who is not a Restructuring Support Party without the requirement that the transferee be or become a Restructuring Support Party.  For these purposes, a "<u>Qualified Marketmaker</u>" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Debtors, and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(c)     <u>Exhibit E</u> hereto sets forth, as of the date hereof, the Backstop Commitment each Backstop Party will have upon execution of the Backstop Commitment Agreement.  Transfers of Backstop Commitments shall be subject solely to the terms contained in the Backstop Commitment Agreement and may be transferred independently of Senior Note Claims or Second Lien Note Claims; <u>provided</u> that prior to the execution of the Backstop Commitment Agreement, the schedule of Backstop Commitments annexed as <u>Exhibit E</u> to this Agreement may only be amended with the consent of the Debtors and (x) each Backstop Party whose Backstop Commitment is modified by such amendment or (y) the Required Consenting Note Holders in the event each Backstop Party's Backstop Commitments are being affected *pro rata*.

(d)     <u>Exhibit D</u> hereto sets forth, as of the date hereof, the Equity Commitment each 2L Investor will have upon execution of the Equity Commitment Agreement.  Transfers of Equity Commitments shall be subject solely to the terms contained in the Equity Commitment Agreement and may be transferred independently of Senior Note Claims or Second Lien Note Claims; <u>provided</u> that prior to the execution of the Equity Commitment Agreement, the schedule of Equity Commitments annexed as <u>Exhibit D</u> to this Agreement may only be amended with the consent of the Debtors and each 2L Investor whose Equity Commitment is modified by such amendment.

12

14.    <u>Releases and Exculpation</u>.  To the fullest extent permitted by applicable law, the Plan shall provide for comprehensive mutual release and exculpation provisions from and for the benefit of each of the following (in their respective capacities as such): the Debtors, the Consenting Second Lien Note Holders, the Consenting Senior Note Holders, the Backstop Parties, the 2L Investors, Delaware Trust Company, as trustee for the Second Lien Notes, UMB Bank, National Association as trustee for the 2020 Notes, and Wilmington Savings Fund Society, FSB as trustee for the 2019 Notes, and all individuals or entities serving, or who have served as a manager, director, managing member, officer, partner, shareholder (other than with respect to an equity holder of a Debtor), or employee of any of the foregoing, and the attorneys and other advisors to each of the foregoing.

15.    <u>Acknowledgment</u>.  No securities of the Company are being offered or sold hereby and this Agreement neither constitutes an offer to sell nor a solicitation of an offer to buy any securities of VNR.  This Agreement is not, and shall not be deemed to be, a solicitation of a vote for the acceptance of the Plan.  The acceptance of the Plan by each of the Restructuring Support Parties will not be solicited until such Parties have received the Disclosure Statement and related ballots in accordance with applicable law (including as provided under sections 1125(g) and 1126(b) of the Bankruptcy Code) and will be subject to sections 1125, 1126, and 1127 of the Bankruptcy Code.

16.    <u>Representations and Warranties</u>.

(a)    Each Restructuring Support Party hereby represents and warrants (on a several and not joint basis) for itself and not any other person or entity that the following statements are true, correct, and complete as of the date hereof:

(i)    it is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and it has the requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational mutual action on its part and no other proceedings on its part are necessary to authorize and approve this Agreement or any of the transactions contemplated herein;

(iii)    this Agreement has been duly executed and delivered by the Restructuring Support Party and constitutes the legal, valid, and binding agreement of the Restructuring Support Party, enforceable against the Restructuring Support Party in accordance with its terms;

(iv)    the execution, delivery, and performance by it of this Agreement does not and shall not (A) violate any provision of law, rule, or regulation applicable to it, or its certificate of incorporation or bylaws or other organizational documents, or (B) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual

obligation to which it is a party;

(v)  subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(vi)  it has been represented by legal counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement, has had the opportunity to review this Agreement with its legal counsel, and has not relied on any other statements made by any Party or its legal counsel as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement or the transactions contemplated hereof;

(vii)  either is (A) the sole beneficial owner of the principal amount of such Second Lien Note Claims, 2020 Note Claims, and 2019 Note Claims indicated on the respective signature page hereto, or (B) has sole investment or voting discretion with respect to the principal amount of such Second Lien Note Claims, 2020 Note Claims, and 2019 Note Claims, as applicable, and as indicated on the respective signature page hereto and has the power and authority to bind the beneficial owner of such Second Lien Note Claims, 2020 Note Claims, and 2019 Note Claims to the terms of this Agreement.

(b)  Each of the Debtors hereby represents and warrants on a several and joint basis that the following statements are true, correct, and complete as of the date hereof:

(i)  it is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and it has the requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)  the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(iii)  the execution, delivery, and performance by it of this Agreement does not and shall not (A) violate any provision of law, rule, or regulation applicable to it, or its certificate of incorporation or bylaws or other organizational documents, or (B) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party (other than, for the avoidance of doubt, a default that would be triggered as a result of the Chapter 11 Cases or any Debtor's undertaking to implement the Restructuring through the Chapter 11 Cases);

14

(iv)    this Agreement has been duly executed and delivered by VNR and constitutes the legal, valid, and binding agreement of each Debtor, enforceable against each Debtor in accordance with its terms;

