# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| VANGUARD NATURAL RESOURCES, LLC, *et al.*,[1] | § | Case No. 17-30560 (MI) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

## DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING PAYMENT OF (A) CERTAIN OIL AND GAS OBLIGATIONS, (B) WAREHOUSING CLAIMS, AND (C) 503(b)(9) CLAIMS, AND (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF <u>OUTSTANDING ORDERS</u>

---

THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED.  IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.  A HEARING WILL BE HELD ON THIS MATTER FOR FEBRUARY 2, 2017, AT 4:00 P.M. (CT) BEFORE THE HONORABLE MARVIN ISGUR, 515 RUSK STREET, COURTROOM 404, HOUSTON, TEXAS 77002.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Vanguard Natural Resources, LLC (1161); Eagle Rock Acquisition Partnership, L.P. (6706); Eagle Rock Acquisition Partnership II, L.P. (0903); Eagle Rock Energy Acquisition Co., Inc. (4564); Eagle Rock Energy Acquisition Co. II, Inc. (3364); Eagle Rock Upstream Development Company, Inc. (0113); Eagle Rock Upstream Development Company II, Inc. (7453); Encore Clear Fork Pipeline LLC (2032); Escambia Asset Co. LLC (3869); Escambia Operating Co. LLC (2000); Vanguard Natural Gas, LLC (1004); Vanguard Operating, LLC (9331); VNR Finance Corp. (1494); and VNR Holdings, LLC (6371).  The location of the Debtors' service address is: 5847 San Felipe, Suite 3000, Houston, Texas 77057.

Vanguard Natural Resources, LLC ("VNR") and its affiliated debtors as debtors in possession in these cases (collectively, "Vanguard" or the "Debtors") submit this motion (the "Motion"), under sections 105(a), 362, 363, 503(b), 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of interim and final orders: (a) authorizing, but not directing, Vanguard to pay in the ordinary course of business all prepetition and postpetition amounts owing on account of (i) royalty and mineral payments, (ii) working interest disbursements and working interest costs, (iii) joint interest billings, (iv) gathering, transporting, processing, and other related expenses, (v) warehousing claims, and (vi) 503(b)(9) claims; (b) confirming the administrative expense priority status of outstanding orders and authorizing payment of such obligations in the ordinary course of business; and (c) granting related relief.  In addition, Vanguard requests that the Court (as defined below) schedule a final hearing twenty-one days after the commencement of these chapter 11 cases, or as soon after twenty-one days as is convenient for the court, to consider approval of this Motion on a final basis.  In support of this Motion, Vanguard respectfully states:

## JURISDICTION, VENUE, AND STATUTORY BASES

1.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The bases for the relief requested in this Motion are sections 105(a), 362, 363, 503(b), 1107, and 1108 the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, and

Bankruptcy Local Rule for the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Local Rules") 9013-1(i).

## BACKGROUND

3.    On the date of this Motion (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have requested that the chapter 11 cases be jointly administered.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.    To date, no creditors' committee has been appointed in the chapter 11 cases by the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee").  No trustee or examiner has been appointed in these chapter 11 cases.

## I.    Vanguard's Business

5.    Formed in 2006, VNR is a publicly traded limited liability company that, through its subsidiaries, is engaged in the acquisition, development, and production of oil and gas properties located in eleven states.  Vanguard has approximately 370 employees, none of whom are represented by labor unions.  VNR is the direct or indirect parent company of each of the other Debtors in these chapter 11 cases.

6.    Vanguard's assets consist primarily of producing and non-producing natural gas and oil reserves, all of which are located within the continental United States.  Vanguard's business strategy involves acquiring properties with mature, long-lived production, relatively predictable decline curves, and lower risk development opportunities.  Vanguard currently owns properties and oil and natural gas reserves in the following ten operating basins:

- the Green River Basin in Wyoming;

3

- the Permian Basin in West Texas and New Mexico;

- the Gulf Coast Basin in Texas, Louisiana, Mississippi and Alabama;

- the Anadarko Basin in Oklahoma and North Texas;

- the Piceance Basin in Colorado;

- the Big Horn Basin in Wyoming and Montana;

- the Arkoma Basin in Arkansas and Oklahoma;

- the Williston Basin in North Dakota and Montana;

- the Wind River Basin in Wyoming; and

- the Powder River Basin in Wyoming.

7. Through September 30, 2016, Vanguard had revenues of approximately $264.4 million on a consolidated basis. As of September 30, 2016, Vanguard's unaudited consolidated financial statements reflected assets with a book value totaling approximately $1.6 billion and liabilities totaling approximately $2.3 billion.

8. As of the Petition Date, Vanguard has approximately $1.8 billion in total funded debt, including approximately $1.3 billion outstanding under its Third Amended and Restated Credit Agreement, dated as of September 30, 2011 (as amended, restated, supplemented, or otherwise modified from time to time, the "First Lien Credit Agreement"), among Debtor Vanguard Natural Gas, LLC, as borrower, the other Debtors, as guarantors, Citibank, N.A., as administrative agent, and the lenders.[2] As of the Petition Date, Vanguard owes approximately $75.6 million in principal on Senior Secured Second Lien Notes due 2023 plus approximately $2.4 million in accrued interest, $51.1 million in principal on 8.375% Senior Notes due 2019

---

[2] The guarantors under the First Lien Credit Agreement are VNR, Eagle Rock Acquisition Partnership, L.P., Eagle Rock Acquisition Partnership II, L.P., Eagle Rock Energy Acquisition Co., Inc., Eagle Rock Energy Acquisition Co. II, Inc., Eagle Rock Upstream Development Company, Inc., Eagle Rock Upstream Development Company II, Inc., Encore Clear Fork Pipeline LLC, Escambia Asset Co. LLC, Escambia Operating Co. LLC, Vanguard Operating, LLC, VNR Finance Corp., and VNR Holdings, LLC.

plus approximately $0.7 million in accrued interest, and $381.8 million in principal on 7.875% Senior Notes due 2020 plus approximately $10.0 million in accrued interest. Moreover, Vanguard owes approximately $19.4 million in connection with a master lease agreement dated July 23, 2012 between Vanguard Operating, LLC, as lessee and Banc of America Leasing & Capital, LLC, as lessor for certain facilities and equipment in the Piceance Basin. In addition, the Debtors also have approximately $20.0 million in ordinary course trade payables as of the Petition Date.

9.     Vanguard's primary goal is to effect a restructuring of its balance sheet that will result in a viable capital structure and maximize the value of its businesses for the benefit of all stakeholders during the chapter 11 cases. To this end, Vanguard has reached an agreement with certain of its prepetition second lien noteholders and its prepetition senior unsecured noteholders regarding the terms of a comprehensive financial restructuring that will result in the deleveraging of Vanguard's balance sheet by approximately $707.9 million. In addition, certain of Vanguard's prepetition first lien secured lenders have agreed to provide Vanguard with a $50 million postpetition, senior secured debtor-in-possession revolving credit facility to provide Vanguard with ample working capital during these chapter 11 cases. Through these, and other efforts, Vanguard believes that it will successfully delever its balance sheet and emerge from chapter 11 as a healthy and viable enterprise.

10.     A description of Vanguard's business, capital structure, and the circumstances leading to these chapter 11 cases is set forth in the *Declaration of Richard A. Robert, Chief Financial Officer of Vanguard Natural Resources, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), which is incorporated by reference and filed contemporaneously with this Motion.

