## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| VANGUARD NATURAL RESOURCES, LLC, *et al.*,[1] | § | Case No. 17-30560 (MI) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION SENIOR SECURED SUPERPRIORITY FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

---

**THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER FOR FEBRUARY 2, 2017, AT 4:00 PM (CT) BEFORE THE HONORABLE JUDGE ISGUR, 515 RUSK STREET, COURTROOM 404, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Vanguard Natural Resources, LLC (1161); Eagle Rock Acquisition Partnership, L.P. (6706); Eagle Rock Acquisition Partnership II, L.P. (0903); Eagle Rock Energy Acquisition Co., Inc. (4564); Eagle Rock Energy Acquisition Co. II, Inc. (3364); Eagle Rock Upstream Development Company, Inc. (0113); Eagle Rock Upstream Development Company II, Inc. (7453); Encore Clear Fork Pipeline LLC (2032); Escambia Asset Co. LLC (3869); Escambia Operating Co. LLC (2000); Vanguard Natural Gas, LLC (1004); Vanguard Operating, LLC (9331); VNR Finance Corp. (1494); and VNR Holdings, LLC (6371). The location of the Debtors' service address is: 5847 San Felipe, Suite 3000, Houston, Texas 77057.

Vanguard Natural Resources, LLC ("VNR") and its affiliated debtors as debtors in possession in these cases (collectively, "Vanguard" or the "Debtors") submit this motion (the "Motion"), under sections 105, 361, 362, 363(c), 364(c), 364(d), 364(e), and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of Texas and the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases (the "Complex Case Procedures" and collectively, the "Bankruptcy Local Rules"), for entry of an interim order substantially in the form attached to this Motion as **Exhibit A** (the "Interim Order") and, following a final hearing to be scheduled by the Court (the "Final Hearing"), entry of a final order (in a form to be filed with the Court prior to the Final Hearing, the "Final Order" and, together with the Interim Order, the "DIP Orders"): (a) authorizing the Debtors to (i) obtain postpetition senior secured superpriority financing and (ii) use cash collateral, (b) granting adequate protection to Prepetition Secured Parties (as defined below), (c) modifying the automatic stay, (d) scheduling a final hearing, and (e) granting related relief.  Vanguard requests that the Court (as defined below) schedule a final hearing twenty-one days after the commencement of the Chapter 11 Cases (as defined below), or as soon after twenty-one days as is convenient for the Court, to consider entry of the Final Order. In support of this Motion, the Debtors have contemporaneously filed: (a) the *Declaration of Daniel M. Aronson in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Senior Secured Superpriority Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V)*

2

*Granting Related Relief,* attached to this Motion as **Exhibit B** (the "Aronson Declaration");[2] and (b) the *Declaration of Richard A. Robert, Chief Financial Officer of Vanguard Natural Resources, LLC, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration").  In further support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      As explained in this Motion and the First Day Declaration, several adverse factors, including persistently low commodity prices, have impacted Vanguard's financial condition and near-term liquidity, precipitating the commencement of the Chapter 11 Cases and requiring Vanguard to seek immediate access to Vanguard's proposed DIP Facility (as defined below).[3]  The proposed postpetition financing will, among other things, provide access to capital necessary to ensure that Vanguard can continue operating without material disruption to its businesses during the Chapter 11 Cases and protect Vanguard's liquidity position from exposure to commodity price volatility.  Access to capital, together with Vanguard's other requested first day relief, will, if approved, provide Vanguard with the greatest opportunity to maximize the value of its estates for the benefit of creditors during the Chapter 11 Cases.

2.      As set forth in the Aronson Declaration, prior to the Petition Date, Vanguard and its advisors spent considerable time soliciting new capital and financing to address Vanguard's liquidity challenges.   Aronson Declaration ¶¶ 10, 11.  During the course of that process, Vanguard approached the marketplace and various financing sources to explore opportunities for both a potential in-court and out-of-court resolution to Vanguard's financial condition.

---

[2]  The Aronson Declaration is attached as **Exhibit B** to this Motion.

[3]  Capitalized terms not otherwise defined herein have the meanings given to them in the DIP Credit Agreement (as defined below) or the Interim Order, as applicable.

Vanguard and its advisors had preliminary discussions with sixty-seven potential lenders and entered into non-disclosure agreements with twenty-three prospective financial investors that conducted due diligence.  Four of these parties eventually submitted term sheets for new financing, but Vanguard determined that those proposals were not actionable.

3.      During the financing solicitation process, Vanguard and Vanguard's investment banker, Evercore Group L.L.C. ("Evercore"), remained in dialogue with its existing creditors and stakeholders to collaborate on potential out-of-court solutions to Vanguard's liquidity constraints.  For several months, Vanguard and its advisors met with principal creditors and their advisors and provided those parties with substantial diligence regarding Vanguard's assets and operations.  Ultimately it became clear that a chapter 11 filing presented the best and most viable option to restructure and rationalize Vanguard's balance sheet and capital structure.  With that clarity, Vanguard focused on negotiating consensual deals with its various constituencies as well as locating sources of capital to fund an in-court process.  Vanguard again approached the marketplace (albeit a smaller universe of potential outside lenders) and engaged with those lenders that already had positions in Vanguard's capital structure.  This robust process yielded the current financing facility that Vanguard now seeks to enter into, which Vanguard believes provides postpetition financing on the best available terms.  Vanguard and its advisors determined that the proposal submitted by the DIP Lenders (as defined below) is the most advantageous, with the most favorable economics and terms in light of the facts and circumstances of Vanguard's restructuring efforts.  The financial institutions serving as the DIP Lenders to Vanguard are a subset of Vanguard's prepetition first-lien lenders.  The DIP Facility was the product of an extensive arm's-length negotiation with the DIP Lenders, and no competing proposal provided Vanguard with a similarly beneficial set of comprehensive terms.

4

4.      Accordingly, by this Motion, Vanguard seeks authorization to obtain postpetition financing pursuant to the terms set forth in this Motion, the DIP Credit Agreement (as defined below), and the DIP Orders.  If approved, Vanguard may draw up to $15 million of the proceeds of the DIP Facility following the entry of, and on the terms set forth in, the Interim Order.

## JURISDICTION, VENUE, AND STATUTORY BASES

5.      The United States Bankruptcy Court for the Southern District of Texas (the Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested in this Motion are sections 105, 361, 362, 363(c), 364(c), 364(d), 364(e), and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, Bankruptcy Local Rules 2002-1, 4001-1(b), 4002-1(i) and 9013-1, and the Complex Case Procedures.

## GENERAL BACKGROUND

7.      On the date of this Motion (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have requested that the Chapter 11 Cases be jointly administered.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee").  No trustee or examiner has been appointed in the Chapter 11 cases.

5

**Vanguard's Business**

9.      Formed in 2006, VNR is a publicly traded limited liability company that, through its subsidiaries, is engaged in the acquisition, development, and production of oil and gas properties located in eleven states.  Vanguard has approximately 370 employees, none of whom are represented by labor unions.  VNR is the direct or indirect parent company of each of the other Debtors in these Chapter 11 Cases.

10.     Vanguard's assets consist primarily of producing and non-producing natural gas and oil reserves, all of which are located within the continental United States.  Vanguard's business strategy involves acquiring properties with mature, long-lived production, relatively predictable decline curves, and lower risk development opportunities.  Vanguard currently owns properties and oil and natural gas reserves in the following ten operating basins:

- the Green River Basin in Wyoming;

- the Permian Basin in West Texas and New Mexico;

- the Gulf Coast Basin in Texas, Louisiana, Mississippi and Alabama;

- the Anadarko Basin in Oklahoma and North Texas;

- the Piceance Basin in Colorado;

- the Big Horn Basin in Wyoming and Montana;

- the Arkoma Basin in Arkansas and Oklahoma;

- the Williston Basin in North Dakota and Montana;

- the Wind River Basin in Wyoming; and

- the Powder River Basin in Wyoming.

11.     Through September 30, 2016, Vanguard had revenues of approximately $264.4 million on a consolidated basis.  As of September 30, 2016, Vanguard's unaudited consolidated

6

financial statements reflected assets with a book value totaling approximately $1.6 billion and liabilities totaling approximately $2.3 billion.

12.     As of the Petition Date, Vanguard has approximately $1.8 billion in total funded debt, including approximately $1.3 billion outstanding under its Third Amended and Restated Credit Agreement, dated as of September 30, 2011 (as amended, restated, supplemented, or otherwise modified from time to time, the "First Lien Credit Agreement"), among Debtor Vanguard Natural Gas, LLC, as borrower, the other Debtors, as guarantors, Citibank, N.A., as administrative agent, and the lenders.[4]  As of the Petition Date, Vanguard owes approximately $75.6 million in principal on Senior Secured Second Lien Notes due 2023 plus approximately $2.4 million in accrued interest, $51.1 million in principal on 8.375% Senior Notes due 2019 plus approximately $0.7 million in accrued interest, and $381.8 million in principal on 7.875% Senior Notes due 2020 plus approximately $10.0 million in accrued interest.  Moreover, Vanguard owes approximately $19.4 million in connection with a master lease agreement dated July 23, 2012 between Vanguard Operating, LLC, as lessee and Banc of America Leasing & Capital, LLC, as lessor for certain facilities and equipment in the Piceance Basin.  In addition, the Debtors also have approximately $20.0 million in ordinary course trade payables as of the Petition Date.

13.     Vanguard's primary goal is to effect a restructuring of its balance sheet that will result in a viable capital structure and maximize the value of its businesses for the benefit of all stakeholders during the chapter 11 cases.  To this end, Vanguard has reached an agreement with

---

[4]  The guarantors under the First Lien Credit Agreement are VNR, Eagle Rock Acquisition Partnership, L.P., Eagle Rock Acquisition Partnership II, L.P., Eagle Rock Energy Acquisition Co., Inc., Eagle Rock Energy Acquisition Co. II, Inc., Eagle Rock Upstream Development Company, Inc., Eagle Rock Upstream Development Company II, Inc., Encore Clear Fork Pipeline LLC, Escambia Asset Co. LLC, Escambia Operating Co. LLC, Vanguard Operating, LLC, VNR Finance Corp., and VNR Holdings, LLC.

certain of its prepetition second lien noteholders and its prepetition senior unsecured noteholders

regarding the terms of a comprehensive financial restructuring that will result in the deleveraging

of Vanguard's balance sheet by approximately $707.9 million.  In addition, certain of

Vanguard's prepetition first lien secured lenders have agreed to provide Vanguard with a $50

million postpetition, senior secured debtor-in-possession revolving credit facility to provide

Vanguard with ample working capital during these chapter 11 cases.  Through these, and other

efforts, Vanguard believes that it will successfully delever its balance sheet and emerge from

chapter 11 as a healthy and viable enterprise.

14.     A description of Vanguard's business, capital structure, and the circumstances

leading to these chapter 11 cases is set forth in the *Declaration of Richard A. Robert, Chief

Financial Officer of Vanguard Natural Resources, LLC, in Support of Chapter 11 Petitions and

First Day Motions* (the "<u>First Day Declaration</u>"), which is incorporated by reference and filed

contemporaneously with this Motion.

