## **EXHIBIT 1**

**DIP Credit Agreement**

**EXECUTION VERSION**
**SUBJECT TO FRE 408**
**CONFIDENTIAL**

**DEBTOR-IN-POSSESSION**
**CREDIT AGREEMENT**

Dated as of
February __, 2017

among

**VANGUARD NATURAL GAS, LLC,**
as Borrower,

**CITIBANK, N.A.,**
as Administrative Agent and Issuing Bank,

and

The Other Lenders Party Hereto

**CITIGROUP GLOBAL MARKETS INC.,**
**J.P. MORGAN SECURITIES LLC and**
**WELLS FARGO SECURITIES, LLC**
as Joint Lead Arrangers and Joint Bookrunners

WEIL:\95962958\14\99980.0531

# TABLE OF CONTENTS

Page

Article I        Definitions And Accounting Matters ................................................................. 1

    Section 1.01.    Certain Defined Terms .......................................................................... 1

    Section 1.02.    Types of Loans and Borrowings ........................................................ 25

    Section 1.03.    Accounting Terms and Determinations; GAAP ................................ 25

    Section 1.04.    Changes in GAAP .............................................................................. 26

    Section 1.05.    [Reserved] ......................................................................................... 26

    Section 1.06.    Determination of Time of Day .......................................................... 26

    Section 1.07.    Amounts of Letters of Credit ........................................................... 26

Article II        The Credits ....................................................................................................... 26

    Section 2.01.    Commitments ..................................................................................... 26

    Section 2.02.    Loans and Borrowings ...................................................................... 26

    Section 2.03.    Requests for Borrowings .................................................................. 27

    Section 2.04.    Interest Elections ............................................................................... 28

    Section 2.05.    Funding of Borrowings ..................................................................... 29

    Section 2.06.    Termination and Reduction of Aggregate Commitments ................. 30

    Section 2.07.    [Reserved] ......................................................................................... 30

    Section 2.08.    Letters of Credit ................................................................................ 30

    Section 2.09.    [Reserved] ......................................................................................... 35

    Section 2.10.    [Reserved] ......................................................................................... 35

    Section 2.11.    Cash Collateral .................................................................................. 35

    Section 2.12.    Defaulting Lenders ............................................................................ 35

    Section 2.13.    Collateral; Guarantees ...................................................................... 37

Article III        Payments of Principal and Interest; Prepayments; Fees ................................ 38

    Section 3.01.    Repayment of Loans ......................................................................... 38

    Section 3.02.    Interest ............................................................................................... 38

    Section 3.03.    Alternate Rate of Interest .................................................................. 39

    Section 3.04.    Prepayments ...................................................................................... 39

    Section 3.05.    Fees ................................................................................................... 42

Article IV        Payments; Pro Rata Treatment; Sharing of Set-offs ..................................... 43

    Section 4.01.    Payments Generally; Pro Rata Treatment; Sharing of Set-offs ........... 43

Section 4.02.    Presumption of Payment by the Borrower.............................................. 44
Section 4.03.    Certain Deductions by the Administrative Agent ................................. 44
Section 4.04.    [Reserved.].................................................................................. 44
Article V        Increased Costs; Break Funding Payments; Taxes; Illegality.............. 44
Section 5.01.    Increased Costs ......................................................................... 44
Section 5.02.    Break Funding Payments ............................................................ 46
Section 5.03.    Taxes.......................................................................................... 46
Section 5.04.    Designation of a Different Lending Office ..................................... 49
Section 5.05.    Illegality...................................................................................... 49
Article VI       Conditions Precedent ................................................................. 50
Section 6.01.    Interim Facility Effective Date ...................................................... 50
Section 6.02.    Final Facility Effective Date ......................................................... 52
Section 6.03.    Conditions Precedent to Each Credit Event.................................... 52
Article VII      Representations and Warranties .................................................... 54
Section 7.01.    Organization; Powers.................................................................. 54
Section 7.02.    Authority; Enforceability .............................................................. 54
Section 7.03.    Approvals; No Conflicts .............................................................. 54
Section 7.04.    Financial Condition; No Material Adverse Change........................... 55
Section 7.05.    Litigation..................................................................................... 55
Section 7.06.    Environmental Matters ................................................................ 55
Section 7.07.    Compliance with the Laws and Agreements; No Defaults .............. 56
Section 7.08.    Investment Company Act ............................................................ 56
Section 7.09.    Taxes.......................................................................................... 56
Section 7.10.    ERISA......................................................................................... 57
Section 7.11.    Disclosure; No Material Misstatements......................................... 58
Section 7.12.    Insurance.................................................................................... 58
Section 7.13.    Restriction on Liens .................................................................... 59
Section 7.14.    Subsidiaries................................................................................ 59
Section 7.15.    Location of Business and Offices ................................................. 59
Section 7.16.    Properties; Titles, Etc.................................................................. 59
Section 7.17.    Maintenance of Properties .......................................................... 60
Section 7.18.    Gas Imbalances, Prepayments .................................................... 60
Section 7.19.    Marketing of Production............................................................... 60

Section 7.20.    Swap Agreements ................................................................. 61

Section 7.21.    [Reserved] ........................................................................... 61

Section 7.22.    [Reserved] ........................................................................... 61

Section 7.23.    Anti-Corruption Laws and Sanctions.................................... 61

Section 7.24.    [Reserved] ........................................................................... 61

Section 7.25.    Article 8 of Uniform Commercial Code ................................ 61

Section 7.26.    EEA Financial Institution .................................................... 61

Section 7.27.    Accounts .............................................................................. 61

Section 7.28.    Secured Obligations; Priority............................................... 61

Section 7.29.    Chapter 11 Orders ............................................................... 62

Article VIII      Affirmative Covenants.......................................................... 62

Section 8.01.    Financial Statements; Other Information............................... 62

Section 8.02.    Notices of Material Events ................................................... 65

Section 8.03.    Existence; Conduct of Business............................................ 66

Section 8.04.    Payment of Obligations ....................................................... 66

Section 8.05.    Performance of Obligations under Loan Documents.............. 66

Section 8.06.    Operation and Maintenance of Properties.............................. 67

Section 8.07.    Insurance ............................................................................. 68

Section 8.08.    Books and Records; Inspection Rights .................................. 68

Section 8.09.    Compliance with Laws ......................................................... 68

Section 8.10.    Environmental Matters ......................................................... 68

Section 8.11.    Further Assurances .............................................................. 69

Section 8.12.    Reserve Reports ................................................................... 70

Section 8.13.    Title Information.................................................................. 71

Section 8.14.    Additional Collateral; Additional Guarantors........................ 71

Section 8.15.    ERISA Compliance............................................................... 72

Section 8.16.    [Reserved]............................................................................ 72

Section 8.17.    Use of Proceeds .................................................................. 72

Section 8.18.    Budget Update; Cash Reporting ........................................... 73

Section 8.19.    Cash Management................................................................. 74

Article IX        Negative Covenants.............................................................. 74

Section 9.01.    Minimum Liquidity.............................................................. 74

Section 9.02.    Debt..................................................................................... 74

Section 9.03.    Liens ............................................................................................... 75

Section 9.04.    Dividends, Distributions and Redemptions ...................................... 76

Section 9.05.    Investments, Loans and Advances ..................................................... 76

Section 9.06.    Nature of Business; International Operations ..................................... 77

Section 9.07.    [Reserved] ......................................................................................... 77

Section 9.08.    Proceeds of Loans ............................................................................. 77

Section 9.09.    ERISA Compliance ............................................................................ 77

Section 9.10.    Sale or Discount of Receivables ........................................................ 78

Section 9.11.    Mergers, Etc ...................................................................................... 78

Section 9.12.    Sale of Properties .............................................................................. 79

Section 9.13.    Environmental Matters ...................................................................... 79

Section 9.14.    Transactions with Affiliates .............................................................. 79

Section 9.15.    Subsidiaries ....................................................................................... 79

Section 9.16.    Negative Pledge Agreements; Dividend Restrictions ........................ 79

Section 9.17.    Gas Imbalances, Take-or-Pay or Other Prepayments ........................ 80

Section 9.18.    Swap Agreements .............................................................................. 80

Section 9.19.    Marketing Activities .......................................................................... 80

Section 9.20.    Liquidation of Swap Agreements ...................................................... 80

Section 9.21.    Budget Variances ............................................................................... 81

Section 9.22.    Accounting Changes .......................................................................... 81

Section 9.23.    Passive Holding Company; Etc .......................................................... 81

Article X        Events of Default; Remedies ............................................................... 81

Section 10.01.   Events of Default ............................................................................... 81

Section 10.02.   Remedies............................................................................................ 84

Article XI        The Agents .......................................................................................... 85

Section 11.01.   Appointment; Powers ........................................................................ 85

Section 11.02.   Rights as a Lender.............................................................................. 86

Section 11.03.   Exculpatory Provisions ...................................................................... 86

Section 11.04.   Reliance by Administrative Agent....................................................... 87

Section 11.05.   Delegation of Duties .......................................................................... 87

Section 11.06.   Resignation of Administrative Agent and/or Issuing Bank ................ 87

Section 11.07.   Non-Reliance on Administrative Agent and Other Lenders ................ 88

Section 11.08.   No Other Duties, etc .......................................................................... 88

Section 11.09. Administrative Agent May File Proofs of Claim ................................................. 89

Section 11.10. *Collateral and Guaranty Matters* ......................................................................... 89

Section 11.11. Secured Treasury Management Agreements ......................................................... 90

Article XII        Miscellaneous ......................................................................................................... 90

Section 12.01. Notices ................................................................................................................. 90

Section 12.02. Waivers; Amendments ......................................................................................... 93

Section 12.03. Expenses, Indemnity; Damage Waiver ............................................................... 94

Section 12.04. Successors and Assigns Generally ...................................................................... 97

Section 12.05. Survival; Revival; Reinstatement ..................................................................... 100

Section 12.06. Counterparts; Integration; Effectiveness; Electronic Signatures ..................... 101

Section 12.07. Severability ....................................................................................................... 101

Section 12.08. Right of Setoff ................................................................................................... 101

Section 12.09. GOVERNING LAW; JURISDICTION; CONSENT TO SERVICE OF
PROCESS; WAIVER OF JURY TRIAL ......................................................... 102

Section 12.10. Headings ........................................................................................................... 103

Section 12.11. Confidentiality .................................................................................................. 103

Section 12.12. Interest Rate Limitation .................................................................................... 104

Section 12.13. EXCULPATION PROVISIONS ....................................................................... 104

Section 12.14. Collateral Matters; Treasury Management Agreements .................................... 105

Section 12.15. No Third Party Beneficiaries ............................................................................ 105

Section 12.16. USA Patriot Act Notice .................................................................................... 105

Section 12.17. [Reserved] ......................................................................................................... 105

Section 12.18. Replacement of Lenders ................................................................................... 105

Section 12.19. Time of the Essence .......................................................................................... 106

Section 12.20. No Advisory or Fiduciary Responsibility ........................................................ 106

Section 12.21. [Reserved] ......................................................................................................... 107

Section 12.22. [Reserved] ......................................................................................................... 107

Section 12.23. Acknowledgement and Consent to Bail-In of EEA Financial Institutions ........ 107

ANNEXES, EXHIBITS AND SCHEDULES

| Annex I | Applicable Percentages and Commitments |
|---|---|

| Exhibit A | Form of Note |
|---|---|
| Exhibit B | Form of Borrowing Request |
| Exhibit C | Form of Interest Election Request |
| Exhibit D | Form of Compliance Certificate |
| Exhibit E | Form of Interim Order |
| Exhibit F | Form of Assignment and Assumption |
| Exhibit G-1 | Form of U.S. Tax Compliance Certificate (Foreign Lenders that are not partnerships) |
| Exhibit G-2 | Form of U.S. Tax Compliance Certificate (Foreign Participants that are not partnerships) |
| Exhibit G-3 | Form of U.S. Tax Compliance Certificate (Foreign Lenders that are partnerships) |
| Exhibit G-4 | Form of U.S. Tax Compliance Certificate (Foreign Participants that are partnerships) |
| Exhibit H | Initial Budget |
| Exhibit I | Form of Reserve Report Certificate |

| Schedule 1.01 | Existing Letters of Credit on the Effective Date |
|---|---|
| Schedule 7.05 | Litigation |
| Schedule 7.06 | Environmental |
| Schedule 7.12 | Insurance |
| Schedule 7.14 | Subsidiaries and Partnerships |
| Schedule 7.18 | Gas Imbalances |
| Schedule 7.19 | Marketing Contracts |
| Schedule 7.20 | Current Swap Agreements |
| Schedule 9.03 | Existing Liens |
| Schedule 9.05 | Investments |

WEIL:\95962958\14\99980.0531

**THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT** dated as of February __, 2017, is among **VANGUARD NATURAL GAS, LLC**, as debtor and debtor-in-possession, a limited liability company duly formed and existing under the laws of the Commonwealth of Kentucky (the "Borrower"), each of the Lenders from time to time party hereto and **CITIBANK, N.A.** (in its individual capacity, "Citibank"), as administrative agent for the Lenders (in such capacity, together with its successors in such capacity, the "Administrative Agent") and as Issuing Bank under and as defined herein.

RECITALS

A.      WHEREAS, on February __, 2017 (the "Petition Date"), the Loan Parties and certain of their respective Subsidiaries (in such capacity, each a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court;

B.      WHEREAS, the Borrower requests that the Lenders provide the Borrower with a debtor-in-possession, super priority, senior secured credit facility in an aggregate principal amount of up to $50,000,000 (the "DIP Facility"), to be afforded the liens and priority set forth in the DIP Order and as set forth in the other Loan Documents and to be used during the Chapter 11 Cases for the purposes set forth in Section 8.17, and which DIP Facility shall be available for borrowings and other extensions of credit as of the Interim Facility Effective Date, subject in all respects to the terms set out herein and in the other Loan Documents; and

C.      WHEREAS, by execution and delivery of this Agreement and the other Loan Documents, the Guarantors, as applicable, agree to guarantee the Obligations and the Borrower and each Guarantor agrees to secure all of the Obligations by granting to the Administrative Agent, for the benefit of the Secured Parties, a lien and security interest in respect of, and on, substantially all of such Loan Party's respective assets, in each case, on and subject to the terms and priorities set forth in the DIP Orders and the other Loan Documents.

In consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING MATTERS

Section 1.01.    *Certain Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:*

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Act" has the meaning assigned to such term in Section 12.16.

"Adequate Protection Liens" has the meaning assigned such term in the DIP Orders.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

1

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied from time to time by the Administrative Agent.

"Affected Loans" has the meaning assigned such term in Section 5.05.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by, or is under common Control with, the Person specified.

"Agent Parties" has the meaning assigned such term in Section 12.01(d)(ii).

"Agents" means, collectively, the Administrative Agent and other agents subsequently named; and "Agent" shall mean either the Administrative Agent or such other agent, as the context requires.

"Aggregate Commitments" at any time, means the sum of the aggregate amount of the Commitments of all of the Lenders at such time, as the same may be reduced or terminated pursuant to Section 2.06.

"Agreement" means this Debtor-in-Possession Credit Agreement, as the same may from time to time be amended, modified, amended and restated, supplemented or restated.

"Alternate Base Rate" means, for any day, a rate per annum equal to the highest of (a) the Federal Funds Effective Rate in effect on such day plus 0.50%, (b) to the extent ascertainable, the LIBO Rate (which rate shall be calculated based upon an Interest Period of one month and shall be determined on a daily basis and, for the avoidance of doubt, the LIBO Rate for any day shall be based on the rate determined on such day at 11:00 a.m. (London time)) plus 1.00%, (c) the Prime Rate and (d) 0.00%. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the LIBO Rate, as the case may be, shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the LIBO Rate, as the case may be.

"Alternate Testing Date" shall have the meaning assigned to such term in Section 8.18(b).

"Anti-Corruption Laws" means all state or federal laws, rules, and regulations applicable to the Borrower or any of its Affiliates from time to time concerning or relating to bribery or corruption, including the FCPA.

"Applicable Margin" means, for any day, (a) with respect to any ABR Loan, 4.50% per annum and (b) with respect to any Eurodollar Loan, 5.50% per annum.

"Applicable Percentage" means, with respect to any Lender at any time, the percentage of the Aggregate Commitments represented by such Lender's Commitment at such time; provided that, at any time a Defaulting Lender shall exist, "Applicable Percentage" shall mean the percentage of the Aggregate Commitments (disregarding any Defaulting Lenders' Commitment as such time, but subject to Section 2.12(a)(i)(A)) represented by such Lender's Commitment. If the Aggregate Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Aggregate Commitments most recently in effect, giving effect to any assignments.

"Approved Counterparty" means any Person engaged in the business of writing Swap Agreements whose long term senior unsecured debt rating is A-/A3 by S&P or Moody's (or their equivalent) or higher (other than any Lender or any Affiliate of a Lender) that is otherwise acceptable to the Administrative Agent and any other Person from time to time approved by the Majority Lenders.

2

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Petroleum Engineers" means DeGolyer and MacNaughton and any other independent petroleum engineers acceptable to the Administrative Agent.

"Approved Plan" shall have the meaning assigned to such term in the DIP Orders.

"Arranger" means (a) Citigroup Global Markets Inc., (b) JPMorgan Securities LLC and (c) Wells Fargo Bank, N.A., in each case, in their respective capacities as co-lead arrangers and co-bookrunners hereunder.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 12.04(b)), and accepted by the Administrative Agent, in the form of Exhibit F or any other form approved by the Administrative Agent.

"Availability Period" means the period from the Interim Facility Effective Date, to, but excluding, the nine-month anniversary of the Interim Facility Effective Date.

"Available Funds" means, as of any date of determination, the amount by which the Effective Commitments on such date exceed the Total Credit Exposure of all Lenders on such date.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" shall have the meaning assigned to such term in the recitals hereto.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America or any successor Governmental Authority.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrower for a borrowing in accordance with Section 2.03.

"Budget" shall have the meaning assigned to such term in Section 8.18(a).

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City or Houston, Texas are authorized or required by law to remain closed; and if

such day relates to a Borrowing or continuation of, a payment or prepayment of principal of or interest on, or a conversion of or into, or the Interest Period for, a Eurodollar Loan or a notice by the Borrower with respect to any such Borrowing or continuation, payment, prepayment, conversion or Interest Period, any day which is also a day on which dealings in dollar deposits are carried out in the London interbank market.

"Capital Expenditures" means, in respect of any Person, for any period, the aggregate (determined without duplication) of all exploration and development expenditures and costs that are capital in nature and any other expenditures that are capitalized on the balance sheet of such Person in accordance with GAAP.

"Capital Leases" means, in respect of any Person, all leases which shall have been, or should have been, in accordance with GAAP, recorded as capital leases on the balance sheet of the Person liable (whether contingent or otherwise) for the payment of rent thereunder.

"Carve-Out" has the meaning assigned to such term in the DIP Order.

"Cash Collateralize" means, in respect of any obligation, the provision, and pledge (as a security interest with the priority set forth in the DIP Order) of, cash collateral in Dollars, at a location and pursuant to documentation in form and substance satisfactory to the Administrative Agent and the Issuing Bank (and "Cash Collateralization" has a corresponding meaning).

"Cash Equivalent" means: (a) securities issued or fully guaranteed or insured by the United States Government or any agency thereof and backed by the full faith and credit of the United States and having maturities of not more than twelve (12) months from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits, or bankers' acceptances having in each case a tenor of not more than twelve (12) months from the date of acquisition issued by, and demand deposits with, any U.S. commercial bank or any branch or agency of a non-U.S. commercial bank licensed to conduct business in the U.S. having combined capital and surplus of not less than $500,000,000, whose long term securities are rated at least A (or then equivalent grade) by S&P and A2 (or then equivalent grade) by Moody's at the time of acquisition; (c) commercial paper of an issuer rated at least A-1 by S&P or P-1 by Moody's at the time of acquisition, and in either case having a tenor of not more than twelve (12) months; and (d) Investments, classified in accordance with GAAP as current assets of the Loan Parties or any of their Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition.

"Casualty Event" means any loss, casualty or other insured damage to, or any nationalization, taking under power of eminent domain or by condemnation or similar proceeding of, any Property of the Borrower or any of the Subsidiaries.

"Change in Control" means an event or series of events by which (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC thereunder as in effect on the date hereof) of Equity Interests representing more than 25% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Parent, or (b) occupation of a majority of those seats (other than vacant seats) on the board of managers of Parent by Persons who were neither (i) nominated by the board of managers of the Parent nor (ii) appointed by managers so nominated.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated thereunder by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities or otherwise, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law" introduced or adopted after the date hereof, regardless of the date enacted, adopted or issued.

"Chapter 11 Cases" means the cases of the Debtors filed under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor statute.

"Collateral" means all property of any kind which is subject to a Lien in favor of Administrative Agent to secure the Obligations or which under the terms of any Loan Document is purported to be subject to such Lien, which includes, for the avoidance of doubt, all existing (whether pre- or post-petition) and after-acquired, tangible and intangible, personal and real property and assets of each of the Loan Parties and any proceeds thereof.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make Loans and to acquire participations in Letters of Credit hereunder in an aggregate principal amount at any one time outstanding not to exceed the amounts set forth opposite such Lender's name as its "Commitment" on Annex I (as such Annex I may be amended or modified from time to time in connection with any reduction or modification to any Commitment or to the Aggregate Commitments pursuant to this Agreement), which amount represents the maximum aggregate amount of such Lender's Revolving Credit Exposure hereunder, as such commitment may be (a) reduced or terminated from time to time pursuant to Section 2.06 and (b) modified from time to time pursuant to assignments by or to such Lender pursuant to Section 12.04(b) or otherwise, and (c) terminated in accordance with Section 10.02 or otherwise in accordance with the terms of this Agreement.

"Commitment Fee Rate" means 1.00% per annum.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Communications" has the meaning assigned such term in Section 12.01(d).

"Confirmation Order" means an order, in form and substance reasonably satisfactory to the Administrative Agent, confirming the Approved Plan.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power,

WEIL:\95962958\14\99980.0531

by contract or otherwise.  For the purposes of this definition, and without limiting the generality of the foregoing, any Person that owns directly or indirectly 10% or more of the Equity Interests having ordinary voting power for the election of the managers or other governing body of a Person will be deemed to "control" such other Person.  "Controlling" and "Controlled" have meanings correlative thereto.

"Debt" means, for any Person (as used in this definition, a "Subject Person"), without duplication, (a) all obligations of such Subject Person for borrowed money or evidenced by bonds, bankers' acceptances, debentures, notes or other similar instruments; (b) all obligations of such Subject Person (whether contingent or otherwise) in respect of letters of credit, surety or other bonds and similar instruments; (c) all accounts payable and all accrued expenses, liabilities or other obligations of such Subject Person to pay the deferred purchase price of Property or services; (d) all obligations under Capital Leases; (e) all obligations under Synthetic Leases; (f) all Debt (as defined in the other clauses of this definition) and other obligations of any other Person secured by (or for which the holder of such Debt or other delegation has an existing right, contingent or otherwise, to be secured by) a Lien on any Property of such Subject Person, whether or not such Debt is assumed by such Subject Person; (g) all Debt (as defined in the other clauses of this definition) and other obligations of any other Person of others guaranteed by such Subject Person or in which such Subject Person otherwise assures a creditor against loss of such Debt (howsoever such assurance shall be made) to the extent of the lesser of the amount of such Debt and the maximum stated amount of such guarantee or assurance against loss; (h) all obligations or undertakings of such Person to maintain or cause to be maintained the financial position or covenants of any other Person or to purchase the Debt or Property of any other Person; (i) obligations to deliver commodities, goods or services, including, without limitation, Hydrocarbons, in consideration of one or more advance payments, other than gas balancing arrangements in the ordinary course of business; (j) obligations to pay for goods or services even if such goods or services are not actually received or utilized by such Subject Person; (k) any Debt of a partnership for which such Subject Person is liable either by agreement, by operation of law or by a Governmental Requirement but only to the extent of such liability; (l) Disqualified Capital Stock; and (m) the undischarged balance of any production payment created by such Subject Person or for the creation of which such Subject Person directly or indirectly received payment.  The Debt of any Subject Person shall include all obligations of such Subject Person of the character described above to the extent such Subject Person remains legally liable in respect thereof notwithstanding that any such obligation is not included as a liability of such Subject Person under GAAP.

"Debtor" has the meaning assigned to such term in the Recitals hereto.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means at any time, subject to Section 2.12(b), (i) any Lender that has failed for two or more Business Days to comply with its obligations under this Agreement to make a Loan, make a payment to the Issuing Bank in respect of an LC Disbursement or make any other payment due hereunder (each, a "funding obligation"), unless such Lender has notified the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding has not been satisfied (which conditions precedent, together with the applicable default, if any, will be specifically identified in such writing), (ii) any Lender that has notified

6

the Administrative Agent, the Borrower or the Issuing Bank in writing, or has stated publicly, that it does not intend to comply with its funding obligations hereunder, unless such writing or statement states that such position is based on such Lender's determination that one or more conditions precedent to funding cannot be satisfied (which conditions precedent, together with the applicable default, if any, will be specifically identified in such writing or public statement), (iii) any Lender that has, for three or more Business Days after written request of the Administrative Agent or the Borrower, failed to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender will cease to be a Defaulting Lender pursuant to this clause (iii) upon the Administrative Agent's and the Borrower's receipt of such written confirmation), or (iv) any Lender with respect to which a Lender Insolvency Event, other than by way of an Undisclosed Administration, has occurred and is continuing with respect to such Lender or its Parent Company (provided, in each case, that neither the reallocation of funding obligations provided for in Section 2.12(a)(i) as a result of a Lender's being a Defaulting Lender nor the performance by Non-Defaulting Lenders of such reallocated funding obligations will by themselves cause the relevant Defaulting Lender to become a Non-Defaulting Lender). Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any of clauses (i) through (v) above will be conclusive and binding absent manifest error, and such Lender will be deemed to be a Defaulting Lender (subject to Section 2.12(b)) upon notification of such determination by the Administrative Agent to the Borrower, the Issuing Bank and the Lenders.

"DIP Agency Fee Letter" means that certain letter agreement dated as of February __, 2017 from Citibank, N.A. and acknowledged and agreed to by the Borrower.

"DIP Facility" shall have the meaning assigned to such term in the recitals hereto.

"DIP Lead Arranger Fee Letter" means that certain letter agreement dated as of February __, 2017 from the Arrangers and acknowledged and agreed to by the Borrower.

"DIP Order" means the Interim Order and the Final Order, as applicable.

"Disposition" means, with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer, casualty, condemnation or other disposition thereof, but excluding any issuance by a Person of its own Equity Interests. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Capital Stock" means any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable) or upon the happening of any event, matures or is mandatorily redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is convertible or exchangeable for Debt or redeemable for any consideration other than other Equity Interests (which would not constitute Disqualified Capital Stock) at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in the case of each of the foregoing, on or prior to the date that is after the earlier of (a) the Maturity Date and (b) the date on which there are no Loans, LC Exposure or other obligations hereunder outstanding and all of the Aggregate Commitments are terminated.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of the United States of America or any state thereof or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Commitment" means (a) during the Interim Facility Period, $15,000,000 and (b) during the Final Facility Period, the Aggregate Commitments.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 12.04(b)(v) and (vi) (subject to such consents, if any, as may be required under Section 12.04(b)(iii)); provided that notwithstanding the foregoing, "Eligible Assignee" shall not include the Parent, the Borrower or any Subsidiary or any of their respective Affiliates.

"Environmental Laws" means any and all Governmental Requirements relating to the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment including ambient air, surface water, ground water, or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such Equity Interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with the Parent, the Borrower or a Subsidiary would be deemed to be a "single employer" within the meaning of Section 4001(b)(1) of ERISA or subsections (b), (c), (m) or (o) of Section 414 of the Code.

"ERISA Event" means (a) a "Reportable Event" described in Section 4043 of ERISA and the regulations issued thereunder, (b) the withdrawal of the Parent, the Borrower, a Subsidiary or any ERISA Affiliate from a Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (c) the filing of a notice of intent to terminate a Plan or the treatment of a Plan amendment as a termination under Section 4041 of ERISA, (d) the institution of proceedings to terminate a Plan by the PBGC, (e) receipt of a notice of withdrawal liability pursuant to Section 4202 of ERISA or (f) any other event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

WEIL:\95962958\14\99980.0531

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned such term in Section 10.01.

