# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION



|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| VANGUARD NATURAL RESOURCES, LLC, *et al.*,[1] | § | Case No. 17-30560 |
|  | § |  |
|  | § | (Jointly Administered) |
| Debtors. | § |  |
|  | § |  |

**DEBTORS' EXPEDITED MOTION, PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a) AND 363(b) AND BANKRUPTCY RULES 2002 AND 6004, FOR AUTHORITY TO (A) ENTER INTO BACKSTOP AGREEMENT AND EQUITY COMMITMENT AGREEMENT AND (B) PAY FEES AND EXPENSES THEREUNDER**

---

**THE DEBTORS HAVE REQUESTED THAT THE COOURT SET THIS MOTION FOR HEARING ON MARCH 20, 2017, AT 10:00 A.M., PREVAILING CENTRAL TIME, IN COURTROOM 404, 515 RUSK STREET, HOUSTON, TEXAS 77002.**

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING, SPECIFICALLY ANSWERING EACH PARAGRAPH OF THIS PLEADING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE WITH THE CLERK OF THE BANKRUPTCY COURT WITHIN 21 DAYS FROM THE DATE YOU WERE SERVED WITH THIS PLEADING. YOU MUST SERVE A COPY OF YOUR RESPONSE ON THE PERSON WHO SENT YOU THE NOTICE; OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**EXPEDITED RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EXPEDITED BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. SPECIFICALLY, VANGUARD IS REQUESTING THAT ANY OBJECTIONS TO THE MOTION BE FILED AND SERVED BY 4:00 P.M. (PREVAILING CENTRAL TIME) ON MARCH 17, 2017. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EXPEDITED CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Vanguard Natural Resources, LLC (1161); Eagle Rock Acquisition Partnership, L.P. (6706); Eagle Rock Acquisition Partnership II, L.P. (0903); Eagle Rock Energy Acquisition Co., Inc. (4564); Eagle Rock Energy Acquisition Co. II, Inc. (3364); Eagle Rock Upstream Development Company, Inc. (0113); Eagle Rock Upstream Development Company II, Inc. (7453); Encore Clear Fork Pipeline LLC (2032); Escambia Asset Co. LLC (3869); Escambia Operating Co. LLC (2000); Vanguard Natural Gas, LLC (1004); Vanguard Operating, LLC (9331); VNR Finance Corp. (1494); and VNR Holdings, LLC (6371). The location of the Debtors' service address is: 5847 San Felipe, Suite 3000, Houston, Texas 77057.

Vanguard Natural Resources, LLC ("VNR") and its affiliated debtors as debtors in possession in these cases (collectively, "Vanguard" or the "Debtors") submit this motion (the "Motion"), pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2002-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules") for entry of an order: (a) approving Vanguard's entry into and performance under the Backstop Agreement[2] and the form of Equity Commitment Agreement;[3] (b) the allowance and payment of the fees and expenses under the Backstop Agreement and the Equity Commitment Agreement; and (c) granting related relief.  In support of this Motion, Vanguard respectfully states as follows:

## PRELIMINARY STATEMENT

1.       On February 1, 2017, after extensive arm's-length and good-faith negotiations with certain holders of Vanguard's Second Lien Notes and Senior Notes (collectively, the "Consenting Noteholders"), the Consenting Noteholders and Vanguard finalized an agreement on the terms of a restructuring, as set forth in the restructuring support agreement (the "RSA"). In accordance with the RSA, Vanguard and the Consenting Noteholders agreed on a chapter 11 plan term sheet (the "Term Sheet"), which is attached as an exhibit to the RSA.

2.       At the heart of Vanguard's proposed restructuring are committed new-money investments that will provide an aggregate of $275 million in new capital to reorganized Vanguard upon emergence from chapter 11.  These new-money investments (the "Investments") consist of:

---

[2]  A copy of the form of Backstop Commitment and Equity Investment Agreement (the "Backstop Agreement") is attached hereto as **Exhibit B**.

[3]  A copy of the form of Equity Commitment Agreement (the "Equity Commitment Agreement") is attached hereto as **Exhibit C**.

(a)     a $127.875 million rights offering (the "Rights Offering"), pursuant to which holders of Senior Notes Claims are entitled to purchase equity in reorganized VNR (the "Senior Note Rights Offering Shares") and a $127.875 million equity investment (the "4(a)(2) Backstop Commitment"), pursuant to which the Commitment Parties will purchase equity in reorganized VNR (the "4(a)(2) Backstop Commitment Shares"), in each case at a 25% discount to Plan value, based on a total enterprise value of $1.625 billion and consideration of net excess cash ($45 million). The Senior Note Rights Offering Shares will be offered *pro rata* to all holders of Senior Notes Claims.

(b)     a commitment (the "Equity Contribution") by certain holders of Second Lien Notes (the "Investors") to purchase $19.25 million in equity in reorganized VNR at a 25% discount to Plan value, based on a total enterprise value of $1.625 billion and consideration of net excess cash ($45 million) in calculation of such Plan equity value.

3.      To ensure that the full $255.75 million is raised through the Rights Offering and the 4(a)(2) Backstop Commitment, the Rights Offering is backstopped by certain holders of Senior Notes party to that the Backstop Agreement (the "Rights Offering Backstop Commitment" and, together with the 4(a)(2) Backstop Commitment, the "Commitments"). Pursuant to the Backstop Agreement, these holders (the "Commitment Parties") have agreed to fully backstop the Rights Offering and purchase any unsubscribed Senior Note Rights Offering Shares in exchange for, among other things, (i) an aggregate backstop premium payable in fully-diluted equity in reorganized VNR in an amount equal to 6% of the Senior Note Rights Offering Shares and the 4(a)(2) Backstop Commitment Shares (the "Commitment Premium") and (ii) reimbursement of expenses (the "Backstop Expense Reimbursement"), in each case, in accordance with the terms and conditions of the Backstop Agreement. In addition, under the Backstop Agreement, certain of the Commitment Parties have also agreed to fully backstop the Investors' obligation to fund the Equity Contribution. No fee is payable to the Investors for the Equity Contribution (other than the reimbursement of certain of their expenses pursuant to the

Equity Contribution Agreement (the "Equity Expense Reimbursement")) or for the Commitment Parties' agreement to backstop the Equity Contribution.

4.     The foregoing new-money investments represent the cornerstone of a comprehensive restructuring that will deleverage Vanguard's balance sheet by over $700 million and will thereby allow Vanguard to emerge as a stronger enterprise poised for future growth.  Obtaining approval of the Backstop Agreement and the Equity Commitment Agreement, and the authority to satisfy the obligations thereunder, is critical to the success of Vanguard's restructuring.  Moreover, Court approval is required for the Debtors' to secure the Commitment Parties' agreement to provide the Commitments and for the Investors to agree to provide the Equity Contribution.

5.     The RSA, the Backstop Agreement, and the Equity Commitment Agreement are the culmination of hard fought, arm's-length negotiations between Vanguard, multiple third party potential new money investors, the Ad Hoc Group of Second Lien Noteholders, and the Ad Hoc Group of Unsecured Noteholders.  Vanguard believes that entry into the Backstop Agreement and the Equity Commitment Agreement will maximize the value of its estates by paving a timely path to emergence and unlocking the value of its estates.  Accordingly, Vanguard believes that entry into the Backstop Agreement and the Equity Commitment Agreement is in the best interest of all creditors.  Therefore, Vanguard submits that its determination to enter into these agreements is a sound exercise of business judgment and should be approved.

