## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| VANGUARD NATURAL RESOURCES, LLC, *et al.*,[1] | § | Case No. 17-30560 (MI) |
| | § | |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | |

## DISCLOSURE STATEMENT RELATING TO THE JOINT PLAN OF REORGANIZATION OF VANGUARD NATURAL RESOURCES, LLC, *ET AL.*, PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Chris L. Dickerson, Esq. (admitted *pro hac vice*)
Todd M. Schwartz, Esq. (admitted *pro hac vice*)
**PAUL HASTINGS LLP**
71 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 499-6000
Facsimile: (312) 499-6100

- and -

James T. Grogan, Esq. (Tex. Bar No. 24027354)
Danny Newman, Esq. (Tex. Bar No. 24092896)
**PAUL HASTINGS LLP**
600 Travis Street, 58th Floor
Houston, Texas 77002
Telephone: (713) 860-7300
Facsimile: (713) 353-2801

*Proposed Counsel to Vanguard*

Dated: February 25, 2017

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Vanguard Natural Resources, LLC (1161); Eagle Rock Acquisition Partnership, L.P. (6706); Eagle Rock Acquisition Partnership II, L.P. (0903); Eagle Rock Energy Acquisition Co., Inc. (4564); Eagle Rock Energy Acquisition Co. II, Inc. (3364); Eagle Rock Upstream Development Company, Inc. (0113); Eagle Rock Upstream Development Company II, Inc. (7453); Encore Clear Fork Pipeline LLC (2032); Escambia Asset Co. LLC (3869); Escambia Operating Co. LLC (2000); Vanguard Natural Gas, LLC (1004); Vanguard Operating, LLC (9331); VNR Finance Corp. (1494); and VNR Holdings, LLC (6371).  The location of the Debtors' service address is: 5847 San Felipe, Suite 3000, Houston, Texas 77057.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[2]

The Debtors are providing the information in this Disclosure Statement to Holders of Claims or Interests for purposes of soliciting votes to accept or reject the joint plan of reorganization of Vanguard Natural Resources, LLC and its Debtor affiliates, pursuant to chapter 11 of the Bankruptcy Code. Nothing in this Disclosure Statement may be relied upon or used by any Entity for any other purpose. Before deciding whether to vote for or against the Plan, each Holder entitled to vote should consider carefully all of the information in this Disclosure Statement, including the Risk Factors described in Article VIII herein.

**Subject to the foregoing, the Plan is supported by the Debtors, the Ad Hoc Group of Second Lien Noteholders, and the Ad Hoc Group of Senior Noteholders. The Debtors urge Holders of Claims or Interests whose votes are being solicited to accept the Plan.**

The Debtors urge each Holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and the proposed transactions contemplated thereby. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan or the Bankruptcy Court's approval of the Plan.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, financial information, and certain anticipated events in the Debtors' Chapter 11 Cases. Although the Debtors believe that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that they do not set forth the entire text of such documents, statutory provisions, or financial information or every detail of such anticipated events. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted. The Debtors do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

In preparing this Disclosure Statement, the Debtors relied on financial data derived from the Debtors' books and records and on various assumptions regarding the Debtors' businesses. The Debtors believe that such financial information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, however, the Debtors make no representations or warranties as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' businesses and their future results and

---

[2] Capitalized terms used but not defined in this disclaimer have the meaning ascribed to them elsewhere in this Disclosure Statement or in the Plan (as defined below), as applicable.

operations.  The Debtors expressly caution readers not to place undue reliance on any forward-looking statements contained herein.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver.  The Debtors or any other authorized party may seek to investigate, File, and prosecute Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Claims or objections to Claims.

Unless otherwise specifically noted, the Debtors are making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof.  Although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, and expressly disclaim any duty to update publicly any forward-looking statements, whether as a result of new information, future events, or otherwise.  Holders of Claims or Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since this Disclosure Statement was Filed.  Information contained herein is subject to completion, modification, or amendment.  The Debtors reserve the right to File an amended or modified Plan and related Disclosure Statement from time to time for the Debtors, subject to the RSA.

The Debtors have not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement.  The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims or Interests (including those Holders of Claims or Interests who do not submit ballots to accept or reject the plan, who vote to reject the Plan, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the Restructuring Transactions contemplated thereby.

The Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read the Plan and this Disclosure Statement in its entirety, including Article VIII, entitled "RISK FACTORS," which begins on page 56, before submitting your ballot to vote on the Plan.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily prepared in accordance with federal or state securities laws or other similar laws.  This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local, or foreign

regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. Other Securities may be issued pursuant to other applicable exemptions under the federal securities laws. To the extent exemptions from registration under section 1145 of the Bankruptcy Code or applicable federal securities law do not apply, the Securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements. Forward-looking statements may include statements about the Debtors':

- business strategy;

- acquisition strategy;

- financial strategy;

- risks associated with the chapter 11 process, including the Debtors' inability to develop, confirm and consummate a plan under chapter 11 or an alternative restructuring transaction;

- inability to maintain relationships with suppliers, customers, employees and other third parties as a result of the chapter 11 filings;

- failure to satisfy the Debtors' short- or long-term liquidity needs, including its inability to generate sufficient cash flow from operations or to obtain adequate financing to fund its capital expenditures and meet working capital needs and its ability to continue as a going concern;

- large or multiple customer defaults on contractual obligations, including defaults resulting from actual or potential insolvencies;

- legal proceedings and the effects thereof;

- **ability to resume payment of distributions in the future or maintain or grow them after such resumption;**

- **drilling locations;**

- **oil, natural gas and natural gas liquid ("NGL") reserves;**

- **realized oil, natural gas and NGL prices;**

- **production volumes;**

- **capital expenditures;**

- **economic and competitive advantages;**

- **credit and capital market conditions;**

- **regulatory changes;**

- **lease operating expenses, general and administrative expenses and development costs;**

- **future operating results, including results of acquired properties;**

- **plans, objectives, expectations, and intentions; and**

- **integration and the resulting benefits of asset and property acquisitions or the effects of asset and property acquisitions or dispositions on the Debtors' cash position and levels of indebtedness.**

**Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance.  There are risks, uncertainties, and other important factors that could cause the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein.  These risks, uncertainties, and factors may include:  the Debtors' ability to confirm and consummate the Plan; the Debtors' ability to reduce their overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees, and the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; customer responses to the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; the Debtors' ability to access financing necessary to consummate the Plan; general economic, business, and market conditions; currency fluctuations; interest rate fluctuations; price increases; exposure to litigation; a decline in the Debtors' market share due to competition or price pressure by customers; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing businesses; financial conditions of the Debtors' customers; adverse tax changes; limited access to capital resources; changes in domestic and foreign laws and**

**regulations; trade balance; natural disasters; geopolitical instability; and the effects of governmental regulation on the Debtors' businesses.**

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I. INTRODUCTION ........................................................................................................... 1

II. EXECUTIVE SUMMARY ............................................................................................. 2

III. OVERVIEW OF THE PLAN ......................................................................................... 5

    A. Exit Facility.......................................................................................................... 6

    B. New Second Lien Notes........................................................................................ 6

    C. Second Lien Investment........................................................................................ 6

    D. Rights Offering for Reorganized VNR Common Stock ........................................ 6

    E. Reorganized VNR Common Stock ....................................................................... 7

    F. New Warrants ....................................................................................................... 7

    G. Reorganized VNR Management Incentive Plan .................................................... 7

    H. Use of Proceeds.................................................................................................... 8

    I. Directors and Officers of the Reorganized Debtors............................................... 8

    J. General Settlement of Claims and Interests .......................................................... 8

    K. Releases................................................................................................................ 9

    L. Dissolution of the Creditors' Committee .............................................................. 9

IV. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
STATEMENT AND PLAN........................................................................................... 10

    A. What is chapter 11?............................................................................................. 10

    B. Why are the Debtors sending me this Disclosure Statement? ............................. 10

    C. Am I entitled to vote on the Plan? ...................................................................... 10

    D. What will I receive from the Debtors if the Plan is consummated? .................... 11

    E. What will I receive from the Debtors if I hold an Allowed Administrative
Claim, DIP Facility Claim, or a Priority Tax Claim? ......................................... 17

    F. How do I know if I hold a Trade Claim or a General Unsecured Claim and
what does it mean for my Claim if I do? ............................................................ 19

    G. Are there any regulatory approvals required to consummate the Plan? .............. 19

    H. What happens to my recovery if the Plan is not confirmed or does not go
effective?............................................................................................................ 20

    I. If the Plan provides that I get a distribution, do I get it upon Confirmation
or when the Plan goes effective, and what is meant by "Confirmation,"
"Effective Date," and "Consummation?" ........................................................... 20

    J. What are the sources of Cash and other consideration required to fund the
Plan?................................................................................................................... 20

i

K.  Are there risks to owning the Reorganized VNR Common Stock upon emergence from chapter 11? .......................................................................... 20

L.  Is there potential litigation related to the Plan? ..................................... 21

M.  Will Royalty and Working Interests be affected by the Plan? ............................ 21

N.  What is the Reorganized VNR Management Incentive Plan and how will it affect the distribution I receive under the Plan? ..................................... 21

O.  Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan? .......................................................................................... 22

P.  What will happen to Executory Contracts and Unexpired Leases under the Plan? .......................................................................................... 22

Q.  How will Claims asserted with respect to rejection damages affect my recovery under the Plan? ..................................................................... 24

R.  How will Governmental Claims affect my recovery under the Plan? ................. 25

S.  How will the resolution of certain contingent, unliquidated, and disputed litigation Claims affect my recovery under the Plan? ......................................... 25

T.  What happens to contingent, unliquidated, and disputed Claims under the Plan? .......................................................................................... 25

U.  How will the preservation of the Causes of Action impact my recovery under the Plan? ................................................................................. 26

V.  Are the Debtors assuming any indemnification obligations for their current officers and directors under the Plan? .................................................. 27

W.  Will there be releases and exculpation granted to parties in interest as part of the Plan? ................................................................................... 27

X.  What impact does the Claims Bar Date or Administrative Claims Bar Date have on my Claim? .......................................................................... 31

Y.  What is the deadline to vote on the Plan? .......................................................... 34

Z.  How do I vote for or against the Plan? .............................................................. 34

AA.  How does a Holder of an Allowed Senior Notes Claim exercise its rights to participate in the Rights Offering as set forth in the 1145 Rights Offering Procedures (the "Rights")? ................................................... 34

BB.  Why is the Bankruptcy Court holding a Confirmation Hearing? ...................... 34

CC.  When is the Confirmation Hearing set to occur? ............................................. 34

DD.  What is the purpose of the Confirmation Hearing? ......................................... 35

EE.  What is the effect of the Plan on the Debtors' ongoing business? ..................... 35

FF.  Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors? ................................................ 35

ii

GG.   Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ........................................................ 36

HH.   Do the Debtors recommend voting in favor of the Plan? .................................... 36

II.   Who Supports the Plan? ...................................................................................... 36

JJ.   What is the Creditors' Committee's position on the Plan? ................................. 37

V.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ..................................................................................... 38

A.   The Debtors .......................................................................................................... 38

B.   The Debtors' Corporate History .......................................................................... 39

C.   The Debtors' Key Assets and Operations ............................................................ 39

D.   Prepetition Capital Structure ............................................................................... 44

VI.   EVENTS LEADING TO THE CHAPTER 11 CASES ................................................... 47

A.   Adverse Market Conditions ................................................................................. 47

B.   Proactive Approach to Addressing Liquidity Constraints ................................... 47

C.   The RSA ............................................................................................................... 49

D.   The DIP Facility ................................................................................................... 50

E.   The Backstop Agreement ..................................................................................... 50

F.   The Second Lien Investment Agreement ............................................................. 51

VII.   MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES ............................................................................................. 52

A.   Corporate Structure upon Emergence .................................................................. 52

B.   Expected Timetable of the Chapter 11 Cases ...................................................... 52

C.   Initial Relief ......................................................................................................... 52

D.   Other Motions ...................................................................................................... 53

E.   Appointment of Official Creditors' Committee ................................................... 54

F.   Retention of Professionals ................................................................................... 54

G.   Consideration of Alternative Proposals ............................................................... 55

H.   Other Litigation Matters ...................................................................................... 55

I.   Rejection and Assumption of Executory Contracts and Unexpired Leases ........ 55

VIII.   RISK FACTORS ...................................................................................................... 56

A.   Bankruptcy Law Considerations .......................................................................... 56

B.   Risks Related to Recoveries under the Plan ........................................................ 60

C.   Risks Related to the Debtors' and the Reorganized Debtors' Businesses ........... 64

IX. SOLICITATION AND VOTING PROCEDURES..........................................................78

 A. Holders of Claims and Interests Entitled to Vote on the Plan ............................78

 B. Voting Record Date ..........................................................................................78

 C. Voting on the Plan ............................................................................................79

 D. Ballots Not Counted..........................................................................................79

X. 1145 RIGHTS OFFERING PROCEDURES ................................................................80

XI. CONFIRMATION OF THE PLAN..............................................................................83

 A. Requirements for Confirmation of the Plan......................................................83

 B. Best Interests of Creditors/Liquidation Analysis ..................................................83

 C. Feasibility.........................................................................................................84

 D. Acceptance by Impaired Classes ......................................................................84

 E. Confirmation without Acceptance by All Impaired Classes................................85

 F. Valuation of the Debtors...................................................................................86

 G. The Plan Supplement ........................................................................................86

XII. CERTAIN SECURITIES LAW MATTERS .................................................................88

 A. 1145 Securities.................................................................................................88

 B. 4(a)(2) Securities...............................................................................................90

XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES
OF THE PLAN .............................................................................................................93

 A. Introduction......................................................................................................93

 B. Certain U.S. Federal Income Tax Consequences to the Debtors and the
Reorganized Debtors........................................................................................94

 C. Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of
Claims or Interests ...........................................................................................95

 D. Certain U.S. Federal Income Tax Consequences to Certain Non-
U.S. Holders of Claims or Interests .................................................................108

 E. Information Reporting and Back-Up Withholding ...........................................114

XIV. RECOMMENDATION ...............................................................................................115

**EXHIBITS[1]**


EXHIBIT A    Plan of Reorganization

EXHIBIT B    Restructuring Support Agreement

EXHIBIT C    1145 Rights Offering Procedures

EXHIBIT D    Corporate Organization Chart

EXHIBIT E    Disclosure Statement Order

EXHIBIT F    Liquidation Analysis

EXHIBIT G    Valuation Analysis

EXHIBIT H    Financial Projections

EXHIBIT I    Backstop Agreement

EXHIBIT J    Second Lien Investment Agreement

---

[1] Each Exhibit is incorporated herein by reference.

# I.     INTRODUCTION

The Debtors submit this disclosure statement (this "<u>Disclosure Statement</u>") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Plan of Reorganization of Vanguard Natural Resources, LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code* (the "<u>Plan</u>"), dated February 25, 2017.[1]  A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS, THE AD HOC GROUP OF SENIOR NOTEHOLDERS, AND THE AD HOC GROUP OF SECOND LIEN NOTEHOLDERS SUPPORT THE PLAN. THE DEBTORS BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO HOLDERS OF CLAIMS OR INTERESTS.  AT THIS TIME, THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

---

[1] Capitalized terms used but not otherwise defined in this Disclosure Statement have the meaning ascribed to such terms in the Plan.  **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

## II.    EXECUTIVE SUMMARY

Vanguard Natural Resources, LLC ("VNR"), along with certain of its subsidiaries (collectively, the "Debtors") form an oil and natural gas company with a principal focus on acquisition, production, and development activities in the Rocky Mountain, Mid-Continent, Gulf Coast, and West Texas regions of the United States.  VNR is a publicly traded limited liability company organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession.  VNR and certain direct and indirect Debtor subsidiaries are the obligors on the majority of the Debtors' funded debt.

The Debtors conduct their exploration and production ("E&P") activities across eleven states in ten geographic basins.  As of September 30, 2016, the Debtors owned working interests in 13,787 gross (4,480 net) productive wells.  The Debtors' operated wells accounted for approximately 56% of their total estimated proved reserves as of September 30, 2016.  The Debtors have interests in approximately 776,676 gross undeveloped leasehold acres surrounding their existing wells.  The Debtors also provide "midstream" services, which involve the gathering, transportation, and processing of produced hydrocarbons.  The Debtors also own and maintain midstream assets, including electrical infrastructure, pipelines, and disposal systems.  In the aggregate, the Debtors generated approximately $264 million in revenue through the third quarter of 2016 as compared to the approximately $388 million over the same period in 2015.

Despite the Debtors' favorable low cost operating structure and the relatively predictable decline curves associated with their production, the Debtors' revenues, earnings, and liquidity have been substantially and negatively affected by depressed commodity prices that have persisted over a prolonged period of time.  These depressed commodity prices have hit E&P companies especially hard, leading to a wave of bankruptcies, defaults, and out-of-court restructurings over the last two years.  This environment has made it especially difficult for some companies to identify and execute on any viable restructuring alternatives.

In an attempt to mitigate the liquidity strain brought on by significantly reduced activity in the E&P sector, beginning in earnest in 2016, the Debtors implemented various operational "right-sizing" and other cost-cutting measures.  These measures included reducing rates with key vendors, reducing employee and other human resources costs, lowering certain E&P software costs, and shutting-in uneconomical wells to allocate capital to the highest return areas and preserve liquidity.  As market conditions hit rock bottom in early 2016, it became clear that the Debtors would not be able to maintain compliance with certain financial covenants under the Credit Agreement.  Accordingly, the Debtors began to engage their key stakeholders—including the Lenders, an ad hoc group of Holders of Second Lien Notes (the "Ad Hoc Group of Second Lien Noteholders"), and an ad hoc group of Holders of Senior Notes (the "Ad Hoc Group of Senior Noteholders" and together with the Ad Hoc Group of Second Lien Noteholders, the "Ad Hoc Noteholders")—regarding comprehensive restructuring alternatives that would strengthen the Debtors' balance sheet and provide near-term liquidity support.

In the months immediately preceding the Petition Date, the Debtors worked with the Lenders and the Ad Hoc Noteholders to negotiate a consensual restructuring transaction to be supported by all levels of the capital structure.  As part of these negotiations, the Debtors solicited and received a proposal from the Ad Hoc Group of Senior Noteholders.  The Debtors

continued negotiations with the Lenders and the Ad Hoc Noteholders in an effort to maximize the overall liquidity commitments from each group and improve the terms on which the liquidity was being offered.

The Debtors explored various leverage points and arrived at a resolution under which the Ad Hoc Noteholders agreed to significant concessions and financial support, including, among other things, (a) agreeing to convert the Senior Notes to ownership interests in Reorganized VNR, (b) a $127.875 million rights offering, pursuant to which Holders of Senior Notes Claims are entitled to purchase equity in reorganized VNR, and a $127.875 million equity investment, pursuant to which the Commitment Parties will purchase equity in Reorganized VNR, and (c) a $19.25 million equity investment from certain Holders of Second Lien Notes (the "Second Lien Investors").  These debt conversion and new-money investments will provide substantial benefits to the Debtors and drive recoveries for stakeholders enterprise-wide.  All told, the resolution would eliminate more than $700 million in existing debt obligations under the Credit Agreement and the Senior Notes.

After extensive good-faith negotiations with the Ad Hoc Noteholders, the Debtors' board of directors (the "Board") determined, after consultation with the Debtors' advisors, that the restructuring proposal outlined above maximized value for all parties in interest, best positioned the Debtors to emerge from chapter 11 as a successful going concern, and represented the best available alternative to effect a successful restructuring.  As a result, the Debtors entered into that certain Restructuring Support Agreement, dated as of February 1, 2017, by and between the Debtors and the Ad Hoc Noteholders (together with all exhibits and schedules thereto, the "RSA") attached hereto as **Exhibit B**.

The RSA contemplates a swift restructuring effectuated through a plan of reorganization and featuring a value-maximizing investment of new capital to pay down existing indebtedness and a debt-to-equity conversion of the Senior Notes.  As a result, the Debtors anticipate emerging from chapter 11 with a significantly deleveraged balance sheet.  Successful implementation of the Debtors' proposed restructuring will mitigate the risk of a sale of all or substantially all of the Debtors' assets, which likely would occur at a significant discount given current market conditions, allowing the Debtors to benefit from any of their assets' appreciation in value if the market improves.

To capture the benefit of the compromises embodied in the RSA, the Debtors must move swiftly through chapter 11.  The RSA sets forth the following milestones (collectively, the "Milestones"), which may be extended with the consent of the requisite Ad Hoc Noteholders:

- on or before February 3, 2017, commence the Chapter 11 Cases (which condition has been satisfied);

- no later than 20 days after the Petition Date, File: (a) the Plan; (b) this Disclosure Statement; (c) a motion seeking approval of the Backstop Agreement and the Second Lien Investment Agreement (which condition has been satisfied following a three-day extension in accordance with the RSA);

- no later than 50 days after the Petition Date, obtain entry of orders approving the Backstop Agreement and the Second Lien Investment Agreement;

- no later than 65 days after the Petition Date, obtain entry of the Disclosure Statement Order;

- no later than 125 days after the Petition Date, obtain entry of the Confirmation Order; and

- no later than 155 days after the Petition Date, consummate the Plan.

The core terms of the RSA will be implemented through a chapter 11 plan of reorganization—namely, the Plan (described more fully in Article III of this Disclosure Statement, entitled "OVERVIEW OF THE PLAN," which begins on page 55).  The RSA is summarized in more detail in Article VI.C of this Disclosure Statement.

In accordance with the RSA, and following additional authorizations from the Board, the Debtors commenced the Chapter 11 Cases.

### III.    OVERVIEW OF THE PLAN

The Plan provides for the reorganization of the Debtors as a going concern and will significantly reduce long-term debt and annual interest payments of the Reorganized Debtors, resulting in a stronger, de-levered balance sheet for the Debtors.

Specifically, the Plan provides for: (a) a $127.875 million rights offering (the "1145 Rights Offering"), pursuant to which Holders of Senior Notes Claims are entitled to purchase equity in reorganized VNR (the "1145 Rights Offering Equity") and a $127.875 million equity investment (the "4(a)(2) Backstop Commitment"), pursuant to which the Commitment Parties will purchase equity in Reorganized VNR (the "4(a)(2) Backstop Commitment Equity"); (b) a fully committed $19.25 million equity investment from the Second Lien Investors for shares of Reorganized VNR Common Stock equal to 4.3% of the aggregate Reorganized VNR Common Stock as of the Effective Date and subject to dilution as set forth in the Plan (the "Second Lien Investment Equity"); (c) a recovery for the Electing Lenders consisting of the $275 million Electing Lender Payment Amount for those Lenders that participate in the Exit Revolving Loans and the Exit Term Loans for Non-Electing Lenders; and (d) the issuance of new notes to Holders of Allowed Second Lien Notes Claims in an aggregate principal amount of approximately $78.075 million, plus accrued and unpaid postpetition interest through the Effective Date (the "New Second Lien Notes").

The Plan also provides that Holders of Senior Notes Claims will receive a recovery consisting of a Pro Rata distribution of a number of shares of Reorganized VNR Common Stock equal to 97% of the aggregate Reorganized VNR Common Stock as of the Effective Date and subject to dilution as set forth in the Plan (the "Senior Note Claim Distribution") and the opportunity to participate in the 1145 Rights Offering in accordance with the Plan and the 1145 Rights Offering Procedures.

Holders of Allowed General Unsecured Claims will receive their Pro Rata share of [•] percent of the Reorganized VNR Common Stock (any such Reorganized VNR Common Stock as may be distributed, the "General Unsecured Equity Distribution").  Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim with an aggregate Allowed General Unsecured Claim of less than $[•] shall have the right to elect to receive, in lieu of any portion of the General Unsecured Equity Distribution described in the immediately preceding sentence, Cash in an amount equal to [•] percent of such Allowed General Unsecured Claim from the General Unsecured Cash Distribution Pool.  The General Unsecured Cash Distribution Pool will consist of $[•] to be used for Cash payments on account of General Unsecured Claims in accordance with the Plan.

Holders of Allowed Trade Claims will receive Cash in an amount equal to their Pro Rata share of the Trade Claims Distribution Pool; *provided*, that no Holder of an Allowed Trade Claim shall be entitled to distributions exceeding the amount of its Allowed Trade Claim.  The Trade Claims Distribution Pool will equal $3 million to be used for Cash payments on account of Trade Claims in accordance with the Plan.

Holders of VNR Preferred Units will receive: if Class 5, Class 6, Class 7, and Class 10 are each determined to have voted to accept the Plan in accordance with the Bankruptcy Code,

such Holder's Pro Rata share of (a) a Pro Rata distribution of a number of shares of Reorganized VNR Common Stock equal to 3% of the Reorganized VNR Common Stock as of the Effective Date and subject to dilution as set forth in the Plan (the "<u>VNR Preferred Unit Equity Distribution</u>") and (b) VNR Preferred Unit New Warrants.