(v)    the execution, delivery, and performance by it of this Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or any other action to, with, or by any federal, state or other governmental authority or regulatory body, except (A) any of the foregoing as may be necessary and/or required for disclosure by applicable federal or state securities or "blue sky" laws, (B) any of the foregoing as may be necessary and/or required in connection with the Chapter 11 Cases, including the approval of the Disclosure Statement and confirmation of the Plan, (C) filings of amended certificates of incorporation or articles of formation or other organizational documents with applicable state authorities, and other registrations, filings, consents, approvals, notices, or other actions that are reasonably necessary to maintain permits, licenses, qualifications, and governmental approvals to carry on the business of the Company, and (D) any other registrations, filings, consents, approvals, notices, or other actions, the failure of which to make, obtain or take, as applicable, would not be reasonably likely, individually or in the aggregate, to materially delay or materially impair the ability of any Party hereto to consummate the transactions contemplated hereby;

(vi)    it has been represented by legal counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement, has had the opportunity to review this Agreement with its legal counsel, and has not relied on any other statements made by any Party or its legal counsel as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement or the transactions contemplated hereof;

(vii)    The Company has filed with or furnished to the Securities and & Exchange Commission all reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) required to be filed or furnished by it since December 31, 2015 under the relevant securities laws.  As of their respective dates, and, if amended, as of the date of the last such amendment, each of the reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) filed with the SEC by the Company, including any financial statements or schedules included therein, (i) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated in such document or necessary in order to make the statements in such document, in light of the circumstances under which they were made, not misleading and (ii) complied in all material respects with the applicable requirements of all applicable federal securities laws and the applicable rules and regulations of the SEC; and

(viii)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code,

15

this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability.

17.     Fees. VNR shall (a) pay or reimburse when due all reasonable and documented fees and expenses (including travel costs and expenses) of the following (regardless of whether such fees and expenses were incurred before or after the Petition Date), Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP as primary counsel, Porter Hedges LLP, as local counsel, W.D. Von Gonten & Co. (or comparable consulting firm) as consultants, PJT Partners LP as financial advisor, in each case to the Consenting Senior Note Holders and Backstop Parties and any such other advisors or consultants as may be reasonably determined by the Consenting Senior Note Holders and Backstop Parties, in consultation with VNR, and (b) subject to Bankruptcy Court approval, pay or reimburse when due  (and absent such approval shall pay or reimburse on the effective date of the Plan), all reasonable and documented fees and expenses (including travel costs and expenses) of the following (regardless of whether such fees and expenses were incurred before or after the Petition Date), Morrison & Foerster LLP as primary counsel, Jackson Walker LLP as local counsel, and Centerview Partners LLC as financial advisor, in each case to the Consenting Second Lien Note Holders and 2L Investors.

18.     Creditors' Committee. All Parties agree that they shall not oppose, and nothing in this Agreement shall prohibit, the participation of any of the Consenting Senior Note Holders, the indenture trustee for the 2019 Notes, or indenture trustee the 2020 Notes on any official committee of unsecured creditors formed in the Chapter 11 Cases. Notwithstanding anything herein to the contrary, if any Consenting Senior Note Holder (or indenture trustee) is appointed to and serves on an official committee of creditors in the Chapter 11 Cases, the terms of this Agreement shall not be construed so as to limit such Consenting Senior Note Holder's (or indenture trustee's) exercise of its fiduciary duties to any person arising from its service on such committee, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement; provided, that, nothing in this Agreement shall be construed as requiring any Consenting Senior Note Holder to serve on any official committee in any of the Chapter 11 Cases.

19.     Survival of Agreement.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the Debtors and in contemplation of possible chapter 11 filings by the Debtors and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including the Bankruptcy Court.

20.     No Waiver or Admissions.  If the transactions contemplated herein are not consummated, or if this Agreement is terminated for any reason, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, or interests, and the Parties expressly reserve any and all of their respective rights, remedies, and interests.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert. No Party shall have, by reason of this Agreement, a fiduciary relationship in respect of any other Party or any person or entity, and

nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon any Party any obligations in respect of this Agreement except as expressly set forth herein. This Agreement and the Restructuring are part of a proposed settlement of a dispute among the Parties. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding involving enforcement of the terms of this Agreement.

21. <u>Relationship Among Parties</u>. Notwithstanding anything herein to the contrary, the duties and obligations of the Parties under this Agreement (other than the Debtors) shall be several, not joint. In the event damages result from the breach of this Agreement by more than one Restructuring Support Party, each such breaching Restructuring Support Party shall be liable, on a several basis, for its pro rata share of such damages, determined by multiplying such damages by the amount of Senior Note Claims and Second Lien Note Claims held by such party divided by the aggregate amount of Senior Note Claims and Second Lien Note Claims held by all such breaching parties. No prior history, pattern, or practice of sharing confidences among or between Parties shall in any way affect or negate this understanding and Agreement. The Parties hereto acknowledge that this Agreement and the other Definitive Documentation do not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and the Restructuring Support Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended. No action taken by any Restructuring Support Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Restructuring Support Parties are in any way acting in concert or as such a "group."

22. <u>Specific Performance; Remedies Cumulative</u>. Each Party acknowledges and agrees that the exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and that any such breach of this Agreement would result in damages that would be difficult to determine with certainty. It is understood and agreed by the Parties that money damages may not be a sufficient remedy for any breach of this Agreement by any Party, and that each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. Such remedy shall not be deemed to be the exclusive remedy for the breach of this Agreement by any Party or its representatives. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy by any Party hereto shall not preclude the simultaneous or later exercise of any other such right, power, or remedy hereunder.

23. <u>Governing Law and Jurisdiction</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under, arising out of, or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought in either the United States District Court for the Southern District of Texas or, if jurisdiction is not

17

available in such court, any Texas State court sitting in Houston, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising under, arising out of, or in connection with this Agreement.  By execution and delivery of this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, or proceeding or other contested matter arising under, arising out of, or in connection with this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

24.  <u>Waiver of Right to Trial by Jury</u>.  Each of the Parties waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort, or otherwise, between any of them arising out of, arising under, in connection with, relating to, or incidental to the relationship established between any of them in connection with this Agreement.  Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

25.  <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon each of the Parties and their respective successors, assigns, heirs, transferees, executors, administrators, and representatives, in each case solely as such parties are permitted under this Agreement; <u>provided</u>, <u>however</u>, that nothing contained in this <u>Section 25</u> shall be deemed to permit any transfer, tender, vote, or consent of any claims other than in accordance with the terms of this Agreement.