## II.   Oil and Gas Obligations

11.     A mineral interest generally consists of a real property interest in the minerals (including oil and natural gas) under a parcel of property, typically in fee simple,[3] and the exclusive right to capture those minerals through exploration, drilling, and production operations. Mineral interests can be conveyed by executing a mineral deed that severs the mineral interests from the surface interests in land.

12.     In addition, through a written agreement (an "Oil and Gas Lease"), owners of mineral interests lease, grant, or otherwise convey their right to capture minerals (a "Working Interest") to a third party (a "Working Interest Holder").

13.     Vanguard holds interests in various oil and gas properties in eleven states: Alabama, Arkansas, Colorado, Louisiana, Mississippi, Montana, New Mexico, North Dakota, Oklahoma, Texas, and Wyoming.

### A.     Royalty and Mineral Payments

14.     A Working Interest may be subject to or burdened by various other interests in minerals, production, or profit, such as a "Royalty." A Royalty is a mineral interest owner's reserved "share of production, free of expenses of production."[4]  In addition to Royalties, burdens on Working Interests may take many other forms, including, but not limited to overriding royalty interests, non-participating royalty interests, net profit interests, and production payments (collectively, and together with Royalties, "Working Interest Burdens").

---

[3]  By this Motion, Vanguard does not concede that the assertion of any such liens would constitute a valid basis for removing Vanguard as Operator (as defined below) of any well and Vanguard expressly reserve the right to contest such an action.

[4]  8-R Howard R. Williams and Charles J. Meyers, Manual of Oil and Gas Terms § R, Matthew Bender & Co. (16th ed. database updated 2015).

15.     The pooling of Working Interests confers on each Working Interest Holder an undivided, fractional interest in the defined area.  The Working Interest holders designate one Working Interest holder as the "Operator."

16.     As Operator, Vanguard makes payments to the holders of the Working Interest Burdens at its various wells (the "Mineral Payments") after extracting and selling its oil and gas. Failure to make the Mineral Payments would have a severe negative impact on Vanguard's interests in its oil and gas properties.  Mineral Payments are governed by the terms of the Oil and Gas Leases and state statutory frameworks—via pooling orders or otherwise—that set strict payment deadlines and contain enforcement mechanisms including interest, fines, recovery of costs and attorneys' fees, and treble damages.  Failure to pay Mineral Payments could expose Vanguard to these enforcement actions and could result in actions seeking the forfeiture, cancellation, or termination of Vanguard's Oil and Gas Leases.

17.     The Mineral Payments vary over time due to many factors such as specific terms of underlying agreements, changes in ownership, changes in the amount or type of minerals captured, and mineral price fluctuations.  In the twelve months before the Petition Date, Vanguard made Mineral Payments totaling approximately $60 million.  These payments are remitted by Vanguard to Working Interest Burden holders (the "Mineral Payees") throughout the course of a given month.  As a result of the time required to market and sell the production and the significant accounting process required each month to accurately disburse the resulting proceeds, Mineral Payments generally are made between sixty and ninety days after production of the underlying oil and gas.

18.     Vanguard estimates that, as of the Petition Date, there are approximately $10 million in Mineral Payments that are outstanding.  Approximately $5 million in Mineral Payments is due to be paid during the interim period.

**B.     Working Interest Disbursements and Costs**

19.     The relationship between the pooled Working Interest Holders (Operators and Non-Operating Working Interest Holders (as defined below)) is often governed by a joint operating agreement (a "JOA").  A JOA provides a contractual basis for the cooperative exploration, development, and production of oil and gas properties among multiple leasehold co-tenants.  In other instances, Working Interests are pooled without an express JOA, in which case the relationship between the Working Interest Holders is governed by applicable state law—pooling orders or otherwise—and industry custom.

20.     The Working Interests of non-operator lessees on an oil and gas property are referred to as "Non-Operating Working Interests" and the holders of those interests are called "Non-Operating Working Interest Holders."

21.     Usually, the Operator will incur most of the initial costs associated with drilling and production, including lease operating expenses and capital expenditures, on account of itself and Non-Operating Working Interests Holders (the "Working Interest Costs"), including payments to third parties such as vendors, contractors, drillers, haulers, and other suppliers of oil and gas related services (the "Mineral Contractors").  The JOA will typically provide for the Operator to bill each Non-Operating Working Interest Holder for its *pro rata* share of the Operator's Working Interest Costs.  These amounts are commonly referred to as "joint interest billings" or "JIBs."  In turn, the Operator distributes to each Non-Operating Working Interest Holder its share of the well's proceeds (a "Working Interest Disbursement").

22.     Vanguard's Working Interest Disbursements and JIBs fluctuate significantly from month to month, particularly so during the recent turbulence in commodity prices.  In the twelve months preceding the Petition Date, Vanguard paid approximately $30 million in Working Interest Disbursements to Non-Operating Working Interest Holders.  As of the Petition Date, Vanguard estimates that it had approximately $5 million of Working Interest Disbursements outstanding.  Approximately $2.5 million in Working Interest Disbursements are due to be paid during the interim period.

23.     For the wells on which it is the Operator, Vanguard generates a JIB for each Non-Operating Working Interest Holder on a monthly basis.    The timing of JIB payments from Non-Operating Working Interest Holders can vary depending on the specific payment arrangement in place, but outstanding JIB balances are usually paid within sixty to ninety days after the billing date.

24.     Regardless of when an Operator is reimbursed by Non-Operating Working Interest holders through the JIB process, the Operator must continue to pay Working Interest Costs in a timely fashion.  Failure to pay Working Interest Costs when due could result in, among other things, the perfection or enforcement of contractual, statutory, or constitutional liens on Vanguard's assets by third parties such as the Mineral Contractors supplying goods and services to the oil and gas properties, as well as Vanguard's potential removal as Operator under various JOAs.

25.     In the twelve months preceding the Petition Date, Vanguard paid approximately $200 million in Working Interest Costs to operate the wells on which it is the Operator.  Non-Operating Working Interest Holders were billed by Vanguard approximately $45 million on account of JIBs.  As of the Petition Date, Vanguard estimates that it had approximately $23

million of Working Interest Costs outstanding, approximately $14 million of which will need to be paid during the interim period.  Vanguard expects to be reimbursed approximately $6 million by Non-Operating Working Interest Holders for any unpaid Working Interest Costs during this period.

### C.    JIBs Owed by Vanguard

26.    Vanguard also holds Non-Operating Working Interests in various oil and gas properties.  A third party acts as the Operator for those interests and is responsible for the daily operations and the Working Interest Costs.  Vanguard's primary responsibility with respect to its Non-Operating Working Interests is to pay the Operators for Vanguard's *pro rata* share of Working Interest Costs through the JIB process—either with cash or in-kind payments—on time.  Some states mandate through pooling orders that Non-Operating Working Interest Holders pay the Operator a set fee per well rather than traditional *pro rata* cost sharing.  In these states, the pooling order set fee is also collected through the JIB process.

27.    The Operator of an oil and gas property commonly is granted a contractual or statutory lien on Non-Operating Working Interest Holders' interests in the oil and gas property to secure the payment of obligations owed to the Operator.  Therefore, Vanguard's failure to timely pay the JIBs it owes could result in Operators asserting lien rights under applicable state laws on Vanguard's interests in the Oil and Gas Leases or the related production.  If asserted, those liens could restrict Vanguard's ability to dispose, transfer, or otherwise monetize its property, potentially impairing Vanguard's businesses severely.