## **Relief Requested**

15.     By this Motion, Vanguard seeks entry of the DIP Orders providing:

(a)     authority for Vanguard Natural Gas, LLC ("<u>VNR</u>"), as borrower (the "<u>DIP Borrower</u>"), to obtain a postpetition, super priority, senior secured revolving credit facility in the aggregate principal amount of up to $50,000,000 (the "<u>DIP  Facility</u>", all extensions of credit under the DIP Facility, the "<u>DIP  Loans</u>"), and to otherwise incur all of the Debtors' obligations and indebtedness arising under or in connection with the DIP Documents (as defined below), the Interim Order and the DIP Loans (the "<u>DIP Obligations</u>") on the terms and conditions set forth in the Interim Order and the Debtor-in-Possession Credit Agreement (substantially in the form attached to the Interim Order as **Exhibit 1**, and as hereafter amended, supplemented or otherwise modified, the "<u>DIP Credit Agreement</u>", and together with all other agreements, documents and instruments executed and delivered in connection with the DIP Credit Agreement, as hereafter amended, supplemented or otherwise modified, the "<u>DIP Documents</u>"), among the DIP Borrower, each Debtor that guarantees the DIP

Obligations (collectively, the "DIP Facility Guarantors"), the lenders thereto from time to time (collectively, together with the other Secured Parties (as defined in the DIP Credit Agreement), the "DIP Lenders"), and Citibank, N.A. ("Citibank") as administrative agent for the DIP Lenders (in such capacity, the "DIP Agent");

(b)     authority for the DIP Facility Guarantors to guarantee on a secured and joint and several basis the DIP Obligations;

(c)     authority for the Debtors to execute and deliver the DIP Credit Agreement and the other DIP Documents to which they are a party and to perform their respective obligations thereunder and such other and further acts as may be necessary or appropriate in connection therewith;

(d)     authority for the Debtors to borrow up to $15 million of DIP Loans on an interim basis, including up to $5 million for letters of credit, and use proceeds of such borrowings in accordance with the DIP Documents, the DIP Orders, and the Budget (as defined in the DIP Credit Agreement; a form of the Budget is attached to the Interim Order as **Exhibit 2**) and, subject to entry of the Final Order to access the full remaining balance of the DIP Facility by borrowing up to an aggregate principal amount of $50 million.

(e)     authority for the Debtors to (a) use the cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code, the "Cash Collateral") pursuant to section 363 of the Bankruptcy Code, subject to and as set forth in the DIP Budget, the Interim Order, and the DIP Documents, and (b) provide adequate protection to the following parties with respect to the applicable prepetition secured debt obligations of:

(i)     the First Lien Secured Parties (as defined herein) under that certain Third Amended and Restated Credit Agreement, dated as of November 30, 2011 (as amended, restated, amended and restated, supplemented, or otherwise modified, the "First Lien Credit Agreement" and, collectively with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, fee letters, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, including the "Loan Documents" as such term is defined in the First Lien Credit Agreement, the "First Lien Loan Documents") by and among Vanguard Natural Gas, LLC ("Vanguard Natural Gas"), as borrower, each Guarantor (as defined in the First Lien Credit Agreement), the Lenders (as defined therein) from time to time party thereto (the "First Lien Secured Lenders"), and Citibank, as Issuing Bank (as defined in

9

the First Lien Credit Agreement) and administrative agent (Citibank, in its capacity as administrative agent, the "First Lien Agent" and, collectively with the First Lien Secured Lenders, the Issuing Bank, the Swap Lenders (as defined in the First Lien Credit Agreement), the Treasury Management Banks (as defined in the First Lien Credit Agreement), and any other parties to whom Obligations (as defined in the First Lien Credit Agreement and used herein, the "First Lien Obligations") may be owed (the "First Lien Secured Parties"));

(ii) the Second Lien Secured Parties (as defined herein) under that certain Second Lien Indenture, dated as of February 10, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified, the "Second Lien Indenture" and, collectively with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, working fee letters, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "Second Lien Notes Documents" and, together with the First Lien Loan Documents, the "Prepetition Financing Documents") by and among Vanguard Natural Gas and VNR Finance Corp. ("VNR Finance"), as co-issuers, each of the Guarantors (as defined in the Second Lien Indenture), and U.S. Bank National Association, as indenture trustee and collateral agent (as succeeded by Delaware Trust Company, in such capacities, the "Second Lien Indenture Trustee" and, together with the First Lien Agent, the "Prepetition Representatives") for the noteholders thereunder (the "Second Lien Noteholders" and, collectively with the Second Lien Indenture Trustee and any other parties to whom obligations may be owed under the Second Lien Notes Documents (such obligations, the "Second Lien Obligations" and, together with the First Lien Obligations, the "Prepetition Secured Obligations"), the "Second Lien Secured Parties" and, together with the First Lien Secured Parties, the "Prepetition Secured Parties");

(f)     authority for the DIP Agent to exercise remedies under, and in accordance with, the DIP Documents upon the occurrence and during the continuance of a DIP Event of Default;

(g)     authority for the Debtors to perform their obligations under, and pay the fees set forth in the DIP Credit Agreement;

(h)     subject to entry of the Final Order, the waiver by the Debtors of any right to seek to surcharge against the security for the DIP Obligations, (as defined in the Interim Order, the "DIP  Collateral") or Prepetition

10

Collateral (as defined in the Interim Order) pursuant to section 506(c) of the Bankruptcy Code and the waiver by the Debtors of the equities of the case exception of section 552(b) of the Bankruptcy Code with respect to the Prepetition Collateral and DIP Collateral;

(i)    to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on this Motion to be held before this Court to consider entry of the Interim Order (1) authorizing the DIP Borrower, on an interim basis, to access up to $15 million of the aggregate principal amount of the DIP Facility, including up to $5 million for letters of credit, the collective proceeds of which shall be used for working capital and general corporate purposes of the Debtors (including fees, costs and expenses related to the Chapter 11 Cases and the DIP Documents and capital expenditures), as and to the extent set forth in the Interim Order and in accordance with the DIP Budget and the DIP Documents, (2) authorizing the Debtors to use the Cash Collateral and the other Prepetition Collateral in accordance with the DIP Documents, the DIP Budget and the Interim Order, and (3) granting adequate protection to the Prepetition Secured Parties;

(j)    to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") for this Court to consider entry of the Final DIP Order authorizing and approving on a final basis the relief requested in this Motion; and

(k)    a waiver of any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order and providing for the immediate effectiveness of the Interim Order.

### FACTUAL BACKGROUND

16.    Vanguard maintains a reserve-based revolving first lien credit facility (the "First Lien Credit Facility") under the First Lien Credit Agreement.[5]  The First Lien Credit Facility is subject to borrowing base limitations, which are periodically adjusted based on redeterminations of the value of Vanguard's oil and gas reserves.  The obligations under the First Lien Credit Agreement are secured by first-priority liens on substantially all of Vanguard's assets including,

---

[5]  The guarantors under the First Lien Credit Agreement are VNR, Eagle Rock Energy Acquisition Co., Inc., Eagle Rock Energy Acquisition Co. II, Inc., Eagle Rock Acquisition Partnership, L.P., Eagle Rock Acquisition Partnership II, L.P., Eagle Rock Upstream Development Company, Inc., Eagle Rock Upstream Development Company II, Inc., Encore Clear Fork Pipeline LLC, Escambia Asset Co. LLC, Escambia Operating Co. LLC, Vanguard Operating, LLC, VNR Finance Corp., and VNR Holdings, LLC (collectively, the "Guarantors").

among other things, equity interests in the Guarantors, mid-stream assets such as pipelines, and substantially all of Vanguard's oil and gas interests (collectively, the "Prepetition Collateral"). As of the Petition Date, approximately $1.2488 billion in borrowings and approximately $150,000 of letters of credit are outstanding under the First Lien Credit Facility.

17.    Second Lien Notes.  VNR and VNR Finance are the issuers of the 7.00% senior secured second lien notes due 2023 (the "Second Lien Notes").  Delaware Trust Company is the indenture trustee and collateral trustee for the Second Lien Notes.  As of the Petition Date, approximately $75.6 million in Second Lien Notes was outstanding.  All of VNR's wholly-owned subsidiaries have guaranteed the obligations of VNR and VNR Finance under the Second Lien Notes.  The Second Lien Notes are secured by second-priority liens on certain of the Prepetition Collateral.  The Intercreditor Agreement, dated as of February 10, 2016, between the First Lien Agent and the Second Lien Indenture Trustee governs the parties' relative rights with respect to the Collateral and provides other protections to the parties.

18.    Unsecured Senior Notes.  VNR and VNR Finance are the issuers of the 7.875% senior notes due 2020 (the "2020 Senior Notes").  In addition, Vanguard Operating, LLC, is the issuer of the 8.375% senior notes due 2019 (the "2019 Senior Notes" and, together with the 2020 Senior Notes, the "Senior Notes").  Wilmington Trust Company is the indenture trustee for the holders of 2019 Senior Notes, and UMB Bank, N.A. is the indenture trustee for the holders of 2020 Senior Notes.  As of the Petition Date, approximately $381.8 million and $51.1 million in 2020 Senior Notes and 2019 Senior Notes, respectively, were outstanding.  VNR is a guarantor under the 2019 Senior Notes.  In addition, all wholly-owned subsidiaries of VNR (other than the issuers) have guaranteed the obligations under the Senior Notes.

12

## VANGUARD'S IMMEDIATE NEED FOR ACCESS TO THE DIP FACILITY AND CASH COLLATERAL

19.     As is typical in its industry, Vanguard's businesses are cash intensive, with significant daily costs to manage and develop oil and natural gas properties, satisfy obligations to employees, maintain the safety of its operations, and fulfill environmental and other regulatory requirements.  First Day Declaration ¶ 163.  To ensure a seamless transition into chapter 11, preserve value, and pursue their restructuring goals, the Debtors require immediate access to postpetition financing and the use of Cash Collateral.  Vanguard, in consultation with its advisors, has reviewed and analyzed its projected cash needs and has prepared a DIP Budget (as updated from time to time in accordance with the DIP Credit Agreement) outlining Vanguard's postpetition cash needs during the anticipated length of these cases. Vanguard believes that the DIP Budget is an accurate reflection of its funding requirements over the identified period, allowing it to meet its obligations, and is reasonable and appropriate under the circumstances. First Day Declaration ¶ 160.

20.     Immediate and ongoing access to funding under the DIP Facility will demonstrate to its employees, vendors, suppliers, and other key constituencies and parties in interest that Vanguard has sufficient resources available to meet its obligations in the ordinary course during these cases.  Additionally, because the Debtors will, as of the Petition Date, lack access to a secured hedging program, without immediate access to available funds under the DIP Facility and the continued and uninterrupted use of Cash Collateral, Vanguard's businesses operations would face serious and immediate impairment.  First Day Declaration ¶ 37.  Vanguard would be unable to manage downward liquidity pressure caused by low strip pricing and commodity pricing volatility.  In such an event, the success of Vanguard's restructuring could be imperiled.

13

In sum, without the relief requested herein, Vanguard would suffer substantial, irreparable, and ongoing harm.  Accordingly, Vanguard's need for access to postpetition financing and the use of Cash Collateral on the terms set forth in the DIP Credit Agreement and the DIP Orders is immediate and urgent.

21.    The DIP Facility also represents the best available source of financing under the circumstances.  As set forth in the Aronson Declaration, Vanguard, through Evercore, commenced a process where the Debtors sought, among other things, proposals to recapitalize the Debtors.  Aronson Declaration ¶ 10.  This process included specific requests and proposals to provide Vanguard with prepetition financing and exit capital.  *Id.*  After outreach efforts and negotiations with multiple constituencies, Vanguard determined that the DIP Facility was the best source of financing available under the circumstances.  Aronson Declaration ¶ 11.  The DIP Facility will provide Vanguard with an opportunity to formulate and implement a plan to restructure its obligations.  Aronson Declaration ¶ 13.