"Excepted Liens" means:

(a)    Liens for Taxes, assessments or other governmental charges or levies which are not delinquent or which are being contested in good faith by appropriate action and for which the Parent or any of its Subsidiaries, as applicable, set aside, and maintains, adequate reserves in accordance with GAAP;

(b)    Liens in connection with workers' compensation, unemployment insurance or other social security, old age pension or public liability obligations which are not delinquent or which are being contested in good faith by appropriate action and for which the Parent or any of its Subsidiaries, as applicable, set aside, and maintains, adequate reserves in accordance with GAAP;

(c)    statutory landlord's liens, operators', vendors', carriers', warehousemen's, repairmen's, mechanics', suppliers', workers', materialmen's, construction or other like Liens arising by operation of law in the ordinary course of business or incident to the exploration, development, operation and maintenance of Oil and Gas Properties each of which is in respect of obligations that are not delinquent or which are being contested in good faith by appropriate action and for which the Parent or any of its Subsidiaries, as applicable, set aside, and maintains, adequate reserves in accordance with GAAP;

(d)    contractual Liens which are customary in the oil and gas business and arise in the ordinary course of business of the Borrower under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business and are for claims which are not delinquent or which are being contested in good faith by appropriate action and for which the Parent or any of its Subsidiaries, as applicable, set aside, and maintains, adequate reserves in accordance with GAAP, provided that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by the Borrower or any Subsidiary or materially impair the value of such Property subject thereto;

(e)    Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained with a creditor depository institution, provided that no such deposit account is a dedicated cash collateral account or is subject to restrictions against access by the depositor in excess of those set forth by regulations promulgated by the Board and no such deposit account is intended by Borrower or any of the Subsidiaries to provide collateral to the depository institution;

WEIL:\95962958\14\99980.0531

(f)     easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations in any Property of the Borrower or any Subsidiary for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals or timber, and other like purposes, or for the joint or common use of real estate, rights of way, facilities and equipment, in each case incurred in the ordinary course of business, which do not secure any Debt or other monetary obligations and which do not materially impair the use of such Property for the purposes of which such Property is held by the Borrower or any Subsidiary or materially impair the value of such Property subject thereto;

(g)     minor defects and irregularities in title to any Property which are incurred in the ordinary course of business and which do not secure any Debt or other monetary obligations and which do not materially impair use of such Property for the purposes for which such Property is held by the Borrower or any Subsidiary, as applicable, or materially impair the value of such Property subject thereto;

(h)     Liens on cash or securities pledged to secure performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred in the ordinary course of business and to the extent the Debt in respect thereof is permitted by Section 9.02(d) and (g); and

(i)     judgment and attachment Liens with respect to obligations arising subsequent to the Petition Date not giving rise to an Event of Default pursuant to Section 10.01(k), provided that any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and no action to enforce such Lien has been commenced;

provided, further that all such Liens described in clauses (a) through (i) shall remain Excepted Liens only for so long as no action to enforce such Lien has been commenced (unless subject to the automatic stay of Section 362 of the Bankruptcy Code) and no intention to subordinate the Liens granted in favor of the Administrative Agent and/or the other Secured Parties is to be hereby implied or expressed by, or as a result of, the permitted existence of any Excepted Liens.

"Excess Cash" means, as of any date of determination, all cash and Cash Equivalents of the Loan Parties in excess of $30,000,000 in the aggregate at any time.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 5.03, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 5.03(g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

10

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof any agreements entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreements and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it; provided that, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Final Facility Effective Date" has the meaning assigned to such term in Section 6.02.

"Final Order" means the order of the Bankruptcy Court authorizing and approving the Debtors' entry into, and performance under, the DIP Facility on a final basis, including the granting of the Liens and Superpriority Claims in respect of the DIP Facility in favor of the Administrative Agent and the Secured Parties, in substantially the form of the Interim Order, with such changes as the Administrative Agent and the Majority Lenders approve.

"Final Period" means the period commencing on the Final Facility Effective Date and ending on the Termination Date.

"Financial Officer" means, for any Person, the chief financial officer, principal accounting officer, treasurer or controller of such Person. Unless otherwise specified, all references herein to a Financial Officer means a Financial Officer of the Borrower.

"Financial Statements" means the financial statement or statements of the Parent and the Subsidiaries referred to in Section 7.04(a).

"Flood Insurance Regulations" has the meaning specified in Section 7.12(b).

"Foreign Lender" means a Lender that is not a U.S. Person.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time subject to the terms and conditions set forth in Section 1.04.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank) over the Parent, the Borrower, any Subsidiary, any of their Properties, any Agent, the Issuing Bank or any Lender.

11

"Governmental Requirement" means any law, statute, code, ordinance, order, determination, rule, regulation, judgment, decree, injunction, franchise, permit, certificate, license, authorization or other directive or requirement, whether now or hereafter in effect, including, without limitation, Environmental Laws, energy regulations and occupational, safety and health standards or controls, of any Governmental Authority.

"Guarantors" means (a) the Parent, (b) each Subsidiary of the Borrower that is a party to the Guaranty, and (c) each other Person that guarantees the Obligations pursuant to, and in accordance with, Section 8.14(e).

"Guaranty" means the Guaranty Agreement executed and delivered by the Guarantors on the date hereof (or pursuant to any joinder thereto as provided therein) and each other guaranty that supports or purports to support the Obligations, including any joinder thereto.

"Highest Lawful Rate" means, with respect to each Lender, the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"Hydrocarbon Interests" means all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases (excluding coal and timber), or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature. Unless otherwise indicated herein, each reference to the term "Hydrocarbon Interests" shall mean Hydrocarbon Interests of the Borrower and the Subsidiaries.

"Hydrocarbons" means oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom. Unless otherwise indicated herein, each reference to the term "Hydrocarbons" shall mean Hydrocarbons of the Borrower and the Subsidiaries.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Information" has the meaning assigned such term in Section 12.11.

"Interest Election Request" means a request by the Borrower substantially in the form of Exhibit C to convert or continue a Borrowing in accordance with Section 2.04.

"Interest Payment Date" means (a) with respect to any ABR Loan, the last day of each calendar month and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Eurodollar Borrowing of which such Eurodollar Loan is a part.

"Interest Period" means with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one month thereafter; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period pertaining to a Eurodollar Borrowing that

WEIL:\95962958\14\99980.0531

commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period and (c) no Interest Period may have a term which would extend beyond the Termination Date.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Facility Cap" means, as of any date of determination, $15,000,000; provided that, if as of any such date of determination the Aggregate Commitments are less than $15,000,000, the "Interim Facility Cap" in effect on such date shall equal the amount of the Aggregate Commitments in effect on such date.

"Interim Facility Effective Date" has the meaning specified therefor in Section 6.01.

"Interim Order" means the interim order of the Bankruptcy Court approving the DIP Facility on an interim basis and entered by the Bankruptcy Court in the form of Exhibit E, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Administrative Agent, the Majority Lenders and the Borrower.

"Interim Period" means the period commencing on the Interim Facility Effective Date and ending on the earlier to occur of (a) the Final Facility Effective Date and (b) the Termination Date.

"Investment" means, for any Person: (a) the acquisition (whether for cash, Property, services or securities or otherwise) of Equity Interests of any other Person or any agreement to make any such acquisition (including, without limitation, any "short sale" or any sale of any securities at a time when such securities are not owned by the Person entering into such short sale) or any capital contribution to any other Persons; (b) the making of any deposit with, or advance, loan or capital contribution to, assumption of Debt of, purchase or other acquisition of any other Debt or equity participation or interest in, or other extension of credit to, any other Person (including the purchase of Property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such Property to such Person, but excluding any such advance, loan or extension of credit having a term not exceeding ninety (90) days representing the purchase price of inventory or supplies sold by such Person in the ordinary course of business); (c) the purchase or acquisition (in one or a series of transactions) of Property of another Person that constitutes a business unit or (d) the entering into of any guarantee of, or other contingent obligation (including the deposit of any Equity Interests to be sold) with respect to, Debt or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"IRS" means the United States Internal Revenue Service.

"Issuing Bank" means Citibank, in its capacity as the issuer of Letters of Credit hereunder, and its successors in such capacity as provided in Section 2.08(i).  The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"LC Collection Account" means each deposit account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Secured Parties, in form and substance satisfactory to the Administrative Agent and the Issuing Bank.

13

"LC Commitment" means, at any time, $5,000,000.

"LC Disbursement" means a payment made by the Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time.  The LC Exposure of any Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

"Lender Insolvency Event" means that (i) a Lender or its Parent Company is insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, (ii) such Lender or its Parent Company is the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor or sequestrator, or a similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation, or any other state or federal regulatory authority acting in such a capacity, has been appointed for such Lender or its Parent Company, or such Lender or its Parent Company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment or (iii) such Lender or its Parent Company has become the subject of a Bail-In Action, provided that a Lender Insolvency Event shall not occur solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or its Parent Company by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender; provided further that a Lender Insolvency Event shall not occur solely by virtue of the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator with respect to a Lender or its Parent Company under the Dutch Financial Supervision Act 2007 (as amended from time to time and including any successor legislation).

"Lenders" means the Persons listed on Annex I and any Person that shall become a party hereto pursuant to an Assignment and Assumption (other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption) and, as the context requires, includes the Issuing Bank and, in each case, includes their respective permitted successors and assigns.

"Letter of Credit" means any stand-by letter of credit issued by the Issuing Bank for the account of any of the Borrower and any Subsidiary that is a Guarantor in accordance with this Agreement.

"Letter of Credit Agreements" means the Letters of Credit, all letter of credit applications and other agreements (including any amendments, modifications or supplements thereto) submitted by the Borrower, or entered into by the Borrower (whether for itself or any Subsidiary as the account party), with the Issuing Bank relating to any Letter of Credit.

"LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, the rate appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such Service, or any successor to or substitute for such Service, providing rate quotations comparable to those currently provided on such page of such Service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period, provided that, if the LIBO Rate shall be less than zero, such rate shall be deemed to be zero for the

14

purposes of this Agreement. In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, provided that, if the LIBO Rate shall be less than zero as so determined, such rate shall be deemed to be zero for the purposes of this Agreement.

"Lien" means any interest in Property securing an obligation owed to, or a claim by, a Person other than the owner of the Property, whether such interest is based on the common law, statute or contract, and whether such obligation or claim is fixed or contingent, and including but not limited to (a) the lien or security interest arising from a mortgage, encumbrance, pledge, security agreement, conditional sale or trust receipt or a lease, consignment or bailment for security purposes or (b) production payments and the like payable out of Oil and Gas Properties. The term "Lien" shall include easements, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations. For the purposes of this Agreement, the Borrower and the Subsidiaries, as applicable, shall be deemed to be the owner of any Property which they have acquired or hold subject to a conditional sale agreement, or leases under a financing lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person in a transaction intended to create a financing.

"Liquidate" or "Liquidation" means, with respect to any Swap Agreement, (a) the sale, assignment, novation, unwind or termination (whether upon the maturity thereof or otherwise) of all or any part of such Swap Agreement (including, without limitation, any transaction thereunder) or (b) the creation of an offsetting position against all or any part of such Swap Agreement.

"Liquidity" means, as of any date of determination, without duplication, the sum of (a) unrestricted cash and Cash Equivalents of the Loan Parties as of such date, which are subject to a perfected lien and security interest in favor of the Administrative Agent pursuant to the Loan Documents with the priority set forth in the DIP Order, plus (b) the Available Funds as of such date.

"Loan Documents" means this Agreement, the Notes, the Letter of Credit Agreements, the Security Instruments, the DIP Agency Fee Letter, the DIP Lead Arranger Fee Letter, the DIP Orders and all other agreements, instruments, consents and certificates heretofore or hereafter executed and delivered by the Parent, the Borrower, any other Loan Party or any of their respective Affiliates in connection with this Agreement (other than Treasury Management Agreements).

"Loan Parties" means, collectively, the Borrower, the Parent and each other Guarantor.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement.

"Majority Lenders" means, at any time, Lenders having Loans, LC Exposure and unused Commitments representing more than 50% of the sum of all Loans outstanding, LC Exposure and unused Commitments at such time (without regard to any sale by a Lender of a participation in any Loan under Section 12.04(d)); provided that Loans, LC Exposure and unused Commitment of any Defaulting Lender at such time shall be disregarded for purposes of making a determination of Majority Lenders.

"Material Adverse Effect" means a material adverse change in, or material adverse effect on (a) the business, operations, Property, condition (financial or otherwise) or prospects of the Parent, the Borrower and the Subsidiaries, taken as a whole, other than any change, event or occurrence, arising individually or in the aggregate, from events that could reasonably be expected to result from the filing or commencement of the Chapter 11 Cases or the announcement of the filing or commencement of the

Chapter 11 Cases, (b) the ability of the Parent, the Borrower, any Subsidiary or any Guarantor to perform any of its obligations under any Loan Document (including, without limitation, payment and performance of the Obligations), (c) the validity or enforceability of any Loan Document or the Obligations or (d) the rights and remedies of, or benefits available to, the Administrative Agent, any other Agent, the Issuing Bank or any Lender under any Loan Document.

"Material Gas Imbalance" means, with respect to all gas balancing agreements to which the Borrower or any Subsidiary is a party or by which any mineral interest owned by the Borrower or any Subsidiary is bound, a net gas imbalance to the Borrower or any Subsidiary, individually or taken as a whole in excess of $1,000,000. Gas imbalances will be determined based on written agreements, if any, specifying the method of calculation thereof, or, alternatively, if no such agreements are in existence, gas imbalances will be calculated by multiplying (x) the volume of gas imbalance as of the date of calculation (expressed in thousand cubic feet) by (y) the heating value in btu's per thousand cubic feet, times the Henry Hub average daily spot price for the month immediately preceding the date of calculation.

"Material Indebtedness" means Debt (other than the Loans and Letters of Credit) of any one or more of the Parent, the Borrower and their respective Subsidiaries in an aggregate principal amount exceeding $2,000,000.

"Maturity Date" means the nine-month anniversary of the Interim Facility Effective Date.

"Midstream Assets" means any Property (including, without limitation, contracts, rights of way, easements, surface leases, surface use agreements, permits, pipelines, flow lines, meters, facilities, tank batteries and electrical generation sources) comprising the business of (a) processing, gathering, storing, transporting, treating and/or marketing of Hydrocarbons or (b) processing, gathering, storing, transporting, treating and/or disposal of fresh or produced water.

"Milestones" shall have the meaning assigned to such term in the DIP Orders.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto that is a nationally recognized rating agency.

"Mortgaged Property" means, as of any date of determination, each Property of the Loan Parties that is subject to a lien and security interest in favor of the Administrative Agent (or its designee) pursuant to any Mortgage and/or any other Loan Document.

"Mortgages" means the mortgages, deeds of trust, leasehold mortgages, assignments of leases and rents, assignments of proceeds of production, security documents and similar agreements securing the Prepetition RBL Obligations (including all amendments, modifications and supplements thereto) delivered pursuant to the Prepetition RBL Credit Agreement granting a lien and security interest in Oil and Gas Properties and other Properties of the Loan Parties in favor of the Prepetition RBL Agent.

"Multiemployer Plan" means a Plan which is a multiemployer plan as defined in Section 3(37) or 4001(a)(3) of ERISA.

"Net Cash Proceeds" means with respect to (x) any Disposition or Casualty Event or (y) the Liquidation, close-out or other similar action in respect of any transaction arising under any Swap Agreement, the cash proceeds (including cash proceeds subsequently received (as and when received) in respect of noncash consideration initially received), net of direct expenses incurred by the Loan Parties in the ordinary course of business in connection with such Disposition, Casualty Event or Liquidation, which shall, in each case, be reasonably acceptable to the Majority Lenders.

WEIL:\95962958\14\99980.0531

"Non-Defaulting Lender" means, at any time, a Lender that is not a Defaulting Lender or a Potential Defaulting Lender.

"Notes" means any promissory notes of the Borrower described in Section 2.02(d) and which are substantially in the form of Exhibit A, together with all amendments, modifications, replacements, extensions and rearrangements thereof.

"Obligations" means any and all amounts owing or to be owing by the Parent, the Borrower, any Subsidiary, any Guarantor or other Loan Party (including without limitation, all debts, liabilities, obligations, covenants and duties of each such Person, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising): (a) to the Administrative Agent, the Issuing Bank, any Lender or any other Secured Party under, or in connection with, any Loan Document; (b) to any Treasury Management Bank under any Secured Treasury Management Agreement to the extent such amounts arise after the Petition Date, and (c) all renewals, extensions and/or rearrangements of any of the above.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Oil and Gas Properties" means (a) Hydrocarbon Interests; (b) the Properties now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment, rental equipment or other personal Property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing. Unless otherwise indicated herein, each reference to the term "Oil and Gas Properties" shall mean Oil and Gas Properties of the Borrower and the Subsidiaries.

"Organizational Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non US jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the

jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Parent" means Vanguard Natural Resources, LLC, a Delaware limited liability company, and the holder of 100% of the Equity Interests in the Borrower.

"Parent Company" means, with respect to a Lender, the bank holding company (as defined in Federal Reserve Board Regulation Y), if any, of such Lender, and/or any Person owning, beneficially or of record, directly or indirectly, a majority of the shares of such Lender.

"Participant" has the meaning set forth in Section 12.04(d).

"Participant Register" has the meaning set forth in Section 12.04(d).

"PBGC" means the Pension Benefit Guaranty Corporation, or any successor thereto.

"PDP" means those Proved Reserves which are expected to be recovered from completion intervals which are open and producing at the time of the estimate.

"Permitted Variance" has the meaning assigned to such term in Section 9.21.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning assigned to such term in the Recitals to this Agreement.

"Plan" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, which (a) is currently or hereafter sponsored, maintained or contributed to by the Parent, the Borrower, a Subsidiary or an ERISA Affiliate or (b) was at any time during the six calendar years preceding the date hereof, sponsored, maintained or contributed to by the Parent, the Borrower or a Subsidiary or an ERISA Affiliate.

"Platform" has the meaning assigned such term in Section 12.01(d).

"Potential Defaulting Lender" means, at any time, (i) any Lender with respect to which an event of the kind referred to in the definition of "Lender Insolvency Event" has occurred and is continuing in respect of any subsidiary or financial institution affiliate of such Lender, or (ii) any Lender that has notified, or whose Parent Company or a subsidiary or financial institution affiliate thereof has notified,

the Administrative Agent, the Borrower or the Issuing Bank in writing, or has stated publicly, that it does not intend to comply with its funding obligations generally under other loan agreements or credit agreements or other similar/other financing agreements, unless such writing or statement states that such position is based on such Lender's determination that one or more conditions precedent to funding cannot be satisfied (which conditions precedent, together with the applicable default, if any, will be specifically identified in such writing or public statement).  Any determination by the Administrative Agent that a Lender is a Potential Defaulting Lender under any of clauses (i) and (ii) above will be conclusive and binding absent manifest error, and such Lender will be deemed a Potential Defaulting Lender (subject to Section 2.12(b)) upon notification of such determination by the Administrative Agent to the Borrower, the Issuing Bank and the Lenders.

"Prepetition" means the time period prior to the Petition Date.

"Prepetition Intercreditor Agreement" means the Intercreditor Agreement among the Borrower, Parent, the other Subsidiaries of the Parent named therein, certain other Affiliates of the Parent, the Prepetition RBL Agent and the Prepetition Second Lien Trustee, dated as of February 10, 2016, as in effect on the Petition Date.

"Prepetition RBL Agent" means Citibank, N.A., as administrative agent under the Prepetition RBL Credit Agreement.

"Prepetition RBL Credit Agreement" means that certain Third Amended and Restated Credit Agreement, dated as of September 30, 2011, among the Borrower, the Parent, the lenders from time to time party thereto (the "Prepetition RBL Lenders") and the Prepetition RBL Agent.

"Prepetition RBL Lenders" means the lenders party to the Prepetition RBL Credit Agreement from time to time.

"Prepetition RBL Loan Documents" means the "Loan Documents" as defined in the Prepetition RBL Credit Agreement.

"Prepetition RBL Obligations" means the "Obligations" as defined in the Prepetition RBL Credit Agreement.

"Prepetition Second Lien Debt Documents" means, collectively, the Prepetition Second Lien Indenture, the Prepetition Second Lien Notes, all guaranties in respect of the Prepetition Second Lien Notes, and all other agreements, documents or instruments executed and delivered by the Borrower or any Guarantor in connection with, or pursuant to, the issuance of the Prepetition Second Lien Notes, in each case, as in effect on the Petition Date.

"Prepetition Second Lien Indenture" means the Indenture, dated February 10, 2016, among, *inter alia*, the Prepetition Second Lien Trustee, the Borrower, the Parent, VNR Finance Corp., and certain subsidiaries (including the Borrower) of the Parent, as guarantors, as in effect on the Petition Date.

"Prepetition Second Lien Noteholders" means the holders of the Prepetition Second Lien Notes.

"Prepetition Second Lien Notes" means the Parent's 7.00% Senior Secured Second Lien Notes due 2023, as in effect on the Petition Date.

"Prepetition Second Lien Obligations" means the "Obligations" (as defined in the Prepetition Second Lien Indenture).

WEIL:\95962958\14\99980.0531

"Prepetition Second Lien Trustee" means Delaware Trust Company (as successor by assignment to U.S. Bank National Association), or such other entity serving in the capacity as the "collateral trustee" under the Prepetition Second Lien Indenture to the extent permitted under the Prepetition Second Lien Indenture and the Prepetition Intercreditor Agreement.

"Prepetition Senior Unsecured Noteholders" means the holders of the Prepetition Senior Unsecured Notes.

"Prepetition Senior Unsecured Notes" means, collectively, (a) the Parent's 8.375% Senior Notes due 2019 and (b) the Parent's 7.875% Senior Notes due 2020, in each case, as in effect on the Petition Date.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by Citibank as its prime rate for loans in dollars; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective. Such rate is set by Citibank as a general reference rate of interest, taking into account such factors as Citibank may deem appropriate; it being understood that many of Citibank's commercial or other loans are priced in relation to such rate, that it is not necessarily the lowest or best rate actually charged to any customer and that Citibank may make various commercial or other loans at rates of interest having no relationship to such rate.

"Professional Fees" means fees and expenses of Retained Professionals and any Committee (each as defined in and in accordance with the DIP Orders).

"Projected Production" means, for any specified period, the projected volume of production of Hydrocarbons from Proved Reserves of the Oil and Gas Properties (as reflected on the most recently delivered Projected Production Report) reasonably anticipated by Borrower and acceptable to Administrative Agent, during such period.

"Projected Production Report" means each report, in form and substance satisfactory to the Administrative Agent, setting forth, as of each December 31st or June 30th, the Projected Production for (i) the first 24 month period following the date of such Projected Production Report, (ii) the succeeding 24-month period (from the 25th month through the 48th month) following the date of such Projected Production Report, and (iii) the succeeding 12-month period (from the 48th month through the 60th month) following the date of such Projected Production Report.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights.

"Proved Reserves" means those recoverable Hydrocarbons that have been estimated with reasonable certainty, as demonstrated by geological and engineering data, to be economically recoverable from the Oil and Gas Properties by existing producing methods under existing economic conditions.

"Public Lender" has the meaning assigned to such term in Section 8.02.

"PUD" means economically recoverable Proved Reserves estimated to exist in proved reservoirs which will be recovered from wells to be drilled in the future. Reserves in undrilled areas are included in proved reserved estimates if they are considered proved by geologic analysis of the current well information.

"PV10" means the present worth of future net income, discounted to present value at the simple interest rate of ten percent (10%) per year.

"Recipient" means (a) the Administrative Agent, (b) any Lender and (c) the Issuing Bank, as applicable.

"Redemption" means with respect to any Debt, the repurchase, redemption, prepayment, repayment, defeasance or any other acquisition or retirement for value (or the segregation of funds with respect to any of the foregoing) of such Debt. "Redeem" has the correlative meaning thereto.

"Register" has the meaning assigned such term in Section 12.04(c).

"Regulation D" means Regulation D of the Board, as the same may be amended, supplemented or replaced from time to time.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Remedial Work" has the meaning assigned such term in Section 8.10(a).

"Reporting Date" has the meaning assigned to such term in Section 8.21(a).

"Reserve Report" means each report, in form and substance satisfactory to the Administrative Agent, setting forth, as of each December 31st or June 30th, the oil and gas reserves attributable to the Oil and Gas Properties of the Borrower and the Subsidiaries, together with a projection of the rate of production and future net income, taxes, operating expenses and Capital Expenditures with respect thereto as of such date, based upon the economic and pricing assumptions consistent with the Administrative Agent's lending requirements at the time.

"Responsible Officer" means, as to any Person, the chief executive officer, the president, any Financial Officer or any vice president of such Person. Unless otherwise specified, all references to a Responsible Officer herein shall mean a Responsible Officer of the Borrower.

"Restricted Payment" means any dividend or other distribution or return of capital (whether in cash, securities or other Property) with respect to any Equity Interests in the Parent, Borrower or any of the Subsidiaries, or any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, Redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in the Parent, Borrower or any of the Subsidiaries or any option, warrant or other right to acquire any such Equity Interests in the Parent, Borrower or any of the Subsidiaries.

"Revolving Credit Exposure" means, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Loans and its LC Exposure at such time and, as the context may require, the aggregate Revolving Credit Exposure of all Lenders.

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., and any successor thereto that is a nationally recognized rating agency.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (including, at the time of this Agreement, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

WEIL:\95962958\14\99980.0531

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council or any European Union member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by OFAC, the U.S. Department of the Treasury or the U.S. Department of State, the United Nations Security Council or any European Union member state.

"SEC" means the Securities and Exchange Commission or any successor Governmental Authority.

"Secured Parties" means the Lenders, the Treasury Management Banks and any other Person holding Obligations secured by the Liens granted under any Loan Document, including pursuant to the DIP Orders.

"Secured Treasury Management Agreement" means any Treasury Management Agreement entered into between, or among, any Loan Party and any Treasury Management Bank.

"Security Instruments" means each security agreement, the Mortgages, the DIP Orders and any and all other agreements, instruments, consents or certificates now or hereafter executed and delivered by the Parent, the Borrower or any other Person (other than Secured Treasury Management Agreements) in connection with, or as security for, the Obligations, the Notes, this Agreement, and reimbursement obligations under the Letters of Credit, as such agreements may be amended, modified, supplemented or restated from time to time.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject, with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subsidiary" means: (a) any Person of which at least a majority of the outstanding Equity Interests having by the terms thereof ordinary voting power to elect a majority of the board of directors, board of managers or other governing body of such Person (irrespective of whether or not at the time Equity Interests of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency) is at the time directly or indirectly owned or controlled by the Parent, the Borrower or one or more of the Subsidiaries, and (b) any partnership of which the Parent, the Borrower or any of the Subsidiaries is a general partner. Unless otherwise indicated herein, each reference to the term 'Subsidiary' shall mean a Subsidiary of the Parent.

"Superpriority Claim" means a superpriority administrative expense claim against a Loan Party in any of the Chapter 11 Cases having priority over any or all administrative expenses and other claims of

the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 552(b), 726 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option (whereby the aggregate position for options creates an obligation for the Borrower or any of the Subsidiaries or any of the Guarantors) or similar agreement, whether exchange traded, "over-the-counter" or otherwise, involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, and to the extent not otherwise included in this definition, any and all agreements, contracts or transactions that constitute a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, managers, officers, employees or consultants of any of the Loan Parties and their respective Subsidiaries shall be a Swap Agreement.

"Swap Obligation" means, with respect to any Loan Party, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swap Termination Value" means, in respect of any one or more Swap Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Agreements, (a) for any date on or after the date such Swap Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Agreements, as determined by the counterparties to such Swap Agreements.

"Synthetic Lease" means, as to any Person, any lease (including a lease that may be terminated by the lessee at any time) of any Property (whether real, personal or mixed) (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the Property so leased for U.S. federal income tax purposes, other than any such lease under which such Person is the lessor.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest additions to tax or penalties applicable thereto.

"Termination Date" means the earliest to occur of (a) the Maturity Date, (b) 45 days after the entry of the Interim Order, if the Bankruptcy Court has not entered the Final Order on or prior to such date, (c) the earlier of the effective date and the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code), in each case, of (if any) a plan of reorganization or a plan of liquidation in any of the Chapter 11 Cases, (d) the consummation of a sale of all or substantially all of the equity and/or assets of the Debtors, (e) the date of the payment in full, in cash, of all Obligations (and the termination of all Commitments in accordance with the terms hereof) and (f) the date of the termination of the Commitments and/or the acceleration of all of the Obligations under this Agreement and the other Loan Documents following the occurrence and during the continuance of an Event of Default in accordance with Section 10.02.

"Testing Date" shall have the meaning assigned to such term in Section 8.18(b).

"Testing Period" shall have the meaning assigned to such term in Section 8.18(b).

"Total Credit Exposure" means, as to any Lender at any time, the sum of such Lender's unused Commitment, the principal amount at such time of its outstanding Loans and such Lender's LC Exposure at such time.

"Transactions" means, with respect to (a) the Borrower, the execution, delivery and performance by the Borrower of this Agreement, and each other Loan Document to which it is a party, the borrowing of Loans, the use of the proceeds thereof and the issuance of Letters of Credit hereunder, and the grant by the Borrower of the security interests and liens by the Borrower in and to all right, title and interest of the Borrower in its Mortgaged Properties and all other Property and the Equity Interests of the Subsidiaries, in each case, pursuant to the Loan Documents and (b) each Guarantor, the execution, delivery and performance by such Guarantor of each Loan Document to which it is a party, such Guarantor's guarantee of the Obligations and all other obligations arising under the Guaranty and such Guarantor's grant of the security interests and provision of collateral under the Loan Documents, including the grant of security interests and liens by such Guarantor on its Mortgaged Properties and its other Properties pursuant to the Loan Documents.

"Treasury Management Agreement" means any agreement to provide cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements.

"Treasury Management Bank" means any Person that, at the time it enters into a Treasury Management Agreement with the Borrower or any Subsidiary or any Guarantor, is a Lender or an Affiliate of a Lender, or was a Lender or an Affiliate of a Lender, at the time such Treasury Management Agreement was entered into; provided that, so long as any Lender is a Defaulting Lender, such Lender will not be a Treasury Management Bank with respect to any Treasury Management Agreement entered into while such Lender was a Defaulting Lender.

"Type", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Alternate Base Rate or the Adjusted LIBO Rate.

"Undisclosed Administration" means in relation to a Lender the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator under or based on the law in the country where such Lender is subject to home jurisdiction supervision if applicable law requires that such appointment is not to be publicly disclosed.

"U.S. Person" means any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"Variance Report" shall have the meaning assigned to such term in Section 8.18(b).

"Variance Testing Date" shall have the meaning assigned to such term in Section 8.18(b).