## **RELIEF REQUESTED**

6.     By this Motion, Vanguard seeks entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) authorizing the Debtors to enter into and perform under the

Backstop Agreement and the Equity Commitment Agreement, (b) approving (i) the payment of the Commitment Premium and the Backstop Expense Reimbursement to the extent provided for in the Backstop Agreement and (ii) the Equity Expense Reimbursement to the extent provided for in the Equity Commitment Agreement, and (c) granting related relief.

### JURISDICTION, VENUE, AND STATUTORY BASES

7.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

8.      The bases for the relief requested in this Motion are sections 105(a) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, and Bankruptcy Local Rule 2002-1.

### BACKGROUND

#### General

9.      Commencing on February 1, 2017 (the "Petition Date"), VNR and the other Debtors commenced these chapter 11 cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  These chapter 11 cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(a).  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.     On February 14, 2017, the Office of the United States Trustee for the Southern District of Texas appointed an official committee of unsecured creditors (the "Committee") in these chapter 11 cases.  No trustee or examiner has been appointed in these chapter 11 cases.

**<u>Vanguard's Business</u>**

11.     Formed in 2006, VNR is a publicly traded limited liability company that, through

its subsidiaries, is engaged in the acquisition, development, and production of oil and gas

properties located in eleven states.  VNR is the direct or indirect parent company of each of the

other Debtors in these chapter 11 cases.  Vanguard's assets consist primarily of producing and

non-producing natural gas and oil reserves, all of which are located within the continental United

States.

12.     A description of Vanguard's business, capital structure, and the circumstances

leading to these chapter 11 cases is set forth in the *Declaration of Richard A. Robert, Chief*

*Financial Officer of Vanguard Natural Resources, LLC, in Support of Chapter 11 Petitions and*

*First Day Motions* [Docket No. 6] (the "<u>First Day Declaration</u>"), which is incorporated by

reference in this Motion.

**<u>The Backstop Agreement</u>**

13.     Through the Rights Offering and the 4(a)(2) Backstop Commitment, Vanguard

anticipates that it will raise approximately $255.75 million of new capital to pay down its senior

secured bank debt.  The following table summarizes the material terms of the Backstop

Agreement:[4]

| **<u>Summary of Principal Terms of the Backstop Agreement</u>** | |
|---|---|
| **Rights Offering Backstop Commitment**<br><br>*See* Backstop Agreement §2.2(b) | On and subject to the terms and conditions of the Backstop Agreement, including entry of the Confirmation Order, each Commitment Party agrees, severally and not jointly, to purchase (or cause certain of its and its affiliates' managed funds and/or accounts to purchase), and the Company shall sell to such Commitment Party (or such managed funds or accounts), on the Closing Date for the applicable aggregate Per Unit Purchase Price, the number of Unsubscribed Units equal to (x) such Commitment Party's Commitment Percentage multiplied by (y) the aggregate |

---

[4]  This summary is provided for the Court's convenience and is subject in all respects to the terms of the Backstop Agreement.  In the event of any inconsistency or conflict between the terms of this summary and the Backstop Agreement, the terms of the Backstop Agreement shall control.  Capitalized terms used but not defined in this Motion have the meanings set forth in the Backstop Agreement.

| **Summary of Principal Terms of the Backstop Agreement** | |
|---|---|
| | number of Unsubscribed Units, rounded among the Commitment Parties solely to avoid fractional units as the Commitment Parties may determine in their sole discretion (provided that in no event shall such rounding reduce the aggregate commitment of such Commitment Parties). |
| **4(a)(2) Backstop Commitment**<br><br>*See* Backstop Agreement §2.2(c) | On and subject to the terms and conditions of the Backstop Agreement, including entry of the Confirmation Order, each Commitment Party agrees, severally (in accordance with its Commitment Percentage) and not jointly, to purchase (or cause certain of its and its affiliates' managed funds and/or accounts to purchase), and the Company shall sell to such Commitment Party (or such managed funds or accounts), on the Closing Date for the applicable aggregate Per Unit Purchase Price, the number of 4(a)(2) Backstop Commitment Units equal to (x) such Commitment Party's Commitment Percentage multiplied by (y) the aggregate number of 4(a)(2) Backstop Commitment Units, rounded among the Commitment Parties solely to avoid fractional units as the Requisite Commitment Parties may determine in their sole discretion (provided that in no event shall such rounding reduce the aggregate commitment of such Commitment Parties); provided that any Defaulting Commitment Party shall be liable to each Senior Commitment Party that is not a Defaulting Commitment Party, and the Company, as a result of any breach of its obligations under the Backstop Agreement. |
| **Commitment Premium and Backstop Expense Reimbursement**<br><br>*See* Backstop Agreement art. III. | Commitment Premium:  Subject to Section 3.2 of the Backstop Agreement, in consideration for the Commitments and the other agreements of the Senior Commitment Parties in the Backstop Agreement, the Debtors shall pay or cause to be paid a nonrefundable aggregate premium in an amount equal to $15,345,000, which represents 6.0% of the Total Commitment Amount, payable in accordance with Section 3.2 of the Backstop Agreement, to the Senior Commitment Parties (including any Replacing Commitment Party, but excluding any Defaulting Commitment Party) or their designees based upon their respective Commitment Percentages at the time such payment is made.<br><br>Backstop Expense Reimbursement:  In accordance with and subject to the BCA Approval Order, the Debtors agree to pay, in accordance with Section 3.3(b)  of the Backstop Agreement, all reasonable and documented out-of-pocket fees and expenses (including travel costs and expenses) of all of the attorneys, accountants, other professionals, advisors, and consultants incurred on behalf of the Commitment Parties, including the fees and expenses of Milbank as primary counsel to the Senior Commitment Parties, Porter Hedges LLP, as co-counsel to the Senior Commitment Parties, W.D. Von Gonten & Co. (or comparable consulting firm) as consultants to the Senior Commitment Parties, and PJT Partners LP as financial advisor to the Senior Commitment Parties. |
| **Representations and Warranties of Vanguard Natural Resources, LLC**<br><br>*See* Backstop Agreement art. IV. | Except (i) as set forth in the corresponding section of the Company Disclosure Schedules or (ii) as disclosed in the Company SEC Documents filed with the SEC on or after December 31, 2015 and publicly available on the SEC's Electronic Data-Gathering, Analysis and Retrieval system prior to the date of the Backstop Agreement (excluding the exhibits, annexes and schedules thereto, any disclosures contained in the "Forward-Looking Statements" or "Risk Factors" sections thereof, or any other statements that are similarly predictive, cautionary or forward looking in nature), the Company, on behalf of itself and each of the other Debtors, jointly and severally, represents and warrants to the Commitment Parties (unless otherwise set forth in the Backstop Agreement, as of the date of the Backstop Agreement and as of the Closing Date), among other things, the following:<br><br>a.   Each of the Debtors (a) is a duly organized and validly existing corporation, |