The formulation of the Plan is a significant achievement for the Debtors in the face of the challenging circumstances facing the Debtors, including historic commodity price declines and a depressed operating environment.  The Debtors strongly believe that the Plan is in the best interests of the Debtors' estates, represents the best available path to restructuring, and significantly deleverages the Debtors' consolidated balance sheet at a critical time when the commodity cycle downturn is negatively affecting highly leveraged companies within the oil and gas industry as a whole.  Given the Debtors' core strengths, including their attractive asset and customer base, an established reputation for the highest level of customer service and operational performance, and an operating footprint that encompasses ten operating basins across the United States, the Debtors are confident that they can implement this agreed restructuring to ensure the Debtors' long-term viability.

### A.    Exit Facility

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facility.  The Exit Facility will comprise the Exit Revolving Loans and the Exit Term Loans, each consistent with the Exit Facility Term Sheet and on such terms as set forth in the Exit Facility Documents that will be included in the Plan Supplement.

### B.    New Second Lien Notes

On the Effective Date, the Reorganized Debtors shall issue the New Second Lien Notes, in accordance with the terms and conditions of the New Second Lien Notes Documents.  The New Second Lien Notes will be senior secured second lien notes due 2024 in an aggregate principal amount of approximately $78.075 million, plus accrued and unpaid postpetition interest through the Effective Date, and will be issued pursuant to the New Second Lien Notes Indenture. The New Second Lien Notes Documents will be included in the Plan Supplement.

### C.    Second Lien Investment

On the Effective Date, the Consenting Second Lien Noteholders will purchase the Second Lien Investment Equity from Reorganized VNR, in accordance with the terms and conditions of the Second Lien Investment Agreement.

### D.    Rights Offering for Reorganized VNR Common Stock

Following approval by the Bankruptcy Court of the 1145 Rights Offering Procedures attached hereto as **Exhibit C**, VNR shall distribute the Rights to the Rights Offering Participants on behalf of Reorganized VNR as set forth in the Plan and the 1145 Rights Offering Procedures. The Rights Offering Participants shall have the right to purchase their allocated shares of Reorganized VNR Common Stock at the per share purchase price set forth in the Backstop Agreement and the 1145 Rights Offering Procedures.  The Rights Offering will be backstopped

by the Backstop Parties in accordance with and subject to the terms and conditions of the Backstop Agreement.

Upon exercise of the Rights by the Rights Offering Participants pursuant to the terms of the Backstop Agreement and the 1145 Rights Offering Procedures, Reorganized VNR shall be authorized to issue the Reorganized VNR Common Stock issuable pursuant to such exercise in accordance with Article IV.C.5 of the Plan.

The Backstop Parties' obligation to backstop the Rights Offering shall be contingent on the entry of the Backstop Agreement Order, which shall, among other things, approve the payment of the Backstop Premium and related expense reimbursements set forth in the Backstop Agreement to the Backstop Parties.  Entry of the Confirmation Order shall constitute Bankruptcy Court approval of the Rights Offering (including the transactions contemplated thereby, and all actions to be undertaken, undertakings to be made, and obligations to be incurred by Reorganized VNR in connection therewith).  On the Effective Date, the rights and obligations of the Debtors under the Backstop Agreement shall vest in the Reorganized Debtors, as applicable.

### E.    Reorganized VNR Common Stock

Reorganized VNR shall be authorized to issue the Reorganized VNR Common Stock to certain Holders of Claims or Interests pursuant to Article III.B. of the Plan.  Reorganized VNR shall issue all securities, instruments, certificates, and other documents required to be issued by it with respect to all such shares of Reorganized VNR Common Stock.  All such Reorganized VNR Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

### F.    New Warrants

Reorganized VNR shall be authorized to issue the New Warrants to certain Holders of Interests pursuant to Article III.B. of the Plan.  Each New Warrant will, subject to the antidilution adjustments described in the Plan and in the Warrant Agreement, be exercisable for one share of Reorganized VNR Common Stock.

The Warrant Agreement will be included in the Plan Supplement and shall contain provisions for the adjustment of the exercise price and shares of Reorganized VNR Common Stock issuable upon exercise following stock splits, stock dividends, and similar combinations or subdivisions of the Reorganized VNR Common Stock.

### G.    Reorganized VNR Management Incentive Plan

The Confirmation Order shall authorize the Reorganized VNR Board to adopt the Reorganized VNR Management Incentive Plan.  The Reorganized VNR Management Incentive Plan shall be subject to approval by the Reorganized VNR Board and shall authorize the issuance of awards representing 10% of the Reorganized VNR Common Stock, on a fully diluted basis as of the Effective Date, after giving effect to the issuance of the Reorganized VNR Common Stock issuable in connection with the Rights Offering, the Second Lien Investment, and the Backstop Premium, and to the Holders of VNR Preferred Units, but subject to dilution by any Reorganized VNR Common Stock issuable upon exercise of the New Warrants, which awards will be issued

after the Effective Date at the discretion of the Reorganized VNR Board and on terms to be determined by the Reorganized VNR Board (including with respect to allocation, timing and structure of such issuance and the Reorganized VNR Management Incentive Plan).

**H.    Use of Proceeds**

Proceeds from the DIP Facility, the Rights Offering, the Second Lien Investment Equity, existing Cash on hand, and the Exit Facility, as applicable, will be used, among other things, to fund certain distributions under the Plan, the Debtors' operations, and administration of the Chapter 11 Cases, as well as for general corporate purposes.

**I.    Directors and Officers of the Reorganized Debtors**

As of the Effective Date, the terms of the current members of the board of directors or managers, as applicable, of each Debtor shall expire and the initial Reorganized VNR Board shall consist of seven directors and will include: (a) two directors of current management selected by management of Debtors prior to the Effective Date; and (b) five directors to be selected by the Senior Commitment Parties in accordance with the RSA. Notwithstanding anything contained herein to the contrary, the Reorganized VNR Board shall be disclosed at or before the Confirmation Hearing.

After the Effective Date, the officers of each of the Reorganized Debtors shall be appointed in accordance with the respective New Organizational Documents.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Debtors.  To the extent any such director or officer of the Reorganized Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents.

**J.    General Settlement of Claims and Interests**

The Plan shall be deemed a motion to approve the good faith compromise and settlement pursuant to which the Debtors, the Holders of Claims against and/or Interests in the Debtors, the Holders of Senior Notes Claims, the Holders of Second Lien Notes Claims settle all Claims, Interests, and Causes of Action pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan (including, without limitation, any argument that the Allowed Second Lien Claims should be increased by a "make-whole" or similar amount or premium).  The Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise, settlement, and release of all such Claims, Interests, and Causes of Action, as well as a finding by the Bankruptcy Court that all such compromises, settlements, and releases are in the best interests of the Debtors, their Estates, and the Holders of Claims or Interests, and Causes of Action, and is fair, equitable, and reasonable. In accordance with the provisions of the Plan,

pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle all Claims and Causes of Action against, and Interests in, the Debtors and their Estates. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan. Subject to Article VI of the Plan, all distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

### K.    Releases

The Plan contains certain releases (as described more fully in Article IV.W of this Disclosure Statement), including: (a) each of the Debtors and the Reorganized Debtors; (b) the Consenting Creditors; (c) the DIP Agent; (d) the DIP Lenders; (e) the Indenture Trustees; (f) the Backstop Parties; (g) each of the Electing Lenders; and (h) with respect to each of the foregoing identified in subsections (a) through (g) herein, each of such entities' respective shareholders, equityholders (regardless of whether such interests are held directly or indirectly) (other than with respect to an equity holder of a Debtor), predecessors, successors, assigns, affiliates, subsidiaries, members, principals, managers, current and former officers, current and former directors, employees, managers, managing member, advisory board members, partners, agents, attorneys, accountants, financial advisors, investment bankers, restructuring advisors, professionals, consultants, advisors, and representatives, each in their capacities as such; *provided*, *however*, that any Holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a "Released Party."

The Plan also provides that (a) all Holders of Claims or Interests that vote to accept the Plan or who are deemed to accept the plan, (b) all Holders of Claims or Interests that abstain from voting on the Plan and who do not opt out of the releases provided by the Plan, (c) all Holders of Claims or Interests that vote to reject the Plan and who do not opt out of the releases provided by the Plan, and (d) with respect to each of the foregoing parties under (a) through (c), herein, each of such Entities' respective shareholders, equityholders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, affiliates, subsidiaries, members, principals, managers, current and former officers, current and former directors, employees, managers, advisory board members, agents, attorneys, accountants, financial advisors, investment bankers, restructuring advisors, professionals, consultants, advisors, and representatives, each in their capacities as such, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

### L.    Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee shall dissolve and all members, employees, or agents thereof shall be released and discharged from all rights and duties arising from or related to the Chapter 11 Cases; provided, that the Creditors' Committee shall be deemed to remain in existence solely with respect to, and shall not be heard on any issue except applications Filed by the Professionals pursuant to section 330 and 331 of the Bankruptcy Code.

IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE
       STATEMENT AND PLAN

A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest Holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest Holder of the debtor, and any other Entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all Holders of Claims or Interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Lender Claims | Impaired | Entitled to Vote |
| Class 4 | Second Lien Notes Claims | Impaired | Entitled to Vote |

| Class 5 | Senior Notes Claims | Impaired | Entitled to Vote |
|---------|---------------------|----------|------------------|
| Class 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 7 | Trade Claims | Impaired | Entitled to Vote |
| Class 8 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept/Reject) |
| Class 9 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 10 | VNR Preferred Units | Impaired | Entitled to Vote |
| Class 11 | VNR Common Units | Impaired | Entitled to Vote |
| Class 12 | Other Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

### D.     What will I receive from the Debtors if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[2]**

---

[2]  The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "*Allowed*" means with respect to any Claim or Interest, except as otherwise provided in the Plan:  (a) a Claim or Interest in a liquidated amount as to which no objection has been Filed prior to the Claims Objection Deadline and that is evidenced by a Proof of Claim or Proof of Interest, as applicable, timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim or Proof of Interest, as applicable, under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim or Interest that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated, and as for which no Proof of Claim or Proof of Interest, as applicable, has been timely Filed in an unliquidated or a different amount; or (c) a Claim or Interest that is upheld or otherwise Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith, or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided*, that with respect to a Claim or Interest described in clauses (a) and (b) above, such Claim or Interest shall be considered Allowed only if and to the extent that with respect to such Claim or Interest no objection to the allowance thereof has been or, in the Debtors' or Reorganized Debtors' reasonable good faith judgment, may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim or Interest, as applicable, shall have been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Proof of Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/ Interest | Treatment of Claim/ Interest | Projected Amount of Claims | Projected Recovery Under the Plan[3] |
| Class 1 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either: (a) payment in full in Cash; (b) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired. | $[•] | 100% |
| Class 2 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either: (a) payment in full in Cash; or (b) other treatment rendering such Claim Unimpaired. | $[•] | 100% |
| Class 3 | Lender Claims | On the Effective Date, except to the extent that a Holder of an Allowed Lender Claim agrees to a less favorable | $[•] | [•]% |

to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.  For the avoidance of doubt, a Proof of Claim or Proof of Interest Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

[3]  Estimated based on Plan Value of $1.625 billion.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/ Interest | Treatment of Claim/ Interest | Projected Amount of Claims | Projected Recovery Under the Plan[3] |
| | | treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Lender Claim, each such Holder shall receive its Pro Rata share of: (a) if such Holder has elected to participate in the Exit Revolving Loans (each, an "Electing Lender"), (i) the Exit Revolving Loans and (ii) following the execution of definitive documentation, dated on or before the Effective Date, necessary to implement the Plan, including the Exit Facility Documents, payment of the Electing Lender Payment Amount under the terms of the Exit Facility Documents; or (b) if such Holder has not elected to participate in the Exit Revolving Loans (each, a "Non-Electing Lender"), the Exit Term Loans. | | |
| Class 4 | Second Lien Notes Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Second Lien Notes Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Second Lien Notes Claim, each such Holder shall receive its Pro Rata share of the New Second Lien Notes.  Distribution to each Holder of an Allowed Second Lien Notes Claim shall be subject to the rights and the terms of the Second Lien Notes Indenture. | $[•] | [•]% |
| Class 5 | Senior Notes | On the Effective Date, or as soon as reasonably practicable thereafter, except | $[•] | [•]% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/ Interest | Treatment of Claim/ Interest | Projected Amount of Claims | Projected Recovery Under the Plan[3] |
| | Claims | to the extent that a Holder of an Allowed Senior Notes Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Senior Notes Claim, each such Holder shall receive: (a) its Pro Rata share of the Senior Note Claim Distribution ; and (b) the opportunity to participate in the 1145 Rights Offering  in accordance with the Plan and the 1145 Rights Offering Procedures. | | |
| Class 6 | General Unsecured Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each such Holder shall receive its Pro Rata share of [•] percent of the Reorganized VNR Common Stock (any such Reorganized VNR Common Stock as may be distributed, the "General Unsecured Equity Distribution"). Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim with an aggregate Allowed General Unsecured Claim of less than $[•] shall have the right to elect to receive, in lieu of any portion of the General Unsecured Equity Distribution described in the immediately preceding sentence, Cash in an amount equal to [•] percent of such Allowed General Unsecured Claim | $[•] | [•]% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/ Interest | Treatment of Claim/ Interest | Projected Amount of Claims | Projected Recovery Under the Plan[3] |
| | | from the General Unsecured Cash Distribution Pool. | | |
| Class 7 | Trade Claims | On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Trade Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Trade Claim, each such Holder shall receive Cash in an amount equal to its Pro Rata share of the Trade Claims Distribution Pool; *provided*, that no Holder of an Allowed Trade Claim shall be entitled to distributions exceeding the amount of its Allowed Trade Claim. | $[•] | [•]% |
| Class 8 | Intercompany Claims | Each Allowed Intercompany Claim shall be, at the option of the Holder of such Intercompany Claim, with the reasonable consent of the Required Consenting Senior Noteholders and the Requisite Commitment Parties, either: (a) Reinstated; (b) compromised, extinguished, or settled or (c) canceled and shall receive no distribution on account of such Claims; *provided, however*, that any Intercompany Claim relating to any postpetition payments from any Debtor to another Debtor under any postpetition Intercompany Transfer (as defined in the Cash Management Order) shall be paid in full as a General Administrative Claim pursuant to Article II.A of the Plan. | N/A | 100%/0% |
| Class 9 | Intercompany | Intercompany Interests shall be | N/A | 100%/0% |

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/ Interest | Treatment of Claim/ Interest | Projected Amount of Claims | Projected Recovery Under the Plan[3] |
|  | Interests | Reinstated as of the Effective Date. |  |  |
| Class 10 | VNR Preferred Units | On the Effective Date, except to the extent that a Holder of VNR Preferred Units agrees to less favorable treatment of its VNR Preferred Units, and subject to the terms of the Restructuring Transactions, all VNR Preferred Units shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and in full and final satisfaction, settlement, release, and discharge of and in exchange for each VNR Preferred Unit, each Holder of VNR Preferred Units shall receive: (a) if Class 5, Class 6, Class 7, and Class 10 are each determined to have voted to accept the Plan in accordance with the Bankruptcy Code, such Holder's Pro Rata share of (i) the VNR Preferred Unit Equity Distribution and (ii) VNR Preferred Unit New Warrants; or (b) if Class 5, Class 6, Class 7, or Class 10 is determined to have voted to reject the Plan in accordance with the Bankruptcy Code, no distribution. | $[•] | [•]% |
| Class 11 | VNR Common Units | On the Effective Date, except to the extent that a Holder of VNR Common Units agrees to less favorable treatment of its VNR Common Units, and subject to the terms of the Restructuring Transactions, all VNR Common Units shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and in full and final satisfaction, settlement, release, and discharge of and in exchange for each | $[•] | [•]% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/ Interest | Treatment of Claim/ Interest | Projected Amount of Claims | Projected Recovery Under the Plan[3] |
| | | VNR Common Unit, each Holder of VNR Common Units shall receive: (a) if Class 5, Class 6, Class 7, Class 10, and Class 11 are each determined to have voted to accept the Plan in accordance with the Bankruptcy Code, such Holder's Pro Rata share the VNR Common Unit New Warrants; or (b) if Class 5, Class 6, Class 7, Class 10, or Class 11 is determined to have voted to reject the Plan in accordance with the Bankruptcy Code, no distribution. | | |
| Class 12 | Other Existing Equity Interests | On the Effective Date, each Other Existing Equity Interest shall be cancelled and of no further force and effect, and the Holders thereof shall not receive or retain any distribution on account of their Other Existing Equity Interests. | $[•] | 0% |

### E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Facility Claim, or a Priority Tax Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### 1.    Administrative Claims

Administrative Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein.  Except as specified in Article II of the Plan, unless the Holder of an Allowed General Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, agree to less favorable treatment, each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either:  (a) on the Effective Date; (b) if the General Administrative Claim is not Allowed as of the Effective Date, 60 days after the date on which an order allowing such General Administrative Claim becomes a Final Order, or as soon thereafter as reasonably practicable; or (c) if the Allowed General Administrative Claim is based on a liability incurred by the Debtors in the ordinary course of their business after the

Petition Date, pursuant to the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Administrative Claim, without any further action by the Holders of such Allowed General Administrative Claim, and without any further notice to or action, order, or approval of the Bankruptcy Court.  Notwithstanding the foregoing, no request for payment of a General Administrative Claim need be Filed with respect to a General Administrative Claim previously Allowed by Final Order.

Except for Claims of Professionals, requests for payment of General Administrative Claims that were not accrued in the ordinary course of business must be Filed and served on the Debtors or the Reorganized VNR, as applicable, no later than the Administrative Claims Bar Date applicable to the Debtor against whom the General Administrative Claim is asserted pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date.  Holders of General Administrative Claims that are required to File and serve a request for payment of such General Administrative Claims by the Administrative Claims Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such General Administrative Claims against the Debtors, the Reorganized Debtors, or their respective property and such General Administrative Claims shall be deemed forever discharged and released as of the Effective Date.  Any requests for payment of General Administrative Claims that are not properly Filed and served by the Administrative Claims Bar Date shall not appear on the Claims Register and shall be disallowed automatically without the need for further action by the Debtors or the Reorganized Debtors or further order of the Bankruptcy Court.

The Reorganized Debtors, in their sole and absolute discretion, may settle General Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.  The Reorganized Debtors may also choose to object to any Administrative Claim no later than 60 days from the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely Filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be allowed and, if so, in what amount.

## 2.      DIP Facility Claims

DIP Facility Claims will be satisfied as set forth in Article II.B of the Plan, as summarized herein.  Subject to the terms, conditions, and priorities set forth in the DIP Orders, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, each such Allowed DIP Facility Claim shall be paid in full in Cash by the Debtors on the Effective Date in an amount equal to the Allowed amount of such DIP Facility Claim and all commitments under the DIP Facility shall terminate.  Upon the indefeasible payment or satisfaction in full in Cash of the DIP Facility Claims (other than any DIP Facility Claims based on the Debtors' contingent obligations under the DIP Facility for which no claim has been made) in accordance with the terms of this Plan, on the Effective Date, all Liens granted to secure such obligations shall be terminated and of no further force and effect.

### 3. Priority Tax Claims

Priority Tax Claims will be satisfied as set forth in Article II.C of the Plan, as summarized herein. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

### F. How do I know if I hold a Trade Claim or a General Unsecured Claim and what does it mean for my Claim if I do?

A "General Unsecured Claim" is any Unsecured Claim (*i.e.* any Claim that is not Secured by a Lien on property in which one of the Debtors' Estates has an interest), excluding any Administrative Claims, DIP Facility Claims, Professional Fee Claims, Priority Tax Claims, Other Secured Claims, Other Priority Claims, Lender Claims, Second Lien Notes Claims, Senior Notes Claims, Trade Claims, Intercompany Claims, a claim under section 510(b) of the Bankruptcy Code, or a claim that may be asserted relating to any Interest.

Under the Plan, Holders of Allowed General Unsecured Claims will receive their Pro Rata share of [•] percent of the Reorganized VNR Common Stock (any such Reorganized VNR Common Stock as may be distributed under the Plan, the "General Unsecured Equity Distribution"). Notwithstanding the foregoing, each Holder of an Allowed General Unsecured Claim with an aggregate Allowed General Unsecured Claim of less than $[•] shall have the right to elect to receive, in lieu of any portion of the General Unsecured Equity Distribution described in the immediately preceding sentence, Cash in an amount equal to [•] percent of such Allowed General Unsecured Claim from the General Unsecured Cash Distribution Pool

A "Trade Claim" is any Allowed Claim held by a Trade Creditor against the Debtors; *provided*, that Trade Claims shall not include Administrative Claims or any Claim of a Trade Creditor that is otherwise paid in full pursuant to an order of the Bankruptcy Court. A "Trade Creditor" is a trade creditor or vendor who has entered into an agreement with the Debtors to have an ongoing business relationship with the Debtors as of and after the Effective Date. Under the Plan, holders of Allowed Trade Claims will receive Cash in an amount equal to their Pro Rata share of the Trade Claims Distribution Pool; *provided*, that no holder of an Allowed Trade Claim shall be entitled to distributions exceeding the amount of its Allowed Trade Claim.

### G. Are there any regulatory approvals required to consummate the Plan?

No. There are no known regulatory approvals that are required to consummate the Plan. However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**H.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims or Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, see Article XI.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 83, and the Liquidation Analysis that will be Filed as **Exhibit F** to this Disclosure Statement.

**I.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  *See* Article XI of this Disclosure Statement, entitled "CONFIRMATION OF THE PLAN," which begins on page 83, for a discussion of the conditions precedent to consummation of the Plan.

In general, and unless otherwise provided in the Plan, each Holder of an Allowed Claim or Interest (or such Holder's affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Interests in each applicable Class on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter (or, if a Claim or Interest is not an Allowed Claim or Interest on the Effective Date, on the date that such Claim or Interest becomes Allowed or as soon as reasonably practicable thereafter).

More detail regarding Plan distributions is set forth in Article VI of the Plan.

**J.      What are the sources of Cash and other consideration required to fund the Plan?**

The Reorganized Debtors shall fund distributions under the Plan, subject to the terms of the Plan, as applicable, with:  (a) the Exit Facility; (b) any encumbered and unencumbered Cash on hand, including Cash from operations or asset dispositions, of the Debtors; (c) the Cash proceeds from the sale of the Reorganized VNR Common Stock pursuant to the Rights Offering; (d) the Cash proceeds from the Second Lien Investment; (e) the Second Lien Notes; (f) the Reorganized VNR Common Stock; and (g) the New Warrants.

**K.      Are there risks to owning the Reorganized VNR Common Stock upon emergence from chapter 11?**

Yes.  *See* Article VIII of this Disclosure Statement, entitled "RISK FACTORS," which begins on page 56.  The Debtors and Reorganized VNR will use commercially reasonable efforts to cause the Reorganized VNR Common Stock to become publicly traded and listed on a national securities exchange on or as soon as reasonably practicable after the Effective Date

**L.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. *See* Article VIII.C.17 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases," which begins on page 76.

In the event that it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such objecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article VIII.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan," which begins on page 56.

**M.      Will Royalty and Working Interests be affected by the Plan?**

Notwithstanding any other provision in the Plan, on and after the Effective Date, all Royalty and Working Interests shall be preserved and remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests, and no Royalty and Working Interests shall be compromised or discharged by the Plan.  The Debtors contend that the Plan may treat any right to payment on account of a Royalty and Working Interest that arose prior to the Petition Date as a General Unsecured Claim.

**N.      What is the Reorganized VNR Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

As is typical for many of the Debtors' peer companies, to be a competitive employer and to maximize the value of the Debtors' estates, the Debtors have requested access to a pool of Reorganized VNR Common Stock that the Reorganized VNR Board can use to attract, incentivize, and retain talented key employees (including officers) after the Effective Date. Accordingly, the Plan provides that up to ten percent of the Reorganized VNR Common Stock may be used for such purposes pursuant to the Reorganized VNR Management Incentive Plan. After the Effective Date, the Reorganized VNR Board will determine the allocation, timing, and structure of the issuance of the Reorganized VNR Common Stock under the Reorganized VNR Management Incentive Plan, if any.  However, as the Reorganized VNR Board has not been appointed, no determination has been made at this time regarding whether or to what extent any of the Reorganized VNR Common Stock will actually be issued for this purpose (and on what terms).  Thus, the only aspect of the Reorganized VNR Management Incentive Plan established under the Plan is an uncommitted ceiling of 10 percent of the Reorganized VNR Common Stock that may (or may not) be distributed in connection therewith after the Effective Date.  *See* Article III.G of this Disclosure Statement, entitled "Reorganized VNR Management Incentive Plan," which begins on page 7.