26.  <u>No Third-Party Beneficiaries</u>.  This Agreement shall be solely for the benefit of the Parties hereto (or any other party that may become a Party to this Agreement pursuant to <u>Section 13</u> of this Agreement), and no other person or entity shall be a third-party beneficiary of this Agreement.

27.  <u>Consideration</u>.  The Parties acknowledge that, other than the agreements, covenants, representations, and warranties set forth herein and to be included in the Definitive Documentation, no consideration shall be due or paid to the Restructuring Support Parties in exchange for their obligations in this Agreement.

28.  <u>Notices</u>.  All notices (including, without limitation, any notice of termination) and other communications from any Party given or made pursuant to this Agreement shall be in writing and shall be deemed to have been duly given: (a) upon personal delivery to the Party to be notified, (b) when sent by confirmed electronic mail or facsimile, (c) three (3) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent:

    (a)    To VNR:

        Vanguard Natural Resources, LLC
        5847 San Felipe, Suite 3000
        Houston, Texas 77057

Attn:   Scott W. Smith, President and Chief Executive Officer
        Richard Robert, Chief Financial Officer
Fax: (832) 327-2260
Email: swsmith@vnrllc.com
        rrobert@vnrllc.com

With a copy (which shall not constitute notice) to:

Paul Hastings LLP
71 S. Wacker Drive
45th Floor
Chicago, IL 60606
Tel.: (312) 499-6000
Fax.: (312) 499-6100
Attn:   Chris Dickerson
        Douglas Getten
        Todd Schwartz
Email: chrisdickerson@paulhastings.com
        douggetten@paulhastings.com
        toddschwartz@paulhastings.com

(b)     To the address set forth on each Consenting Second Lien Note Holder's
        signature page (or as directed by any transferee thereof), as the case may
        be, with a copy (which shall not constitute notice) to:

Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019
Tel: (212) 468-8000
Fax: (212) 468-7900
Attn:   John Pintarelli
        Jon Levine
        Daniel Harris
Email: jpintarelli@mofo.com
        jonlevine@mofo.com
        dharris@mofo.com

(c)     To the address set forth on each Consenting Senior Note Holders signature
        page (or as directed by any transferee thereof), as the case may be, with a
        copy (which shall not constitute notice) to:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005
Tel: (212) 530-5100
Fax: (212) 530-5219
Attn:   Dennis Dunne
        Samuel Khalil

Brian Kinney
Email: ddunne@milbank.com
skhalil@milbank.com
bkinney@milbank.com

29.    Entire Agreement.  This Agreement, including the Exhibits and Schedules hereto, constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all other prior negotiations, agreements, representations, warranties, term sheets, proposals, and understandings, whether written, oral, or implied, among the Parties with respect to the subject matter of this Agreement; provided, however, that any confidentiality agreement executed by any Party shall survive this Agreement and shall continue in full force and effect, subject to the terms thereof, irrespective of the terms hereof.

30.    Time Periods.  If any time period or other deadline provided in this Agreement expires on a day that is not a business day, then such time period or other deadline, as applicable, shall be deemed extended to the next succeeding business day.

31.    Severability of Provisions.  If any provision of this Agreement for any reason is held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, the remaining provisions shall remain in full force and effect if the essential terms and conditions of this Agreement for each party remain valid, binding, and enforceable.

32.    Amendment or Waiver.

(a)    This Agreement may not be modified, amended, or supplemented without the prior written consent of VNR and the Required Consenting Senior Note Holders.   Notwithstanding the foregoing, this Section 32 may not be modified, altered, or amended except in writing signed by each of the Parties.

(b)    Each of the Parties agrees to negotiate in good faith all amendments and modifications to this Agreement as reasonably necessary and appropriate to consummate the Restructuring.

(c)    No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver.

33.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall be deemed an original and all of which shall constitute one and the same Agreement.  The signatures of all of the Parties need not appear on the same counterpart. Delivery of an executed signature page of this Agreement by facsimile or electronic mail shall be effective as delivery of a manually executed signature page of this Agreement.

34.    Public Disclosure.  VNR may, in its sole discretion, disclose this Agreement (including the signature pages hereto) in a press release and/or public filing, including the Chapter 11 Cases; but shall not disclose the holdings set forth on any signature page hereto or the commitment schedules annexed hereto.

35.    Headings.  The section headings of this Agreement are for convenience only and

shall not affect the interpretation hereof.  References to sections, unless otherwise indicated, are references to sections of this Agreement.

36.    <u>Interpretation</u>.  This Agreement constitutes a fully negotiated agreement among commercially sophisticated parties and therefore shall not be construed or interpreted for or against any Party, and any rule or maxim of construction to such effect shall not apply to this Agreement.