28.    Vanguard's monthly obligation to third-party Operators under JIBs is unpredictable on a month-to-month basis, especially given the current commodity price environment.  However, over the twelve months preceding the Petition Date, Vanguard paid

approximately $100 million in JIBs to third-party Operators.  As of the Petition Date, Vanguard estimates that it has approximately $14 million of prepetition JIBs outstanding, approximately $8 million of which will need to be paid during the interim period.

**D.      Gathering, Transportation, and Processing Expenses**

29.      Sometimes Vanguard sells some of its production for delivery at the wellhead. For production not sold that way, Vanguard is obligated to third parties under various gathering, processing, and related agreements for, among other things, costs associated with gathering, treating, transporting, processing, compressing, and similar services (the "GTP Expenses"). Potential consequences of not paying GTP Expenses include penalties and interest, turnover actions, conversion and constructive trust claims, assertion of significant secured claims against property of the estate, litigation, and, in some instances, removal as Operator.

30.      Vanguard similarly incurs GTP Expenses on non-operated oil and gas properties where Vanguard elects to take its production "in-kind," separate and apart from the other Working Interest Holders, rather than requesting that the third party Operator sell the production on Vanguard's behalf.  Where Vanguard takes its production in-kind, Vanguard incurs GTP Expenses.

31.      As of the Petition Date, Vanguard estimates that it owes approximately $12 million in GTP Expenses that are paid directly by Vanguard.  Of this amount, Vanguard believes that approximately $6 million in GTP Expenses will become due during the interim period.

**E.      Payment of Warehousing Claims**

32.      In the ordinary course of business Vanguard relies on certain vendors to store materials (collectively, the "Warehousemen"), such as casings, when they are not being used.

33.      If Vanguard were to default on any obligation to the Warehousemen, the Warehousemen may assert a possessory lien on Vanguard's property in their possession, attempt

to retain possession of that property, and bar Vanguard's access to what is stored at the Warehousemen's yards.

34.      As a result, Warehousemen may refuse to deliver or release Vanguard's property or other property in their possession before the prepetition amounts owed to them by Vanguard (collectively, the "Warehousing Claims") have been satisfied and their liens redeemed.

35.      In the twelve months preceding the Petition Date, Vanguard paid approximately $100,000 in Warehousing Claims.  As of the Petition Date, Vanguard estimates that it has approximately $25,000 of prepetition Warehousing Claims outstanding.  Accordingly, Vanguard seeks authority, but not direction, to pay prepetition and postpetition Warehousing Claims.

### F.      503(b)(9) Claims

36.      Vanguard may have received certain goods or materials from various vendors (collectively, the "503(b)(9) Claimants") within the twenty days before the Petition Date.  Many of Vanguard's relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, Vanguard often obtains supplies on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.

37.      Vanguard also believes certain 503(b)(9) Claimants could alter Vanguard's existing trade credit—or demand payment in cash on delivery—which would make Vanguard's liquidity worse.  Vanguard believes that as of the Petition Date it does not owe any amounts on account of goods delivered within the twenty days prior to the Petition Date which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code (each, a "503(b)(9) Claim" and, together with the Mineral Payments, Working Interest Disbursements, Working Interest Costs, JIBs, GTP Expenses, Warehousing Claims, the "Oil and Gas

Obligations").[5]   To the extent such claims arise and are valid, however, Vanguard proposes to pay the 503(b)(9) Claims as they come due in the ordinary course of business.

### G.   Outstanding Orders

38.    Prior to the Petition Date and in the ordinary course of business, Vanguard may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders").  To avoid becoming general unsecured creditors of Vanguard's estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless Vanguard issues substitute purchase orders postpetition.  Receiving delivery of Outstanding Orders may be critical to preventing a disruption in Vanguard's business operations.  Therefore, Vanguard seeks authorization to confirm the administrative expense priority status of amounts owed on account of Outstanding Orders that have not been completed and to make payments on account of Outstanding Orders in the ordinary course of business.

### RELIEF REQUESTED

39.    Vanguard seeks entry of interim and final orders, substantially in the forms attached to this Motion as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and the "Final Order") under Bankruptcy Code sections 105(a), 362, 363, 503(b), 1107, and 1108 and Bankruptcy Rules 6003 and 6004: (a) authorizing, but not directing, Vanguard to pay in the ordinary course of business all prepetition and postpetition amounts owing on account of (i) Mineral Payments, (ii) Working Interest Disbursements and Working Interest Costs, (iii) Joint Interest Billings, (iv) GTP Expenses, (v) Warehousing Claims, and (vi) 503(b)(9) Claims; and

---

[5]  Vanguard does not concede that any claims described in this Motion are conclusively entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code, and Vanguard expressly reserves the right to contest the extent or validity of all such claims.

(b) confirming the administrative expense priority status of Outstanding Orders and authorizing payment of such obligations in the ordinary course of business, in each case, subject to and solely to the extent consistent with the terms of any interim and final orders (together, the "DIP Orders") entered by the Court pursuant to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing and  (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, dated February 2, 2017, the DIP Budget (as defined in the DIP Orders), and the DIP Documents (as defined in the DIP Orders).  In addition, Vanguard requests that the Court schedule a final hearing twenty-one days after the commencement of these chapter 11 cases, or as soon after twenty-one days as is convenient for the Court, to consider approval of this Motion on a final basis.

40.     Furthermore, out of an abundance of caution, and in order to successfully implement the relief requested herein and to further its reorganization efforts, Vanguard also requests that the Interim Order and Final Order permit Vanguard to require that (a) a payee maintain or apply, as applicable, terms ("Customary Terms") during the pendency of these chapter 11 cases that are at least as favorable as those terms existing as of the Petition Date, or on terms satisfactory to Vanguard in its sole discretion, as a condition to receiving any payment under the Interim Order or Final Order, and (b) if a payee, after receiving a payment under the Interim Order or Final Order, ceases to provide Customary Terms, then Vanguard may, in its discretion, deem such payment to apply instead to any postpetition amount that may be due to that payee or treat that payment as an avoidable postpetition transfer of property.

## BASIS FOR RELIEF

I. **Vanguard Should Be Authorized to Pay the Oil and Gas Obligations**

    A. **Certain of Vanguard's Oil and Gas Obligations Are Not Property of Vanguard's Estate**

41.    Many of Vanguard's Oil and Gas Obligations—including Mineral Payments and Working Interest Disbursements—constitute funds held in trust for others and therefore are not property of Vanguard's estates.  These funds are not available for distribution under a chapter 11 plan and thus can be paid in the ordinary course of business without prejudice to creditors.

42.    Bankruptcy Code section 541 defines the property of a debtor's estate but does not itself create new property interests; rather, the debtor's property interests are a creature of applicable non-bankruptcy law.[6]  Accordingly, the classification and treatment of Vanguard's Oil and Gas Obligations is determined by the laws of jurisdictions in which Vanguard operates.

43.    In this respect, section 541(a)(1) of the Bankruptcy Code "is not intended to expand the debtor's rights against others more than they exist at the commencement of the case."[7]  Relatedly, the bankruptcy laws do "not authorize a [debtor] to distribute other people's property among a bankrupt's creditors . . . .  [S]uch property rights existing before bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy."[8]

44.    Further, section 541(d) of the Bankruptcy Code provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title

---

[6] *See Butner v. United States*, 440 U.S. 48, 54–55 (1979).