## MATERIAL TERMS OF THE DIP FACILITY[6]

22.    The principal terms of the DIP Facility are as follows:

| Borrower<br><br>*DIP Credit Agreement, Introduction* | Vanguard Natural Gas, LLC |
| --- | --- |
| Guarantors<br><br>*DIP Credit Agreement, Recitals;  Definitions, § 8.14(e)* | Vanguard Natural Resources, LLC, Eagle Rock Acquisition Partnership, L.P., Eagle Rock Acquisition Partnership II, L.P., Eagle Rock Energy Acquisition Co., Inc., Eagle Rock Energy Acquisition Co. II, Inc., Eagle Rock Upstream Development Company, Inc., Eagle Rock Upstream Development Company II, Inc., Encore Clear Fork Pipeline LLC, Escambia Asset Co. LLC, Escambia Operating Co. LLC, Vanguard Natural Gas, LLC, Vanguard Operating, LLC, VNR Finance Corp., and VNR Holdings, LLC and other parties executing the Guaranty |

---

[6]  NTD:  To be updated.

This summary is qualified in its entirety by the provisions of the DIP Credit Agreement and the Interim Order.  Unless otherwise set forth in this summary, capitalized terms used within this summary have the meanings ascribed to them in the DIP Credit Agreement or the Interim Order, as applicable. Further, the DIP Credit Agreement also contains other customary affirmative and negative covenants and representations and warranties that are not described herein but are customary for a transaction of this nature.

| | |
|---|---|
| **DIP Lenders**<br><br>*DIP Credit Agreement, Definitions, Annex I* | The lenders that are listed on <u>Annex I</u> of the DIP Credit Agreement or have become parties thereto pursuant to an Assignment and Assumption, including Citibank in its capacity as the issuer of Letters of Credit, and their respective successors and assigns |
| **DIP Agent**<br><br>*DIP Credit Agreement, Introduction* | Citibank, N.A. as Administrative Agent and Issuing Bank |
| **DIP Facility**<br><br>*DIP Credit Agreement, Recitals* | Debtor-in-possession, super priority, senior secured revolving credit facility in an aggregate principal amount of up to $50,000,000 |
| **Borrowing Limits**<br><br>*DIP Credit Agreement, Definitions, § 2.01, Annex I* | The Debtors may borrow an aggregate principal amount that will not result in (a) each Lender's Revolving Credit Exposure exceeding such Lender's Commitment, (b) during the Interim Period, the total Revolving Credit Exposure of the Lenders exceeding $15 million or (c) the total Revolving Credit Exposure of all Lenders exceeding the aggregate total of the Lenders' Commitments.  However, the Debtors may borrow, repay, and reborrow the Loans. |
| **Interest Rates**<br><br>*DIP Credit Agreement, Definitions, §§ 3.02, 3.03* | The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the maximum nonusurious interest rate. The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin, but in no event to exceed the maximum nonusurious interest rate.<br><br><u>Alternate Base Rate</u> means, for any day, a rate per annum equal to the highest of (a) the Federal Funds Effective Rate in effect on such day plus 0.50%, (b) to the extent ascertainable, the LIBO Rate (which rate shall be calculated based upon an Interest Period of one month and shall be determined on a daily basis and, for the avoidance of doubt, the LIBO Rate for any day shall be based on the rate determined on such day at 11:00 a.m. (London time)) plus 1.00%, (c) the Prime Rate and (d) 0.00%.  <u>Adjusted LIBO Rate</u> means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.  <u>Applicable Margin</u> means, for any day, (a) with respect to any ABR Loan, 4.50% per annum and (b) with respect to any Eurodollar Loan, 5.50% per annum. |
| **Use of Proceeds**<br><br>*DIP Credit Agreement, § 8.17; Interim Order* | The proceeds of the Borrowings shall be used by the Borrower to (i) pay certain costs and expenses of administering the Chapter 11 Cases, (ii) fund the working capital needs, capital improvements, and other general corporate purposes of the Borrower and its Subsidiaries and (iii) make the payments provided for in the DIP Order, subject to compliance with the DIP Budget and Federal Reserve Board regulations. |
| **Collateral and Priority; Liens on Avoidance Actions**<br><br>*Interim Order, ¶ 5* | The DIP Agent, for the benefit of the DIP Secured Parties, shall have, effective as of the Petition Date, with respect to the Debtors, their estates, and all DIP Collateral, the following liens:<br><br>A first priority, priming security interest in and lien pursuant to Bankruptcy Code section 364(d)(1) on all encumbered property of the Debtors and their estates (the "<u>Section 364(d)(1) Liens</u>"), which Section 364(d)(1) Liens shall be senior to any existing liens or claims, subject only to (i) the Carve-Out, (ii) valid, perfected, and non-avoidable liens on property of a Debtor that are in existence on the Petition Date, other than the First Priority Prepetition Liens and the Second Priority Prepetition Liens, and (iii) valid and non-avoidable liens on property of a Debtor that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the foregoing clauses (ii) and (iii) being referred to collectively as the "<u>Permitted Prior Liens</u>");<br><br>a first priority security interest in and lien pursuant to Bankruptcy Code section 364(c)(2) on all unencumbered property of the Debtors (the "<u>Section 364(c)(2) Liens</u>"), *provided* that upon entry of the order of the Bankruptcy Court authorizing and approving the Debtors' entry into, and performance under, the DIP Facility on a final basis, including the granting of the Liens and Superpriority Claims in respect of the DIP Facility in favor of the Administrative Agent and the Secured Parties, in substantially the form of the Interim Order, with such changes as the |

| | |
|---|---|
| | Administrative Agent and the Majority Lenders approve, the Parties may seek and the Court will determine whether the Section 364(d)(1) Liens shall include the proceeds and property recovered in respect of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548 and 550 or any other similar state or federal law (collectively, the "Avoidance Action Proceeds"), which Section 364(c)(2) Liens shall be subject only to the Carve-Out; and<br><br>A junior security interest and lien pursuant to Bankruptcy Code section 364(c)(3) on all property of the Debtors and their estates that is subject to a Permitted Prior Lien (the "Section 364(c)(3) Liens"), which Section 364(c)(3) Liens are also subject to the Carve-Out.  The Section 364(d)(1) Liens, Section 364(c)(2) Liens, and Section 364(c)(3) Liens shall be collectively referred to as the "DIP Liens."). <br><br>Additionally, the Debtors' stipulations (summarized below) address the interests of the Prepetition Secured Parties. |
| **Optional Prepayments**<br><br>*DIP Credit Agreement, § 3.04(a),(b)* | The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with Section 3.04(b). |
| **Mandatory Prepayments**<br><br>*DIP Credit Agreement, § 3.04(c),(d),* | (i) If the total Revolving Credit Exposure exceeds the Effective Commitment, then the Borrower shall prepay the Borrowings in an aggregate principal amount equal to such excess;<br>(ii) [reserved];<br>(iii) If any Loan Party receives any Net Cash Proceeds in excess of $5,000,000 from the monetization, Liquidation, close-out or other similar equivalent action taken by any Loan Party in respect of any transaction arising under any Swap Agreement to which any Loan Party is a party, the Borrower shall immediately repay an aggregate principal amount of outstanding Borrowings on a (ratably, to each Lender in accordance with each such Lender's Applicable Percentage) equal to 100% of such Net Cash Proceeds, subject to certain limitations;<br>(iv) If any Loan Party receives or realizes any Net Cash Proceeds from the monetization, Liquidation, close-out or other similar equivalent action taken by any Loan Party in respect of any transaction arising under any Swap Agreement to which any Loan Party is a party, the Borrower shall immediately repay an aggregate principal amount of outstanding Borrowings (ratably, to each Lender in accordance with each such Lender's Applicable Percentage) equal to 100% of such Net Cash Proceeds to net or set-off amounts against such Net Cash Proceeds, less any prepayments made pursuant to an excess of the Revolving Credit Exposure, as set forth in clause (i) above;<br>(v) Subject to the payment priorities set forth in the DIP Order, immediately upon the incurrence of any Debt (other than permitted Debt) or receipt of Equity Interest by any Loan Party or any of their respective Subsidiaries, the Borrower shall repay an aggregate principal amount of outstanding Borrowings (ratably to each lender in accordance with each such Lender's Applicable Percentage) equal to 100% of such amount, net of any costs associated with Debt incurrence, if applicable;<br>(vi) If the Loan Parties and/or any of their respective Subsidiaries have any cash in excess of $30 million ("Excess Cash"), then the Borrower shall immediately repay an aggregate principal amount of outstanding Borrowings (ratably to each Lender in accordance with each such Lender's Applicable Percentage) in an amount equal to the lesser of (A) such Excess Cash and (B) the aggregate principal amount of the outstanding Borrowings as of such date.<br><br>Mandatory prepayments shall be applied ratably to the Loans included in such Borrowings, first to ABR Borrowings, then Eurodollar Borrowings in order of priority, and paid first toward accrued interest, second toward principal amounts, and third as required by the DIP Order, without premium or penalty. |
| **Fees**<br><br>*DIP Credit Agreement, § 3.05* | Commitment Fees.  To the Administrative Agent for the account of each Lender in accordance with each such Lender's Applicable Percentage, a commitment fee, which shall accrue at the Commitment Fee Rate on the average daily amount of the unused amount of the Commitment of such Lender during the period from and including the Interim Facility Effective Date to but excluding the Termination Date, payable monthly in arrears and computed on the basis of a 360-day year so long as it does not exceed the maximum nonusurious interest rate. |