"Wholly-Owned Subsidiary" means (a) any Subsidiary of which all of the outstanding Equity Interests, on a fully-diluted basis, are owned by the Parent, the Borrower or one or more of the Wholly Owned Subsidiaries or are owned by the Parent, the Borrower and one or more of the Wholly Owned Subsidiaries or (b) if permitted by this Agreement, any Subsidiary that is organized in a foreign jurisdiction and is required by the applicable laws and regulations of such foreign jurisdiction to be partially owned by the government of such foreign jurisdiction or individual or corporate citizens of such

foreign jurisdiction, provided that the Parent directly or indirectly, owns the remaining Equity Interests in such Subsidiary and, by contract or otherwise, controls the management and business of such Subsidiary and derives economic benefits of ownership of such Subsidiary to substantially the same extent as if such Subsidiary were a Wholly-Owned Subsidiary.

"Withholding Agent" means any Loan Party and the Administrative Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02.   Types of Loans and Borrowings.   For purposes of this Agreement, Loans and Borrowings, respectively, may be classified and referred to by Type (*e.g.*, a "Eurodollar Loan" or a "Eurodollar Borrowing").

(a)      Terms Generally; Rules of Construction.   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.   Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.   The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".   The word "will" shall be construed to have the same meaning and effect as the word "shall".   Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, amendments and restatements, supplements or modifications set forth in the Loan Documents), (b) any reference herein to any law shall be construed as referring to such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time, (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to the restrictions contained in the Loan Documents), (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including", (f) any reference herein to Articles, Sections, Annexes, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Annexes, Exhibits and Schedules to, this Agreement, (g) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (h) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including, cash, securities, accounts and contract rights.   No provision of this Agreement or any other Loan Document shall be interpreted or construed against any Person solely because such Person or its legal representative drafted such provision.

(b)      Headings.   Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03.   Accounting Terms and Determinations; GAAP.   Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished to the Administrative Agent or the Lenders hereunder shall be prepared for the Parent, the Borrower and the Subsidiaries, on a consolidated basis, in accordance with GAAP,

WEIL:\95962958\14\99980.0531

applied on a basis consistent with the Financial Statements except for changes in which the Parent's independent certified public accountants concur and which are disclosed to Administrative Agent on the next date on which financial statements are required to be delivered to the Lenders pursuant to Section 8.01(a); provided that, unless the Borrower and the Majority Lenders shall otherwise agree in writing, no such change shall modify or affect the manner in which compliance with the covenants contained herein is computed such that all such computations shall be conducted utilizing financial information presented consistently with prior periods.

Section 1.04.    Changes in GAAP.    If at any time any change in GAAP would affect the computation of any financial requirement set forth in any Loan Document, and either the Borrower or the Majority Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Majority Lenders); provided that, until so amended, (i) such requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

Section 1.05.    **[Reserved]**.

Section 1.06.    Determination of Time of Day.    Unless designated otherwise, all references herein to times of day shall be references to Central time (daylight or standard, as applicable).

Section 1.07.    Amounts of Letters of Credit.    Unless otherwise specified herein, the amount of a Letter of Credit at any time shall be deemed to be the stated amount of such Letter of Credit in effect at such time; provided, however, that with respect to any Letter of Credit that, by its terms or the terms of any Letter of Credit Agreements related thereto, provides for one or more automatic increases in the stated amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at such time.

ARTICLE II

THE CREDITS

Section 2.01.    Commitments.    Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender agrees to make Loans to the Borrower during the Availability Period in an aggregate principal amount that will not result in (a) such Lender's Revolving Credit Exposure exceeding such Lender's Commitment, (b) during the Interim Period, the total Revolving Credit Exposure of the Lenders exceeding the Interim Facility Cap or (c) the total Revolving Credit Exposure of all Lenders exceeding the Effective Commitment.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, repay and reborrow the Loans.

Section 2.02.    Loans and Borrowings.

(a)    Borrowings; Several Obligations.    Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its

obligations hereunder; provided that the Commitments are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)     Types of Loans.  Subject to Section 3.03, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith.  Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)     Minimum Amounts; Limitation on Number of Borrowings.  At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $500,000 and not less than $2,500,000.  At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $100,000 and not less than $1,000,000; provided that an ABR Borrowing may be in an aggregate amount that is equal to the entire unused balance of the Aggregate Commitments or that is required to finance the reimbursement of an LC Disbursement as contemplated by Section 2.08(e).  Borrowings of more than one Type may be outstanding at the same time, provided that there shall not at any time be more than a total of five Eurodollar Borrowings outstanding.  Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Termination Date.

(d)     Loans, Obligations and Notes.  The Obligations and credit extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the credit extensions made by the Lender to the Borrower and the interest and payments thereon.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each Lender may attach schedules to its Note and endorse the date, Type (if applicable), and amount and maturity of its Loans and payments made with respect thereto.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the Obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.

Section 2.03.     Requests for Borrowings.  To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a Eurodollar Borrowing, not later than 11:00 a.m., Houston, Texas time, three Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 11:00 a.m., Houston, Texas time, on the date of the proposed Borrowing; provided that no such notice shall be required for any deemed request of an ABR Borrowing to finance the reimbursement of an LC Disbursement as provided in Section 2.08(e).  Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or facsimile to the Administrative Agent of a written Borrowing Request in substantially the form of Exhibit B and signed by the Borrower, provided that the failure by the Borrower to provide such written confirmation shall not in any way revoke or affect such Borrowing Request.  Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.02:

(i)      the aggregate amount of the requested Borrowing;

(ii)     the date of such Borrowing, which shall be a Business Day;

(iii)     whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)     in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period of one month;

(v)     the amount of the (A) then-effective Aggregate Commitments, (B) the amount of Available Funds and the then-effective Effective Commitment, (C) the current total Revolving Credit Exposure (without regard to the requested Borrowing) and (D) the pro forma total Revolving Credit Exposure (giving effect to the requested Borrowing); and

(vi)     the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.05.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. Each Borrowing Request shall constitute a representation by the Borrower that the amount of the requested Borrowing shall not cause the total Revolving Credit Exposure to exceed the then-effective Effective Commitments.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

Section 2.04.    Interest Elections.

(a)    Conversion and Continuance. Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period of one month. Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing, all as provided in this Section 2.04. The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    Interest Election Requests. To make an election pursuant to this Section 2.04, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or facsimile to the Administrative Agent of a written Interest Election Request in substantially the form of Exhibit C and signed by the Borrower, provided that the failure by the Borrower to provide such written confirmation shall not in any way revoke or affect such Interest Election Request.

(c)    Information in Interest Election Requests. Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to Section 2.04(c)(iii) and (iv) shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

28

(iii)     whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)     if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which, in all cases, whether or not so indicated in such Interest Election Request, shall be a period of one month.

If any such Interest Election Request does not specify a Type, then the Borrower shall be deemed to have selected a Type of ABR Borrowing.

(d)     Notice to Lenders by the Administrative Agent.  Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     Effect of Failure to Deliver Timely Interest Election Request and Events of Default on Interest Election.  If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing:  (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing (and any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective) and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.05.     Funding of Borrowings.

(a)     Funding by Lenders.  Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 1:00 p.m., Houston, Texas time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower maintained with the Administrative Agent and designated by the Borrower in the applicable Borrowing Request; provided that ABR Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.08(e) shall be remitted by the Administrative Agent to the Issuing Bank.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for its Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for its Loan in any particular place or manner.

(b)     Presumption of Funding by the Lenders.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.05(a) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (ii) in the case of a

payment to be made by the Borrower, the interest rate applicable to ABR Loans. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(c)     <u>Several Obligations of Lenders</u>.  The obligations of the Lenders hereunder to make Loans, to fund participations in Letters of Credit and to make payments pursuant to <u>Section 12.03(c)</u> are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under <u>Section 12.03(c)</u> on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under <u>Section 12.03(c)</u>.

Section 2.06.     <u>Termination and Reduction of Aggregate Commitments</u>.

(a)     <u>Scheduled Termination of Commitments</u>.     Unless previously terminated, the Commitments shall terminate on the Termination Date.

(b)     <u>Optional Termination and Reduction of Aggregate Commitments</u>.

(i)     The Borrower may at any time terminate, or from time to time reduce, the Aggregate Commitments; <u>provided</u> that (A) each reduction of the Aggregate Commitments shall be in an amount that is an integral multiple of $500,000 and not less than $2,500,000 and (B) the Borrower shall not terminate or reduce the Aggregate Commitments if, after giving effect to any concurrent prepayment of the Loans in accordance with <u>Section 3.04(c)</u>, the total Revolving Credit Exposure would exceed the total Effective Commitments.

(ii)     The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Aggregate Commitments under <u>Section 2.06(b)(i)</u> at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Borrower pursuant to this <u>Section 2.06(b)(ii)</u> shall be irrevocable. Any termination or reduction of the Aggregate Commitments shall be permanent and may not be reinstated. Each reduction of the Aggregate Commitments shall be made ratably among the Lenders in accordance with each Lender's Applicable Percentage.

Section 2.07.     **[Reserved]**.

Section 2.08.     <u>Letters of Credit</u>.

(a)     <u>General</u>.  Subject to the terms and conditions set forth herein, the Borrower may request the issuance of dollar denominated standby Letters of Credit, in an aggregate amount not to exceed the LC Commitment, for its own account or for the account of any of the Subsidiaries, in a form reasonably acceptable to the Administrative Agent and the Issuing Bank, at any time and from time to time during the Availability Period. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement

submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

(b)     Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions.  To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or facsimile (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) to the Issuing Bank and the Administrative Agent (not less than three (3) Business Days in advance of the requested date of issuance, amendment, renewal or extension) a notice:

(i)     requesting the issuance of a Letter of Credit or identifying the Letter of Credit to be amended, renewed or extended;

(ii)     specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day);

(iii)     specifying the date on which such Letter of Credit is to expire (which shall comply with Section 2.08(c));

(iv)     specifying the amount of such Letter of Credit;

(v)     specifying the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit; and

(vi)     specifying the amount of the current total Revolving Credit Exposure (without regard to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit) and the pro forma total Revolving Credit Exposure (giving effect to the requested Letter of Credit or the requested amendment, renewal or extension of an outstanding Letter of Credit).

Each notice shall constitute a representation that after giving effect to the requested issuance, amendment, renewal or extension, as applicable, (i) the LC Exposure shall not exceed the LC Commitment and (ii) the total Revolving Credit Exposure shall not exceed the then-effective Effective Commitments.

If requested by the Issuing Bank, the Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit.

The Issuing Bank shall not be under any obligation to issue any Letter of Credit if there is a default of any Lender's obligations to fund under Section 2.08(d) or any Lender is at such time a Defaulting Lender hereunder, unless the Issuing Bank has entered into satisfactory arrangements with the Borrower or such Lender to eliminate the Issuing Bank's risk with respect to such Defaulting Lender.

(c)     Expiration Date.  Each Letter of Credit shall expire at or prior to the close of business no later than ten (10) days prior to the last day of the Availability Period.

(d)     Participations.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each Lender, and each Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance

31

of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by the Issuing Bank and not reimbursed by the Borrower on the date due as provided in Section 2.08(e), or of any reimbursement payment required to be refunded to the Borrower for any reason. Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section 2.08(d) in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default, or reduction or termination of the Aggregate Commitments or otherwise, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)     Reimbursement.  If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 12:00 noon, New York City time, on the date that such LC Disbursement is made, if the Borrower shall have received notice of such LC Disbursement prior to 10:00 a.m., New York City time, on such date, or, if such notice has not been received by the Borrower prior to such time on such date, then not later than 12:00 noon, New York City time, on (i) the Business Day that the Borrower receives such notice, if such notice is received prior to 10:00 a.m., New York City time, on the day of receipt, or (ii) the Business Day immediately following the day that the Borrower receives such notice, if such notice is not received prior to such time on the day of receipt; provided that if such LC Disbursement is less than or equal to $1,000,000, the Borrower shall, subject to the conditions to Borrowing set forth herein, be deemed to have requested, and the Borrower does hereby request under such circumstances, that such payment be financed with an ABR Borrowing in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Borrowing.  If the Borrower fails to make such payment when due, the Administrative Agent shall notify each Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof.  Promptly following receipt of such notice, each Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, in the same manner as provided in Section 2.05 with respect to Loans made by such Lender (and Section 2.05 shall apply, mutatis mutandis, to the payment obligations of the Lenders), and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this Section 2.08(e), the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that Lenders have made payments pursuant to this Section 2.08(e) to reimburse the Issuing Bank, then to such Lenders and the Issuing Bank as their interests may appear.  Any payment made by a Lender pursuant to this Section 2.08(e) to reimburse the Issuing Bank for any LC Disbursement (other than the funding of ABR Loans as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(f)     Obligations Absolute.  The Borrower's obligation to reimburse LC Disbursements as provided in Section 2.08(e) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, any Letter of Credit Agreement or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit or any Letter of Credit Agreement, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section 2.08(f), constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder.

32

Neither the Administrative Agent, the Lenders nor the Issuing Bank, nor any of their Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; provided that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise any requisite care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised all requisite care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)     Disbursement Procedures. The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. The Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by facsimile) of such demand for payment and whether the Issuing Bank has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Bank and the Lenders with respect to any such LC Disbursement.

(h)     Interim Interest. If the Issuing Bank shall make any LC Disbursement, then, until the Borrower shall have reimbursed the Issuing Bank for such LC Disbursement (either with its own funds or a Borrowing under Section 2.08(e)), the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made but excluding the date that the Borrower reimburses the Issuing Bank for such LC Disbursement, at the rate per annum then applicable to ABR Loans. Interest accrued pursuant to this Section 2.08(h) shall be for the account of the Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to Section 2.08(e) to reimburse the Issuing Bank shall be for the account of such Lender to the extent of such payment.

(i)     Replacement of the Issuing Bank. The Issuing Bank may be replaced at any time by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank and the successor Issuing Bank. The Administrative Agent shall notify the Lenders of any such replacement of the Issuing Bank. At the time any such replacement shall become effective, the Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 3.05(b). From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require. From and after the effective date of any such replacement, the retiring Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement and the other Loan Documents with respect to Letters of Credit issued by it prior to such

WEIL:\95962958\14\99980.0531

resignation, but shall not be required to issue additional Letters of Credit or to extend, renew or increase any existing Letter of Credit, including, without limitation, any Letter of Credit with an auto-extend feature (for the avoidance of doubt, the retiring Issuing Bank is authorized to notify any and each beneficiary of each Letter of Credit (in accordance with the terms of such Letter of Credit) that any such *Letter of Credit will not be renewed, extended or increased, automatically or otherwise*). Upon the acceptance of a successor's appointment as Issuing Bank hereunder, (A) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank, except with respect to Letters of Credit issued by such retiring Issuing Bank prior to its resignation, (B) the retiring Issuing Bank and shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (C) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

(j)     Cash Collateralization.  If (i) any Event of Default shall occur and be continuing and the Borrower receives notice from the Administrative Agent or the Majority Lenders demanding the deposit of cash collateral pursuant to this Section 2.08(j), (ii) the LC Exposure exceeds the LC Commitment or (iii) the Borrower is required to pay to the Administrative Agent the excess attributable to an LC Exposure *in connection with any prepayment pursuant to Section 3.04(c)*, then the Borrower shall deposit, in an LC Collection Account, in the name of the Administrative Agent and for the benefit of the Lenders, an amount in cash equal to, in the case of an Event of Default, the LC Exposure, and in the case of a payment required by Section 3.04(c), the amount of such excess as provided in Section 3.04(c), as of such date plus any accrued and unpaid interest thereon; provided that the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to the Borrower or any Subsidiary described in Section 10.01(h).  The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Bank and the Lenders, an exclusive first priority *and continuing perfected security interest in and Lien on the LC Collection Account and all cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held in the LC Collection Account, all deposits or wire transfers made thereto, any and all investments purchased with funds deposited in such account, all interest, dividends, cash, instruments, financial assets and other Property from time to time received, receivable or otherwise payable in respect of, or in exchange for, any or all of the foregoing, and all proceeds, products, accessions, rents, profits, income and benefits therefrom, and any substitutions and replacements therefor.* The Borrower's obligation to deposit amounts pursuant to this Section 2.08(j) shall be absolute and unconditional, without regard to whether any beneficiary of any such Letter of Credit has attempted to draw down all or a portion of such amount under the terms of a *Letter of Credit*, and, to the fullest extent permitted by applicable law, shall not be subject to any defense or be affected by a right of set-off, counterclaim or recoupment which the Borrower or any of the Subsidiaries may now or hereafter have against any such beneficiary, the Issuing Bank, the Administrative Agent, the Lenders or any other Person for any reason whatsoever.  Such deposit shall be held as collateral securing the payment and performance of the Obligations.  The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over the LC Collection Account.   Other than any interest earned on the investment of such deposits, which investments shall be made at the option and sole discretion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall not bear interest.  Interest or profits, if any, on such *investments shall accumulate in the LC Collection Account. Moneys in the LC Collection Account* shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity of the *Loans has been accelerated, be applied to satisfy other obligations of the Borrower and the Guarantors* under this Agreement or the other Loan Documents (other than the DIP Order).  If the Borrower is

required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, and the Borrower is not otherwise required to pay to the Administrative Agent the excess attributable to an LC Exposure in connection with any prepayment pursuant to Section 3.04(c), then such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived.

Section 2.09.    **[Reserved]**.

Section 2.10.    **[Reserved]**.

Section 2.11.    Cash Collateral.  If any Lender becomes, and during the period it remains, a Defaulting Lender or a Potential Defaulting Lender, if any Letter of Credit is at the time outstanding, the Issuing Bank may (except, in the case of a Defaulting Lender, to the extent the Commitment of such Defaulting Lender has been fully reallocated pursuant to Section 2.12(a)(i)), by notice to the Borrower and such Defaulting Lender or Potential Defaulting Lender through the Administrative Agent, require the Borrower to Cash Collateralize the obligations of the Borrower to the Issuing Bank in respect of such Letter of Credit in amount at least equal to 102% of the aggregate amount of the unreallocated obligations (contingent or otherwise) of such Defaulting Lender or such Potential Defaulting Lender to be applied pro rata in respect thereof, or to make other arrangements satisfactory to the Administrative Agent and to the Issuing Bank in their sole discretion to protect them against the risk of non-payment by such Defaulting Lender or Potential Defaulting Lender.

Section 2.12.    Defaulting Lenders.

(a)    Defaulting Lender Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    Reallocation of Defaulting Lender Commitment, Etc.  If a Lender becomes, and during the period it remains, a Defaulting Lender, the following provisions shall apply with respect to any outstanding LC Exposure of such Defaulting Lender:

(A)    the LC Exposure of such Defaulting Lender will, subject to the limitation in the first and second proviso below, automatically be reallocated (effective on the day such Lender becomes a Defaulting Lender) among the Non-Defaulting Lenders pro rata in accordance with their respective Commitments; provided that (I) the sum of each Non-Defaulting Lender's Revolving Credit Exposure may not in any event exceed the Commitment of such Non-Defaulting Lender as in effect at the time of such reallocation, (II) there exists no Default at such time of reallocation and (III) neither such reallocation nor any payment by a Non-Defaulting Lender pursuant thereto will constitute a waiver or release of any claim the Borrower, the Administrative Agent, the Issuing Bank or any other Lender may have against such Defaulting Lender or cause such Defaulting Lender to be a Non-Defaulting Lender;

(B)    to the extent that any portion (the "unreallocated portion") of the Defaulting Lender's LC Exposure cannot be so reallocated, whether by reason of the first provisos in clause (I) or (II) preceding or otherwise, the Borrower will, not later than two (2) Business Days after demand by the Administrative Agent (at the direction of the Issuing Bank), (I) Cash Collateralize the obligations of the Borrower to the Issuing Bank in respect of such LC Exposure, in an amount at least equal to the aggregate amount of the unreallocated portion of such LC Exposure, or (II) make other arrangements

35

satisfactory to the Administrative Agent, and to the Issuing Bank, in their sole discretion to protect them against the risk of non-payment by such Defaulting Lender; and

(C)      any amount paid by the Borrower or otherwise received by the Administrative Agent for the account of a Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity payments or other amounts) will not be paid or distributed to such Defaulting Lender, but will instead be retained by the Administrative Agent in a segregated non-interest bearing account until (subject to Section 2.12(b)) the termination of the Aggregate Commitments and payment in full of all Obligations and will be applied by the Administrative Agent, to the fullest extent permitted by law, to the making of payments from time to time in the following order of priority: first to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent under this Agreement, second to the payment of any amounts owing by such Defaulting Lender to the Issuing Bank (pro rata as to the respective amounts owing to each of them) under this Agreement, third to the payment of post-default interest and then current interest due and payable to the Lenders hereunder other than Defaulting Lenders, ratably among them in accordance with the amounts of such interest then due and payable to them, fourth to the payment of fees then due and payable to the Non-Defaulting Lenders hereunder, ratably among them in accordance with the amounts of such fees then due and payable to them, fifth to pay principal and unreimbursed LC Disbursements then due and payable to the Non-Defaulting Lenders hereunder ratably in accordance with the amounts thereof then due and payable to them, sixth to the ratable payment of other amounts then due and payable to the Non-Defaulting Lenders, and seventh after the termination of the Aggregate Commitments and payment in full of all obligations of the Borrower hereunder, to pay amounts owing under this Agreement to such Defaulting Lender or as the Bankruptcy Court or any other court of competent jurisdiction may otherwise direct.

(ii)      Right to Give Drawdown Notices.  In furtherance of the foregoing, if any Lender becomes, and during the period it remains, a Defaulting Lender or a Potential Defaulting Lender, the Issuing Bank is hereby authorized by the Borrower (which authorization is irrevocable and coupled with an interest) to give, in its discretion, through the Administrative Agent, Notices of Borrowing pursuant to Section 2.03 in such amounts and in such times as may be required to (A) reimburse an outstanding LC Disbursement, and/or (B) Cash Collateralize the obligations of the Borrower in respect of outstanding Letters of Credit in an amount at least equal to the aggregate amount of the obligations (contingent or otherwise) of such Defaulting Lender or Potential Defaulting Lender in respect of such Letter of Credit.

(iii)      Certain Fees.  Anything herein to the contrary notwithstanding, during such period as a Lender is a Defaulting Lender, such Defaulting Lender will not be entitled to any fees accruing during such period pursuant to Section 3.05(a) and Section 3.05(b)(i) (without prejudice to the rights of the Non-Defaulting Lenders in respect of such fees), provided that (A) to the extent that all or a portion of the LC Exposure of such Defaulting Lender is reallocated to the Non-Defaulting Lenders pursuant to Section 2.12(a)(i)(A), such fees that would have accrued for the benefit of such Defaulting Lender will instead accrue for the benefit of and be payable to such Non-Defaulting Lenders, pro rata in accordance with their respective Commitments, and (B) to the extent that all or any portion of such LC Exposure cannot be so reallocated, such fees will instead accrue for the benefit of and be payable to the Issuing Bank, as applicable (and the pro rata payment provisions of this Agreement (including without limitation, Article IV) will automatically be deemed adjusted to reflect the provisions of this Section).

(b)     Defaulting Lender Cure.  If the Borrower, the Administrative Agent and the Issuing Bank agree in writing in their discretion that a Lender is no longer a Defaulting Lender or a Potential Defaulting Lender, as the case may be, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any amounts then held in the segregated account referred to in Section 2.12(a)(i)), such Lender will, to the extent applicable, purchase at par such portion of outstanding Loans of the other Lenders and/or make such other adjustments as the Administrative Agent may determine to be necessary to cause the Revolving Credit Exposure and LC Exposure of the Lenders to be on a pro rata basis in accordance with their respective Commitments, whereupon such Lender will cease to be a Defaulting Lender or Potential Defaulting Lender and will be a Non-Defaulting Lender (and such Revolving Credit Exposure and LC Exposure of each Lender will automatically be adjusted on a prospective basis to reflect the foregoing); provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender or Potential Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender or Potential Defaulting Lender.

Section 2.13.    Collateral; Guarantees.

(a)     Priority and Liens.  The parties hereto acknowledge and agree that, upon entry of the DIP Orders and the delivery and execution of this Agreement, the Obligations shall at all times be secured and perfected pursuant to, and have the superpriority claims and liens as set forth in, the DIP Orders.

(b)     Payment of Obligations.  On the Termination Date, the Lenders shall be entitled to immediate payment of all Obligations without further application to, or order of, the Bankruptcy Court.

(c)     No Discharge; Survival of Claims.  The Borrower and each Guarantor agrees that (a) any confirmation order entered in the Chapter 11 Cases shall not discharge or otherwise affect in any way any of the Obligations, other than after the payment in full in cash to the Secured Parties of all Obligations (and the cash collateralization of all outstanding Letters of Credit in amount and subject to documentation satisfactory to the Issuing Bank) and termination of the Commitments on or before the effective date of a plan of reorganization and (b) to the extent the Obligations are not satisfied in full, (i) the Obligations shall not be discharged by the entry of a Confirmation Order (and each Loan Party, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Administrative Agent, the Lenders and Secured Treasury Management Banks pursuant to the DIP Order and the Liens granted to the Administrative Agent pursuant to the DIP Order shall not be affected in any manner by the entry of a Confirmation Order.

(d)     Perfection and Protection of Security Interests and Liens.  The Loan Parties will from time to time deliver to the Administrative Agent all financing statements, amendments, assignments and continuation statements, extension agreements and other documents, properly completed and executed (and acknowledged when required) by each Loan Party, as applicable, in form and substance satisfactory to the Administrative Agent, in each case, which the Administrative Agent requests for the purpose of perfecting, confirming, or protecting its lien and security interest in Collateral for the purpose of securing the Obligations.

(e)     Offset.  To secure the payment performance of the Obligations each Loan Party hereby grants the Administrative Agent and each Lender a security interest, lien, and right of offset, each of which shall be in addition to all other interests, liens, and rights of the Administrative Agent at common law, under the Loan Documents, or otherwise, and each of which shall be upon and against (a) any and all

monies, securities or other property (and the proceeds therefrom) of the Loan Parties now or hereafter held or received by or in transit to the Administrative Agent or any Lender from or for the account of any Loan Party, whether for safekeeping, custody, pledge, transmission, collection or otherwise, (b) any and all deposits (general or special, time or demand, provisional or final) of any Loan Party with the Administrative Agent or any Lender, and (c) any other credits and claims of any Loan Party at any time existing against the Administrative Agent or any Lender, including claims under certificates of deposit. During the existence of any Event of Default, the Administrative Agent or any Lender is hereby authorized to foreclose upon, offset, appropriate, and apply, at any time and from time to time, without notice to any Loan Party, any and all items hereinabove referred to against the Obligations then due and payable.

(f)     Subsidiary Guaranty and Security Agreement.

(i)     Each Subsidiary of a Loan Party (other than the Borrower) now existing or created, acquired or coming into existence after the date hereof, including each of the Guarantors, shall comply with Section 8.14(e).

(g)     The direct or indirect value of the consideration received and to be received by such Guarantor in connection herewith is reasonably worth at least as much as the liability and obligations of each Guarantor hereunder and under the other Loan Documents, and the incurrence of such liability and obligations in return for such consideration may reasonably be expected to benefit each Guarantor, directly or indirectly.

ARTICLE III

PAYMENTS OF PRINCIPAL AND INTEREST; PREPAYMENTS; FEES

Section 3.01.    Repayment of Loans.   The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan on the Termination Date.

Section 3.02.    Interest.

(a)     ABR Loans.   The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(b)     Eurodollar Loans.   The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin, but in no event to exceed the Highest Lawful Rate.

(c)     Post-Default Rate.   Notwithstanding the foregoing,

(i)     if any principal of or interest on any Loan or any fee or other amount payable by the Borrower or any Guarantor hereunder or under any other Loan Document is not paid when due, whether at stated maturity, upon acceleration or otherwise, then all Loans outstanding shall bear interest, after as well as before judgment, at a rate per annum equal to three percent (3%) plus the rate applicable to ABR Loans as provided in Section 3.02(a), but in no event to exceed the Highest Lawful Rate, and

(ii)     if there exists any Event of Default, then all Loans outstanding shall bear interest, after as well as before judgment, at a rate per annum equal to three percent (3%) plus the rate

38

applicable to ABR Loans as provided in Section 3.02(a), but in no event to exceed the Highest Lawful Rate.

(d)    Interest Payment Dates.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and on the Termination Date; provided that (i) interest accrued pursuant to Section 3.02(c) shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than an optional prepayment of an ABR Loan prior to the Termination Date), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment, and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)    Interest Rate Computations.  All interest hereunder shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate, Adjusted LIBO Rate or LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error, and be binding upon the parties hereto.

Section 3.03.    Alternate Rate of Interest.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)    the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate for such Interest Period; or

(b)    the Administrative Agent is advised by the Majority Lenders that the Adjusted LIBO Rate or LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or facsimile as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective (and shall be deemed to be a request for an ABR Borrowing), and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.

Section 3.04.    Prepayments.

(a)    Optional Prepayments.  The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, subject to prior notice in accordance with Section 3.04(b).

(b)    Notice and Terms of Optional Prepayment.  The Borrower shall notify the Administrative Agent by telephone (confirmed by facsimile) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 11:00 a.m., Houston, Texas time, three Business Days before the date of prepayment, or (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m.

39

Houston, Texas time, one Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid. Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by Section 3.02.

(c)     Mandatory Prepayments.

(i)     If, at any time after giving effect to any termination or reduction of the Aggregate Commitments pursuant to Section 2.06(b) or for any other reason, the total Revolving Credit Exposure exceeds the Effective Commitment at such time, then the Borrower shall (A) prepay the Borrowings on the date of such termination or reduction in an aggregate principal amount equal to such excess, and (B) if any excess remains after prepaying all of the Borrowings as a result of an LC Exposure, immediately pay to the Administrative Agent on behalf of the Lenders an amount equal to such excess to be held as cash collateral as provided in Section 2.08(j).

(ii)     [Reserved].