| **Summary of Principal Terms of the Backstop Agreement** |
|---|

|  | limited liability company or limited partnership, as the case may be, and, if applicable, in good standing (or the equivalent thereof) under the Laws of the jurisdiction of its incorporation or organization, (b) has the corporate or other applicable power and authority to own its property and assets and to transact the business in which it is currently engaged and presently proposes to engage and (c) except where the failure to have such authority or qualification would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, is duly qualified and is authorized to do business and is in good standing in each jurisdiction where the conduct of its business as currently conducted requires such qualifications; |
|---|---|
|  | b. The Company has the requisite corporate power and authority (i) (A) subject to entry of the BCA Approval Order and the Confirmation Order, to enter into, execute and deliver the Backstop Agreement and to perform the BCA Approval Obligations and (B) subject to entry of the BCA Approval Order and the Confirmation Order, to perform each of its other obligations under the Backstop Agreement and (ii) subject to entry of the BCA Approval Order, the Plan Solicitation Order, and the Confirmation Order, to consummate the transactions contemplated in the Backstop Agreement and in the Plan, to enter into, execute and deliver all agreements to which it will be a party as contemplated by the Backstop Agreement and the Plan (the Backstop Agreement, the Plan, the Disclosure Statement, the Restructuring Support Agreement, the debtor-in-possession credit agreement for the DIP Facility to be entered into in accordance with the DIP Orders, the Exit Facility, and such other agreements and any Plan supplements or documents referred to therein or thereunder, collectively, the "Transaction Agreements") and to perform its obligations under each of the Transaction Agreements (other than the Backstop Agreement).  Subject to the receipt of the foregoing Orders, as applicable, the execution and delivery of the Backstop Agreement and each of the other Transaction Agreements and the consummation of the transactions contemplated thereby have been or will be duly authorized by all requisite corporate action on behalf of the Company, and no other corporate proceedings on the part of the Company are or will be necessary to authorize the Backstop Agreement or any of the other Transaction Agreements or to consummate the transactions contemplated thereby; |
|  | c. Each of the Debtors has good and valid title to its respective Real Properties, in each case, except for Permitted Liens and except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes, and except where the failure (or failures) to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; provided, however, the enforceability of such leased Real Properties may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditor's rights generally or general principles of equity, including the Chapter 11 Cases.  To the Knowledge of the Company, all such properties and assets are free and clear of Liens, other than Permitted Liens and such Liens as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; and |
|  | d. As of the date of the Backstop Agreement, the Company is not pursuing, or in discussions or negotiations regarding, any solicitation, offer, or proposal from any Person concerning any actual or proposed Alternative Transaction and, as applicable, has terminated any existing discussions or negotiations regarding any actual or proposed Alternative Transaction. |

| **Summary of Principal Terms of the Backstop Agreement** | |
|---|---|
| **Representations and Warranties of the Commitment Parties**<br><br>*See* Backstop Agreement art. V. | Each Commitment Party, severally (in accordance with its Commitment Percentage) and not jointly, represents and warrants as to itself only (unless otherwise set forth in the Backstop Agreement, as of the date of the Backstop Agreement and as of the Closing Date), among other things, the following:<br><br>a.  Such Commitment Party is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the Laws of its jurisdiction of incorporation or organization;<br><br>b.  Such Commitment Party has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver the Backstop Agreement and each other Transaction Agreement to which such Commitment Party is a party and to perform its obligations thereunder and has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and performance by it of the Backstop Agreement and the other Transaction Agreements;<br><br>c.  Such Commitment Party understands that (a) the Unsubscribed Units, the 4(a)(2) Backstop Commitment Units and any Common Units issued to such Commitment Party in satisfaction of the Commitment Premium, have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends on, among other things, the bona fide nature of the investment intent and the accuracy of such Commitment Party's representations as expressed in the Backstop Agreement or otherwise made pursuant thereto, and (b) the foregoing units cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available;<br><br>d.  Such Commitment Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Unsubscribed Units and any Common Units issued to such Commitment Party in satisfaction of the Commitment Premium.  Such Commitment Party is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act.  Such Commitment Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding such units for an indefinite period of time).  Except for the representations and warranties expressly set forth in the Backstop Agreement or any other Transaction Agreement, such Commitment Party has independently evaluated the merits and risks of its decision to enter into the Backstop Agreement and disclaims reliance on any representations or warranties, either express or implied, by or on behalf of any of the Debtors; and<br><br>e.  Such Commitment Party has sufficient assets and the financial capacity to perform all of its obligations under the Backstop Agreement, including the ability to fully exercise all Subscription Rights that are issued to it pursuant to the Rights Offering, fund such Commitment Party's Commitments. |
| **Additional Covenants**<br><br>*See* Backstop Agreement art VI. | Subject to the conditions set forth in the Backstop Agreement, the Company and the Commitment Parties, as applicable, additionally agree, among other things, to the following:<br><br>a.  The Company shall support and make commercially reasonable efforts, consistent with the Restructuring Support Agreement and the Plan, to (a) obtain the entry of the BCA Approval Order, the Plan Solicitation Order, the Confirmation Order, and any DIP Orders supported by the Requisite Commitment Parties, and (b) cause the BCA Approval Order, the Plan |

| **Summary of Principal Terms of the Backstop Agreement** |
|---|

| | Solicitation Order, the Confirmation Order, and any DIP Orders supported by the Requisite Commitment Parties to become Final Orders (and request that such Orders become effective immediately upon entry by the Bankruptcy Court pursuant to a waiver of Rules 3020 and 6004(h) of the Bankruptcy Rules, as applicable), in each case, as soon as reasonably practicable, consistent with the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement, following the filing of the respective motion seeking entry of such Orders.  The Company shall comply with Section 3 of the Restructuring Support Agreement with respect to providing each of the Commitment Parties and its counsel copies of the proposed motions seeking entry of the BCA Approval Order, the Plan Solicitation Order, the Confirmation Order, and the DIP Orders (together with the proposed Plan Solicitation Order, the proposed BCA Approval Order and the DIP Orders), and the BCA Approval Order, the Plan Solicitation Order, the Confirmation Order and the DIP Orders must be in form and substance satisfactory to the Requisite Commitment Parties and the Company.  Any amendments, modifications, changes, or supplements to the BCA Approval Order, Plan Solicitation Order, Confirmation Order, and DIP Orders, and any of the motions seeking entry of such Orders, shall be in form and substance satisfactory to the Requisite Commitment Parties and the Company; provided, that notwithstanding the foregoing, it shall not be a breach of <u>Section 6.1</u> of the Backstop Agreement for the Debtors to propose or support entry of an Interim DIP Order or a Final DIP Order sought pursuant to the First Day DIP Motion, in each case, subject to the rights of the Commitment Parties to oppose entry of, or seek other relief in connection with, such an Interim DIP Order or Final DIP Order; |
|---|---|
| b. | The Debtors shall use their commercially reasonable efforts to obtain entry of the Confirmation Order.  The Company shall provide to each of the Commitment Parties and its counsel a copy of the proposed Plan and the Disclosure Statement and any proposed amendment, modification, supplement or change to the Plan or the Disclosure Statement, and a reasonable opportunity to review and comment on such documents (and in no event less than 48 hours prior to filing the Plan and/or the Disclosure Statement, as applicable, with the Bankruptcy Court), and each such amendment, modification, supplement or change to the Plan or the Disclosure Statement must be in form and substance satisfactory to each of the Requisite Commitment Parties and the Company.  The Company shall provide to each of the Commitment Parties and its counsel a copy of the proposed Confirmation Order (together with copies of any briefs, pleadings and motions related thereto), and a reasonable opportunity to review and comment on such Order, briefs, pleadings and motions prior to such Order, briefs, pleadings and motions being filed with the Bankruptcy Court (and in no event less than 48 hours prior to a filing of such Order, briefs, pleadings or motions with the Bankruptcy Court), and such Order, briefs, pleadings and motions must be in form and substance satisfactory to each of the Requisite Commitment Parties and the Company; |
| c. | Except as expressly set forth in the Backstop Agreement, the Restructuring Support Agreement, the Plan or with the prior written consent of Requisite Commitment Parties (requests for which, including related information, shall be directed to the counsel and financial advisors to the Commitment Parties), during the period from the date of the Backstop Agreement to the earlier of the Closing Date and the date on which the Backstop Agreement is terminated in accordance with its terms (the "<u>Pre-Closing Period</u>"), (a) the Company shall, and shall cause each of the other Debtors to, carry on its business in the ordinary course and use its commercially reasonable efforts to: (i) preserve intact its business, |