**O.      Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?**

The Debtors estimate that the amount of Allowed General Unsecured Claims could range from approximately $[•] to approximately $[•].  These ranges, and the corresponding ranges of potential recoveries resulting therefrom, depends on a number of contingencies, including, among others:  (a) the determination to be made by the Debtors regarding the assumption and rejection of Executory Contracts and Unexpired Leases; (b) the amount of Claims from the rejection of Executory Contracts and Unexpired Leases; (c) the amount of Claims Filed by Governmental Units; (d) Claims arising from litigation against the Debtors; and (e) the Claims reconciliation process.

Although the estimated range of Allowed General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.  Moreover, the Debtors are rejecting and in the future may reject certain Executory Contracts and Unexpired Leases, which may result in additional rejection damages Claims not accounted for in this estimate.  Indeed, the Debtors estimate that, in the event the Debtors reject a number of contracts they have not yet decided to reject, and are unsuccessful in reducing the rejection damage claims of any such contract counterparties, rejection damages Claims could reach as high as approximately $[•] million.  Further, the Debtors may object to certain Proofs of Claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change.  These changes could affect recoveries to Holders of Claims in Class 6, and such changes could be material.

**P.      What will happen to Executory Contracts and Unexpired Leases under the Plan?**

As set forth more fully in Article V of the Plan, on the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases of the Debtors, not previously assumed or rejected pursuant to an order of the Bankruptcy Court, will be deemed to be Assumed Executory Contracts or Unexpired Leases, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that:  (a) previously were assumed or rejected by the Debtors; (b) are identified on the Rejected Executory Contract and Unexpired Lease List; (c) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (d) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date, provided, however, that any Executory Contracts (including, without limitation, indemnification obligations) that could give rise to any tax related liability for the reorganized Debtors (including any obligations to pay taxes to any other person) shall be deemed rejected as of the Effective Date, unless otherwise agreed to by the Required Consenting Senior Note Holders and the Requisite Commitment Parties; provided, further, however, that in the event the Debtors seek to assume any existing employment agreements or other severance arrangements with management or any existing management incentive programs, the Debtors shall expressly list such agreements, arrangements, or programs on the Assumed Executory Contract and Unexpired Lease List (in each case, with the consent of the Required Consenting Senior Note Holders and

22

the Requisite Commitment Parties), and to the extent such agreements, arrangements, or programs are not expressly listed, they shall be deemed rejected as of the Effective Date.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute a court order approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, the Rejected Executory Contract and Unexpired Lease List, or the Assumed Executory Contract and Unexpired Lease List pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.  Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party before the Confirmation Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List and the Assumed Executory Contract and Unexpired Lease List at any time through and including 45 days after the Effective Date.

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed within 30 days after the later of:  (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; and (b) the effective date of such rejection.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary**.  All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims against the applicable Debtor and shall be treated in accordance with the Plan, unless a different security or priority is otherwise asserted in such Proof of Claim and Allowed in accordance with Article VII of the Plan.

Any monetary defaults under each Assumed Executory Contract or Unexpired Lease shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (a) the amount of any payments to cure such a default, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1)

of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

At least 14 days before the Confirmation Hearing, the Debtors will provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served, and actually received by the Debtors at least 7 days before the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have consented to such assumption or proposed cure amount.

If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, may add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any Assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption.  **Any Proofs of Claim Filed with respect to an Assumed Executory Contract or Unexpired Lease shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court**.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed by the Executory Contract or Unexpired Lease counterparty or counterparties to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

Contracts and leases entered into after the Petition Date by any Debtor, including any Assumed Executory Contracts or Unexpired Leases, will be performed by the applicable Debtor or the applicable Reorganized Debtor liable thereunder in the ordinary course of their business. Accordingly, any such contracts and leases (including any Assumed Executory Contracts or Unexpired Leases) that have not been rejected as of the date of the Confirmation Date shall survive and remain unaffected by entry of the Confirmation Order.

**Q.**     **How will Claims asserted with respect to rejection damages affect my recovery under the Plan?**

The Debtors estimate that the amount of Allowed General Unsecured Claims could range from approximately $0 to approximately $[•] million.  The Debtors currently estimate that Claims arising from the Debtors' rejection of Executory Contracts and Unexpired Leases total approximately $[•] million in the aggregate, but, in the event that the Debtors reject a number of contracts and leases they have not yet decided to reject, and are unsuccessful in reducing the

rejection damage claims of any such lease counterparties, that amount could range as high as $[•] million in the aggregate.  To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to Holders of Claims in Class 6 could change as well, and such changes could be material.  For more information about how recoveries could be impacted, see Article IV.O of this Disclosure Statement, entitled "Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?," which begins on page 22.

**R.**     **How will Governmental Claims affect my recovery under the Plan?**

The Debtors estimate that there will be a de minimis amount of Governmental Claims not covered by their First Day Motions, if any.  Depending on the actual amount of General Unsecured Claims from Governmental Units, the value of recoveries to Holders of Claims in Class 6 could change as well, and such changes could be material.  For more information about how recoveries could be impacted, see Article IV.O of this Disclosure Statement, entitled "Will the final amount of Allowed General Unsecured Claims affect the recovery of Holders of Allowed General Unsecured Claims under the Plan?," which begins on page 22.

**S.**     **How will the resolution of certain contingent, unliquidated, and disputed litigation Claims affect my recovery under the Plan?**

The Debtors estimate that the amount of Allowed General Unsecured Claims could range from approximately $0 to approximately $[•] million.  These amounts include the Debtors' reasonable estimate of certain contingent, unliquidated, and disputed litigation Claims known to the Debtors as of the date hereof, which generally are considered General Unsecured Claims.  As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to Holders of Claims in Class 6 could change as well, and such changes could be material.

**T.**     **What happens to contingent, unliquidated, and disputed Claims under the Plan?**

As set forth in more detail in Article VIII of the Plan, the applicable Reorganized Debtor(s) shall have the sole authority: (a) to File, withdraw, or litigate to judgment, objections to Claims; (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

The Reorganized Debtors shall File any and all claims objections with respect to General Unsecured Claims no later than 180 days after the Effective Date.

In addition, before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate

any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.A and VII.B of the Plan, no payment or distribution provided under the Plan shall be made on account of such Disputed Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

**U.      How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

Except as otherwise provided in the Plan, in accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Reorganized Debtors shall retain (or shall receive from the Debtors, as applicable) and may enforce all rights to commence and pursue any and all Causes of Action belonging to their Estates, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than: (a) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date; and (b) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law; *provided, however*, that in no event shall any Cause of Action against the Lenders be preserved to the extent provided in the release, exculpation, injunction provisions set forth in Article VIII of the Plan.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or in a Bankruptcy Court order, the

26

Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation; *provided, however*, that in no event shall any Cause of Action against the Lenders be preserved to the extent provided in the release, exculpation, injunction provisions set forth in Article VIII of the Plan.

The Reorganized Debtors reserve (or receive) and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### V.     Are the Debtors assuming any indemnification obligations for their current officers and directors under the Plan?

The Debtors will treat their Indemnification Obligations and their prepetition D&O Liability Insurance Policies, if any, in accordance with the lists of Executory Contracts and Unexpired Leases that will be Filed with the Plan Supplement.

### W.     Will there be releases and exculpation granted to parties in interest as part of the Plan?

Yes.  The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and the Consenting Creditors in obtaining their support for the Plan pursuant to the terms of the RSA.  All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Each Holder of a Claim or Interest that (a) votes to accept the Plan or is deemed to accept the Plan, (b) abstains from voting on the Plan and who does not opt out of the releases provided by the Plan, and (c) votes to reject the Plan and who does not opt out of the releases provided by the Plan will be deemed to have released and discharged any and all Claims or Interests and Causes of Action against the Debtors and the Released Parties.  In other words, Holders of Claims or Interests that vote against the Plan must also opt out of the releases or they automatically are deemed to grant these releases.  A Holder of a Claim or Interest in a voting

Class who abstains from voting and returns its ballot may choose to opt out of granting the releases on its ballot.  The releases represent an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and that they meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for, and propriety of, the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are provided below.

### 1.      Release of Liens

**Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B.1 of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors; *provided*, that Article VIII.D of the Plan shall not apply to the Lender Claims to the extent specifically provided for in the Exit Facility or the Second Lien Notes Claims to the extent specifically provided for in the New Second Lien Notes Documents.**

### 2.      Releases by the Debtors

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed expressly, unconditionally, generally, and individually and collectively, acquitted, released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), Reorganized VNR (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions (including dividends and management fees paid), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or consummation of the RSA, the Exit Facility, the New Second Lien Notes, the DIP Facility, the Rights Offering, the Backstop Agreement, the Second Lien Investment Agreement, the Warrant Agreement or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including**

28

providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility, the New Second Lien Notes, the DIP Facility, the Rights Offering, the Backstop Agreement, the Second Lien Investment Agreement, the Warrant Agreement or the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, except as expressly provided under the Plan, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Article VIII.E of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the release set forth in Article VIII.E of the Plan is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all Holders of Claims or Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the release set forth in Article VIII.E of the Plan.

### 3.      Releases by Holders of Claims or Interests

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, including Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), Reorganized VNR (including the formation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions including dividends and management fees paid), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or consummation of the RSA, the Exit Facility, the New Second Lien Notes, the DIP Facility, the Rights Offering, the Backstop Agreement, the Second Lien Investment Agreement, the Warrant Agreement or any Restructuring

Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility, the New Second Lien Notes, the DIP Facility, the Rights Offering, the Backstop Agreement, the Second Lien Investment Agreement, the Warrant Agreement or the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, except as expressly provided under the Plan, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan and (b) any individual from any claim related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.F of the Plan, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that each release described in Article VIII.F of the Plan is: (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of such Claims; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to Article VIII.F of the Plan.

4.      Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the RSA, and related prepetition transactions, and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the Disclosure Statement, the Plan, the Plan Supplement, the Exit Facility, the New Second Lien Notes, the DIP Facility, the Rights Offering, the Backstop Agreement, the Second Lien Investment

Agreement, the Warrant Agreement, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to or in connection with the Plan and the Restructuring Transactions.  The Exculpated Parties have, and upon completion of the Plan shall be found to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## 5.      Injunction

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.E or Article VIII.F of the Plan, shall be discharged pursuant to Article VIII.A of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

## X.      What impact does the Claims Bar Date or Administrative Claims Bar Date have on my Claim?

The Bankruptcy Code allows a bankruptcy court to fix the time within which proofs of claim must be Filed in a chapter 11 case.

### 1.      Claims Bar Date

The Bankruptcy Court has established April 30, 2017, as the deadline for all non-governmental entities to File Proofs of Claim in the Chapter 11 Cases (the "<u>Claims Bar Date</u>").

Except for Holders of Claims by Governmental Units ("<u>Governmental Claims</u>") and Holders of Administrative Claims that have not accrued in the ordinary course of the Debtors' businesses, the following entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date are required to Proofs of Claim on or before the Claims Bar Date: (a) any Entity whose Claim against a Debtor is not listed in the applicable Debtor's Schedules or is listed in the applicable Debtor's Schedules as contingent, unliquidated, or disputed if such Entity desires to participate in any of the Chapter 11 Cases or share in any distribution in any of the Chapter 11 Cases; (b) any Entity that believes its Claim is improperly classified in the Schedules or is listed in an incorrect amount and desires to have its Claim allowed in a different classification or amount from that identified in the Schedules; (c) any Entity that believes its Claim as listed in the Schedules is not an obligation of the specific Debtor against which the Claim is listed and that desires to have its Claim allowed against a Debtor other than that identified in the Schedules; and (d) any Entity that believes its Claim against a Debtor, is or may be, an administrative expense pursuant to section 503(b)(9) of the Bankruptcy Code (but not any entity that believes it holds an administrative expense Claim under section 503(b)(1) of the Bankruptcy Code).[4]

In accordance with Bankruptcy Rule 3003(c)(2), if any person or Entity that is required, but failed, to File a Proof of Claim on or before the Claims Bar Date, except in the case of certain exceptions explicitly set forth herein or by further order of the Bankruptcy Court, such person or Entity will be:  (a) barred from asserting such Claims against the Debtors in the Chapter 11 Cases; (b) precluded from voting on any plans of reorganization Filed in the Chapter 11 Cases; and (c) precluded from receiving distributions from the Debtors on account of such Claims in the Chapter 11 Cases.  Notwithstanding the foregoing, a Holder of a Claim shall be able to assert, vote upon, and receive distributions under the Plan, or any other plan of reorganization or liquidation in the Chapter 11 Cases, to the extent, and in such amount, as any undisputed, non-contingent, and liquidated Claims identified in the Schedules on behalf of such Claim Holder

### 2.      Administrative Claims Bar Date

The deadline for Filing Requests for payment of Administrative Claims other than those that accrued in the ordinary course of the Debtors' business is (a) 30 days after the Effective

---

[4]  In accordance with the DIP Orders, the Administrative Agent, on behalf of the Lenders, and the Second Lien Notes Trustee, on behalf of the Second Lien Noteholders, are not required to File Proofs of Claim in the Chapter 11 Cases or any successor case for any Claim.  Notwithstanding any court order to the contrary in the Chapter 11 Cases or any successor case, the Administrative Agent, on behalf of the Lenders, and the Second Lien Notes Trustee, on behalf of the Second Lien Noteholders, are each authorized (but not required) in their sole discretion to File a Master Proof of Claim (as defined in the DIP Orders) against the Debtors on account of their prepetition Claims arising under the First Lien Loan Documents (as defined in the DIP Orders) and the Second Lien Notes Documents (as defined in the DIP Orders) as applicable, and the Administrative Agent and the Second Lien Notes Trustee shall not be required to File a verified statement pursuant to Bankruptcy Rule 2019.

Date with respect to General Administrative Claims and (b) 60 days after the Effective Date with respect to Professional Fee Claims (the "Administrative Claims Bar Date").

Except for Claims of Professionals, requests for payment of General Administrative Claims that were not accrued in the ordinary course of business must be Filed and served on the Debtors or the Reorganized VNR, as applicable, no later than the Administrative Claims Bar Date applicable to the Debtor against whom the General Administrative Claim is asserted pursuant to the procedures specified in the Confirmation Order and the notice of the Effective Date.  Holders of General Administrative Claims that are required to File and serve a request for payment of such General Administrative Claims by the Administrative Claims Bar Date that do not File and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such General Administrative Claims against the Debtors, the Reorganized Debtors, or their respective property and such General Administrative Claims shall be deemed forever discharged and released as of the Effective Date.  Any requests for payment of General Administrative Claims that are not properly Filed and served by the Administrative Claims Bar Date shall not appear on the Claims Register and shall be disallowed automatically without the need for further action by the Debtors or the Reorganized Debtors or further order of the Bankruptcy Court.

The Reorganized Debtors, in their sole and absolute discretion, may settle General Administrative Claims in the ordinary course of business without further Bankruptcy Court approval.  The Reorganized Debtors may also choose to object to any Administrative Claim no later than 60 days from the Administrative Claims Bar Date, subject to extensions by the Bankruptcy Court, agreement in writing of the parties, or on motion of a party in interest approved by the Bankruptcy Court.  Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested.  In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be allowed and, if so, in what amount.

### 3. Governmental Claims

Governmental Units that are Holders of Claims must File Proofs of Claim with regard to such Claims by July 31, 2017.

### 4. Allowance and Dispute by Debtors or Reorganized Debtors

Except as otherwise provided in the Plan, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such claim.

### 5. Distributions

As described in this Disclosure Statement, the distribution you receive on account of your Claim or Interest (if any) may depend, in part, on the amount of Claims and Interests for which Proofs of Claim are Filed on or before the Claims Bar Date or the Effective Date, as applicable.

**Y.      What is the deadline to vote on the Plan?**

The Voting Deadline is [•], 2017, at 4:00 p.m. (prevailing Central Time).

**Z.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims or Interests that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be completed and signed so that it is **actually received** by [•], 2017, at 4:00 p.m. (prevailing Central Time) at the following address:  Vanguard Natural Resources, LLC Ballot Processing, c/o Prime Clerk LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022.  Ballots may not be transmitted by facsimile, email, or other electronic means, except for certain Voting Classes, through a customized online balloting portal on the Debtors' case website maintained by the Solicitation Agent, as further detailed in Article IX of this Disclosure Statement, entitled "SOLICITATION AND VOTING PROCEDURES," which begins on page 78.

**AA.    How does a Holder of an Allowed Senior Notes Claim exercise its rights to participate in the Rights Offering as set forth in the 1145 Rights Offering Procedures (the "Rights")?**

As part of the Disclosure Statement Order, the Bankruptcy Court has approved the 1145 Rights Offering.  Detailed instructions regarding the exercise of Rights, which are contained in the 1145 Rights Offering Procedures, will be distributed to each Holder (an "1145 Eligible Holder") of an Allowed Senior Notes Claim (an "Eligible Claim") contemporaneously with distribution of ballots for voting on the Plan.  Any 1145 Eligible Holder seeking to participate in the Rights Offering must return a duly completed and executed 1145 Beneficial Holder Subscription Form(s) (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent so that such documents are actually received by the Subscription Agent by no later than [•], 2017, at 4:00 p.m. (prevailing Central Time) (the "Subscription Expiration Deadline").[5]  *See* Article X of this Disclosure Statement, entitled "1145 RIGHTS OFFERING PROCEDURES," which begins on page 80, for more information.

**BB.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**CC.    When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for [•], 2017, at 9:00 a.m. (prevailing Central Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

---

[5]  As used herein, the term "1145 Beneficial Holder Subscription Form has the meaning given to it in the 1145 Rights Offering Procedures.

Objections to Confirmation of the Plan must be Filed and served on the Debtors, and certain other parties, by no later than [•], 2017, at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order that will be Filed as **Exhibit E** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in each of the *Houston Chronicle* and *The New York Times* (national edition) to provide notification to those persons who may not receive notice by mail.

### DD.     What is the purpose of the Confirmation Hearing?

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest Holder of a debtor, and any other person or Entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### EE.     What is the effect of the Plan on the Debtors' ongoing business?

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will not be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first Business Day after which all conditions to Consummation have been satisfied or waived.  *See* Article IX of the Plan, entitled "CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN," which begins on page 65.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### FF.     Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?

As of the Effective Date, the terms of the current members of the board of directors or managers, as applicable, of each Debtor shall expire, and the initial Reorganized VNR Board and the boards of directors or managers of each of the other Reorganized Debtors will include those directors set forth in the list of directors of the Reorganized Debtors that will be included in the Plan Supplement.  *See* Article III.I of this Disclosure Statement, entitled "Directors and Officers of the Reorganized Debtors," which begins on page 8.

**GG.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Solicitation Agent, Prime Clerk LLC:

> *By regular mail, hand delivery, or overnight mail at:*
> Vanguard Natural Resources, LLC Ballot Processing
> c/o Prime Clerk LLC
> 830 3rd Avenue, 3rd Floor
> New York, NY 10022
>
> *By electronic mail at:*
> vanguardballots@primeclerk.com
>
> *By telephone at:*
> (844) 596-2260
> (929) 333-8976 (International)

Copies of the Plan, this Disclosure Statement, and any other publicly Filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Solicitation Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Solicitation Agent at https://cases.primeclerk.com/vanguard/ (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy (for a fee).

**HH.    Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors and equity holders than would otherwise result from any other available alternative. The Debtors believe the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**II.    Who Supports the Plan?**

The Plan is supported by the Debtors, certain members of the Ad Hoc Group of Second Lien Noteholders and certain members of the Ad Hoc Group of Senior Noteholders, as set forth in the following chart:

| Consenting Parties | Support (expressed as an approximate percentage of the total principal amount of claims outstanding) |
|---|---|
| The Debtors | [•]% |

36

| The Lenders | [•]% |
| The Second Lien Noteholders | [•]% |
| The Senior Noteholders | [•]% |

**JJ.     What is the Creditors' Committee's position on the Plan?**

[TO COME]

**V.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW**

  **A.      The Debtors**

The Debtors are an oil and natural gas company with a principal focus on acquisition, production, and development activities in the Rocky Mountain, Mid-Continent, Gulf Coast, and West Texas regions of the United States.  The Debtors conduct their E&P activities across eleven states in ten geographic basins.  Headquartered in Houston, Texas, the Debtors have approximately 370 employees.  The Debtors' strategy involves acquiring properties with mature, long-lived production, relatively predictable decline curves, and lower-risk development opportunities.

The Debtors' E&P operations involve the capture and sale of oil and natural gas from domestic, onshore hydrocarbon basins.  Through oil and gas leases entered into with mineral rights owners throughout the Debtors' operating regions, the Debtors hold working interests in oil and gas properties that give them the right to drill and maintain wells in the applicable geographic areas.  The Debtors operate these wells with the expectation of producing hydrocarbons.

As an "operator," the Debtors are the parties that are engaged in the production of oil or gas for a certain geographic unit, often established pursuant to state law, for the benefit of themselves and other parties with mineral interests or leasehold interests in the same unit. Acting as operator, the Debtors will conduct the day-to-day business of producing oil and gas at the well sites and will initially cover their own expenses as well as the expenses incurred on behalf of the owners of working interests in a designated unit covered by a joint operating agreement, pooling order, or similar agreement.

In areas where the Debtors have oil and gas leases, but do not have the largest leasehold interest in the unit, a third party will typically serve as the operator for the wells relating to the Debtors' oil and gas leases and will distribute an allocable share of any sale proceeds to the Debtors.  These non-operating interests are significant to the Debtors' business, accounting for approximately 44% of the Debtors' total estimated proved reserves as of September 30, 2016.

The Debtors transport the majority of their hydrocarbon production by pipeline or tanker truck for sale to their customers.  After receipt of gross proceeds, the Debtors distribute funds to various working interest holders, royalty interest holders, governmental entities, and other parties with an interest in production.  The remaining proceeds are retained by the Debtors as operating revenues.

VNR is the ultimate parent of the Debtor entities.  VNR is a publicly traded Delaware limited liability company that has elected to be treated as a "pass through" non-taxable entity, whereby income and losses are realized by VNR's unitholders.  As such, tax attributes, such as net operating gains and losses, are realized by unitholders rather than VNR.  A Corporate Organization chart summarizing the Debtors' organizational structure is attached hereto as **Exhibit D**.

### B.       The Debtors' Corporate History

Founded in October 2006, VNR went public in October 2007 through an initial public offering (the "IPO").  Following the IPO, the Debtors' business focused on oil and natural gas reserve production primarily in the southern portion of the Appalachian Basin.[6]  Subsequently, the Debtors expanded by acquiring properties and oil and natural gas reserves primarily located in the following ten operating basins: (a) the Green River Basin in Wyoming; (b) the Permian Basin in West Texas and New Mexico; (c) the Gulf Coast Basin in Texas, Louisiana, Mississippi, and Alabama; (d) the Anadarko Basin in Oklahoma and North Texas; (e) the Piceance Basin in Colorado; (f) the Big Horn Basin in Wyoming and Montana; (g) the Arkoma Basin in Arkansas and Oklahoma; (h) the Williston Basin in North Dakota and Montana; (i) the Wind River Basin in Wyoming; and (j) the Powder River Basin in Wyoming.

Among other acquisitions, in October 2015, the Debtors completed two significant merger transactions.  First, the Debtors merged with LRR Energy, L.P. and its general partner, LRE GP, LLC, in a $413.3 million unit-for-unit transaction (the "LRE Merger").  As consideration for the LRE Merger, VNR issued approximately 15.4 million in VNR common units valued at $123.3 million based on the closing price per VNR common unit of $7.98 on October 5, 2015, and assumed $290.0 million in debt.  Following the LRE Merger, that debt was extinguished using borrowings under the Debtors' reserve-based credit facility.

Second, the Debtors merged with Eagle Rock Energy Partners, L.P. in a $415.2 million unit-for-unit transaction (the "Eagle Rock Merger").  As consideration for the Eagle Rock Merger, VNR issued approximately 27.7 million VNR common units valued at $258.3 million based on the closing price per VNR common unit of $9.31 on October 8, 2015 and assumed $156.6 million in debt.  Following the Eagle Rock Merger, $122.3 million of the debt was extinguished using borrowings under the Debtors' reserve-based credit facility.

### C.       The Debtors' Key Assets and Operations

The most recent publicly disclosed book value of the Debtors' total assets was approximately $1.5 billion as of September 30, 2016.  As set forth in Article XI.F of this Disclosure Statement entitled "Valuation of the Debtors," which begins on page 86, book value is generally computed in accordance with various accounting pronouncements and is not indicative of true enterprise value.  The Liquidation Analysis will provide additional information about the Debtors' enterprise valuation.