*[Signatures and exhibits follow]*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**CONTRARIAN CAPITAL FUND I, L.P.**
By: Contrarian Capital Management, L.L.C., its Investment Manager

By: _____
Name:
Title:

Holdings: ████████████████████████

Holdings: ████████████████████████

*[Signature Page to Restructuring Support Agreement]*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**CCM PENSION-A, L.L.C.**
By: Contrarian Capital Management, L.L.C., its
Managing Member

By: _____
Name:
Title:

Holdings: ████████████████████████

Holdings: ████████████████████████

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**CCM PENSION-B, L.L.C.**
By: Contrarian Capital Management, L.L.C., its Managing Member

By: _____
Name:
Title:

Holdings: ███████████████████████

Holdings: ███████████████████████

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**CONTRARIAN DOME DU GOUTER MASTER FUND, LP**
By: Contrarian Capital Management, L.L.C., its Investment Manager

By: _____
Name:
Title:

Holdings: ████████████████████

Holdings: ████████████████████

*[Signature Page to Restructuring Support Agreement]*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**CONTRARIAN CENTRE STREET PARTNERSHIP, L.P.**
By: Contrarian Capital Management, L.L.C., its Investment Manager

By: _____
Name:
Title:

Holdings: ████████████████████████

Holdings: ████████████████████████

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**CONTRARIAN OPPORTUNITY FUND, L.P.**
By: Contrarian Capital Management, L.L.C., its Investment Manager

By: _____
Name:
Title:

Holdings:
Holdings:

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**CONTRARIAN CAPITAL SENIOR SECURED, L.P.**
By: Contrarian Capital Management, L.L.C., its Investment Manager

By: _____
Name:
Title:

Holdings:

Holdings:

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**CONTRARIAN CAPITAL TRADE CLAIMS, L.P.**
By: Contrarian Capital Management, L.L.C., its Investment Manager

By: _____
Name:
Title:


Holdings: ████████████████████████

Holdings: ████████████████████████

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**CONTRARIAN ADVANTAGE-B, LP**
By: Contrarian Capital Management, L.L.C., its
Investment Manager

By: _____
Name:
Title:

Holdings: ███████████████████████

Holdings: ███████████████████████

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**J.H. Lane Partners, LP**

By: _____

Name: Haskel Ginsberg

Title: Cfo

Holdings: ███████████████████████████

Holdings: ███████████████████████████

*[Signature Page to Restructuring Support Agreement]*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**Latigo Partners, L.P.**

By: _____

Name: Ben Cohn

Title: Authorized Signatory

Holdings:

Holdings:

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**Marathon Asset Management, LP**, solely on behalf of certain of its affiliated funds and managed accounts

By: _____

Name: Peter Coppa

Title: Authorized Signatory

Holdings:

Holdings:

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

Monarch Alternative Solutions Master Fund Ltd
Monarch Capital Master Partners III LP
MCP Holdings Master LP
Monarch Debt Recovery Master Fund Ltd
P Monarch Recovery Ltd.

By:  Monarch Alternative Capital LP, as investment advisor

By: _____
Name:   Christopher Santana
Title:     Managing Principal

Holdings: ███████████████████████

Holdings: ███████████████████████

*[Signature Page to Restructuring Support Agreement]*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**Morgan Stanley & Co., LLC**, on behalf of its New York Distressed Debt Trading Desk and not any of its other trading desks or business units, or those of its affiliates

By: _____

Name: Jeffrey Goodman

Title: managing Director

Holdings: ████████████████████████

Holdings: ████████████████████████

*[Signature Page to Restructuring Support Agreement]*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

**J.P. MORGAN SECURITIES, LLC\*,** with respect to only its Credit Trading group

By: _____
Name:  Jeffrey Panzo
Title:    Attorney-In-Fact

Address for Notices:
J.P. Morgan Securities LLC
277 Park Avenue
11th FL, Mail Code NY1-L204
New York, NY 10172
Fax: (212) 270-4074
Attention: Jeffrey L. Panzo
Email: Jeffrey.L.Panzo@JPMorgan.com

Holdings: ███████████████████████

Holdings: ███████████████████████

\*The Restructuring Support Agreement (the "**Agreement**") applies only to the Credit Trading group of J.P. Morgan Securities LLC ("**CTG**") and the Senor Notes Claims (the "**Notes**") beneficially held by such group in the aggregate principal amount(s) set forth below the signature of J.P. Morgan Securities LLC on behalf of, and with respect to, CTG.  Accordingly, the terms "Consenting 2020 Note Holders", "Consenting Senior Note Holder", "Restructuring Support Parties", "Party", and/or "Parties" for all purposes of the Agreement mean and refer only to CTG and such business unit's holdings of the Notes. For the avoidance of doubt, the Agreement does not apply to (i) credit facilities, claims, securities, notes, other obligations or any other interests in the Debtors (as defined in the Agreement) that may be held, acquired or sold by, or any activities, services or businesses conducted or provided by, any other group or business unit within, or affiliate of J.P. Morgan Securities LLC, (ii) any credit facilities or indentures to which JPMorgan Chase & Co. or any of its affiliates ("**Morgan**") is a party in effect as of the date hereof, (iii) any new indenture, amendment to an existing indenture, or debt or equity securities offering involving Morgan, (iv) any direct or indirect principal activities undertaken by any Morgan entity engaged in the venture capital, private equity or mezzanine businesses, or portfolio companies in which they have investments, (v) any ordinary course sales and trading activity undertaken by employees who are not a member of CTG, (vi) any Morgan entity or business engaged in providing private banking or investment management services, or (vii) any Notes, loans, notes, or related claims that may be beneficially owned by non-affiliated clients of J.P. Morgan Securities LLC or any of its affiliates or for which Morgan acts in a fiduciary capacity

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

FIR TREE INC. (on behalf of certain investment funds under mgmt)

By: _____
Name: Brian Meyer
Title: General Counsel

Holdings: ███████████████

Holdings: █████████████████████

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

WEXFORD CAPITAL LP
By: Wexford GP, LLC, its General Partner

By: _____
Name:  Arthur Amron
Title:    Partner & General Counsel


Holdings: ███████████████████

Holdings: ███████████████████████

*[Signature Page to Restructuring Support Agreement]*

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

York Capital Management Global Advisors, LLC
o/b/o certain funds managed by it or its affiliates