[7] H.R. REP. No. 95-595, at 367–68 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963; *see also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) (holding that the "rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less").

[8] *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135-36 (1962) (footnote omitted).

to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.[9]

45.     As such, courts have interpreted section 541(d) of the Bankruptcy Code to "expressly" provide that when a debtor holds only bare legal title in property, such property is not property of the estate.[10]  When a debtor holds legal title but not equitable interest in property, the debtor must turn the property over to the equitable owner of the property.[11]  A debtor who holds proceeds attributable to real property owned by another holds only bare legal title to such property.[12]

46.     Under applicable non-bankruptcy law, money owed by Vanguard for the Mineral Payments may not constitute property of the estate.  Often, Working Interest Burdens are considered interests in real property like fee interests, incorporeal hereditaments, or profit à prendre.[13]

---

[9] 11 U.S.C. § 541(d).

[10] *Golden v. The Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 100 (Bankr. D. Del. 2006).

[11] *See In re MCZ, Inc.*, 82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) (citation omitted) ("Where Debtor merely holds bare legal title to property as agent or bailee for another, Debtor's bare legal title is of no value to the estate, and Debtor should convey the property to its rightful owner.").

[12] *See, e.g.*, *In re Columbia Pac. Mortg., Inc.*, 20 B.R. 259, 262–64 (Bankr. W.D. Wash. 1981) (holder of participation ownership interest brought successful action against bankruptcy trustee for proceeds of a sale of real property because holder was beneficial owner and debtor having only legal title held the proceeds in trust).

[13] *See, e.g.*, *Rich v. Doneghey*, 177 P. 86, 89 (Okla. 1918) (holding oil and gas lease grants "an 'incorporeal hereditament;' or more specifically, . . . a profit à prendre"); *Norris v. Vaughan*, 260 S.W.2d 676, 678–79 (Tex. 1953) (citations omitted) ("It is well established in Texas that the lessee in the usual oil and gas lease obtains a determinable fee in the oil and gas in place, and thus an interest in realty."); *Maralex Res., Inc. v. Chamberlain*, 320 P.3d 399, 403 (Colo. App. 2014) (finding that an oil and gas lease is an interest in real property); *State v. Pennzoil Co.*, 752 P.2d 975, 980 (Wyo. 1988) ("In Wyoming, the right created by an oil and gas lease is a profit à prendre, connoting the right "to search for oil and gas and if either is found, to remove it from the land." (quoting *Denver Joint Stock Land Bank of Denver v. Dixon*, 122 P.2d 842, 847 (Wyo. 1942)); La. Rev.Stat. 31:16, 31:18, and La. Civ. Code Ann. art. 470 (2016) (oil and gas leases in Louisiana are classified as "mineral rights," which are defined as "real rights" and "incorporeal immovables"); *In re Antweil*, 97 B.R. 65, 66 (Bankr. D.N.M. 1989) ("Under New Mexico law an oil and gas lease creates an interest in real property.") (citations omitted); *Nantt v. Puckett Energy Co.*, 382 N.W.2d 655, 659 (N.D. 1986) (citations omitted) ("Oil and gas leases are interests in real property in North Dakota."); *Dauphin Island Prop. Owners Ass'n v. Callon Institutional Royalty Inv'rs I*, 519 So. 2d 948, 950 (Ala. 1988) ("Clearly a 'mineral interest' is real property[.]"); *Whittington v. Whittington*, 608 So. 2d 1274, 1278–79 (Miss. 1992) (explaining that "Mississippi adheres to the ownership in place theory," granting mineral lessees real

16

47.    Indeed, Working Interest Burdens are considered interests in real property in most

of the jurisdictions in which Vanguard operates.[14]   In these jurisdictions, the real property

Working Interest Burdens, once created, become the property of their holders.[15]   As such,

Working Interest Burdens, and the Mineral Payments owed on account thereof, are generally

treated as property of the third-party Mineral Payees and are outside the scope of property of the

estate.   This is because the Mineral Payment represents the distribution to the Working Interest

property interests); *Arrington v. United Royalty Co.*, 65 S.W.2d 36, 38 (Ark.1933) (citations omitted) (holding that a mineral interest is "not merely a license but an interest and easement in the land itself"); *Homestake Expl. Corp. v. Schoregge*, 264 P. 388, 392 (Mont. 1928) ("The [mineral] lessee acquires no corporeal interest in the land itself, but rather a privilege *à prendre*.").

[14]   *See, e.g.*, Minerals-Royalty Interests, 1991 Colo. Legis. Serv. S.B. 91-34 (West) ("Any conveyance, reservation, or devise of a royalty interest in minerals or geothermal resources, whether of a perpetual or limited duration, contained in any instrument executed on or after July 1, 1991, creates a real property interest which vests in the holder or holders of such interest the right to receive the designated royalty share of the specified minerals or geothermal resources or the proceeds therefrom in accordance with the terms of the instrument."); *Alamo Nat'l Bank v. Hurd*, 485 S.W.2d 335, 340 (Tex. App.—San Antonio 1972, *writ ref'd n.r.e*) ("[T]here can be no doubt in Texas but that an overriding royalty, whether payable in money or by the delivery of oil, is an interest in land . . . ."); *De Mik v. Cargill*, 485 P.2d 229, 231 (Okla. 1971) (noting that "[a]n overriding royalty interest generally is held to be an interest in real property" under Oklahoma law); *Johnson v. Anderson*, 768 P.2d 18, 23 (Wyo. 1989) (stating that an overriding royalty interest is a non-possessory real property interest); La. Rev. Stat. 31:16, 31:18, 31:80 and La. Civ. Code Ann. art. 470 (mineral royalties in Louisiana are classified as "mineral rights," which are defined as "real rights" and "incorporeal immovables"); *Terry v. Terry*, 565 So. 2d 997, 1000 (La. Ct. App. 1990) ("overriding royalties are . . . classified as real rights and incorporeal immovable" in Louisiana); *ANR W. Coal Dev. Co. v. Basin Elec. Power Coop.*, 276 F.3d 957, 965 (8th Cir. 2002) (recognizing that "[o]verriding royalty holders have an interest that is a form of real property under North Dakota law"); *Hanson v. Ware*, 274 S.W.2d 359, 362 (Ark. 1955) ("[I]t is settled in Arkansas that royalties in oil and gas, until brought to the surface and reduced to possession, are interests in real estate and not personal property." (internal quotation marks omitted) (citation omitted)); *Dauphin Island*, 519 So. 2d at 951 (holding that in Alabama most royalty interests do not violate the rule against perpetuities although declining to "hold that royalty interests are real property for all purposes"); *Whittington*, 608 So. 2d at 1279 (explaining that Mississippi "[a]ccept[s] royalty as a separate ownership interest in real property"); *Homestake Expl.* 264 P. at 392  (holding that a mineral lessee acquiring à prendre acquires a real property interest, though failing to extend that principle to derivative royalty interests directly).