16

| | |
|---|---|
| | <u>Letter of Credit Fees</u>.  (i) To the Administrative Agent for the account of each Lender in accordance with each such Lender's Applicable Percentage, a participation fee with respect to its participations in Letters of Credit, which shall accrue at a per annum rate equal to the same Applicable Margin used to determine the interest rate applicable to ABR Loans on the daily face amount of such Lender's Applicable Percentage (excluding any portion thereof attributable to unreimbursed LC Disbursements) in respect of Letters of Credit on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Interim Facility Effective Date to but excluding the later of the date on which such Lender's Commitment terminates and the date on which such Lender ceases to have any LC Exposure;<br><br>(ii) To the Issuing Bank, a fronting fee, which shall accrue at the rate of 0.35% per annum on the average daily amount of the LC Exposure during the period from and including the Interim Facility Effective Date to but excluding the later of the date of termination of the Commitments and the date on which there ceases to be any LC Exposure, <u>provided</u> that in no event shall such fee be less than $500 during any quarter; and<br><br>(iii) To the Issuing Bank, for its own account, its standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder. All the Letter of Credit Fees are payable monthly in arrears and computed on the basis of a year of 365 days so long as it does not exceed the maximum nonusurious interest rate.<br><br><u>Administrative Agent Fees</u>.  To the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent. |
| **Maturity Date**<br><br>*DIP Credit Agreement, Definitions* | The Maturity Date is the nine-month anniversary of the Interim Facility Effective Date. |
| **Acceleration of Maturity**<br><br>*DIP Credit Agreement, § 10.02(a)* | (a) Upon the occurrence and continuance of any Event of Default, (i) the Administrative Agent, upon the written request of the Majority Lenders, shall (A) deliver a notice to the Company of the Event of Default, (B) terminate the Commitments, and thereupon the Commitments shall terminate immediately unless and until the Majority Lenders and the Administrative Agent shall reinstate the same in writing, (C) declare the Loans then outstanding to be due and payable in whole or in part, and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations, shall become due and payable immediately, in each case, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by each Loan Party, (D) terminate the DIP Facility and (E) charge the Default Rate; and (ii) upon five Business Days' written notice to the Borrower and the Administrative Agent from the Majority Lenders, in their sole and absolute discretion, the automatic stay of section 362 of the Bankruptcy Code shall be terminated without any further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading, for the purpose of permitting the Lenders to do any of the following: (A) direct the Administrative Agent to foreclose on the Collateral and (B) enforce all of the Lenders' rights under the Guaranty and under the other Loan Documents. |
| **Conditions Precedent to Each Credit Event**<br><br>*DIP Credit Agreement, § 6.03* | The obligation of each Lender to make a Loan on the occasion of any Borrowing, and of the Issuing Bank to issue, amend, renew or extend any Letter of Credit, is subject to the satisfaction of the following conditions:<br><br>(i) No Events of Default have occurred and are continuing;<br>(ii) No circumstance has or is reasonably expected to have Material Adverse Effect;<br>(iii) The representations and warranties of the Borrower and other Loan Parties are materially true and correct;<br>(iv) There is no conflict with or violation of any applicable Governmental Requirement and no material litigation is pending or threatened;<br>(vi) The Administrative Agent received a Borrowing Request or a request for a Letter of Credit and all Budget updates and Variance Reports;<br>(vii) The aggregate Revolving Credit Exposures for all Lenders do not exceed the Effective Commitments;<br>(viii) The making of the Loans do not contravene any laws applicable to any Agent or Lender; |

| | |
|---|---|
| | (viii) All necessary consents, authorizations and approvals, filings and registrations, and all other required actions have been obtained and are in full force and effect;<br>(ix) The DIP Orders are in full force and effect, with all Loan Parties in compliance;<br>(x) There is no Excess Cash and no mandatory prepayments are triggered;<br>(xi) All "second day" orders are reasonably satisfactory to the Administrative Agent; and<br>(xii) No Lender is a Defaulting Lender or a Potential Defaulting Lender, or the Issuing Bank is satisfied that any exposure that would result therefrom is eliminated or fully covered by the remaining commitments.<br><br>Other conditions governing the effectiveness of the DIP Facility on interim and final bases are set forth in sections 6.01 and 6.02 of the DIP Credit Agreement. |
| **Covenants**<br><br>*DIP Credit Agreement,<br>Articles VIII, IX* | Usual and customary for financings of this type, including:<br><br>Affirmative Covenants: Financial statement and other reporting; notices of Events of Default, Material Adverse Effects, formation of new subsidiaries, and similar events; maintenance of insurance; payment of governmental obligations; pledges of equity in new subsidiaries; issuance of guaranties by new subsidiaries; compliance with the Budget; and approval of the cash management system.<br><br>Negative Covenants: Limitations on: incurrence of liens; asset dispositions; mergers; investments; incurrence of indebtedness; certain transactions with affiliates; incurrence of contingent obligations; making of restricted payments; entry into derivatives contracts; changes in the operation of the business, corporate operations; actions involving ERISA. |
| **Events of Default**<br><br>*DIP Credit Agreement,<br>§ 10.01* | One or more of the following events shall constitute an "Event of Default":<br><br>(i) Failure to pay any principal, interest, fee or any other amount of any Loan, reimbursement obligation in respect of any LC Disbursement or Material Indebtedness incurred on or after the Petition Date;<br>(ii) Inaccuracy of any representation or warranty;<br>(iii) Failure to observe or perform certain covenants without remedy;<br>(iv) Events or conditions that result in Material Indebtedness becoming due, or requiring the Redemption thereof or any offer to Redeem to be made in respect thereof, or requiring the Parent, Borrower, or any Subsidiary to make an offer in respect thereof, prior to the scheduled maturity;<br>(v) Any Change of Control;<br>(vi) Certain final judgments against the Parent, Borrower or any Subsidiary;<br>(vii) Invalidity of the Loan Documents<br>(viii) ERISA Event reasonably expected to result in liability of more than $1,000,000 in any year;<br>(ix) An early Termination Date pursuant to a Swap Agreement;<br>(xiii) Motion by the Loan Parties to dismiss or convert the Chapter 11 Cases, or such dismissal or conversion;<br>(xiv) Appointment of a trustee or examiner;<br>(xv) Payment or granting of adequate protection in excess of $1,000,000 without prior written consent;<br>(xvi) (a) Invalidity of liens granted with respect to the DIP Facility in the priority set forth in the DIP facility, (b) invalidity of DIP Obligations or lack of superpriority status of such DIP Obligations, or (c) disallowance extinguishment of the Obligations;<br>(xvii) Motion seeking modification of the Interim Order or Final Order without prior written consent or altering the payments made to the Administrative Agent or the Lenders;<br>(xviii) Bankruptcy Court order modifying the automatic stay with respect to assets having a value in excess of $1,000,000;<br>(xix) Failure to satisfy any of the Plan Milestones;<br>(xx) Breach or invalidity of the Interim Order or Final Order; or<br>(xxi) Entry of an order precluding the Prepetition RBL Agent, the Prepetition RBL Lenders, the Administrative Agent and/or the Lenders from "credit bidding." |
| **Milestones**<br><br>*DIP Credit Agreement,<br>Definitions;<br>Interim Order ¶ 21* | On or before the date that is 90 days following the Petition Date, the Debtors shall file (i) a plan of reorganization, which shall be in form and substance acceptable to the Majority Lenders and the Required Lenders (as defined in the First Lien Credit Agreement), as confirmed by the DIP Agent and the First Lien Agent, respectively, in writing (the "Approved Plan") and (ii) a disclosure statement for the Approved Plan, which shall be in form and substance acceptable to |

| | the Majority Lenders and the Required Lenders (as defined in the First Lien Credit Agreement), as confirmed by the DIP Agent and the First Lien Agent, respectively, in writing (the "Approved Disclosure Statement");<br><br>On or before the date that is 135 days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Approved Disclosure Statement, which order shall be in form and substance acceptable to Majority Lenders and the Required Lenders (as defined in the First Lien Credit Agreement), as confirmed by the DIP Agent and the First Lien Agent, respectively, in writing;<br><br>On or before the date that is 195 days following the Petition Date, the Bankruptcy Court shall have entered an order confirming the Approved Plan, which order shall be in form and substance acceptable to Majority Lenders and the Required Lenders (as defined in the First Lien Credit Agreement), as confirmed by the DIP Agent and the First Lien Agent, respectively, in writing; and<br><br>On or before the date that is 225 days following the Petition Date, the Approved Plan shall become effective. |
|---|---|
| **DIP Budget**<br><br>*DIP Credit Agreement, §§ 6.01(j), 8.18(a),(b)* | The DIP Budget consists of the Initial Budget and any Budget Updates.<br><br>Initial Budget: A 13-week cash flow forecast, containing line items of sufficient detail to reflect the Loan Parties' projected receipts and disbursements for the 13-week period commencing on the Petition Date, in form and substance acceptable to the Administrative Agent and the Majority Lenders.<br><br>Budget Updates: On or before 5:00 pm, New York City time, on March 3, 2017, and on the date of each four-week anniversary of such date occurring thereafter (each, a "Reporting Date"), the Borrower will provide to the Administrative Agent a new updated thirteen (13)-week budget covering the 13-week period commencing on the applicable Reporting Date, which update shall contain line items substantially similar to the Initial Budget and all other information reasonably requested by the Administrative Agent and/or the Majority Lenders, in each case, in form and substance satisfactory to the Administrative Agent and the Majority Lenders.<br>On or before 5:00 pm, New York City time, on (i) the first Tuesday following each Reporting Date, and (ii) the third Tuesday following each Reporting Date, solely to the extent that any Loans, Letters of Credit Loans or Letters of Credit with an aggregate principal face amount in excess of $1,000,000 are outstanding, the Debtors will provide to the DIP Agent and the First Lien Agent a Variance Report. |
| **Budget Variance**<br><br>*DIP Credit Agreement, § 9.21* | As of any Variance Testing Date, for the Testing Period ending on such Variance Testing Date, the Parent and the Borrower shall not allow the aggregate disbursements made by the Loan Parties and their respective Subsidiaries during such Testing Period to be greater than 115% of the aggregate disbursements for the Loan Parties and their respective Subsidiaries set forth in the Budget for such Testing Period (after giving effect to the accrued and unused portion of the most recent rolling 4-week carryover). |
| **Use of Cash Collateral**<br><br>*Interim Order ¶ 10* | The Debtors are authorized to use Cash Collateral, subject to and as set forth in the DIP Budget, the Interim Order, and the DIP Documents. In no event shall the Debtors be authorized to use Cash Collateral or the DIP Facility for any purpose or under any terms other than those set forth in the DIP Budget, the Interim Order, and the DIP Documents. The Debtors are further authorized to use the other Prepetition Collateral during the period from the Petition Date through and including the DIP Termination Date in accordance with the terms and conditions of the Interim Order. |
| **Stipulations to Prepetition Liens and Claims**<br><br>*Interim Order ¶ D* | The Interim Order contains stipulations regarding the First Lien Obligations, First Lien Collateral, Second Lien Obligations, Second Lien Collateral, Intercreditor Agreement, validity of Prepetition Liens and Prepetition Obligations, Cash Collateral, releases, and default. |
| **Adequate Protection**<br><br>*Interim Order ¶ 11* | *First Lien Secured Parties' Adequate Protection Liens.* As adequate protection, the First Lien Agent, in accordance with sections 361, 363(e), and 364(d) of the Bankruptcy Code, is hereby granted, for the benefit of the First Lien Secured Parties, valid, binding, enforceable, and automatically perfected security interests and replacement liens (the "First Lien Adequate |

Protection Liens") upon all of the Debtors' right, title, and interest in any assets and properties of each of the Debtors, whether arising prepetition or postpetition, of any nature whatsoever, wherever located, in each case to secure the First Lien Obligations against the diminution in the value of the Prepetition Collateral, if any, subsequent to the Petition Date, including any such diminution by reason of (i) the reduction of the Prepetition Collateral as a consequence of the priming by the DIP Obligations, (ii) depreciation, use, sale, loss, or decline in market value or otherwise of the Prepetition Collateral, and (iii) the sum of the aggregate amount of all Cash Collateral and the aggregate value of all non-cash Prepetition Collateral, which is applied in payment of the DIP Obligations or any other obligations other than the First Lien Obligations. The First Lien Adequate Protection Liens are subject and subordinate to (1) the Carve-Out, (2) the DIP Obligations, the DIP Liens, and the DIP Superpriority Claims, and (3) the Permitted Prior Liens, and are senior to the Second Priority Liens, the Second Lien Adequate Protection Liens (as defined below), and the Second Lien Adequate Protection Superpriority Claims (as defined below). The First Lien Adequate Protection Liens shall not (x) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, (y) subject to any intercompany claim, whether secured or unsecured, of any Debtor or any domestic or foreign subsidiary or affiliate of any Debtor, or (z) hereafter be subordinated to or made *pari passu* with any other lien or security interest under sections 361, 363, or 364 of the Bankruptcy Code or otherwise except as expressly provided in this Interim Order and the DIP Documents.