(iii)     Subject to the payment priorities set forth in the DIP Orders, if any Loan Party receives any Net Cash Proceeds from the consummation, whether in a single transaction or a series of transactions, of any Disposition, including in connection with any Casualty Event, of any Loan Party's Property (other than Net Cash Proceeds from the sale of Hydrocarbons in the ordinary course of business as permitted by Section 9.12), the Borrower shall immediately repay an aggregate principal amount of outstanding Borrowings (ratably to each Lender in accordance with each such Lender's Applicable Percentage) equal to 100% of such Net Cash Proceeds (less any prepayments from such Net Cash Proceeds made pursuant to clause (i) of this Section 3.04(c)); provided that no such prepayment or repayment shall be required unless and until the aggregate amount of Net Cash Proceeds received by the Loan Parties after the Petition Date in connection with all such Dispositions and Casualty Events exceeds $5,000,000, and thereupon, only in respect of amounts in excess of such $5,000,000 exception.

(iv)     Subject to the payment priorities set forth in the DIP Orders, notwithstanding anything to the contrary in clause (iii) of this Section 3.04(c), if any Loan Party receives or realizes any Net Cash Proceeds from the monetization, Liquidation, close-out or other similar equivalent action taken by any Loan Party in respect of any transaction arising under any Swap Agreement to which any Loan Party is a party, the Borrower shall immediately repay an aggregate principal amount of outstanding Borrowings (ratably to each Lender in accordance with each such Lender's Applicable Percentage) equal to 100% of such Net Cash Proceeds (without giving effect to any voluntary election, or action, directly or indirectly, having the same effect as a voluntary election, of a Loan Party (other than an election to Liquidate the subject hedge transaction)) to net or set-off amounts against such Net Cash Proceeds, less any prepayments from such Net Cash Proceeds made pursuant to clause (i) of this Section 3.04(c).

(v)     Subject to the payment priorities set forth in the DIP Orders, immediately upon the incurrence of any Debt (other than Debt permitted pursuant to Section 9.02) by any Loan Party or any of their respective Subsidiaries or the receipt of any amount in respect of the Equity Interests of any Loan Party or their respective Subsidiaries, the Borrower shall repay an aggregate principal amount of outstanding Borrowings (ratably to each Lender in accordance with each

40

such Lender's Applicable Percentage) on the date of such incurrence or receipt equal to 100% of (i) in the case of the proceeds of any Debt, the net cash proceeds (after ordinary and customary direct costs incurred in connection with such Debt incurrence) received by any Loan Party or any of their respective Subsidiaries or (ii) in the case of amounts received in respect of any such Equity Interests, 100% of such amounts.

(vi)    If, at any time, the Loan Parties and/or any of their respective Subsidiaries have any Excess Cash, then the Borrower shall immediately repay an aggregate principal amount of outstanding Borrowings (ratably to each Lender in accordance with each such Lender's Applicable Percentage) in an amount equal to the lesser of (A) such Excess Cash and (B) the aggregate principal amount of the outstanding Borrowings as of such date.  To effectuate the payment required hereunder, the Loan Parties hereby authorize each Lender, in its (or its applicable Affiliate's) capacity as a depository bank, to, upon written notice from the Administrative Agent, initiate debit entries to any and all accounts held by any Loan Party or any Subsidiary thereof with such bank and to debit the amount set forth in such written notice (which, for the avoidance of doubt, shall be an amount not to exceed the lesser of (i) the outstanding principal amount of the outstanding Borrowings and (ii) the amount of such Excess Cash) from such accounts.  The foregoing authorizations to initiate debit entries shall remain in full force and *effect until the Administrative Agent terminates such respective arrangement. The Borrower, for itself and the other Loan Parties and their respective Subsidiaries, acknowledges that (x) such debit entries may cause an overdraft of such accounts which may result in such bank's refusal to honor items drawn on such accounts until adequate deposits are made to such account, (y) such bank is under no duty or obligation to initiate any debit entry for any purposes and (z) if a debit is not made, the payment required by this Section 3.04(c)(vi) may be late or past due for purposes hereunder.

(vii)    Each prepayment or repayment of Borrowings pursuant to clauses (i) and (iii) through (vi) of this Section 3.04(c) shall be applied as follows: first, ratably to any ABR Borrowings then outstanding, and, second, to any Eurodollar Borrowings then outstanding, and if more than one Eurodollar Borrowing is then outstanding, to each such Eurodollar Borrowing in order of priority beginning with the Eurodollar Borrowing with the least number of days remaining in the Interest Period applicable thereto and ending with the Eurodollar Borrowing with the most number of days remaining in the Interest Period applicable thereto and otherwise, (A) first, on a pro rata basis in accordance with each such Lender's Applicable Percentage, to pay accrued and unpaid interest on, and accrued and unpaid expenses in respect of, the Obligations, to the extent due and payable in accordance with the Loan Documents; and (B) second, on a pro rata basis in accordance with each such Lender's Applicable Percentage, to repay any principal amounts or other Obligations which have been advanced and are outstanding under the DIP Facility (including to cash-collateralize LC Exposure); and (C) third, as required by the DIP Orders.    Each prepayment or repayment of Borrowings pursuant to clause (v) of this Section 3.04(c) shall also permanently reduce the Aggregate Commitments by the amount of such prepayment.

(viii)    Each prepayment of Borrowings pursuant to this Section 3.04(c) shall be applied *ratably to the Loans included in such Borrowings.  Prepayments pursuant to this Section 3.04(c)* shall be accompanied by accrued interest in accordance with Section 3.02.

(d)    No Premium or Penalty.  Prepayments permitted or required under this Section 3.04 shall be without premium or penalty, except as required under Section 5.02.

41

(e)     No Effect on Treasury Management Agreements.  Prepayments permitted or required under this Section 3.04 shall not affect the Borrower's obligation to continue making payments under any Secured Treasury Management Agreement, each of which shall remain in full force and effect notwithstanding such prepayment, subject to the terms of such Secured Treasury Management Agreement.

Section 3.05.   Fees.

(a)     Commitment Fees.  The Borrower agrees to pay to the Administrative Agent for the account of each Lender in accordance with each such Lender's Applicable Percentage a commitment fee, which shall accrue at the Commitment Fee Rate on the average daily amount of the unused amount of the Commitment of such Lender during the period from and including the Interim Facility Effective Date to but excluding the Termination Date.  Accrued commitment fees shall be payable monthly in arrears on the last day of each calendar month, and on the Termination Date, commencing on the first such date to occur after the date hereof.  All commitment fees shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate, in which case interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)     Letter of Credit Fees.  The Borrower agrees to pay (i) to the Administrative Agent for the account of each Lender in accordance with each such Lender's Applicable Percentage a participation fee with respect to its participations in Letters of Credit, which shall accrue at a per annum rate equal to the same Applicable Margin used to determine the interest rate applicable to ABR Loans on the daily face amount of such Lender's Applicable Percentage in respect of Letters of Credit (excluding any portion thereof attributable to unreimbursed LC Disbursements) on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Interim Facility Effective Date to but excluding the later of the date on which such Lender's Commitment terminates and the date on which such Lender ceases to have any LC Exposure, (ii) to the Issuing Bank a fronting fee, which shall accrue at the rate of 0.35% per annum on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the Interim Facility Effective Date to but excluding the later of the date of termination of the Commitments and the date on which there ceases to be any LC Exposure, provided that in no event shall such fee be less than $500 during any quarter, and (iii) to the Issuing Bank, for its own account, its standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.  Participation fees and fronting fees under this Section 3.05(b) shall be payable monthly in arrears on the last day of each calendar month following such last day, commencing on the first such date to occur after the Interim Facility Effective Date; provided that all such fees shall be payable on the Termination Date and any such fees accruing after the Termination Date shall be payable on demand.  All fronting fees in Section 3.05(b)(ii) shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  All other fees in this Section 3.05(b) shall be computed on the basis of a year of 360 days, unless such computation would exceed the Highest Lawful Rate in which case such fee shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(c)     Administrative Agent Fees.  The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

WEIL:\95962958\14\99980.0531

ARTICLE IV

PAYMENTS; PRO RATA TREATMENT; SHARING OF SET-OFFS

Section 4.01.    Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)    Payments by the Borrower.  The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or reimbursement of LC Disbursements, or of amounts payable under Section 5.01, Section 5.02, Section 5.03 or otherwise) prior to 12:00 noon, New York City time, on the date when due, in immediately available funds, without defense, deduction, recoupment, set-off or counterclaim.  Fees, once paid, shall be fully earned and shall not be refundable under any circumstances.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its offices specified in Section 12.01, except payments to be made directly to the Issuing Bank as expressly provided herein and except that payments pursuant to Section 5.01, Section 5.02, Section 5.03 and Section 12.03 shall be made directly to the Persons entitled thereto.  The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

(b)    Application of Insufficient Payments.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal and unreimbursed LC Disbursements then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal and unreimbursed LC Disbursements then due to such parties.

(c)    Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall

(i)    notify the Administrative Agent of such fact, and

(ii)    purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided that

(A)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and

43

(B)     the provisions of this Section 4.01(c) shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans or participations in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this Section 4.01(c) shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Loan Party rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of each Loan Party in the amount of such participation.

Section 4.02.    Presumption of Payment by the Borrower. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Bank that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 4.03.    Certain Deductions by the Administrative Agent. If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.05(a), Section 2.08(d), Section 2.08(e) or Section 4.02 then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 4.04.    [Reserved.]

### ARTICLE V

### INCREASED COSTS; BREAK FUNDING PAYMENTS; TAXES; ILLEGALITY

Section 5.01.    Increased Costs.

(a)    Increased Costs, Generally. If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate) or the Issuing Bank;

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection

Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender or the Issuing Bank or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to or continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, the Issuing Bank or such other Recipient of participating in, issuing or maintaining any Letter of Credit (or of maintaining its obligation to participate in or to issue any Letter of Credit), or to reduce the amount of any sum received or receivable by such Lender, the Issuing Bank or such other Recipient hereunder (whether of principal, interest or any other amount), then the Borrower will pay to such Lender, the Issuing Bank or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender, the Issuing Bank or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Lender or the Issuing Bank determines that any Change in Law affecting such Lender or the Issuing Bank or any lending office of such Lender or such Lender's or the Issuing Bank's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)     Certificates for Reimbursement.  A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in Section 5.01(a) and (b) and delivered to the Borrower, shall be conclusive absent manifest error.  The Borrower shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this Section 5.01 shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section 5.01 for any increased costs incurred or reductions suffered more than 270 days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270 day period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     Protection Absolute.  The protection of this Section shall be available to each Lender and the Issuing Bank regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

WEIL:\95962958\14\99980.0531

Section 5.02.   Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan into an ABR Loan other than on the last day of the Interest Period applicable thereto, or (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market.

A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 5.02 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

Section 5.03.   Taxes.

(a)   Issuing Bank.  For purposes of this Section 5.03, the term "Lender" includes the Issuing Bank.

(b)   Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)   Payment of Other Taxes by the Borrower.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)   Indemnification by the Borrower and the Other Loan Parties.  The Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

46

(e)     _Indemnification by the Lenders._     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)     _Evidence of Payments._     As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 5.03, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)     Status of Lenders.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 5.03(g)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, _deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender_

47

becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

        (1)    in the case of a Foreign Lender claiming the benefits of an *income tax treaty to which the United States is a party* (x) *with respect to payments of* interest under any Loan Document, executed originals of IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

        (2)    executed originals of IRS Form W-8ECI;

        (3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) executed originals of IRS Form W-8BEN-E; or

        (4)    to the extent a Foreign Lender is not the beneficial owner, *executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form* W-8BEN, IRS Form W-8BEN-E, a certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner;

        (C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender *becomes a Lender under this Agreement (and from time to time thereafter upon the* reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

        (D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably

WEIL:\95962958\14\99980.0531

requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)     Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 5.03 (including by the payment of additional amounts pursuant to this Section 5.03), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person , but the indemnifying party will be entitled to receive reasonable evidence of the actual payment(s) giving rise to the indemnification obligations.

Section 5.04.     Designation of a Different Lending Office. If any Lender requests compensation under Section 5.01, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 5.01 or 5.03, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 5.05.     Illegality. Notwithstanding any other provision of this Agreement, in the event that it becomes unlawful for any Lender or its applicable lending office to honor its obligation to make or maintain Eurodollar Loans either generally or having a particular Interest Period hereunder, then (a) such Lender shall promptly notify the Borrower and the Administrative Agent thereof and such Lender's obligation to make such Eurodollar Loans shall be suspended (the "Affected Loans") until such time as such Lender may again make and maintain such Eurodollar Loans and (b) all Affected Loans which would otherwise be made by such Lender shall be made instead as ABR Loans (and, if such Lender so requests by notice to the Borrower and the Administrative Agent, all Affected Loans of such Lender then outstanding shall be automatically converted into ABR Loans on the date specified by such Lender in such notice) and, to the extent that Affected Loans are so made as (or converted into) ABR Loans, all

49

payments of principal which would otherwise be applied to such Lender's Affected Loans shall be applied instead to its ABR Loans.

ARTICLE VI

CONDITIONS PRECEDENT

Section 6.01.   Interim Facility Effective Date.  The obligations of the Lenders to enter into and execute this Agreement, and make Loans and other extensions of credit hereunder during the Interim Facility Period, shall commence on the first Business Day (the "Interim Facility Effective Date") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Administrative Agent:

(a)   the Petition Date shall have occurred;

(b)   the Administrative Agent shall have received duly executed and delivered counterparts of this Agreement and the other Loan Documents to be executed and delivered on or prior to such date;

(c)   the Administrative Agent will have received a certificate of the Secretary, Assistant Secretary or a Responsible Officer with similar responsibilities of each Loan Party, or in the event that such Loan Party is a limited partnership, of such Person's general partner, certifying as of the Interim Facility Effective Date:

(i)   resolutions of its board of directors or members, authorizing the transactions contemplated hereby;

(ii)   the names and genuine signatures of the Responsible Officers and Financial Officers of such Person, authorized to execute, deliver and perform, as applicable, this Agreement, any notes, the Guaranty, the Security Instruments, and all other Loan Documents to be delivered by such Person;

(iii)   the Organizational Documents of such Person as in effect as of the Interim Facility Effective Date;

(iv)   the good standing certificate for such Person, from its state of incorporation, formation or organization, as applicable, dated as of a recent date; and

(v)   as may be reasonably requested by the Administrative Agent, certificate(s) of authority for such Person from states wherein such Person is required to be qualified to conduct business, evidencing such Person's qualification to do business in such state, dated as of a recent date; provided that, if requested by the Borrower prior to the Interim Facility Effective Date, the certificates described in this clause (v) may be provided within a reasonable period of time after the Interim Facility Effective Date, such period of time to be agreed by the Borrower and the Administrative Agent;

(d)   the Bankruptcy Court shall have entered the Interim Order within five (5) Business Days following the Petition Date, which Interim Order (i) shall have been entered on the docket of the Bankruptcy Court and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Administrative Agent and the Majority Lenders;

WEIL:\95962958\14\99980.0531

(e)     all first-day motions filed by the Loan Parties and/or their Subsidiaries, as applicable (including any motions related to any critical vendor or supplier motions) and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the Majority Lenders, the Administrative Agent and its counsel;

(f)     all motions related to the DIP Facility and cash management shall be in form and substance satisfactory to the Administrative Agent and the Majority Lenders in their sole discretion;

(g)     all governmental and third-party consents and approvals, in each case, necessary in connection with the DIP Facility shall have been obtained and remain in effect;

(h)     the making of the Loans and the issuance of the Letters of Credit, if any, shall not violate any requirement or law and shall not have been enjoined, whether temporarily, preliminarily, or permanently;

(i)     all reasonable and documented fees and expenses (including the documented fees and expenses of counsel) required to be paid to the Administrative Agent and Lenders on or before the Interim Facility Effective Date shall have been paid;

(j)     the Administrative Agent shall have received a 13-week cash flow forecast, containing line items of sufficient detail to reflect the Loan Parties' projected receipts and disbursements for the 13-week period commencing on the Petition Date, in form and substance acceptable to the Administrative Agent and the Majority Lenders and attached hereto as Exhibit H (the "Initial Budget"), together with a certificate of a Financial Officer of the Borrower stating that such Initial Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Borrower and each other Loan Party to be reasonable at the time made and from the best information then available to the Borrower and each other Loan Party;

(k)     there shall not exist any action, suit, investigation, litigation or proceeding pending or threatened (other than the Chapter 11 Cases) in any court or before any Governmental Authority or facts or circumstances that, in the reasonable opinion of the Administrative Agent and the Majority Lenders, materially and adversely affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a Material Adverse Effect;

(l)     the Administrative Agent and Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including the PATRIOT Act;

(m)     the holders of the Prepetition RBL Obligations shall have received Adequate Protection in respect of the Liens securing such Prepetition RBL Obligations pursuant to, and on the terms set forth in, the Interim Order; and

(n)     all Obligations shall be secured by a perfected lien and security interest on all assets of the Loan Parties pursuant to, and such lien and security interest shall have the priorities set forth in, the Interim Order.

For purposes of determining compliance with the conditions specified in this Section 6.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Interim Facility Effective Date specifying its objection thereto.

51

Section 6.02.   <u>Final Facility Effective Date</u>.  The obligation of each Lender to make its Loans hereunder and the obligation of the Issuing Bank to issue Letters of Credit hereunder during the Final Period shall commence as of the Business Day (the "<u>Final Facility Effective Date</u>") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Administrative Agent:

(a)     the Bankruptcy Court shall have entered the Final Order within forty-five (45) days following the entry of the Interim Order, which Final Order (i) shall have been entered on the docket of the Bankruptcy Court and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Administrative Agent and the Majority Lenders; and

(b)     the Administrative Agent shall have received all Budget updates required in accordance with <u>Section 8.18</u>.

For purposes of determining compliance with the conditions specified in this <u>Section 6.02</u>, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Final Facility Effective Date specifying its objection thereto.

Section 6.03.   <u>Conditions Precedent to Each Credit Event</u>.  The obligation of each Lender to make a Loan on the occasion of any Borrowing (including the initial funding, if any, on the Interim Facility Effective Date), and of the Issuing Bank to issue, amend, renew or extend any Letter of Credit, is subject to the satisfaction of the following conditions:

(a)     At the time of and immediately after giving effect to such Borrowing or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, no Default or Event of Default shall have occurred and be continuing.

(b)     At the time of and immediately after giving effect to such Borrowing or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, no event, development or circumstance has occurred or shall then exist that has resulted in, or could reasonably be expected to have, a Material Adverse Effect.

(c)     The representations and warranties of the Borrower and the other Loan Parties set forth in this Agreement and in the other Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, except to the extent any such representations and warranties are expressly limited to an earlier date, in which case, on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable, such representations and warranties shall continue to be true and correct as of such specified earlier date; <u>provided</u> that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates).

(d)     The making of such Loan or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, would not conflict with, or cause any Lender or the Issuing Bank to violate or exceed, any applicable Governmental Requirement, and no Change in Law shall have occurred, and no litigation shall be pending or threatened, which does or, with respect to any threatened litigation, seeks to, enjoin, prohibit or restrain, the making or repayment of any Loan, the issuance, amendment, renewal,

52

extension or repayment of any Letter of Credit or any participations therein or the consummation of the transactions contemplated by this Agreement or any other Loan Document.

(e)     The receipt by the Administrative Agent of a Borrowing Request in accordance with Section 2.03 or a request for a Letter of Credit in accordance with Section 2.08(b), as applicable.

(f)     At the time of and immediately after giving effect to each such Borrowing or the issuance, amendment, renewal or extension of each such Letter of Credit, or both, as applicable, the aggregate Revolving Credit Exposures for all Lenders shall not exceed the then-effective Effective Commitments.

(g)     The making of the Loans shall not contravene any laws applicable to any Agent or any Lender.

(h)     All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of the Loans or the conduct of the Loan Parties' business shall have been obtained and shall be in full force and effect.

(i)     The Administrative Agent shall have received all Budget updates and Variance Reports required in accordance with Section 8.18.

(j)     DIP Orders.

(i)     The Interim Order or Final Order, as applicable, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the written consent of the Administrative Agent and the Majority Lenders.

(ii)    The Loan Parties shall be in compliance with the applicable DIP Order.

(k)     (i) At the time of such Borrowing before giving effect thereto, the Borrower and the Loan Parties shall not have any Excess Cash and (ii) such Borrowing shall not trigger a mandatory prepayment under Section 3.04(c)(vi).

(l)     All "second day" orders filed on or after the Petition Date shall be, in substance, reasonably satisfactory to the Administrative Agent.

In addition to the other conditions precedent herein set forth, if any Lender becomes, and during the period it remains, a Defaulting Lender or a Potential Defaulting Lender, the Issuing Bank will not be required to issue any Letter of Credit, or to amend, extend increase or renew any outstanding Letter of Credit (or increase the face amount thereof, alter the drawing terms thereunder or extend the expiry date thereof), unless the Issuing Bank is satisfied that any exposure that would result therefrom is eliminated or fully covered by the commitments of the Non-Defaulting Lenders or by Cash Collateralization or a combination thereof satisfactory to the Issuing Bank.

Each request for a Borrowing and each request for the issuance, amendment, renewal or extension of any Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in Section 6.03(a) through (l).

WEIL:\95962958\14\99980.0531

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent, the Issuing Bank and the Lenders that:

Section 7.01.   Organization; Powers.   Subject to any restrictions arising on account of the Borrower's or any Subsidiaries' status as a "debtor" under the Bankruptcy Code and entry of the DIP Order, each of the Parent, the Borrower and the Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority, and has all material governmental licenses, authorizations, consents and approvals necessary, to own its assets and to carry on its business as now conducted, and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except, to the extent any such failure occurs after the Petition Date, where failure to have such power, authority, licenses, authorizations, consents, approvals and qualifications could not reasonably be expected to have a Material Adverse Effect.

Section 7.02.   Authority; Enforceability.   Subject to any restrictions arising on account of the Borrower's or any Subsidiaries' status as a "debtor" under the Bankruptcy Code and entry of the DIP Order, the Transactions are within the Borrower's and each Guarantor's limited liability company, partnership, and corporate powers (as applicable) and have been duly authorized by all necessary limited liability company and, if required, member action (including, without limitation, any action required to be taken by any class of managers, directors or partners (as applicable) of the Borrower or any other Person, whether interested or disinterested, in order to ensure the due authorization of the Transactions). Each Loan Document to which the Borrower and each Guarantor is a party has been duly executed and delivered by the Borrower and such Guarantor and, upon the entry of the Interim Order or the Final Order, as applicable, constitutes a legal, valid and binding obligation of the Borrower and such Guarantor, as applicable, enforceable in accordance with its terms, subject to entry of the DIP Order and subject to any restrictions arising on account of the Parent's, the Borrower's or any Subsidiary's status as a "debtor" under the Bankruptcy Code and further subject to other applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 7.03.   Approvals; No Conflicts.   The Transactions (a) subject to the entry of the DIP Order, do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority or any other third Person (including members or any class of managers, whether interested or disinterested, of the Borrower or any other Person), nor is any such consent, approval, registration, filing or other action necessary for the validity or enforceability of any Loan Document or the consummation of the Transactions, except such as have been obtained or made and are in full force and effect, (b) will not violate any applicable law or Organizational Documents of the Borrower or any Subsidiary or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon the Borrower or any Subsidiary or its Properties, or give rise to a right thereunder to require any payment to be made by the Borrower or such Subsidiary and (d) will not result in the creation or imposition of any Lien on any Property of the Borrower or any Subsidiary (other than the liens and security interests in favor of the Administrative Agent (or any designee) created by the Loan Documents).

Section 7.04.    Financial Condition; No Material Adverse Change.

(a)    The Borrower has heretofore furnished to the Lenders the Parent's consolidated balance sheet and statements of income, members' equity and cash flows (i) as of and for the fiscal year ended December 31, 2015, reported on by BDO USA, LLP, independent public accountant and (ii) as of and for the fiscal quarter and the portion of the fiscal year ended September 30, 2016, certified by its chief financial officer.   Such financial statements present fairly, in all material respects, the consolidated financial condition and results of operations and cash flows of the Parent as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the unaudited quarterly financial statements.   Such balance sheets and the notes thereto disclose all Debt and other liabilities, direct or contingent, of the Parent and the Subsidiaries as of the dates thereof (other than immaterial Debt to the extent permitted by Section 9.02).

(b)    Since the Petition Date, (i) there has been no event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Effect and (ii) the business of the Parent and the Subsidiaries has been conducted only in the ordinary course consistent with past business practices.

(c)    As of the date of the most recently delivered financial statements pursuant to Section 8.01(a) or (b), or, prior to any such delivery, the Financial Statements, neither the Parent, the Borrower nor any Subsidiary has any Debt (including Disqualified Capital Stock) or any contingent liabilities, off-balance sheet liabilities or partnerships, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments, except as referred to or reflected or provided for in such financial statements and except for immaterial Debt to the extent permitted by Section 9.02.

Section 7.05.    Litigation.    Other than the Chapter 11 Cases, there are no actions, suits, investigations or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrower or Parent, threatened against or affecting the Parent, the Borrower or any Subsidiary which (a) affect or pertain to the Transactions or this Agreement or any other Loan Document, or (b) either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect or is not otherwise subject to the automatic stay as a result of the Chapter 11 Cases.

Section 7.06.    Environmental Matters.    Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)    Neither any Property of the Borrower or any Subsidiary nor the operations conducted thereon violate any order or requirement of any court or Governmental Authority or any Environmental Laws.

(b)    No Property of the Borrower or any Subsidiary nor the operations currently conducted thereon or, to the knowledge of the Borrower, by any prior owner or operator of such Property or operation, are in violation of or subject to any existing, pending or threatened action, suit, investigation, inquiry or proceeding by or before any court or Governmental Authority or to any remedial obligations under Environmental Laws.

(c)    All notices, permits, licenses, exemptions, approvals or similar authorizations, if any, required to be obtained or filed in connection with the operation or use of any and all Property of the Borrower and each Subsidiary, including, without limitation, past or present treatment, storage, disposal or release of a hazardous substance, oil and gas waste or solid waste into the environment, have been duly

obtained or filed, and the Borrower and each Subsidiary are in compliance with the terms and conditions of all such notices, permits, licenses and similar authorizations.

(d)     All hazardous substances, solid waste and oil and gas waste, if any, generated at any and all Property of the Borrower or any Subsidiary have in the past been transported, treated and disposed of in accordance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment, and, to the knowledge of the Borrower, all such transport carriers and treatment and disposal facilities have been and are operating in compliance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment, and are not the subject of any existing, pending or threatened action, investigation or inquiry by any Governmental Authority in connection with any Environmental Laws.

(e)     The Borrower and its Subsidiaries have taken all steps reasonably necessary to determine and have determined that no oil, hazardous substances, solid waste or oil and gas waste, have been disposed of or otherwise released and there has been no threatened release of any oil, hazardous substances, solid waste or oil and gas waste on or to any Property of the Borrower or any Subsidiary except in compliance with Environmental Laws and so as not to pose an imminent and substantial endangerment to public health or welfare or the environment.

(f)     Neither the Borrower nor any Subsidiary has any known contingent liability or Remedial Work in connection with any release or threatened release of any oil, hazardous substance, solid waste or oil and gas waste into the environment.

Section 7.07.     Compliance with the Laws and Agreements; No Defaults.

(a)     Each of the Parent, the Borrower and each Subsidiary is in compliance in all material respects with all Governmental Requirements applicable to it and/or its Property and all agreements and other instruments binding upon it and/or its Property, and, subject to any restrictions arising on account of Parent's, the Borrower's or any Subsidiaries' status as a "debtor" under the Bankruptcy Code, possesses all licenses, permits, franchises, exemptions, approvals and other governmental authorizations necessary for the ownership of the Parent's, the Borrower's or any Subsidiaries' Property and/or the conduct of the Parent's, the Borrower's or any Subsidiaries' business.

(b)     Except to the extent subject to the automatic stay under the Chapter 11 Cases, none of the Parent, the Borrower or any Subsidiary is in default nor has any event or circumstance occurred which, but for the expiration of any applicable grace period or the giving of notice, or both, would constitute a default or would require the Parent, the Borrower or a Subsidiary to Redeem or make any offer to Redeem under any indenture, note, credit agreement or instrument pursuant to which any Material Indebtedness is outstanding or by which the Parent, the Borrower or any Subsidiary or any of their Properties is bound.

(c)     No Default has occurred and is continuing.

Section 7.08.     Investment Company Act.   None of the Parent, the Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company," within the meaning of, or subject to regulation under, the Investment Company Act of 1940, as amended.

Section 7.09.     Taxes.   Each of the Parent, the Borrower and the Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (i) Taxes that are being contested in good faith by appropriate proceedings and for which the Parent, the Borrower or such Subsidiary, as applicable, has set

56

aside on its books adequate reserves in accordance with GAAP or (ii) to the extent otherwise excused or prohibited by the Bankruptcy Code and not otherwise authorized by the Bankruptcy Court. The charges, accruals and reserves on the books of the Parent, the Borrower and the Subsidiaries in respect of Taxes and other governmental charges are adequate. No Tax Lien has been filed and, to the knowledge of the Parent or the Borrower, no claim is being asserted with respect to any such Tax or other such governmental charge.

Section 7.10.   ERISA.

(a)      The Parent, the Borrower, the Subsidiaries and each ERISA Affiliate have complied in all material respects with ERISA and, where applicable, the Code regarding each Plan.

(b)      Each Plan is, and has been, maintained in substantial compliance with ERISA and, where applicable, the Code.

(c)      No act, omission or transaction has occurred which could result in imposition on the Parent, the Borrower, any Subsidiary or any ERISA Affiliate (whether directly or indirectly) of (i) either a civil penalty assessed pursuant to subsections (c), (i) or (l) of section 502 of ERISA or a tax imposed pursuant to Chapter 43 of Subtitle D of the Code or (ii) breach of fiduciary duty liability damages under section 409 of ERISA.