| **Summary of Principal Terms of the Backstop Agreement** |
|---|

|  | (ii) preserve its material relationships with customers, suppliers, licensors, licensees, distributors and others having material business dealings with any of the Debtors in connection with their business, (iii) keep available the services of its officers and employees and (iv) file Company SEC Documents within the time periods required under the Exchange Act, in each case in accordance with ordinary course practices, and (b) each of the Debtors shall not enter into any transaction that is material to the Debtors' business other than (A) transactions in the ordinary course of business in a manner consistent with prior business practices of the Debtors, (B) other transactions after prior notice to the Commitment Parties to implement tax planning which transactions are not reasonably expected to materially adversely affect any Commitment Party and (C) transactions expressly contemplated by the Transaction Agreements; |
|---|---|
|  | d.  Without in any way limiting any other respective obligation of the Company or any Commitment Party in the Backstop Agreement, each Party shall use (and the Company shall cause the other Debtors to use) commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by the Backstop Agreement and the Plan; |
|  | e.  The Debtors will apply the proceeds from the exercise of the Subscription Rights, the sale of the Unsubscribed Units and the sale of 4(a)(2) Backstop Commitment Units for the purposes identified in the Disclosure Statement and the Plan; and |
|  | f.  In the event that all of the Common Units being issued in connection with the 2L Investment are not purchased by the 2L Investors (such Common Units, the "2L Available Units") in accordance with the terms of the Equity Commitment Agreement (a "2L Undersubscription"), the Company and the Commitment Parties agree that upon the occurrence of a 2L Undersubscription, the Commitment Parties and their respective Affiliated Funds, shall, within five (5) Business Days after receipt of written notice from the Company to all Commitment Parties of such 2L Undersubscription, which notice shall be given promptly following the occurrence of such 2L Undersubscription and to all Commitment Parties concurrently, make arrangements for the Commitment Parties and their respective Affiliated Funds to purchase all of the 2L Available Units based upon their relative applicable Commitment Percentages. |
| **Conditions to the Obligations of the Commitment Parties**<br><br>*See* Backstop Agreement §7.1. | The obligations of each Commitment Party to consummate the transactions contemplated by the Backstop Agreement shall be subject to (unless waived in accordance with Section 7.2 of the Backstop Agreement) the satisfaction of the following conditions, among others, prior to or at the Closing:<br><br>a.  The Bankruptcy Court shall have entered the BCA Approval Order in form and substance acceptable to the Requisite Commitment Parties, and such Order shall be a Final Order;<br><br>b.  The Bankruptcy Court shall have entered the Plan Solicitation Order in form and substance acceptable to the Requisite Commitment Parties, and such Order shall be a Final Order;<br><br>c.  The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Requisite Commitment Parties, and such Order shall be a Final Order;<br><br>d.  The Company and all of the other Debtors shall have complied, in all material |

| **Summary of Principal Terms of the Backstop Agreement** |
|---|

| | |
|---|---|
| | respects, with the terms of the Plan (as amended or supplemented from time to time) that are to be performed by the Company and the other Debtors on or prior to the Effective Date and the conditions to the occurrence of the Effective Date (other than any conditions relating to occurrence of the Closing) set forth in the Plan shall have been satisfied or waived in accordance with the terms of the Plan; |
| | e. The Transactions shall have been conducted, in all material respects, in accordance with the Plan Solicitation Order, the Rights Offerings Procedures and the Backstop Agreement, as applicable; |
| | f. The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Plan and in the Confirmation Order; |
| | g. The Debtors shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in the Backstop Agreement that contemplate, by their terms, performance or compliance prior to the Closing Date. |
| | h. Since the date of the Backstop Agreement, there shall not have occurred, and there shall not exist, any Event that has had or would be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect; and |
| | i. The Exit Facility shall have become effective, provide for a $1,100,000,000 initial borrowing base limit with undrawn capacity of no less than $125,000,000 and shall otherwise be in form and substance substantially in accordance with the Restructuring Term Sheet, or as otherwise set forth in the Plan and with the consent of the Requisite Commitment Parties. |
| | j. The Debtors have fully implemented an Acceptable Hedging Program, which program shall continue following the Closing Date for the benefit of the reorganized Company and is permitted by the Exit Facility and any other financing arrangements entered into by the Debtors on the Effective Date or otherwise in accordance with the Plan. |
| | k. The representations and warranties made by each of the Debtors as of the date of the Backstop Agreement shall be true and correct as of the Closing Date, subject to certain specified materiality standards. |
| **Conditions to the Obligations of Vanguard**<br><br>*See* Backstop Agreement §7.3. | The obligations of the Debtors to consummate the transactions contemplated by the Backstop Agreement with the Commitment Parties is subject to (unless waived by the Company) the satisfaction of each of the following conditions, among others:<br><br>a. The Bankruptcy Court shall have entered the BCA Approval Order and such Order shall be a Final Order;<br><br>b. The Bankruptcy Court shall have entered the Plan Solicitation Order, and such Order shall be a Final Order;<br><br>c. The Bankruptcy Court shall have entered the Confirmation Order, and such Order shall be a Final Order;<br><br>d. The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, as applicable, in accordance with the terms and |

| **Summary of Principal Terms of the Backstop Agreement** | |
|---|---|
| | conditions in the Plan and in the Confirmation Order; |
| | e. The Commitment Parties shall have performed and complied, in all material respects, with all of their covenants and agreements contained in the Backstop Agreement and in any other document delivered pursuant to the Backstop Agreement; |
| | f. The Exit Facility shall have become effective and shall otherwise be in form and substance substantially in accordance with the Restructuring Term Sheet, or as otherwise set forth in the Plan and with the consent of the Requisite Commitment Parties; and |
| | g. The representations and warranties made by each of the Commitment Parties as of the date of the Backstop Agreement shall be true and correct as of the Closing Date, as specified in the Backstop Agreement. |
| **Indemnification and Contribution**<br><br>*See* Backstop Agreement §8.1. | Following the entry of the BCA Approval Order, the Company and the other Debtors (the "Indemnifying Parties" and each, an "Indemnifying Party") shall, jointly and severally, indemnify and hold harmless each Commitment Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective Representatives and controlling persons (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Commitment Parties except to the extent otherwise provided for in the Backstop Agreement) arising out of a claim asserted by a third-party (collectively, "Losses") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with the Backstop Agreement, the Plan and the transactions contemplated thereby, including the Rights Offering Backstop Commitment, the Rights Offering, the 4(a)(2) Backstop Commitment, the 4(a)(2) Backstop Commitment Investment, the payment of the Commitment Premium or the use of the proceeds of the Transactions, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, the other Debtors, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third-party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth in the Backstop Agreement), irrespective of whether or not the transactions contemplated by the Backstop Agreement or the Plan are consummated or whether or not the Backstop Agreement is terminated; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (a) as to a Defaulting Commitment Party, its Related Parties or any Indemnified Person related thereto, caused by a Commitment Party Default by such Commitment Party, or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person. |
| **Termination Events**<br><br>*See* Backstop Agreement art IX. | The Backstop Agreement may be terminated and the transactions contemplated by the Backstop may be abandoned at any time prior to the Closing Date by mutual written consent of the Company and the Requisite Commitment Parties.<br><br>Notwithstanding anything to the contrary in the Backstop Agreement, unless and |

| |
|---|
| **Summary of Principal Terms of the Backstop Agreement** |

until there is an unstayed Order of the Bankruptcy Court providing that the giving of notice under and/or termination of the Backstop Agreement in accordance with its terms is not prohibited by the automatic stay imposed by section 362 of the Bankruptcy Code, and except as otherwise provided in <u>Section 9.2</u> of the Backstop Agreement, at which point the Backstop Agreement may be terminated by the Requisite Commitment Parties upon written notice to the Company upon the occurrence of any of the following Events, the Backstop Agreement shall terminate automatically without any further action or notice by any Party at 5:00 p.m., New York City time on the fifth Business Day following the occurrence of any of the following Events; <u>provided</u> that, the Requisite Commitment Parties may waive such termination or extend any applicable dates in accordance with <u>Section 10.7</u> of the Backstop Agreement:

a.  the Closing Date has not occurred by 11:59 p.m., New York City time on the date that is one hundred twenty (120) days after the Petition Date (as it may be extended pursuant to <u>Section 9.2(a)</u> or <u>Section 2.3</u> of the Backstop Agreement, the "<u>Outside Date</u>"), unless prior thereto the Effective Date occurs and each of the Transactions have been consummated; provided, that the Outside Date may be waived or extended with the prior written approval of the Requisite Commitment Parties; <u>provided</u>, <u>further</u>, that if any Commitment Party does not consent to a waiver or extension of the Outside Date beyond 5:00 p.m., New York City time on February 24, 2018  the ("<u>End Date</u>") within seven (7) days of a written request being made either by the Company or by any other Commitment Party for such a waiver or extension (which request was made no later than the date seven (7) days prior to the Outside Date and has not been withdrawn) and such waiver or extension is duly approved by the Requisite Commitment Parties, such Commitment Party shall be deemed a Non-Consenting Commitment Party who has elected to withdraw from its Commitments pursuant to <u>Section 6.16</u> (Withdrawal of Commitment Party) of the Backstop Agreement and shall no longer be a party to the Backstop Agreement or the Restructuring Support Agreement (and, for the avoidance of doubt, such Commitment Party shall not be entitled to receive any portion of the Commitment Premium);

b.  the Restructuring Support Agreement is terminated as to the Debtors or the Consenting Senior Note Holders (as defined in the Restructuring Support Agreement) in accordance with its terms;

c.  the Company or any of the other Debtors files any motion, application or adversary proceeding (or any of the Company, any of the other Debtors or other Restructuring Support Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) (i) challenging the validity, enforceability, or priority of, or seeking avoidance or subordination of the Note Claims, or (ii) asserting any other cause of action against and/or with respect or relating to such claims;

d.  (i) the Company or the other Debtors shall have breached any representation, warranty, covenant or other agreement made by the Company or the other Debtors in the Backstop Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in <u>Section 7.1(k)</u> (Representations and Warranties), <u>Section 7.1(l)</u> (Covenants) or <u>Section 7.1(m)</u> (Material Adverse Effect) of the Backstop Agreement not to be satisfied, (ii) the Commitment Parties shall have delivered written notice of such breach or inaccuracy to the

| | |
|---|---|
| | **Summary of Principal Terms of the Backstop Agreement** |

|   | |
|---|---|
| | Company, (iii) such breach or inaccuracy is not cured by the Company or the other Debtors by the tenth (10th) Business Day after receipt of such notice, and (iv) as a result of such failure to cure, any condition set forth in Section 7.1(k) (Representations and Warranties), Section 7.1(l) (Covenants), or Section 7.1(m) (Material Adverse Effect) of the Backstop Agreement is not capable of being satisfied; provided, that, the Backstop Agreement shall not terminate automatically pursuant to Section 9.2(d) of the Backstop Agreement if the Commitment Parties are then in willful or intentional breach of the Backstop Agreement; |
| e. | any Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan or the Transactions or the transactions contemplated by the Backstop Agreement or the other Transaction Agreements, and, by the tenth (10th) Business Day after such Law or final and non-appealable Order shall have been enacted, adopted or issued, no relief has been obtained allowing consummation of the Rights Offerings or the transactions contemplated by the Backstop Agreement and the other Transaction Agreements in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and the Backstop Agreement, or (ii) is reasonably acceptable to the Requisite Commitment Parties; |
| f. | (i) the Debtors have materially breached their obligations under Section 6.13 (Alternative Transactions) of the Backstop Agreement; (ii) the Bankruptcy Court approves or authorizes an Alternative Transaction; or (iii) any of the Debtors enters into any Contract providing for the consummation of any Alternative Transaction or files any motion or application seeking authority to propose, join in or participate in the formation of, any actual or proposed Alternative Transaction; |
| g. | the Company or any other Debtor (i)  amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that is materially inconsistent with the Backstop Agreement; (ii) suspends or revokes the Transaction Agreements; or (iii) publicly announces its intention to take any such action listed in sub-clauses (i) or (ii) of this subsection; |
| h. | any of the BCA Approval Order, Plan Solicitation Order, or the Confirmation Order is terminated, reversed, stayed, dismissed, vacated, or reconsidered, or any such Order is modified or amended after entry without the prior written consent of the Requisite Commitment Parties; |
| i. | any of the Orders approving the Exit Facility, the Backstop Agreement, the Rights Offering Procedures, the Plan or the Disclosure Statement or the Confirmation Order are reversed, stayed, dismissed, vacated or reconsidered or modified or amended without the acquiescence or written consent (not to be unreasonably withheld, conditioned or delayed) of the Requisite Commitment Parties (and such action has not been reversed or vacated within thirty (30) calendar days after its issuance) in a manner that prevents or prohibits the consummation of the Restructuring Transactions contemplated in the Backstop Agreement or any of the Definitive Documents in a way that cannot be remedied by the Debtors subject to the reasonable satisfaction of the Requisite Commitment Parties; or |
| j. | an acceleration of the obligations or termination of commitments under the DIP |

| **Summary of Principal Terms of the Backstop Agreement** | |
|---|---|
| | Facility. |
| | The Backstop Agreement may be terminated by the Company upon written notice to each Commitment Party upon the occurrence of any of the following Events, subject to the rights of the Company to fully and conditionally waive, in writing, on a prospective or retroactive basis the occurrence of such Event: |
| | a. any Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Plan, the Transactions or the transactions contemplated by the Backstop Agreement or the other Transaction Agreements, and, by the tenth (10th) Business Day after such Law or final and non-appealable Order shall have been enacted, adopted or issued, no relief has been obtained allowing consummation of the Rights Offerings or the transactions contemplated by the Backstop Agreement and the other Transaction Agreements in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and the Backstop Agreement, or (ii) is reasonably acceptable to the Requisite Commitment Parties; |
| | b. subject to the right of the Commitment Parties to arrange a Commitment Party Replacement in accordance with Section 2.3(a) of the Backstop Agreement (which will be deemed to cure any breach by the replaced Commitment Party pursuant to this subsection (b)), (i) any Commitment Party shall have breached any representation, warranty, covenant or other agreement made by such Commitment Party in the Backstop Agreement or any such representation or warranty shall have become inaccurate and such breach or inaccuracy would, individually or in the aggregate, cause a condition set forth in Section 7.3(g) (Representations and Warranties) or Section 7.3(h) (Covenants) of the Backstop Agreement not to be satisfied, (ii) the Company shall have delivered written notice of such breach or inaccuracy to such Commitment Party, (iii) such breach or inaccuracy is not cured by such Commitment Party by the tenth (10th) Business Day after receipt of such notice, and (iv) as a result of such failure to cure, any condition set forth in Section 7.3(g) (Representations and Warranties) or Section 7.3(h) (Covenants) of the Backstop Agreement is not capable of being satisfied; provided, that the Company shall not have the right to terminate the Backstop Agreement pursuant to this Section 9.3(b) of the Backstop Agreement if it is then in willful or intentional breach of the Backstop Agreement; |
| | c. the Debtors determine, after receiving advice from counsel, that proceeding with the Restructuring Transactions (including, without limitation, the Plan or solicitation of the Plan) would be inconsistent with the exercise of the fiduciary duties of the board of directors or analogous governing body of the Debtors; provided, that, concurrently with such termination, the Company pays the Commitment Premium pursuant to Section 9.4(b)(ii) of the Backstop Agreement; |
| | d. the BCA Approval Order, Plan Solicitation Order, or Confirmation Order is terminated, reversed, stayed, dismissed, vacated, or reconsidered, or any such Order is modified or amended after entry without the prior acquiescence or written consent (not to be unreasonably withheld, conditioned or delayed) of the Company in a manner that prevents or prohibits the consummation of the Restructuring Transactions contemplated in the Backstop Agreement or any of the Definitive Documents in a way that cannot be remedied by the Commitment |