As of September 30, 2016, the Debtors estimated that their total proved reserves were approximately 1,898 Bcfe,[7] of which approximately 67% were natural gas reserves, 17% were oil reserves, and 16% were NGLs reserves.  Of these total estimated proved reserves, approximately 70%, or 1,338 Bcfe, were classified as proved developed.

In addition, as of September 30, 2016, the Debtors owned working interests in 13,787 gross (4,480 net) productive wells.  The Debtors' operated wells accounted for approximately

---

[6]  The Debtors divested their properties in the Appalachian Basin in 2012.

[7]  Bcfe means billion cubic feet equivalent.

56% of their total estimated proved reserves as of September 30, 2016.  The Debtors' average net daily production for the nine months ended September 30, 2016 and the year ended December 31, 2015 was 447 MMcfe/day[8] and 415 MMcfe/day, respectively.  The Debtors have interests in approximately 776,676 gross undeveloped leasehold acres surrounding their existing wells.  As of September 30, 2016, based on internal reserve estimates, approximately 30% (or 560 Bcfe) of the Debtors' estimated proved reserves were attributable to their interests in undeveloped acreage.

### 1.      Upstream Activities

As noted above, the Debtors presently conduct their core E&P operations in ten operating basins in the United States.  The Debtors' operations in each basin are described below.

#### (a)      Green River Basin Properties

The Debtors' Green River Basin properties comprise assets in the Pinedale and Jonah fields of southwestern Wyoming.  As of September 30, 2016, total proved reserves of the Green River Basin properties were estimated to be approximately 1 Tcfe,[9] of which 45% were proved developed.  Natural gas comprised 87% of the total proved reserves.  During the third quarter of 2016, the average daily net production of the Green River Basin properties was approximately 136 MMcfe/day.

#### (b)      Permian Basin Properties

The Debtors' Permian Basin properties are located in several counties in Southeastern New Mexico and West Texas and encompass hundreds of fields with multiple producing intervals.  As of September 30, 2016, total proved reserves of the Permian Basin properties were estimated to be approximately 35 MMBoe, of which 96% were proved developed.  Liquids comprised 63% of the total proved reserves.  During the third quarter of 2016, the average daily net production of the Permian Basin properties was approximately 8 MBoe/day.

#### (c)      Gulf Coast Basin Properties

The Debtors' Gulf Coast Basin properties include properties in the onshore Gulf Coast area, North Louisiana, Alabama, East Texas, South Texas, and Mississippi.  As of September 30, 2016, total proved reserves of the Gulf Coast Basin properties were estimated to be approximately 238 Bcfe, of which 74% were proved developed.  Natural gas comprised 47% of the total proved reserves.  During the third quarter of 2016, the average daily net production of the Gulf Coast Basin properties was approximately 49 MMcfe/day.

#### (d)      Anadarko Basin Properties

The Anadarko Basin consists of operated and non-operated properties in the Golden Trend field, Verden field, and other fields located in the Anadarko Basin of western Oklahoma.

---

[8]  MMcfe means million cubic feet equivalent.

[9]  Tcfe means trillion cubic feet equivalent.

As of September 30, 2016, total proved reserves of the Anadarko Basin properties were estimated to be approximately 35 Bcfe, of which 94% were proved developed. Natural gas comprised 66% of the total proved reserves. During the third quarter of 2016, the average daily net production of the Anadarko Basin properties was approximately 10 MMcfe/day.

### (e) Piceance Basin Properties

The Piceance Basin is located in northwestern Colorado. The Debtors' Piceance Basin properties, which they operate, are located in the Gibson Gulch area. As of September 30, 2016, total proved reserves of the Piceance Basin properties were estimated to be approximately 406 Bcfe, of which 72% were proved developed. Natural gas comprised 67% of the total proved reserves. During the third quarter of 2016, the average daily net production of the Piceance Basin properties was approximately 80 MMcfe/day.

### (f) Big Horn Basin Properties

The Debtors' Big Horn Basin properties comprise assets in Wyoming and Montana. As of September 30, 2016, total proved reserves of the Big Horn Basin properties were estimated to be approximately 14 MMBoe, of which 100% were proved developed. Liquids comprised 96% of the total proved reserves. During the third quarter of 2016, the average daily net production of the Big Horn Basin properties was approximately 3 MBoe/day.

### (g) Arkoma Basin Properties

The Debtors' Arkoma Basin properties include properties in the Woodford Shale, located in eastern Oklahoma, the Fayetteville Shale, located in Arkansas, and royalty interests and non-operated working interests in both states. As of September 30, 2016, total proved reserves of the Arkoma Basin properties were estimated to be approximately 187 MMcfe, of which 100% were proved developed. Natural gas comprised 90% of the total proved reserves. During the second quarter of 2016, the average daily net production of the Arkoma Basin properties was approximately 47 MMcfe/day.

### (h) Williston Basin Properties

The Debtors' Williston Basin properties are located in North Dakota and Montana. As of September 30, 2016, total proved reserves of the Williston Basin properties were estimated to be approximately 4 MMBoe, of which 100% were proved developed. Liquids comprised 95% of the total proved reserves. During the third quarter of 2016, the average daily net production of the Williston Basin properties was approximately 1 MMBoe/day.

### (i) Wind River Basin Properties

The Wind River Basin is located in central Wyoming. The Debtors' activities are concentrated primarily in the eastern Wind River Basin, along the greater Waltman Arch. As of September 30, 2016, total proved reserves of the Wind River Basin properties were estimated to be approximately 23 Bcfe, of which 100% were proved developed. Natural gas comprised 92% of the total proved reserves. During the third quarter of 2016, the average daily net production of the Wind River Basin properties was approximately 10 MMcfe/day.

(j)      **Powder River Basin Properties**

The Powder River Basin is primarily located in northeastern Wyoming.  As of September 30, 2016, total proved reserves of the Powder River Basin were estimated to be approximately 14 Bcfe, of which 100% were proved developed.  Natural gas comprised 100% of the total proved reserves.  During the third quarter of 2016, the average daily net production of the Powder River Basin properties was approximately 21 MMcfe/day.

2.      **Midstream Activities**

Primarily for the benefit of their production activities, the Debtors also provide midstream services, which involve the gathering, transportation, and processing of produced hydrocarbons.  The Debtors also owns and maintain other midstream assets, including electrical infrastructure, pipelines, and disposal systems.

(a)      **Gathering Systems**

The Debtors own the Piceance Basin Gas Gathering System, which includes sixty miles of gathering lines, eight miles of discharge lines, four water injection wells that have a 4,000-5,000 water barrel per day capacity, and forty-six miles of water (frac and produced) transportation lines.  The Debtors also own the 2.4 mile Mamm Creek-Summit Natural Gas Pipeline in the Piceance Basin, the 5.8 mile Wild Horse Natural Gas Pipeline in the South Elk Basin, the 3.7 mile Clearfork Oil Pipeline in the Elk Basin, and the 9.4 mile Wild Cow Natural Gas Surface Pipeline in the Sierra Madre field.

The Debtors also own 51% of the partnership interests in Potato Hills Gas Gathering System ("Potato Hills").  Potato Hills operates a 35.5 mile low-pressure natural gas gathering system located in Pushmataha County and Latimer County, Oklahoma.  The Debtors acquired Potato Hills from Oneok Field Services Company LLC in 2016 for approximately $7.9 million.  The remaining 49% of the partnership interests in Potato Hills are held by Continuum Midstream, LLC.

As part of the $7.9 million acquisition of Potato Hills, the Debtors own 100% of the compression assets associated with Potato Hills' gathering system, which are essential for transporting natural gas from the pipeline to customers.  The Debtors charge customers fees for using the compression assets, including a $107,000 per month reservation fee.

The Debtors also own a 32% interest in the Bayou Dorcheat Gathering System in the Haynesville Shale in North Louisiana.  This system consists of a 22-mile pipeline linking North Shongaloo and Red Rock, Louisiana to the Debtors' gas processing plant in Haynesville, Louisiana.

(b)      **Plants and Facilities**

The Debtors own a variety of oil, gas, and sulfur processing plants and facilities across their operating regions.  The Debtors' ownership interests in plants and facilities include: (a) 62.2% ownership of the Elk Basin Plant, which is a 48 MMcf/day refrigeration gas processing plant in Powell, Wyoming; (b) 20.0% ownership of the Fairway Plant, which is a lean oil gas

42

processing plant in East Haynesville, Louisiana; (c) 27.4% ownership of the Cotton Valley Plant, which is a 90 MMcf/day cryogenic gas processing plant in Haynesville, Louisiana; (d) 74% ownership of the BEC Plant, which is a gas processing, hydrogen sulfide treating, and sulfur recovery plant in Atmore, Alabama; and (e) 93.9% ownership of the Flomation Gathering Station, which is a sulfur recovery unit, in Escambia County, Alabama.

### 3.        Sales and Marketing Arrangements

The Debtors' oil production is principally sold to marketers, processors, refiners, and other purchasers that have access to nearby pipeline, processing and gathering facilities.  In areas where there is no practical access to pipelines, oil can be trucked to central storage facilities where it is aggregated and sold to various markets and downstream purchasers.  The Debtors also sell some of their oil production from their operated Permian Basin properties at the wellhead to third-party gathering and marketing companies.

If the Debtors serve as the operator of a well, they will generally sell the natural gas production on the spot market or under market-sensitive, short-term agreements with credit-worthy purchasers, including independent marketing companies, gas processing companies, and other purchasers who have the ability to pay the highest price for the natural gas production and move the natural gas under the most efficient and effective transportation agreements.  In addition, the Debtors market their own natural gas on some of their non-operated properties. Natural gas is transported through the Debtors' own and third-party gathering systems and pipelines, and the Debtors incur processing, gathering and transportation expenses to move their natural gas from the wellhead to a specified delivery point. These expenses vary based on the volume and distance shipped, and the fee charged by the third-party gatherer, processor or transporter.

The Debtors' production sales agreements generally contain customary terms and conditions for the oil and natural gas industry, provide for sales based on prevailing market prices in the area, and generally are month-to-month or have terms of one year or less.

### 4.        Hedging Portfolio

To provide protection against volatility in oil and natural gas prices, the Debtors have historically maintained a hedging portfolio of oil and natural gas swaps, collars, puts, and other derivatives.  These commodity derivative instruments generally provide cash settlement payments to the Debtors when prevailing oil and gas prices are below contract prices on the settlement date.  By removing some measure of price volatility associated with production, the Debtors' hedging portfolio helped mitigate, but did not eliminate, the effects of the sustained decline in commodity prices.  In October 2016, the Debtors monetized certain of its outstanding commodity price hedge agreements for total proceeds of approximately $42.3 million.

After assessing the situation, the Debtors concluded that there was a significant risk that hedging counterparties would seek to liquidate all or a portion of the Debtors' hedging portfolio in a compressed timeframe shortly after the Petition Date. Given the potential adverse impact on value of a rapid liquidation postpetition, the Debtors determined to commence an orderly unwinding of the portfolio before the Petition Date. In December 2016, the Debtors monetized

43

their remaining outstanding commodity price and interest rate hedge agreements for total proceeds of approximately $11.7 million.[10]  The foregoing proceeds were used to reduce the amount of borrowings under the Credit Agreement.  As a result of the monetization of hedges in October and December, 2016, the Debtors' have no commodity hedging contracts in place as of the Petition Date.[11]

### D.    Prepetition Capital Structure

As of the Petition Date, the Debtors have approximately $1.8 billion in total funded debt outstanding, including approximately $1.25 billion outstanding under the Credit Agreement, approximately $78.075 million of Second Lien Notes (including accrued and unpaid interest), and approximately $443.7 million of Senior Notes (including accrued and unpaid interest).  The Debtors also owe approximately $19.4 million under a capital lease of equipment in the Piceance Basin, and have approximately $20.0 million in ordinary course trade payables as of the Petition Date.  The Debtors also have three series of preferred units with an aggregate liquidation preference of approximately $371.6 million.

The following table summarizes the Debtors' prepetition capital structure:

| Debt | Approximate Amount Outstanding (in millions) |
|------|----------------------------------------------|
| **Credit Agreement** | **$1,248.8** |
| **Second Lien Notes** | **$78.1[12]** |
| **Total Senior Notes** | **$443.7** |
| 8.375% Senior Notes due 2019 | $51.8[13] |
| 7.875% Senior Notes due 2020 | $391.9[14] |
| **Lease Financing Obligations** | **$19.4** |
| **Trade Payables** | **$20.0** |
| **Total Debt** | **1,810** |

| Preferred Units | Approx. Liquidation Preference (in millions)[15] |
|-----------------|--------------------------------------------------|
| Series A Preferred Units | $69.2 |
| Series B Preferred Units | $187.2 |

---

[10]  This amount includes the $5 million negative impact from interest rate hedges that were also monetized.

[11]  The Debtors have one remaining interest rate hedge that expires in February 2017.

[12]  This amount includes accrued and unpaid interest through February 1, 2017.

[13]  This amount includes accrued and unpaid interest through February 1, 2017.

[14]  This amount includes accrued and unpaid interest through February 1, 2017.

[15]  This amount includes unpaid distributions.

| Series C Preferred Units | $115.1 |
| **Total Preferred Units** | **$371.6** |

| **Common Units** | **Units Outstanding (as of September 30, 2016)** |
| --- | --- |
| Common Units | 131,039,675 |
| Class B Units | 420,000 |

### 1.      Credit Agreement

The Debtors are parties to the Credit Agreement.[16]  The Credit Agreement is subject to borrowing base limitations which are periodically adjusted based on the Lenders' redeterminations of the value of the Debtors' oil and gas reserves.  The obligations under the Credit Agreement are secured by first-priority liens on substantially all of the Debtors' assets including, among other things, equity interests in the Guarantors, midstream assets such as pipelines, and substantially all of the Debtors' oil and gas interests (collectively, the "Collateral").  As of the Petition Date, approximately $1.25 billion in borrowings and approximately $150,000 of letters of credit are outstanding under the Credit Agreement.

### 2.      Second Lien Notes

VNR and VNR Finance Corp. ("VNR Finance") are the issuers of the Second Lien Notes.  As of the Petition Date, approximately $78.075 million in Second Lien Notes (including accrued and unpaid interest) was outstanding.  All of VNR's wholly owned subsidiaries have guaranteed the obligations of VNR and VNR Finance under the Second Lien Notes.  The Second Lien Notes are secured by second-priority liens on the Collateral.  The Intercreditor Agreement governs the parties' relative rights with respect to the Collateral and provides other protections to the parties.

### 3.      Senior Notes

VNR and VNR Finance are the issuers of the 2020 Senior Notes.  In addition, Vanguard Operating, LLC, is the issuer of the 2019 Senior Notes (collectively, with the 2020 Senior Notes, the "Senior Notes").  As of the Petition Date, approximately $391.9 million (including accrued and unpaid interest) and $51.8 million (including accrued and unpaid interest) in 2020 Senior Notes and 2019 Senior Notes, respectively, were outstanding.  VNR is a guarantor under the 2019 Senior Notes.  In addition, all wholly owned subsidiaries of VNR (other than the issuers) have guaranteed the obligations under the Senior Notes.

---

[16]  The guarantors under the Credit Agreement are VNR, Eagle Rock Energy Acquisition Co., Inc., Eagle Rock Energy Acquisition Co. II, Inc., Eagle Rock Acquisition Partnership, L.P., Eagle Rock Acquisition Partnership II, L.P., Eagle Rock Upstream Development Company, Inc., Eagle Rock Upstream Development Company II, Inc., Encore Clear Fork Pipeline LLC, Escambia Asset Co. LLC, Escambia Operating Co. LLC, Vanguard Operating, LLC, VNR Finance Corp., and VNR Holdings, LLC (collectively, the "Guarantors").

4.      **Lease Financing Obligations**

On October 24, 2014, in connection with the Debtors' acquisition of certain Piceance Basin properties described above, the Debtors entered into an assignment and assumption agreement with Banc of America Leasing & Capital, LLC as the lead bank, to acquire rights to certain compressors and related facilities, and assume the related financing obligations (the "Lease Financing Obligations").  Certain rights, title, interest and obligations under the Lease Financing Obligations were assigned to several lenders and are covered by separate assignment agreements, which expire on August 10, 2020 or July 10, 2021, as the case may be.  The Debtors have the option to purchase the equipment at the end of the lease term for fair market value at that time.  The Lease Financing Obligations also contain an early buyout option that gives the Debtors the right to purchase the equipment for $16.0 million on February 10, 2019.  The lease payments related to the equipment are recognized as a principal and interest expense based on a weighted average implicit interest rate of 4.16%.  As of the Petition Date, approximately $19.4 million in Lease Financing Obligations are outstanding.

5.      **Preferred and Common Units in VNR**

(a)      **Preferred Units**

As noted in the table above, VNR has issued three series of preferred units: (a) the 7.875% Series A Cumulative Redeemable Perpetual Preferred Units; (b) the 7.625% Series B Cumulative Redeemable Perpetual Preferred Units; and (c) the 7.75% Series C Cumulative Redeemable Perpetual Preferred Units (collectively, the "VNR Preferred Units").  The three series of VNR Preferred Units are traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbols "VNRAP," "VNRBP," and "VNRCP," respectively.  As of September 30, 2016, there were 13,881,873 VNR Preferred Units issued and outstanding.  On February 25, 2016, the Debtors' Board elected to suspend cash distributions to Holders of VNR Preferred Units.

(b)      **Common Units**

As of September 30, 2016, there were 131,039,675 VNR common units outstanding.  In addition, as of September 30, 2016, there were approximately 420,000 units of Class B units in VNR outstanding (collectively, with the VNR common units, the "VNR Common Units").  The VNR Common Units are traded on the NASDAQ under the ticker symbol "VNR."  On February 25, 2016, the Debtors' Board elected to suspend cash distributions to Holders of the VNR Common Units.

## VI.     EVENTS LEADING TO THE CHAPTER 11 CASES

### A.     Adverse Market Conditions

Notwithstanding a favorable cost structure and the relatively predictable decline curves associated with their production, the Debtors' revenues, earnings, and liquidity have been substantially and negatively affected by depressed commodity prices that have persisted over a prolonged period of time.  Beginning in mid-2014, oil prices significantly declined due to worldwide oversupply and have yet to recover.  Simultaneously, the natural gas market saw the impact of continued growth in natural gas production in the United States, which has caused a sustained drop in natural gas prices over a several year period.

The difficulties faced by the Debtors are consistent with the difficulties faced industry-wide.  E&P companies, like the Debtors, have been especially hard-hit from the decline in commodity prices, because their revenues are generated from the sale of unrefined oil and natural gas.  More than 100 oil and natural gas producers in North America have filed for bankruptcy since the beginning of 2015, and numerous other oil and gas companies have defaulted on their debt obligations, negotiated amendments or covenant relief with creditors to avoid defaulting, or have effectuated out-of-court restructurings.  The depressed oil and natural gas price environment over the last two years has made it especially difficult for some companies to identify and execute on any viable restructuring alternatives.

Even with an extensive hedging portfolio in place, these challenges, among others, caused a significant decline in the Debtors' financial health.  To illustrate, the Debtors' revenue declined from approximately $788.1 million in calendar year 2014 to approximately $566.6 million in calendar year 2015, and down to $264.4 million through the third quarter of 2016, all as a result of depressed commodity prices.  Moreover, operating cash flow through the third quarter of 2016 was $179.6 million as compared to $265.3 million over the same period of 2015.

### B.     Proactive Approach to Addressing Liquidity Constraints

The Debtors implemented a disciplined strategy focused on preserving liquidity and reducing operating and corporate expenditures to align the business with the current commodity price environment.  This included (and continues to include) a focus on increasing asset value through innovation and cost reduction, as opposed to a focus on top-line growth.  To date, the Debtors' cost-saving initiatives have included reducing rates with key vendors, reducing employee and other human resources costs, lowering certain E&P software costs, and shutting-in uneconomical wells to allocate capital to the highest return areas and preserve liquidity.  The Debtors also eliminated distributions to Holders of VNR Preferred Units and VNR Common Units.  The Debtors simultaneously acquired strategic and mature E&P assets while prices remain low.

In order to further reduce operational costs and eliminate expenses that are unnecessary to the Debtors' reorganization, the Debtors recently completed an office-space consolidation that involved vacating leased premises at Wedge Tower in Houston, Texas.  As part of the relief sought at the outset of the Chapter 11 Cases, the Debtors Filed the Rejection Motion seeking to reject their lease at the Wedge Tower as well as other uneconomical and unnecessary contracts

and leases.  The contracts and leases that were identified for immediate rejection in the Rejection Motion had cost the Debtors more than $12 million per year in the aggregate.

Prior to the Petition Date, the Debtors also took a proactive approach to improve liquidity and reduce their debt under the Credit Agreement.  In May 2016, the Debtors completed the sale of their natural gas, oil and natural gas liquids assets in the SCOOP/STACK area in Oklahoma to entities managed by Titanium Exploration Partners, LLC for approximately $272.5 million.  In addition, the Debtors sold certain properties in several different counties in Texas, New Mexico and Oklahoma for an aggregate consideration of approximately $22.2 million.  The Debtors primarily used the cash received from these sales to reduce their borrowings under the Credit Agreement.

Despite these efforts, the Debtors' liquidity was further constrained as a result of borrowing-base redeterminations over the past several months that eliminated the Debtors' ability to draw on their Credit Agreement and triggered mandatory repayments of principal to address the resulting borrowing-base deficiency.  In May 2016, as part of an amendment to the Credit Agreement, the borrowing base under the Credit Agreement was reduced from $1.8 billion to $1.25 billion, which resulted in a borrowing base deficiency of approximately $103.5 million.  To address this borrowing base deficiency, the Debtors were required to repay the deficiency in six equal monthly installments, beginning in June 2016.  The Debtors have repaid the full borrowing base deficiency resulting from the May redetermination.

Following the May borrowing base redetermination, the Debtors also began to explore a variety of strategic alternatives designed to address its imminent liquidity challenges.  To assist in those endeavors, the Debtors hired Evercore as their financial advisor to advise the Debtors on potential refinancing options, and begin the process of soliciting financing proposals from prospective lenders.

During the financing-solicitation process, the Debtors and Evercore also remained in dialogue with its existing creditors and stakeholders to collaborate on potential out-of-court solutions to the Debtors' liquidity constraints.  For several months, the Debtors and their advisors met with principal creditors and their advisors, and provided those parties with substantial diligence regarding the Debtors' assets and operations.

Although the Debtors initially hoped that these efforts would lead to a successful out-of-court restructuring opportunity, that hope faded after the Debtors completed another semi-annual redetermination of its borrowing base under the Credit Agreement on November 3, 2016, and new potential investors were concerned about Lenders' continued reductions in the Debtors' borrowing base.  As a result of the November borrowing-base redetermination, the Debtors' borrowing base was further reduced from $1.25 billion to $1.1 billion.  The Debtors were required to repay this borrowing base deficiency of $225.0 million with the first $37.5 million payment made in October 2016 and the remaining balance to be paid in five equal monthly installments of $37.5 million, beginning in January 2017.  The Debtors made the second of these installment payments on January 3, 2017, thereby reducing the outstanding borrowings to approximately $1.25 billion, and reducing the borrowing base deficiency to $150 million.

Faced with a lack of viable out-of-court financing options, the focus of the Debtors' discussions with stakeholders shifted to restructuring alternatives to be implemented through the voluntary filing of cases under chapter 11 of the Bankruptcy Code.  In light of the fact that the most recent borrowing base redetermination will quickly decimate the Debtors' liquidity, the Debtors' Board determined that these chapter 11 cases are necessary to preserve the Debtors' going concern value.

After extensive discussions with their advisors, the Debtors determined that filing for chapter 11 was in their best interest and in the best interest of their creditors.  Given the lack of alternatives and the fact that the vast majority of Claims against the Debtors arise from the Debtors' funded-debt obligations, the Debtors have focused their restructuring efforts on discussions with the Lenders, the Ad Hoc Group of Second Lien Noteholders, and the Ad Hoc Group of Senior Noteholders.  The Debtors' main goal in those discussions and in the Chapter 11 Cases was to restructure their balance sheet through a consensual plan of reorganization supported by the Lenders, the Holders of Second Lien Notes, and the Holders of Senior Notes.

The Debtors' efforts in this regard have been successful.  After extensive good-faith negotiations with the Ad Hoc Noteholders, on February 1, 2017, the Ad Hoc Noteholders and the Debtors finalized an agreement on the terms of a restructuring as set forth in the RSA.

### C.    The RSA

The RSA binds the support of the Consenting Creditors for the contemplated restructuring so long as the Debtors are successful in taking the steps necessary to meet the Milestones, which establish a 155 day timeline to emerge from chapter 11.  Through the implementation of the transactions set forth in the RSA and Plan, which is based on the term sheet attached to the RSA, the Debtors will eliminate more than $700 million in debt under the Credit Agreement and the Senior Notes.