By: _____

Name:

Title:   Richard P. Swanson
         General Counsel

Holdings: ███████████████████████████

Holdings: ███████████████████████████

*[Signature Page to Restructuring Support Agreement]*

Vanguard Natural Resources, LLC on behalf of
itself and each other Debtor

By: _____
    Name: Scott W. Smith
    Title:  President and Chief Executive Officer

For Notices to the Consenting
Senior Note Holders

Contrarian Capital Fund I, L.P.
c/o Contrarian Capital Management, L.L.C.
411 West Putnam Avenue
Suite 425
Greenwich, CT 06830

CCM Pension-A, L.L.C.
c/o Contrarian Capital Management, L.L.C.
411 West Putnam Avenue
Suite 425
Greenwich, CT 06830

CCM Pension-B, L.L.C.
c/o Contrarian Capital Management, L.L.C.
411 West Putnam Avenue
Suite 425
Greenwich, CT 06830

Contrarian Dome du Gouter Master Fund, LP
c/o Contrarian Capital Management, L.L.C.
411 West Putnam Avenue
Suite 425
Greenwich, CT 06830

Contrarian Centre Street Partnership, L.P.
c/o Contrarian Capital Management, L.L.C.
411 West Putnam Avenue
Suite 425
Greenwich, CT 06830

Contrarian Opportunity Fund, L.P.
c/o Contrarian Capital Management, L.L.C.
411 West Putnam Avenue
Suite 425
Greenwich, CT 06830

Contrarian Capital Senior Secured, L.P.
c/o Contrarian Capital Management, L.L.C.
411 West Putnam Avenue
Suite 425
Greenwich, CT 06830

Contrarian Capital Trade Claims, L.P.
c/o Contrarian Capital Management, L.L.C.
411 West Putnam Avenue
Suite 425
Greenwich, CT 06830

Contrarian Advantage-B, LP
c/o Contrarian Capital Management, L.L.C.
411 West Putnam Avenue
Suite 425
Greenwich, CT 06830

J.H. Lane Partners, LP
126 East 56th Street
Suite 1620
New York, NY 10022
Fax:      (212) 899-9796
Attn:     Haskel Ginsberg
Email:    hginsberg@jhlanepartners.com

J.P. Morgan Securities, LLC
277 Park Avenue
11th FL, Mail Code NY1-L204
New York, NY 10172
Fax:      (212) 270-4074
Attn:     Jeffrey L. Panzo
Email:    Jeffery.L.Panzo@JPMorgan.com

Latigo Partners, LP
450 Park Avenue, 12th Floor
New York, NY 10022
Attn:     Ben Cohn
Email:    Ben.Cohn@latigopartners.com

Marathon Asset Management, LP
One Bryant Park, 38th Floor
New York, NY 10036
Attn:     Daniel Pine
Email:    dpine@marathonfund.com

Monarch Alternative Capital, LP
535 Madison Avenue
New York, NY 10022

Morgan Stanley & Co., LLC
1585 Broadway
New York, NY 10036
Fax:      (212) 507-1295
Attn:     Amy Kim
Email:    amy.kim@morganstanley.com

For notices to the Consenting
Second Lien Note Holders

Fir Tree Inc.
55 West 46th Street, 29th Floor
New York, NY 10036
Tel.: (212) 599-0090
Attn:      Evan Lederman
              David Proman
              Andrew Teno
Email: elederman@firtree.com
              dproman@firtree.com
              ateno@firtree.com


Wexford Capital LP
411 West Putnam Avenue
Greenwich, CT  06830
Tel.: (203) 862-7000
Fax:  (203) 862-7312
Attn:      Arthur H. Amron
              Marc McCarthy
Email: aamron@wexford.com
              mmcarthy@wexford.com


York Capital Management
767 Fifth Avenue, 17th Floor
New York, NY 10153
Tel.: (212) 300-1300
Attn:      Matthew Bonanno
              Meghan Force
Thanasi Skafidas
Email: mbonanno@yorkcapital.com
              mforce@yorkcapital.com
              tskafidas@yorkcapital.com

**<u>Exhibit A</u>**

**<u>to the Restructuring Support Agreement</u>**

**TERM SHEET**

EXECUTION VERSION

VANGUARD NATURAL RESOURCES, LLC
**PLAN TERM SHEET**

**February 1, 2017**

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN OF REORGANIZATION PURSUANT TO THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND PROVISIONS OF THE BANKRUPTCY CODE.  THIS TERM SHEET IS BEING PROVIDED IN FURTHERANCE OF SETTLEMENT DISCUSSIONS AND IS ENTITLED TO PROTECTION PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY SIMILAR FEDERAL OR STATE RULE OF EVIDENCE.  THE TRANSACTIONS DESCRIBED IN THIS TERM SHEET ARE SUBJECT IN ALL RESPECTS TO, AMONG OTHER THINGS, CONDUCT OF ACCEPTABLE DUE DILIGENCE, OBTAINING REQUIRED INTERNAL APPROVALS, EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION AND SATISFACTION OR WAIVER OF THE CONDITIONS PRECEDENT SET FORTH THEREIN AND AS SUCH THIS TERM SHEET IS NOT AN OFFER CAPABLE OF ACCEPTANCE.**

NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS AND DEFENSES OF THE NOTEHOLDERS, DEBTORS, AND ANY CREDITOR PARTY.  THIS TERM SHEET DOES NOT INCLUDE A DESCRIPTION OF ALL OF THE TERMS, CONDITIONS, AND OTHER PROVISIONS THAT ARE TO BE CONTAINED IN THE DEFINITIVE DOCUMENTS, WHICH REMAIN SUBJECT TO DISCUSSION, NEGOTIATION AND EXECUTION.  THIS TERM SHEET AND THE TERMS CONTAINED HEREIN ARE CONFIDENTIAL.