[15]   *See, e.g.*, *Tennant v. Dunn*, 110 S.W. 2d 53, 56 (Tex. 1937) (holding under Texas law that conveyances made pursuant to the creation of an Oil and Gas Lease convey a vested real property right at the time of the conveyance); *Boley v. Greenough*, 22 P.3d 854, 859 (Wyo. 2001); *Dauphin Island,*, 519 So. 2d at 951 (holding that "whether a non-participating royalty interest be construed as an interest in the minerals or as a personal property right in the minerals once they are extracted, it does not violate the rule against perpetuities, because it is a vested interest even though uncertain in the enjoyment"); *Homestake Expl.*, 264 P. at 391 (quoting authority for proposition that mineral or royalty lease vests upon conveyance); *Bay's Expl., Inc. v. Pensa, Inc.*, No. CIV-07-754-D, 2011 WL 832097, at *11 (W.D. Okla. Mar. 2, 2011) (noting that oil and gas leasehold interests may not be unreasonably restrained from alienation because under Oklahoma law, vested real property interests cannot be so restrained). Vanguard cannot find authority in the remaining jurisdictions that directly supports this proposition.  It is Vanguard's good-faith belief, however, that because the relevant jurisdictions deem oil and gas leases real property interests in almost all circumstances, those jurisdictions would hold that the interest vests at conveyance.

Holder, the Mineral Payee, of his or her real property rather than payment of an *in personam* claim.

48.     To the extent applicable nonbankruptcy law does not treat Working Interest Burdens as real property interests, section 541 expressly excludes certain Working Interest Burdens, such as overriding royalty interests, from the definition of property of the estate. Section 541(b)(4)(B) states that:

> Property of the estate does not include any interest of the debtor in liquid or gaseous hydrocarbons to the extent that the debtor has transferred such interest pursuant to a written conveyance of a production payment to an entity that does not participate in the operation of the property from which such production payment is transferred.[16]

49.     Because Working Interests and Working Interest Burdens, including Royalties, are not property of the estate either by application of state law or pursuant to section 541(b) of the Bankruptcy Code, any proceeds that Vanguard may take possession of while these chapter 11 cases are ongoing that is earned on account of Working Interests or Working Interest Burdens are not property of the estate under section 541(a)(6) of the Bankruptcy Code.[17]

50.     Additionally, to the extent Vanguard has proceeds of Working Interest Holders or Mineral Payees in its possession, Vanguard at most holds bare legal title to such funds and holds no legal title to the percentage of the oil and gas production attributable to the Working Interests Holders or Mineral Payees.  Indeed, Vanguard only takes possession of proceeds from the sale of the Working Interest Holders' and Mineral Payees' share of oil and gas production because it

---

[16]  11 U.S.C. § 541(b)(4)(B). Production payment means "a term overriding royalty satisfiable in cash or in kind contingent on the production of a liquid or gaseous hydrocarbon from particular real property . . . determined without regard to production costs." 11 U.S.C. § 101(42A).

[17]  *See* 11 U.S.C. § 541(a)(6) (providing that "proceeds, products, offspring, rents, or profits *of or from property of the estate*" constitute property of the estate under section 541 of the Bankruptcy Code) (emphasis added).  *Cf. Pearlman*, 371 U.S. at 135–36 ("The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors.").

markets and sells the oil and gas production on behalf of the Working Interest Holders and Mineral Payees before remitting the Working Interest Disbursements and Mineral Payments to them. Some courts have held that in such situations, a resulting trust is established on behalf of the holders of oil and gas royalty interests.[18] The Supreme Court has held that property held by debtors for a third party (such as funds held on account of a resulting trust) is not property of the estate.[19] Thus, any property held by Vanguard on account of the Working Interest Holders and Mineral Payees is not property of Vanguard's estates.

51.     Because the Working Interest Disbursements and Mineral Payments are not property of the estate, it is unclear whether the automatic stay would prevent any action by a Working Interest Holder or Mineral Payee to obtain possession or exercise control over the Working Interest Disbursements or Mineral Payments, as applicable.[20] Failure to grant the relief requested by this Motion could subject Vanguard to unnecessary litigation, either in or outside of the Bankruptcy Court, at a time when its resources are already strained. Consequently, Vanguard believes payment of the Working Interest Disbursements and Mineral Payments in the ordinary course of business is in the best interests of Vanguard and its creditors, and should be authorized by the Court.

---

[18] *See, e.g.*, *Dahlberg v. ConocoPhillips Co. (In re Reichmann Petroleum Corp.),* 434 B.R. 790, 797 (Bankr. S.D. Tex. 2010) (finding that revenue earned by working interests was property of the working interest owners, regardless of whether the operator held such revenues); *Vess Oil Corp. v. SemCrude, L.P. (In re SemCrude, L.P.)*, 418 B.R. 98, 106 (Bankr. D. Del. 2009) (holding that funds in debtors' possession held on behalf of royalty interest holders were held in a resulting trust for such parties, debtors only held bare legal title to such property, and thus such funds were not property of the estate).

[19] *Begier v. IRS*, 496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'"); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983) (noting that "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition" from the bankruptcy estate).

[20] *See* 11 U.S.C. § 362(a)(3) (providing that the automatic stay is applicable to all entities for "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate").

52.     Moreover, no creditors are prejudiced by this Motion.  Vanguard has no right to distribute any funds on account of the Working Interest Disbursements or Mineral Payments to its creditors because the Working Interest Disbursements and Mineral Payments are not property of the estate.

53.     For all these reasons, courts in this district have routinely authorized payment to Working Interest Holders and Mineral Payees under similar circumstances.[21]

54.     Therefore, Vanguard respectfully requests that this Court permit Vanguard to make prepetition and postpetition Working Interest Disbursements and Mineral Payments in the ordinary course of business.

**B.      Failure to Make Timely Payments on the Oil and Gas Obligations Could Threaten Vanguard's Ability to Operate and Subject Vanguard's Assets to Asserted Liens**

55.     Applicable state law and contractual agreements may afford unpaid oil and gas vendors a variety of remedies, including the right to assert liens on Vanguard's oil and gas properties and produced hydrocarbons.[22]  While Vanguard reserves the right to contest any

---

[21] *See, e.g.*, *In re Memorial Production Partners LP*, No. 17-30262 (MI) (Bankr. S.D. Tex. Jan. 23, 2017) [Dkt. No. 120]; *In re Stone Energy Corporation*, No. 16-36390 (MI) (Bankr. S.D. Tex. Jan. 10, 2017) [Dkt. No. 258]; *In re Shoreline Energy LLC*, No. 16-35571 (DRJ) (Bankr. S.D. Tex. Dec. 15, 2016) [Dkt. No. 184]; *In re Warren Res., Inc.*, No. 16-32760 (MI) (Bankr. S.D. Tex. June 3, 2016) [Dkt. 41]; *In re LINC USA GP*, No. 16-32689 (MI) (Bankr. S.D. Tex. June 1, 2016) [Dkt. 29]; *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. May 18, 2016) [Dkt. No. 94]; *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. July 1, 2016) [Dkt. No. 450]; *In re Midstates Petroleum Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016) [Dkt. No. 64]; *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. June 16, 2016) [Dkt. No. 314]; *In re RAAM Glob. Energy Co.*, No. 15-35615 (MI) (Bankr. S.D. Tex. Dec. 22, 2015) [Dkt. No. 270]; *In re Luca Int'l Grp. LLC*, No. 15-34221 (DRJ) (Bankr. S.D. Tex. Oct. 19, 2015) [Dkt. 293].  Because of the voluminous nature of the orders cited in this Motion, such orders have not been attached to the Motion.  Copies of these orders are available upon request to Vanguard's proposed counsel.