*Payment of Fees and Expenses.* The Debtors shall pay in cash, without the need for the filing of formal fee applications: (i) immediately upon entry of this Interim Order, the reasonable professional fees, expenses, and disbursements (including, but not limited to, the fees, expenses, and disbursements of counsel and third-party consultants, including financial advisors and auditors) incurred by the First Lien Agent and the First Lien Lenders under the First Lien Loan Documents arising prior to the Petition Date; and (ii) the reasonable professional fees, expenses, and disbursements (including, but not limited to, the fees, expenses, and disbursements of counsel and third-party consultants, including financial advisors and auditors) incurred by the First Lien Agent and the First Lien Lenders under the First Lien Loan Documents arising subsequent to the Petition Date.

*Interest Payments to First Lien Secured Parties.* The Debtors shall pay, in cash, interest to the First Lien Secured Parties at the non-default rate at such times as provided for in and in accordance with the terms of the First Lien Loan Documents. Notwithstanding the foregoing, the First Lien Secured Parties reserve the right to seek interest at the default rate, subject to the right of the Debtors to object thereto. In addition, all letter of credit fees provided for in the First Lien Loan Documents, whether payable prior to or after the Petition Date, shall be payable in cash.

*First Lien Secured Parties' Superpriority Claims.* Pursuant to section 507(b) of the Bankruptcy Code, the First Lien Secured Parties, effective as of the entry of this Interim Order, are hereby further granted an allowed superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases (collectively, the "First Lien Superpriority Claims"), for the diminution in the value of the Prepetition Collateral, if any, subsequent to the Petition Date, which claims shall only be junior to the DIP Superpriority Claims and the Carve-Out, but shall be senior to and have priority over any other administrative expense claims, unsecured claims, and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever. The First Lien Superpriority Claims shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all assets and properties of each of the Debtors. Except for the DIP Superpriority Claims and the Carve-Out, the First Lien Superpriority Claims shall not be made subject to, or *pari passu* with, any claim heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates, and any successors or assigns thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases.

*Adequate Protection Reservation.* The receipt by the First Lien Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the First Lien Secured Parties are adequately protected. Further, this Interim Order shall not prejudice or limit the rights of the First Lien Secured Parties to seek additional relief with respect to the use of Cash

20

Collateral or for additional adequate protection, without prejudice to the Debtors' rights to contest the seeking of such relief by the First Lien Secured Parties.

*Second Lien Secured Parties' Adequate Protection Liens.* As adequate protection, the Second Lien Indenture Trustee, in accordance with sections 361, 363(e), and 364(d) of the Bankruptcy Code, is hereby granted, for the benefit of the Second Lien Secured Parties, valid, binding, enforceable, and automatically perfected security interests and replacement liens (the "Second Lien Adequate Protection Liens" and, together with the First Lien Adequate Protection Liens, the "Adequate Protection Liens") upon all of the Debtors' right, title, and interest in any assets and properties of each of the Debtors, whether arising prepetition or postpetition, of any nature whatsoever, wherever located, in each case to secure the Second Lien Obligations against the diminution in the value of the Prepetition Collateral, if any, subsequent to the Petition Date, including any such diminution by reason of (i) the reduction of the Prepetition Collateral as a consequence of the priming by the DIP Obligations, (ii) depreciation, use, sale, loss, or decline in market value or otherwise of the Prepetition Collateral, and (iii) the sum of the aggregate amount of all Cash Collateral and the aggregate value of all non-cash Prepetition Collateral, which is applied in payment of the DIP Obligations or any other obligations other than the Second Lien Obligations. The Second Lien Adequate Protection Liens are subject and subordinate to the (1) the Carve-Out, (2) the DIP Obligations, DIP Liens, and DIP Superpriority Claims, (3) the First Lien Adequate Protection Liens and the First Lien Superpriority Claims, (4) the First Priority Prepetiton Liens, and (v) the Permitted Prior Liens. The Second Lien Adequate Protection Liens shall not (x) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, (y) subject to any intercompany claim, whether secured or unsecured, of any Debtor or any domestic or foreign subsidiary or affiliate of any Debtor, or (z) hereafter be subordinated to or made *pari passu* with any other lien or security interest under sections 361, 363, or 364 of the Bankruptcy Code or otherwise except as expressly provided in this Interim Order and the DIP Documents.

*Second Lien Secured Parties Superpriority Claims.* Pursuant to section 507(b) of the Bankruptcy Code, the Second Lien Secured Parties, effective as of the entry of this Interim Order, are hereby further granted an allowed superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases (collectively, the "Second Lien Superpriority Claims" and, together with the First Lien Superpriority Claims, the "Adequate Protection Superpriority Claims"), for the diminution in the value of the Prepetition Collateral, if any, subsequent to the Petition Date, which claims shall be junior to the DIP Superpriority Claims, the First Lien Superpriority Claims, any claims arising under the First Lien Loan Documents, and the Carve-Out, and subject in all respects to the Intercreditor Agreement, but shall be senior to and have priority over any other administrative expense claims, unsecured claims, and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever. The Second Lien Superpriority Claims shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all assets and properties of each of the Debtors. Except for the DIP Superpriority Claims, the First Lien Superpriority Claims, any claims arising under the First Lien Loan Documents, and the Carve-Out, the Second Lien Superpriority Claims shall not be made subject to, or *pari passu* with, any claim heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any Successor Cases.

| | |
|---|---|
| **Carve-Out**<br><br>*DIP Credit Agreement, Definitions;*<br>*Interim Order ¶¶ 28(a),(e)* | The DIP Liens, the DIP Superpriority Claims, the First Priority Prepetition Liens, the Second Priority Prepetition Liens, the Adequate Protection Liens, and the Adequate Protection Superpriority Claims, shall be subject to the payment, without duplication, of the following fees and expenses (the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve-Out"): (i) the reasonable fee and expense claims of the respective retained professionals of the Debtors and any official committee that may be appointed in these cases (each, a "Committee") that have been approved by this Court at any time during the Chapter 11 Cases pursuant to sections 327, 328, and 1103 of the Bankruptcy Code (the Court-approved professionals of the Debtors and any Committee are collectively referred to as the "Retained Professionals", the reasonable expenses of members of any Committee ("Committee Member Expenses", which shall not include legal fees and expenses of such Committee member) which were incurred (A) on and after the Petition Date and before the Carve-Out Trigger Date (as defined herein), and (B) on and after the Carve-Out Trigger Date in an aggregate amount not exceeding $2,500,000 for all Retained Professionals and Committee Member Expenses, *provided,* |

| | |
|---|---|
| | that, in each case, such fees and expenses of the Retained Professionals and Committee Member Expenses are ultimately allowed on a final basis by this Court pursuant to sections 330 and 331 of the Bankruptcy Code or otherwise and are not excluded from the Carve-Out under the Interim Order, and *provided further*, that nothing herein shall waive the right of any party to object to the allowance of any such fees and expenses; and, *provided further*, that the Carve-Out shall not include any bonus, transaction, success fees, completion fees, substantial contribution fees, or any other fees of similar import of any of the foregoing for Retained Professionals; and (ii) the unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code.  There is no limitation on the obligations of the Debtors and their estates with respect to unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code.<br><br>In the event the Chapter 11 Cases are converted to chapter 7, there shall be a separate carve-out of $25,000 in the aggregate (the "<u>Trustee Carve-Out</u>") that may be used for the reasonable fees and expenses of a chapter 7 trustee and such separate Trustee Carve-Out shall have the same priorities as the Carve-Out. |
| **Effect of Debtor's Stipulations on Third Parties**<br><br>*Interim Order ¶ 29* | Subject to Challenges made prior to the Challenge Deadline (as such terms are defined in the Interim Order) that result in a final and non-appealable judgment or order of the Court that is inconsistent with the admissions, stipulations, agreements, releases, and waivers set forth in the Interim Order (the "<u>Prepetition Lien and Claim Matters</u>"), the Prepetition Lien and Claim Matters shall be binding upon the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative and all parties in interest and all of their successors in interest and assigns. |
| **Waiver or Modification of the Automatic Stay**<br><br>*Interim Order ¶ 15* | The automatic stay is modified solely to the extent necessary to permit (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform any and all acts as the DIP Agent may request to assure the perfection and priority of the DIP Liens; (b) the Debtors to grant the First Lien Adequate Protection Liens, the First Lien Superpriority Claims, the Second Lien Adequate Protection Liens, and the Second Lien Superpriority Claims, in each case as set forth in the Interim Order, and to perform any and all acts to ensure that the First Lien Adequate Protection Liens and the Second Lien Adequate Protection Liens are perfected and maintain the priority set forth in the Interim Order; (c) the Debtors to incur any and all liabilities and obligations, including all the DIP Obligations and the Adequate Protection obligations, as contemplated under the Interim Order and the DIP Documents; (d) the Debtors to pay any and all amounts as provided in the Interim Order and the DIP Documents; (e) the DIP Secured Parties and the First Lien Secured Parties to retain and apply payments made in accordance with the DIP Documents and the Interim Order; (f) subject to the Interim Order, the DIP Agent, on behalf of the DIP Secured Parties, and the First Lien Agent, on behalf of the First Lien Secured Parties, to exercise the rights and remedies provided for under this Interim Order, the DIP Documents, and the First Lien Loan Documents, as applicable; and (g) the implementation of any and all of the other terms, rights, benefits, privileges, remedies, and provisions of the Interim Order and the DIP Documents. |
| **Waiver or Modification of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br><br>*Interim Order ¶ 16* | Neither the DIP Secured Parties in respect of the DIP Liens, nor the Prepetition Secured Parties in respect of the Adequate Protection Liens, shall be required to enter into or to obtain any security agreements, control agreements, landlord waivers, mortgagee waivers, bailee waivers, or warehouseman waivers or to give, file, or record any UCC-1 financing statements, mortgages, deeds of trust, leasehold mortgages, notices to account debtors or other third parties, notices of lien, or similar instruments in any jurisdiction (including filings with the United States Patent and Trademark Office, the United States Copyright Office, or any similar agency in respect of trademarks, copyrights, trade names, or patents with respect to intellectual property) (collectively, the "<u>Perfection Documents</u>"), or obtain consents from any licensor or similarly situated party in interest, or take any other action to validate, record, or perfect the DIP Liens granted under the DIP Documents and/or the Interim Order and the Adequate Protection Liens granted under the Interim Order and approved thereby, all of which are automatically and immediately perfected by the entry of the Interim Order. |
| **Indemnification**<br><br>*DIP Credit Agreement, §§ 5.03(d),(e)* | <u>Indemnification by the Borrower and the Other Loan Parties</u>. The Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or |

| | |
|---|---|
| | asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.<br><br>Indemnification by the Lenders. Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph. |
| **Sections 506(c) and 552(b) Waiver**<br><br>*Interim Order ¶ 32* | Each of the provisions of section 506(c) and any claims under section 552(b) of the Bankruptcy Code are waived as to the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, the DIP Obligations, the First Lien Obligations, and the Second Lien Obligations. |
| **Release, Waivers or Limitation on any Claim or Cause of Action**<br><br>*Interim Order ¶¶ D(vi),(viii)* | Each Debtor irrevocably waives, for itself and its estate, any right to challenge or contest in any way the scope, extent, perfection, priority, validity, non-avoidability, or enforceability of the Prepetition Liens or the validity, or enforceability of the Prepetition Financing Documents or the validity, enforceability, or priority of payment of the Prepetition Secured Obligations.<br><br>The Debtors do not have, and hereby forever release and waive, any claims, objections, challenges, counterclaims, causes of action, defenses, setoff rights, obligations, rights to subordination, or any other liabilities, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, against the Prepetition Secured Parties, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees from the beginning of time through the Petition Date. |