(d)      No Plan (other than a defined contribution plan) or any trust created under any such Plan has been terminated since September 2, 1974. No liability to the PBGC (other than for the payment of current premiums which are not past due) by the Parent, the Borrower, any Subsidiary or any ERISA Affiliate has been or is expected by the Parent, the Borrower, any Subsidiary or any ERISA Affiliate to be incurred with respect to any Plan. No ERISA Event with respect to any Plan has occurred.

(e)      Full payment when due has been made of all amounts which the Parent, the Borrower, the Subsidiaries or any ERISA Affiliate is required under the terms of each Plan or applicable law to have paid as contributions to such Plan as of the date hereof, and no accumulated funding deficiency (as defined in section 302 of ERISA and section 412 of the Code), whether or not waived, exists with respect to any Plan.

(f)      The actuarial present value of the benefit liabilities under each Plan which is subject to Title IV of ERISA does not, as of the end of the Parent's most recently ended fiscal year, exceed the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities. The term "actuarial present value of the benefit liabilities" shall have the meaning specified in section 4041 of ERISA.

(g)      None of the Parent, the Borrower, the Subsidiaries or any ERISA Affiliate sponsors, maintains, or contributes to an employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by the Parent, the Borrower, a Subsidiary or any ERISA Affiliate in its sole discretion at any time without any material liability.

(h)      None of the Parent, the Borrower, the Subsidiaries or any ERISA Affiliate sponsors, maintains or contributes to, or has at any time in the six-year period preceding the date hereof sponsored, maintained or contributed to, any Multiemployer Plan.

WEIL:\95962958\14\99980.0531

(i)      None of the Parent, the Borrower, the Subsidiaries or any ERISA Affiliate is required to provide security under section 401(a)(29) of the Code due to a Plan amendment that results in an increase in current liability for the Plan.

Section 7.11.   Disclosure; No Material Misstatements.   The Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it, the Parent, or any of the Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the other reports, financial statements, certificates or other information furnished by or on behalf of the Parent, the Borrower or any Subsidiary to the Administrative Agent or any Lender or any of their Affiliates in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time. There is no fact peculiar to the Parent, the Borrower or any Subsidiary which could reasonably be expected to have a Material Adverse Effect or in the future is reasonably likely to have a Material Adverse Effect and which has not been set forth in this Agreement or the Loan Documents or the other documents, certificates and statements furnished to the Administrative Agent or the Lenders by or on behalf of the Parent, the Borrower or any Subsidiary prior to, or on, the date hereof in connection with the transactions contemplated hereby. There are no statements or conclusions in any Reserve Report which are based upon or include misleading information or fail to take into account material information regarding the matters reported therein, it being understood that projections concerning volumes attributable to the Oil and Gas Properties and production and cost estimates contained in each Reserve Report are necessarily based upon professional opinions, estimates and projections and that the Parent, the Borrower and the Subsidiaries do not warrant that such opinions, estimates and projections will ultimately prove to have been accurate.

Section 7.12.   Insurance.

(a)      Schedule 7.12 sets forth a true, complete and correct description of all insurance maintained by the Parent, the Borrower or by the Parent or the Borrower for the Subsidiaries or by each Subsidiary for itself, as the case may be, as of the date hereof. The Borrower has, and has caused all of the Subsidiaries to have, (i) all insurance policies sufficient for the compliance in all material respects by each of them with all Governmental Requirements and all agreements and (ii) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are commercially reasonable and usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Borrower and the Subsidiaries. The Administrative Agent has been named as an additional insured in respect of such liability insurance policies, and the Administrative Agent has been named as loss payee with respect to Property loss insurance.

(b)      Schedule 7.12 lists the descriptions and street addresses of all Buildings (as defined in the applicable Flood Insurance Regulations) and Manufactured (Mobile) Homes (also as defined in the applicable Flood Insurance Regulations) constituting Collateral. Except to the extent that flood insurance in form and substance satisfactory to the Administrative Agent has been obtained with respect thereto, no such Building or Manufactured (Mobile) Home (each as defined in the applicable Flood Insurance Regulations) is located on any real property in a special flood hazard area as designated by any Governmental Authority. As used herein, "Flood Insurance Regulations" shall mean (i) the National Flood Insurance Act of 1968, as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973, as now or hereafter in effect or any successor statute thereto, (iii) the

58

National Flood Insurance Reform Act of 1994 (amending 42 U.S.C. 4001 et seq.), as the same may be amended or recodified from time to time, and (iv) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

Section 7.13.   Restriction on Liens.   Subject to any restrictions arising on account of the Parent's, the Borrower's or any Subsidiaries' status as a "debtor" under the Bankruptcy Code, neither the Borrower nor any of the Subsidiaries is a party to any agreement or arrangement (other than Capital Leases creating Liens permitted by Section 9.03(c), but then only on the Property subject of such Capital Lease), or, other than as a result of the Chapter 11 Cases, subject to any order, judgment, writ or decree, which either restricts or purports to restrict any of the Parent's, the Borrower's or any of their respective Subsidiaries' ability to grant Liens to the Administrative Agent and the Lenders on, or in respect of, any material portion of their respective Properties to secure the Obligations.

Section 7.14.   Subsidiaries.   Neither the Parent nor the Borrower have any Subsidiaries other than those set forth on Schedule 7.14.   No Loan Party has any Foreign Subsidiaries.   Each Subsidiary on Schedule 7.14 is a Wholly-Owned Subsidiary.

Section 7.15.   Location of Business and Offices.   The Borrower's jurisdiction of organization is Kentucky; the name of the Borrower as listed in the public records of its jurisdiction of organization is Vanguard Natural Gas, LLC; and the organizational identification number of the Borrower in its jurisdiction of organization is 0601349 (or, in each case, as set forth in a notice delivered to the Administrative Agent pursuant to Section 8.01(m) in accordance with Section 12.01).   The Borrower's principal place of business is located at the address in London, Kentucky specified in Section 12.01, and the Borrower's chief executive offices is located at the San Felipe street address in Houston, Texas specified in Section 12.01.   Each Subsidiary's jurisdiction of organization, name as listed in the public records of its jurisdiction of organization, organizational identification number in its jurisdiction of organization, and the location of its principal place of business and chief executive office is stated on Schedule 7.14.

Section 7.16.   Properties; Titles, Etc.

(a)     Each of the Borrower and the Subsidiaries has good and defensible title to the Oil and Gas Properties evaluated in the most recently delivered Reserve Report, and each Loan Party has good title to all its personal Properties, in each case, free and clear of all Liens (other than Liens permitted by Section 9.03).   The Loan Party or Subsidiary who is specified as the owner in such Reserve Report owns the net interests in production attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, and the ownership of such Properties shall not in any material respect obligate the Borrower or such Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such Property in an amount in excess of the working interest of each Property set forth in the most recently delivered Reserve Report that is not offset by a corresponding proportionate increase in the Borrower's or such Subsidiary's net revenue interest in such Property.   The ownership by the Borrower or any Subsidiary of the Hydrocarbons and the undivided interests therein specified on the exhibits to the Mortgages are the same interests reflected in the most recently delivered Reserve Report.

(b)     Other than as a result of the Chapter 11 Cases, all leases and agreements necessary for the conduct of the business of the Borrower and the Subsidiaries are valid and subsisting, in full force and effect, and there exists no default or event or circumstance which with the giving of notice or the passage of time or both would give rise to a default under any such lease or leases to the extent material (determined individually for each such lease and in the aggregate for all such leases).

WEIL:\95962958\14\99980.0531

(c)     The rights and Properties presently owned, leased or licensed by the Borrower and the Subsidiaries including, without limitation, all easements and rights of way, include all rights and Properties necessary to permit the Borrower and the Subsidiaries to conduct their business in all material respects in the same manner as its business has been conducted prior to the date hereof.

(d)     All of the Properties of the Borrower and the Subsidiaries which are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards.

(e)     The Borrower and each Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual Property material to its business, and the use thereof by the Borrower and such Subsidiary does not infringe upon the rights of any other Person.  The Borrower and the Subsidiaries either own or have valid licenses or other rights to use all material databases, geological data, geophysical data, engineering data, seismic data, maps, interpretations and other technical information used in their businesses as presently conducted, subject to the limitations contained in the agreements governing the use of the same, which limitations are customary for companies engaged in the business of the exploration and production of Hydrocarbons.

(f)     Each Loan Party has good and defensible title to its Midstream Assets free and clear of all Liens except Liens permitted by Section 9.03.

Section 7.17.   Maintenance of Properties.  Subject to the prior rights and limitations of Borrower as an owner of non-operated working interests, the Oil and Gas Properties (and Properties unitized therewith) of the Borrower and the Subsidiaries have been maintained, operated and developed in a good and workmanlike manner and in conformity with all Governmental Requirements and in conformity with the provisions of all leases, subleases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of the Oil and Gas Properties of the Borrower and the Subsidiaries. (i) No Oil and Gas Property of the Borrower or any Subsidiary is subject to having allowable production reduced below the full and regular allowable (including the maximum permissible tolerance) because of any overproduction (whether or not the same was permissible at the time) and (ii) none of the wells comprising a part of the Oil and Gas Properties (or Properties unitized therewith) of the Borrower or any Subsidiary is deviated from the vertical more than the maximum permitted by Governmental Requirements (except with respect to horizontal wells permitted by Governmental Authority), and such wells are, in fact, bottomed under and are producing from, and the well bores are wholly within, the Oil and Gas Properties (or in the case of wells located on Properties unitized therewith, such unitized Properties) of the Borrower or such Subsidiary.  Subject to any necessary order or authorization of the Bankruptcy Court, all pipelines, wells, gas processing plants, platforms and other material improvements, fixtures, equipment and all other Midstream Assets owned in whole or in part by the Borrower or any of the Subsidiaries that are necessary to conduct normal operations are being maintained in a state adequate to conduct normal operations, and with respect to such of the foregoing which are operated by the Borrower or any of the Subsidiaries, in a manner consistent with the Borrower's or the Subsidiaries' past practices.

Section 7.18.   Gas Imbalances, Prepayments.  Except as set forth on Schedule 7.18 or on the most recent certificate delivered pursuant to Section 8.12(c), on a net basis there are no Material Gas Imbalances, take or pay or other prepayments which would require the Borrower or any of the Subsidiaries to deliver Hydrocarbons produced from the Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

Section 7.19.   Marketing of Production.  Except for contracts listed and in effect on the date hereof on Schedule 7.19, and thereafter included in the most recently delivered Reserve Report (with

60

respect to all of which contracts the Borrower represents that it or the Subsidiaries are receiving a price for all production sold thereunder which is computed substantially in accordance with the terms of the relevant contract and are not having deliveries curtailed substantially below the subject Property's delivery capacity), no material agreements exist which are not cancelable on 60 days' notice or less without penalty or detriment for the sale of production from the Borrower's or the Subsidiaries' Hydrocarbons (including, without limitation, calls on or other rights to purchase, production, whether or not the same are currently being exercised) that (a) pertain to the sale of production at a fixed price and (b) have a maturity or expiry date of longer than six (6) months from the date hereof.

Section 7.20.   *Swap Agreements.   Schedule 7.20, as of the date hereof, and after the date hereof, each report required to be delivered by the Borrower pursuant to Section 8.01(f), sets forth, a true and complete list of all Swap Agreements of the Borrower and each Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark to market value thereof, all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.*

Section 7.21.   **[Reserved].**

Section 7.22.   **[Reserved].**

Section 7.23.   Anti-Corruption Laws and Sanctions.   The Borrower has implemented and maintains in effect policies and/or procedures designed to ensure compliance by the Borrower, the Parent and the Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and *the Borrower, the Parent and the Subsidiaries and their respective officers and employees and, to the knowledge of the Borrower, their respective directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.* None of (a) the Borrower, the Parent and the Subsidiaries or any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower, Parent or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Borrowing or Letter of Credit, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Law or applicable Sanctions.

Section 7.24.   **[Reserved].**

Section 7.25.   Article 8 of Uniform Commercial Code.   No Equity Interest of Borrower or any Subsidiary is evidenced by a certificate or other instrument.  None of the Organizational Documents of Borrower or any Subsidiary provides that any Equity Interest in Borrower or any Subsidiary is a security governed by Article 8 of the Uniform Commercial Code.

Section 7.26.   EEA Financial Institution.   Neither the Parent, the Borrower, nor any Subsidiary is an EEA Financial Institution.

Section 7.27.   Accounts.   Schedule 7.27 attached hereto sets forth as of the Interim Facility Effective Date a complete and accurate list of all deposit, checking and other bank accounts, all securities and other accounts maintained with any broker dealer and all other similar accounts maintained by each Loan Party, together with a description thereof (i.e., the bank or broker dealer at which such deposit or other account is maintained and the account number and the purpose thereof).

Section 7.28.   Secured Obligations; Priority.

(a)     The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for (x) the motions seeking approval of the Loan Documents and the DIP Facility and (y) the hearings for the approval of the DIP Order was given in each case.  The Borrower shall give, on a timely basis as specified in the DIP Order, all notices required to be given to all parties specified in the DIP Order.

(b)     The provisions of this Agreement and the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests in all right, title and interest in the Collateral (the "DIP Liens"), having the priority set forth in the Loan Documents, including the DIP Order, and enforceable against the Loan Parties.

(c)     Pursuant to Section 364(c)(1) of the Bankruptcy Code and the DIP Order, all Obligations and all other obligations of the Loan Parties under the Loan Documents constituting Super-Priority Claims shall be allowed by the Bankruptcy Court, and shall at all times be senior to the rights of Loan Parties, the estates of Loan Parties, and any successor trustee or estate representative in the Chapter 11 Cases or any subsequent proceeding or case under the Bankruptcy Code, subject only to the Carve-Out.

Section 7.29.   Chapter 11 Orders.  The DIP Order and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of the Majority Lenders.

ARTICLE VIII

AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding, each Loan Party covenants and agrees with the Lenders that:

Section 8.01.   Financial Statements; Other Information.  The Borrower will furnish to the Administrative Agent and each Lender:

(a)     Annual Financial Statements.  As soon as available, but in any event in accordance with then applicable law and not later than 90 days after the end of each fiscal year of the Parent, its audited consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by an independent public accountant of recognized national to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Parent and the Subsidiaries on a consolidated basis in accordance with GAAP consistently applied.

(b)     Quarterly Financial Statements.  As soon as available, but in any event in accordance with then applicable law and not later than 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Parent, its consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition

WEIL:\95962958\14\99980.0531

and results of operations of the Parent and the Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes.

(c)     Certificate of Financial Officer – Compliance.   Concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer in substantially the form of Exhibit D hereto or such other form acceptable to the Administrative Agent (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) certifying that the Borrower has been in compliance with Section 9.01 at such times as required therein and in connection therewith, (iii) setting forth reasonably detailed calculations demonstrating compliance with Section 9.01 and (iv) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 7.04 (or, if later, the most recently delivered audited financial statements pursuant to Section 8.01(a)) and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate.

(d)     Certificate of Accounting Firm – Defaults.   Concurrently with any delivery of financial statements under Section 8.01(a), a certificate of the accounting firm that reported on such financial statements stating whether they obtained knowledge during the course of their examination of such financial statements of any Default (which certificate may be limited to the extent required by accounting rules or guidelines).

(e)     Certificate of Financial Officer – Consolidating Information.   If, at any time, all of the Subsidiaries of the Parent are not consolidated Subsidiaries, then concurrently with any delivery of financial statements under Section 8.01(a) or Section 8.01(b), a certificate of a Financial Officer setting forth consolidating spreadsheets that show all consolidated Subsidiaries and the eliminating entries, in such form as would be presentable to the auditors of the Parent.

(f)     Certificate of Financial Officer – Swap Agreements.   Concurrently with any delivery of financial statements under Section 8.01(a) and Section 8.01(b), a certificate of a Financial Officer, in form and substance satisfactory to the Administrative Agent, setting forth as of the last Business Day of such fiscal quarter or fiscal year, a true and complete list of all Swap Agreements of the Borrower and each Subsidiary, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value therefor, any new credit support agreements relating thereto, any margin required or supplied under any credit support document, and the counterparty to each such agreement.

(g)     Certificate of Insurer – Insurance Coverage.   Concurrently with any delivery of financial statements under Section 8.01(a) and Section 8.01(b), a certificate of insurance coverage from each insurer with respect to the insurance required by Section 8.07, in form and substance satisfactory to the Administrative Agent, and, if requested by the Administrative Agent or any Lender, all copies of the applicable policies.

(h)     Other Accounting Reports.   Promptly upon receipt thereof, a copy of each other report or letter submitted to the Parent, the Borrower or any of the Subsidiaries by independent accountants in connection with any annual, interim or special audit made by them of the books of the Parent, the Borrower or any such Subsidiary, and a copy of any response by the Parent, the Borrower or any such Subsidiary, or the board of managers of the Parent, the Borrower or any such Subsidiary, to such letter or report.

(i)     SEC and Other Filings; Reports to Shareholders.   Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by

WEIL:\95962958\14\99980.0531

Parent with the SEC, or with any national securities exchange, or distributed by Parent to its shareholders generally, as the case may be.

(j)      Notices Under Material Instruments.  Promptly after the furnishing thereof, copies of any financial statement, report or notice furnished to or by any Person pursuant to the terms of any preferred stock designation, indenture, loan or credit or other similar agreement, other than this Agreement and not otherwise required to be furnished to the Lenders pursuant to any other provision of this Section 8.01.

(k)      Notice of Sales of Oil and Gas Properties; Midstream Assets.  In the event the Borrower or any Subsidiary intends to Dispose of any Oil or Gas Properties, Midstream Assets or any Equity Interests in any Subsidiary in accordance with, and as permitted by, Section 9.12, prior written notice of such Disposition, the price thereof and the anticipated date of closing and any other details thereof requested by the Administrative Agent or any Lender.

(l)      Notice of Casualty Events.  Prompt written notice, and in any event within 1 Business Day, of the occurrence of any Casualty Event or the commencement of any action or proceeding that could reasonably be expected to result in a Casualty Event.

(m)      Information Regarding Borrower and Guarantors.  Prompt written notice (and in any event within thirty (30) days prior thereto) of any change (i) in the Borrower or any Guarantor's corporate name or in any trade name used to identify such Person in the conduct of its business or in the ownership of its Properties, (ii) in the location of the Borrower or any Guarantor's chief executive office or principal place of business, (iii) in the Borrower or any Guarantor's identity or corporate structure or in the jurisdiction in which such Person is incorporated or formed, (iv) in the Borrower or any Guarantor's jurisdiction of organization or such Person's organizational identification number in such jurisdiction of organization, and (v) in the Borrower or any Guarantor's federal taxpayer identification number, if any.

(n)      Production Reports, Lease Operating Statements and Projected Production Reports.  Concurrently with the delivery of any Reserve Report to the Administrative Agent pursuant to Section 8.12, (i) a report setting forth, for each calendar month during the then current fiscal year to date, on a field by field summary basis and an aggregate summary basis (A) the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and (B) the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month, and (ii) a Projected Production Report.

(o)      Gas Balancing Reports.  Within 45 days after the end of each fiscal quarter, a report setting forth, for the quarter during the then current fiscal year to date, the existence of any Material Gas Imbalances listed on a property-by-property basis.

(p)      Notices of Certain Changes.  Promptly, but in any event within five (5) Business Days after the execution thereof, copies of any amendment, modification or supplement to the Organizational Documents of the Parent, the Borrower or any Subsidiary.

(q)      [Reserved].

(r)      PATRIOT Act.  Promptly after the request by the Administrative Agent, the Issuing Bank or any Lender, all documentation and other information that the Administrative Agent, the Issuing Bank or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Act.

(s)     _Other Requested Information._  Promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Parent, the Borrower or any Subsidiary or Affiliates (including, without limitation, (x) a list of first purchasers which accounted for at least 75% of the total revenues of the Borrower and its Subsidiaries during the twelve month period ended as of the immediately preceding December 31 or June 30th, as applicable, and (y) any Plan or Multiemployer Plan and any reports or other information required to be filed under ERISA), or compliance with the terms of this Agreement or any other Loan Document, as the Administrative Agent or any Lender may request.

(t)     **[Reserved.]**

(u)     _Notification of Hedging Violation._  Promptly notify Administrative Agent if the volumes of Hydrocarbons hedged under Swap Agreements ever exceed the actual daily production of the Hydrocarbons from the Mortgaged Property.

Documents required to be delivered under _Section 8.01_ may be delivered electronically and if so delivered, shall be deemed to be delivered on the date (i) on which the Parent posts such documents, or provides a link thereto on the Parent's website on the internet or (ii) on which such documents are posted the Parent's or the Borrower's behalf on an internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); _provided, however,_ that (x) the Borrower shall deliver paper copies of such documents to the Administrative Agent upon its request until a written request to cease delivering paper copies is given by the Administrative Agent and (y) the Borrower shall notify the Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e. soft copies) of such documents.

Section 8.02.     _Notices of Material Events._  The Borrower will furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a)     the occurrence of any Default or Event of Default;

(b)     other than the Chapter 11 Cases, the filing or commencement of, or the threat in writing of, any action, suit, proceeding, investigation or arbitration by or before any arbitrator or Governmental Authority against or affecting any Loan Party or any Affiliate thereof not previously disclosed in writing to the Lenders or any material adverse development in any action, suit, proceeding, investigation or arbitration previously disclosed to the Lenders that could reasonably be expected to be adversely determined and reasonably be expected to result in liability, obligation or judgment in excess of $2,000,000 and not subject to the automatic stay in the Chapter 11 Cases;

(c)     the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Parent, the Borrower and the Subsidiaries in an aggregate amount exceeding $500,000;

(d)     promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of the Parent or the Borrower, and copies of all annual, regular, periodic and special reports and registration statements which Parent or the Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, and not otherwise required to be delivered to the Administrative Agent pursuant hereto;

65

(e)     at least two Business Days prior to filing, copies of all pleadings and motions to be filed by or on behalf of the Borrower or any of the other Loan Parties with the Bankruptcy Court or the United States Trustee in the Chapter 11 Cases, or to be distributed by or on behalf of the Borrower or any of the other Loan Parties to any official committee appointed in the Chapter 11 Cases; and

(f)     any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 8.02 shall be accompanied by a statement of a Responsible Officer setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Arrangers may, at their option, make available to the Lenders and the Issuing Bank the Communications by posting the Communications on the Platform and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or Parent or any of the other Loan Parties, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities.  The Borrower hereby agrees that (w) all Communications that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Communications "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the other Agents, the Arrangers, the Issuing Bank and the Lenders to treat such Communications as not containing any material non-public information with respect to the Borrower, any of the Loan Parties or Parent, or any of their securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Communications constitute Information, they shall be treated as set forth in Section 12.11); (y) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent, the other Agents and each of the Arrangers shall be entitled to treat any Communications that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

Section 8.03.   Existence; Conduct of Business.   The Borrower will, and will cause each Subsidiary to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business and maintain, if necessary, its qualification to do business in each other jurisdiction in which any of its Oil and Gas Properties is located or the ownership of any Properties requires such qualification.

Section 8.04.   Payment of Obligations.   The Borrower will, and will cause each Subsidiary to, pay its obligations, including Tax liabilities of the Borrower and all of the Subsidiaries before the same shall become delinquent or in default, except (x) to the extent such payment is excused by, or is otherwise prohibited by the provisions of the Bankruptcy Code or order of the Bankruptcy Court and (y) where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

Section 8.05.   Performance of Obligations under Loan Documents.   The Borrower will pay the Obligations in accordance with the Loan Documents and the Borrower will, and will cause the Parent and each Subsidiary to, do and perform every act and discharge all of the obligations to be performed and

discharged by them under the Loan Documents, including, without limitation, this Agreement, at the time or times and in the manner specified.

Section 8.06.   <u>Operation and Maintenance of Properties</u>.   Subject to any necessary order or authorization of the Bankruptcy Court, the Borrower, at its own expense, will, and will cause each Subsidiary to:

(a)      operate its *Oil and Gas Properties and other material Properties or cause such Oil and Gas Properties and other material Properties* to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, applicable pro ration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom, except, in each case, in those circumstances where a reasonably prudent operator under similar circumstances and in accordance with customary industry practice would be prudent not to do so, and the failure to comply could not reasonably be expected to have a Material Adverse Effect.

(b)      operate and maintain in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all Governmental Requirements, including, without limitation, all applicable laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the gathering, transportation or processing of Hydrocarbons and other minerals therefrom, except, in each case, in those circumstances where a reasonably prudent operator under similar circumstances and in accordance with customary industry practice would be prudent not to do so, and the failure to comply could not reasonably be expected to have a Material Adverse Effect, all pipelines, compressor stations, wells, gas or crude oil processing facilities, field gathering systems, tanks, tank batteries, pumps, pumping units, fixtures, valves, fittings, machinery, parts, engines, boilers, meters, apparatus, appliances, tools, implements, casing, tubing, rods, cables, wires, towers, surface and other material improvements, fixtures and equipment owned in whole or in part by the Borrower or any of the Subsidiaries that are useful or necessary to conduct normal operations relating to gathering, transportation, processing or removal of Hydrocarbons and other minerals or $CO_2$ therefrom.

(c)      keep and maintain all Property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its material Oil and Gas Properties, all gas or crude oil processing facilities and other material Properties, including, without limitation, all equipment, machinery and facilities.

(d)      promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases or other agreements affecting or pertaining to its Oil and Gas Properties or gas or crude oil processing facilities and will do all other things necessary to keep unimpaired their rights with respect thereto and prevent any forfeiture thereof or default thereunder.

(e)      promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties, all gas or crude oil processing facilities and other material Properties.

(f)     operate its Oil and Gas Properties, all gas or crude oil processing facilities and other material Properties or cause or make reasonable and customary efforts to cause such Oil and Gas Properties, gas or crude oil processing facilities and other material Properties to be operated in accordance with the practices of the industry and in compliance with all applicable contracts and agreements which are necessary for the operation of such Properties and facilities and in compliance with all Governmental Requirements, in each case, other than any such failure to operate or comply could not reasonably be expected to result in claims against, or obligations and/or liabilities of, any of the Loan Parties in an amount in excess of $2,000,000 in the aggregate.

To the extent the Borrower is not the operator of any Property, the Borrower shall use reasonable efforts to cause the operator to comply with this Section 8.06.

Section 8.07.     Insurance.  The Borrower will, and will cause each Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.  The loss payable clauses or provisions in said insurance policy or policies insuring any of the Collateral for the Loans shall be endorsed in favor of and made payable to the Administrative Agent as its interests may appear and such policies shall name the Administrative Agent in its capacity as such as "additional insured" and "loss payee," as applicable, and provide that the insurer will use commercially reasonable efforts to give at least 30 days prior notice of any cancellation to the Administrative Agent.

Section 8.08.     Books and Records; Inspection Rights.  The Borrower will, and will cause the Parent and each Subsidiary to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  The Borrower will, and will cause the Parent and each Subsidiary to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its Properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

Section 8.09.     Compliance with Laws.  Subject to any necessary order or authorization of the Bankruptcy Court, the Borrower will, and will cause the Parent and each Subsidiary to (a) comply in all material respects with all laws, rules, regulations and orders of any Governmental Authority applicable to any of the Parent and/or its Subsidiaries or any such Person's Property, and (b) maintain in effect and enforce policies and/or procedures designed to ensure compliance by the Borrower, the Parent, the Subsidiaries and each of their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

Section 8.10.     Environmental Matters.

(a)     Subject to any necessary order or authorization of the Bankruptcy Court, the Borrower shall at its sole expense: (i) comply, and shall cause its Properties and operations and each Subsidiary and each Subsidiary's Properties and operations to comply, with all applicable Environmental Laws, the breach of which could be reasonably expected to have a Material Adverse Effect; (ii) not dispose of or otherwise release, and shall cause each Subsidiary not to dispose of or otherwise release, any oil, oil and gas waste, hazardous substance, or solid waste on, under, about or from any of the Borrower's or the Subsidiaries' Properties or any other Property to the extent caused by the Borrower's or any of the Subsidiaries' operations except in compliance with applicable Environmental Laws, the disposal or release of which could be reasonably expected to have a Material Adverse Effect; (iii) timely obtain or file, and shall cause each Subsidiary to timely obtain or file, all notices, permits, licenses, exemptions,

WEIL:\95962958\14\99980.0531

approvals, registrations or other authorizations, if any, required under applicable Environmental Laws to be obtained or filed in connection with the operation or use of the Borrower's or the Subsidiaries' Properties, which failure to obtain or file could reasonably be expected to have a Material Adverse Effect; (iv) promptly commence and diligently prosecute to completion, and shall cause each Subsidiary to promptly commence and diligently prosecute to completion, any assessment, evaluation, investigation, monitoring, containment, cleanup, removal, repair, restoration, remediation or other remedial obligations (collectively, the "Remedial Work") in the event any Remedial Work is required or reasonably necessary under applicable Environmental Laws because of or in connection with the actual or suspected past, present or future disposal or other release of any oil, oil and gas waste, hazardous substance or solid waste on, under, about or from any of the Borrower's or the Subsidiaries' Properties, which failure to commence and diligently prosecute to completion could reasonably be expected to have a Material Adverse Effect; and (v) establish and implement, and shall cause each Subsidiary to establish and implement, such procedures as may be necessary to continuously determine and assure that the Borrower's and the Subsidiaries' obligations under this Section 8.10(a) are timely and fully satisfied, which failure to establish and implement could reasonably be expected to have a Material Adverse Effect.