| Summary of Principal Terms of the Backstop Agreement | |
|---|---|
| | Parties subject to the reasonable satisfaction of the Debtors; |
| | e.   the Restructuring Support Agreement is terminated in accordance with its terms; |
| | f.   any of the Orders approving the Exit Facility, the Backstop Agreement, the Rights Offering Procedures, the Plan or the Disclosure Statement or the Confirmation Order are reversed, stayed, dismissed, vacated or reconsidered or modified or amended without the acquiescence or consent (not to be unreasonably withheld, conditioned or delayed) of the Company (and such action has not been reversed or vacated within thirty (30) calendar days after its issuance) in a manner that prevents or prohibits the consummation of the Restructuring Transactions contemplated in the Backstop Agreement or any of the Definitive Documents in a way that cannot be remedied by the Commitment Parties subject to the reasonable satisfaction of the Debtors; or |
| | g.   the Closing Date has not occurred by the earlier of (i) the Outside Date (as the same may be extended pursuant to Section 9.2(a) or Section 2.3 of the Backstop Agreement), and (ii) the date that is two hundred seventy (270) days from the date of the Backstop Agreement, in either case, unless prior thereto the Effective Date occurs and each of the Transactions have been consummated; provided, that the Company shall not have the right to terminate the Backstop Agreement pursuant to this Section 9.3(g) of the Backstop Agreement if it is then in material breach of the Backstop Agreement. |

## The Equity Commitment Agreement

14.     Through the Equity Commitment from the Investors, Vanguard anticipates that it will raise approximately $19.25 million of new capital to pay down their senior secured bank debt.  The following table summarizes the material terms of the Equity Commitment Agreement:[5]

| Summary of Principal Terms of the Equity Commitment Agreement | |
|---|---|
| **Equity Contribution**<br><br>*See* Equity Commitment Agreement §2.1. | Each Investor severally, and not jointly, irrevocably agrees to make an equity contribution in accordance with the Equity Commitment Agreement (each an "Equity Contribution") in an aggregate amount equal to its Equity Commitment.  In no event shall any Investor be obligated to make any Equity Contribution that exceeds such Investor's Equity Commitment at the time such Equity Contribution is made.  Each Equity Contribution shall be transferred to the Company in immediately available funds no later than the Effective Date.<br><br>In return for their Equity Contributions, the Investors shall receive New Equity |

---

[5]  This summary is provided for the Court's convenience and is subject in all respects to the terms of the Equity Commitment Agreement.  In the event of any inconsistency or conflict between the terms of this summary and the Equity Commitment Agreement, the terms of the Equity Commitment Agreement shall control.  Capitalized terms used but not defined herein have the meanings set forth in the Equity Commitment Agreement.

| | |
|---|---|
| **Summary of Principal Terms of the Equity Commitment Agreement** | |
| | Interests in an amount equal to the Aggregate Equity Commitment Amount at a 25% discount to plan value (based on a total enterprise value of $1.625 billion and consideration of net excess cash ($45 million) and net indebtedness ($1.023 billion) in calculation of such plan equity value), which amount shall equal 4.3% of the total New Equity Interests, subject to dilution by the management incentive plan. |
| **Equity Expense Reimbursement**<br><br>*See* Equity Commitment Agreement § 3.2. | In connection with the Transaction and subject to and in accordance with the Restructuring Support Agreement, the Company shall, subject to Bankruptcy Court approval, pay or reimburse when due, all reasonable and documented fees and expenses (including travel costs and expenses) of the following in accordance with the engagement letters entered into with each of the following on February 1, 2017 (regardless of whether such fees and expenses were incurred before or after the Petition Date), Morrison & Foerster LLP as primary counsel, Jackson Walker LLP as local counsel, and Centerview Partners LLC as financial advisor, in each case to the Investors. |
| **Indemnification**<br><br>*See* Equity Commitment Agreement § 3.3. | The Company agrees, subject to the provisions of this paragraph below, to indemnify and hold harmless each Investor and its affiliates and their respective members, managers, trustees, general and limited partners, controlling persons, securityholders, officers, directors, employees, affiliates, advisors, agents, attorneys and representatives (each, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities and expenses (including fees and disbursements of counsel), to which any such Indemnified Party may become subject arising out of or in connection with or relating to the Equity Commitment Agreement, the Definitive Documentation, the Investment, any use made or proposed to be made with the proceeds thereof, the Transaction or any related transaction or any claim, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether the Company or any Indemnified Party shall have initiated the foregoing or shall be a party thereto, and to reimburse each Indemnified Party upon demand for any legal or other expenses reasonably incurred in connection with investigating or defending any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth in the Equity Commitment Agreement), irrespective of whether any of the transactions contemplated by the Equity Commitment Agreement are consummated; provided, however, that the foregoing indemnity will not, as to any Indemnified Party, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct or gross negligence of such Indemnified Party. In no event shall any Indemnified Party be liable to Company or any other Debtor or any creditor or equityholder of any thereof on any theory of liability for any special, indirect, consequential or punitive damages.<br><br>The Company further agrees that, without the prior written consent of Investors, none of the Debtors will enter into any settlement of any claim, litigation, investigation or proceeding involving the Equity Commitment Agreement, or the Investment, any use made or proposed to be made with the proceeds thereof or the Transaction unless such settlement (i) includes an explicit and unconditional release, from the party bringing such claim, litigation, investigation or proceeding, of all Indemnified Parties and (ii) does not include a statement as to or an admission of fault, culpability, or a failure to act by or on behalf of any Indemnified Party. No Indemnified Party shall be liable for any damages arising from the use by unauthorized persons of any information made available to any Indemnified Party by any Debtor or any representative thereof through electronic, telecommunications or other information transmission systems that is intercepted by such unauthorized persons. |
| **Termination Events** | Investors shall have the right, but not the obligation, upon five (5) days' written |