The principal terms of the RSA are summarized below and have been incorporated into the Plan, which include:

- a recovery for the Lenders consisting of the $275 million Electing Lender Payment Amount from the Rights Offering, the Second Lien Investment, and additional proceeds from the Exit Facility;

- the $1.1 billion Exit Facility;

- the issuance of the New Second Lien Notes to Holders of Allowed Second Lien Notes Claims;

- the $19.25 million Second Lien Investment and the $255.75 million Rights Offering with a 4(a)(2) Backstop Commitment;

- a Pro Rata distribution to Holders of Senior Notes Claims of Reorganized VNR Common Stock equal to 97% as of the Effective Date and subject to dilution;

- the opportunity for Holders of Senior Notes Claims to participate in the Rights Offering;

- a $3 million pool of funds for distribution to unsecured creditors;

- Reorganized VNR Common Stock and New Warrants to Holders of Preferred Units and New Warrants to Holders of VNR Common Units, provided that certain Classes of Claims vote to accept the Plan; and

- the establishment of the Reorganized VNR Management Incentive Plan.

The cornerstone of the RSA is the Electing Lender Payment Amount made possible by the $255.75 million Rights Offering, the $19.25 million Second Lien Investment, the 4(a)(2) Backstop Commitment for the Rights Offering, and the proceeds from the Exit Facility. Moreover, the Exit Facility will be sufficient to fund the Debtors' post-emergence operations. The RSA and Plan provide for the reorganization of the Debtors as a going concern with a deleveraged capital structure and sufficient liquidity to fund the Debtors' postpetition business plan.

### D.     The DIP Facility

While the Debtors were negotiating the terms of the RSA, they also were in discussions with the Lenders over the terms of a debtor-in-possession facility.  These discussions resulted in the negotiation of the DIP Facility.  The DIP Facility provides the Debtors with postpetition financing in the form of a senior secured, superpriority revolving credit facility in the aggregate principal amount of $50 million, as well as consensual use of the Lenders' cash collateral.  Based on the analysis of the Debtors' management team and advisors, the Debtors determined that the DIP Facility was on the most favorable terms available in light of the Debtors' circumstances as well as the current market for DIP financing.  The Debtors and their advisors concluded that the DIP Facility would provide the Debtors with sufficient liquidity to transition into the Chapter 11 Cases smoothly and implement the restructuring contemplated by the RSA.

### E.     The Backstop Agreement

On February 24, 2017, the Debtors executed the Backstop Agreement with the Backstop Parties.  The Backstop Agreement provides that the Backstop Parties commit to buy all outstanding shares of Rights Offering Equity not purchased pursuant to the Rights Offering, in accordance with the terms and condition of the Backstop Agreement.  Pursuant to the Backstop Agreement, the Debtors will pay the Backstop Premium to the Backstop Parties.  The Backstop Premium will be payable either (a) as a number of shares of Reorganized VNR Common Stock equal to 6% of the number of the Rights to purchase Reorganized VNR Common Stock sold in the Rights Offering, or (b) upon termination of the Backstop Agreement in the circumstances set forth in Section 9.4(b) of such Backstop Agreement, as a cash payment.  In accordance with the Backstop Agreement, the Debtors will reimburse the reasonable fees and expenses accrued by the advisors of the Backstop Parties.

The Backstop Agreement is attached hereto as **<u>Exhibit I</u>**.

F.        **The Second Lien Investment Agreement**

On February 24, 2017 the Debtors executed the Second Lien Investment Agreement with the Second Lien Investors, which provides for the Second Lien Investors to purchase the Second Lien Investment Equity for an aggregate purchase price of $19.25 million at a price per share to be determined based on a twenty-five percent (25%) discount to Plan Value.

The Second Lien Investment Agreement is attached hereto as **<u>Exhibit J</u>**.

The Plan, and the associated Rights Offering, Backstop Agreement, and the Second Lien Investment Agreement, are a critical step in the Debtors' months-long restructuring process, and will allow the Debtors to proceed expeditiously through chapter 11 to a successful emergence. The Plan will significantly deleverage the Debtors' balance sheet and provide the capital injection needed for the Debtors to return to conduct competitive operations going forward.

While the Debtors remain committed to working with other constituents in the capital structure on the terms of superior restructuring transactions, the Debtors believe that the Plan represents the best available alternative to maximize value for all stakeholders and emerge from Chapter 11 at this time.

## VII.  MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.  Corporate Structure upon Emergence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of Entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of Entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### B.  Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly.  Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 approximately five months after the Petition Date.  Under the terms of the RSA and the DIP Facility, the Debtors are required to administer the Chapter 11 Cases in accordance with the Milestones, including Consummation of the Plan within 155 days of the Petition Date.  **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### C.  Initial Relief

Shortly after filing their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions") on the Petition Date, on February 2, 2017, the Debtors Filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Richard A. Robert, Chief Financial Officer of Vanguard Natural Resources, LLC In Support of Chapter 11 Petitions and First Day Motion* (the "First Day Declaration") [Docket No. 6], Filed on February 2, 2017. Significantly, pursuant to the First Day Motions, the Debtors sought and were granted the authority to pay the Claims of a number of their vendors in full, in the regular course of business.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.primeclerk.com/vanguard/.

### 1.    Cash Management Motion

On February 2, 2017, the Debtors Filed the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Bank Accounts, Business Forms, and Cash Management System, (II) Waiving Requirements of Section 345 of the Bankruptcy Code, and (III) Authorizing Continuation of Intercompany Transfers* [Docket No. 5] (the "Cash Management Motion") requesting, among other things, authority to continue to operate their consolidated cash management system, maintain existing bank accounts, use business forms in their present form without reference to the Debtors' status as debtors in possession, continue to use certain investment accounts, close existing bank accounts and open new accounts, and continue certain intercompany transactions on an administrative priority basis. The Bankruptcy Court granted the Cash Management Motion on an interim basis on February 3, 2017 [Docket No. 57].

### 2.    DIP Financing Motion

As one of their First Day Motions, the Debtors Filed the *Debtors Emergency Motion for Interim and Final Orders (I) (A) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No.10] (the "DIP Motion") requesting, among other things, authority to enter into the DIP Facility, use cash collateral, grant adequate protection to the Lenders and the Holders of Senior Notes.  The Bankruptcy Court granted the DIP Motion on an interim basis on February 3, 2017 [Docket No. 63].

### 3.    Complex Case Notice

Along with their First Day Motions, the Debtors Filed their *Notice of Designation as Complex Chapter 11 Bankruptcy Case* [Docket No. 2] requesting, among other things, that the Bankruptcy Court designate the Debtors' Chapter 11 Cases as "complex chapter 11 cases." On February 3, 2017, the Bankruptcy Court entered the *Order Granting Complex Chapter Bankruptcy Case Treatment and Order Setting Bar Date for Filing Proofs of Claim* [Docket No. 56] (the "Complex Case Order").  In the Complex Case Order, the Bankruptcy Court established April 30, 2017 as the Claims Bar Date.

### D.    Other Motions

The Debtors also Filed several other motions subsequent to the Petition Date, including motions intended to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith.  These motions include:

- Ordinary Course Professionals Motion.  On February 7, 2017, the Debtors Filed the *Debtors' Motion for Entry of an Order Authorizing Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business, Effective* Nunc Pro Tunc *to the Petition Date* [Docket No. 105] (the "OCP Motion"), requesting entry of an order that, among other things, establishes procedures for

the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses.

- **Excess Asset Sale Motion**.  On February 7, 2017, the Debtors Filed the *Debtors' Motion, Pursuant to Bankruptcy Code Sections 327(a), 328(a), 330, 363, and 544(a) and Bankruptcy Rules 2002, 2014, 2016, 6004(h), 6007, and 9006, for Entry of Order Approving Procedures to Sell Excess Assets* [Docket No. 106] (the "Excess Asset Sale Motion"), requesting entry of an order that, among other things authorizes the Debtors to sell certain assets that it no longer needs for its remaining operations, free and clear of liens, claims, and encumbrances.

- **Interim Compensation Procedures Motion**.  On February 7, 2017, the Debtors Filed the *Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 110] (the "Interim Compensation Motion"), requesting entry of an order that, among other things, sets forth the procedures for the interim compensation and reimbursement of expenses of retained Professionals in the Chapter 11 Cases.

The Debtors plan to File a motion (the "Hedging Motion") requesting entry of an order that, among other things, authorizes the Debtors to enter into and perform under new hedging agreements (the "Hedging and Trading Arrangements") that limit exposure to volatility in the price of oil, natural gas, and natural gas liquids production.

### E.    Appointment of Official Creditors' Committee

On February 14, 2017, the U.S. Trustee Filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 172], notifying parties in interest that the U.S. Trustee had appointed the Creditors' Committee in the Chapter 11 Cases.  The Creditors' Committee is currently composed of the following members: (a) UMB Bank, National Association; (b) Wilmington Trust, National Association; and (c) Encana Oil & Gas (USA) Inc.

### F.    Retention of Professionals

The Debtors Filed applications for the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases:

- Opportune LLP ("Opportune"), as restructuring advisor [Docket No. 113];

- Prime Clerk LLC, as claims, noticing, and solicitation agent (the "Solicitation Agent") [Docket No. 15];

- Evercore Group L.L.C. ("Evercore"), as investment banker [Docket No. 114]; and

- Paul Hastings LLP, as restructuring counsel [Docket No. 112].

### G.      Consideration of Alternative Proposals

The Debtors may determine to terminate the RSA if the board of directors or board of managers, as applicable, of any Debtor entity determines, after receiving advice from counsel, that proceeding with the transactions contemplated by the RSA (including the Plan or solicitation of the Plan) would be inconsistent with the exercise of their fiduciary duties.

### H.      Other Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the Filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

Following commencement of the Chapter 11 Cases, certain litigation counterparties, or may File in the future, requests to modify or lift the automatic stay to continue pursuing their prepetition litigation against the Debtors.  The Debtors will evaluate all such requests for relief from the automatic stay on a case-by-case basis and object or resolve on a consensual basis, as appropriate.

### I.      Rejection and Assumption of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into certain Executory Contracts and Unexpired Leases.  The Debtors, with the assistance of their advisors, are reviewing the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code.

On February 2, 2017, the Debtors Filed the *Debtors' Motion for Entry of an Order Authorizing Rejection of Certain Executory Contracts and Unexpired Leases, Effective* Nunc Pro Tunc *to the Petition Date* [Docket No. 16] (the "Rejection Motion"), seeking authority to reject certain Executory Contracts and Unexpired Leases.

The Debtors may file additional motions seeking to assume or reject certain Executory Contracts or Unexpired Leases.  Additionally, the Plan Supplement will include information regarding the assumption or rejection of the remaining Executory Contracts and Unexpired Leases.  Any Executory Contracts or Unexpired Leases not addressed during the Chapter 11 Cases will be treated in accordance with Article V of the Plan.

# VIII.   RISK FACTORS

Holders of Claims or Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

## A.      Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims or Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims or Interests in such Impaired Classes.

### 1.      Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.      The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Confirmation Date, and the Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Confirmation Date, or the Effective Date will not take place.

### 3.      The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or transaction would be similar or as favorable to the Holders of Allowed Claims or Interests as those proposed in the Plan.

### 4.      The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-

accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims or Interests would ultimately receive on account of such Allowed Claims or Interests.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims or Interests will receive on account of such Allowed Claims or Interests.

The Debtors, subject to the terms and conditions of the Plan, the RSA, the Backstop Agreement, and the Second Lien Investment Agreement reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.    Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.     Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in consumer demand for, and acceptance of, their oil and natural gas, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan.  The Debtors will have retained the exclusive right to propose the Plan upon Filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

### 7.     The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

Further, conversion to a case under chapter 7 is a Consenting Senior Note Holder Termination Event, as that term is defined in the RSA.  Occurrence of a Senior Note Holder Termination Event entitles, but does not require, the Required Consenting Senior Noteholders to terminate the RSA (as more fully set forth therein).  The Debtors anticipate that such parties

would exercise their termination rights under the RSA if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.

### 8.      The Debtors May Object to the Amount or Classification of a Claim or Interest

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection.  Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9.      Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.  If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, this Disclosure Statement, the RSA, the Backstop Agreement, and the Second Lien Investment Agreement shall:  (a) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holder of a Claim or Interest or any other Entity; (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; or (d) be used by the Debtors or any Entity as evidence (or otherwise) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

### 10.     Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims or Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims or Interests to be subordinated to other Allowed Claims or Interests.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims or Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and Interests and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Interests may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims or Interests may vary from the estimated Claims or Interests contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time the number or amount of Claims and Interests that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims or Interests under the Plan.

11. **Releases, Injunctions, and Exculpation Provisions May Not Be Approved**

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

B. **Risks Related to Recoveries under the Plan**

1. **The Total Amount of Allowed General Unsecured Claims and Trade Claims May Be Higher Than Anticipated by the Debtors**

With respect to Holders of Allowed General Unsecured Claims and Trade Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

2. **The Debtors May Not Be Able to Achieve Their Projected Financial Results**

The Reorganized Debtors may not be able to achieve their projected financial results. The financial projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular.  While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the Reorganized VNR Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

3. **The New Second Lien Notes, Reorganized VNR Common Stock, or New Warrants May Not Be Publicly Traded**

The Reorganized VNR Common Stock and New Warrants to be issued under the Plan may not initially be listed on or traded on any nationally recognized market or exchange. Accordingly, there can be no assurance that an active trading market for the Reorganized VNR Common Stock or New Warrants (as applicable) will develop, nor can any assurance be given as to the prices at which such securities might be traded.  In the event an active trading market does not develop, the ability to transfer or sell the Reorganized VNR Common Stock or New Warrants (as applicable) may be substantially limited.  Finally, there can be no assurance that even if an active trading market does develop, that such shares will trade at prices that are

60

anywhere near (and in fact, may be materially different) to the recovery percentages as set forth in the Disclosure Statement.

4.      **The Trading Price for the New Second Lien Notes, Shares of Reorganized VNR Common Stock, or the New Warrants May Be Depressed Following the Effective Date**

Assuming that the Effective Date occurs, shares of Reorganized VNR Common Stock and New Warrants (as applicable) will be issued to Holders of certain Classes of Claims or Interests (as applicable).  Following the Effective Date of the Plan, shares of Reorganized VNR Common Stock and New Warrants (as applicable) may be sold to satisfy withholding tax requirements.  In addition, Holders of Claims or Interests (as applicable) that receive shares of Reorganized VNR Common Stock or New Warrants (as applicable) may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of Reorganized VNR Common Stock available for trading could cause the trading price for the shares of Reorganized VNR Common Stock or the New Warrants (as applicable) to be depressed, particularly in the absence of an established trading market for the Reorganized VNR Common Stock or the New Warrants (as applicable).

5.      **If the New Warrants are Exercised, the Underlying Shares of Reorganized VNR Common Stock Will Be Eligible for Future Resale in the Public Market, Which Could Lead to "Market Overhang," Resulting in Dilution and Potentially Depressing the Trading Price of the Reorganized VNR Common Stock**

If the New Warrants are issued and become exercisable, a substantial number of additional shares of Reorganized VNR Common Stock could be eligible for resale in the public market, which could depress the trading price of the Reorganized VNR Common Stock. Reorganized VNR also may grant options and equity awards pursuant to the Reorganized VNR Management Incentive Plan and may grant additional options, warrants, or other convertible securities in the future.  The exercise or conversion of the New Warrants (as applicable) or other options or convertible securities will dilute the percentage ownership of other Holders of the Reorganized VNR Common Stock.  If Holders of the Reorganized VNR Common Stock sell substantial amounts of Reorganized VNR Common Stock, shares issued upon the exercise of the New Warrants (as applicable), or other outstanding options or convertible securities in the public market, it could create a circumstance commonly referred to as an "overhang" and, in anticipation of which, the trading price of the Reorganized VNR Common Stock could fall.  An overhang may adversely affect Reorganized VNR's ability to obtain financing on reasonable and acceptable terms whether or not sales have occurred or are occurring.

6.      **Certain Holders of Reorganized VNR Common Stock or New Warrants Issued Under the Plan May Be Restricted in Their Ability to Transfer or Sell their Securities**

To the extent that the Rights, the Reorganized VNR Common Stock, or New Warrants (as applicable) issued under the Plan are covered by section 1145(a) of the Bankruptcy Code, they may be resold by the Holders thereof without registration under the Securities Act unless

the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; provided, however, such rights or shares of such stock will not be freely tradable if, at the time of transfer, the Holder is an "affiliate" of Reorganized VNR as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer.  Such affiliate Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.  Resales by Persons who receive Rights and Reorganized VNR Common Stock or New Warrants (as applicable) pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law.  Such Persons would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The Rights, Reorganized VNR Common Stock, and the New Warrants (as applicable) may not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of any Rights, Reorganized VNR Common Stock or New Warrants (as applicable) to freely resell the Rights, Reorganized VNR Common Stock (including, as applicable, shares issuable upon exercise of the New Warrants), or the New Warrants (as applicable).  The unsubscribed shares of Reorganized VNR Common Stock purchased by the Backstop Parties pursuant to the Backstop Agreement (which excludes any shares issued on account of the Backstop Premium) will be issued in reliance upon section (4)(a)(2) of the Securities Act or Regulation D promulgated thereunder, and each will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration or an applicable exemption from registration under the Securities Act and other applicable law.  *See* Article XII to this Disclosure Statement, entitled "CERTAIN SECURITIES LAW MATTERS," which begins on page 88.

### 7.   Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act.  Holders of such restricted securities may not be entitled to have their restricted securities registered and will be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act.  Under Rule 144, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the Holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period unless certain current public information regarding the issuer is not available at the time of sale, in which case the non-affiliate may resell after a one-year holding period.  An affiliate may resell restricted securities after a six-month holding period but only if certain current public information regarding the issuer is available at the time of the sale and only if the affiliate also complies with the volume, manner of sale and notice requirements of Rule 144.  While the

Debtors currently expect that the current public information requirement will be met when the six-month holding period expires, they cannot guarantee that resales of the restricted securities will qualify for an exemption from registration under Rule 144. In any event, Holders of restricted securities should expect to be required to hold their restricted securities for at least six months.

Holders of Reorganized VNR Common Stock or New Warrants (as applicable) who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities. Resale restrictions are discussed in more detail in Article XII to this Disclosure Statement, entitled "CERTAIN SECURITIES LAW MATTERS," which begins on page 88.

### 8. Certain Significant Holders of Shares of Reorganized VNR Common Stock May Have Substantial Influence Over the Reorganized Debtors Following the Effective Date

Assuming that the Effective Date occurs, the Backstop Parties, pursuant to the Backstop Agreement, may receive a substantial percentage of the outstanding shares of Reorganized VNR Common Stock in the form of the Rights Offering Equity. As a result, the Backstop Parties, as well as any other Holders of Claims or Interests (as applicable) who receive distributions representing a substantial percentage of the outstanding shares of the Reorganized VNR Common Stock (including, as applicable, shares issued upon exercise of the New Warrants), may be in a position to influence matters requiring approval by the Holders of shares of Reorganized VNR Common Stock, including, among other things, the election of directors and the approval of a change of control of the Reorganized Debtors. The Backstop Parties, or other Holders, may have interests that differ from those of the other Holders of shares of Reorganized VNR Common Stock and may vote in a manner adverse to the interests of other Holders of shares of Reorganized VNR Common Stock. This concentration of ownership may facilitate or may delay, prevent, or deter a change of control of the Reorganized Debtors and consequently impact the value of the shares of the Reorganized VNR Common Stock or the New Warrants (as applicable). In addition, one or more of the Backstop Parties, or other holders of a significant number of shares of Reorganized VNR Common Stock, may sell all or a large portion of its shares of Reorganized VNR Common Stock within a short period of time, which sale may adversely affect the trading price of the shares of Reorganized VNR Common Stock or the New Warrants (as applicable). One or more of the Backstop Parties, or other Holders of a significant number of shares of Reorganized VNR Common Stock, may, on its own account, pursue acquisition opportunities that may be complementary to the Reorganized Debtors' businesses, and as a result, such acquisition opportunities may be unavailable to the Reorganized Debtors. Such actions by the Backstop Parties or other Holders of a significant number of shares of Reorganized VNR Common Stock may have a material adverse impact on the Reorganized Debtors' businesses, financial condition, and operating results.

### 9. Reorganized VNR Does Not Expect to Pay Cash Dividends on the Reorganized VNR Common Stock for the Foreseeable Future

The terms of the Exit Facility and any other new debt may limit, among other things, Reorganized VNR's ability to pay dividends.

### 10.     Certain Securities Law Implications of the Plan

Holders of Allowed Claims or Interests should carefully review Article XII of this Disclosure Statement, entitled "CERTAIN SECURITIES LAW MATTERS," which begins on page 88, to determine how the securities law implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of Claims or Interests.

### 11.     Certain Tax Implications of the Plan

Holders of Allowed Claims or Interests should carefully review Article XIII of this Disclosure Statement, entitled "CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN," which begins on page 93, to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and Holders of Claims or Interests.

### 12.     The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### C.     Risks Related to the Debtors' and the Reorganized Debtors' Businesses

### 1.     The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness

The Reorganized Debtors will emerge from chapter 11 carrying approximately $78.075 million in principal amount of the New Second Lien Notes, plus accrued and unpaid postpetition interest through the Effective Date, and borrowings of approximately $975 million under the Exit Facility.  The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, including the New Second Lien Notes and Exit Facility, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest

on their indebtedness, including, without limitation, anticipated borrowings under the Exit Facility and the New Second Lien Notes upon emergence.

### 2.     The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, vendors, service providers, customers, employees, royalty interest Holders, working interest Holders, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

### 3.     Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors'

ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. The Chapter 11 Cases are also supported by debtor-in-possession financing. If the Debtors are unable to fully draw on the availability under the DIP Facility, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4. Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

### 5. The Debtors' Substantial Liquidity Needs May Impact Production Levels and Revenue

The Debtors' principal sources of liquidity historically have been cash flow from operations, sales of oil and natural gas properties, borrowings under the Credit Agreement and issuances of debt or equity securities. If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices or otherwise, the Debtors' ability to expend the capital necessary to replace proved reserves, maintain leasehold acreage, or maintain current production may be limited, resulting in decreased production and proved reserves over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the

66

cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand, cash flow from operations, and cash provided by the DIP Facility will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things:  (a) their ability to comply with the terms and conditions of any debtor-in-possession financing and/or cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; (e) the availability of incremental draws under the DIP Facility; and (f) the cost, duration, and outcome of the Chapter 11 Cases.  The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that cash on hand, cash flow from operations, and cash provided under the DIP Facility are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

**6.      Drilling for and Producing Oil, Natural Gas and NGLs are High-Risk Activities with Many Uncertainties that Could Adversely Affect the Debtors' Financial Condition or Results of Operations**

The Debtors' drilling activities are subject to many risks, including the risk that they will not discover commercially productive reservoirs.  Drilling for oil or natural gas can be uneconomical, not only from dry holes, but also from productive wells that do not produce sufficient revenues to be commercially viable.  In addition, the Debtors' drilling and producing operations may be curtailed, delayed or canceled as a result of other factors, including, but not limited to:

- the high cost, shortages or delivery delays of equipment and services;

- shortages of or delays in obtaining water for hydraulic fracturing operations;

- unexpected operational events and conditions;

- adverse weather conditions;

- human errors;

- facility or equipment malfunctions;

- title deficiencies that can render a lease worthless;

- compliance with environmental and other governmental requirements;

- unusual or unexpected geological formations;

- loss of drilling fluid circulation;

- formations with abnormal pressures;

- environmental hazards, such as natural gas leaks, oil spills, pipeline and tank ruptures, encountering naturally occurring radioactive materials, and unauthorized discharges of brine, well stimulation and completion fluids, toxic gases or other pollutants into the surface and subsurface environment;

- fires;

- blowouts, craterings and explosions;

- uncontrollable flows of oil, natural gas or well fluids; and

- pipeline capacity curtailments.

Any of these events can cause substantial losses, including personal injury or loss of life, damage to or destruction of property, natural resources and equipment, pollution, environmental contamination, loss of wells and regulatory penalties.

The Debtors ordinarily maintain insurance against various losses and liabilities arising from their operations; however, insurance against all operational risks is not available to the Debtors. Additionally, the Debtors may elect not to obtain insurance if they believe that the cost of available insurance is excessive relative to the perceived risks presented. Losses could therefore occur for uninsurable or uninsured risks or in amounts in excess of existing insurance coverage. The occurrence of an event that is not fully covered by insurance could have a material adverse impact on the Debtors' business activities, financial condition and results of operations.

**7.      Oil and Natural Gas Prices Are Volatile Due to Factors Beyond the Debtors' Control.  Sustained Lower Prices or any Further Decline in Prices of Oil, Natural Gas and NGLs Could Have a Material Adverse Impact on the Debtors**

The Debtors' financial condition, profitability and future growth and the carrying value of their oil and natural gas properties depend substantially on prevailing oil, natural gas and NGLs prices. Prices also affect the amount of cash flow available for capital expenditures and the Debtors' ability to borrow and raise additional capital.