**SUMMARY OF PRINCIPAL TERMS
OF POTENTIAL RESTRUCTURING TRANSACTION**

This term sheet (the "**Term Sheet**") sets forth certain key terms of a potential restructuring transaction (the "**Transaction**") with respect to the existing debt and other obligations of Vanguard Natural Resources, LLC ("**VNR**") and each direct and indirect subsidiary of VNR (collectively with VNR, the "**VNR Parties**" or the "**Company**").  The Transaction will be executed pursuant to a chapter 11 plan of reorganization (the "**Plan**") to be confirmed by the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").  To effectuate the Transaction, certain holders of Senior Note Claims (the "**Ad Hoc Senior Noteholders**") and certain holders of Second Lien Note Claims (the "**Ad Hoc 2L Noteholders**") would execute a restructuring support agreement (an "**RSA**") with the Company.  It is expected that the RSA would contain customary terms and conditions, including milestones, the breach of which would entitle the Ad Hoc Senior Noteholders or Ad Hoc 2L Noteholders (as applicable) to terminate their obligations under the RSA and the Backstop Commitment Agreement (as defined below).  The Plan will act as (and contain) a global settlement of all claims of causes of actions amongst the relevant parties.

The Transaction will be financed by (i) use of cash collateral (ii) if necessary, a DIP Financing provided by certain or all of the RBL Lenders and acceptable to the Company and the Senior Note Backstop Parties, (iii) a fully committed $19.25 million equity investment (the "**2L Investment**") by certain holders of Second Lien Note Claims (in their capacity as such, the "**2L Investors**")**,** and (iv) a $255.75 million rights offering (the "**Senior Note Rights Offering**") that is fully backstopped by certain holders of Senior Note Claims (in their capacity as such, the "**Senior Note Backstop Parties**"), each pursuant to a Backstop Commitment Agreement consistent with terms hereof and otherwise acceptable to the Company and the Senior Note Backstop Parties.  The Senior Note Backstop Parties will additionally work with the Company to determine if non-core assets can be profitably monetized during the bankruptcy case.

Reference is made to the following documents and obligations:

1

**EXECUTION VERSION**

(i)  that certain third Amended and Restated Credit Agreement, dated as of September 30, 2011 (the "**RBL**" and all claims and obligations arising under or in connection with the RBL, "**RBL Claims**"), by and among the Vanguard Natural Gas, LLC, the lenders from time to time party thereto (the "**RBL Lenders**") and Citibank N.A., as administrative agent (the "**RBL Agent**").

(ii)  those certain 7.0% Senior Secured Second Lien Notes due 2023 (the "**Second Lien Notes**", and all claims and obligations arising under or in connection with the Second Lien Notes, the "**Second Lien Note Claims**") issued under the Indenture dated February 10, 2016, by and among VNR, VNR Finance Corp. and U.S. Bank National Association, as trustee.

(iii)  those certain 7.875% Senior Notes due 2020 (the "**2020 Notes**", and all claims and obligations arising under or in connection with the 2020 Notes, the "**2020 Note Claims**") issued under the Indenture dated April 4, 2012, by and among VNR, VNR Finance Corp. and U.S. Bank National Association, as trustee.

(iv)  those certain 8 3/8% Senior Notes due 2019 (the "**2019 Notes**" and together with the 2020 Notes, the "**Senior Notes**", and all claims and obligations arising under or in connection with the 2019 Notes, the "**2019 Note Claims**" and together with the 2020 Note Claims, the "**Senior Note Claims**") issued under the Indenture dated as of May 27, 2011, among Eagle Rock Energy Partners, L.P., Eagle Rock Energy Finance Corp. and U.S. Bank National Association, as trustee.

<u>**TREATMENT OF CLAIMS AND INTERESTS**</u>

The below summarizes the treatment to be received on or as soon as practicable after the Plan Effective Date (as defined below) by holders of claims against, and interests in, the Company pursuant to the Plan.

| | |
|---|---|
| **Administrative, Priority, and Tax Claims** | Allowed administrative, priority, and tax claims will be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **RBL Claims** | Allowed RBL Claims shall be paid down with $275 million in cash from the proceeds of the Rights Offering and the 2L Investment and may be paid down further with proceeds from non-core asset sales or other available cash. The remaining Allowed RBL Claims (no more than $975 million) will be paid in full with the proceeds of a new $1,100 million RBL Facility (the "**Exit Facility**") on terms substantially the same as the current RBL Facility and provided by some or all of the RBL Lenders, with such terms including an interest rate of LIBOR + 2.5%. The Exit Facility will be due 4 years after emergence and the first redetermination under the Exit Facility will occur after December 2018 (18 month holiday) with semi-annual redeterminations thereafter. |
| **Second Lien Note Claims** | Allowed Second Lien Notes Claims will receive new notes in the current principal amount (approximately $75,600,000), which shall be substantially similar to the current Second Lien Notes but providing a 12 month later maturity and a 200 basis point increase to the interest rate. Holders of Allowed Second Lien Note Claims will receive cash payment of accrued but unpaid interest, at the non-default interest rate, <u>provided</u> that payment (but not accrual) of such interest prior to the effective date of the Plan will be subject to Bankruptcy Court approval and if interest is not paid on a current basis, all parties reserve their rights with respect to default interest. |
| **Senior Note Claims** | Each holder of an allowed Senior Note Claim shall receive (a) its *pro rata* share of 97% of the ownership interests in reorganized VNR (the "**New Equity Interests**"), subject to dilution by the Senior Note Rights Offering, 2L Investment the Backstop Fee, and the Management Incentive Plan, as set forth herein (following dilution by the Senior Note Rights Offering, the 2L Investment, and Backstop Fee (but prior to |