[22] *See e.g.*, Tex. Prop. Code Ann. § 56.002; Colo. Rev. Stat. Ann. § 38-24-101; N.M. Stat. Ann. § 70-4-1; Okla. Stat. Ann. tit. 42, § 144; Wyo. Stat. Ann. § 29-3-103(a); La. Rev. Stat. Ann. § 9:4862 (granting liens to secure "obligations incurred in operations[.]"); N.D. Cent. Code Ann. § 35-24-02 ("Any person who shall, under contract with the owner of any leasehold for oil or gas purposes or any pipeline, perform any labor or furnish any material or services . . . is entitled to a lien under this chapter[.]"); Ala. Code § 35-11-210 (general M&M lienholder statute granting lien to "[e]very mechanic, person, firm, or corporation" that creates improvement or building on land); Ark. Code Ann. § 18-44-202 (granting lien to any person or entity performing labor or furnishing materials in connection with oil or gas operations against holder of any interest in operation); Miss. Code Ann. § 85-7-131 ("As to oil and

efforts to exercise such remedies during the chapter 11 cases, doing so could result in serious disruption to Vanguard's business.

56.     Bankruptcy Code section 362(b)(3) codifies an exception to the automatic stay for the postpetition perfection of liens if, under state law, such liens "relate back" to the date of attachment for purposes of determining priority.[23]

57.     Accordingly, Mineral Payees, Mineral Contractors, and Non-Operating Working Interest Holders may be successful in asserting liens with respect to accrued and unpaid Mineral Payments, Working Interest Costs, and Working Interest Disbursements notwithstanding the commencement of the chapter 11 cases and the imposition of the automatic stay.  If these parties were able to assert liens on Vanguard's property, the results would be costly to Vanguard and its creditors.

58.     In a similar way, Vanguard's failure to timely make JIB payments is likely to result in third-party Operators asserting lien rights against Vanguard's interests in, among other things, the wells, the production and proceeds from such wells, or Vanguard's Working Interests (which are real property rights), as well fixtures and equipment associated with the oil and gas properties.[24]  Accordingly, the failure to timely pay JIBs could threaten Vanguard's operations and ability to successfully reorganize.

---

gas wells, the operator thereof shall have such a lien upon the interest of each nonoperator owner of an interest in the mineral leasehold[.]"); Mont. Code Ann. § 71-3-1002 (granting lien to any person or entity performing labor or furnishing materials in connection with oil or gas operations against holder of any interest in operation). *See also In re Tri-Union Dev. Corp.*, 253 B.R. 808, 815 (Bankr. S.D. Tex. 2000) (finding an automatically perfected security interest in the oil and gas production and its proceeds in the debtor's possession).

[23]  11 U.S.C. §§ 362(b)(3), 546(b)(1).

[24]  *See, e.g.*, Tex. Prop. Code Ann. § 56.002; Colo. Rev. Stat. Ann. § 38-24-101; La. Rev. Stat. Ann. § 9:4862; N.M. Stat. Ann. § 70-4-1; N.D. Cent. Code Ann. § 35-24-02; Okla. Stat. Ann. tit 42, § 144; Wyo. Stat. Ann. § 29-3-103(a); Ala. Code § 35-11-210; Ark. Code Ann. § 18-44-202; Miss. Code Ann. § 85-7-131; Mont. Code Ann. § 71-3-1002.

59.     While Vanguard reserves its right to contest any such asserted liens, its ability to do so successfully is unclear given the safe harbors embodied in Bankruptcy Code sections 362(b)(3) and 546(b).

60.     Courts in this District, including in this recent round of oil and gas bankruptcies, have routinely authorized payments to lien claimants under similar circumstances.[25]

### C.     Payment of the Oil and Gas Obligations Furthers Vanguard's Fiduciary Duties Under Bankruptcy Code Sections 1107(a) and 1108

61.     Vanguard, operating its businesses as debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code, charged with the duties of a fiduciary, is holding the estate and operating the business for the benefit of that debtor's creditors and equity owners.[26]  Implicit in the duties of chapter 11 debtors in possession is the duty "to protect and preserve the estate, including an operating business's going-concern value."[27]

62.     Courts have noted that there are instances in which debtors in possession can fulfill their fiduciary duties "only . . . by the preplan satisfaction of a prepetition claim."[28]  The court in *CoServ* specifically noted that the preplan satisfaction of prepetition claims is a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial

---

[25]    *See, e.g.*, *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2001) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation); *In re Tri-Union*, 253 B.R. at 815 (authorizing the debtor to pay prepetition royalties with respect to Texas oil and gas leases which would otherwise be entitled to statutory liens); *see also In re Memorial Production Partners LP*, No. 17-30262 (MI) (Bankr. S.D. Tex. Jan. 23, 2017) [Dkt. No. 120]; *In re Stone Energy Corporation*, No. 16-36390 (MI) (Bankr. S.D. Tex. Jan. 10, 2017) [Dkt. No. 258]; *In re Shoreline Energy LLC*, No. 16-35571 (DRJ) (Bankr. S.D. Tex. Dec. 15, 2016) [Dkt. No. 184]; *In re Atinum MidCon I, LLC*, No. 16-33645 (MI) (Bankr. S.D. Tex. Aug. 17, 2016) [Dkt. No. 52]; *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. July 1, 2016) [Dkt. 450]; *In re Warren Res., Inc.*, No. 16-32760 (MI) (Bankr. S.D. Tex. June 3, 2016) [Dkt. No. 41]; *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. May 18, 2016) [Dkt. No. 95]; *In re Midstates Petroleum Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016) [Dkt. No. 64].

[26]    *In re Texasoil Enters. Inc.*, 296 B.R. 431, 435 (Bankr. N.D. Tex. 2003) (citing *Dodson v. Huff* (*In re Smyth*), 207 F.3d 758, 761 (5th Cir. 2000)).

[27]    *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

[28]    *Id.*

enhancement of the estate,"[29] and also when the payment was to "sole suppliers of a given

product."[30]  The court provided a three part test for determining whether a preplan payment on

account of a prepetition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.
> Second, unless it deals with the claimant, the debtor risks the
> probability of harm, or alternatively, loss of economic advantage to
> the estate or the debtor's going concern value, which is
> disproportionate to the amount of the claimant's prepetition claim.
> Third, there is no practical or legal alternative by which the debtor can
> deal with the claimant other than by payment of the claim.[31]

63.    Payment of the prepetition Oil and Gas Obligations meets each of these elements

because many of the creditors holding prepetition Oil and Gas Obligations, such as Working

Interest Costs, GTP Expenses, and Warehousing Claims, are in possession of critical goods,

products, and related materials, or provide critical services that Vanguard needs to continue

operations.[32]  Moreover, the cost of replacing such goods, products, materials held by, or the

services provided by, the creditors owed prepetition Oil and Gas Obligations would be

significantly more than the prepetition claim that Vanguard would have to pay.  Additionally,

any disruption in Vanguard's network of suppliers, service providers, and vendors would

significantly disrupt Vanguard's businesses and restructuring process, which could cost

Vanguard's estate a substantial amount in lost revenue.  Other creditors holding Oil and Gas

---

[29]  *id.*

[30]  *Id.* at 498.

[31]  *Id.*; *see also In re Scotia Dev., LLC*, No. 07-20027, 2007 WL 2788840, at *2 (Bankr. S.D. Tex. Sept. 21, 2007) (adopting the *Coserv* test).