## STATEMENT REGARDING SIGNIFICANT PROVISIONS

23.     The DIP Credit Agreement and the DIP Orders contain certain provisions

(the "Significant Provisions") summarized above and identified on Exhibit B to Complex Case

Procedures as summarized in the Attorney Checklist Concerning Motion and Order Pertaining to

Use of Cash Collateral attached as **Exhibit C** to this Motion.  These provisions include the

following:

- **Milestones**.  Vanguard must meet certain Milestones (as defined in the Interim

  Order) throughout its Chapter 11 Cases, and failure to meet such Milestones

constitutes an event of default under the DIP Credit Agreement, subject to entry of the

Final Order.  The Milestones include the following:

- o     On or before the date that is 90 days following the Petition Date, the Debtors shall file (i) a plan of reorganization, which shall be in form and substance acceptable to the DIP Agent and the DIP Lenders, as confirmed by the DIP Agent and the DIP Lenders in writing, and which provides for payment of the DIP Facility in full, in cash and contains a financing commitment to support the Debtors' emergence from the Chapter 11 Cases (the "Approved Plan") and (ii) a disclosure statement for the Approved Plan, which shall be in form and substance acceptable to the DIP Agent and the DIP Lenders, as confirmed by the DIP Agent and DIP Lenders in writing (the "Approved Disclosure Statement");

- o     On or before the date that is 135 days following the Petition Date, the Bankruptcy Court shall have entered an order approving the Approved Disclosure Statement, which order shall be in form and substance acceptable to the DIP Agent and the DIP Lenders, as confirmed by the DIP Agent and DIP Lenders in writing;

- o     On or before the date that is 195 days following the Petition Date, the Bankruptcy Court shall have entered an order confirming the Approved Plan, which order shall be in form and substance acceptable to the DIP Agent and the DIP Lenders, as confirmed by DIP Agent and the DIP Lenders in writing; and

- o     On or before the date that is 225 days following the Petition Date, the Approved Plan shall become effective.

- **Priming of Liens.** The Interim Order provides for liens under section 364(d)(1) of the

  Bankruptcy Code that will prime the liens of the Prepetition Secured Parties.

- **Carve-Out.** The Carve-Out provides for the payment of all accrued fees and expenses

  incurred at any time before the Carve-Out Trigger Date, and imposes a $2,500,000

  cap on expenses incurred on or after the Carve-Out Trigger Date.

- **Waiver of Right to Surcharge.** Subject to entry of the Final Order, each of (a) the

  provisions of section 506(c) of the Bankruptcy Code, and (b) any "equities of the

  case" claims or other claims under sections 105(a) or 552(b) of the Bankruptcy Code

24

are and shall be waived as to the DIP Agent, the DIP Lenders, the Prepetition Secured

Parties, the DIP Obligations, the First Lien Obligations, and the Second Lien

Obligations.

- **Avoidance Actions.**  Upon entry of the Final Order, the Parties may seek and the

  Court will determine whether the Section 364(d)(1) Liens (as defined in the Interim

  Order) shall include the proceeds and property recovered in respect of the Debtors'

  claims and causes of action (but not on the actual claims and causes of action) arising

  under chapter 5 of the Bankruptcy Code.

- **Fees.**

  o *Commitment Fees*.  1% on the average daily amount of the unused amount of the
    Commitment of such Lender during the period from and including the Interim
    Facility Effective Date to but excluding the Termination Date, payable monthly in
    arrears and computed on the basis of a 360-day year so long as it does not exceed
    the maximum nonusurious interest rate.

  o *Letter of Credit Fees*.

    a.   A participation fee with respect to each DIP Lender's participations in
         Letters of Credit (as defined in the Credit Agreement), which shall accrue
         at 5.50% per annum on the average daily amount of such DIP Lender's LC
         Exposure (as defined in the Credit Agreement)

    b.   A fronting fee, which shall accrue at the rate of 0.35% per annum on the
         average daily amount of the LC Exposure

    c.   Standard fees of Citibank with respect to the issuance, amendment,
         renewal or extension of any Letter of Credit or processing of drawings
         thereunder

  o *Administrative Agent Fees*.  Payable in the amounts and at the times separately
    agreed upon between the Borrower and the Administrative Agent.

- **Stipulations**.  The Debtors have agreed to certain stipulations regarding the First Lien

  Obligations, First Lien Collateral, Second Lien Obligations, Second Lien Collateral,

Intercreditor Agreement, validity of Prepetition Liens and Prepetition Secured

Obligations, and Cash Collateral (each as defined in the Interim Order), releases, and

default.  The stipulations are subject to a challenge period. Any party in interest that

successfully seeks and obtains standing to do so must timely file an adversary

proceeding no later than (a) forty-five days after the entry of the Interim Order, if the

party-in-interest is not the official committee of unsecured creditors (the "Creditors'

Committee"), if any or (b) with respect to the Creditors' Committee, forty-five days

after the formation of such committee.

## BASIS FOR RELIEF

24.     Absent the relief requested herein, Vanguard's ability to access capital and a

smooth transition into chapter 11 will be in jeopardy.  Aronson Declaration ¶ 9.  It is, therefore,

essential that the Debtors obtain access to the proposed financing and use of Cash Collateral to

avoid immediate and irreparable harm to their businesses.

### I.     Vanguard Should Be Authorized to Obtain DIP Financing Under Section 364 of the Bankruptcy Code

25.     To ensure a seamless transition into chapter 11, preserve value, and pursue its

restructuring goals, Vanguard needs immediate access to postpetition financing and use of Cash

Collateral.  Aronson Declaration ¶ 20.  The preservation of estate assets, the Debtors' continuing

viability, and their ability to maximize value for stakeholders depends heavily upon the

expeditious approval of the relief requested herein.  *Id.*

26.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured

credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary

course of business, and (c) obtaining credit with specialized priority or with security.[7]  Vanguard proposes to obtain financing on the terms set forth in the DIP Documents and the Interim Order by providing, among other things, superpriority claims, security interests, and liens pursuant to section 364(c) and (d) of the Bankruptcy Code.  Section 364(c) of the Bankruptcy Code provides, among other things, that, if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, a court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.[8]

27.    Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

(a)    the debtor is unable to obtain unsecured credit under section 364(b) (*i.e.*, by granting a lender administrative expense priority);

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.[9]

28.    Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or *pari passu* lien on property of the estate that is subject to a lien, after notice and a hearing, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is

---

[7]  11 U.S.C. § 364.

[8]  11 U.S.C. § 364(c).

[9]  *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying these factors); *In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (same). *See also In re Ames Dep't Stores*, 115 B.R. 34, 39-40 (Bankr. S.D.N.Y. 1990) (applying section 364(c)).

adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.[10]

29.     For the reasons discussed below, Vanguard meets these requirements. Accordingly, Vanguard submits that it should be authorized to obtain DIP financing through the DIP Facility.

### A.     Vanguard Was Unable to Obtain Necessary Funding on an Unsecured Basis

30.     Despite its efforts,  and months-long marketing process for financing, Vanguard has been unable to (a) procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an administrative expense under section 364(a) or (b), (iii) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1), (iv) in exchange for a junior lien on property of the estate subject to a lien pursuant to section 364(c)(3), or (v) without granting priming liens on property that would remain subject to a lien pursuant to section 364(d), or (b) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.  Aronson Declaration ¶ 11.

31.     Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, Vanguard negotiated for the DIP Facility at arm's-length.  Aronson Declaration ¶ 15.  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying the Bankruptcy Code, courts grant a debtor considerable

---

[10]  11 U.S.C. § 364(d).

deference in acting in accordance therewith,[11] and courts in this district and neighboring districts
regularly authorize debtors' requests for relief under sections 363(c) and (d).[12]

32.      Section 364 of the Bankruptcy Code does not require that a debtor seek
alternative financing from every possible lender; rather, the debtor simply must demonstrate
sufficient efforts to obtain financing without the need to grant a senior lien.[13]

33.      Furthermore, a debtor may borrow money under section 364(d)(4) of the
Bankruptcy Code if the debtor meets its burden of establishing that the holder of the lien to be
subordinated is adequately protected.[14]  The transaction "should provide the pre-petition secured
creditor with the same level of protection it would have had if there had not been postpetition

---

[11]  *See, e.g.*, *Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("More exacting
scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its
cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten
the court's ability to control in case impartially"); *L.A. Dodgers*, 457 B.R. at 313 ("[C]ourts will almost always defer
to the business judgment of a debtor in the selection of the lender."); *Ames Dep't Stores*, 115 B.R. at 40 ("These
cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit
reasonable business judgment to be exercised so long as the financing agreement does not contain terms that
leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a
party-in-interest.").

[12]  *See, e.g.*, *In re Shoreline Energy LLC*, No. 16-35571 (Bankr. S.D. Tex. Dec. 16, 2016) [Dkt. No. 190]; *In re
Southcross Holdings LP*, No. 16-20111 (Bankr. S.D. Tex. Apr. 11, 2016) [Dkt. No. 183]; *In re Dune Energy*, No.
15-10336  Bankr. W.D. Tex. Apr. 9, 2015) [Dkt. No. 162]; *In re Autoseis Inc.*, No. 14-20130 (Bankr. S.D. Tex.,
Apr. 25, 2014) [Dkt. No. 234]; *Broadstar Wind Sys. Grp. LLC*, No. 10–33373, 2010 WL 5208222, at *2 (Bankr.
N.D. Tex. July 1, 2010); *In re Monitor Dynamics, Inc.*, No. 10–51821, 2010 WL 4780375, at *3 (Bankr. W.D. Tex.
June 30, 2010).

[13]  *See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986)
(demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other
financial institutions in the geographic area); *L.A. Dodgers*, 457 B.R. at 313 (citing *Ames Dep't Stores*, 115 B.R. at
37 and noting that the court "may not approve any credit transaction under subsection (c) [of Section 364] unless the
debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under section 364(a) or (b)"); *In re
495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts
to procure financing from various sources, explaining that "most banks lend money only in return for a senior
secured position"); *Aqua Assocs.*, 123 B.R. at 197 ("[T]he Debtor's evidence of a credit quest has been adequate to
establish that some degree of priming of a loan is necessary").

[14]  *See In re Futures Equity L.L.C.*, No. 00-33682, 2001 Bankr. LEXIS 2229 at *14 (Bankr. N.D. Tex. April 11,
2001).

superpriority financing."[15]  "The debtor also has the burden of demonstrating that: (i) the credit transaction is necessary to preserve the estate, and (ii) the terms of the transaction are fair and reasonable given the circumstances."[16]

34.     Substantially all of Vanguard's assets are encumbered and, despite the diligent efforts of Vanguard and Evercore, Vanguard has been unable to procure the necessary funding that would not require either the satisfaction of existing liens with new postpetition financing secured by a first priority lien or the proposed superpriority claims and consensual priming liens to be granted here.  Aronson Declaration ¶ 8.  Moreover, the Prepetition Secured Parties have consented to the priming liens proposed hereunder and will receive adequate protection as further specified below.