(b)     The Borrower will promptly, but in no event later than five days of the occurrence of a triggering event, notify the Administrative Agent and the Lenders in writing of any threatened action, investigation or inquiry by any Governmental Authority or any threatened demand or lawsuit by any landowner or other third party against the Borrower or the Subsidiaries or their Properties of which the Borrower has knowledge in connection with any Environmental Laws (excluding routine testing and corrective action) if the Borrower reasonably anticipates that such action will result in liability (whether individually or in the aggregate) in excess of $1,000,000, not fully covered by insurance, subject to normal deductibles.

(c)     The Borrower will, and will cause each Subsidiary to, provide environmental audits and tests in accordance with American Society of Testing Materials standards upon request by the Administrative Agent and the Lenders in connection with any future acquisitions of Oil and Gas Properties or other Properties.

Section 8.11.     Further Assurances.

(a)     The Borrower, at its sole expense, and each other Loan Party will, and will cause their respective Subsidiaries to, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to comply with, cure any defects or accomplish the conditions precedent, covenants and agreements of the Borrower, the Parent and any Subsidiary, as the case may be, in the Loan Documents, including Notes (and to deliver a Note to any Lender at its request), or to further evidence and more fully describe the collateral intended as security for the Obligations, or to correct any omissions in this Agreement and the other Loan Documents, or to state more fully the obligations secured therein, or to perfect, protect or preserve any Liens created pursuant to this Agreement and the other Loan Documents or the priority thereof, or to make any recordings, file any notices or obtain any consents, all as may be reasonably necessary or appropriate, in the sole discretion of the Administrative Agent, in connection therewith. Borrower and each other Loan Party does hereby grant Administrative Agent a special power of attorney to act in the name, place and stead of such Loan Party for the purpose of taking any and all actions requested by Administrative Agent to be taken by Borrower and the other Loan Parties pursuant to this Section 8.11(a). The special power of attorney herein granted may be exercised any time with the authorization of the Bankruptcy Court. Each Loan Party recognizes that such power of attorney is in favor of Administrative Agent and is coupled with an interest under this Agreement and, thus, irrevocable as long as this Agreement is in force and effect. All Persons dealing with Administrative Agent, or any officer thereof, or any substitute, shall be fully protected in treating the powers and authorities conferred

69

by this Section as continuing in full force and effect until advised by Administrative Agent of the occurrence of the termination of all of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations), the expiration or termination of all Letters of Credit (other than Letters of Credit as to which other arrangements satisfactory to the Administrative Agent and the Issuing Bank shall have been made), and the expiration or termination of all Secured Treasury Management Agreement (other than Secured Treasury Management Agreement as to which other arrangements satisfactory to the Treasury Management Bank shall have been made).

(b)     Each Loan Party hereby authorizes the Administrative Agent to file one or more *financing or continuation statements, and amendments thereto, relative to all or any part of the Mortgaged* Property or other Property covered by the Lien of the Loan Documents without the signature of the Borrower or any other Guarantor where permitted by law. A carbon, photographic or other reproduction of the Loan Documents or any financing statement covering the Mortgaged Property such other Property or any part thereof shall be sufficient as a financing statement where permitted by law.

Section 8.12.     Reserve Reports.

(a)     On or before March 1 and September 1 of each year, the Borrower shall furnish to the Administrative Agent and the Lenders a Reserve Report evaluating the Oil and Gas Properties of the Borrower and the Subsidiaries as of the immediately preceding December 31st and June 30th,

(i)     the Reserve Report as of December 31 of each year shall be prepared by Approved Petroleum Engineers or prepared by or under the supervision of the chief engineer of the Borrower and then audited by one or more Approved Petroleum Engineers (it being agreed that such an audited report will comment on total reserves and whether the audited reserves and PV10 of such reserves are within a 10% tolerance of the Approved Petroleum Engineer's estimates, based on both PDP and total Proved Reserves) and shall use economic parameters (including but not limited to, hydrocarbon prices, escalation rates, discount rate assumptions, and other economic assumptions) acceptable to Administrative Agent; provided that notwithstanding the foregoing, in respect of any election made by the Majority Lenders by November 1 of any year for such year's applicable Reserve Report, the Majority Lenders shall have the right to require that Reserve Report delivered pursuant to this Section 8.12(a)(i) be prepared by an Approved Petroleum Engineer rather than by or under the supervision of the chief engineer of the Borrower and then audited by an Approved Petroleum Engineer, and

(ii)     the Reserve Report as of June 30 of each year shall be prepared by or under the supervision of the chief engineer of the Borrower and shall use economic parameters (including but not limited to hydrocarbon prices, escalation rates, discount rate assumptions, and other economic assumptions) acceptable to Administrative Agent. The chief engineer of the Borrower shall certify such Reserve Report to be true and accurate and to have been prepared in accordance with the procedures used in the immediately preceding June 30 Reserve Report.

(b)     **[Reserved]**.

(c)     With the delivery of each Reserve Report, Borrower shall provide to the Administrative *Agent and the Lenders a certificate from a Responsible Officer, substantially in the form of Exhibit I* attached hereto, certifying that:  (i) the information contained in the Reserve Report and any other information delivered in connection therewith is true and correct in all respects, (ii) the Borrower or the Subsidiaries own good and defensible title to the Oil and Gas Properties and other Properties evaluated in such Reserve Report and such Oil and Gas Properties are free of all Liens except for Liens permitted by Section 9.03, (iii) except as set forth on an exhibit to the certificate, on a net basis there are no Material

Gas Imbalances, take or pay or other prepayments in excess of the volume specified in Section 7.18 with respect to its Oil and Gas Properties evaluated in such Reserve Report which would require the Borrower or any Subsidiary to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor, (iv) none of the Oil and Gas Properties have been sold since the Petition Date except as set forth on an exhibit to the certificate, which shall list all of the Oil and Gas Properties sold, in such detail as reasonably required by the Administrative Agent, (v) attached to the certificate is a list of all marketing agreements entered into subsequent to the later of the date hereof or the most recently delivered Reserve Report which the Borrower could reasonably be expected to have been obligated to list on Schedule 7.18 had such agreement been in effect on the date hereof and (vi) attached thereto is a schedule of the Oil and Gas Properties evaluated by such Reserve Report that are Mortgaged Properties (the certificate described herein, the "Reserve Report Certificate").

Section 8.13.    Title Information.

(a)    On or before the delivery to the Administrative Agent and the Lenders of each Reserve Report required by Section 8.12 and at such other times as Agent shall request, the Borrower will deliver title information in form and substance acceptable to the Administrative Agent covering enough of the Oil and Gas Properties evaluated by such Reserve Report that were not included in the immediately preceding Reserve Report, so that the Administrative Agent shall have received together with title information previously delivered to the Administrative Agent, satisfactory title information on at least 95% of the Recognized Value of the Oil and Gas Properties evaluated by such Reserve Report.

(b)    If the Borrower has provided title information for additional Properties under Section 8.13(a), the Borrower shall, within 60 days of notice from the Administrative Agent that title defects or exceptions exist with respect to such additional Properties, either (i) cure any such title defects or exceptions (including defects or exceptions as to priority) which are not permitted by Section 9.03 raised by such information or (ii) deliver title information in form and substance acceptable to the Administrative Agent so that the Administrative Agent shall have received, together with title information previously delivered to the Administrative Agent, satisfactory title information on at least 95% of the Recognized Value of the Oil and Gas Properties evaluated by such Reserve Report.

(c)    [Reserved.]

(d)    In respect of any Midstream Assets not covered by the title information delivered in clauses (a) and (b) above, the Borrower shall, and shall cause each of its Subsidiaries to, deliver to the Administrative Agent such information as the Administrative Agent shall deem reasonably necessary to verify the Loan Parties' ownership of the easements, rights of way, fee-owned real estate and other real estate interests necessary to use, operate and maintain the Midstream Assets.

Section 8.14.    Additional Collateral; Additional Guarantors.

(a)    [Reserved.]

(b)    The Borrower shall promptly cause each Domestic Subsidiary to guarantee the Obligations pursuant to the Guaranty. In connection with any such guarantee, the Borrower shall, or shall cause such Subsidiary to, (A) execute and deliver a supplement or joinder to the Guaranty, this Agreement and any other Loan Document reasonably requested by the Administrative Agent, (B) if requested by the Administrative Agent, pledge all of the Equity Interests of such new Subsidiary pursuant to a Security Instrument or other Loan Document (including, without limitation, delivery of original stock certificates, if any, evidencing the Equity Interests of such Subsidiary, together with an appropriate

71

undated stock powers for each certificate duly executed in blank by the registered owner thereof) and (C) execute and deliver such other additional closing documents, certificates and legal opinions as shall reasonably be requested by the Administrative Agent.

      (c)      **[Reserved].**

      (d)      **[Reserved].**

      (e)      Notwithstanding the restrictions in <u>Section 9.06</u>, each Subsidiary of a Loan Party now existing or created, acquired or coming into existence after the date hereof, including each of the Guarantors, shall promptly execute and deliver to the Administrative Agent the Guaranty (or joinder thereto) and any Security Instrument or other Loan Document (or joinder thereto) as may be required by the Administrative Agent. Such Subsidiary shall, and the Borrower shall cause such Subsidiary to, deliver to the Administrative Agent, simultaneously with its delivery of such Guaranty and any such Security Instrument or other Loan Document (or joinder), (x) written evidence satisfactory to the Administrative Agent that such Subsidiary has taken all organizational action necessary to duly approve and authorize its execution, delivery and performance of such Guaranty, any such Security Instrument and any other documents which it is required to execute, and (y) such additional closing documents, certificates and opinions of counsel as the Administrative Agent shall require.

      (f)      **[Reserved].**

      Section 8.15.   <u>ERISA Compliance</u>. The Borrower will promptly furnish and will cause the Parent and the Subsidiaries and any ERISA Affiliate to promptly furnish to the Administrative Agent (a) promptly after the filing thereof with the United States Secretary of Labor, the Internal Revenue Service or the PBGC, copies of each annual and other report with respect to each Plan or any trust created thereunder, (b) immediately upon becoming aware of the occurrence of any ERISA Event or of any "prohibited transaction," as described in Section 406 of ERISA or in Section 4975 of the Code, in connection with any Plan or any trust created thereunder, a written notice signed by the President or the principal Financial Officer, the Subsidiary or the ERISA Affiliate, as the case may be, specifying the nature thereof, what action the Borrower, the Parent, the Subsidiary or the ERISA Affiliate is taking or proposes to take with respect thereto, and, when known, any action taken or proposed by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto, and (c) immediately upon receipt thereof, copies of any notice of the PBGC's intention to terminate or to have a trustee appointed to administer any Plan. With respect to each Plan (other than a Multiemployer Plan), the Borrower will, and will cause the Parent and each Subsidiary and ERISA Affiliate to, (i) satisfy in full and in a timely manner, without incurring any late payment or underpayment charge or penalty and without giving rise to any Lien, all of the contribution and funding requirements of Section 412 of the Code (determined without regard to subsections (d), (e), (f) and (k) thereof) and of Section 302 of ERISA (determined without regard to Sections 303, 304 and 306 of ERISA), and (ii) pay, or cause to be paid, to the PBGC in a timely manner, without incurring any late payment or underpayment charge or penalty, all premiums required pursuant to Sections 4006 and 4007 of ERISA.

      Section 8.16.   **[Reserved].**

      Section 8.17.   <u>Use of Proceeds</u>.

      (a)      The proceeds of the Borrowings shall be used by the Borrower to (i) pay certain costs and expenses of administering the Chapter 11 Cases, (ii) fund the working capital needs, capital improvements and other general corporate purposes of the Borrower and its Subsidiaries and (iii) make the payments provided for in the DIP Orders.

WEIL:\95962958\14\99980.0531

(b)     The proceeds of the Loans shall be applied by the Borrower for uses solely to the extent that any such application of proceeds shall be in compliance with the Budget covenant set forth in Section 9.21, including the Permitted Variances.

(c)     No portion of the proceeds of any Loan shall be used in any manner that causes such Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the FRB or any other regulation thereof.

Section 8.18.    Budget Update; Cash Reporting.

(a)     On or before 5:00 pm, New York City time, on March 3, 2017, and on the date of each four-week anniversary of such date occurring thereafter (each, a "Reporting Date"), the Borrower will provide to the Administrative Agent a new updated thirteen (13)-week budget covering the 13-week period commencing on the applicable Reporting Date, which update shall contain line items substantially similar to the Initial Budget and all other information reasonably requested by the Administrative Agent and/or the Majority Lenders, in each case, in form and substance satisfactory to the Administrative Agent and the Majority Lenders (the Initial Budget and each such updated 13-week budget, as applicable, the "Budget"). Within five Business Days after receipt by the Administrative Agent and the Majority Lenders of each new updated Budget, the Administrative Agent (on its own behalf and as directed by the Majority Lenders) shall deliver notice to the Borrower indicating whether such updated Budget is in form and substance satisfactory to the Administrative Agent and the Majority Lenders; provided that (i) if the Administrative Agent does not deliver such notice to the Borrower within such five-Business Day period, such updated Budget shall then become the "Budget" for all purposes herein on the day immediately following such five-Business Day period and (ii) if Administrative Agent delivers notice to the Borrower within such five-Business Day period indicating that such update is not in form and substance satisfactory to the Administrative Agent and the Majority Lenders, the most recent preceding Budget shall continue as the then-effective Budget until the day immediately following the delivery of an updated Budget in form and substance satisfactory to the Administrative Agent and the Majority Lenders.

(b)     On or before 5:00 pm, New York City time, on (i) the first Tuesday (or, if such Tuesday is not a Business Day, the immediately succeeding Business Day) following each Reporting Date (each such Tuesday, a "Testing Date") and (ii) the third Tuesday (or, if such Tuesday is not a Business Day, the immediately succeeding Business Day) following each Reporting Date (each such Tuesday, an "Alternate Testing Date" and, together with each Testing Date, a "Variance Testing Date"), in the case of this clause (ii), solely to the extent that any Loans, or Letters of Credit with an aggregate principal face amount in excess of $1,000,000, are outstanding as of such Alternate Testing Date, or were outstanding, at any time since the most recent Reporting Date, in each case, commencing with the first such Variance Testing Date to occur after the Interim Facility Effective Date, the Borrower will provide to the Administrative Agent a variance report tested as of the most recent Variance Testing Date for the immediately preceding four-week period then ended (each such period, a "Testing Period" and each such report, a "Variance Report"), in form and substance reasonably satisfactory to the Administrative Agent and the Majority Lenders, detailing the following:

(i)     the aggregate disbursements of the Loan Parties and their Subsidiaries and aggregate receipts during the applicable Testing Period; and

(ii)    any variance (whether positive or negative, expressed as a percentage) between the aggregate disbursements made during such Testing Period by the Loan Parties and their Subsidiaries against the aggregate disbursements for the Testing Period, as set forth in the applicable Budget, the amount of any carryforward applied to such variance (to the extent such

carryforward is permitted by <u>Section 9.21</u>) and the amount of any unused carryforward as of such Variance Test Date (to the extent such carryforward is permitted by <u>Section 9.21</u>).

(c)     No later than 5:00 p.m. (prevailing Eastern Time) on each Tuesday, commencing with the first such Tuesday to occur after the Interim Facility Effective Date, the Borrower shall provide to the Administrative Agent and the Lenders a report showing actual receipts and disbursements through the prior week in the format of the Budget, and, promptly upon request of the Administrative Agent, an explanation of any variance to the Budget.

Section 8.19.    <u>Cash Management</u>.    The Loan Parties and their respective Subsidiaries shall *maintain their cash management system as it existed prior to the Petition Date for the benefit of the entire DIP Facility, with such changes as may be required by an order of the Bankruptcy Court and/or as may be made with the consent of the Administrative Agent and the Majority Lenders.*

ARTICLE IX

NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation shall *remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding, each Loan Party covenants and agrees with the Lenders that:*

Section 9.01.    <u>Minimum Liquidity</u>.    The Borrower and its Subsidiaries shall not permit Liquidity to be less than (i) $15,000,000 at any time during the period commencing on the Interim Facility Effective Date and ending on, but excluding, the Final Facility Effective Date and (ii) $25,000,000 at any time from and after the Final Facility Effective Date.

Section 9.02.    <u>Debt</u>.    The Parent and the Borrower will not, and will not permit any of their *respective Subsidiaries to, incur, create, assume or suffer to exist any Debt, except:*

(a)     the Obligations;

(b)     (i) Debt of the Borrower and its Subsidiaries in respect of trade payables arising as a *result of the deferred purchase price of Property or services from time to time incurred in the ordinary course of business of the Borrower and its Subsidiaries and (ii) Debt of the Parent in respect of trade payables arising as a result of the deferred purchase price of services from time to time incurred in the ordinary course of business of the Parent; provided that, in respect of each of the foregoing* <u>clause (i)</u> and <u>(ii)</u>, such trade payables are not overdue by more than sixty (60) days or such trade payables *are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;*

(c)     Debt of the Borrower and its Subsidiaries under Capital Leases entered into prior to the Petition Date and set forth on <u>Schedule 9.02(c)</u> hereto;

(d)     Debt of the Borrower and its Subsidiaries associated with worker's compensation claims, *performance, bid, surety or similar bonds or surety obligations for the account of the Borrower and its Subsidiaries to the extent required by any Governmental Requirements and otherwise in connection with the operation of the Oil and Gas Properties; provided that the aggregate amount of such Debt shall not exceed $1,000,000;*

74

(e)    intercompany Debt between the Borrower and any Guarantor (other than the Parent) or between Guarantors (other than the Parent) to the extent permitted by Section 9.05(g); provided that such Debt is not held, assigned, transferred, negotiated or pledged to any Person other than the Borrower or one of its Wholly-Owned Subsidiaries, and, provided, further, that any such Debt owed by either the Borrower or a Guarantor shall be subordinated to the Obligations on terms satisfactory to the Administrative Agent;

(f)    Debt of the Borrower and its Subsidiaries in the form of endorsements of negotiable instruments for collection in the ordinary course of business;

(g)    to the extent set forth on Schedule 9.02(g), Debt in existence on the Petition Date in respect of performance, bid, surety or similar bonds or surety obligations for the account of the Borrower and its Subsidiaries, in each case, to the extent required by any Governmental Requirements applicable to the Borrower and its Subsidiaries and otherwise in connection with the operation of the Oil and Gas Properties of the Borrower and its Subsidiaries, together with all replacements, extensions and renewals thereof made in the ordinary course of business;

(h)    [Reserved];

(i)    [Reserved]; and

(j)    (i) the Prepetition Senior Unsecured Notes, (ii) the Prepetition Second Lien Obligations and (iii) the Prepetition RBL Obligations;

Section 9.03.    Liens.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, create, incur, assume or permit to exist any Lien on any of its Properties (now owned or hereafter acquired), except:

(a)    Liens securing the payment of any Obligations;

(b)    (i) Excepted Liens on any Property of the Borrower and its Subsidiaries, (ii) Excepted Liens on any Property (other than the Parent's right, title and interest in, and to, any and all Equity Interests issued by any of the direct or indirect Subsidiaries of the Parent) of the Parent and (iii) inchoate Tax Liens on the Parent's right, title and interest in, and to, any and all Equity Interests issued by any of the direct or indirect Subsidiaries of the Parent;

(c)    Liens on any Property of the Borrower and its Subsidiaries securing Debt arising in respect of Capital Leases so long as such Indebtedness is permitted under Section 9.02(c); provided that such Liens attach only to the assets acquired with the proceeds of such Indebtedness and do not cover any Hydrocarbon Interests or equity interests in Persons owning direct or indirect interests in Hydrocarbon Interests);

(d)    Liens on any Property of the Borrower and its Subsidiaries existing on the Petition Date and set forth on Schedule 9.03; provided that (i) no such Lien shall at any time be extended to cover any additional property not subject thereto on the Petition Date and (ii) the principal amount of the Debt secured by such Liens shall not be extended, renewed, refunded or refinanced;

(e)    Liens securing the Prepetition RBL Obligations under the Prepetition RBL Loan Documents; provided that such Liens are subject to the terms and conditions of the DIP Order; and

(f)    Adequate Protection Liens;

WEIL:\95962958\14\99980.0531

Section 9.04.   Dividends, Distributions and Redemptions.

(a)   Dividends and Distributions.  The Borrower and the Parent will not, and will not permit any of their respective Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, return any capital to its stockholders, members or partners or make any distribution of its Property to its Equity Interest holders, except (i) the Borrower may declare and pay cash distributions to Parent to permit Parent to pay federal and state Taxes due with respect to the income of the Borrower arising after the Petition Date and to pay federal and state Taxes arising prior to the Petition Date to the extent the payment of such Taxes arising prior to the Petition Date is approved by the Bankruptcy Court and (ii) any Subsidiary may declare and pay cash distributions to the Borrower or any Guarantor other than the Parent.

(b)   Prepayments, Redemptions of Prepetition RBL Loan Obligations, Prepetition Second Lien Debt and Prepetition Senior Unsecured Notes; Certain Amendments.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to make any Redemption or any other prepayments of principal or payment of fees on, or in connection with, the Prepetition RBL Loan Documents, the Prepetition Second Lien Debt Documents or the Prepetition Senior Unsecured Notes (collectively "Restricted Payments"), in each case, other than payments permitted to be made as required by the DIP Orders.  No Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, consent to any amendment, supplement, waiver or other modification of, or enter into any forbearance from exercising any rights with respect to, the terms or provisions contained in any of (i) the Prepetition Senior Unsecured Notes and any documents executed in connection therewith or related thereto, (ii) the Prepetition Second Lien Debt Documents, (iii) the Prepetition RBL Loan Documents or (iv) the documentation relating to any other Debt.

Section 9.05.   Investments, Loans and Advances.  The Parent and the Borrower will not, and will not permit any Subsidiary to, make or permit to remain outstanding any Investments in or to any Person, except that the foregoing restriction shall not apply to:

(a)   Investments in existence on the Petition Date and set forth in Schedule 9.05;

(b)   Investments of the Borrower and its Subsidiaries in the form of accounts receivable arising in the ordinary course of business;

(c)   Investments of the Borrower and its Subsidiaries in the form of direct obligations of the United States or any agency thereof, or obligations guaranteed by the United States or any agency thereof, in each case maturing within one year from the date of creation thereof;

(d)   Investments of the Borrower and its Subsidiaries in the form of commercial paper maturing within one year from the date of creation thereof rated in the highest grade by S&P or Moody's;

(e)   Investments of the Borrower and its Subsidiaries in the form of deposits maturing within one year from the date of creation thereof with, including certificates of deposit issued by, any Lender or any office located in the United States of any other bank or trust company which is organized under the laws of the United States or any state thereof, has capital, surplus and undivided profits aggregating at least $100,000,000 (as of the date of such bank or trust company's most recent financial reports) and has a short term deposit rating of no lower than A2 or P2, as such rating is set forth from time to time, by S&P or Moody's, respectively;

76

(f)     Investments of the Borrower and its Subsidiaries in the form of deposits in money market funds investing exclusively in Investments described in Section 9.05(c), Section 9.05(d) or Section 9.05(e);

(g)     Investments (i) made by the Borrower in or to the Guarantors (other than Parent), and (ii) made by any Subsidiary in or to the Borrower or any Guarantor (other than Parent);

(h)     [Reserved];

(i)     Investments made by the Borrower or any of its Subsidiaries in direct ownership interests in additional Oil and Gas Properties and gas gathering systems related thereto or related to farm-out, farm-in, joint operating, joint venture or area of mutual interest agreements, gathering systems, pipelines or other similar arrangements which are usual and customary in the oil and gas exploration and production business located within the geographic boundaries of the United States of America, provided that (A) the Borrower shall be in compliance, on a pro forma basis after giving effect to any such Investment, with Section 9.01, and (B) no Default shall have occurred and be continuing or would result therefrom;

(j)     [Reserved;]

(k)     other Investments of the Borrower and its Subsidiaries not to exceed $1,000,000 in the aggregate at any time.

Section 9.06.    Nature of Business; International Operations.  The Parent and the Borrower will not, and will not permit their respective Subsidiaries to, allow any material change to be made in the character of its business as currently conducted by it and business activities reasonably incidental thereto as an independent oil and gas exploration and production company with operations in the continental United States.  From and after the date hereof, the Parent and the Borrower and their respective Subsidiaries will not acquire or make any other expenditure (whether such expenditure is capital, operating or otherwise) in or related to, any Oil and Gas Properties not located within the geographical boundaries of the United States.

Section 9.07.    [Reserved].

Section 9.08.    Proceeds of Loans.  Neither the Parent, the Borrower nor any Person acting on behalf of the Parent or the Borrower has taken or will take any action which might cause any of the Loan Documents to violate Regulations T, U or X or any other regulation of the Board, to violate Section 7 of the Securities Exchange Act of 1934 or any rule or regulation thereunder or to violate any Anti-Corruption Law or applicable Sanctions, in each case as now in effect or as the same may hereafter be in effect.  If requested by the Administrative Agent, the Parent and the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form U-1 or such other form referred to in Regulation U, Regulation T or Regulation X of the Board, as the case may be.

Section 9.09.    ERISA Compliance.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, at any time:

(a)     engage in, or permit any ERISA Affiliate to engage in, any transaction in connection with which the Borrower, the Parent or a Subsidiary or any ERISA Affiliate could be subjected to either a civil penalty assessed pursuant to subsections (c), (i) or (l) of Section 502 of ERISA or a tax imposed by Chapter 43 of Subtitle D of the Code.

(b)     terminate, or permit any ERISA Affiliate to terminate, any Plan in a manner, or take any other action with respect to any Plan, which could result in any liability of the Borrower, the Parent or a Subsidiary or any ERISA Affiliate to the PBGC.

(c)     fail to make, or permit any ERISA Affiliate to fail to make, full payment when due of all amounts which, under the provisions of any Plan, agreement relating thereto or applicable law, the Borrower, the Parent or a Subsidiary or any ERISA Affiliate is required to pay as contributions thereto.

(d)     permit to exist, or allow any ERISA Affiliate to permit to exist, any accumulated funding deficiency within the meaning of Section 302 of ERISA or Section 412 of the Code, whether or not waived, with respect to any Plan.

(e)     permit, or allow any ERISA Affiliate to permit, the actuarial present value of the benefit liabilities under any Plan maintained by the Borrower, the Parent or a Subsidiary or any ERISA Affiliate which is regulated under Title IV of ERISA to exceed the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities. The term "actuarial present value of the benefit liabilities" shall have the meaning specified in Section 4041 of ERISA.

(f)     contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to, any Multiemployer Plan.

(g)     acquire, or permit any ERISA Affiliate to acquire, an interest in any Person that causes such Person to become an ERISA Affiliate with respect to the Borrower, the Parent or a Subsidiary or with respect to any ERISA Affiliate of the Borrower, the Parent or a Subsidiary if such Person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained, or contributed to, (1) any Multiemployer Plan, or (2) any other Plan that is subject to Title IV of ERISA under which the actuarial present value of the benefit liabilities under such Plan exceeds the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities.

(h)     incur, or permit any ERISA Affiliate to incur, a liability to or on account of a Plan under Sections 515, 4062, 4063, 4064, 4201 or 4204 of ERISA.

(i)     contribute to or assume an obligation to contribute to, or permit any ERISA Affiliate to contribute to or assume an obligation to contribute to, any employee welfare benefit plan, as defined in Section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by such entities in their sole discretion at any time without any material liability.

(j)     amend, or permit any ERISA Affiliate to amend, a Plan resulting in an increase in current liability such that the Borrower, the Parent or a Subsidiary or any ERISA Affiliate is required to provide security to such Plan under Section 401(a)(29) of the Code.

Section 9.10.   Sale or Discount of Receivables.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, discount or sell (with or without recourse) any of its notes receivable or accounts receivable.

Section 9.11.   Mergers, Etc.  Neither the Parent, the Borrower nor any of their respective Subsidiaries will merge into or with or consolidate with any other Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property to any other Person.

WEIL:\95962958\14\99980.0531

Section 9.12.   Sale of Properties.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, sell, assign, farm-out, convey or otherwise transfer any Property, including without limitation, Equity Interests of the Parent, the Borrower or any of their respective Subsidiaries, except for:

(a)      the sale of Hydrocarbons of the Borrower and its Subsidiaries in the ordinary course of business;

(b)      farmouts of undeveloped acreage of the Borrower and its Subsidiaries and assignments in connection with such farmouts and reassignments of Oil and Gas Property to a farmout upon expiration or termination of a farmout, in each case, in the ordinary course of business;

(c)      the sale or transfer of equipment of the Borrower and its Subsidiaries that is no longer necessary for the business of the Borrower or such Subsidiary or is replaced by equipment of at least comparable value and use; and

(d)      Dispositions of any Property of the Borrower and its Subsidiaries not otherwise permitted by this Section 9.12, provided that (i) no Default or Event of Default shall have occurred and be continuing or result therefrom and (ii) the aggregate fair market value of such Dispositions shall not exceed $5,000,000 in the aggregate.

Section 9.13.   Environmental Matters.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, cause or permit any of its Property which such Persons operate to be in violation of, or do anything or permit anything to be done which will subject any such Property to any Remedial Work under any Environmental Laws, assuming disclosure to the applicable Governmental Authority of all relevant facts, conditions and circumstances, if any, pertaining to such Property.  The Borrower will use its reasonable efforts to cause the operator of Properties which the Borrower or any Subsidiary does not operate to comply with the terms and provisions of this Section 9.13.

Section 9.14.   Transactions with Affiliates.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property or the rendering of any service, with any Affiliate (other than the Guarantors and Wholly-Owned Subsidiaries of the Borrower) other than transactions or arrangements in place as of the Petition Date (including contractual obligations in place at such time) or approved by the Bankruptcy Court pursuant to an order in form and substance satisfactory to the Administrative Agent and the Majority Lenders.