| **Summary of Principal Terms of the Equity Commitment Agreement** | |
|---|---|
| *See* Equity Commitment Agreement art. IV. | notice to the Company and counsel to the Consenting Senior Note Holders, to terminate their obligations under the Equity Commitment Agreement upon the occurrence of any of the following events, unless waived, in writing, by the Investors on a prospective or retroactive basis:<br><br>1. the filing by the Debtors of any Definitive Documentation that is materially inconsistent with the terms of the Investment as set forth in the Equity Commitment Agreement and in the Term Sheet;<br><br>2. the failure to meet any Milestone in Section 4 of the Restructuring Support Agreement unless (i) such failure is the result of any act, omission, or delay on the part of Investors in violation of its obligations under the Restructuring Support Agreement or under the Equity Commitment Agreement or (ii) such Milestone is extended in accordance with Section 4 of the Restructuring Support Agreement;<br><br>3. the filing by the Debtors of any Definitive Documentation that does not have the consent required by Section 3 (iv) of the Restructuring Support Agreement, to the extent such consent is required by such subsection;<br><br>4. entry of an order by the Bankruptcy Court amending or modifying the Definitive Documentation, unless such amendment or modification is consistent in all material respects with the terms of the Equity Commitment Agreement;<br><br>5. the termination of the Backstop Commitment Agreement in accordance with its terms; or<br><br>6. the Required Consenting Senior Note Holders terminate the Restructuring Support Agreement as set forth in Section 7 of the Restructuring Support Agreement.<br><br>The Equity Commitment Agreement may be terminated and the transactions contemplated thereby may be abandoned at any time by mutual written consent of the Company and the Investors. Upon any termination pursuant to the terms in the Equity Commitment Agreement, the Equity Commitment Agreement shall forthwith become void and there shall be no further obligations or liabilities on the part of the Company or the Investors; provided, that Company's indemnification obligations set forth in the Equity Commitment Agreement shall survive termination of the Equity Commitment Agreement indefinitely and shall remain in full force and effect. |
| **Representations and Warranties of Vanguard Natural Resources, LLC**<br><br>*See* Equity Commitment Agreement § 5.2. | The Company represents and warrants in favor of each Investor as follows:<br><br>1. (a) audited consolidated balance sheets of the Company as at December 31, 2015 and the related consolidated statements of operations and of cash flows for the fiscal year then ended, accompanied by a report thereon by BDO USA LLP (collectively, the "Audited Financial Statements") and (b) unaudited consolidated balance sheet of the Company as at September 30, 2016 and the related statements of operations and cash flows (the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements"), in each case, present fairly the consolidated financial condition of the Company as at such date, and the consolidated results of its operations and its consolidated cash flows for the fiscal year then ended. All such Financial Statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as disclosed therein);<br><br>2. The Company has filed with or furnished to the Securities and Exchange Commission (the "SEC") all reports, schedules, forms, statements and other |

| Summary of Principal Terms of the Equity Commitment Agreement | |
|---|---|
| | documents (including exhibits and other information incorporated therein) required to be filed or furnished by it since December 31, 2015 under the relevant securities laws As of their respective dates, and, if amended, as of the date of the last such amendment, each of the reports, schedules, forms, statements and other documents (including exhibits and other information incorporated therein) filed with the SEC by the Company, including any financial statements or schedules included therein, (i) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated in such document or necessary in order to make the statements in such document, in light of the circumstances under which they were made, not misleading and (ii) complied in all material respects with the applicable requirements of all applicable federal securities laws and the applicable rules and regulations of the SEC; and |
| | 3. The projections (the "<u>Projections</u>") that have been or will be prepared and made available to Investors by the Company or any of its representatives have been and will be prepared in good faith based upon reasonable assumptions at the time made. The Company agrees that if, at any time prior to the Effective Date, any of the representations in the preceding sentence would be incorrect in any material respect if the Projections were being furnished, and such representations were being made, at such time, then the Company will promptly supplement the Projections so that such representations will be correct under those circumstances. |
| **Representations and Warranties of the Investors**<br><br>*See* Equity Commitment Agreement § 5.1. | Each Investor represents and warrants in favor of the Company as follows:<br><br>1. Such Investor is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the laws of its jurisdiction of incorporation or organization;<br><br>2. Such Investor has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver the Equity Commitment Agreement and each other agreement to which such Investor is a party and to perform its obligations hereunder and thereunder and has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and performance by it of the Equity Commitment Agreement and the Transaction;<br><br>3. The Equity Commitment Agreement and the Transaction to which such Investor is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Investor and (b) upon entry of an order from the Bankruptcy Court approving the Transaction and assuming due and valid execution and delivery thereof by the Company and the other Debtors (as applicable), will constitute valid and legally binding obligations of such Investor, enforceable against such Investor in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws limiting creditors' rights generally or by equitable principles relating to enforceability;<br><br>4. No consent, approval, authorization, order, registration or qualification of or with any governmental entity having jurisdiction over such Investor or any of its properties is required for the execution and delivery by such Investor of the Equity Commitment Agreement and the Transaction, the compliance by such Investor with the provisions thereof and the consummation of the transactions, except (a) any consent, approval, authorization, order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact |

| Summary of Principal Terms of the Equity Commitment Agreement | |
|---|---|
| | such Investor's performance of its obligations under the Equity Commitment Agreement and the Transaction and (b) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any antitrust laws in connection with the transactions contemplated by the Equity Commitment Agreement; |
| | 5. Assuming that the consents referred to in clauses Section 5.1.4 are obtained, the execution and delivery by such Investor of the Equity Commitment Agreement and the Transaction, the compliance by such Investor with all of the provisions thereof and the consummation of the transactions contemplated therein (a) will not conflict with, or result in breach, modification, termination or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time or both), or result in the acceleration of, or the creation of any lien under, any contract to which such Investor is party or is bound or to which any of the property or assets or such Investor is subject, (b) will not result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of such Investor and (c) will not result in any material violation of any law or order applicable to such Investor or any of its properties, except in each of the cases described in clauses (a) or (c), for any conflict, breach, modification, termination, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit or materially and adversely impact such Investor's performance of its obligations under the Equity Commitment Agreement; |
| | 6. To the best of its knowledge, there are no actions pending or threatened against it that would reasonably be expected to have a material adverse effect on its ability to perform its obligations under the Equity Commitment Agreement or to consummate the transactions contemplated by the Equity Commitment Agreement; and |
| | 7. Such Investors have sufficient assets and the financial capacity to perform all of their obligations under the Equity Commitment Agreement and in connection with the Transaction. |

## BASIS FOR RELIEF

## I.  Entry Into the Backstop Agreement and the Equity Commitment Agreement Is an Exercise of the Debtors' Sound Business Judgment and Is in the Best Interests of Their Estates and All Parties in Interest.[6]

15.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession,

"after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1). The Fifth Circuit has held that debtors must

articulate a "business justification" for using, selling, or leasing property outside of the ordinary

---

[6] Although the Backstop Agreement represents Vanguard's best chances for a successful emergence at this time, Vanguard nevertheless maintain a "fiduciary out" under each of the agreements to terminate the agreement and enter into superior restructuring alternatives.

course of business.[7]   The "business judgment standard is flexible and encourages discretion."[8]
Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside
of the ordinary course of business upon a finding that such use is supported by sound
business reasons.[9]

16.     Section 105 of the Bankruptcy Code provides further support for entry of an order
approving the Backstop Agreement and the Equity Commitment Agreement.  Section 105 of the
Bankruptcy Code gives this Court "vast equitable powers"[10] in carrying out the provisions of the
Bankruptcy Code.  And the method of doing so is left to the discretion of the court.[11]  The Court
is given these vast equitable powers to ensure that the Debtors are "not unduly denied
benefits" provided to them under the Bankruptcy Code.[12]

17.     Here, the Backstop Agreement and the Equity Commitment Agreement enable
Vanguard to move expeditiously to confirm and consummate the Plan by ensuring that the new
money investment in an aggregate amount of approximately $275 million will be fully funded.
The Rights Offering, the 4(a)(2) Backstop Commitment, the Backstop Agreement, and the

---

[7]  *See, e.g.*, *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (outside of the ordinary course of business, "for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property" (internal quotation marks omitted) (citation omitted)).

[8]  *Id.*

[9]  *See, e.g.*,  *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (citation omitted).

[10]  *McKenzie v. Kukui, Inc. (In re McKenzie)*, 209 F.3d 719 (5th Cir. 2000) (unpublished table decision); *see also Davis v. Davis (In re Davis)*, 170 F.3d 475, 492 (5th Cir. 1999) ("The basic purpose of § 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction.").