Historically, the markets for oil, natural gas and NGLs have been volatile, and they are likely to continue to be volatile in the future, especially given current geopolitical and economic

68

conditions.  During 2014, 2015 and the beginning of 2016, for example, oil, natural gas and NGLs prices decreased dramatically.  The crude oil spot price per barrel during the years ended December 31, 2014 and 2015 ranged from a high of $107.95 to a low of $34.55 and the NYMEX natural gas spot price per MMBtu during the same period ranged from a high of $6.15 to a low of $1.76. NGLs prices also suffered a similar decline.  As of February 21, 2017, the crude oil price per barrel was $54.06 and the NYMEX natural gas spot price per MMBtu was $2.58.

The prices for oil, natural gas and NGLs are volatile due to a variety of factors, including, but not limited to:

- the domestic and foreign supply of oil and natural gas;

- the ability of members of the Organization of Petroleum Exporting Countries ("OPEC") and other producing countries to agree upon production levels which have an impact on oil prices;

- social unrest and political instability, particularly in major oil and natural gas producing regions outside the United States, such as the Middle East, and armed conflict or terrorist attacks, whether or not in oil or natural gas producing regions;

- the level and growth of consumer product demand;

- labor unrest in oil and natural gas producing regions;

- weather conditions, including hurricanes and other natural occurrences that affect the supply and/or demand of oil and natural gas;

- the price and availability of alternative fuels and renewable energy sources;

- the impact of the U.S. dollar exchange rates on commodity prices;

- the price of foreign imports;

- technological advances affecting energy consumption;

- worldwide economic conditions; and

- the availability of liquid natural gas imports.

These external factors and the volatile nature of the energy markets make it difficult to estimate future prices of oil, natural gas and NGLs.

Sustained lower prices or any further decline in prices of oil, natural gas and NGLs prices would not only reduce the Debtors' revenue, but could reduce the amount of oil, natural gas and NGLs that they can produce economically, cause the Debtors to delay or postpone their planned capital expenditures and result in further impairments to their oil and gas properties, all of which could have a material adverse effect on the Debtors' financial condition, results of operations and reserves.  If the oil and gas industry continues to experience low prices or experiences significant

further price declines, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, repay current or future indebtedness or obtain additional capital on attractive terms.

8. **The Debtors' Future Distributions and Proved Reserves Will Be Dependent upon the Success of the Debtors' Efforts to Prudently Acquire, Manage, and Develop Oil and Natural Gas Properties**

In addition to ownership of the properties currently owned by the Debtors, unless the Debtors acquire properties in the future containing additional proved reserves or successfully develop proved reserves on their existing properties, their proved reserves will decline as the reserves attributable to the underlying properties are produced. In addition, if the costs to develop or operate the Debtors' properties increase, the estimated proved reserves associated with properties will be reduced below the level that would otherwise be estimated. The Debtors will manage and develop their properties, and the ultimate value to them of such properties which they acquire will be dependent upon the price they pay and their ability to prudently acquire, manage and develop such properties.

Suitable acquisition candidates may not be available on terms and conditions that the Debtors find acceptable, they may not be able to obtain financing for certain acquisitions, or they may be outbid by competitors. If the Debtors are unable to acquire properties containing additional proved reserves, their total level of additional proved reserves will decline as a result of their production, and the Debtors will be limited in their ability to pay cash distributions to their unitholders. Even if future acquisitions are completed, they may pose substantial risks to the Debtors' businesses, financial conditions and results of operations.

9. **Unless the Debtors Replace Their Reserves, Their Existing Reserves and Production Will Decline, Which Would Adversely Affect the Debtors' Cash Flow from Operations**

Producing oil and natural gas wells extract hydrocarbons from underground structures referred to as reservoirs. Reservoirs contain a finite volume of hydrocarbon reserves referred to as reserves in place. Based on prevailing prices and production technologies, only a fraction of reserves in place can be recovered from a given reservoir. The volume of the reserves in place that is recoverable from a particular reservoir is reduced as production from that well continues. The reduction is referred to as depletion. Ultimately, the economically recoverable reserves from a particular well will deplete entirely, and the producing well will cease to produce and will be plugged and abandoned. In that event, the Debtors must replace their reserves. The Debtors can give no assurances that the distributions their unitholders receive over the life of their investment will meet or exceed their initial capital investment.

10. **The Debtors' Estimated Reserves are Based on Many Assumptions that May Prove to be Inaccurate.  Any Material Inaccuracies in these Reserve Estimates or Underlying Assumptions will Materially Affect the Quantities and Present Value of the Debtors' Reserves**

No one can measure underground accumulations of oil or natural gas in an exact way. Oil and natural gas reservoir engineering requires subjective estimates of underground accumulations of oil and/or natural gas and assumptions concerning future oil and natural gas prices, production levels, and operating and development costs.  As a result, estimated quantities of proved reserves and projections of future production rates and the timing of development expenditures may prove to be inaccurate.  The Debtors prepare their own estimates of proved reserves and engage DeGolyer &MacNaughton, an independent petroleum engineering firm, to audit a substantial portion of their reserves.  Some of the Debtors' reserve estimates are made without the benefit of a lengthy production history, which are less reliable than estimates based on a lengthy production history.  Also, the calculation of estimated reserves requires certain assumptions regarding future oil and natural gas prices, production levels, and operating and development costs, any of which assumptions may prove incorrect.  Any significant variance from these assumptions by actual figures could greatly affect the Debtors' estimates of reserves, the economically recoverable quantities of oil, natural gas and NGLs attributable to any particular group of properties, the classifications of reserves based on risk of recovery, and estimates of the future net cash flows.

11. **The Debtors' Acquisition Activities will Subject the Debtors to Certain Risks**

A principal component of the Debtors' business strategy is to grow their asset base and production through the acquisition of oil and natural gas properties characterized by long-lived, stable production.  The Debtors have therefore historically expanded their operations through acquisitions.

Any acquisition involves potential risks, including, but not limited to, the following, which could reduce the amount of cash available from the affected properties:

- the validity of the Debtors' assumptions about reserves, future production, revenues and costs, including synergies;

- unforeseen difficulties encountered in operating in new geographic areas;

- some of the acquired properties may not produce revenues, reserves, earnings or cash flow at anticipated levels;

- the Debtors may assume liabilities, including environmental liabilities, that were not disclosed or that exceed their estimates, losses or costs for which the Debtors are not indemnified or for which the Debtors' indemnity is inadequate;

- the Debtors may be unable to integrate acquired properties successfully and may not realize anticipated economic, operational and other benefits in a timely

71

manner, which could result in substantial costs and delays or other operational, technical or financial problems;

- acquisitions could decrease the Debtors' liquidity by using a significant portion of the Debtors' available cash or borrowings to finance acquisitions;

- acquisitions could disrupt the Debtors' ongoing business, distract management, divert resources and make it difficult to maintain the Debtors' current business standards, controls and procedures;

- an inability to hire, train or retain qualified personnel to manage and operate the Debtors' growing business and assets;

- the Debtors may incur a significant increase in their interest expense or financial leverage if the Debtors incur additional debt related to future acquisitions;

- an increase in the Debtors' costs or a decrease in their revenues associated with any potential royalty owner or landowner claims or disputes;

- customer or key employee losses at the acquired businesses; and

- acquisitions could cause other significant changes, such as impairment of oil and natural gas properties, goodwill or other intangible assets, asset devaluation or restructuring charge.

The Debtors' decision to acquire a property will depend in part on the evaluation of data obtained from production reports and engineering studies, geophysical and geological analyses and seismic and other information, the results of which are often inconclusive and subject to various interpretations. Also, the Debtors' reviews of acquired properties are inherently incomplete because it generally is not feasible to perform an in-depth review of the individual properties involved in each acquisition. Even a detailed review of records and properties may not necessarily reveal existing or potential problems, nor will it permit the Debtors to become sufficiently familiar with the properties to assess fully their deficiencies and potential. Inspections may not always be performed on every well, and environmental problems, such as ground water contamination, are not necessarily observable even when an inspection is undertaken.

### 12. The Debtors Have Limited Control over the Activities on Properties the Debtors do not Operate

Other companies operate some of the properties in which the Debtors have an interest. As of September 30, 2016, the Debtors' operated wells accounted for approximately 56% of their total estimated proved reserves, while non-operating interests accounted for approximately 44% of their total estimated proved reserves. The Debtors have limited ability to influence or control the operation or future development of these non-operated properties, including timing of drilling and other scheduled operations activities, compliance with environmental, safety and other regulations, or the amount of capital expenditures that they are required to fund with respect to

them.  In the past, the Debtors have changed their development plans for certain proved undeveloped reserves and expect future development plans may also change as the operators of the Debtors' outside operated properties adjust their capital plans based on prevailing market conditions.  The failure of an operator of the Debtors' wells to adequately perform operations, an operator's breach of the applicable agreements or an operator's failure to act in ways that are in the Debtors' best interest could reduce the Debtors' production and revenues.  The Debtors' dependence on the operator and other working interest owners for these projects and their limited ability to influence or control the operation and future development of these properties could materially adversely affect the realization of the Debtors' targeted returns on capital in drilling or acquisition activities and lead to unexpected future costs.

> **13.    The Debtors are Subject to Complex Federal, State, Local, and Other Laws and Regulations that Could Adversely Affect the Cost, Manner, or Feasibility of Doing Business**

The Debtors' operations are regulated extensively at the federal, state and local levels.  Environmental and other governmental laws and regulations have increased the costs to plan, design, drill, install, operate and abandon oil and natural gas wells.  Under these laws and regulations, the Debtors could also be liable for personal injuries, property and natural resource damage and other damages.  Failure to comply with these laws and regulations may result in the suspension or termination of the Debtors' operations and subject them to administrative, civil and criminal penalties.  Moreover, public interest in environmental protection has increased in recent years, and environmental organizations have opposed, with some success, certain drilling projects.

Part of the regulatory environment in which the Debtors operate includes, in some cases, legal requirements for obtaining environmental assessments, environmental impact studies and/or plans of development before commencing drilling and production activities.  In addition, the Debtors' activities are subject to the regulations regarding conservation practices and protection of correlative rights.  These regulations affect the Debtors' operations and limit the quantity of natural gas the Debtors may produce and sell.  A major regulatory requirement inherent in the Debtors' drilling plans is the need to obtain drilling permits from state and local authorities.  Delays in obtaining regulatory approvals or drilling permits, the failure to obtain a drilling permit for a well or the receipt of a permit with unreasonable conditions or costs could have a material adverse effect on the Debtors' ability to develop their properties.  Additionally, the oil and natural gas regulatory environment could change in ways that might substantially increase the financial and managerial costs of compliance with these laws and regulations and, consequently, adversely affect the Debtors' profitability.  At this time, the Debtors cannot predict the effect of this increase on their results of operations.  Furthermore, the Debtors may be put at a competitive disadvantage to larger companies in their industry that can spread these additional costs over a greater number of wells and larger operating staff.

14. **The Debtors are Subject to Compliance with Environmental and Occupational Safety and Health Laws and Regulations that May Expose the Debtors to Significant Costs and Liabilities**

The operations of the Debtors' wells are subject to stringent and complex federal, state and local laws and regulations governing the discharge of materials into the environment, environmental protection, and the health and safety of employees.  These laws and regulations may impose numerous obligations on the Debtors' operations including the acquisition of permits, including drilling permits, to conduct regulated activities; the incurrence of capital expenditures to mitigate or prevent releases of materials from the Debtors' facilities; restriction of types, quantities and concentration of materials that can be released into the environment; limitation or prohibition of construction and operating activities in environmental sensitive areas such as wetlands, wilderness regions and other protected areas; the imposition of substantial liabilities for pollution resulting from the Debtors' operations; and the application of specific health and safety criteria addressing worker protection.  Numerous governmental authorities, such as the EPA and analogous state agencies, have the power to enforce compliance with these laws and regulations and the permits issued under them, often requiring difficult and costly actions.

Failure to comply with these laws and regulations may trigger a variety of administrative, civil and criminal enforcement measures, including the assessment of monetary penalties, the imposition of investigatory, corrective action or remedial requirements, and the issuance of orders enjoining future operations.  Certain environmental statutes impose joint and several strict liability for costs required to clean up and restore sites where hazardous substances or wastes have been disposed of or otherwise released.  Moreover, it is not uncommon for neighboring landowners and other third parties to file claims for personal injury and property or natural resource damage allegedly caused by the release of hazardous substances or other waste products into the environment.

The Debtors may incur significant environmental costs and liabilities in the performance of their operations as a result of the Debtors' handling of petroleum hydrocarbons, hazardous substances and wastes, because of air emissions and wastewater discharges relating to their operations, and due to historical industry operations and waste disposal practices by the Debtors or prior operators or other third parties over whom the Debtors had no control.  For example, an accidental release of petroleum hydrocarbons from one of the Debtors' wells could subject the Debtors to substantial liabilities arising from environmental cleanup and restoration costs, claims made by neighboring landowners and other third parties for personal injury, property and natural resource damage, and fines or penalties for related violations of environmental laws or regulations.  Moreover, the possibility exists that stricter laws, regulations or enforcement policies could significantly increase the Debtors' compliance costs and the cost of any remediation that may become necessary.

### 15. Federal Legislation and State Legislative and Regulatory Initiatives Relating to Hydraulic Fracturing, as well as Governmental Reviews of Such Activities, Could Result in Increased Costs, Operating Restrictions or Delays, and Adversely Affect the Debtors' Production

Hydraulic fracturing is an important and common practice that is used to stimulate production of natural gas and/or oil from dense subsurface rock formations. The hydraulic fracturing process involves the injection of water, sand and chemicals under pressure into targeted subsurface formations to fracture the surrounding rock and stimulate production. The Debtors commonly use hydraulic fracturing as part of their operations.

While hydraulic fracturing is typically regulated by state oil and natural gas commissions, and other similar state agencies, increased federal interest has arisen in recent years. Some states in which the Debtors operate, including Montana, North Dakota, Texas and Wyoming, have adopted and other states are considering adopting legal requirements that could impose more stringent permitting public disclosure, or well construction requirements on hydraulic fracturing activities. States could elect to prohibit hydraulic fracturing altogether, as the State of New York announced in December 2014 with regard to fracturing activities in New York. Also, local government may seek to adopt ordinances within their jurisdictions regulating the time, place and manner of drilling activities in general or hydraulic fracturing activities in particular. If new or more stringent federal, state or local legal restrictions relating to the hydraulic fracturing process are adopted in areas where the Debtors operate, the Debtors could incur potentially significant added costs to comply with such requirements, experience delays or curtailment in the pursuit of exploration, development, or production activities, and perhaps even be precluded from drilling wells.

### 16. Commodity Prices and Hedging May Present Additional Risks

The Hedging Motion, if filed and granted, would authorize the Debtors to perform under new Hedging and Trading Arrangements on a postpetition basis. If the Debtors are unable or unwilling to enter into commodity derivatives in the future on favorable terms, the Debtors could be more affected by changes in commodity prices than their competitors that engage in favorable hedging arrangements. The Debtors' inability to hedge the risk of low commodity prices in the future, on favorable terms or at all, could have a material adverse impact on their businesses, financial condition, and results of operations.

The Debtors' actual future production may be significantly higher or lower than they estimate at the time the Debtors enter into derivative contracts for such period. If the actual amount of production is higher than the Debtors estimate, they will have greater commodity price exposure than they intended. If the actual amount of production is lower than the notional amount that is subject to the Debtors' derivative financial instruments, the Debtors might be forced to satisfy all or a portion of their derivative transactions without the benefit of the cash flow from their sale of the underlying physical commodity, resulting in a substantial diminution of the Debtors' liquidity. As a result of these factors, the Debtors' hedging activities may not be as effective as they intend in reducing the volatility of their cash flows, and in certain circumstances may actually increase the volatility of their cash flows. In addition, the Debtors' price risk management activities are subject to the following risks:

75

- a counterparty may not perform its obligation under the applicable derivative instrument;

- there may be a change in the expected differential between the underlying commodity price in the derivative instrument and the actual price received; and

- the steps the Debtors take to monitor their derivative financial instruments may not detect and prevent violations of their risk management policies and procedures.

The Debtors' price risk management arrangements in place will not fully mitigate the effect of oil, natural gas and NGLs price volatility, and the Debtors' revenue and results of operations will be adversely affected if prices remain at current levels or decline further.

### 17. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 18. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors may experience increased levels of employee attrition. Because competition for experienced personnel in the oil and gas industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 19. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few

exceptions, all Claims that arise prior to the Debtors' Filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization.  Any Claims not ultimately discharged through a plan of reorganization could be asserted against the Reorganized Debtors and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

## IX.  SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims or Interests in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit E**.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.*

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.  PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.  Holders of Claims and Interests Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all Holders of Claims against a Debtor or Interests in a Debtor are entitled to vote on a chapter 11 plan.  The table in section IV.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," which begins on page 10, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims or Interests in Class 3, Class 4, Class 5, Class 6, and Class 7, Class 10, and Class 11 (collectively, the "Voting Classes").  The Holders of Claims or Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims or Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are ***not*** soliciting votes from Holders of Claims or Interests in Class 1, Class 2, Class 8, Class 9, and Class 12.  Additionally, the Disclosure Statement Order provides that certain Holders of Claims or Interests in the Voting Classes, such as those Holders whose Claims or Interests have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.  Voting Record Date

**The Voting Record Date is [•], 2017**.  The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

C.      **Voting on the Plan**

**The Voting Deadline is [•], 2017, at 4:00 p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be (a) properly executed, completed, and delivered (either by using the return envelope provided, by first class mail, overnight courier, or personal delivery) so that the ballots are **actually received** by the Solicitation Agent on or before the Voting Deadline at the below address; or (b) with respect to Class 6 and Class 7, ballots may also be electronically submitted utilizing the online balloting portal maintained by the Solicitation Agent on or before the Voting Deadline.

---

**DELIVERY OF BALLOTS**

VANGUARD NATURAL RESOURCES, LLC BALLOT PROCESSING
C/O PRIME CLERK LLC
830 3RD AVENUE, 3RD FLOOR
NEW YORK, NY 10022

If you received an envelope addressed to your nominee, please return your ballot to your nominee, allowing enough time for your nominee to cast your vote on a ballot before the Voting Deadline.

---

D.      **Ballots Not Counted**

**No ballot will be counted toward Confirmation if, among other things**:  (a) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (b) it was transmitted by facsimile, email, or other electronic means other than as specifically set forth in the ballots; (c) it was cast by an Entity that is not entitled to vote on the Plan; (d) it was cast for a Claim listed in the Debtors' Schedules as contingent, unliquidated, or disputed for which the applicable Claims Bar Date has passed and no Proof of Claim was timely Filed; (e) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (f) it was sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), the Administrative Agent, an indenture trustee, or the Debtors' financial or legal advisors instead of the Solicitation Agent; (g) it is unsigned; or (h) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

---

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION
OR VOTING PROCESS,
PLEASE CONTACT THE SOLICITATION AGENT TOLL-FREE AT
844-276-3026.
ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE
NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL
NOT BE COUNTED.**

---

## X.      1145 RIGHTS OFFERING PROCEDURES[17]

The procedures and instructions for exercising Rights are set forth in the 1145 Rights Offering Procedures, which are incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to exercise Rights. ***The discussion of the 1145 Rights Offering Procedures set forth in this Disclosure Statement is only a summary.  Please refer to the 1145 Rights Offering Procedures attached hereto for a more comprehensive description.***

Pursuant to the Plan, in the 1145 Rights Offering, each 1145 Eligible Holder will receive rights to subscribe for its *Pro Rata* portion of a rights offering of 1145 Rights Offering Equity in an aggregate amount of $127,875,000  provided each 1145 Eligible Holder (a) timely and properly executes and delivers its 1145 Beneficial Holder Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Rights Offering Subscription Agent or its Nominee, as applicable, in advance of the Subscription Expiration Deadline and (b) pays the aggregate Purchase Price as set forth in the 1145 Rights Offering Procedures.  The 1145 Eligible Holders will not have any over-subscription rights.  Any unsubscribed shares from the Rights Offering will be purchased by the Backstop Parties pursuant to the Backstop Agreement.

No 1145 Eligible Holder shall be entitled to participate in the 1145 Rights Offering unless the aggregate Purchase Price for the 1145 Rights Offering Equity it subscribes for is received by the Rights Offering Subscription Agent (a) in the case of an 1145 Eligible Holder that is not a Backstop Party, by the Subscription Expiration Deadline, and (b) in the case of an 1145 Eligible Holder that is a Backstop Party, no later than the deadline specified in a written notice delivered by or on behalf of the Debtors to the Backstop Parties in accordance with Section 2.4 of the Backstop Agreement (the "Backstop Funding Deadline"), provided that the Backstop Parties may deposit their aggregate Purchase Price in the Escrow Account (as defined below), in accordance with the terms of the Backstop Agreement.  No interest is payable on any advanced funding of the Purchase Price.  If the 1145 Rights Offering is terminated for any reason, the aggregate Purchase Price previously received by the Rights Offering Subscription Agent will be returned to 1145 Eligible Holders as provided in Section 6 of the 1145 Rights Offering Procedures.  No interest will be paid on any returned Purchase Price.  Any 1145 Eligible Holder who is not a Backstop Party submitting payment via its Nominee must coordinate such payment with its Nominee in sufficient time to allow the Nominee to forward such payment to the Rights Offering Subscription Agent by the Subscription Expiration Deadline.

**TO PARTICIPATE IN THE 1145 RIGHTS OFFERING, EACH 1145 ELIGIBLE HOLDER MUST COMPLETE ALL THE STEPS OUTLINED IN THE 1145 RIGHTS OFFERING PROCEDURES.  IF ALL OF THE STEPS OUTLINED IN THE 1145 RIGHTS OFFERING PROCEDURES ARE NOT COMPLETED BY THE SUBSCRIPTION EXPIRATION DEADLINE OR THE BACKSTOP FUNDING DEADLINE, AS APPLICABLE, THE 1145 ELIGIBLE HOLDER SHALL BE DEEMED**

---

[17]  Capitalized terms used in this Article X but not otherwise defined in this Disclosure Statement or the Plan shall have the meanings ascribed to them in the 1145 Rights Offering Procedures.

**TO HAVE <u>FOREVER AND IRREVOCABLY RELINQUISHED AND WAIVED</u> ITS RIGHT TO PARTICIPATE IN THE 1145 RIGHTS OFFERING.**

To validly exercise its Rights, each 1145 Eligible Holder that is not a Backstop Party must:

**(a)**   return a duly completed and executed applicable 1145 Beneficial Holder Subscription Form(s) to the Rights Offering Subscription Agent or its Nominee, as applicable, so that, if applicable, such documents may be transmitted to the Rights Offering Subscription Agent by the Nominee, so that such documents are actually received by the Rights Offering Subscription Agent by the Subscription Expiration Deadline; and

**(b)**   at the same time it returns its 1145 Beneficial Holder Subscription Form(s) to its Nominee, but in no event later than the Subscription Expiration Deadline, pay, or arrange for the payment by its Nominee of, the applicable Purchase Price to the Rights Offering Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in the applicable 1145 Beneficial Holder Subscription Form(s).

To validly exercise its Rights, each 1145 Eligible Holder that is a Backstop Party must:

**(a)**   return duly completed and executed applicable 1145 Beneficial Holder Subscription Form(s) to the Rights Offering Subscription Agent or its Nominee, as applicable so that, if applicable, such documents may be transmitted to the Rights Offering Subscription Agent by the Nominee, so that such documents are actually received by the Rights Offering Subscription Agent by the Subscription Expiration Deadline; and

**(b)**   no later than the Backstop Funding Deadline, pay the applicable Purchase Price to the Rights Offering Subscription Agent or to the escrow account established and maintained by a third party satisfactory to the Backstop Parties and the Company (the "<u>Escrow Account</u>") by wire transfer **ONLY** of immediately available funds in accordance with the wire instructions included in the Funding Notice.

All 1145 Eligible Holders must duly complete, execute and return the applicable 1145 Beneficial Holder Subscription Form(s) in accordance with the instructions herein to its Nominee in sufficient time to allow its Nominee to process its instructions and deliver to the Rights Offering Subscription Agent the Master 1145 Subscription Form, its completed 1145 Beneficial Holder Subscription Form(s), and, solely with respect to the 1145 Eligible Holders that are not Backstop Parties, payment of the applicable Purchase Price, payable for the 1145 Rights Offering Equity elected to be purchased by such 1145 Eligible Holder, by the Subscription Expiration Deadline.  1145 Eligible Holders that are Backstop Parties must deliver their payment of the applicable Purchase Price payable for the 1145 Rights Offering Equity elected to be purchased by such Backstop Party directly to the Rights Offering Subscription Agent or to the Escrow Account, as applicable, no later than the Backstop Funding Deadline.