2

EXECUTION VERSION

dilution by the Management Incentive Plan) such interests will equal 34.7% of the New Equity Interests) and (b) the opportunity to participate in the Senior Note Rights Offering.

| | |
|---|---|
| **General Unsecured Claims** | Allowed General Unsecured Claims will receive treatment consistent with the provisions of the Bankruptcy Code; provided that trade claims of up to $3 million may be unimpaired. |
| **Intercompany Claims** | Intercompany claims shall be reinstated, compromised, or cancelled, at the option of the relevant holder of such claims with the reasonable consent of the Ad Hoc Noteholders. |
| **Preferred Equity** | If Plan is accepted by the classes of General Unsecured Claims and Preferred Equity and subject to all other restructuring terms being agreed to in a manner acceptable to the Company and the Senior Note Backstop Parties, holders of Preferred Equity will receive their pro rata share of (a) 3% of the New Equity Interests (subject to dilution by the Senior Note Rights Offering, 2L Investment, Management Incentive Plan, and the Backstop Fee) and (b) 3-year warrants for 3% of the New Equity Interests exercisable at a TEV to be calculated based on actual net debt[1], plus Allowed General Unsecured Claims (including rejection damage claims) and administrative expense claims, each as determined as of the Plan Effective Date without giving effect to the Senior Note Right Offering, the Senior Note Backstop, or the 2L Investment. |
| **Common Equity** | If Plan is accepted by the classes of General Unsecured Claims, Preferred Equity, and Common Equity and subject to all other restructuring terms being agreed to in a manner acceptable to the Company and the Senior Note Backstop Parties, holders of Common Equity will receive their pro rata share of 3-year warrants for 3% of the New Equity Interests exercisable at a TEV to be calculated based on actual net debt[2], plus Allowed General Unsecured Claims (including rejection damage claims), administrative expense claims, and the liquidation preference of the Preferred Equity, each as determined as of the Plan Effective Date without giving effect to the Senior Note Right Offering, the Senior Note Backstop, or the 2L Investment. |

<u>RIGHTS OFFERING</u>

| | |
|---|---|
| **Senior Notes Rights Offering** | The Plan will provide for a $255.75 million rights offering to purchase New Equity Interests (the "**Senior Note Rights Offering Shares**") at a 25% discount to plan value (based on a total enterprise value of $1.625 billion and consideration of net excess cash ($45 million) in calculation of such plan equity value) to holders of Senior Note Claims (of which $127.875 million shall be reserved for the Senior Note Backstop Parties and the remaining $127.875 million will be offered *pro rata* to all holders of Senior Note Claims.  The Senior Note Rights Offering Shares equal 56.6% of the New Equity Interests, subject to dilution by the Management Incentive Plan. |
| **Senior Note Backstop** | The Senior Note Backstop Parties will execute a backstop commitment agreement (the "**Backstop Commitment Agreement**") whereby they will agree to fully backstop the Senior Notes Rights Offering and purchase any unsubscribed Senior Note Rights Offering Shares in exchange for an aggregate backstop fee payable in |

---

[1] See Exhibit A.

[2] See Exhibit A.

**EXECUTION VERSION**

fully-diluted New Equity Interests in an amount equal to 6% of the Senior Note Rights Offering Shares.

| | |
|---|---|
| **2L Investment** | The Plan will provide for the 2L Investors to purchase $19.25 million in New Equity Interests (the "**2L Investment Shares**") at a 25% discount to plan value (based on a total enterprise value of $1.625 billion and consideration of net excess cash ($45 million) in calculation of such plan equity value). There will be no additional fee payable to the 2L Investors in connection with this fully committed purchase. The 2L Investment Shares equal 4.3% of the New Equity Interests, subject to dilution by the Management Incentive Plan. |

**OTHER TERMS OF THE TRANSACTION**

| | |
|---|---|
| **DIP Financing** | If necessary, the Senior Note Backstop Parties will provide the Company with DIP Financing (on terms, conditions, documentation, and notice satisfactory to the Company and the Senior Note Backstop Parties), which will be repaid with proceeds from the Rights Offering or otherwise treated under the Plan in a manner satisfactory to the DIP Lenders. |
| **Adequate Protection** | The prepetition revolving agent shall be granted (i) a replacement security interest and lien, (ii) a superpriority administrative expense claim and (iii) payment of interest at the non-default Eurodollar rate. |
| | The prepetition second lien collateral agent shall be granted a junior replacement security interest and lien, subject to the intercreditor agreement. |
| **Tax Issues** | The Plan and the corporate form of reorganized VNR shall be structured to achieve a tax efficient structure, in a manner acceptable to the Company and the Senior Note Backstop Parties after appropriate due diligence by the Senior Note Backstop Parties. |
| **Corporate Governance** | The terms and conditions of the new corporate governance documents of the reorganized Company (including the bylaws and certificates of incorporation or similar documents, among other governance documents, and an equityholders agreement if desired by the Senior Note Backstop Parties) shall be acceptable to the Senior Note Backstop Parties. |
| **Board of Directors** | The initial directors of the New Board shall consist of 5 directors selected by the Senior Note Backstop Parties and 2 members of current management selected by current management. |
| **Management Incentive Plan** | 10% of the New Equity Interests will be reserved for a management incentive plan (the "**Management Incentive Plan**"), the form, terms, allocation, and vesting to be determined by the New Board. |
| **Releases & Exculpation** | The Plan and Confirmation Order will contain customary mutual releases and exculpation provisions, including releases from and for the benefit of the Ad Hoc Senior Noteholders, the Ad Hoc 2L Noteholders, the Senior Note Backstop Parties, and the 2L Investors. |
| **Injunction & Discharge** | The Plan and Confirmation Order will contain customary injunction and discharge provisions. |