[32]  *Cf. In re Stone Energy Corporation*, No. 16-36390 (MI) (Bankr. S.D. Tex. Jan. 10, 2017) [Dkt. No. 258] (where the motion argued paying oil and gas obligations met the *Coserv* test and the court granted permission to pay prepetition oil and gas obligations); *In re Warren Res., Inc.*, No. 16-32760 (MI) (Bankr. S.D. Tex. June 3, 2016) [Dkt. 41] (same); *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. May 18, 2016) [Dkt. 95] (same); *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. July 1, 2016) [Dkt. No. 450] (same); *In re Midstates Petroleum Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016) [Dkt. No. 64] (same); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. June 16, 2016) [Dkt. No. 314] (same); *In re Energy XXI Ltd.*, No. 16-31928 (DRJ) (Bankr. S.D. Tex. May 19, 2016) [Dkt. No. 320] (same).

Obligations, like Mineral Contractors and those due Working Interest Disbursements, could place liens on Vanguard's oil and gas interests, and the time and cost to dealing with those liens could disrupt Vanguard's businesses and restructuring process.

64.     Accordingly, the harm and economic disadvantage that would stem from failure to pay any of the prepetition Oil and Gas Obligations is grossly disproportionate to the amount of the prepetition claim that would have to be paid.  Finally, with respect to each of the holders of the prepetition Oil and Gas Obligations, Vanguard has determined that, to avoid significant disruption of its business operations, there is no practical or legal alternative to payment of the prepetition Oil and Gas Obligations.  Therefore, Vanguard can only meet its fiduciary duties as debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code through payment of the prepetition Oil and Gas Obligations.

**D.     Payment of the Oil and Gas Obligations Is a Sound Exercise of Vanguard's Business Judgment Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code**

65.     Even if the Oil and Gas Obligations are property of the estate and not subject to liens, the relief sought here would be appropriate under Bankruptcy Code sections 105 and 363. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."[33]  Courts in the Fifth Circuit have authorized relief under section 363(b) where a debtor demonstrates a sound business justification for such relief.[34]

---

[33]  11 U.S.C. § 363(b)(1).

[34]  *See, e.g., Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (citation omitted) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate

24

66.     Vanguard has determined, in the exercise of its business judgment, that paying its Oil and Gas Obligations enables Vanguard to maintain existing operations and acquire and develop new reserves.  As such, doing so is in the best interest of the Vanguard's estates and of its creditors and, therefore, should be approved.  Paying the Oil and Gas Obligations will benefit Vanguard and its creditors by allowing Vanguard to continue the operation of its businesses without interruption and facilitate the maximization of value of its estates.

67.     Furthermore, section 105(a) of the Bankruptcy Code provides that a court "may issue any order . . . necessary or appropriate to carry out the provisions of" the Bankruptcy Code.[35]  The doctrine of necessity is a well-settled doctrine that permits a bankruptcy court to authorize payment of certain prepetition claims prior to the completion of the reorganization process where the payment of such claims is necessary to the reorganization.[36]  The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested in this Motion.[37]

---

some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

[35]  11 U.S.C. § 105(a).

[36]  *See In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (stating that where the debtor "cannot survive" absent payment of certain prepetition claims, the doctrine of necessity should be invoked to permit payment); *see also In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a pre-petition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the Chapter 11 process.").

[37]  *See In re CEI Roofing, Inc.,* 315 B.R. 50, 61 (Bankr. N.D. Tex. 2004) (recognizing the "doctrine of necessity" and its connection to section 105(a)); *In re Gulf Air, Inc.*, 112 B.R. 152, 153–54 (Bankr. W.D. La. 1989) (granting various payments under the "necessity of payment doctrine"); *see also In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *In re Just for Feet*, 242 B.R. at 824  (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

68.     Courts in this district and elsewhere have frequently permitted postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors—as those payments are sound exercises of business judgment.[38]

69.     Vanguard respectfully submits that payment of prepetition Oil and Gas Obligations is proper under Bankruptcy Code section 105 and the doctrine of necessity. Vanguard's long-term business prospects depend on the willingness of numerous Operators, Mineral Contractors, Working Interest Holders, vendors providing gathering, transportation, processing and other services, Warehousemen and others to continue dealing with Vanguard. Vanguard's long-term prospects depend on its ability to acquire and process reserves in the future.  To do so successfully, Vanguard will require the cooperation of various other actors in the industry as indicated above.  These parties may be unwilling to conduct new business with Vanguard if they doubt Vanguard can satisfy its Oil and Gas Obligations.

70.     This is especially true now because bankruptcy will not be seen as an excuse— dozens of other industry actors have entered bankruptcy during this down-cycle and substantially

---

[38] *See, e.g.*, *Miltenberger v. LogansportRy. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of [crucial] business relations"); *Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (extending doctrine for payment of prepetition claims beyond railroad reorganization cases; *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses and benefits); *cf. In re Memorial Production Partners LP*, No. 17-30262 (MI) (Bankr. S.D. Tex. Jan. 23, 2017) [Dkt. No. 120] (granting permission to pay prepetition oil and gas obligations where the motion argued paying oil and gas obligations was a sound exercise of the debtors' business judgment); *In re Stone Energy Corporation*, No. 16-36390 (MI) (Bankr. S.D. Tex. Jan. 10, 2017) [Dkt. No. 258] (same); *In re Shoreline Energy LLC*, No. 16-35571 (DRJ) (Bankr. S.D. Tex. Dec. 15, 2016) [Dkt. No. 184] (same); *In re Warren Res., Inc.*, No. 16-32760 (MI) (Bankr. S.D. Tex. June 3, 2016) [Dkt. No. 41] (same); *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. May 18, 2016) [Dkt. No. 95] (same); *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. July 1, 2016) [Dkt. No. 450] (same); *In re Midstates Petroleum Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016) [Dkt. No. 64] (same); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. June 16, 2016) [Dkt. No. 314] (same); *In re Energy XXI Ltd.*, No. 16-31928 (DRJ) (Bankr. S.D. Tex. May 19, 2016) [Dkt. No. 320] (same).

all have been permitted to make payments on their oil and gas obligations.[39]  Vanguard has

significant dealings with other industry players on its approximately 15,000 wells and has

experienced no interruption in operations with those companies—Vanguard has had to make

only *one* relatively small claim in a chapter 11 case since the commodity price downturn.  The

Bankruptcy courts—most critically in this district—have done a masterful job keeping the oil

and gas industry moving through these difficult moments (for debtors and creditors) and

Vanguard believes that trend should continue in this case.

71.     Last, even if Vanguard could avoid payment of certain accrued Oil and Gas

Obligations, the collateral consequences on Vanguard's business would greatly exceed any cost

savings Vanguard would achieve.  Therefore, satisfaction of the Oil and Gas Obligations in the

ordinary course of business is critically important to Vanguard's ongoing business.  Accordingly,

Vanguard submits that the proposed relief is in the best interest of Vanguard and all stakeholders

in these chapter 11 cases.