35.     Furthermore, Vanguard has negotiated the best terms available to obtain funding it needs to maintain sufficient liquidity to preserve its assets over the course of its Chapter 11 Cases.  Aronson Declaration ¶ 14.  The interest rate on the DIP Facility is within the range of market rates and fair and reasonable in light of the credit profile of Vanguard, the nature and extent of the DIP Collateral, and the business risks associated with the Chapter 11 Cases.  Aronson Declaration ¶ 16.  Vanguard submits that the circumstances of the Chapter 11 Cases requires Vanguard to obtain financing under sections 364(c) and (d) of the Bankruptcy Code and, accordingly, the DIP Facility reflect the exercise of its sound business judgment.

---

[15]  *Id*. at *15 (internal quotation marks and citation omitted).

[16]  *Id*. at *14.

B.     **Immediate Access to the DIP Facility is Necessary to Preserve and Protect Vanguard's Estates**

36.     As further detailed in the Aronson Declaration, Vanguard requires immediate access to the DIP Facility to ensure a seamless transition into chapter 11, preserve value, pursue its restructuring goals, and manage the risks associated with running its businesses unhedged against a drop in commodity prices.  Aronson Declaration ¶ 9; First Day Declaration ¶ 37.  As previously noted, the decline in oil and natural gas prices has adversely affected Vanguard's liquidity.  First Day Declaration ¶ 46.  Immediate and ongoing access to Cash Collateral and funding under the DIP Facility will demonstrate to Vanguard's employees, vendors, suppliers, and other key constituencies and parties in interest that Vanguard has sufficient resources available to meet its obligations in the ordinary course during the Chapter 11 Cases.  First Day Declaration ¶ 159.  Without access to the DIP Facility and the use of Cash Collateral, Vanguard's businesses and operations would be put at risk of serious and immediate impairment. *Id.* ¶ 161.  Without access to capital, a precipitous drop in commodity prices would severely impact Vanguard's liquidity and put at risk its entire restructuring efforts.  *Id.* ¶ 37.  Accordingly, the DIP Facility is necessary to ensure that Vanguard is able to maintain its business, and thus maximize the value of its estates, pending confirmation of a plan of reorganization.[17]

C.     **The Terms of the DIP Facility are Fair, Reasonable, and Appropriate Under the Circumstances**

37.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of

---

[17]  *See La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 246 (5th Cir. 1988) (debtors have "*the duty to maximize the value of the estate.*") (emphasis in original).

both the debtor and potential lender.[18]   The terms of the DIP Credit Agreement and the proposed

DIP Orders were negotiated in good faith and at arm's-length between Vanguard and the DIP

Lenders, resulting in agreements designed to permit Vanguard to obtain the needed liquidity to

maximize the value of their assets during their Chapter 11 Cases.  Aronson Declaration ¶ 15.

With the Court's approval of the DIP Facility, Vanguard will be well situated to formulate and

implement a plan to restructure its obligations.  *Id.* ¶ 13.

### D.      The DIP Facility is in the Best Interests of Vanguard's Estates and Creditors

38.      Approval of the DIP Facility is in the best interests of Vanguard's estates and

creditors.  Given that Vanguard does not currently have any other executable options for

financing, the Debtors, in the exercise of their sound business judgment, believe that they have

negotiated for the best possible terms for the DIP Facility.  Aronson Declaration ¶ 11.  Moreover,

after an exhaustive search for postpetition financing alternatives, Vanguard could not find a more

favorable proposal that could be approved over the objections of the Prepetition Secured Parties.

*Id.*  Under such circumstances, Vanguard submits that the DIP Facility is unquestionably in the

best interest of its estates and creditors.

### E.      Entry into the DIP Facility Is an Exercise of the Debtors' Sound Business Judgment

39.      As described above, after appropriate investigation and analysis, Vanguard's

management has concluded that the DIP Facility is the best option available under the

circumstances of these cases.  *Id.*  Vanguard, with the assistance of its advisors, has exercised its

sound business judgment in determining that a postpetition credit facility is appropriate and has

---

[18]   *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors'
Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 n.7
(W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

satisfied the legal prerequisites to incur debt under the DIP Facility.  Given that the Debtors

could not obtain postpetition financing from another lending source on terms superior to the DIP

Facility, Vanguard's decision to enter into the DIP Facility is a sound exercise of its business

judgment.  Accordingly, the Court should grant the Vanguard the authority to enter into the DIP

Facility and obtain funds from the DIP Lenders on the secured, administrative superpriority basis

described above, pursuant to section 364 of the Bankruptcy Code.

## II.        The Proposed Adequate Protection Should Be Authorized

40.        Section 364(d)(1) authorizes the Debtors to obtain postpetition credit on a priming

basis if the Debtors are unable to obtain sufficient credit and the interests of nonconsenting lien

holders are adequately protected.[19]   Section 363(e) of the Bankruptcy Code provides that, "on

request of an entity that has an interest in property used . . . or proposed to be used by a [debtor

in possession] . . . the court . . . shall prohibit or condition such use . . . as is necessary to provide

adequate protection of such interest."[20]   Section 361 of the Bankruptcy Code delineates the forms

of adequate protection, which include periodic cash payments, additional liens, replacement liens

and other forms of relief.[21]   What constitutes adequate protection must be decided on a case-by-

---

[19]  11 U.S.C. § 364(d)(1).

[20]  11 U.S.C. § 363(e).

[21]  11 U.S.C. § 361.

case basis.[22]  The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use.[23]

41.     As noted above, as adequate protection for the interests of the First Lien Secured Parties, the Debtors will provide the First Lien Secured Parties with replacement liens, superpriority claims, adequate protection payments, and payment of reasonable fees and expenses of counsel and advisors to the First Lien Agent.  As adequate protection for the interests of the Second Lien Secured Parties, the Debtors will provide the Second Lien Indenture Trustee with replacement liens, superpriority claims.  By this Motion, the Debtors also propose to pay the Second Lien Secured Parties cash payments of interest at the non-default rate, fees, and expenses.

42.     In consideration for the adequate protection provided to them, the Prepetition Secured Parties are agreeing to be primed and consent to Vanguard's use of their Cash Collateral.  Without immediate access to the proposed DIP Facility and use of Cash Collateral, Vanguard's ability to implement a successful restructuring will be weakened significantly.  First Day Declaration ¶ 161.  In contrast, the value of the interest of the Prepetition Secured Parties in their collateral will be preserved, if not increased, by the DIP Facility because it ensures the

---

[22]  *See Memphis-Shelby Cty. Airport Auth. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 783 F.2d 1283, 1286 (5th Cir. 1986) (adequate protection is determined by "circumstances of the case"); *MBank Dall., N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396–97 (10th Cir. 1987) (adequate protection is to be "is to be decided flexibly on the proverbial 'case-by-case' basis"); *Martin v. United States (In re Martin)*, 761 F.2d 472, 474 (8th Cir. 1985) (same); *In re Shaw Indus., Inc., v. First Nat'l Bank (In re Shaw Indus., Inc.)* 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (same).

[23]  *See RTC v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[T]he whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (citation omitted).

uninterrupted continuance of Vanguard's operations and paves the way for a successful restructuring of Vanguard's business. *Id.* ¶ 159.

43.     The adequate protection described above will, taken together, sufficiently protect the interests of the Prepetition Secured Parties in any Prepetition Collateral.  As such, the adequate protection proposed here is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

**III.     The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent Under the DIP Documents**

44.     Under the DIP Documents, Vanguard has agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders.  In particular, as noted above, Vanguard has agreed to the following:

(a)     *Commitment Fees*. 1% on the average daily amount of the unused amount of the Commitment of such Lender during the period from and including the Interim Facility Effective Date to but excluding the Termination Date, payable monthly in arrears and computed on the basis of a 360-day year so long as it does not exceed the maximum nonusurious interest rate;

(b)     *Letter of Credit Fees* consisting of (a) participation fee with respect to each DIP Lender's participations in Letters of Credit (as defined in the Credit Agreement), which shall accrue at 5.50% per annum on the average daily amount of such DIP Lender's LC Exposure (as defined in the Credit Agreement), (b) a fronting fee, which shall accrue at the rate of 0.35% per annum on the average daily amount of the LC Exposure, and (c) Standard fees of Citibank with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder; and

(c)     *Administrative Agent Fees*.  Payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

45.     As set forth in the Aronson Declaration, Vanguard believes that the interest and fees to be paid under the DIP Facility are consistent with the market and are reasonable and

appropriate, particularly in light of the circumstances of the Chapter 11 Cases, and represent the most favorable terms available to Vanguard.  Aronson Declaration ¶¶ 16, 17.  Vanguard considered the fees described above when determining, in its sound business judgment, that the DIP Facility constituted the best terms on which Vanguard could obtain the postpetition financing necessary to continue its operations and prosecute its cases.  *Id.* ¶ 17.  Courts routinely authorize debtors to pay fees similar to those Vanguard proposes to pay, where the associated financing is, in the debtor's business judgment, beneficial to the debtors' estates.[24]  *Id.* Accordingly, the Court should authorize Vanguard to pay the interest and fees provided under the DIP Documents in connection with the DIP Facility.

## IV. The DIP Agent and the DIP Lenders Should be Afforded Good-Faith Protection Under Section 364(e)

46.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.[25]

---

[24] *See, e.g.*, *In re Great Atl. & Pac. Tea Co.*, No. 10-24549 (Bankr. S.D.N.Y. Jan. 11, 2011) (approving 3 percent letter of credit fee); *In re Lear Corp.*, No. 09-14326 (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5.0 percent up-front fee and a 1.0 percent exit/conversion fee); *In re Gen. Growth Props., Inc.*, No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75 percent exit fee); *In re Tronox Inc.*, No. 09-10156 (Bankr. S.D.N.Y. Feb. 9, 2009) (approving an up-front 3 percent facility fee, a 3 percent commitment fee, an arrangement fee, and administration fees). Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available on request to Vanguard's proposed counsel.

[25] 11 U.S.C. § 364(e).

47.     The DIP Facility is the result of (i) Vanguard's reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing and (ii) extensive arms-length, good-faith negotiations among Vanguard and the DIP Lenders.  Aronson Declaration ¶ 18.  Vanguard submits that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  *Id.* ¶ 13.  Further, no consideration is being provided to the DIP Agent, the DIP Lenders, or any other party to the DIP Documents other than as described herein.  Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Agent and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Agent and the DIP Lenders are entitled to all of the protections afforded thereby.

## V.     The Automatic Stay Should Be Modified on a Limited Basis

48.     The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The proposed Interim Order further provides that the automatic stay is modified as necessary to permit Vanguard to grant the liens described herein to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order provides that the automatic stay shall be vacated and modified, subject to certain limitations, to the extent

necessary to permit the DIP Agent and DIP Lenders to exercise certain remedies in the event of a default by Vanguard under the DIP Documents.

49.     Stay modifications are ordinary and standard features of postpetition debtor financing facilities[26] and, moreover, in Vanguard's business judgment, stay modifications are reasonable and fair under the circumstances of these Chapter 11 Cases.