Section 9.15.   Subsidiaries.  The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, create or acquire any additional Subsidiary.  The Parent and the Borrower shall not, and shall not permit any of their respective Subsidiaries to, Dispose of any Equity Interests in any such Subsidiary.  None of the Borrower, the Parent nor any Subsidiary shall create, form or otherwise hold or acquire any Foreign Subsidiaries.

Section 9.16.   Negative Pledge Agreements; Dividend Restrictions.  No Loan Party nor any of such Loan Party's Subsidiaries shall enter into or permit to exist any contractual obligation (other than this Agreement, any other Loan Document, the Prepetition RBL Loan Documents or the Prepetition Second Lien Debt Documents or, with respect to clause (b) only, the Prepetition Senior Unsecured Notes) that limits the ability (a) of any Subsidiary to make Restricted Payments to or otherwise transfer property to Parent, the Borrower or any Guarantor, (b) of Parent to guarantee the Obligations, or any Subsidiary to guarantee the Obligations, or (c) of Parent, the Borrower, or any Subsidiary to create, incur, assume or

79

suffer to exist Liens on property of such Person to secure the Obligations, except restrictions imposed pursuant to an agreement entered into in connection with a Disposition permitted under Section 9.12.

Section 9.17.   Gas Imbalances, Take-or-Pay or Other Prepayments.   The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, (a) incur, become or remain liable for, any Material Gas Imbalance, or (b) allow take-or-pay or other prepayments with respect to the Oil and Gas Properties of the Borrower or any Subsidiary that would require the Borrower or such Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor.

Section 9.18.   Swap Agreements.   The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, enter into any Swap Agreements with any Person other than Swap Agreements of the Borrower and any Subsidiary in respect of commodities (x) with an Approved Counterparty and (y) the notional volumes for which (when aggregated with other commodity Swap Agreements then in effect other than basis differential swaps on volumes already hedged pursuant to other Swap Agreements) do not (and in connection with any future acquisition of Oil and Gas Properties, after giving effect to such future acquisition on a pro forma basis):

(i)      exceed the greater of, during any five year period beginning on the date of the most recently delivered Projected Production Report:

(A)      85% of the Projected Production for such five-year period for each of crude oil and natural gas, calculated separately, and

(B)      for Projected Production from Proved Reserves constituting PDP only, (x) for the first 24 months following such date, 100% of such Projected Production for such 24-month period for each of crude oil and natural gas, calculated separately, and (y) for the period from the 25th month through the 48th month following such date, 90% of such Projected Production for such 24-month period for each of crude oil and natural gas, calculated separately, and (z) for such period from the 49th month through the 60th month following such date, 85% of the Projected Production for such 12-month period for each of crude oil and natural gas, calculated separately.   For purposes of this calculation, the Borrower may, in its discretion, include natural gas liquids production in natural gas or crude oil calculations so long as the Borrower and its Subsidiaries are in compliance with the preceding restrictions, and

(ii)     include more than 50% of the Projected Production for such five-year period from Proved Reserves constituting PUD.

Section 9.19.   Marketing Activities.   The Parent and the Borrower will not, and will not permit any of their respective Subsidiaries to, engage in marketing activities for any Hydrocarbons or enter into any contracts related thereto other than marketing activities and such contracts of the Borrower and its Subsidiaries (i) as are in effect on the Petition Date and (ii) as entered into from time to time in the ordinary course of business of the Borrower and its Subsidiaries.

Section 9.20.   Liquidation of Swap Agreements.   Neither the Parent, the Borrower nor any their respective Subsidiaries shall Liquidate any Swap Agreement (including, without limitation, any transaction thereunder); provided that the foregoing shall not prohibit the Liquidation of Swap Agreements (including, without limitation, any transactions thereunder) to the extent the Net Cash Proceeds of any such Liquidation are, subject to the DIP Orders, applied to the Borrowings as required by Section 3.04(c)(iv).

WEIL:\95962958\14\99980.0531

Section 9.21.   <u>Budget Variances</u>.   As of any Variance Testing Date, for the Testing Period ending on such Variance Testing Date, the Parent and the Borrower shall not allow the aggregate disbursements (excluding disbursements in respect of Professional Fees by the Loan Parties during such Testing Period) made by the Loan Parties and their respective Subsidiaries during such Testing Period to be greater than 115% of the aggregate disbursements for the Loan Parties and their respective Subsidiaries set forth in the Budget for such Testing Period (after giving effect to the accrued and unused portion of the most recent rolling 4-week carryover) (the variances described in the foregoing, the "<u>Permitted Variances</u>").

Section 9.22.   <u>Accounting Changes</u>.   No Loan Party shall, or permit any of its Subsidiaries to, (i) make any significant change in accounting treatment or reporting practices, except as required by GAAP, or (ii) change the fiscal year of any Loan Party or of any of its Subsidiaries.

Section 9.23.   <u>Passive Holding Company; Etc</u>.   The Parent will not conduct, transact or otherwise engage in any business or operations other than (i) the ownership and/or acquisition of the Equity Interests (other than Disqualified Capital Stock) of the Borrower, (ii) the maintenance of its legal existence, including the ability to incur fees, costs and expenses relating to such maintenance, (iii) to the extent applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of Parent and the Borrower and (iv) the performance of its obligations under and in connection with the Loan Documents, the Chapter 11 Cases, the Prepetition Senior Unsecured Notes, the Prepetition Second Lien Debt Documents and any documents relating to other Indebtedness permitted under <u>Section 9.02</u>.

ARTICLE X

EVENTS OF DEFAULT; REMEDIES

Section 10.01.   <u>Events of Default</u>.   One or more of the following events shall constitute an "<u>Event of Default</u>":

(a)      the Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement when and as the same shall become due and payable (other than LC Disbursements which are repaid through an ABR Borrowing as permitted by <u>Section 2.08(e)</u> hereof), whether at the due date thereof or at a date fixed for prepayment thereof, by acceleration or otherwise;

(b)      the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in <u>Section 10.01(a)</u>) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days;

(c)      any representation or warranty made or deemed made by or on behalf of the Parent, the Borrower or any Subsidiary in, or in connection with, any Loan Document or any amendment or modification of any Loan Document or waiver under such Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect when made or deemed made;

(d)      the Parent, the Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in <u>Section 2.12(a)(i)(B)</u>, <u>Section 8.01(a)</u>, <u>Section 8.01(b)</u>, <u>Section 8.01(j)</u>, <u>Section 8.01(k)</u>, <u>Section 8.01(m)</u>, <u>Section 8.01(p)</u>, <u>Section 8.01(t)</u>, <u>Section 8.02</u>, <u>Section 8.03</u>, <u>Section 8.13</u>, <u>Section 8.14</u>, <u>Section 8.15</u>, <u>Section 8.17</u>, <u>Section 8.18</u> or in <u>Article IX</u>.

WEIL:\95962958\14\99980.0531

(e)       the Parent, the Borrower or any Subsidiary shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those specified in Section 10.01(a), Section 10.01(b) or Section 10.01(d)) or any other Loan Document, and such failure shall continue unremedied for a period of 15 days after the earlier to occur of (A) notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender) or (B) a Responsible Officer of the Borrower or such Subsidiary otherwise becoming aware of such default.

(f)       the Parent, the Borrower or any Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness incurred on or after the Petition Date.

(g)       any event or condition occurs that results in any Material Indebtedness incurred on or after the Petition Date becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any such Material Indebtedness or any trustee or agent on its or their behalf to cause any such Material Indebtedness to become due, or to require the Redemption thereof or any offer to Redeem to be made in respect thereof, prior to its scheduled maturity or require the Parent, the Borrower or any Subsidiary to make an offer in respect thereof;

(h)       any Change in Control;

(i)       **[Reserved]**;

(j)       **[Reserved]**;

(k)       with respect to the Parent, the Borrower or any Subsidiary: (i) one or more judgments for the payment of money in an aggregate amount in excess of $1,000,000 (to the extent not covered by independent third party insurance provided by insurers of the highest claims paying rating or financial strength as to which the insurer does not dispute coverage and is not subject to an insolvency proceeding) or (ii) any one or more non-monetary judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, shall be rendered against the Parent, the Borrower, any Subsidiary or any combination thereof, and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Parent, the Borrower or any Subsidiary to enforce any such judgment.

(l)       the Loan Documents after delivery thereof shall for any reason cease to be in full force and effect and valid, binding and enforceable in accordance with their terms against any Loan Party party thereto or shall be repudiated by any of them, or cease to create a valid and perfected Lien of the priority required thereby on any of the collateral purported to be covered thereby or the Parent, the Borrower or any Subsidiary or any of their Affiliates shall so state in writing.

(m)       an ERISA Event shall have occurred that, in the opinion of the Majority Lenders, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in liability of the Parent, the Borrower and the Subsidiaries in an aggregate amount exceeding $1,000,000 in any year.

(n)       the occurrence of any early Termination Date (as defined in such Swap Agreement) under any Swap Agreement entered into after the Petition Date resulting from (i) any event of default under such Swap Agreement to which the Borrower or any Subsidiary is the Defaulting Party (as defined in such Swap Agreement), or (ii) any Termination Event (as so defined) under such Swap Agreement as

82

to which the Borrower or any Subsidiary is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Borrower or such Subsidiary as a result thereof exceeds $1,000,000 in the aggregate;

(o)     **[Reserved];**

(p)     **[Reserved];**

(q)     **[Reserved];**

(r)     **[Reserved];**

(s)     the filing of a motion by any of the Loan Parties seeking dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(t)     the dismissal or conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(u)     the appointment of a trustee, examiner or other person with expanded powers in any of the Chapter 11 Cases;

(v)     the Bankruptcy Court's entry of an order granting any lien or claim that is senior to or *pari passu* with the Administrative Agent's liens and claims under the DIP Facility without the prior written consent of the Administrative Agent and the Majority Lenders;

(w)     the payment or granting of adequate protection with respect to any Indebtedness in an amount in excess of $1,000,000 (other than as described herein or the applicable DIP Order) without the prior written consent of the Prepetition RBL Agent;

(x)     (i) any Liens granted with respect to the DIP Facility or the Obligations shall cease to be valid, perfected and enforceable in all material respects with the priority set forth in the DIP Order, (ii) the Obligations shall cease to be valid and enforceable or shall cease to have the superpriority claims status set forth in the DIP Orders, or (iii) the disallowance, expungement, extinguishment or impairment of any portion of the Obligations;

(y)     the filing of a motion by any of the Loan Parties seeking, or the entry of, one or more orders of the Bankruptcy Court (i) reversing, amending, supplementing, vacating, or otherwise modifying the Interim Order or Final Order, as applicable, without the prior written consent of the Administrative Agent and the Majority Lenders, or (ii) avoiding or requiring repayment of any of the payments made to the Administrative Agent or the Lenders in accordance with the terms hereof;

(z)     the entry of one or more orders of the Bankruptcy Court modifying the automatic stay with respect to assets having a value in excess of $1,000,000 in the aggregate without the prior written consent of the Majority Lenders;

(aa)    failure to satisfy any of the Plan Milestones in accordance with the terms relating to such Plan Milestone;

(bb)    there shall be a breach by any Debtor of any provisions of the Interim DIP Order (prior to entry of the Final DIP Order) or the Final DIP Order, or the Interim DIP Order (prior to entry of the Final DIP Order) or Final DIP Order shall cease to be in full force and effect or shall have been reversed,

83

modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of the DIP Agent and Majority DIP Lenders; or

(cc)     entry of an order precluding the Prepetition RBL Agent, the Prepetition RBL Lenders, the Administrative Agent and/or the Lenders from "credit bidding".

Section 10.02.  Remedies.

(a)     Upon the occurrence and continuance of any Event of Default, (i) the Administrative Agent, upon the written request of the Majority Lenders, shall (A) deliver a notice to the Company of the Event of Default, (B) terminate the Commitments, and thereupon the Commitments shall terminate immediately unless and until the Majority Lenders and the Administrative Agent shall reinstate the same in writing, (C) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other Obligations), shall become due and payable immediately, in each case, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other notice of any kind, all of which are hereby waived by each Loan Party, (D) terminate the DIP Facility and (E) charge the Default Rate; and (ii) upon five Business Days' written notice to the Borrower and the Administrative Agent from the Majority Lenders, in their sole and absolute discretion, the automatic stay of section 362 of the Bankruptcy Code shall be terminated without any further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading, for the purpose of permitting the Lenders to do any of the following: (A) direct the Administrative Agent to foreclose on the Collateral and (B) enforce all of the Lenders' rights under the Guaranty and under the other Loan Documents.

(b)     In the case of the occurrence of an Event of Default and at any time thereafter during the continuance of such Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

(c)     All proceeds realized from the liquidation or other disposition of collateral or otherwise received after maturity of the Loans, whether by acceleration or otherwise, shall be applied:

First, to payment or reimbursement of that portion of the Obligations constituting fees, expenses, indemnities and other amounts (including all fees, costs and disbursements of counsel to the Administrative Agent, and amounts payable under Article V) payable to the Administrative Agent in its capacity as such;

Second, pro rata to payment or reimbursement of that portion of the Obligations constituting fees, expenses and indemnities payable to the Issuing Bank and to the Lenders;

Third, pro rata to payment of (i) accrued and unpaid interest on the Loans and LC Disbursements, (ii) fees on each Letter of Credit and (iii) other accrued and unpaid interest included in the Obligations;

Fourth, pro rata to payment of (i) principal outstanding on the Loans, and (ii) Obligations then owing under any Secured Treasury Management Agreement;

Fifth, to serve as Cash Collateral to be held by the Administrative Agent to secure the LC Exposure;

84

*Sixth,* pro rata to any other unpaid Obligations; and

*Seventh,* any excess, after all of the Obligations shall have been paid in full in cash, shall be held as required by the Bankruptcy Court and/or any Governmental Requirement.

Subject to Sections 2.08 and 2.11, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Fifth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

Notwithstanding the foregoing, Obligations arising under Secured Treasury Management Agreements shall be excluded from the application described above if the Administrative Agent has not received written notice thereof, together with such supporting documentation as the Administrative Agent may request, from the applicable Treasury Management Bank. Each Treasury Management Bank not a party to this Agreement that has given the notice contemplated by the preceding sentence shall, by such notice, be deemed to have acknowledged and accepted the appointment of the Administrative Agent pursuant to the terms of Article XI hereof for itself and its Affiliates as if a "Lender" party hereto.

## ARTICLE XI

## THE AGENTS

Section 11.01.  Appointment; Powers.

(a)     Each of the Lenders and the Issuing Bank hereby irrevocably appoints Citibank, N.A. to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders and the Issuing Bank, and neither the Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)     The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (including in its capacity as a Treasury Management Bank) and the Issuing Bank hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender and the Issuing Bank for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 11.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Instruments or any other Loan Document, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article XI and Article XII (including Section 12.03(c), as though such

85

co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 11.02.  Rights as a Lender.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 11.03.  Exculpatory Provisions.

(a)      The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent:

(i)      shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)      shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Majority Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent will not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt, any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii)      shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b)      The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 12.02 and 10.02)), or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent in writing by the Borrower, a Lender or the Issuing Bank.

(c)      The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of

86

any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Instruments, (v) the value or sufficiency of any of the Collateral, or (vi) the satisfaction of any condition set forth in Article VI or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 11.04.  <u>Reliance by Administrative Agent</u>. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, or the issuance, extension, renewal or increase of a Letter of Credit, that by its terms must be fulfilled to the satisfaction of a Lender or the Issuing Bank, the Administrative Agent may presume that such condition is satisfactory to such Lender or the Issuing Bank unless the Administrative Agent shall have received notice to the contrary from such Lender or the Issuing Bank prior to the making of such Loan or the issuance of such Letter of Credit.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 11.05.  <u>Delegation of Duties</u>. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub agents appointed by the Administrative Agent. The Administrative Agent and any such sub agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub agent and to the Related Parties of the Administrative Agent and any such sub agent, and shall apply to their respective activities in connection with the syndication of the Loans as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub agents.

Section 11.06.  <u>Resignation of Administrative Agent and/or Issuing Bank</u>.

(a)     The Administrative Agent may at any time give notice of its resignation to the Lenders, the Issuing Bank and the Borrower.  Upon receipt of any such notice of resignation, the Majority Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders and the Issuing Bank, appoint a successor Administrative Agent meeting the qualifications set forth above; <u>provided</u> that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and the Issuing Bank directly, until such time as the Majority Lenders appoint a successor Administrative Agent

87

as provided for above in this Section.   Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).   The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.   After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 12.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

(b)    Any resignation by Citibank, N.A. as Administrative Agent pursuant to this Section shall also constitute its resignation as Issuing Bank.   After the resignation of the Issuing Bank hereunder, the retiring Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement and the other Loan Documents with respect to Letters of Credit issued by it prior to such resignation, but shall not be required to issue additional Letters of Credit or to extend, renew or increase any existing Letter of Credit, including, without limitation, any Letter of Credit with an auto-extend feature (for the avoidance of doubt, the retiring Issuing Bank is authorized to notify any and each beneficiary of each Letter of Credit (in accordance with the terms of such Letter of Credit) that any such Letter of Credit will not be renewed, extended or increased, automatically or otherwise).   Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank, (ii) the retiring Issuing Bank and shall be discharged from all of their respective duties and obligations hereunder or under the other Loan Documents, and (iii) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

(c)    In addition to the foregoing, if a Lender becomes, and during the period it remains, a Defaulting Lender or a Potential Defaulting Lender, the Issuing Bank may, upon prior written notice to the Borrower and the Administrative Agent, resign as Issuing Bank, effective at the close of business New York time on a date specified in such notice (which date may not be less than 30 days after the date of such notice); provided that such resignation by the Issuing Bank will have no effect on the validity or enforceability of any Letter of Credit then outstanding or on the obligations of the Borrower or any Lender under this Agreement with respect to any such outstanding Letter of Credit or otherwise to the Issuing Bank.

Section 11.07.   Non-Reliance on Administrative Agent and Other Lenders.   Each Lender and the Issuing Bank acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender and the Issuing Bank also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 11.08.   No Other Duties, etc.   Anything herein to the contrary notwithstanding, none of the Bookrunners, Arrangers, Documentation Agents or Syndication Agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan

WEIL:\95962958\14\99980.0531

Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender or the Issuing Bank hereunder. No Bookrunner, Arranger, Documentation Agent or Syndication Agent listed on the cover page hereof shall have or be deemed to have any fiduciary relationship with any Lender.

Section 11.09.  <u>Administrative Agent May File Proofs of Claim</u>.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or LC Exposure shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, LC Exposure and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Issuing Bank and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Issuing Bank and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders, the Issuing Bank and the Administrative Agent under <u>Sections 3.05</u> and <u>12.03</u>) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender and the Issuing Bank to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders and the Issuing Bank, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Section 12.03</u>.

Section 11.10.  <u>Collateral and Guaranty Matters</u>.

(a)     Each of Lenders and the other Secured Parties (including each Lender in its capacity as a potential Treasury Management Bank), and the Issuing Bank, irrevocably authorize the Administrative Agent, at its option and in its discretion,

(i)     to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (x) upon termination of all of the Aggregate Commitments and payment in full of all Obligations (other than contingent indemnification obligations) and the expiration or termination of all Letters of Credit (other than Letters of Credit as to which other arrangements satisfactory to the Administrative Agent and the Issuing Bank shall have been made), (y) that is Disposed of or to be Disposed of as part of or in connection with any Disposition permitted under the Loan Documents, or (z) subject to <u>Section 12.02</u>, if approved, authorized or ratified in writing by the Majority Lenders;

(ii)     to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by <u>Section 9.03</u>; and

(iii)     to release any Guarantor from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents.

WEIL:\95962958\14\99980.0531

Upon request by the Administrative Agent at any time, the Majority Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Article XI. In each case as specified in this Section 11.10, the Administrative Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Security Instruments and the other Loan Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 11.10.

(b)     The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

(c)     The Secured Parties further irrevocably authorize the Administrative Agent, at their option and in their discretion, without the necessity of any notice to or further consent from the Secured Parties, at the at the direction of the Majority Lenders, to credit bid and purchase (either directly or through one or more acquisition vehicles) or to Dispose of (or to consent to any such Disposition of) all or any portion of the Collateral at any sale thereof conducted by the Administrative Agent under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or pursuant to a plan of reorganization, or at any sale or foreclosure conducted by the Administrative Agent (whether by judicial action or otherwise) in accordance with applicable law.

Section 11.11. Secured Treasury Management Agreements. No Treasury Management Bank that obtains the benefits of Section 10.02(c), any Guaranty or any Collateral by virtue of the provisions hereof or of any Guaranty, any Security Instrument or any other Loan Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. Notwithstanding any other provision of this Article XI to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Treasury Management Agreements unless the Administrative Agent has received written notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Treasury Management Bank.

ARTICLE XII

MISCELLANEOUS

Section 12.01. Notices.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to Section 12.01(b)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

(i)        if to the Borrower or any other Loan Party, to it at

> 5847 San Felipe, Suite 3000
> Houston, Texas  77057-3399
> Attn:  Mr. Richard Robert
> Facsimile No: 832-327-2260
> Telephone: 832-327-2258
> Electronic Mail Address:  rrobert@vnrllc.com
> Website Address (for Section 8.02 purposes): www.vnrllc.com

(ii)      if to the Administrative Agent, to it at

> Citibank, N.A.
> 811 Main Street, Suite 4000
> Houston, TX  77002
> Attention:  Mr. Phil Ballard
> Facsimile No:  281-271-8970
> Telephone:  713-821-4789
> Electronic Mail Address: phil.ballard@citi.com

> with a copy to:

> Weil, Gotshal & Manges LLP
> 200 Crescent Court, Suite 300
> Dallas, TX  75201
> Attention:  Mr. Aaron Turner
> Telephone:  214-746-8503
> Electronic Mail Address: aaron.turner@weil.com

(iii)    if to the Issuing Bank, to it at

> Citibank, N.A.
> 811 Main Street, Suite 4000
> Houston, TX  77002
> Attention:  Ms. Hilda Munoz
> Facsimile No: 713-481-0252
> Telephone: 713-821-4738
> Electronic Mail Address:  hilda.g.munoz@citi.com

(iv)    if to any other Lender, to it at its address (or facsimile number), or electronic mail address set forth in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices delivered through electronic communications to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)    Notices and other communications to the Lenders and the Issuing Bank hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites)

pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to any Lender or the Issuing Bank pursuant to Article II, Article III, Article IV and Article V if such Lender or the Issuing Bank, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that for both clauses (i) and (ii) above, if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)     Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(d)     Platform.

(i)     Each Loan Party agrees that the Administrative Agent and/or the Arrangers may, but shall not be obligated to, make the Communications (as defined below) available to the Issuing Bank and the other Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the "Platform").

(ii)     The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower or the other Loan Parties, any Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of the Borrower's, any Loan Party's or the Administrative Agent's transmission of communications through the Platform. "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of the Borrower, any Loan Party nor Parent pursuant to any Loan Document or the transactions contemplated therein which is distributed to the Administrative Agent, any Lender or the Issuing Bank by means of electronic communications, including through the Platform.

(iii)     Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Communications

92

that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower, any of the other Loan Parties, or Parent, or their securities for purposes of United States Federal or state securities laws.

Section 12.02.   Waivers; Amendments.

(a)     No failure on the part of the Administrative Agent, any other Agent, the Issuing Bank or any Lender to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege, or any abandonment or discontinuance of steps to enforce such right, power or privilege, under any of the Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any of the Loan Documents preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies of the Administrative Agent, any other Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 12.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any other Agent, any Lender or the Issuing Bank may have had notice or knowledge of such Default at the time.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 10.02 for the benefit of all the Lenders and the Issuing Bank; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as the Administrative Agent) hereunder and under the other Loan Documents, (b) the Issuing Bank from exercising the rights and remedies that inure to its benefit (solely in its capacity as Issuing Bank) hereunder and under the other Loan Documents, (c) any Lender from exercising setoff rights in accordance with Section 12.08 (subject to the terms of Section 4.01), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any debtor relief law; and provided, further, that if at any time there is no Person acting as the Administrative Agent hereunder and under the other Loan Documents, then (i) the Majority Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 10.02 and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to Section 4.01, any Lender may, with the consent of the Majority Lenders, enforce any rights and remedies available to it and as authorized by the Majority Lenders.

(b)     Neither this Agreement nor any provision hereof nor any other Loan Document nor any provision thereof may be waived, amended or modified, except pursuant to an agreement or agreements in writing entered into by the Borrower and the Majority Lenders or by the Borrower and the Administrative Agent with the consent of the Majority Lenders; provided that no such agreement shall (i) increase the Aggregate Commitments or the Commitment of any Lender without the written consent of such Lender, (ii) reduce the principal amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any fees payable hereunder, or reduce any other Obligations hereunder or under any other Loan Document, without the written consent of each Lender affected thereby, (iii) postpone the scheduled date of payment or prepayment of the principal amount of any Loan or LC Disbursement, or any interest thereon, or any fees payable hereunder, or any other Obligations hereunder

93

or under any other Loan Document, or reduce the amount of, waive or excuse any such payment, or postpone or extend the Termination Date without the written consent of each Lender affected thereby, (iv) change  Section 2.02(a),  Section 2.04(a),  Section 2.06(b)(ii),  Section 3.04(b),  Section 4.01(b), Section 4.01(c) or Section 10.02(c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender affected thereby, (v) waive or amend Section 8.14, without the written consent of each Lender affected thereby, (vi) release all or substantially all of the Guarantors (except in accordance with the terms of the Guaranty), release all or substantially all of the Collateral (other than as provided in Section 11.10), without the written consent of each Lender affected thereby, or (vii) change any of the provisions of this Section 12.02(b) or the definition of "Majority Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or under any other Loan Documents or make any determination or grant any consent hereunder or any other Loan Documents, without the written consent of each Lender affected thereby; provided, further, that notwithstanding the foregoing or any other provision to the contrary, (A) no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, any other Agent, or the Issuing Bank hereunder or under any other Loan Document without the prior written consent of the Administrative Agent, such other Agent or the Issuing Bank, as the case may be, and (B) nothing in this Section 12.02 shall cause any waiver, amendment, modification or consent to (1) any fee letter between the Borrower and any Lender, Agent or the Administrative Agent or the Issuing Bank to require the consent of the Majority Lenders, (2) any Letter of Credit Agreements between the Borrower or any Subsidiary of the Borrower and the Issuing Bank to require the consent of the Majority Lenders, (3) any Letter of Credit issued by the Issuing Bank pursuant to the terms of this Agreement to require the consent of the Majority Lenders except as specifically required by Section 2.08, or (4) any Secured Treasury Management Agreement to require the consent of the Majority Lenders.

(c)     Anything herein to the contrary notwithstanding, during such period as a Lender is a Defaulting Lender, to the fullest extent permitted by applicable law, such Lender will not be entitled to vote in respect of amendments and waivers hereunder and the Commitment and the outstanding Loans or other extensions of credit of such Lender hereunder will not be taken into account in determining whether the Majority Lenders or all of the Lenders, as required, have approved any such amendment or waiver (and the definition of "Majority Lenders" will automatically be deemed modified accordingly for the duration of such period); provided, that any such amendment or waiver that would increase or extend the term of the Commitment of such Defaulting Lender, extend the date fixed for the payment of principal or interest owing to such Defaulting Lender hereunder, reduce the principal amount of any obligation owing to such Defaulting Lender, reduce the amount of or the rate or amount of interest on any amount owing to such Defaulting Lender or of any fee payable to such Defaulting Lender hereunder, or alter the terms of this proviso, will require the consent of such Defaulting Lender.

Section 12.03.   Expenses, Indemnity; Damage Waiver.

(a)     The Borrower shall pay, on a monthly basis (and in any event promptly following written demand therefor), without the requirement of prior Bankruptcy Court approval and whether incurred before or after the Petition Date, (i) all out-of-pocket expenses incurred by the Administrative Agent and its Affiliates in connection with in the preparation, negotiation, execution, delivery and administration (both before and after the execution hereof) of this Agreement and the other Loan Documents and any amendments, modifications or waivers of or consents related to the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all costs, expenses, Taxes, assessments and other charges incurred by any Agent or any Lender in connection with any filing, registration, recording or perfection of any security interest contemplated by this Agreement, any Security Instrument or any other Loan Document or any other document referred to herein or therein, (iii) all out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, (iv) all out-of-pocket expenses

94

incurred by any Agent, the Issuing Bank or any Lender in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 12.03, or (B) in connection with the Loans made or Letters of Credit issued hereunder, including, without limitation, all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit. The Borrower shall also pay the fees and expenses of the attorneys and advisors for the Administrative Agent, any Lender or the Issuing Bank on the Interim Facility Effective Date and thereafter as provided under the Budget, whether or not incurred prior to, on or after the Petition Date. Invoices supporting such fees and expenses shall be submitted to counsel for the Loan Parties, with copies to the U.S. Trustee and counsel for any Committee (invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine). No attorney or advisor to the Administrative Agent, any Lender or the Issuing Bank shall be required to file an application seeking compensation for services or reimbursement of expenses with the Bankruptcy Court. The U.S. Trustee, the Loan Parties, and any Committee shall have ten (10) Business Days in which to raise an objection to the fees and expenses of such attorneys and advisors. In the event any such payment would be required to be repaid to the Loan Parties as a result of application of Section 506(b) of the Bankruptcy Code or otherwise, any such amounts shall not be repaid and instead shall be applied as follows: first, to the Obligations until such Indebtedness is indefeasibly paid in full, in cash; second, to the Prepetition RBL Obligations until such Indebtedness is paid in full, in cash; and third, to the Borrower and its estate.