[11]  *See Rojas v. Citi Corp Trust Bank FSB (In re Rojas)*, No. 07-70058, 2009 WL 2496807, at *7 (Bankr. S.D. Tex. Aug. 12, 2009) ("Section 105 does not require a court to use the least restrictive means to carry out the requirements of the Code. Section 105(a) does not say that the Court's authority is limited to orders or judgments *necessary* to carry out the Code. Rather, Congress explicitly added to the statute deferential, discretionary language with 'or appropriate.'") (emphasis in original).

[12]  *Exquisito Servs., Inc. v. United States (In re Exquisito Servs., Inc.)*, 823 F.2d 151, 155 (5th Cir. 1987).

Equity Commitment Agreement are key components to Vanguard's ability to emerge from chapter 11 with a significantly deleveraged capital structure to ensure a sustainable business after emergence. Absent the Commitments, there is simply no assurance that sufficient capital would be raised, which potentially could jeopardize Vanguard's restructuring and viability going forward.

18.     Moreover, the Backstop Agreement provides a strong foundation upon which to build consensus across Vanguard's capital structure. Not only does the Backstop Agreement guarantee the funds necessary to effectuate Vanguard's restructuring, but it also affords proportional participation rights in the Rights Offerings to holders of Senior Notes. As noted above, the Commitment Parties consist of the largest holders of the Senior Notes, who have already agreed to support the overall terms of Vanguard's restructuring, as embodied in the RSA and the Plan. With these agreements in hand, Vanguard has the support of its major creditor constituencies. In the weeks leading up to hearings on this Motion and the Disclosure Statement, Vanguard expects that it will continue to work in good faith with other stakeholders to build further support for the Plan.

**II.     The Commitment Premium, the Backstop Expense Reimbursement, and the Equity Expense Reimbursement Should Be Approved Because They Are Reasonable, Market-Based, and Essential Components of the Backstop Agreement and the Equity Commitment Agreement**

19.     Providing the Commitment Premium and the Backstop Expense Reimbursement under the Backstop Agreement is necessary to secure the Commitments and compensate the Commitment Parties for their undertaking. Without these fees and expense reimbursements, the Commitment Parties simply would not have been willing to provide the Commitments, which are a critical component of Vanguard's restructuring efforts.

20.     For these reasons, Vanguard determined, in its business judgment and in consultation with its advisors, that providing the Commitment Premium and the Backstop Expense Reimbursement was an essential and fair means to secure the Commitments.

21.     Given the substantial benefits provided by the Commitments, such fees and reimbursements are a reasonable use of estate resources and should be accorded administrative expense priority.  These fees are actual and necessary costs, not only for preserving the Debtors' estates, but also for maximizing the value thereof and enhancing creditor recoveries.

22.     The terms of the Commitment Premium and the Backstop Expense Reimbursement are market-based and comparable to those that courts have approved in other recent chapter 11 cases.[13]  Here, the Commitment Premium is equal to 6.0 percent.  The Commitment Premium and Backstop Expense Reimbursement are necessary inducements for the Commitment Parties to enter into the Backstop Agreement at a fraction of the total value of the Rights Offering and the 4(a)(2) Backstop Commitment.  Given the substantial investment the Commitment Parties have agreed to undertake, Vanguard submits that these fees are necessary to the successful completion of the Investments.

23.     Moreover, providing the Equity Expense Reimbursement under the Equity Commitment Agreement is necessary to secure the Equity Contribution and compensate the

---

[13]  *See, e.g.*, *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. January 19, 2017) [Dkt. No. 996] (approving a commitment fee equal to 6.0 percent of the rights offering amount in new common stock); *In re CHC Group Ltd.*, No 16-31854 (BJH) (Bankr. N.D. Tex. Dec. 20, 2016) [Dkt. No. 1381] (approving a commitment fee, referred to as a "put option premium," equal to 10.3 percent of the rights offering amount); *In re Penn Virginia Corp.*, No 16-32395 (KLP) (Bankr. E.D. Va. June 14, 2016) [Dkt. No. 290] (approving backstop commitment agreement with a backstop premium equal to 6.0 percent of the rights offering amount and expense reimbursement of the backstop parties' advisors); *In re Chaparral Energy, Inc.*, No. 16-11144 (LSS) (Bankr. D. Del. Dec. 14, 2016) [Dkt. No. 651] (approving a commitment premium equal to 8.75 percent of the rights offering amount in new common stock); *In re Key Energy Services, Inc.*, No. 16-12306 (BLS) (Bankr. D. Del. Dec. 6, 2016) [Dkt. No. 245] (approving a commitment fee, referred to as a "put option percentage", equal to 6.0 percent of the rights offering amount in new common stock plus an additional "put premium" equal to the quotient of (i) $1.5 million divided by (ii) the share price on the effective date).

Investors for their undertaking. Without this expense reimbursement, the Investors simply would not have been willing to provide the Equity Contribution, which are a critical component of Vanguard's restructuring efforts.

24.     For these reasons, Vanguard determined, in its business judgment and in consultation with its advisors, that providing the Equity Expense Reimbursement under the Equity Commitment Agreement was an essential and fair means to secure the Equity Contribution.

25.     Given the substantial benefits provided by the Equity Investors, such reimbursement is a reasonable use of estate resources and should be accorded administrative expense priority. These fees are actual and necessary costs, not only for preserving the Debtors' estates, but also for maximizing the value thereof and enhancing creditor recoveries.

26.     For all of the foregoing reasons, Vanguard respectfully submits that entry into the Backstop Agreement and the Equity Commitment Agreement is in the best interest of its estates and an appropriate exercise of its business judgment as it assures an expeditious path toward emergence with the support of nearly all of their major stakeholders.

## **EXPEDITED CONSIDERATION**

27.     In accordance with Bankruptcy Local Rule 9013-1(i), Vanguard respectfully submits that it is appropriate for the Court to consider this Motion on an expedited basis. Specifically, Vanguard is proposing to have this Motion heard on **March 20, 2017 at 10:00 a.m. (prevailing Central Time)**, with an objection deadline of **March 16, 2017 at 4:00 p.m. (prevailing Central Time)**, given that, under the milestones in its RSA, Vanguard must have obtained court approval of the Backstop Agreement and the Equity Commitment Agreement by March 23, 2017. To be clear, Vanguard is not requesting that the Court shorten the time for the

hearing itself.  Rather, Vanguard is solely requesting that the time to **respond** to this Motion be shortened from 21 days to 17 days (based on a service date of February 27, 2017), so that Vanguard has the opportunity to reply to any objections that may be filed to the relief requested in the Motion.

## NOTICE

28.     Notice of this Motion has been provided by email, facsimile, or overnight courier to: (a) the U.S. Trustee; (b) counsel to the Creditors' Committee; (c) Citibank, N.A., as administrative agent under Vanguard's first lien credit facility, and its counsel; (d) the indenture trustee for Vanguard's second lien notes; (e) counsel to the ad hoc group of second lien noteholders; (f) the indenture trustees for Vanguard's senior unsecured notes; (g) counsel to the ad hoc group of unsecured noteholders; (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002. Vanguard submits that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

29.     No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, Vanguard respectfully requests that the Court enter an order, substantially in the form attached to this Motion as **Exhibit A**, granting the relief requested in this Motion and granting Vanguard such other relief as is just and proper.

Dated:  February 25, 2017                    Respectfully Submitted,

*/s/ James T. Grogan*
Chris L. Dickerson, Esq. (admitted *pro hac vice*)
Todd M. Schwartz (admitted *pro hac vice*)
PAUL HASTINGS LLP
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100

- and -

James T. Grogan, Esq. (Tex. Bar No. 24027354)
Danny Newman (Tex. Bar No. 24092896)
PAUL HASTINGS LLP
600 Travis St., 58th Floor
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-2801

*Proposed Counsel to Vanguard*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 25, 2017, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ James T. Grogan*
James T. Grogan