In the event that the funds received by the Rights Offering Subscription Agent or the Escrow Amount, as applicable, from any 1145 Eligible Holder do not correspond to the Purchase Price payable for the 1145 Rights Offering Equity elected to be purchased by such 1145 Eligible Holder, the number of the 1145 Rights Offering Equity deemed to be purchased by such 1145 Eligible Holder will be the lesser of (a) the number of the 1145 Rights Offering Equity elected to be purchased by such 1145 Eligible Holder and (b) a number of the 1145 Rights Offering Equity determined by dividing the amount of the funds received by the Purchase Price, in each case up to such 1145 Eligible Holder's *Pro Rata* portion of 1145 Rights Offering Equity.

The cash paid to the Rights Offering Subscription Agent in accordance with these 1145 Rights Offering Procedures will be deposited and held by the Rights Offering Subscription Agent in a segregated account until released to the Debtors in connection with the settlement of the 1145 Rights Offering on the Effective Date.  The Rights Offering Subscription Agent may not use such cash for any other purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance.  The cash held by the Rights Offering Subscription Agent under the 1145 Rights Offering Procedures shall not be deemed part of the Debtors' bankruptcy estates.

XI.    **CONFIRMATION OF THE PLAN**

A.    **Requirements for Confirmation of the Plan**

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (a) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (b) the Plan is feasible; and (c) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (a) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (b) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (c) the Plan has been proposed in good faith.

B.    **Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a Claim or Interest in such impaired class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting Holder would receive or retain if the Debtors liquidated under chapter 7.

As reflected in the Liquidation Analysis that is being prepared by the Debtors with the assistance of Opportune and Evercore, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to Holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Second Lien Notes, Reorganized VNR Common Stock, and New Warrants (as applicable) to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

Further, conversion to a case under Chapter 7 or failure to confirm a plan of reorganization are each a Senior Note Holder Termination Event, as that term is defined in section 7 of the RSA. Occurrence of a Senior Note Holder Termination Event entitles, but does not require, the Required Consenting Senior Noteholders, to terminate the RSA (as more fully set forth therein). The Debtors anticipate that such parties would exercise their termination rights under the RSA if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code or if the Debtors fail to obtain Confirmation of the Plan and are forced to pursue a plan of liquidation.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of Opportune and Evercore, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors are preparing a projected consolidated income statement, which will include certain financial projections of the Debtors (the "Financial Projections"). The Financial Projections will be based on an assumed Effective Date of July 6, 2017 and certain assumptions regarding the Debtors' ability to obtain Exit Financing. To the extent that the Effective Date occurs before or after July 6, 2017, recoveries on account of Allowed Claims could be impacted. Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "RISK FACTORS," which begins on page 56, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections will be Filed as **Exhibit H** to this Disclosure Statement. Based on the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[18]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in dollar amount and more than

---

[18]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by Holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have actually voted to accept or to reject the plan.  Thus, a class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.F of the Plan, if a Class contains Claims or Interests is eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.   Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class' rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.   No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F. Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors. Accordingly, the Debtors, with the assistance of Evercore and Opportune, are preparing the Valuation Analysis that will be Filed as **Exhibit G** to this Disclosure Statement. The Debtors anticipate that the Valuation Analysis will further support the Debtors' conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

### G. The Plan Supplement

The Debtors will File certain documents that provide additional details regarding implementation of the Plan in the Plan Supplement, which will be Filed with the Bankruptcy Court no later than 10 days before the Confirmation Hearing (or such later date as may be approved by the Bankruptcy Court). The Debtors will serve a notice that will inform all parties that the Plan Supplement was Filed, list the information included therein, and explain how copies of the Plan Supplement may be obtained. Holders of Claims or Interests that are eligible to vote to accept or reject the Plan shall not be entitled to change their vote based on the contents of the Plan Supplement. It is anticipated that the Plan Supplement will include:

- the New Organizational Documents;

- the Assumed Executory Contract and Unexpired Lease List;

- the Rejected Executory Contract and Unexpired Lease List;

- a list of retained Causes of Action;

- the Reorganized VNR Registration Rights Agreement;

- the identity of the members of the new boards and management for the Reorganized Debtors;

- the New Second Lien Notes Documents;

- the Warrant Agreement; and

- the Exit Facility Documents.

Copies of the Plan Supplement documents will be available on the website of the Debtors' Solicitation Agent at https://cases.primeclerk.com/vanguard/ (free of charge) or the Bankruptcy Court's website at http://www.txs.uscourts.gov/bankruptcy (for a fee).

## XII.    CERTAIN SECURITIES LAW MATTERS

The Debtors believe that the New Second Lien Notes, the Reorganized VNR Common Stock, and the New Warrants (as applicable), and the options or other equity awards to be issued pursuant to the Reorganized VNR Management Incentive Plan will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities law (a "Blue Sky Law").  The Debtors further believe that the offer, sale, issuance, and initial distribution of the New Second Lien Notes, the Reorganized VNR Common Stock, and the New Warrants (as applicable) by Reorganized VNR pursuant to the Plan is exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below.  The Reorganized VNR Common Stock underlying the Reorganized VNR Management Incentive Plan will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.

### A.    1145 Securities

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution by Reorganized VNR of the New Second Lien Notes, the Reorganized VNR Common Stock, and the New Warrants (as applicable) (collectively, the "1145 Securities").

#### 1.    Issuance

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act, and state securities laws if three principal requirements are satisfied: (a) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (b) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (c) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property.

Because the total value of an Eligible Claim, as implied by the value of distributions under the Plan, significantly exceeds the cash value payable on account of such Claim pursuant to Rights in the Rights Offering, the Debtors submit that all 1145 Securities issued pursuant to the Plan will be issued principally in exchange for the corresponding Eligible Claims, and only partly in exchange for the cash purchase price to be paid pursuant to the Rights Offering.  Accordingly, the 1145 Securities satisfy all the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws (except with respect to an underwriter as described below).  Furthermore, the Debtors believe that the value of the direct distributions being made to 1145 Eligible Holders (excluding the Rights), and thus the value of the interests in any such Eligible Claim to be exchanged pursuant to the Rights Offering, exceeds the value of the capital being raised pursuant to the exercise of the Rights.

Recipients of any 1145 Securities are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.

### 2.      Subsequent Transfers

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; provided, however, such securities will not be freely tradable if, at the time of transfer, the Holder thereof is an "affiliate" of Reorganized VNR as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an Entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the Holders of such securities; (c) offers to buy securities offered or sold under a plan from the Holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  While there is no precise definition of a "controlling" stockholder, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of 1145 Securities by Entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances,

Holders of New Second Lien Notes, Reorganized VNR Common Stock, and New Warrants, who are deemed to be "underwriters" may be entitled to resell their New Second Lien Notes, Reorganized VNR Common Stock, and New Warrants pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Second Lien Notes, Reorganized VNR Common Stock, and New Warrants would depend upon various facts and circumstances applicable to that Person.  Given the complex nature of the question of whether a particular person may be an underwriter and other issues arising under applicable securities laws, accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Second Lien Notes, Reorganized VNR Common Stock, and New Warrants.

**The Debtors recommend that potential recipients of New Second Lien Notes, Reorganized VNR Common Stock, and the New Warrants consult their own counsel concerning their ability to freely trade such securities without compliance with the federal law and any applicable state Blue Sky Law.**

### B.    4(a)(2) Securities

#### 1.  Issuance

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.  Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.

The Debtors believe that any 4(a)(2) Backstop Commitment Equity (the "4(a)(2) Securities") would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  The Debtors submit that the 4(a)(2) Securities are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.  The 4(a)(2) Securities will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

#### 2.  Subsequent Transfers

Unlike the securities that will be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, the 4(a)(2) Securities will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.

The Backstop Parties will not be permitted to offer, sell, or otherwise transfer their 4(a)(2) Securities except pursuant to a registration statement or an available exemption from registration.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer. An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer. Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934 during the twelve months preceding the sale of the restricted securities. If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available. The Debtors currently expect that the Reorganized Debtors will continue to be a reporting issuer and file all such required periodic reports and that current public information will be available to allow resales by non-affiliates when the six-month holding period expires (approximately six months after the Effective Date).

An affiliate may resell restricted securities after the six-month holding period if at the time of the sale certain current public information regarding the issuer is available. As noted above, the Debtors currently expect that this information requirement will be satisfied. The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of one percent of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of one percent of the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction. The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations. Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000 in any three-month period, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144. The sale must occur within three months of filing the notice unless an amended notice is filed.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least six months after the Effective Date. Accordingly, holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least six months and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144.

All 4(a)(2) Securities will be issued in certificated or book-entry form and will bear a restrictive legend.  Each certificate or book-entry representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Securities shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON ISSUANCE DATE, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Reorganized Debtors will reserve the right to require certification or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities.  The Reorganized Debtors will also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144.  Any Person who receives 4(a)(2) Securities will be required to acknowledge and agree not to resell such securities except in accordance with Rule 144, when available, and that the securities will be subject to the other restrictions described above.

Any Persons receiving "restricted securities" under the Plan should consult with their own counsel concerning the availability of an exemption from registration for resale of these securities under the Securities Act and other applicable law.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

## XIII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.     Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders of Claims or Interests.  This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law").  Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.  The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or Interests or who will hold the new common equity as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims or Interests who are themselves in bankruptcy).  Furthermore, this summary assumes that a Holder of a Claim or Interest holds only Claims or Interests in a single Class and holds a Claim or Interest only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims or Interests constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code.  This summary does not discuss differences in tax consequences to Holders of Claims or Interests that act or receive consideration in a capacity other than any other Holder of a Claim or Interest of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other Entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States

93

persons have authority to control all substantial decisions of the trust or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any Holder of a Claim or Interest that is not a U.S. Holder other than any partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes).

If a partnership (or other Entity treated as a partnership or other pass-through Entity for U.S. federal income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the Entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims or Interests should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

**1.      The Restructuring Transactions Are Being Structured as a Taxable Transaction**

In general, the Restructuring Transactions are being structured as a taxable transfer of assets by the Debtors to the Reorganized Debtors. The effect of these transactions on VNR and the other Debtors is described immediately below.

VNR should be treated as transferring its assets (and the assets of its subsidiaries, which are primarily disregarded entities from VNR for U.S. federal income tax purposes) in a taxable transaction. Because VNR is a partnership for U.S. federal income tax purposes, VNR's items of gain or loss in connection with these transfers should be allocated to VNR's unitholders. Subject to further confirmation, the Debtors expect that substantial losses should be generated in connection with such transfers.

The final structure of Reorganized VNR has not yet been determined. In particular, Reorganized VNR may be structured such that (a) the Reorganized VNR Common Stock consists entirely of common stock in an entity taxed as a corporation for U.S. federal income tax purposes (the "Corporation Structure") or (b) the Reorganized VNR Common Stock consists of a combination of (i) common stock in an entity taxed as a corporation for U.S. federal income tax purposes and (ii) common units in an LLC that is taxed as a partnership for U.S. federal income

94

tax purposes, with such common units exchangeable for common stock in the corporation (the "Up-C Structure").[19]

Regardless of whether the Corporation Structure or the Up-C Structure is utilized, profits interests[20] being received pursuant to the Reorganized VNR Management Incentive Plan will be issued by an LLC that either directly or indirectly owns all of the operating assets of the Reorganized Debtors (the "Operating LLC").  In the Corporation Structure, the Operating LLC will otherwise be wholly-owned by the corporation that is the issuer of the Reorganized VNR Common Stock (the "Corporate Issuer").  In the Up-C Structure, the Operating LLC will be the LLC that issues a portion of the Reorganized VNR Common Stock.  As a result of this structure, even in the Corporation Structure, for U.S. federal income tax purposes, the Operating LLC will allocate its items of gain and loss to holders of the Operating LLC's units: in the Corporation Structure, such allocation will be limited to the Corporate Issuer and management, while in the Up-C Structure, such allocation will include the Corporate Issuer and any parties that own Reorganized VNR Common Stock in the form of Operating LLC units (such units, the "Operating LLC Units").  Accordingly, for U.S. federal income tax purposes, the Operating LLC will allocate its items of gain and loss to the Corporate Issuer and recipients under the Reorganized VNR Management Incentive Plan.[21]

The cancellation of Claims against VNR should give rise to cancellation of indebtedness income ("CODI").  Because VNR is a partnership for U.S. federal income tax purposes, such CODI will be allocated to the VNR's unitholders.

C.  **Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims or Interests**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  Holders of Claims or Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

1.  **U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Lender Claims**

Pursuant to the Plan, except to the extent that a U.S. Holder of an Allowed Lender Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, the U.S. Holder of such Claim shall receive its Pro Rata share of: (a) if such Holder elects to be an Electing Lender, (i)

---

[19]  It is possible that the Reorganized VNR Common Stock could consist entirely of common units in an LLC that is taxed as a partnership for U.S. federal income tax purposes (the "Partnership Structure").  However, the Debtors do not anticipate that the Partnership Structure will be utilized, and it is not analyzed any further in this Disclosure Statement.

[20]  At this time, the Debtors have not determined whether the Reorganized VNR Management Incentive Plan will include profits interests.

[21]  The U.S. federal income tax treatment of units in the Operating LLC held by management is not discussed herein.  Accordingly, further references in this tax disclosure to Reorganized VNR Common Stock are references to Reorganized VNR Common Stock issued by the Corporate Issuer, unless otherwise indicated.

the Exit Revolving Loans and (ii) payment of the Electing Lender Payment Amount (*i.e.* Cash) under the terms of the Exit Facility Documents following the execution of definitive documentation, dated on or before the Effective Date, necessary to implement the Plan, including the Exit Facility Documents; or (b) if such Holder elects to be a Non-Electing Lender, the Exit Term Loans.

U.S. Holders of Lender Claims should be treated as exchanging such Claim for the Cash, the Exit Revolving Loans, and the Exit Term Loans (as applicable) in a taxable exchange under section 1001 of the Tax Code. Accordingly, other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (a) the sum of (i) the Cash received and (ii) the issue price of the Exit Revolving Loans or Exit Term Loans (as applicable) and as discussed in Article XIII.C.12 of this Disclosure Statement, entitled "Determination of Issue Price for the Exit Revolving Loans, the Exit Term Loans, and the New Second Lien Notes," which begins on page 104) received in exchange for the Claim, and (b) such U.S. Holder's adjusted basis, if any, in such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim. The deductibility of capital losses is subject to limitations, as discussed in Article XIII.C.11 of this Disclosure Statement, entitled "Limitation on Use of Capital Losses," which begins on page 104. *See* Article XIII.C.8 of this Disclosure Statement, entitled "Exercise or Sale, Exchange, Lapse, or Other Disposition of New Warrants," which begins on page 102. A U.S. Holder's tax basis in its Pro Rata share of the Exit Revolving Loans or the Exit Term Loans (as applicable) received should equal the issue price of such Pro Rata share of the Exit Revolving Loans or the Exit Term Loans (as applicable) as of the Effective Date. A U.S. Holder's holding period for its Pro Rata share of the Exit Revolving Loans or the Exit Term Loans (as applicable) should begin on the day following the Effective Date.

### 2.   U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Second Lien Notes Claims

Pursuant to the Plan, except to the extent that a U.S. Holder of an Allowed Second Lien Notes Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, the U.S. Holder of such Claim shall receive its Pro Rata share of the New Second Lien Notes. Distribution to each Holder of an Allowed Second Lien Notes Claim shall be subject to the rights and the terms of the Second Lien Notes Indenture.

### (a)   Treatment of the New Second Lien Notes

A U.S. Holder of an Allowed Second Lien Notes Claim will be treated as receiving its distributions under the Plan in a taxable exchange under section 1001 of the U.S. Tax Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (a) the issue price of the New Second Lien Notes received in exchange for the Claim

and (b) such U.S. Holder's adjusted basis, if any, in such Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim. The deductibility of capital losses is subject to limitations, as discussed in Article XIII.C.11 of this Disclosure Statement, entitled "Limitation on Use of Capital Losses," which begins on page 104. *See* Article XIII.C.8 of this Disclosure Statement, entitled "Exercise or Sale, Exchange, Lapse, or Other Disposition of New Warrants," which begins on page 102.

U.s. holders of such Claims should obtain a tax basis in the New Second Lien Notes, other than any such amounts treated as received in satisfaction of accrued but untaxed interest, equal to the New Second Lien Notes' issue price as of the date such property is distributed to the U.S. Holder. The holding period for any such New Second Lien Notes should begin on the day following the Effective Date.

The tax basis of any New Second Lien Notes determined to be received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, but in no event should such basis exceed the issue price of the New Second Lien Notes received in satisfaction of accrued but untaxed interest. The holding period for any such New Second Lien Notes should begin on the day following the Effective Date.

### (b)     Original Issue Discount on the New Second Lien Notes

The New Second Lien Notes may be treated as having been issued with original issue discount ("OID") to the extent the face amount of such New Second Lien Notes exceeds the "issue price" of the New Second Lien Notes as described in Article XIII.C.12 of this Disclosure Statement, entitled "Determination of Issue Price for the Exit Revolving Loans, the Exit Term Loans, and the New Second Lien Notes," which begins on page 104.

Although not free from doubt, the Debtors believe it is likely that the Claims against the Debtors and/or the new debt instruments being issued will have an issue price equal to the fair market value of the New Second Lien Notes. As a result, the issue price of the new debt instruments being issued may not equal the stated redemption price at maturity and such debt instruments may be treated as issued with OID.

Where debt instruments are treated as being issued with OID, a U.S. Holder of such debt instrument will generally be required to include any OID in income over the term of such debt instrument in accordance with a constant yield-to-maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when such U.S. Holder receives cash payments of interest on such debt instrument (other than cash attributable to qualified stated interest, which is includible in income in accordance with the U.S. Holder's normal method of tax accounting). Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash. Any OID that a U.S. Holder includes in income will increase the tax basis of the U.S. Holder in its interest in such debt instrument. A U.S. Holder of an interest in such new debt instruments will not be separately taxable on any

cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such debt instruments by the amount of such payments.

In general, interest (including OID) received or accrued by U.S. Holders should be treated as ordinary income.

### (c)    Acquisition Premium/Bond Premium

If a U.S. Holder's initial tax basis in the New Second Lien Notes is less than or equal to the stated redemption price at maturity of the New Second Lien Notes, but greater than the issue price of such interest, the U.S. Holder will be treated as acquiring such interest in the New Second Lien Notes at an "acquisition premium."  Unless an election is made, the U.S. Holder generally will reduce the amount of OID otherwise includible in gross income for an accrual period by an amount equal to the amount of OID otherwise includible in gross income multiplied by a fraction, the numerator of which is the excess of the U.S. Holder's initial tax basis in its interest in the New Second Lien Notes, as applicable, over such interest's issue price, and the denominator of which is the excess of the sum of all amounts payable on such New Second Lien Notes (other than amounts that are qualified stated interest) over its issue price.

If a U.S. Holder's initial tax basis in the New Second Lien Notes exceeds the stated redemption price at maturity of the New Second Lien Notes, such U.S. Holder will be treated as acquiring the New Second Lien Notes with "bond premium" and will not be required to include OID, if any, in income.  Such U.S. Holder generally may elect to amortize the premium over the remaining term of the New Second Lien Notes on a constant yield method as an offset to interest when includible in income under such U.S. Holder's regular accounting method.  If a U.S. Holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss such U.S. Holder would otherwise recognize on disposition of the New Second Lien Notes.

### 3.    U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Senior Notes Claims

Pursuant to the Plan, except to the extent that a U.S. Holder of an Allowed Senior Notes Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, the U.S. Holder of such Claim shall receive: (a) its Pro Rata share of the Senior Note Claim Distribution (*i.e.* Reorganized VNR Common Stock); and (b) the Rights to participate in the 1145 Rights Offering in accordance with the Plan and the 1145 Rights Offering Procedures.

U.S. Holders of Allowed Senior Notes Claims should be treated as exchanging such Claims for the consideration received in a taxable exchange under section 1001 of the Tax Code. Accordingly, other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (a) the fair market value of the Reorganized VNR Common Stock and the Rights received and (b) such U.S. Holder's adjusted basis, if any, in such Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature

98

of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim. The deductibility of capital losses is subject to limitations, as discussed in Article XIII.C.11 of this Disclosure Statement, entitled "Limitation on Use of Capital Losses," which begins on page 104. *See* Article XIII.C.8 of this Disclosure Statement, entitled "Exercise or Sale, Exchange, Lapse, or Other Disposition of New Warrants," which begins on page 102. A U.S. Holder's tax basis in the Reorganized VNR Common Stock and the Rights received should equal the fair market value of such Reorganized VNR Common Stock as of the Effective Date. A U.S. Holder's holding period for the Reorganized VNR Common Stock and the Rights received should begin on the day following the Effective Date.

### (a) Election to Participate in the 1145 Rights Offering

Holders of Allowed Senior Notes Claims will receive additional Reorganized VNR Common Stock if they participate in the 1145 Rights Offering.

A U.S. Holder that elects to exercise the Rights should be treated as purchasing, in exchange for its participation right and the amount of cash funded by the U.S. Holder to exercise such Rights, Reorganized VNR Common Stock. Such a purchase should generally be treated as the exercise of an option under general tax principles, and such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it exercises the Rights. A U.S. Holder's aggregate tax basis in the Reorganized VNR Common Stock should equal the sum of (a) the amount of Cash paid by the U.S. Holder to exercise the Rights plus (b) such U.S. Holder's tax basis in the Rights immediately before the Rights are exercised. A U.S. Holder's holding period for the Reorganized VNR Common Stock received pursuant to such exercise should begin on the day following the Effective Date.

A U.S. Holder that elects not to exercise the Rights may be entitled to claim a (likely short-term capital) loss equal to the amount of tax basis allocated to such Rights, subject to any limitation on such U.S. Holder's ability to utilize capital losses. U.S. Holders electing not to exercise their Rights should consult with their own tax advisors as to the tax consequences of electing not to exercise the Rights.

### 4. U.S. Federal Income Tax Consequences to U.S. Holders of Allowed General Unsecured Claims

Pursuant to the Plan, except to the extent that a U.S. Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment of its Allowed Claim, in exchange for full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, the U.S. Holder of such Claim shall receive either: (a) its Pro Rata share of the General Unsecured Equity Distribution (*i.e.* Reorganized VNR Common Stock); or (b) Cash, if such Holder has an aggregate Allowed General Unsecured Claim of less than $[•] and elects to receive Cash in lieu of any portion of the General Unsecured Equity Distribution.

U.S. Holders of Allowed General Unsecured Claims should be treated as exchanging such Claims for the consideration received in a taxable exchange under section 1001 of the Tax Code. Accordingly, other than with respect to any amounts received that are attributable to

accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (a) the fair market value of the Reorganized VNR Common Stock received and/or the Cash received (as applicable), and (b) such U.S. Holder's adjusted basis, if any, in such Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.  The deductibility of capital losses is subject to limitations, as discussed in Article XIII.C.11 of this Disclosure Statement, entitled "Limitation on Use of Capital Losses," which begins on page 104.  *See* Article XIII.C.8 of this Disclosure Statement, entitled "Exercise or Sale, Exchange, Lapse, or Other Disposition of New Warrants," which begins on page 102.  A U.S. Holder's tax basis in the Reorganized VNR Common Stock received (as applicable) should equal the fair market value of such Pro Rata share of such Reorganized VNR Common Stock as of the Effective Date.  A U.S. Holder's holding period for the Reorganized VNR Common Stock received (as applicable) should begin on the day following the Effective Date.

### 5.    U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Trade Claims

Pursuant to the Plan, except to the extent that a U.S. Holder of an Allowed Trade Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, the U.S. Holder of such Claim shall receive its Pro Rata share of the Trade Claims Distribution Pool (*i.e.* Cash), with distributions not to exceed the amount of such Holder's Allowed Trade Claim.

U.S. Holders of Trade Claims should be treated as exchanging such Claims for the consideration received in a taxable exchange under section 1001 of the Tax Code.  Accordingly, other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (a) the Cash received in exchange for the Claim and (b) such U.S. Holder's adjusted basis, if any, in such Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.  The deductibility of capital losses is subject to limitations, as discussed in Article XIII.C.11 of this Disclosure Statement, entitled "Limitation on Use of Capital Losses," which begins on page 104.  *See* Article XIII.C.8 of this Disclosure Statement, entitled "Exercise or Sale, Exchange, Lapse, or Other Disposition of New Warrants," which begins on page 102.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

### 6. U.S. Federal Income Tax Consequences to U.S. Holders of VNR Preferred Units

Pursuant to the Plan, except to the extent that a U.S. Holder of VNR Preferred Units agrees to less favorable treatment of its VNR Preferred Units, and subject to the terms of the Restructuring Transactions, all VNR Preferred Units shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and in full and final satisfaction, settlement, release, and discharge of and in exchange for each VNR Preferred Unit, each U.S. Holder of VNR Preferred Units shall receive: if Class 5, Class 6, Class 7, and Class 10 are each determined to have voted to accept the Plan, such U.S. Holder's Pro Rata share of (a) the VNR Preferred Unit Equity Distribution (*i.e.* Reorganized VNR Common Stock) and (b) VNR Preferred Unit New Warrants.