4

**EXECUTION VERSION**

| | |
|---|---|
| **Cancellation of Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided herein or in the Plan, all instruments, certificates, and other documents evidencing debt of or equity interests in VNR and its subsidiaries shall be cancelled, and the obligations of VNR and its subsidiaries thereunder, or in any way related thereto, shall be discharged. |
| **Registration Rights** | To be determined by the Senior Note Backstop Parties. |
| **SEC Reporting** | To be determined by the Senior Note Backstop Parties. |
| **Plan Effective Date** | The effective date of the Plan, on which the Transaction shall be fully consummated in accordance with the terms and conditions of the Definitive Documents (the "**Plan Effective Date**"). |
| **Definitive Documents** | All Definitive Documents (including the Plan, disclosure statement, confirmation order, and plan supplement documents) will be in form and substance acceptable to the Company and the Senior Note Backstop Parties and consistent with this term sheet. |
| **Conditions to Plan Effectiveness** | The Plan shall contain customary conditions precedent (which shall be satisfactory to the Company and the Senior Note Backstop Parties) to confirmation of the Plan and occurrence of the Plan Effective Date, some of which may be waived in writing by agreement of the Company and the Senior Note Backstop Parties. |
| **Hedging** | The Senior Note Backstop Parties will work with the Company to implement a comprehensive hedging program during the bankruptcy and after emergence for 80% of the Company's projected 2017 and 2018 production from its proved, developed, and producing reserves. |
| **Milestones** | <ul><li>Petition Date by February 3, 2017</li><li>Within 20 days of the Petition Date file:<ul><li>Plan</li><li>Disclosure Statement</li><li>Motion seeking approval of the Backstop Commitment Agreement and the Equity Commitment Agreement</li></ul></li><li>Within 50 days of the Petition Date obtain entry of orders approving the Backstop Commitment Agreement and the Equity Commitment Agreement</li><li>Within 65 days of the Petition Date, obtain entry of an order approving the Disclosure Statement and solicitation procedures</li><li>Within 125 of the Petition Date, obtain entry of the confirmation order</li><li>Within 155 days of the Petition Date, consummate the Plan.</li></ul> |
| **Noteholder Fees and Expenses** | All fees and expenses of the Senior Notes indenture trustees, Ad Hoc Senior Noteholders, and Senior Note Backstop Parties (including their respective counsel and financial advisors) to be paid in full whether incurred before or after execution of the RSA. All fees and expenses of one counsel and one financial advisor to the Ad Hoc 2L Noteholders and the 2L Investors (collectively) to be paid in full whether incurred before or after execution of the RSA, provided that payment (but not accrual) of the advisors to the Ad Hoc 2L Noteholders and the 2L Investors prior to |

**EXECUTION VERSION**

the effective date of the Plan will be subject to Bankruptcy Court approval. Company to execute (before execution of an RSA and the Backstop Commitment Agreement) fee letters with Milbank, Tweed, Hadley & McCloy LLP, PJT Partners LP, and an engineering firm to be retained by the Ad Hoc Senior Noteholders.

6

**<u>Exhibit B</u>**

**<u>to the Restructuring Support Agreement</u>**

**FORM OF TRANSFEREE JOINDER**

The undersigned ("<u>Transferee</u>") hereby acknowledges that it has read and understands the Restructuring Support Agreement (the "<u>Agreement</u>"), dated as of __, 2017, entered into by and among Vanguard Natural Resources, LLC ("<u>VNR</u>"), certain other direct and indirect subsidiaries of VNR (collectively, the "<u>Company</u>"), [Transferor's Name] ("<u>Transferor</u>") and other holders of claims against the Company signatory thereto and, with respect to the claims acquired from the Transferor, agrees to be bound to the terms and conditions thereof to the extent Transferor was thereby bound, without modification, and shall be deemed a "<u>Restructuring Support Party</u>" under the terms of the Agreement.

Date Executed: _____, 2017

**[Transferee's Name]**

By: _____
    Name:
    Title:

Principal Amount of Debt acquired:

$_____ of Second Lien Note Claims

$_____ of Senior Note Claims

Acknowledgements:

By: _____
    Name:
    Title:

**<u>Exhibit C</u>**

**<u>to the Restructuring Support Agreement</u>**

**PLAN SUPPLEMENT DOCUMENTS**

- The Exit Facility documents, including intercreditor agreement, collateral documents, ISDA schedules, and other related documents

- New formation documents and bylaws for each Debtor

- An equityholder's agreement (if applicable)

- A registration rights agreement

- A description of any corporate restructuring transactions to be taken in connection with emergence

- A schedule of assumed contracts and leases

- A schedule of rejected contracts and leases

- New executive employment agreements

- A list of retained causes of action

- The identity of the members of the boards of directors for the reorganized Debtors and the information required by 11 U.S.C. § 1129(a)(5) with respect to the reorganized Debtors

- Rights Offering Procedures for the Senior Notes Rights Offering

**<u>Exhibit D</u>**

**<u>to the Restructuring Support Agreement</u>**

**SCHEDULE OF EQUITY COMMITMENTS**

**<u>Exhibit E</u>**

**<u>to the Restructuring Support Agreement</u>**

**SCHEDULE OF BACKSTOP COMMITMENTS**