### E.     The Court Should Authorize the Payment of Claims Entitled to Priority Pursuant to Section 503(b)(9) of the Bankruptcy Code

72.     Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the

"value of any goods received by the debtor within twenty days before the date of commencement

of a case under this title in which goods have been sold to the debtor in the ordinary course of

such debtor's business."  These claims must be paid in full for Vanguard to confirm a chapter 11

---

[39]  *See, e.g.*, *In re Memorial Production Partners LP*, No. 17-30262 (MI) (Bankr. S.D. Tex. Jan. 23, 2017) [Dkt. No. 120]; *In re Stone Energy Corporation*, No. 16-36390 (MI) (Bankr. S.D. Tex. Jan. 10, 2017) [Dkt. No. 258]; *In re Shoreline Energy LLC*, No. 16-35571 (DRJ) (Bankr. S.D. Tex. Dec. 15, 2016) [Dkt. No. 184]; *In re Atinum MidCon I, LLC*, No. 16-33645 (MI) (Bankr. S.D. Tex. August 17, 2016) [Dkt. No. 52]; *In re Warren Res., Inc.*, No. 16-32760 (MI) (Bankr. S.D. Tex. June 3, 2016) [Dkt. No. 41]; *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. May 18, 2016) [Dkt. No. 95]; *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. June 27, 2016) [Dkt. 450]; *In re Midstates Petroleum Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016) [Dkt. No. 64]; *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. June 16, 2016) [Dkt. No. 314]; *In re Energy XXI Ltd.*, No. 16-31928 (DRJ) (Bankr. S.D. Tex. May 19, 2016) [Dkt. No. 320].

plan.[40]  Therefore, payment of such claims now only provides these creditors with what they would be entitled to receive under a chapter 11 plan.  Additionally, all creditors will benefit from the smooth transition of Vanguard's operations into bankruptcy.

73.     Moreover, the Bankruptcy Code does not prohibit a debtor from paying administrative claims prior to confirmation.  As administrative claims incurred in the ordinary course of business, Vanguard believes it may pay such claims in accordance with its business judgment pursuant to section 363(c)(1) of the Bankruptcy Code.[41]  The timing of these payments also lies squarely within the Court's discretion.[42]

74.     Vanguard's ongoing ability to obtain goods as needed to operate the business is key to its survival and necessary to preserve the value of the estates.  Failure to honor these claims in the ordinary course of business may also cause Vanguard's vendors to withhold support for Vanguard during the chapter 11 process.  Vendors could also eliminate favorable trade terms.  Needless to say, those kinds of costs and distractions would limit Vanguard's ability to stabilize its operations at this critical time to the detriment of all stakeholders.

75.     Courts in this district and others have regularly authorized the payment of claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of business.[43]

---

[40]  *See* 11 U.S.C. § 1129(a)(9)(A).

[41]  *See, e.g.*, *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21-23 ("I think arguably the debtor could pay its 503(b)(9) claimants without court approval.").

[42]  *See In re Glob. Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court") (citations omitted).

[43]  *See, e.g.*, *In re Shoreline Energy LLC*, No. 16-35571 (DRJ) (Bankr. S.D. Tex. Dec. 15, 2016) [Dkt. No. 184]; *In re SandRidge Energy, Inc.*, No. 16-32488 (DRJ) (Bankr. S.D. Tex. May 18, 2016) [Dkt. No. 95]; *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. July 1, 2016) [Dkt. No. 450]; *In re Midstates Petroleum Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016) [Dkt. No. 64]; *In re Sherwin Alumina Co. LLC*, No. 16-20012 (DRJ) (Bankr. S.D. Tex. Jan. 13, 2016) [Dkt. No. 82]; *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. Dec. 23, 2015) [Dkt. No. 150].

## II.     The Court Should Confirm that Outstanding Orders Are Administrative Expense Priority Claims and that Payment of Such Claims Is Authorized

76.     Pursuant to section 503(b)(1) of the Bankruptcy Code, obligations that arise in connection with the postpetition delivery of goods and services, including goods ordered prepetition, are in fact, administrative expense priority claims because they benefit the estate postpetition.[44]  Thus, the granting of the relief sought herein with respect to the Outstanding Orders will not afford such claimants any greater priority than they otherwise would have if the relief requested herein were not granted, and will not prejudice any other party in interest.

77.     Absent such relief, however, Vanguard may be required to expend substantial time and effort reissuing the Outstanding Orders to provide certain suppliers with assurance of administrative priority.  The disruption to Vanguard's supply chain could force Vanguard to halt some of its operations and production, and disrupt Vanguard's business and lead to a loss of revenue, all to the detriment of Vanguard and its creditors.  Accordingly, Vanguard submits that the Court should confirm the administrative expense priority status of the Outstanding Orders and should authorize Vanguard to pay the Outstanding Orders in the ordinary course of business.

## III.     The Proposed Payment Processing Procedures Are Appropriate

78.     As set forth above, Vanguard requests that all financial institutions be authorized and directed to honor and process payments on account of the Oil and Gas Obligations as directed by Vanguard.  Taking into account the proposed DIP financing, Vanguard has sufficient liquidity to pay the amounts delineated in this Motion in the ordinary course of business and have implemented controls to ensure that prepetition claims will not be paid except as authorized

---

[44]  *See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797, 809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition are entitled to administrative priority).

by this Court.  Vanguard therefore submits that the payment processing procedures described in this Motion are appropriate.

## EMERGENCY CONSIDERATION

79.    In accordance with Bankruptcy Local Rule 9013-1(i), Vanguard respectfully requests emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." Vanguard anticipates that Oil and Gas Obligations will come due within twenty-one days of the Petition Date, and that third parties may take adverse action to the estates if the applicable payments are not timely made.  Failure to receive the relief during the first twenty-one days of these chapter 11 cases would thus greatly disrupt Vanguard's operations at this critical juncture. Accordingly, Vanguard submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully requests that the Court approve the relief requested in this Motion on an emergency basis.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

80.    To implement the foregoing successfully, Vanguard seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

81.    Nothing contained in this Motion is intended or shall be construed as: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of Vanguard's rights to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay a prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a

request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of Vanguard's rights under the Bankruptcy Code or any other applicable law.

## **NOTICE**

82.     Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) the U.S. Trustee; (b) the holders of the 50 largest unsecured claims against Vanguard (on a consolidated basis); (c) Citibank, N.A., as administrative agent under Vanguard's first lien credit facility, and its counsel; (d) the indenture trustee for Vanguard's second lien notes; (e) counsel to the ad hoc group of second lien noteholders; (f) the indenture trustees for Vanguard's senior unsecured notes; (g) counsel to the ad hoc group of unsecured noteholders; (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the state attorneys general for states in which Vanguard conducts business; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Vanguard submits that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PRIOR REQUEST**

83.     No prior request for the relief sought in this Motion has been made by Vanguard to this or any other court.

*[remainder of page intentionally left blank]*

**WHEREFORE**, Vanguard respectfully requests that the Court enter Interim and Final Orders, substantially in the forms attached to this Motion as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested in this Motion and granting Vanguard such other and further relief as is just and proper.

Dated:  February 2, 2017                    Respectfully Submitted,

*/s/ James T. Grogan*
Chris L. Dickerson, Esq. (*pro hac vice* requested)
Todd M. Schwartz, Esq. (*pro hac vice* requested)
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone:  (312) 499-6000
Facsimile: (312) 499-6100

- and -

James T. Grogan, Esq. (Tex. Bar No. 24027354)
Danny Newman, Esq. (Tex. Bar No. 24092896)
600 Travis St., 58th Floor
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-2801


*Proposed Counsel to Vanguard*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 2, 2017, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ James T. Grogan*
James T. Grogan