## VI.     The Scope of the Carve-Out is Appropriate

50.     The proposed liens and claims under the DIP Facility and adequate protection granted for the use of cash collateral are all subject to the Carve-Out (as defined in the Interim Order).  Such carve-outs for administrative expenses, professional fees and U.S. Trustee's fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can obtain appropriate assistance from counsel and other professionals.[27]  The Carve-Out includes amounts for the reasonable fee and expense claims of the respective retained professionals of Vanguard and the Creditor's Committee and the reasonable expenses of any member of the Creditor's Committee (a) incurred between the Petition Date and the occurrence of the termination event and (b) up to $2,500,000 of such fees and expenses incurred on and after a termination event. [28]  The Carve-Out ensures that assets remain for the professional fees of the Debtors and the Creditors' Committee (if any) that were incurred prior to the termination event

---

[26]  *See, e.g.*, *In re Shoreline Energy LLC*, No. 16-35571 (Bankr. S.D. Tex. Dec. 16, 2016) [Dkt. No. 190]; *In re Southcross Holdings LP*, No. 16-20111 (Bankr. S.D. Tex. Apr. 11, 2016) [Dkt. No. 183]; *In re Dune Energy*, No. 15-10336  Bankr. W.D. Tex. Apr. 9, 2015) [Dkt. No. 162]; *In re Southcross Holdings LP*, No. 16-20111 (Bankr. S.D. Tex. Apr. 11, 2016) [Dkt. No. 183]; *In re Autoseis, Inc.*, No. 14-20130 (Bankr. S.D. Tex. Apr. 25, 2014) [Dkt. No. 234]; *In re ATP Oil and Gas Corp.*, No. 12-36187 (Bankr. S.D. Tex. Sept. 20, 2012) [Dkt. No. 440].

[27]  *See Ames Dep't Stores,* 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").

[28]  In the event the Chapter 11 Cases are converted to chapter 7, there shall be a separate carve-out of [$25,000] in the aggregate (the "Trustee Carve-Out") that may be used for the reasonable fees and expenses of a chapter 7 trustee and such separate Trustee Carve-Out shall have the same priorities as the Carve-Out.

notwithstanding the grant of superpriority and administrative liens and claims under the DIP

Facility and adequate protection liens and claims.  Similar carve-outs for professional fees have

been found to be reasonable and necessary to ensure that a debtor's estate and any statutory

committee can retain assistance from counsel.[29]

51.    In Vanguard's business judgment, the Carve-Out is reasonable and fair under the

circumstances of these Chapter 11 Cases and should be approved.

## VII.    The Pay-Down Feature of the DIP Facility Is Appropriate and Warranted Under the Circumstances

52.    Pursuant to Paragraph 12 of the Interim DIP Order, the Debtors are required to

use proceeds from material collateral sales and casualty and condemnation events first, to pay

down the First Lien Obligations until 50% of such obligations are satisfied, second, to pay down

the DIP Obligations until such obligations are satisfied in full, and third, to pay down the

remaining First Lien Obligations.  In addition, to the extent that there is Excess Cash, such cash

will be applied first to the outstanding obligations under the First Lien Credit Agreement

(together with the pay-downs in the preceding sentence, the "Pay-Down").  After careful

consideration of the terms of the DIP Facility, the Debtors determined that the Pay-Down

provisions were appropriate and necessary under the circumstances.  These features are critical

components of the willingness of the DIP Lenders to provide funding under the DIP Facility and

the consent to use Cash Collateral constituting Prepetition Collateral.  Aronson Dec. ¶ 19.

Indeed, the DIP Lenders would not have agreed to provide the DIP Facility without the

Pay-Down.  Moreover, this type of provision is reasonable given that the DIP Facility provides

---

[29] *See, e.g.*, *In re Shoreline Energy LLC*, No. 16-35571 (Bankr. S.D. Tex. Dec. 16, 2016); *In re Southcross Holdings LP*, No. 16-20111 (Bankr. S.D. Tex. Apr. 11, 2016) [Dkt. No. 183]; *In re Dune Energy*, No. 15-10336  Bankr. W.D. Tex. Apr. 9, 2015) [Dkt. No. 162];  *In re Autoseis*, No. 14-20130 (Bankr. S.D. Tex. March 27, 2014); *In re ATP Oil & Gas Corp.*, No. 12-36187 (Bankr. S.D. Tex. Aug. 17, 2012) (same)

revolving access to financing.  To protect the First Lien Lenders' collateral base in the event the

Prepetition Collateral is sold, the First Lien Lenders require paydown of the First Lien

Obligations with the proceeds of such sale (up to 50% of such obligations).

53.     Pay-Downs are a common feature of debtor-in-possession financings and have

been approved in a variety of cases.[30]  Accordingly, as part of the DIP Facility requested herein,

Vanguard's request to use cash collateral in the operation of its businesses and administration of

the Chapter 11 Cases should be approved.

**VIII.   Use of the Cash Collateral Should Be Approved**

54.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash

collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the

court, after notice and a hearing, authorizes such use in accordance with the provisions of this

section."[31]  As an initial matter, the Prepetition Secured Parties have consented to the use of Cash

Collateral.  In exchange therefor, the Debtors have agreed to provide the Prepetition Secured

Parties with the adequate protection set forth above.

55.     It is essential to the success of the Debtors' Chapter 11 Cases that the Debtors

immediately obtain authority to use Cash Collateral.  First Day Declaration ¶ 159.  The Debtors

must maintain sufficient access to cash to continue to operate their businesses as a going concern.

*Id.*  This will directly benefit all stakeholders and permit the Debtors to develop and implement

their reorganization.  *Id.* ¶ 158.  The preservation of estate assets, the Debtors' continuing

---

[30]  *See, e.g. In re Black Elk Energy Offshore Operations, LLC*, No. 15-34287 (Bankr. S.D. Tex. Mar. 18, 2016) [Dkt. No. 717]; *In re HII Techs., Inc.*, No. 15-60070 (Bankr. S.D. Tex. (Bankr. S.D. Tex. Sept. 24, 2015) [Dkt. No. 149]; *In re So. Air Holdings, Inc.*, No. 12-12690 (Bankr. D. Del. Oct. 1, 2012); *In re Appleseed's Intermediate Holdings LLC, et al.*, No. 11-10160 (Bankr. D. Del. Feb. 23, 2011) [Dkt. No. 315]; *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. May 15, 2009) [Dkt. 237].

[31]  11 U.S.C. § 363(c)(2).

viability and their ability to reorganize successfully and maximize value for stakeholders, thus, depend heavily upon the expeditious approval of the relief requested in this Motion.  *Id.* ¶ 161. Bankruptcy courts in this jurisdiction have granted similar relief to that requested by this Motion. Accordingly, as part of the DIP Facility requested herein, Vanguard's request to use cash collateral in the operation of its businesses and administration of these Chapter 11 Cases should be approved.[32]

## IX.   The Budget Is Appropriate

56.   Vanguard's access to Cash Collateral and DIP Loans under the DIP Facility will be subject to the Budget, which, after extensive negotiations, has been approved by the DIP Lenders.  After diligent consideration of all known circumstances, and upon consultation with its advisors, Vanguard believes, in its reasonable business judgment, that the proposed Budget (including the variances permitted thereunder pursuant to the DIP Credit Agreement) is achievable and reasonable under the circumstances.  First Day Declaration ¶ 160.  Furthermore, Vanguard believes that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the DIP Facility and the Budget.  *Id.*  Accordingly, Vanguard submits that the proposed Budget is appropriate.

## X.   Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm

57.   Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to

---

[32]  *See, e.g.*, *In re Shoreline Energy LLC*, No. 16-35571 (Bankr. S.D. Tex. Dec. 16, 2016); *In re Warren Res., Inc.*, No 16-32760 (Bankr. S.D. Tex. Jul. 13, 2016) [Dkt. No. 169]; *In re Southcross Holdings LP*, No. 16-20111 (Bankr. S.D. Tex. Apr. 11, 2016) [Dkt. No. 183]; *In re Dune Energy*, No. 15-10336  Bankr. W.D. Tex. Apr. 9, 2015) [Dkt. No. 162]; *In re Southcross Holdings LP*, No. 16-20111 (Bankr. S.D. Tex. Apr. 11, 2016) [Dkt. No. 183]; *In re Autoseis, Inc.*, No. 14-20130 (Bankr. S.D. Tex. Apr. 25, 2014) [Dkt. No. 234]; *In re ATP Oil and Gas Corp.*, No. 12-36187 (Bankr. S.D. Tex. Sept. 20, 2012) [Dkt. No. 440].

section 363 of the Bankruptcy Code may not be commenced earlier than fourteen days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

58.     Vanguard requests that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing Vanguard, from and after entry of the Interim Order until the Final Hearing, to receive the up to the $15 million of the proceeds of the DIP Facility.  Vanguard requires access to the DIP Facility prior to the Final Hearing and entry of the Final Order to continue operating, pay its administrative expenses, and to implement the relief requested in Vanguard's other "first day" motions.  First Day Declaration ¶ 161.  This relief will enable Vanguard to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to its estates and all parties in interest, pending the Final Hearing.

## REQUEST FOR A FINAL HEARING

59.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), Vanguard requests that the Court schedule a final hearing twenty-one days after the commencement of these Chapter 11 Cases, or as soon after twenty-one days as is convenient for the Court, to consider entry of the Final Order.  Vanguard requests that it be authorized to serve a copy of the Interim Order, which fixes the time and date for filing objections, if any, by first class mail on the notice parties listed below.  Vanguard further requests that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy 4001(c)(2).

## EMERGENCY CONSIDERATION

60.     In accordance with Bankruptcy Local Rule 9013-1(i), Vanguard respectfully requests emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which

empowers a court to grant relief within the first twenty-one days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." Vanguard requires immediate access to the DIP Facility and Cash Collateral to effect a successful restructuring.   The failure to receive the requested relief during the first twenty-one days of these Chapter 11 Cases would severely Vanguard's impact Vanguard's ability to achieve this goal at this critical juncture.   Accordingly, Vanguard submits that it has satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully requests that the Court approve the relief requested in this Motion on an emergency basis.

### WAIVER OF BANKRUPTCY RULE 6004(a) AND (h)

61.     To implement the foregoing successfully, Vanguard seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### NOTICE

62.     Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) the U.S. Trustee; (b) the holders of the 50 largest unsecured claims against Vanguard (on a consolidated basis); (c) Citibank, N.A., as administrative agent under Vanguard's first lien credit facility, and its counsel; (d) the indenture trustee for Vanguard's second lien notes; (e) counsel to the ad hoc group of second lien noteholders; (f) the indenture trustees for Vanguard's senior unsecured notes; (g) counsel to the ad hoc group of unsecured noteholders; (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the state attorneys general for states in which Vanguard conducts business; and (l) any party that has requested notice pursuant to

Bankruptcy Rule 2002.  Vanguard submits that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PRIOR REQUEST**

63.     No prior request for the relief sought in this Motion has been made by Vanguard to this or any other court.

**WHEREFORE**, Vanguard respectfully requests that the Court enter the DIP Orders, substantially in the forms attached to this Motion as **Exhibit A**, granting the relief requested in this Motion and granting Vanguard such other and further relief as is just and proper.

Dated:  February 2, 2017

Respectfully Submitted,

*/s/ James T. Grogan*

Chris L. Dickerson, Esq. (*pro hac vice* requested)
Todd M. Schwartz (*pro hac vice* requested)
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone:  (312) 499-6000
Facsimile: (312) 499-6100

- and -

James T. Grogan, Esq. (Tex. Bar No. 24027354)
Danny Newman, Esq. (Tex. Bar No. 24092896)
600 Travis St., 58th Floor
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-2801

*Proposed Counsel to Vanguard*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 2, 2017, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ James T. Grogan*
James T. Grogan