(b)     THE BORROWER SHALL INDEMNIFY THE ADMINISTRATIVE AGENT (AND ANY SUB-AGENT THEREOF), EACH LENDER, EACH ARRANGER AND THE ISSUING BANK, AND EACH RELATED PARTY OF ANY OF THE FOREGOING PERSONS (EACH SUCH PERSON BEING CALLED AN "INDEMNITEE") AGAINST, AND HOLD EACH INDEMNITEE HARMLESS FROM, ANY AND ALL LOSSES, CLAIMS, DAMAGES, LIABILITIES, PENALTIES AND RELATED EXPENSES (INCLUDING THE FEES, CHARGES AND DISBURSEMENTS OF ANY COUNSEL FOR ANY INDEMNITEE), AND SHALL INDEMNIFY AND HOLD HARMLESS EACH INDEMNITEE FROM ALL FEES AND TIME CHARGES AND DISBURSEMENTS FOR ATTORNEYS WHO MAY BE EMPLOYEES OF ANY INDEMNITEE, INCURRED BY ANY INDEMNITEE OR ASSERTED AGAINST ANY INDEMNITEE BY ANY PERSON OR BY THE BORROWER OR ANY OTHER LOAN PARTY ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF (I) THE EXECUTION OR DELIVERY OF THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, THE PERFORMANCE BY THE PARTIES HERETO OR THE PARTIES TO ANY OTHER LOAN DOCUMENT OF THEIR RESPECTIVE OBLIGATIONS HEREUNDER OR THEREUNDER OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, (II) ANY LOAN OR LETTER OF CREDIT OR THE USE OR PROPOSED USE OF THE PROCEEDS THEREFROM (INCLUDING ANY REFUSAL BY THE ISSUING BANK TO HONOR A DEMAND FOR PAYMENT UNDER A LETTER OF CREDIT IF THE DOCUMENTS PRESENTED IN CONNECTION WITH SUCH DEMAND DO NOT STRICTLY COMPLY WITH THE TERMS OF SUCH LETTER OF CREDIT), (III) ANY ACTUAL OR ALLEGED PRESENCE OR RELEASE OF HAZARDOUS MATERIALS ON OR FROM ANY PROPERTY OWNED OR OPERATED BY THE BORROWER OR ANY OF THE SUBSIDIARIES OR OTHER LOAN PARTIES, OR ANY ENVIRONMENTAL LIABILITY RELATED IN ANY WAY TO THE BORROWER OR ANY OF THE SUBSIDIARIES OR OTHER LOAN PARTIES, (IV) OR THE PAYMENT OF A DRAWING UNDER ANY LETTER OF CREDIT NOTWITHSTANDING THE NON-COMPLIANCE, NON-DELIVERY OR OTHER IMPROPER PRESENTATION OF THE DOCUMENTS PRESENTED IN CONNECTION THEREWITH, (V) ANY OTHER ASPECT OF THE LOAN DOCUMENTS, (VI) THE OPERATIONS OF THE BUSINESS OF THE BORROWER AND

ITS SUBSIDIARIES BY THE BORROWER AND ITS SUBSIDIARIES, (VII) ANY ASSERTION THAT THE LENDERS WERE NOT ENTITLED TO RECEIVE THE PROCEEDS RECEIVED PURSUANT TO THE SECURITY INSTRUMENTS AND THE OTHER LOAN DOCUMENTS, (VIII) ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY OR ANY OF THEIR PROPERTIES, INCLUDING WITHOUT LIMITATION, THE PRESENCE, GENERATION, STORAGE, RELEASE, THREATENED RELEASE, USE, TRANSPORT, DISPOSAL, ARRANGEMENT OF DISPOSAL OR TREATMENT OF OIL, OIL AND GAS WASTES, SOLID WASTES OR HAZARDOUS SUBSTANCES ON ANY OF THEIR PROPERTIES, (IX) THE BREACH OR NON-COMPLIANCE BY THE BORROWER OR ANY SUBSIDIARY WITH ANY ENVIRONMENTAL LAW APPLICABLE TO THE BORROWER OR ANY SUBSIDIARY, (X) THE PAST OWNERSHIP BY THE BORROWER OR ANY SUBSIDIARY OF ANY OF THEIR PROPERTIES OR PAST ACTIVITY ON ANY OF THEIR PROPERTIES WHICH, THOUGH LAWFUL AND FULLY PERMISSIBLE AT THE TIME, COULD RESULT IN PRESENT LIABILITY, THE PRESENCE, USE, RELEASE, STORAGE, TREATMENT, DISPOSAL, GENERATION, THREATENED RELEASE, TRANSPORT, ARRANGEMENT FOR TRANSPORT OR ARRANGEMENT FOR DISPOSAL OF OIL, OIL AND GAS WASTES, SOLID WASTES OR HAZARDOUS SUBSTANCES ON OR AT ANY OF THE PROPERTIES OWNED OR OPERATED BY THE BORROWER OR ANY SUBSIDIARY, (XI) ANY ACTUAL OR PROSPECTIVE CLAIM, LITIGATION, INVESTIGATION OR PROCEEDING RELATING TO ANY OF THE FOREGOING, WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY, WHETHER BROUGHT BY A THIRD PARTY OR BY THE BORROWER OR ANY SUBSIDIARY OR OTHER LOAN PARTY, AND REGARDLESS OF WHETHER ANY INDEMNITEE IS A PARTY THERETO, PROVIDED THAT SUCH INDEMNITY SHALL NOT, AS TO ANY INDEMNITEE, BE AVAILABLE TO THE EXTENT THAT SUCH LOSSES, CLAIMS, DAMAGES, LIABILITIES, PENALTIES OR RELATED EXPENSES (X) ARE DETERMINED BY A COURT OF COMPETENT JURISDICTION BY FINAL AND NONAPPEALABLE JUDGMENT TO HAVE RESULTED FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH INDEMNITEE OR (Y) RESULT FROM A CLAIM BROUGHT BY THE BORROWER OR ANY OTHER LOAN PARTY AGAINST AN INDEMNITEE FOR MATERIAL BREACH IN BAD FAITH OF SUCH INDEMNITEE'S OBLIGATIONS HEREUNDER OR UNDER ANY OTHER LOAN DOCUMENT, IF THE BORROWER OR SUCH LOAN PARTY HAS OBTAINED A FINAL AND NONAPPEALABLE JUDGMENT IN ITS FAVOR ON SUCH CLAIM AS DETERMINED BY A COURT OF COMPETENT JURISDICTION. This Section 12.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under paragraph (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), the Issuing Bank or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Issuing Bank or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's Total Credit Exposure at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided that with respect to such unpaid amounts owed to the Issuing Bank solely in its capacity as such, only the Lenders shall be required to pay such unpaid amounts, such payment to be made severally among them based on such Lenders' Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) provided, further, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), the Issuing Bank in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), the Issuing Bank in connection with such capacity. The obligations of the Lenders under this paragraph (c) are subject to the provisions of Section 2.05(c).

WEIL:\95962958\14\99980.0531

(d)     To the fullest extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof.  No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)     All amounts due under this Section 12.03 shall be payable not later than three Business Days after written demand therefor.

(f)     The provisions of this Section 12.03 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans and the Obligations, the expiration or termination of the Aggregate Commitments, the expiration of any Letter of Credit, the invalidity, unenforceability or termination of any or all Loan Documents or term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, any Lender or the Issuing Bank.

Section 12.04.   Successors and Assigns Generally.

(a)     Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of paragraph (b) of this Section, (ii) by way of participation in accordance with the provisions of paragraph (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (e) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds that equal at least the amount specified in paragraph (b)(i)(B) of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

97

(B)     in any case not described in paragraph (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $2,500,000, unless the Administrative Agent otherwise consents.

(ii)     <u>Proportionate Amounts</u>.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or the Commitment assigned.

(iii)     <u>Required Consents</u>.  No consent shall be required for any assignment except to the extent required by paragraph (b)(i)(B) of this Section and, in addition:

(A)     **[Reserved]**;

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments if such assignment is to a Person that is not a Lender with a Commitment, an Affiliate of such Lender or an Approved Fund with respect to such Lender;

and

(C)     the consent of the Issuing Bank shall be required for any assignment in respect of the Loan and Commitment of any Lender.

(iv)     <u>Assignment and Assumption</u>.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500; <u>provided</u> that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)     <u>No Assignment to Certain Persons</u>.  No such assignment shall be made to (A) any Loan Party or any Loan Party's Affiliates and Subsidiaries or (B) any Defaulting Lender or Potential Defaulting Lender or any of their respective subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B).

(vi)     <u>No Assignment to Natural Persons</u>.  No such assignment shall be made to a natural Person.

(vii)     <u>Certain Additional Payments</u>.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment will be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and

98

assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, the Issuing Bank and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all Loans and participations in Letters of Credit in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder becomes effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest will be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 5.01 and 5.03 and Section 12.03 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section.

(c)     Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at its office located at 1615 Brett Road, New Castle, DE 19720 a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"), and upon the determination by the Administrative Agent of (i) the satisfaction of all conditions precedent to the effectiveness of such Assignment and Assumption (including, without limitation, the receipt of all requisite consents, payment of fees and transfer of money) and (ii) the expiration of any trading freeze or trading holds due to any amendment, consent or waiver, or any other interruption in, or hold on, trading as determined by the Administrative Agent, the Administrative Agent will accept such Assignment and Assumption and record the appropriate information contained therein in the Register.  The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent, the Issuing Bank and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall

99

be responsible for the indemnity under Section 2.08(d), Section 12.03(c) and otherwise with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver which requires the consent of each Lender affected thereby under Section 12.02 to the extent if affects such Participant.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 5.01, 5.02 and 5.03 (subject to the requirements and limitations therein, including the requirements under Section 5.03(g) (it being understood that the documentation required under Section 5.03(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Sections 5.04 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Sections 5.01 or 5.03, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  To the extent permitted by law, each Participant shall also be entitled to the benefits of Section 12.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 4.01 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)     Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 12.05.  Survival; Revival; Reinstatement.  All covenants, agreements, representations and warranties made by the Borrower and the other Loan Parties herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any other Agent, the Issuing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other Obligation or amount payable under this Agreement or any other Loan Document is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Aggregate

100

Commitments have not expired or terminated. The provisions of Section 5.01, Section 5.02, Section 5.03 and Section 12.03 and Article XI shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or any other Obligation, the expiration or termination of the Letters of Credit and the Aggregate Commitments or the termination of this Agreement, any other Loan Document or any provision hereof or thereof. Each party's obligations under Section 5.03 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender.

Section 12.06.   Counterparts; Integration; Effectiveness; Electronic Signatures.

(a)      This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)      This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES HERETO AND THERETO AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. **TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THE TERMS OF THIS AGREEMENT OR ANY LOAN DOCUMENT AND THE DIP ORDER, THE PROVISIONS OF THE DIP ORDER SHALL GOVERN.**

(c)      The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 12.07.   Severability. Any provision of this Agreement or any other Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof or thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 12.08.   Right of Setoff. If an Event of Default shall have occurred and be continuing, each Lender, the Issuing Bank, and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held, and other obligations (in whatever currency) at any time owing, by such Lender, the Issuing Bank or any such Affiliate, to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or the Issuing Bank or their respective Affiliates, irrespective of whether or not such Lender, the Issuing Bank or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan

101

Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender or the Issuing Bank different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; provided that in the event that any Defaulting Lender exercises any such right of setoff, (x) all amounts so set off will be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.12(a)(i) and, pending such payment, will be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Issuing Bank and the Lenders and (y) the Defaulting Lender will provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender, the Issuing Bank and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, the Issuing Bank or their respective Affiliates may have. Each Lender and the Issuing Bank agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 12.09.  GOVERNING  LAW;  JURISDICTION;  CONSENT  TO  SERVICE  OF PROCESS; WAIVER OF JURY TRIAL.

(a)    Governing Law.  This Agreement and the other Loan Documents (other than the DIP Order) and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except for the DIP Order and, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of New York and applicable Federal law.

(b)    Submission to Jurisdiction.  The Borrower and each other Loan Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Administrative Agent, any Lender, the Issuing Bank, or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the Bankruptcy Court and if the Bankruptcy Court does not have (or abstains from) jurisdiction, the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York in the Borough of Manhattan, and any appellate court from any thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such courts. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent, any Lender or the Issuing Bank may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or any other Loan Party or its properties in the courts of any jurisdiction.

(c)    Waiver of Venue.  The Borrower and each other Loan Party irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Service of Process. Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 12.01. Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

(e)     WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 12.10. Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 12.11. Confidentiality. Each of the Administrative Agent, the Issuing Bank and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement or any other Loan Document, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 12.11, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement, (g) with the consent of the Borrower, (h) to any credit insurance provider relating to the Borrower and its obligations, this Agreement or payments hereunder, (i) on a confidential basis (i) to any rating agency in connection with the rating the Parent, the Borrower or the Subsidiaries or the Loans or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans; or (j) to the extent such Information (1) becomes publicly available other than as a result of a breach of this Section 12.11 or (2) becomes available to the Administrative Agent, the Issuing Bank or any Lender or any of their Affiliates on a nonconfidential basis from a source other than the Borrower.

For the purposes of this Section 12.11, "Information" means all information received from the Borrower, the Parent or any of the Subsidiaries relating to the Parent, the Borrower or any of the Subsidiaries and their respective businesses, including, but not limited to, any Swap Agreements, other than any such information that is available to the Administrative Agent, the Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by the Parent, the Borrower or any of the Subsidiaries; provided that, in the case of information received from the Parent, the Borrower or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 12.11 shall be

considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent, the Lenders and the Issuing Bank acknowledges that (a) the Information may include material non-public information concerning the Parent, the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

Section 12.12.   Interest Rate Limitation.   It is the intention of the parties hereto that each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby would be usurious as to any Lender under laws applicable to it (including the laws of the United States of America and the States of New York and Texas, or any other jurisdiction whose laws may be mandatorily applicable to such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in any of the Loan Documents or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (a) the aggregate of all consideration which constitutes interest under law applicable to any Lender that is contracted for, taken, reserved, charged or received by such Lender under any of the Loan Documents or agreements or otherwise in connection with the Loans shall under no circumstances exceed the maximum amount allowed by such applicable law, and any excess shall be canceled automatically and if theretofore paid shall be credited by such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower); and (b) in the event that the maturity of the Loans is accelerated by reason of an election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically by such Lender as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Lender to the Borrower).  All sums paid or agreed to be paid to any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Lender, be amortized, prorated, allocated and spread throughout the stated term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (i) the amount of interest payable to any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Lender pursuant to this Section 12.12 and (ii) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Lender would be less than the amount of interest payable to such Lender computed at the Highest Lawful Rate applicable to such Lender, then the amount of interest payable to such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Lender until the total amount of interest payable to such Lender shall equal the total amount of interest which would have been payable to such Lender if the total amount of interest had been computed without giving effect to this Section 12.12.  To the extent that Chapter 303 of the Texas Finance Code is relevant for the purpose of determining the Highest Lawful Rate applicable to a Lender, such Lender elects to determine the applicable rate ceiling under such Chapter by the weekly ceiling from time to time in effect.  Chapter 346 of the Texas Finance Code does not apply to the Borrower's obligations hereunder.

Section 12.13.  EXCULPATION PROVISIONS.   EACH OF THE PARTIES HERETO SPECIFICALLY AGREES THAT IT HAS A DUTY TO READ THIS AGREEMENT AND THE

104

OTHER LOAN DOCUMENTS AND AGREES THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; THAT IT HAS IN FACT READ THIS AGREEMENT AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS AGREEMENT; THAT IT HAS BEEN REPRESENTED BY INDEPENDENT LEGAL COUNSEL OF ITS CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND HAS RECEIVED THE ADVICE OF ITS ATTORNEY IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS; AND THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS RESULT IN ONE PARTY ASSUMING THE LIABILITY INHERENT IN SOME ASPECTS OF THE TRANSACTION AND RELIEVING THE OTHER PARTY OF ITS RESPONSIBILITY FOR SUCH LIABILITY.  EACH PARTY HERETO AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY EXCULPATORY PROVISION OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT THE PROVISION IS NOT "CONSPICUOUS."

Section 12.14.  Collateral Matters; Treasury Management Agreements.  The benefit of the Security Instruments and the other Loan Documents and of the provisions of this Agreement relating to any Collateral securing the Obligations shall also extend to and be available to (a) any Treasury Management Bank with respect to amounts payable by the Borrower, any Subsidiary, and any Guarantor under any Secured Treasury Management Agreement, in each case on a *pari passu* basis with respect to repayment of principal outstanding on Loans due under this Agreement.  All Secured Treasury Management Agreements are independent agreements governed by the terms thereof and will remain in full force and effect, unaffected by any repayment, prepayment, acceleration, reduction, increase or change in the terms of the Loans created under this Agreement except as otherwise provided in such Secured Treasury Management Agreements, and any payoff statement from any Lender relating to this Agreement shall not apply to Secured Treasury Management Agreements, except as otherwise expressly provided in such payoff statement.

Section 12.15.  No Third Party Beneficiaries.  This Agreement, the other Loan Documents, and the agreement of the Lenders to make Loans and the Issuing Bank to issue, amend, renew or extend Letters of Credit hereunder are solely for the benefit of the Borrower, and no other Person (including, without limitation, the Parent, any Subsidiary, any obligor, contractor, subcontractor, supplier or materialman) shall have any rights, claims, remedies or privileges hereunder or under any other Loan Document against the Administrative Agent, any other Agent, the Issuing Bank or any Lender for any reason whatsoever.  There are no third party beneficiaries.

Section 12.16.  USA Patriot Act Notice.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrower, the Parent and each other Guarantor, which information includes the name and address of the Borrower, the Parent and each other Guarantor and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower, the Parent and each other Guarantor in accordance with the Act.

Section 12.17.  **[Reserved]**.

Section 12.18.  Replacement of Lenders.  If any Lender requests compensation under Section 5.01, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any

Lender or any Governmental Authority for the account of any Lender pursuant to Section 5.03 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 5.04, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 12.04), all of its interests, rights (other than its existing rights to payments pursuant to Section 5.01 or Section 5.03) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(a)     the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 12.04;

(b)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 5.02) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)     in the case of any such assignment resulting from a claim for compensation under Section 5.01 or payments required to be made pursuant to Section 5.03, such assignment will result in a reduction in such compensation or payments thereafter;

(d)     such assignment does not conflict with applicable law; and

(e)     in the case of any assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 12.19.   Time of the Essence.  Time is of the essence of the Loan Documents.

Section 12.20.   No Advisory or Fiduciary Responsibility.  The Borrower and each other Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that in connection with all aspects of (1) the transaction evidenced by this Agreement and the other Loan Documents, (2) the Transactions and (3) each other transaction contemplated hereby and by the other Loan Documents (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) that:

(a)     (i)     the arranging and other services regarding this Agreement and the other Loan Documents provided by the Agents and the Arrangers, are arm's-length commercial transactions between the Borrower, each other Loan Party and their respective Affiliates, on the one hand, and the Administrative Agent, the other Agents and each of the Arrangers, on the other hand,

(ii)     each of the Borrower and the other Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and

(iii)   the Borrower and each other Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents;

(b)   (i)   each of the Administrative Agent, the other Agents, the Lenders and each of the Arrangers, is, and has been, acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, any other Loan Party or any of their respective Affiliates, or any other Person;

(ii)   none of the Administrative Agent, the other Agents, the Lenders nor any of the Arrangers has any obligation to the Borrower, any other Loan Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents;

(iii)   any of the Administrative Agent, the other Agents, the Lenders and the Arrangers, and any of their respective Affiliates, may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, the other Loan Parties and their respective Affiliates, and none of the Administrative Agent, the other Agents nor any of the Arrangers has any obligation to disclose any of such interests to the Borrower, any other Loan Party or any of their respective Affiliates.

To the fullest extent permitted by law, each of the Borrower and the other Loan Parties hereby waives and releases any claims that it may have against the Administrative Agent, any of the other Agents, the Lenders or any of the Arrangers with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby and by the other Loan Documents.

Section 12.21.   **[Reserved]**.

Section 12.22.   **[Reserved]**.

Section 12.23.   Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)   the effects of any Bail-In Action on any such liability, including, if applicable:

(i)   a reduction in full or in part or cancellation of any such liability;

(ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

[This space is left intentionally blank.  Signature Pages follow.]

108

The parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**BORROWER:**

**VANGUARD NATURAL GAS, LLC**

By:_____
    Richard Robert
    Executive Vice President
    and Chief Financial Officer

**VANGUARD NATURAL RESOURCES, LLC**

By:_____
    Richard Robert, Executive Vice President
    and Chief Financial Officer

**VNR HOLDINGS, LLC**

By: Vanguard Natural Gas, LLC
    Sole Member

    By:_____
        Richard Robert, Executive Vice President
        and Chief Financial Officer

**VANGUARD OPERATING, LLC**

By: Vanguard Natural Gas, LLC
    Sole Member

    By:_____
        Richard Robert, Executive Vice President
        and Chief Financial Officer

**ENCORE CLEAR FORK PIPELINE LLC**


By:_____
      Richard Robert, Executive Vice President
      and Chief Financial Officer


**EAGLE ROCK ACQUISITION PARTNERSHIP, L.P.**

By:  EAGLE ROCK UPSTREAM DEVOLOPMENT
      COMPANY, INC.,
      its general partner


      By:_____
          Richard Robert
          Executive Vice President, Chief Financial
          Officer and Secretary


**EAGLE ROCK ACQUISITION PARTNERSHIP II, L.P.**

By:  EAGLE ROCK UPSTREAM DEVOLOPMENT
      COMPANY II, INC.,
      its general partner


      By:_____
          Richard Robert
          Executive Vice President, Chief Financial
          Officer and Secretary


**EAGLE ROCK ENERGY ACQUISITION CO., INC.**


By:_____
      Richard Robert
      Executive Vice President, Chief Financial
      Officer and Secretary


*[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT]*

**EAGLE ROCK ENERGY ACQUISITION CO. II, INC.**

By:_____
      Richard Robert
      Executive Vice President, Chief Financial
      Officer and Secretary

**EAGLE ROCK UPSTREAM DEVELOPMENT COMPANY, INC.**

By:_____
      Richard Robert
      Executive Vice President, Chief Financial
      Officer and Secretary

**EAGLE ROCK UPSTREAM DEVELOPMENT COMPANY II, INC.**

By:_____
      Richard Robert
      Executive Vice President, Chief Financial
      Officer and Secretary

**ESCAMBIA ASSET CO. LLC**

By:_____
      Richard Robert
      Executive Vice President, Chief Financial
      Officer and Secretary

**ESCAMBIA OPERATING CO. LLC**

By:_____
      Richard Robert
      Executive Vice President, Chief Financial
      Officer and Secretary

[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT]

**VNR FINANCE CORP.**

By:_____
         Richard Robert
         Executive Vice President and Chief Financial
         Officer

**ADMINISTRATIVE AGENT:**

**CITIBANK, N.A.**
as Administrative Agent and Issuing Bank


By:_____
Name: _____
Title: _____



**LENDERS:**

**CITIBANK, N.A.,**
as a Lender


By:_____
Name: _____
Title: _____


**JPMORGAN CHASE BANK, N.A..,**
as a Lender


By:_____
Name: _____
Title: _____


**WELLS FARGO BANK, N.A.,**
as a Lender


By:_____
Name: _____
Title: _____


[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT]

*Annex I*

| | Name of Lender | Applicable Percentage | Commitment |
|---|---|---|---|
| 1 | Citibank, N.A. | 33.333% | $16,666,500.00 |
| 2 | Wells Fargo Bank, N.A. | 33.333% | $16,666,500.00 |
| 3 | JPMorgan Chase Bank, N.A. | 33.333% | $16,666,500.00 |

## EXHIBIT 2

**Initial Budget**

Prepared at the Request of Counsel
Preliminary and Subject to Ongoing Review and Modification

**Vanguard Natural Resources, LLC**
DIP Budget [1]
As of January 31, 2017

($ in thousands)

| | Forecast 1 [08] | Forecast 2 | Forecast 3 | Forecast 4 | Forecast 5 | Forecast 6 | Forecast 7 | Forecast 8 | Forecast 9 | Forecast 10 | Forecast 11 | Forecast 12 | Forecast 13 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 2/3/17 | 2/10/17 | 2/17/17 | 2/24/17 | 3/3/17 | 3/10/17 | 3/17/17 | 3/24/17 | 3/31/17 | 4/7/17 | 4/14/17 | 4/21/17 | 4/28/17 | |
| Beginning Cash | $ 36,400 | $ 31,755 | $ 11,306 | $ 12,373 | $ 26,824 | $ 25,192 | $ 20,402 | $ 30,922 | $ 60,017 | $ 46,234 | $ 35,382 | $ 27,900 | $ 41,007 | $ 38,400 |
| **Collections** | | | | | | | | | | | | | | |
| Net Cash Receipts [2,3] | 3,777 | 3,988 | 9,310 | 29,697 | 14,225 | 3,225 | 15,914 | 35,782 | 4,443 | 3,602 | 3,602 | 19,740 | 29,289 | 176,593 |
| Hedge Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Asset Sales & Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Collections | $ 3,777 | $ 3,988 | $ 9,310 | $ 29,697 | $ 14,225 | $ 3,225 | $ 15,914 | $ 35,782 | $ 4,443 | $ 3,602 | $ 3,602 | $ 19,740 | $ 29,289 | $ 176,593 |
| **Operating Disbursements & CapEx** [4] | | | | | | | | | | | | | | |
| Accounts Payable [5] | (4,704) | (11,246) | (7,593) | (12,496) | (6,686) | (5,015) | (3,343) | (6,686) | (11,701) | (6,333) | (6,333) | (6,333) | (12,667) | (101,176) |
| Employee Compensation [6] | - | (1,750) | - | (1,750) | - | - | (1,750) | - | (5,000) | - | (1,750) | - | (1,750) | (13,750) |
| Production Tax Payments | (2,383) | (2,090) | - | (1,000) | (4,000) | - | - | - | - | (4,000) | - | - | (2,500) | (15,973) |
| Other Disbursements [7] | (471) | (3,000) | (350) | - | (821) | (3,000) | - | - | - | (821) | (3,000) | - | - | (11,463) |
| Total Operating Disbursements | $ (7,598) | $ (18,086) | $ (7,943) | $ (15,246) | $ (11,507) | $ (8,015) | $ (5,093) | $ (6,686) | $ (16,701) | $ (11,154) | $ (11,083) | $ (6,333) | $ (16,917) | $ (142,344) |
| Net Operating Cash Flow | $ (3,820) | $ (14,100) | $ 1,367 | $ 14,451 | $ 2,717 | $ (4,790) | $ 10,821 | $ 29,096 | $ (12,258) | $ (7,553) | $ (7,482) | $ 13,407 | $ 12,373 | $ 34,229 |
| **Restructuring Costs** | | | | | | | | | | | | | | |
| Professional Fees | (2,525) | - | - | - | (1,000) | - | - | - | (1,475) | - | - | - | (2,300) | (7,300) |
| Other [8] | (236) | (3,050) | - | - | - | - | - | - | - | - | - | - | - | (3,286) |
| Total Restructuring Costs | $ (2,761) | $ (3,050) | $ - | $ - | $ (1,000) | $ - | $ - | $ - | $ (1,475) | $ - | $ - | $ - | $ (2,300) | $ (10,586) |
| **Debt Service** | | | | | | | | | | | | | | |
| Interest & Fees [9] | (64) | (3,300) | (300) | - | (3,350) | - | (300) | - | (50) | (3,300) | - | (300) | (50) | (11,014) |
| Total Debt Service | $ (64) | $ (3,300) | $ (300) | $ - | $ (3,560) | $ - | $ (300) | $ - | $ (50) | $ (3,300) | $ - | $ (300) | $ (50) | $ (11,014) |
| Net Cash Flow | $ (6,645) | $ (20,450) | $ 1,067 | $ 14,451 | $ (1,633) | $ (4,790) | $ 10,521 | $ 29,095 | $ (13,783) | $ (10,853) | $ (7,482) | $ 13,107 | $ 10,023 | $ 12,630 |
| DIP Draw/(Repayment) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Ending Cash Balance | $ 31,755 | $ 11,306 | $ 12,373 | $ 26,824 | $ 25,192 | $ 20,402 | $ 30,922 | $ 60,017 | $ 46,234 | $ 35,382 | $ 27,900 | $ 41,007 | $ 51,030 | $ 51,030 |
| DIP Availability [10] | $ 15,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 |
| Minimum Liquidity [12] | $ 46,755 | $ 26,306 | $ 27,373 | $ 41,824 | $ 50,192 | $ 45,402 | $ 55,922 | $ 85,017 | $ 71,234 | $ 60,382 | $ 52,900 | $ 66,007 | $ 76,030 | $ 76,030 |

Notes:
1) Based on Company's January 5, 2017 Business Plan and January 2017 reserve reports, updated to reflect 1/30/17 strip pricing. Cash amounts reflect book basis.
2) Includes addbacks for estimates of marketing, gathering and transportation costs, royalty costs & joint-interest billing receipts which are netted against revenues or excluded from the Company's Business Plan.
3) Forecast assumes unhedged production
4) Forecast includes disbursements for post-petition amounts and pre-petition amounts requested in first day motions.
5) Accounts Payable includes LOE, CapEx, SG&A costs, marketing, gathering and transportation costs, royalty costs & costs reimbursed through joint-interest billing receipts.
6) Includes estimated disbursements related to employee (non-executive) incentive compensation programs, subject to court approval
7) Other Disbursements include capital calls and certain other operating expenses.
8) Includes estimated DIP fees, utility adequate assurance deposit and other costs associated with the chapter 11 filing.
9) Includes interest on DIP facility and RBL at non-default interest rates.
10) Disbursements include amounts paid prior to chapter 11 filing date. No disbursements are forecasted to be made on Feb. 1, 2 &3.
11) $15 million in interim period; $25 million upon final court authorization.
12) Ending Cash plus DIP Availability.