While the matter is not free from doubt, the exchange of VNR Preferred Units for the VNR Preferred Unit Equity Distribution and VNR Preferred Unit New Warrants should likely be treated as a taxable transaction for U.S. Holders of VNR Preferred Units.  In such case, a U.S. Holder of VNR Preferred Units would recognize gain or loss for United States federal income tax purposes in an amount equal to the difference between (a) the sum of the fair market value of its Pro Rata share of (i) the Reorganized VNR Common Stock received and (ii) the VNR Preferred Unit New Warrants received, and (b) the U.S. Holder's adjusted tax basis in its VNR Preferred Units.  Such gain or loss should be capital gain or loss and should be long-term capital gain or loss if the VNR Preferred Units were held for more than one year by the Holder.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to limitations, as discussed in Article XIII.C.11 of this Disclosure Statement, entitled "Limitation on Use of Capital Losses," which begins on page 104. *See* Article XIII.C.8 of this Disclosure Statement, entitled "Exercise or Sale, Exchange, Lapse, or Other Disposition of New Warrants," which begins on page 102.  A U.S. Holder's tax basis in the Reorganized VNR Common Stock received should equal the fair market value of such Pro Rata share of such Reorganized VNR Common Stock as of the Effective Date.  A U.S. Holder's holding period for the Reorganized VNR Common Stock received should begin on the day following the Effective Date.  A U.S. Holder's initial tax basis in the VNR Preferred Unit New Warrants will be the fair market value of the VNR Preferred Unit New Warrants, and a U.S. Holder's holding period should begin the day after the Effective Date.

### 7. U.S. Federal Income Tax Consequences to U.S. Holders of VNR Common Units

Pursuant to the Plan, except to the extent that a U.S. Holder of VNR Common Units agrees to less favorable treatment of its VNR Common Units, and subject to the terms of the Restructuring Transactions, all VNR Common Units shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and in full and final satisfaction, settlement, release, and discharge of and in exchange for each VNR Common Unit, each U.S. Holder of VNR Common Units shall receive such U.S. Holder's Pro Rata share the VNR Common Unit New Warrants if Class 5, Class 6, Class 7, Class 10, and Class 11 are each determined to have voted to accept the Plan.

While the matter is not free from doubt, the exchange of VNR Common Units for the VNR Common Unit New Warrants should likely be treated as a taxable transaction for U.S. Holders of VNR Common Units.  In such case, a U.S. Holder of VNR Common Units would recognize gain or loss for United States federal income tax purposes in an amount equal to the difference between (a) the fair market value of its share of the VNR Common Unit New Warrants and (b) the U.S. Holder's adjusted tax basis in its VNR Common Units.  Such gain or loss should be capital gain or loss and should be long-term capital gain or loss if the VNR Common Units were held for more than one year by the Holder.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to limitations, as discussed in Article XIII.C.11 of this Disclosure Statement, entitled "Limitation on Use of Capital Losses," which begins on page 104.  *See* Article XIII.C.8 of this Disclosure Statement, entitled "Exercise or Sale, Exchange, Lapse, or Other Disposition of New Warrants," which begins on page 102.  A U.S. Holder's initial tax basis in the VNR Common Unit New Warrants will be the fair market value of the VNR Common Unit New Warrants, and a U.S. Holder's holding period will begin the day after the Effective Date.

Because VNR is transferring its assets to Reorganized VNR in a taxable transaction (see Article XIII.B.1 of this Disclosure Statement entitled, "The Restructuring Transactions Are Being Structured as a Taxable Transaction," which begins on page 94), the gain or loss arising from that taxable transaction will be allocated to the Holders of the VNR Common Units.  Any gain allocated to a Holder of VNR Common Units will increase the tax basis of that Holder's VNR Common Units, and any loss allocated to a Holder of VNR Common Units will decrease the tax basis of that Holder's VNR Common Units.  These adjustments to the tax basis of the VNR Common Units will occur prior to the exchange of VNR Common Units for VNR Common Unit New Warrants described above.

### 8.   Exercise or Sale, Exchange, Lapse, or Other Disposition of the New Warrants

#### (a)   Sale, Exchange, Lapse, or Other Disposition of the New Warrants

Upon the sale, exchange, lapse, or other disposition (other than its exercise) of a New Warrant, a U.S. Holder should generally recognize capital gain or loss equal to the difference between the amount realized (if any) and such U.S. Holder's adjusted tax basis in such New Warrant.  Such gain or loss should generally be long-term capital gain or loss if the U.S. Holder has held its New Warrant for more than one year at the time of the sale, exchange, or other disposition, and short-term capital gain or loss otherwise.  The deductibility of capital losses is subject to certain limitations, as discussed in Article XIII.C.11 of this Disclosure Statement, entitled "Limitations on Use of Capital Losses," which begins on page 104.  Depending on the particular circumstances in which the Claim or Interest for which the New Warrant was exchanged had been acquired and the treatment of the U.S. Holder's exchange of its Claim or Interest for its New Warrant, the sale, exchange or other disposition of the New Warrant might result in the recognition of market discount.  *See* Article XIII.C.10 of this Disclosure Statement, entitled "Market Discount," which begins on page 103.

102

### (b)  Adjustments

If the terms of the New Warrants provide for any adjustment to the number of shares of Reorganized VNR Common Stock for which the New Warrants may be exercised or to the exercise price of the New Warrants, such adjustment may, under limited circumstances, result in a constructive distribution that could be taxable as a dividend to a U.S. Holder even though such Holder would not receive any cash related thereto.  Conversely, the absence of an appropriate adjustment may result in a constructive distribution that could be taxable as a dividend to U.S. Holders of the Reorganized VNR Common Stock.

### 9.  Accrued Interest

To the extent that any amount received by a U.S. Holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder).  Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 10.  Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (a) the

sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 11. Limitation on Use of Capital Losses

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### 12. Determination of Issue Price for the Exit Revolving Loans, the Exit Term Loans, and the New Second Lien Notes

As noted above, Holders of Lender Claims will receive their Pro Rata share of the Exit Revolving Loans, or the Exit Term Loans (as applicable) in satisfaction of their Claims, and Holders of Allowed Second Lien Notes Claims will receive their Pro Rata share of the New Second Lien Notes in satisfaction of their Claims.  In each case, the amount of gain or loss recognized by U.S. Holders of such Claims will be determined, in part, by the issue price of a U.S. Holder's Pro Rata share of the new debt received.  The determine of "issue price" for purposes of this analysis will depend, in part, on whether the new debt is traded on an established market for U.S. federal income tax purposes.  The issue price of a debt instrument that is traded on an established market (or that is issued for Claims against the Debtors that are so traded) would be the fair market value of such debt instrument (or the Claims so traded, if the new debt instrument is not traded) on the Effective Date as determined by such trading.  The issue price of a debt instrument that is neither so traded nor issued for Claims would be its stated principal amount (provided that the interest rate on the debt instrument exceeds the applicable federal rate published by the IRS).  New debt instruments (or Claims against the Debtors) may be considered

104

to be traded on an established market for these purposes even if no trades actually occur and there are merely firm or indicative quotes with respect to such new debt or Claims.

Although not free from doubt, the Debtors believe it is likely that the Claims against the Debtors and/or the new debt instruments being issued will be traded on an established market for these purposes. As a result, the issue price of the new debt instruments being issued will likely not equal the stated redemption price at maturity and such debt instruments may be traded as issued with OID.

Where debt instruments are treated as being issued with OID, a U.S. Holder of such debt instrument will generally be required to include any OID in income over the term of such debt instrument in accordance with a constant yield-to-maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when such U.S. Holder received cash payments of interest on such debt instrument (other than cash attributable to qualified stated interest, which is includible in income in accordance with the U.S Holder's normal method of tax accounting). Accordingly, a U.S. Holder could be treated as receiving income in advance of a corresponding receipt of cash. Any OID that a U.S. Holder includes in income will increase the tax basis of the U.S. Holder in its interest in such debt instrument. A U.S. Holder of an interest in such new debt instruments will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such debt instruments by the amount of such payments.

In general, interest (including OID) received or accrued by U.S. Holders should be treated as ordinary income.

### 13. U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of Reorganized VNR Common Stock and Common Equity in Reorganized VNR (if Reorganized VNR is Taxed as a Corporation)

#### (a) Dividends on Reorganized VNR Common Stock of the Corporate Issuer and Reorganized VNR Common Stock

Any distributions made on account of the Reorganized VNR Common Stock (to the extent such Reorganized VNR Common Stock constitutes stock in the Corporate Issuer) and equity in Reorganized VNR (if Reorganized VNR is taxed as a corporation and such equity is treated as common stock) will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized VNR as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares. Any such distributions in excess of the Holder's basis in its shares (determined on a share-by-share basis) generally should be treated as capital gain.

Dividends paid to U.S. Holders that are corporations generally should be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are

105

satisfied.  The length of time that a U.S. Holder has held its stock is reduced for any period during which the Holder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

**(b)     Sale, Redemption, or Repurchase of Reorganized VNR Common Stock of the Corporate Issuer and Common Equity in Reorganized VNR**

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of Reorganized VNR Common Stock (to the extent such Reorganized VNR Common Stock constitutes stock in the Corporate Issuer) and equity in Reorganized VNR (if Reorganized VNR is taxed as a corporation and such equity is treated as common stock).  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the stock for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations. *See* Article XIII.C.11 of this Disclosure Statement, entitled "Limitation on Use of Capital Losses," which begins on page 104.

**(c)     Medicare Tax**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, dividends and gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of stock.

**14.     U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of Operating LLC Units or Equity in Reorganized VNR (if Reorganized VNR is Taxed as a Partnership)**

**(a)     Ownership of Operating LLC Units or Partnership Units**

As discussed above, in the Up-C Structure, a portion of the Reorganized VNR Common Stock may consist of Operating LLC Units.  Under applicable partnership tax rules, each U.S. Holder of an Operating LLC Unit will be required to take into account their share of items of income, gain, loss, and deduction of Operating LLC in computing their federal income tax liability, regardless of whether cash distributions are made by Operating LLC.  The calculation of the allocation of such items of income, gain, loss, and deduction are complex and may vary depending on acquisition date and consideration paid for each Operating LLC Unit.

Distributions that are not in partial or full redemption of the Operating LLC Units should generally be governed by Section 731 of the Tax Code (Section 737 of the Tax Code should not be applicable with respect to Operating LLC Units received in exchange for Claims against the Debtors).  Section 731(a)(1) generally provides that a partner will not recognize taxable gain in

106

connection with a partnership distribution except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution.  Section 731(a)(2) generally provides that a partner will not recognize loss upon a non-liquidating distribution.  In addition, under Section 751(b) of the Tax Code, to the extent a partner receives a distribution of unrealized receivables or inventory (as defined under Section 751(b) of the Tax Code), such distribution shall be treated as a sale or exchange of the partner's interest in the partnership and subject to the rules discussed below.

The same treatment will apply with respect to ownership of equity in Reorganized VNR (if Reorganized VNR is taxed as a partnership and the equity is treated as common partnership units).

### (b)      Conversion of Operating LLC Units

In the Up-C Structure, Operating LLC Units will be convertible into Reorganized VNR Common Stock consisting of stock issued by the Corporate Issuer (the "Corporate Issuer Stock").  In the event a holder of Operating LLC Units elects to convert their Operating LLC Units to Corporate Issuer Stock, the Operating LLC Units may, instead, be redeemed for an amount of cash equal to the fair market value of the Corporate Issuer Stock that such Operating LLC Unit holder would be entitled to receive in exchange for its Operating LLC Units.  For U.S. federal income tax purposes, any conversion of Operating LLC Units for Corporate Issuer Stock would be treated as Corporate Issuer purchasing the Operating LLC Units from the tendering holder.  Similarly, if the Corporate Issuer elects to redeem tendered Operating LLC Units for cash, such transaction is treated as a purchase by the Corporate Issuer of such Operating LLC Units for cash.

The conversion of any Operating LLC Units for Corporate Issuer Stock (or the redemption of such Operating LLC Units for cash) should be treated as a taxable exchange under Section 1001 of the Tax Code.  Accordingly, a U.S. Holder of such Operating LLC Units should recognize taxable income or loss equal to the difference between (a) the fair market value of the Corporate Issuer Stock received in exchange for such Operating LLC Units (or the amount of cash received) and (b) such U.S. Holder's tax basis in the Operating LLC Units (as adjusted by, among other things, allocations of partnership items of taxable income or loss and distributions on account of such Operating LLC Units).  Such taxable income or loss should likely be a capital gain or loss, and characterization as long or short-term capital gain or loss will depend on such U.S. Holder's holding period with respect to the Operating LLC Units tendered in the exchange.

### (c)      Sale, Redemption, or Repurchase of Operating LLC Units

Unless a non-recognition provision applies, U.S. Holders generally should recognize gain or loss upon the sale or other taxable disposition of Operating LLC Units equal to the difference between (a) the sum of (i) the cash or fair market value received in exchange for such Operating LLC Units units and (ii) such U.S. Holder's share of Operating LLC's liabilities immediately prior to the sale or other taxable disposition and (b) such U.S. Holder's adjusted tax basis in the Operating LLC Units transferred.  A U.S. Holder's adjusted tax basis in Operating LLC Units will generally be equal to: (a) the original purchase price of the Operating LLC Units units; *plus* (b) Operating LLC's liabilities allocated to such unitholder; *plus* (c) Operating LLC's income

and gain previously allocated to such unitholder; *minus* (d) Operating LLC losses previously allocated to, distributions to, and the share of nondeductible, noncapitalized expenses allocated to, such unitholder (which decrease such unitholder's tax basis, but not below zero).

Gain or loss recognized by a U.S. Holder in a sale or other taxable disposition should generally be taxable as capital gain or loss. However, a portion of this gain or loss, which portion may be substantial, will be separately computed and taxed as ordinary income or loss under Section 751 of the Tax Code to the extent attributable to "unrealized receivables" or to "inventory items" owned by Operating LLC. The term "unrealized receivables" includes potential recapture items, including recapture of depreciation, depletion, and intangible drilling and development costs. Ordinary income attributable to unrealized receivables, inventory items, and recapture may exceed net taxable gain realized upon the sale or taxable disposition of an Operating LLC Unit and may be recognized even if there is a net taxable loss realized on the transfer. Consequently, a U.S. Holder may recognize both ordinary income and a capital loss upon a sale or other taxable disposition of an Operating LLC Unit.

If Operating LLC redeems any Operating LLC Units (as opposed to an acquisition of such Operating LLC Units by Operating LLC, as described above), such redemption should be subject to Sections 731 and 751(b) of the Tax Code. Section 731(a)(1) generally provides that a partner will not recognize taxable gain in connection with a partnership distribution except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution. Section 731(a)(2) generally provides that a partner will not recognize taxable loss unless (a) a distribution is is in liquidation of a partner's interest in the partnership and (b) only money, unrealized receivables (as defined in Section 751(c) of the Tax Code), and inventory (as defined in Section 751(d) of the Tax Code) are distributed, in which case loss shall be recognized to the extent of the excess of the adjusted basis of the partner's interest in the partnership over the sum of the property distributed.

The calculation of gain or loss in connection with the application of Section 751 is complex, particularly with respect to oil and gas companies such as Reorganized VNR, and Holders of Reorganized VNR units should consult with their own tax advisors with respect to such calculations.

The same treatment will apply with respect to ownership of equity in Reorganized VNR (if Reorganized VNR is taxed as a partnership and the equity is treated as common partnership units).

### (d)    Medicare Tax

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, dividends and gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of Operating LLC Units and equity in Reorganized VNR.

### D.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims or Interests

### 1.    Consequences to Non-U.S. Holders of Claims or Interests

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex.  Each non-U.S. Holders should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such non-U.S. Holders and the ownership and disposition of the various forms of consideration non-U.S. Holders may receive under the Plan.

Whether a non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

### (a)    Gain Recognition

Subject to the FIRPTA rules discussed below, any gain realized by a non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception above applies, to the extent that any gain is taxable and does not qualify for deferral, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception above applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### (b)    Accrued Interest and Interest Payable on the New Second Lien Notes, the Exit Revolving Loans, and the Exit Term Loans

Interest payments to (or OID accruals with respect to) a non-U.S. Holder on debt instruments received pursuant to the Plan, and any other payments to a non-U.S. Holder that are attributable to accrued but untaxed interest, generally will not be subject to U.S. federal income tax or withholding pursuant to the portfolio interest exemption, provided that the withholding

agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BENE) establishing that the non-U.S. Holder is not a U.S. person, unless:

(i)     the non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of VNR's units (in the case of recoveries in respect of Claims against the Debtors) or Reorganized VNR, as applicable (in the case of the new debt instruments issued pursuant to the Plan) entitled to vote (after application of certain attribution rules);

(ii)    the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to VNR (in the case of recoveries in respect of Claims against the Debtors) or Reorganized VNR, as applicable (in the case of the new debt instruments issued pursuant to the Plan) (each, within the meaning of the Tax Code);

(iii)   the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the U.S. Tax Code; or

(iv)    such interest (or OID) is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for the portfolio interest exemption generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any interest payments under the New Second Lien Notes, the Exit Revolving Loans, or the Exit Term Loans (as applicable) and any other payments that are attributable to accrued interest.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

> **2.**     **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Corporate Issuer Stock, Operating LLC Units, and Common Equity in Reorganized VNR**
>
> > **(a)**     **Dividends on Corporate Issuer Stock and Common Equity in Reorganized VNR if Reorganized VNR is Taxed as a Corporation**

Any distributions made with respect to Corporate Issuer Stock and equity in Reorganized VNR (if Reorganized VNR is taxed as a corporation and such equity is treated as common stock) will constitute dividends for U.S. federal income tax purposes to the extent of the Corporate Issuer's or Reorganized VNR's (as applicable) current or accumulated earnings and profits as determined under U.S. federal income tax principles.  To the extent that a non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its shares. Any such distributions in excess of a non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange, and will be subject to the FIRPTA rules (as defined and discussed below).  Except as described below, dividends paid with respect to stock held by a non-U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable).  A non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-BEN-E (or a successor form) upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to stock held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

**(b)      Ownership of Operating LLC Units and Common Equity in Reorganized VNR if Reorganized VNR is Taxed as a Partnership**

The U.S. federal income tax treatment of a non-U.S. Holder of Operating LLC Units and equity in Reorganized VNR (if Reorganized VNR is taxed as a partnership and such equity is treated as common partnership units) is complex and will vary depending on the circumstances and activities of each such non-U.S. Holder.  Such non-U.S. Holders are urged to consult their own tax advisors.  The following discussion assumes that non-U.S. Holder is not subject to U.S. federal income taxes as a result of its presence or activities in the United States (other than as a holder of Operating LLC Units or common partnership units in Reorganized VNR).

A non-U.S. Holder generally will be subject to U.S. federal withholding taxes on its share of Operating LLC's or Reorganized VNR's income from dividends, interest (other than interest that constitutes portfolio interest within the meaning of the Tax Code), and certain other income. The activities of Operating LLC or Reorganized VNR should be treated as a U.S. trade or business and, as a result, a non-U.S. Holder would be deemed to be engaging in that underlying U.S. trade or business.  A non-U.S. Holder's share of Operating LLC's or Reorganized VNR's

effectively connected income would be subject to tax at normal graduated U.S. federal income tax rates and, if the non- U.S. Holder is a corporation for U.S. federal income tax purposes, may also be subject to U.S. branch profits tax.  In addition, some or all of the gain on a disposition of a non-U.S. Holder's interest in Operating LLC or Reorganized VNR could be treated as effectively connected income to the extent such gain is attributable to assets that generate effectively connected income.  A non-U.S. Holder generally will be required to file a U.S. federal income tax return if Operating LLC or Reorganized VNR is, as expected, deemed to be engaging in a U.S. trade or business (even if no income allocated to the non-U.S. Holder is effectively connected income).  Operating LLC or Reorganized VNR would be required to withhold U.S. federal income tax with respect to the non-U.S. Holder's share of income that is effectively connected income.

> **(c)      Disposition of the New Second Lien Notes, the Exit Revolving Loans, the Exit Term Loans, the Reorganized VNR Common Stock, and the New Warrants**

In general, and subject to the discussion immediately below regarding FIRPTA, a non-U.S. Holder of the Reorganized VNR Common Stock or the New Warrants (as applicable) should not be subject to U.S. federal income tax or U.S. federal withholding tax with respect to the Reorganized VNR Common Stock or the New Warrants (as applicable) unless: (a) in the case of gain only, such non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition, and certain other requirements are met; or (b) any gain is effectively connected with such non-U.S. Holder's conduct of a trade or business in the U.S. (and, if required by any applicable tax treaty, is attributable to a permanent establishment maintained by the non-U.S. Holder in the United States).  A non-U.S. Holder that is a corporation also may be subject to a branch profits tax equal to 30% (or such lower rate specified by an applicable tax treaty) of its effectively connected earnings and profits for the taxable year, as adjusted for certain taxes.  Non-U.S. Holders are urged to consult their tax advisors regarding any applicable tax treaties that may provide for different rules.

Notwithstanding the general rule stated above, the Debtors expect that Operating LLC Units and common partnership units in Reorganized VNR (if Reorganized VNR is taxed as a partnership) will represent U.S. real property interests, Corporate Issuer Stock and common stock in Reorganized VNR (if Reorganized VNR is taxed as a corporation) and the New Warrants will each represent an interest in a U.S. real property holding company (a "USRPHC"), all under the Foreign Investment in Real Property Tax Act ("FIRPTA").

Because Operating LLC is not expected to be publicly traded, a non-U.S. Holder of Operating LLC Units generally should be subject to federal income tax upon the sale or disposition of an Operating LLC Units, and the transferee of such Operating LLC Units will be required to withhold at a 15% tax rate.[22]

A non-U.S. Holder of New Warrants generally should be subject to federal income tax upon the sale or disposition of New Warrants, and the transferee of such New Warrants will be required to withhold at a 15% tax rate.

---

[22]  As previously noted, the Debtors have not determined final structure of Reorganized VNR.

The application of the FIRPTA rules to the Reorganized VNR Common Stock will depend on whether (a) such equity is regularly traded on an established securities market and (b) whether an individual non-U.S. Holder has directly or indirectly owned more than 5% of the value of such equity during a specified testing period.

If the shares of Reorganized VNR Common Stock are not regularly traded on an established securities market, or if a non-U.S. Holder holds more than 5% of the Reorganized VNR Common Stock (directly or indirectly by attribution), on the sale or other taxable disposition of the Reorganized VNR Common Stock, such non-U.S. Holder will be subject to U.S. federal income tax as if the gain were effectively connected with the conduct of the non-U.S. Holder's trade or business in the United States.  In this case, a transferee of the Reorganized VNR Common Stock generally will be required to withhold tax, under U.S. federal income tax laws, in an amount equal to 15% of the amount realized by a non-U.S. Holder on the sale or other taxable disposition of the Reorganized VNR Common Stock (subject to certain exceptions).

The New Second Lien Notes, the Exit Revolving Loans, and the Exit Term Loans should be considered an interest that is solely the interest of a creditor and therefore be exempt from the FIRPTA provisions.  The Holder will not be subject to U.S. federal income tax with respect to the disposition of the New Second Lien Notes, the Exit Revolving Loans, or the Exit Term Loans (as applicable) unless the New Second Lien Notes, the Exit Revolving Loans, or the Exit Term Loans are effectively connected with the conduct of such non-U.S. holder's trade or business in the United States.

The rules regarding United States real property interests are complex, and non-U.S. Holders are urged to consult with their own tax advisors on the application of these rules based on their particular circumstances.

### 3.    FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

As currently proposed, FATCA withholding rules would apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2018.

Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder's ownership of the consideration being received under the Plan.

### E.    Information Reporting and Back-Up Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the Tax Code.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.  In addition, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. Holder, such non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a Holder's U.S. federal income tax liability, and a Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIV.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims or Interests entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.


Dated:  February 25, 2017              VANGUARD NATURAL RESOURCES, LLC
                                       on behalf of itself and all other Debtors



                                         /s/ Richard A. Robert
                                       Name:  Richard A. Robert
                                       Title:    Executive Vice President &
                                                 Chief Financial Officer